```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

IN RE:                          :  No. 3:14MD-2516 (SRU)
                                :  915 Lafayette Boulevard
                                :  Bridgeport, Connecticut
                                :
                                :  May 22, 2014
AGGRENOX ANTITRUST LITIGATION   :

- - - - - - - - - - - - - - - x

                   PRETRIAL CONFERENCE


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

         BRENNER, SALTZMAN & WALLMAN
              271 Whitney Avenue
              P. O. Box 1746
              New Haven, Connecticut  06511-1746
          BY:  DAVID R. SCHAEFER, ESQ.
               BRIAN P. DANIELS, ESQ.

         MOTLEY RICE LLC
              One Corporate Center,  17th FL
              20 Church Street
              Hartford, Connecticut   06103
          BY:  WILLIAM H. NARWOLD, ESQ. (via telephone)
               MICHAEL M. BUCHMAN, ESQ.

         HAGENS BERMAN SOBEL SHAPIRO, LLP
              55 Cambridge Parkway
              Suite 301
              Cambridge, Massachusetts  02`42
          BY:  DAVID S. NALVEN, ESQ.

         BERGER & MONTAGUE
              1622 Locust Street
              Philadelphia, Pennsylvania  19103
          BY:  DAVID F. SORENSEN, ESQ.
```

GRANT & EISENHOFER, PA
        485 Lexington Avenue, 29th FL
        New York, New York  10117
BY:  LINDA P. NUSSBAUM, ESQ.

GARWIN GERSTEIN & FISHER, LLP
        88 Pine Street
        New York, New York  10005
BY:  JOSEPH OPPER, ESQ.

LOWEY DANNENBERG COHEN & HART, PC
        One North Broadway
        White Plains, New York  10601
BY:  PETER ST. PHILLIP, ESQ.

COHEN PLACITELLA & ROTH PC
        Two Commerce Square
        2001 Market Place, Suite 2900
        Philadelphia, Pennsylvania  19103
BY:  JACOB ALEXANDER GOLDBERG, ESQ

HAUSFELD LLP
        1604 Locust Street, 2nd FL
        Philadelphia, Pennsylvania  19103
BY:  BRENT W. LANDAU, ESQ.

SHEPERD FINKELMAN MILLER & SHAH
        35 East State Street
        Media, Pennsylvania  19063
BY:  NATALIE FINKELMAN BENNETT, ESQ.

GARWIN GERSTEIN & FISHER LLP
        Wall Street Plaza
        88 Pine Street, 2nd FL
        New York, New York  10005
BY:  EPHRAIM R. GERSTEIN, ESQ.

SMITH SEGURA & RAPHAEL LLP
        3600 Jackson Street, Suite 111
        Alexandria, Louisiana  71303
BY:  DAVID C. RAPHAEL, JR., ESQ.

HEINS MILLS & OLSON, PLC
        310 Clifton Avenue
        Minneapolis, Minnesota  55403
BY:  RENAE D. STEINER, ESQ.

```
            FARUQI & FARUQI LLP
                  369 Lexington Avenue
                  New York, New York  10017
            BY:  SARAH A . WESTBY, ESQ.

            HILLIARD SHADOWEN LLC
                  39 West Main Street
                  Mechanisburg, Pennsylvania  17055
            BY:  STEVE D. SHADOWEN, ESQ.
                  ANNE K. FORNECKER, ESQ.

            POMERANTZ GROSSMAN HUFFORD DAHLSTROM & GROSS
                  600 Third Avenue
                  New York, New York  10016
            BY:  ADAM G. KURTZ, ESQ.

   FOR THE DEFENDANTS:

            ROCHE PIA LLC
                  Two Corporate Drive, Suite 248
                  Shelton, Connecticut  06484
            BY:  GERALD C. PIA, JR., ESQ.

            GOODWIN PROCTER
                  Exchange Place
                  Boston, Massachusetts  02109
            BY:  CHRISTOPHER T. HOLDING, ESQ.

            PULLMAN & COMLEY
                  850 Main Street
                  P.O. Box 7006
                  Bridgeport, Connecticut 06601-7006
            BY:  JAMES T. SHEARIN, ESQ.

            WHITE & CASE
                  1155 Avenue of Americas
                  New York, New York  10036
            BY:  ROBERT A. MILNE, ESQ.

            FULBRIGHT & JAWORSKI LLP
                  666 Fifth Avenue
                  New York, New York  10103
            BY:  NORTON ROSE FULBRIGHT, ESQ.

            MILLER LAW LLC
                  115 LaSalle Street, Suite 2910
                  Chicago, Illinois  60603
            BY:  MARVIN A. MILLER, ESQ.
```

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917)703-0761

<pre>
 1                    (3:40 O'CLOCK P. M.)

 2              THE COURT:  Good afternoon.

 3              I don't want to think about the billable rate

 4    for the group collected here today.

 5              Well, we're here in the Aggrenox antitrust

 6    litigation.  Mr. Narwold, are you on the phone?

 7              MR. NALVEN:  Yes, Your Honor.

 8              THE COURT:  All right, that's a miracle.  None

 9    of the phones in Bridgeport are working, apparently, but

10    this one.  So if we lose you, I apologize.

11              I thought it important to get everybody together

12    and to see if we can make some progress to try and get the

13    case organized and moving forward.

14              I've had a chance to read the submissions

15    regarding appointment of counsel, your pretrial memoranda,

16    if you will, and I have a good sense of the claims that

17    are being made in the case.  My thought, unless there's an

18    dissent, is to, in essence, follow the outline that I set

19    forth in the, in paragraph 23 of the initial practice and

20    procedure order.  That set forth some of the issues I

21    thought we would want to talk about and try and sort

22    through.  I put the toughest issue first, which is

23    figuring out who's going to be counsel in the case, and I

24    think, I think things can be summarized this way.

25              We have four direct purchaser representative
</pre>

1    plaintiffs, all four of whom want to be lead counsel in

2    one form or another.  We have 20 indirect purchaser

3    representative plaintiffs, and 19 of those 20 have agreed

4    on an approach that sets forth a small group of three, I

5    think, to be lead counsel.

6         And I guess what I would throw out is I think

7    the interim lead counsel position is, in my mind, just

8    that, an interim position, and that class counsel is

9    really where the principal decision has to be made about

10   who's going to be litigating on behalf of each of these

11   groups of plaintiffs.

12        But with that introduction, let's take up first

13   the direct purchaser suggestions, and I'm happy to hear

14   any supplemental argument that you'd like to make.

15        MR. OPPER:  Good afternoon, Your Honor.  My name

16   is Joseph Opper.  I'm with the law firm of Garwin,

17   Gerstein & Fisher and we were the proponents of the

18   recommendation that the Court appoint a three colead

19   leadership.

20        Resolving these issues at the beginning of the

21   case might be unpleasant but I think it is an important

22   task to get, to be resolved early.  I think it's very

23   important for the effective and efficient prosecution of

24   the case for all lead counsel to have the confidence in

25   each other's ability and their ability to prosecute the

1    case in the best interests of the class members.

2              With this, with respect to this particular case,

3    we think resolution of the issue should be very

4    straightforward and easy.  Pursuant to the private

5    ordering recommendation from the manual, as set forth in

6    the manual in complex litigation, counsel for three of the

7    four direct purchaser cases, the three that were filed

8    first, consulted and came up with a proposal that would

9    establish their three firms, Garwin Gerstein & Fisher, my

10   co-counsel from Berger & Montague and from Hagens, Berman,

11   Sobel & Shapiro in the position of coleads, and to include

12   in the leadership structure counsel for the last filed

13   case, that would be Ms. Nussbaum, who represents Cesar

14   Castillo, I believe, which is the last direct purchaser

15   case filed.

16             It's our understanding that that, our proposal,

17   our inclusive proposal was rejected by counsel for the

18   last filed action, and they are proposing that

19   Ms. Nussbaum be appointed solely, or one of two coleads or

20   one of three coleads or one of four coleads.

21             The leadership structure that we're proposing,

22   the three, the three colead firms with Ms. Nussbaum's firm

23   as a member of the executive committee we believe is

24   entirely consistent with the factors identified in Rule

25   23(g) concerning the appointment of class counsel.

1           And then the standard is usually applied equally

2     to the decision of interim class counsel, and I believe

3     that interim class counsel is a important position because

4     often much of the discovery in the case might be decided,

5     you know, long before the class certification is mutually

6     decided and there are key strategic and substantive issues

7     that would be within the control of interim class counsel.

8           The first factor identified by the federal rules

9     is that the work counsel has done in identifying and

10    investigating potential claims in the case --

11          THE COURT:  You set that forth in your brief

12    about your early investigation and you actually filed the

13    very first case.

14          MR. OPPER:  We did.  We filed that in November.

15          THE COURT:  Right.  So when we have a group of

16    four cases, why do we need three?

17          MR. OPPER:  Well, we don't necessarily need

18    three, Your Honor, but in this particular case, my firm

19    has had considerable experience in working with Berger

20    Montague and Hagens Berman and I think we have come up

21    with a pretty well crafted and efficient litigation

22    machine that is able to expeditiously prosecute the case

23    and is very keen to the interests of the, of the, of the

24    members of the class.

25          Sometimes there have been instances where my

1    firm has served as sole lead counsel and I think we've

2    also litigated that case, you know, extremely well, but

3    sometimes there is great benefit to be received, you know,

4    in the plaintiff's camp from the input and advice of other

5    firms.

6              THE COURT:  Right, I acknowledge that.  I guess

7    the -- my gut reaction is it might make more sense to,

8    frankly -- I don't mean to put you in an awkward position

9    but to appoint you as lead counsel and then have the other

10   three be on the executive committee.

11             In other words, what is the difference between

12   having three coleads and one extra on the executive

13   committee, and one lead counsel and the other three on the

14   executive committee?

15             MR. OPPER:  Practically I don't see any, Your

16   Honor, and we would be -- that proposal would be

17   acceptable certainly to my firm, and I have represented to

18   my co-counsel that, you know, positions aside, that this

19   is a collective and collaborate effort and we would

20   certainly continue that.

21             THE COURT:  Right, I'm sure, and they may want

22   to weigh in on why that's a bad idea.  But that's my gut

23   reaction, is when you've got four firms, let's pick one

24   person to be lead.  You get out there in front, you filed

25   the first case, you did the research, et cetera, get you

1    in front.

2          But let's be inclusive about hearing from

3    everybody else, because you only have three others on the

4    executive committee, so I'd be interested in hearing from

5    any four of you on that.  You've essentially said that's

6    okay.

7          MR. OPPER:  That would be acceptable, yes, from

8    our firm.

9          THE COURT:  All right.  Let me hear from the

10   other three, if any of you want to be heard.

11         MR. NALVEN:  Your Honor, I'm David Nalven from

12   the Hagens firm, and one of the three that Mr. Opper

13   referred to.

14         The three firms that are proposed, as has been

15   detailed, have a history of working together in a

16   cooperative way, and in a case like this in which each of

17   the firms is being asked to make a substantial

18   contribution of both resources, professional resources,

19   and funds to fund the litigation, it's often useful to

20   have a number of firms in the position of lead so that,

21   you know, they are fully into the case and fully in

22   control of their financial destiny.

23         There have been a lot of ways that lead counsel

24   assignments have been made three, two, one.  One of the

25   benefits of three over two is that there's a tie breaker

1    in the event there's a dispute.  One of the benefits of

2    three over one that is it avoids the tyranny, the

3    potential tyranny anyway, of having a sole lead counsel.

4         And so, for those reasons this group has gotten

5    together in this case and in others and made this

6    proposal, and we think it makes sense.

7         THE COURT:  All right, thank you.

8         MR. SORENSEN:  Your Honor, David Sorensen of

9    Berger & Montague.  We also think that the proposal that

10   was made of the three firms is the correct one for all the

11   reasons that Mr. Nalven offered.

12        The three firms, Garwin, Berger and Grant

13   Eisenhofer are working current cooperatively in similar

14   cases.  From my perspective, I do think that that is

15   beneficial to the class, having multiple voices on equal

16   footing, multiple odd numbered voices to deal with issues

17   of ties and so forth.  I think that that's a helpful

18   thing.

19        And also with respect to this class, this class

20   is not large numerically.  The classes of direct

21   purchasers in these cases tend to be on the smaller side,

22   less than 50, sometimes less than 40, thereabouts.

23        And these cases -- as we set forth in our

24   supplement statement, there are, in addition to the named

25   plaintiffs, there are three companies that are the largest

1    wholesalers in the United States; Pittsburgh and Cardinal

2    Health and McKesson.  They are class members in this and

3    other cases like it.

4         And over the last ten years of litigating

5    similar cases our firm in particular has developed a close

6    relationship with those companies and earned their trust.

7    As set forth in letters that were submitted as part of our

8    statement by these three companies, not in opposition to

9    any particular firm but affirmatively supporting Berger

10   Montague as being part of a leadership, part of the

11   leadership decision-making which is obviously important.

12        And so for that reason, and the reasons that

13   Mr. Navlen offered, and obviously Mr. Opper hasn't

14   opposed, I would urge the Court to adopt the three firm

15   structure that has been proposed.

16        THE COURT:  Okay.

17        MS. NUSSBAUM:  Good afternoon, Your Honor.

18        I've been litigating these types of cases for a

19   dozen years, and I have served in every type of structure

20   that Your Honor has spoken about.  I've been sole lead

21   counsel in some of these cases, in the Paxil case and

22   Ibuprofen.  I served as Chairman of a committee and been

23   the main spokesperson in court in Ovcon with a court

24   appointed seven to serve as executive committee.

25        I've been one of four with some of my colleagues

1    here in the Doryx case; one of two in the Mylan case; one

2    of three in a number of cases.  So I think any of those

3    structures can work and can be efficient.

4            I would like to make clear to the Court what we

5    want to be is included here.  Although it is true we filed

6    our case somewhat later, we informed one of the attorneys

7    that we had investigated the case and were filing, but

8    that we were working with a new plaintiff that had never

9    come forth before and that that might take some time.

10           There have been many occasions when every single

11   other firm sitting at counsel table had filed a month, two

12   months, three months, after we filed cases and, despite

13   that, we were inclusive in the structure.  We agreed they

14   could be a colead, that they could serve equally with us.

15           The proposal that they have has us as one

16   executive committee member of a committee that includes

17   all of the other firms on their complaints.  That is not

18   fair and I also don't think is really in the interests of

19   the class.

20           We have, I have, proven ability and as much

21   experience in this filed as anybody.  My firm is a

22   significant firm with a lot of resources to support this.

23   We have the recognized expertise.  I've served as counsel

24   in regular antitrust cases in the antitrust class actions.

25   I've been hired by CBS to try cases for them.  I've tried

```
1    a case for Keiser, I have real trial experience, and I
2    think for all of those reasons, we should be included here
3    as a lead counsel, and in whatever structure Your Honor
4    deems appropriate.
5              THE COURT:  If I decide to go with the
6    suggestion that I made at the outset, that is single lead
7    and a executive committee of three, are you going to be
8    able to work with, cooperatively with the other members of
9    that committee?
10             MS. NUSSBAUM:  Your Honor, that's difficult.  I
11   must say, in the Proventil case, Mr. Gerstein is sole lead
12   counsel and we are on the executive committee.  And a very
13   concrete example is last week papers were filed in terms
14   of class certification.  My client, Meyer, was included, I
15   was included, we didn't even get a draft of those papers.
16   So I think that it is best that we serve on an equal
17   footing and I think that that's by far in the best
18   interests of the class.
19             THE COURT:  Okay.  So are you saying you would
20   not be able to work cooperatively with the other counsel?
21             MS. NUSSBAUM:  Your Honor, I attempt to work
22   very cooperatively with the other counsel.  I've done that
23   in this case.  Emails other people have annexed make clear
24   that we reached out immediately, we worked very
25   cooperatively, we've had the meet and confer sessions with
```

1   the defendants, we invite everybody, we keep everybody in

2   the loop.  So, yes, I would personally include everybody,

3   which is what my history is in doing and I would work

4   cooperatively.

5           I have a concern that if we are not lead counsel

6   here, that other counsel might not be as inclusive and as

7   cooperative and I think it's really in the best interests

8   of the class and most efficient that we all move forward,

9   you know, in a cooperative way here.

10          THE COURT:  Okay.  All right.  My proposal would

11  also, in effect, knock a few people off the proposed

12  executive committee.  I don't know if people want to be

13  heard.  I think the suggestion was there were six on your

14  executive committee proposal, and this would be down to

15  three.  Anybody care to be heard about that?

16          (No response.)

17          THE COURT:  Okay.

18          MR. OPPER:  Well, Your Honor, the members of the

19  executive committee that we proposed did not make the trip

20  except for Mr. Raphael, who is here, who I know is very

21  involved in the actual investigation of the group.  I know

22  they would -- they would be there, at their preference,

23  that they also be included in the executive committee

24  since we have worked as a team with them in the past and,

25  you know, so I would propose that to Your Honor.

1           I understand the Court has its views to

2     streamline the leadership, and I certainly would support

3     that but I would ask the Court to consider, you know,

4     expanding the executive committee to permit these other

5     firms.

6           (Pause)

7           THE COURT:  Well, let's try it this way.  Let's

8     make Garwin Gerstein & Fisher lead counsel.  Let's make

9     Berger Montague, the Hagens firm and Grant & Eisenhofer

10    the executive committee.  And let's work together well.

11          And if it turns out that you need greater

12    representation or if there are counsel who are serving in

13    a very active role and want representation on the

14    executive committee, we can modify it.  But it seems to me

15    that there is what I would call some apparent friction

16    among the group seated at this table right now and this is

17    the best suggestion that I have, knowing what I know --

18    which is at this point very little -- for how to try and

19    bring this group of talented lawyers together in a way

20    that they can serve ultimately this group of clients they

21    are going to represent.  So, I think I'd like to proceed

22    that way on the direct case.

23          This is subject to modification.  You know, if

24    it turns out that one or more of you feel left out, feel

25    your voice is not being heard or whatever, I hope not to

1    revisit this but I am willing to, and I'm just going to

2    urge everybody to do their best to put other cases, past

3    experiences, whatever it may be that divides you, aside,

4    and hopefully under the leadership of a single lead

5    counsel and a powerful executive committee, we'll be able

6    to do that.

7              MR. OPPER:  Thank you, Your Honor.

8              THE COURT:  All right?

9              MR. OPPER:  Thank you.

10             THE COURT:  So there will be some obvious

11   modification.  There is the related issue of liaison

12   counsel.  I don't know how best to resolve that.

13             MR. OPPER:  Well, Your Honor, we have proposed

14   Jerry Pia of Roche Pia, the Roche Pia Firm --

15             MR. PIA:  Good afternoon, Your Honor.

16             MR. OPPER:  -- to serve.

17             THE COURT:  Good afternoon.

18             Well, again, you've got two talented liaison

19   counsel proposed.  I know Mr. Pia and I know Mr. Schaefer.

20   You know, I almost hope the two of you might be able to

21   work together.  What do you think?

22             MR. PIA:  I would be willing to work with Mr.

23   Schaefer, Your Honor.

24             MR. SCHAEFER:  No problem, Your Honor.

25             THE COURT:  Let's do that.  We'll have

1    co-liaison counsel.  That may help pull the team together,

2    if you will.

3              MR. OPPER:  Thank you.

4              MR. MILNE:  Your Honor, if I may be heard,

5    Robert Milne on behalf of Boehringer Ingelheim.  We really

6    don't have a horse in this, or a dog in this fight,

7    whatever the analogy is, but when it comes to liaison

8    counsel, it is an important, an important issue for the

9    defense side of the case to have one person that we know

10   we can reach out to if we need to discuss whatever it may

11   be; if we need to talk about an extension, if we need to

12   figure out who is the right person for a consultation with

13   plaintiffs' lawyers, to speak to.

14             So, we take no position on who the liaison

15   counsel should be but it does seem to me that a

16   proliferation of liaison counsel could be -- could create

17   issues.  I will just note that we will abide by whatever

18   decision you make.

19             MR. OPPER:  Your Honor, my suggestion would be

20   that if a situation like that arise, they contact me.

21             THE COURT:  That was my first impulse as well.

22   Let's give it a shot and see if this works.  If there's a

23   problem, again, let me know.

24             MR. MILNE:  Very well.

25             THE COURT:  I think that takes care of the

1   direct purchaser line-up.

2          On the indirect side, we have, I think, Humana

3   who has not joined what's known as consensus counsel.

4   Where is counsel for Humana?  Do you want to be heard,

5   sir?

6          MR. ST. PHILLIP:  Good afternoon, Your Honor.

7   Peter St. Phillip from Lowey Dannenberg, Your Honor.

8          Humana, Inc., is on our client.  We plead a

9   hundred million dollars in purchases over the class

10  period.  We are proposing Lowey Dannenberg and Rawlings

11  and Associates, a firm that represents a number of large

12  payors as well.  We have worked with the Rawlings firm for

13  a long time.  We have also worked with other counsel here.

14         We don't want to be portrayed as not inclusive.

15  We, I think, arrived at the case where there was already

16  some arrangements made among counsel, but we believe that

17  from a client perspective, that Humana is the appropriate

18  class representative, lead class representative, and its

19  choice of counsel should prevail.  And so otherwise, you

20  know, you have our papers.

21         THE COURT:  Okay.  Anyone want to be heard on

22  the indirect?

23         MR. BUCHMAN:  Good afternoon, Your Honor.

24  Michael Buchman from Motley Rice, and on the phone with me

25  today is Mr. William Narwold of the Motley Rice Hartford

```
1    office.  Also with me today, Your Honor, is Marvin Miller,

2    proposed interim colead counselor from the Miller law

3    firm.

4              MR. MILLER:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.

6              MR. BUCHMAN:  Steve Shadowen from Hilliard

7    Shadowen.

8              MR. SHADOWEN:  Good afternoon, Your Honor.

9              THE COURT:  Good afternoon.

10             MR. BUCHMAN:  And Renae Steiner from the Heins

11   Mills & Olson firm.

12             Your Honor, I've been asked to speak here today

13   as proposed interim colead counsel, so I believe it would

14   be appropriate for each of the firms to come up and

15   address the issue that you've raised individually, as the

16   direct purchaser proposed colead counsel did, if that's

17   all right with Your Honor.

18             THE COURT:  Sure.

19             MR. BUCHMAN:  I would like to add though before

20   that, Your Honor, that Motley Rice was the first filed

21   case in the District of Connecticut, and that we, along

22   with the other 19 firms that are end payor counsel, have

23   historically worked very cooperatively and collegially

24   together.

25             And I think the fact that we were able to put
```

1    together the 19 firms on a private ordering basis speaks

2    loudly as to our ability to work closely and cooperatively

3    together, and we would ask that the Court give that

4    consideration as part of the decision that you make here

5    today regarding the organization of counsel.  We can and

6    will work cooperatively together, no matter what decision

7    this Court makes.

8           And having said that, I would like to also say

9    that we've worked closely and cooperatively with Humana's

10   counsel, but typically the Lowey Dannenberg firm has

11   represented large plaintiffs in end payor cases and opted

12   those clients out.  And it is our position with regard to

13   this motion, that with respect to the 23(g) factors of

14   experience of counsel and who developed this case, that

15   the 19 firms who filed well before the Lowey Dannenberg

16   firm spent considerable time and resources to develop this

17   case and get the cases on file.

18          And, more importantly, with regard to the Lowey

19   firm opting their clients out of cases, we believe that we

20   have significant experience because we have continuously

21   litigated the cases over the past 14 years that the Lowey

22   firm has opted their clients out.  We have been the ones

23   routinely in these cases that have filed the complaints;

24   that have prepared the oppositions to the motions to

25   dismiss; done the discovery work; that have worked with

1    the experts on merits and class certification issues and

2    gotten those class certification motions filed and argued;

3    that have worked on oppositions for motions for summary

4    judgment and otherwise preparing these cases for trial.

5           We believe that that experience over the past 14

6    years, as outlined in our papers, speaks loudly as to our

7    ability to represent the class in this case.

8           And, with that, I will turn this over first to

9    Ms. Steiner with regard to her firm and then the other two

10   firms as well.  Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MS. STEINER:  Good afternoon.

13          THE COURT:  Good afternoon.

14          MS. STEINER:  My firm has the support of 10 of

15   the 20 cases that have been filed in this case.  I think

16   any of the firms of the 19 could lead this case.  They

17   have, in fact.  Dan Girard, for example, who filed the

18   first indirect purchaser case in this action has agreed to

19   be an executive committee member in this action and let

20   others lead this case.  That speaks to the nature of the

21   cooperation that has been exhibited by the consensus

22   counsel in this case.

23          In our papers we lay this out and I don't need,

24   I think, to go through it here, but in the four months we

25   have all come together, we have not only done the work to

```
 1    file the case but we have done additional work post-filing

 2    that includes working with experts, that includes

 3    negotiating with these defendants who sit here, to get an

 4    interim protective order so that we can start doing

 5    discovery and, in fact, we have started doing discovery.

 6    The defendants have turned over some, not all the

 7    documents we want, but some of the documents we want.

 8    Likewise, our clients have gathered and turned over

 9    documents that the defendants requested of us.

10            So I think that speaks to the nature of our

11    cooperation.  As Mike mentioned, Humana is slightly

12    different.  In Humana's papers they say they would like to

13    be lead counsel.  Their counsel would like to be lead

14    counsel and, if so, then they would be in this case.

15            I think you will hear from them today an

16    argument that they don't want to be in the case in the

17    class case if they not lead counsel, and I think that

18    speaks to whether they are an adequate representative

19    under the 23(g) factors.

20            THE COURT:  Thank you.

21            MR. SHADOWEN:  Good afternoon, Your Honor.

22    Steve Shadowen.  I think the unspoken assumption seems to

23    be that the Court is leaning toward appointing only one

24    firm on behalf of the indirects.  I'm not sure that that's

25    true --
```

```
 1              THE COURT:  No, no.  Actually I think there's a

 2    difference here.  That's the number of parties.  If we

 3    have 20 --

 4              MR. SHADOWEN:  Exactly.

 5              THE COURT:  -- I think three might be

 6    reasonable, and the fact that you've all come together I

 7    think speaks volumes about whether that's the right

 8    approach.  I think the direct is a different issue where

 9    there's some obvious tension on that side that I think

10    needed to be addressed.

11              MR. SHADOWEN:  That was really my point, Your

12    Honor, is that I think the three, given that there's 20

13    cases, is perfectly appropriate.  We need the resources,

14    we need the horse power, and we need to hear voices from

15    all of those different plaintiffs, so I would urge that

16    the court adopt our proposal.

17              THE COURT:  All right.  Thank you.

18              MR. SHADOWEN:  Thank you.

19              MR. MILLER:  Good afternoon, Your Honor.  I'm

20    not sure I have much more to say.

21              THE COURT:  Don't feel you have to.

22              (Laughter)

23              MR. MILLER:  It would just be piling on, but I

24    think one of the important factors that Your Honor should

25    also consider, and we had it in our papers, is that we
```

1    actually have the resources and intend to go to trial in

2    this case, if necessary.

3              THE COURT:  Okay, great.

4         All right.  Well, I'm going adopt the proposal

5    by the so-called consensus counsel.  I think the structure

6    they set up makes sense with the number of indirect

7    purchaser cases.  It appears to be a group that is working

8    well together and that represents the vast majority of the

9    views of those cases, and I think that, I think the

10   proposal is fully supporting and addresses each of the

11   concerns or factors that I have to address in appointing

12   counsel, so I'm going to adopt that proposal as set forth.

13             All right.  Let me see whether there are any

14   other issues regarding the organization of the cooperating

15   groups.  I know that Humana raised a concern regarding

16   consolidation versus coordination.  I'm happy to hear you

17   on that, although I'll tell you that I think consolidation

18   is my preference and makes sense.  The issue about the

19   need or ability to file an interlocutory appeal, I think,

20   can be addressed in other ways; through 1292(b) or 4(b).

21   And if this is truly a class proceeding, it's not clear to

22   me why the cases shouldn't be consolidated until we get to

23   a class.

24             MR. SORENSEN:  I think that's fine, Your Honor.

25   I think to the extent that there's an issue with respect

```
1    to how the 2nd Circuit's going to treat somebody's
2    appellate rights in the event that there are cases, the
3    constituent cases are dismissed and others are going --
4    keep going forward, that we can address that issue at that
5    point.
6              THE COURT:  Okay, great.  All right.
7              MR. OPPER:  Excuse me, Your Honor, could I ask
8    one question?  Would it assist the Court if we, on behalf
9    of the direct purchasers, submit a proposed order?
10             THE COURT:  That would be lovely, yes.  Thank
11   you.
12             MR. OPPER:  Thank you.
13             THE COURT:  Otherwise it may take me two or
14   three weeks to get it done.
15             MR. BUCHMAN:  Your Honor, Michael Buchman from
16   Motley Rice.   We did attach a proposed order as part of
17   our motion.
18             THE COURT:  Yes, I saw that.  Very good, thank
19   you.
20             All right.  Scope and timing of discovery.  I
21   see some obvious points of disagreement in the competing
22   pretrial conference reports.  Let me maybe make some
23   introductory remarks and then everybody can go from there.
24             Unless convinced otherwise, I think it makes
25   sense for some discovery to begin immediately.  It seems
```

1    to me that that discovery should be limited to domestic

2    discovery, it should be limited to paper discovery, and

3    it's not clear to me that it should include the

4    defendants' sales data.

5            But I, I'm not convinced that this is a case

6    that is so implausible that the kind of Twombly concern

7    arises here.  And if I am convinced of that, we can always

8    stay discovery later, but it seems to me that makes a lot

9    of sense to get the case started, that discovery in this

10   case could take much -- probably will take longer than the

11   plaintiffs think it's going to take -- that is, more than

12   a year -- and I'd just as soon get it started sooner

13   rather than later.

14           So, I don't know who wants to be heard first but

15   I'm happy to hear you both.

16           MR. MILNE:  May I go first, Your Honor?

17           THE COURT:  I should say you all.  There's more

18   than two.

19           MR. MILNE:  Your Honor, Robert Milne again on

20   behalf of Boehringer Ingelheim.  First, to just speak to

21   the issue about whether this is a Twombly case or

22   something else, and, you know, one thing to observe at the

23   outset is we don't have the operative complaints yet.

24           THE COURT:  Right.

25           MR. MILNE:  You've set up a mechanism so we'll

1    see those at the end of June, so we're working off what we

2    see in the current complaints.

3            The essence of our plan's motion is partly

4    Twombly based, but really to a large extent driven by what

5    Actavis says, by the very -- and we summarize some of that

6    but not in the detail we would in motions.

7            So I just -- I don't propose, unless Your Honor

8    would like to hear it, to do a full blown argument on

9    these issues, but I do -- and we, as a group of

10   defendants, are not averse to the limited discovery of the

11   sort that I think you're proposing.

12           We laid out in our report that what we propose

13   to do is basically what really most of the courts that are

14   handling these types of cases are doing with the cases.

15           So, you know, the Lamictal case pending in New

16   Jersey, the Effexor XR, the Lipitor, we attach those

17   materials to our papers, and in each of those cases, to

18   varying degrees -- well, in Lamictal the Court stayed all

19   discovery pending resolution of the motions.

20           But in the other cases, what the Courts have

21   done is said we're going to stay discovery in general

22   pending resolution, but we are going to allow these more

23   targeted document discovery categories to go forward.

24           So we may be saying the same thing.  We think

25   that's -- we're okay with doing that.  We think that is

the appropriate way to proceed, but I, but I also wanted

to be clear, and if you'd like to hear anymore, we really

do feel strongly about these motions to dismiss that we

will be filing.  We think we have a very strong motion

here with respect to the basic theory being alleged.

THE COURT:  Well, and if you're right, you won't

have undergone tremendous expense in the meantime.  I

mean, yes, this document discovery will go forward but,

you know, it sounds like some of that got started already

in the actions before, at least some of the actions before

they were transferred, and the FTC documents, for example,

are some presumably that you can put your hands on and

there's not going to be great expense in producing those.

MR. MILNE:  Well, see, Your Honor, if I may

address that.

THE COURT:  Okay.

MR. MILNE:  That is a point of disagreement

between the parties.  I think we've come to agreement on a

fair number of things, you know, the categories that we're

willing to produce that are specified in the papers.

The two sticking points are the data, which you

mentioned, and then also the extent of materials coming

out of the FTC production.  And the issue with the FTC

production, there are a couple issues but most

fundamentally, again, we don't even have an operative

 1    complaint yet so we don't know what the full scope of what

 2    is going be claimed, but we do know that the FTC swept

 3    much more broadly than what is claimed in these cases.

 4         This was -- this case, these cases are about

 5    Aggrenox, about selling the patent litigation relating to

 6    Aggrenox.  The FTC was interested in Aggrenox but also in

 7    another product called Mirapex, and in the scope of its

 8    request went even beyond that in terms of other things

 9    that the FTC was looking for.

10         And so, for us it's a substantial volume of

11    material and for us to go through that, separate out what

12    is perhaps relevant to the Aggrenox issues, what may not

13    be, that is not, that is a nontrivial exercise for us,

14    it's a burdensome exercise, and given where we are in the

15    case --

16         THE COURT:  Let me press you a little bit on

17    that.

18         MR. MILNE:  Sure.

19         THE COURT:  Obviously I don't know how your

20    client kept its documents but I would assume that there

21    would be a group of people, a department, a team, working

22    on Aggrenox, and a separate team working on other

23    products.  And if that's the case, then there ought to be

24    a way, presumably, if the documents were collected and

25    maintained in a rational, organized way, there ought to be

1   a way to fairly easily say, oh, let's grab that pile and

2   not the other pile.

3         MR. MILNE:  That is not my understanding of how

4   things are organized in the production materials.

5         THE COURT:  Okay.

6         MR. MILNE:  But to be 100 percent honest with

7   Your Honor, we are not counsel in the FTC matter, so we

8   are not, you know, we don't have complete visibility into

9   what, how the production materials are organized.  But in

10   the way they were produced to the FTC, I would be very

11   surprised if you could just say, okay, give me only

12   Aggrenox documents, don't include any Mirapex, because

13   it's certainly possible that there could be overlap

14   between documents.  There are issues around third party

15   confidentiality because some of the materials, you know,

16   you needed to get third party consents and the consent

17   would have related to production to the FTC, not in

18   connection with another litigation.

19         So there are burdens associated with that.  We

20   would have to figure out what's in there, identify that

21   which is Aggrenox-related and figure out what third party

22   material needs to be dealt with in that fashion.

23         So this is not a straightforward -- unlike the

24   another situation like, for example, with the patent

25   litigation, the underlying Barr patent litigation

material, there, it's a very voluminous set as well, but
it is more like what you're describing, Your Honor.  We
feel that it is a relatively easy thing to identify and
turn that material over, and that's why we agreed to do
it.

Fundamentally here we see that, the FTC
material, as a very different proposition that's going to
require much closer review, and at bare minimum, we should
await the receipt of an amended complaint before we can,
before there's any basis to start looking at, well, what
may be relevant and what may not be relevant from a FTC
universe.

THE COURT:  Okay.

MR. MILNE:  So, and if Your Honor has any other
questions there, we're happy to address them, if you'd
like to see briefing on this, because I do think it's tied
to the strength of motion issue as well, and we would be
happy to do that.

So, and, you know, one other, one other issue
that I'd just like to point out here that we mentioned to
the plaintiff's side in the meet and confer process is
that, you know, I don't think there's any real question
that when you talk about the concern that Twombly is
expressing about particularly -- with Twombly itself was
an antitrust case and the Court was saying you really

1    should determine whether there is a viable complaint here

2    before you put the parties and the Court to the burdens

3    that go along with big ticket antitrust litigation.  And

4    so that's a critical issue here and we really believe that

5    we have a very strong motion and if there is briefing that

6    we can do to give you more comfort on that, we're happy to

7    do it.  We're also happy to expedite the briefing on the

8    motion to dismiss, within reason, to move things up so

9    that we, we can get to a resolution a little quicker.

10            THE COURT:  I'd be interested in doing that.  I

11   thought that there were some pretty generous briefing

12   deadlines that were proposed with respect to the motion to

13   dismiss.  So, we'll talk about that.

14            MR. MILNE:  Thank you, Your Honor.

15            THE COURT:  All right?

16            MR. HOLDING:  Your Honor?  Good afternoon.  My

17   name is Chris Holding.  I represent the generic company

18   defendants.  Most people understand what Mr. Milne said,

19   but I wanted to take a minute to address your question

20   about how documents are organized from the generic company

21   perspective.

22            Because one of the banes of the existence of

23   being a litigator for a generic drug company is that there

24   are documents that almost always contain references to any

25   number of drugs because a generic company is not organized

 1    in a product team in the way perhaps a brand company might

 2    be.  And so, I can tell you from some of the initial work

 3    we've done, just trying to do name searches in the FTC

 4    database when we received it from FTC counsel, there are

 5    lots of documents that will generate a hit for Aggrenox

 6    and a hit for one or dozens and dozens of other drugs that

 7    the company sells that have nothing to do with this case,

 8    partly because the FTC asked us for some very sweeping

 9    information.  Part of that is because that's just the

10    nature of the way my clients do their business, and so you

11    might have an email chain.

12            So, just as a practical point, the burden that

13    would be imposed on going through that production to

14    produce it in this case is a lot more than I think your

15    question might have presupposed, and I just wanted to

16    reiterate that point.

17            THE COURT:  Let me be sure I understand what

18    you're saying.  If there is a single document that talks

19    about Aggrenox and some other generic drug, that it

20    wouldn't be responsive in this case?

21            MR. HOLDING:  No, I think part of it might be

22    responsive but it's also been a practice that I've had in

23    many of the cases we've been counsel that portions of the

24    drug -- sorry, portions of the document that talk about

25    other drugs might be redactable, and that has been a

1    program we have carried out often.  And so --

2            THE COURT:  Yes, there's two approaches to that.

3    One is to redact, the other is to have a good protective

4    order.

5            MR. HOLDING:  That is right.  What I would say

6    to that is there is a, there's a long history of

7    litigation between everybody in this room, and we believe

8    that redacting is the better way to go.  Thank you.

9            THE COURT:  Okay.  Thank you.

10           MR. NALVEN:  Your Honor, David Nalven.  I

11   believe I'm speaking on behalf of all plaintiffs.

12           Let me just try to address the points that

13   defense counsel has made.  First of all, this case follows

14   very closely the structure of the Actavis case.  There's

15   an agreement to settle, there's a large payment, the FTC

16   has estimated at about 120 million-dollars, and there's a

17   delay in the availability of generic Aggrenox.

18           In fact, just like the Actavis case, this case

19   is a case in which the alleged payment has been made under

20   the guise of a co-promotion agreement that's been alleged

21   here.  So, respectfully, while we, of course, you know,

22   respect the defendants' right to file a motion to dismiss,

23   we don't believe that there are substantial arguments in

24   that motion to dismiss such that under both the

25   Connecticut rules and Connecticut law, that it's a kind of

1    motion to dismiss that should stay discovery.

2         Plaintiffs, I speak on behalf of all, I hope, we

3    would accept Your Honor's limitation that initial

4    discovery be limited to domestic discovery and to

5    documentary discovery, but we think that it would be

6    useful to begin producing the documents that are already

7    prepackaged forthwith.

8         Now, the focus here has been on the FTC

9    documents.  One of the arguments that my colleague, Mr.

10   Milne, made is that there are not only Aggrenox documents

11   but there are also Mirapex documents that were called for

12   by the FTC.  Well, there's a reason for that.  Mirapex is

13   also a drug that is manufactured by Boehringer.  Mirapex

14   is also a drug that Barr has sought to make on a generic

15   basis.

16        In fact, Barr provided Boehringer with its half

17   waxman notification (ph), litigation ensued and it was was

18   ultimately settled.  In fact, the Mirapex litigation and

19   the Aggrenox litigation were settled together and they are

20   all, we suspect, part of the same agreement.  And so, for

21   that -- that is the reason that the FTC has focused on not

22   just Aggrenox, but Mirapex.  These are related agreements

23   between the same parties.

24        Now, with respect to the FTC documents

25   themselves, let's talk about what those FTC documents are.

1           First of all, the FTC has been conducting an

2      investigation over the last several years, so there are

3      investigatory hearing transcripts, and the exhibits that

4      go with those transcripts.  There have been investigatory

5      examinations, essentially depositions, conducted by the

6      FTC, and exhibits to those depositions.  Those cannot

7      possibly be burdensome to produce and they are clearly

8      relevant to the case.

9           There are, in addition to documents that were

10     produced, there were the equivalent of interrogatories and

11     interrogatory responses -- again, imposing no meaningful

12     burden on the defendants to produce.

13          Now, as far as the documents themselves, let's

14     take about what they are.  The defendants have already

15     collected the documents, they've already reviewed the

16     documents, they've already -- at least to some extent

17     redacted the documents, and let me get to that in a

18     minute -- they have culled the documents for privilege.

19     They have put in the documents on disks and sent them to

20     the FTC.  There isn't much more for them to do to provide

21     those documents to us, and so the burden of producing them

22     is also minimal.

23          Compare that to the benefit that the case will

24     obtain by the production of those documents.  Those

25     documents are potentially core documents that will not

1    only help us to understand the case, but also to shape and

2    limit future discovery, so that as the parties move

3    forward over the summer and the fall, by having those

4    documents and being able to evaluate them, we may be able

5    to do less than would otherwise be necessary if we didn't

6    have the documents.

7            On redaction, as I'm sure Your Honor recalls

8    when Your Honor was on this side of the bench, there's

9    often nothing more frustrating than trying to read and

10   understand a document that is heavily redacted or, in

11   fact, redacted at all.  You know, you know as a litigator

12   that you trying to understand the story, you're trying to

13   understand people, you're trying to understand

14   relationships.  And when a document is redacted, it's very

15   difficult to do that.

16           In the presence of a protective order, in which

17   documents are available to outside counsel's eyes only,

18   there simply is no basis to redact the documents.  They

19   are with us and, as far as I know, there's never been a

20   claim in any of these cases that any plaintiff's lawyer

21   has acted in an untoward way to disclose information.

22   Redaction is merely an obstacle.

23           In short, Your Honor, we are, you know, as we

24   argued in our papers, we believe that discovery should

25   proceed forthwith, and with the limitations that you

1    impose we are pleased to proceed but, in particular, we

2    believe that all documents produced and generated in the

3    FTC proceeding should be produced on an expedited basis so

4    that this litigation can get underway.

5            THE COURT:  Okay, thank you.

6            MR. BUCHMAN:  Your Honor, Michael Buchman,

7    again, for the end payor plaintiffs.  We adopt and support

8    Mr. Nalven's position and that of the direct purchaser

9    plaintiffs.

10           THE COURT:  Great, thank you.  And are

11   plaintiffs prepared to expedite the briefing and the

12   decision on the motion to dismiss?

13           MR. NALVEN:  Yes, we are, Your Honor.

14           THE COURT:  What about expediting the filing of

15   the amended complaints?

16           MR. NALVEN:  There are a number of complaints

17   that require some harmonization but, yes, we are prepared

18   to expedite that as well.

19           THE COURT:  And while we're on that, let me just

20   raise as a general matter whether there is a need to plead

21   violations of state law.

22           MR. NALVEN:  Your Honor, that's primarily an

23   issue that I believe would be better handled by the

24   indirect purchaser plaintiffs.  The direct purchaser

25   plaintiffs don't plead that.

```
 1              THE COURT:  Right.
 2              MR. NALVEN:  If I may, Your Honor, one of my
 3    co-counsel reminded me just to say, yes, we agree with
 4    your suggestion as well that there's no need to produce,
 5    for the defendants to produce their transactional sales
 6    data at this time.
 7              THE COURT:  Okay, great.
 8              MR. BUCHMAN:  Your Honor, I'm sorry, I did not
 9    hear Your Honor's question.
10              THE COURT:  Well, I'm just -- I saw somewhere
11    that I think 28 or 30 state's laws are allegedly violated
12    in the various complaints and, you know, I always try and
13    streamline complaints, especially when state and federal
14    causes of action are essentially duplicative.  I haven't
15    researched the laws of all these states and I don't know
16    that they are entirely duplicative, but is there -- is it
17    easier to prove a violation of state law than federal law?
18    Is there a greater damages availability under state law
19    than federal law?  And, if not, can we try and streamline
20    the complaints so we're not at a point where we sometimes
21    have to charge a jury on 28 or 30 different state laws.
22              MR. BUCHMAN:  Well, let me begin by saying this,
23    Your Honor, there are approximately 26 indirect purchaser
24    repealer states that exist, and we typically allege
25    violations of about 45 state consumer protection statutes.
```

1          Now, if I understand Your Honor's question, we

2     can look to the fact that the state antitrust laws that we

3     are alleging are referred to as little Sherman Acts.  They

4     are little versions of the federal statute, the federal

5     antitrust statute, the Sherman Act.  The same holds true

6     with regard to the consumer protection statutes.  There

7     are number of states that are known as little FTC Act

8     states.

9          So there are ways of coupling and combining

10    these states, and we will endeavored to that, but we think

11    that they are pretty much uniform, the exception being

12    that with regard to three antitrust states, California,

13    New York and Kansas require a -- they have a plurality

14    requirement that two or more actors must combine in order

15    to violate the statute under an monopolization claim.  But

16    other states have a unilateral act violation just like the

17    Sherman Act does.

18         So, I hope that gives the Court a little comfort

19    as to the uniformity of the laws that we will be alleging

20    in our complaint.

21              THE COURT:  That's helpful.  Thank you.

22              MR. BUCHMAN:  Thank you.

23              THE COURT:  One more behind you.

24              MR. ST. PHILLIP:  Your Honor, Peter St. Phillip.

25    The other reason, of course, that we allege the state laws

1    is because the 1977 decision of federal -- of the Supreme

2    Court in Illinois Bricks as the only direct purchasers of

3    a federal cause of action.  So, because of where we are in

4    the distribution chain, we don't have that cause of

5    action, so we're left with the state laws.

6            THE COURT:  Okay.  But -- well, you can allege a

7    violation of state law as a predicate -- no, never mind.

8    Never mind.

9            Okay, do what you have to do.  My only point is

10   I would prefer, when we get to trying these cases, to have

11   the simplest most direct, clearest complaint possible.

12           MR. ST. PHILLIP:  Understood, understood.

13           THE COURT:  Yes, fair enough.

14           MR. MILNE:  If I may, Your Honor, just briefly

15   to respond to some of what we've heard from the

16   plaintiff's side, first of all, with respect to, again,

17   the strength of the motion to dismiss, we believe that

18   when you really look at what Actavis holds and combine

19   that with what's been pled, you will see that the

20   plaintiffs have not met the Actavis standard, and we

21   believe that very, very firmly.

22           And, in fact, you know, there's at least one

23   other Court, Judge Walls in the Lominco case that, while

24   the arguments are not right on point to the ones we would

25   be making here, are at least in the same ball park, and he

1    has agreed and dismissed claims that are not dissimilar to

2    the ones here.

3           So, I would remind, I would just flag that for

4    the Court and also flag as well, there are other bases for

5    dismissal that we identified in the report and would plan

6    to raise, among them statute of limitations.  This

7    agreement was entered into more than four years prior to

8    the filing of the first complaint, more than four years

9    prior to the FTC's investigation becoming public.  So

10   theres a very fundamental issue on that level alone.

11          Talking about some of the state issues, I don't

12   disagree with some of the things that the plaintiff's

13   lawyers have said, but I will tell you that there are many

14   bases to dismiss aspects of -- over and above the basic

15   failure to plead a viable reverse payment, a viable large

16   and unexplained payment.  What's -- many of these state

17   causes of action that are being asserted here are just not

18   viable by their terms, and we will be briefing those

19   issues as well.

20          On the issue of the FTC material, you know, it's

21   easy to say that there are a bunch of disks out there, but

22   it comes back to the issue of figuring out on those disks

23   how do you sort through and figure out what's relevant and

24   what's not relevant and in a context where we have yet to

25   really test these complaints.  So, we are very much

prepared, we think we've come forward with a good

compromise, unlike Lominco where the parties stuck for no

discovery at all, we are saying we are prepared to do

discovery that is significant discovery, it's just with

respect to this more undifferentiated FTC material that we

know is broader, and this claim that the FTC may have been

investigating related agreements and somehow Mirapex is

related to Aggrenox, that's not in the complaint.

        You don't get to do discovery and take a fishing

expedition to figure out if you can come up with some new

theory.  You have to state a theory in your complaint.

That complaint should be tested, and then if there's

relevance, if they had something about Mirapex, for

example, in this new complaint, that's a different issue,

but we have to test that.

        And the idea that, well, the FTC must have been

investigating the two because they must have been linked,

that's not found in the complaint.  So it comes back to a

balance here, and what we would submit is what we have

proposed is very reasonable.  There is a substantial

amount of material that the plaintiffs will to have work

with, and if you combine it with perhaps an expedited

briefing schedule whereby we'll get to a resolution on the

motions to dismiss more quickly, we can be working

productively on the material that we are agreeing to

```
1    produce, and at the same time, we can work on other things

2    that need to be dealt with, things like the side protocol

3    which, given the complexity of these organizations and all

4    that's involved, and we're talking about complexity on

5    both sides of the aisle here because we have on the

6    defense side very, very large, sophisticated entities with

7    different computer systems and all of that, but you've

8    heard from the Humana, there are some big players on the

9    other side as well.

10          So, we will have that to deal with and we will

11   work diligently with the plaintiffs, as we have.  We are

12   in many of these cases and we are used to working with

13   those lawyers.  So we know that takes time and we will

14   work to get it right, and if there are any issues that,

15   where there's disagreement, we can bring those to Your

16   Honor during this period, we're also working on motions to

17   dismiss.

18          So, we submit what we have proposed is a

19   reasonable compromise, and with respect to the FTC, we'll

20   work with the plaintiffs so that if, as and when Your

21   Honor rules on the motions, if Your Honor rules that the

22   cases should go forward, then we will be ready to produce

23   relevant material out of the FTC production on a very

24   quick basis.

25          THE COURT:  Okay.  And with respect to the FTC
```

1    production, I'm just going to have to rely on whatever

2    you're telling me, but is it organized in a way where a

3    chunk of it isn't going to have the issues that you're

4    talking about and some other chunk of it will?  In other

5    words, is there a third of it that's pretty clean, that's

6    going to be minimal amount that, minimal amount of review,

7    and not have redaction and third party disclosure,

8    confidentiality concerns, et cetera, et cetera.

9            MR. MILNE:  Your Honor, sitting here today, I

10   honestly can't give you the answer to that question.

11           THE COURT:  Well, all right.  I think that's

12   something that the parties are going to have to promptly

13   confer about.

14           MR. MILNE:  Be happy to.

15           THE COURT:  And will require you to go back and

16   get the sense of that, because I think that the,

17   consistent with what I started with, I think there ought

18   to be -- discovery should start, it should be somewhat

19   limited and it should be somewhat easy, in the sense that

20   let's do the low hanging fruit and get that moving and get

21   that started, so we're not starting that three or four

22   months, five months down the road.

23           MR. MILNE:  We certainly agree with that

24   sentiment, Your Honor.

25           THE COURT:  Okay, let me propose this.  Can we

```
 1    get the revised complaints on file by June 15th?
 2              MR. OPPER:  Yes, Your Honor.
 3              MR. NALVEN:  Yes, Your Honor.
 4              MR. BUCHMAN:  Yes, Your Honor.
 5              THE COURT:  Can we get the motion to dismiss by
 6    July 15th?
 7              MR. MILNE:  So basically 30 days?
 8              THE COURT:  Thirty days.
 9              MR. MILNE:  If it's okay with defendants'
10    counsel --
11              MR. HOLDING:  Yes.
12              THE COURT:  All right.  Then I thought about, I
13    thought about -- how about August 5th for the reply?
14              MR. MILNE:  No problem.
15              THE COURT:  Too fast?
16              MR. OPPER:  Three weeks -- we would prefer 30
17    days, the same amount of time as the defendants have.
18              THE COURT:  Well --
19              MR. NALVEN:  Your Honor, you look like you're
20    struggling.  August 5th would be fine.
21              THE COURT:  How about August 8th.  We'll
22    compromise.
23              MR. OPPER:  That's fine.
24              THE COURT:  All right.  August 8.  So we'll have
25    this teed up August 8th.
```

```
 1              MR. MILNE:  Your Honor, we would request a reply
 2    brief as well?
 3              THE COURT:  I'm sorry, you're replying.  It's
 4    your motion, their opposition.
 5              MR. MILNE:  Right.
 6              THE COURT:  Thirty days, opposition, you're
 7    getting until August 8 to reply.  Right?
 8              MR. MILNE:  Oh, I see.
 9              THE COURT:  You get 30 days.  It was nice for
10    you guys to compromise to give them extra time, but --
11              MR. HOLDING:  I'm sorry, I apologize.  Maybe I'm
12    confused.  So I've got June 15th for the plaintiff.
13              THE COURT:  Right.
14              MR. HOLDING:  July 15th for the motion to
15    dismiss.
16              THE COURT:  You have 30 days.
17              MR. MILNE:  That's ours.  They oppose.
18              THE COURT:  Oh, I'm sorry, I'm missing a step
19    here.  Yes, okay.  8/15 to oppose and would be --
20              MR. MILNE:  Could we get 21 days, Your Honor?
21    Just because we have multiple defendants and --
22              THE COURT:  Yes.  Yes, 21 days would be
23    September 5.  Okay.
24              MR. MILNE:  Is that Labor Day?
25              THE COURT:  No.
```

```
 1              MR. MILNE:  Okay.

 2              THE COURT:  Couple days after.

 3              MR. MILNE:  Couple days after.  That's fine.

 4              THE COURT:  Does that work for everybody?

 5              MR. NALVEN:  Yes.

 6              THE COURT:  So, early September we'll have it

 7    teed up, we'll argue, we'll know.  So that helps.

 8              Let's get through these other deadlines.  I'm

 9    working off page 19 of the plaintiff's proposal.

10              So, plaintiffs are proposing automatic

11    production, if it hasn't already been produced, by

12    June 2nd.  That still works for everybody?

13              MR. MILNE:  I'm sorry, Your Honor --

14              THE COURT:  What they are calling direct

15    purchaser plaintiffs serve automatic production.  I'm not

16    entirely sure what that is, but they are willing to do it

17    quickly so that sounds good to me.

18              MR. MILNE:  Well, Your Honor, I mean to the

19    degree that it's a reciprocal thing --

20              THE COURT:  Doesn't appear to be.  This is the

21    plaintiff's obligation to you, as I understand it.

22              MR. NALVEN:  Okay.  That's agreeable, Your

23    Honor.

24              THE COURT:  All right?

25              MR. MILNE:  Okay.
```

1          THE COURT:  Then we have proposal for June 20th

2     for the Rule 26a disclosures.

3          MR. MILNE:  And, Your Honor, we from the defense

4     side think that it's -- again, this goes to the overall

5     stay issue, you know, that these are the sort of things

6     that really should wait until we see, at bare minimum

7     until we see the amended complaint, and under the current

8     schedule we won't have those complaints until June 15th.

9          So, there having been some further, some

10    discovery obligations based off those, being due five days

11    later seems very much too fast.

12         But, more fundamentally, we would view that as

13    the type of discovery that should wait until Your Honor

14    rules, which is, which is how it's been done in the other

15    cases that have, that we're talking about and we'll be

16    referencing in our materials, where that awaits the

17    outcome of the motion to dismiss, because no one knows who

18    the knowledgeable parties are, et cetera, et cetera, will

19    depend on what is the complaint, what is in the complaint

20    and what Your Honor has felt should go forward or should

21    not go forward.

22         THE COURT:  Well, there's two different issues.

23    What's in the complaint, I haven't heard any suggestion

24    that what's in the complaint is going to change in any

25    substantial way.

1          MR. NALVEN:  Yes, Your Honor.

2          THE COURT:  You're going to consolidate in

3     effect the claims that have already been made.

4          MR. NALVEN:  We would not expect the complaint

5     to change substantially.

6          THE COURT:  So, you've had those complaints for

7     quite a while, so it seems to me that June 30th for the

8     26(a) disclosures ought to be plenty of time.  If you're

9     surprised and there's some brand new crazy theory in the

10    amended complaint as to which you're not ready to make a

11    26(a) disclosure on June 30, just file a motion --

12         MR. MILNE:  All right.  Very good, Your Honor.

13         THE COURT:  All right.  The discovery that the

14    defendants have indicated they are willing to make

15    voluntarily, when can you reasonably make that production?

16         MR. MILNE:  Well, we would be prepared to do

17    that by June 30th with the exception -- the FTC, we hold

18    off to the side --

19         THE COURT:  You haven't agreed to that.

20         MR. MILNE:  Yes.

21         THE COURT:  So I'm talking about the classes of

22    documents you are willing to produce.  June 30th.

23         MR. MILNE:  June 30, yes, Your Honor.

24         MR. NALVEN:  Your Honor, if I may, you referred

25    to low hanging fruit.

1           THE COURT:  Yes.

2           MR. NALVEN:  I would suggest that includes

3   hearing transcripts and the exhibits annexed to them,

4   deposition transcripts and the exhibits annexed to them,

5   and the equivalent of FTC interrogatories and

6   interrogatory responses, and that those should be included

7   in the initial preliminary production.

8           MR. MILNE:  Well, Your Honor, again,

9   particularly with respect to the transcripts, that is the

10  kind of thing we would need to go through, figure out

11  what's relevant, redact, do that exercise.

12          And fundamentally, again coming back to the

13  Twombly issues and the things that we've been discussing

14  here, we really don't think it's appropriate, fair and an

15  orderly way to proceed, to start getting into that

16  material before the Court has ruled on our motions that

17  we're now agreed to do on a expedited basis precisely so

18  we can get to that point.

19          THE COURT:  Okay, this is what I'm going to

20  suggest there.  Serve by June 30th what you're agreeing to

21  serve.

22          MR. MILNE:  Okay.

23          THE COURT:  Okay?  And come June 15th, the

24  parties can serve written discovery requests.

25          There's going to be a presumptive 60 days to

 1    respond, so you don't have make a motion in 30 days that

 2    you need another 30 days, which we get all the time.  All

 3    right?  Make your discovery requests, you'll have sixty

 4    days.

 5             We'll be well into the briefing before your

 6    response date is up, and so I will have a real good sense

 7    because I will have seen your motion to dismiss for a

 8    month before, and if I have a sense that, hey, you know

 9    what?  There's a risk here this case is not going

10    anywhere.  We'll have a phone conference, okay?

11             MR. MILNE:  That's perfectly acceptable.

12             THE COURT:  Okay.

13             MR. OPPER:  And, Your Honor, if I could just add

14    to that, it would certainly be helpful in drafting our

15    complaints if we had copies of the agreements themselves,

16    and so I would urge the defendants to make those available

17    to us, I would suggest June 1st so we have sufficient time

18    to review them in their entirety, and so we can --

19             THE COURT:  That makes sense.  That makes sense.

20             MR. MILNE:  And we -- actually should have

21    mentioned that, Your Honor, we have agreed to do that so

22    we would be willing to do that.

23             THE COURT:  Great.  Okay.  The parties I think

24    are both in agreement on July 25th is the date for a

25    proposed protective order and ESI protocol?  Does that

```
1    still work for everybody?

2              MR. NALVEN:  Yes, Your Honor.

3              THE COURT:  Great.

4              MR. NALVEN:  Your Honor, I understand, we

5    understand that there is a form of protective order in

6    this district.

7              THE COURT:  Right.

8              MR. NALVEN:  Is it the Court's preference that

9    we use that as a starting point for a protective order?

10             THE COURT:  Whatever is easiest for you frankly.

11   If you want to take it and add to it or substract from it,

12   that's fine.  If you want to propose something you've used

13   in another case and you've got it on your word processor

14   and everybody is happy with that, just do that.  That's

15   fine.

16             MR. NALVEN:  Thank you.

17             THE COURT:  Sure.

18             All right.  There's a proposal that as of August

19   1st, the end payor plaintiffs serve preliminary

20   production.  Any concerns about that date?

21             MR. MILNE:  No, Your Honor.

22             MR. BUCHMAN:  No, Your Honor.

23             THE COURT:  All right.  We'll stick with that.

24   I do want to set dates for the close of fact discovery,

25   disclosure of experts, summary judgment.  I think, as I
```

1    noted earlier, I think the May 29, 2015 proposed date,

2    that is plaintiffs' proposed date, is optimistic in a case

3    of this sort and I would suggest adding a, you know, four

4    to six months to that anyway.

5              MR. MILNE:  Well, Your Honor, we totally, we

6    agree with you that more time is needed, but we would

7    also -- our view is that it's just so much more efficient

8    because, especially since we are going to be engaging in

9    these, if you will, preemptive targeted discovery

10   activities while the motion is pending, that we have

11   deadlines that key off of your decisions so that, rather

12   than saying here's a date certain, let's make it eight

13   months after the Court has issued its ruling, and

14   similarly with respect to the motion for summary judgment,

15   if Your Honor is interested in scheduling things out

16   beyond that point, that we key things off of when

17   decisions get rendered.

18             THE COURT:  Well, I agree at the very end, in

19   terms of your pretrial memo and the trial date and that

20   sort of thing ought to go off some period of time after

21   ruling on summary judgment, but I guess I disagree on the

22   discovery and the expert disclosure.  I think it's helpful

23   for everybody to know plaintiffs are going to have to

24   disclose their experts on whatever the date is, so we

25   don't get a point where, oh gosh, we didn't know when you

1    were going to rule, Judge, and now I don't have time.

2    And, you know, I see this time and time again.

3            If you have a date, just -- you're going to work

4    toward that date, and so if the date for their disclosure

5    is, whatever, 14 months from now, they know they've got to

6    have an expert disclosed 14 months from now.  So I'd like

7    to get those dates set.

8            So, let me hear if there's any reason why we

9    shouldn't set -- I'll say October 15th, 2015, for fact

10   discovery.

11           MR. BUCHMAN:  Your Honor --

12           THE COURT:  Uh huh.

13           MR. BUCHMAN:  One housekeeping matter, I was

14   looking at my calendar a second ago, with regard to the

15   filing of the consolidated complaint, June 15th I believe

16   is a Sunday.

17           THE COURT:  You don't work on Sunday?

18           (Laughter)

19           MR. MILNE:  Just another workday.

20           MR. BUCHMAN:  Your Honor, would it be all right

21   if we filed it on Monday the 16th?

22           THE COURT:  That would be fine.  I think you're

23   permitted that under the rules.

24           MR. BUCHMAN:  Thank you, Your Honor.

25           MR. MILNE:  Your Honor, with respect to the

1   proposed discovery cutoff, could we -- we really think

2   that 18 months is a realistic timeframe.  I think that

3   would bring us out to the beginning of January.  I think

4   that's more realistic, especially if we're doing dates --

5        MR. NALVEN:  Respectfully, Your Honor, we think

6   the dates we put in our proposal is reasonable, and I'm

7   getting claws on my back from the four to six month

8   extension that you proposed.  So we would ask for less,

9   but --

10        THE COURT:  Right, no, it's my job to make

11   everybody unhappy.  Okay?  So I think this is reasonable.

12   It may be a little aggressive, frankly, it may be that it

13   takes a little bit more time, but let's get into it and

14   see how we do.

15        MR. MILNE:  Very good.

16        THE COURT:  All right.  10/15/15 for fact

17   discovery.  What I think I'd like to do is simply set up

18   two months after that for disclosure of plaintiffs' expert

19   witnesses, and then three months after that for disclosure

20   of defense expert witnesses, which would give a month to

21   take their depositions, and then you'd have another month

22   to take, the plaintiffs would have another month to take

23   the defense expert depositions.  And if we get to the

24   point where we need, we're into rebuttal experts, we'll

25   deal with that at the time, but how does that sound to

1    everybody?

2         MR. SORENSEN:  Your Honor, one clarifying

3    question.  Two months after the close of fact discovery,

4    plaintiffs' expert reports -- one month later, that is,

5    three months after the fact discovery closes, defense

6    reports?  Is that --

7         THE COURT:  Yes.  So it would be 12/15/15 for

8    plaintiffs' expert disclosure and it would be --

9         MR. SORENSEN:  One month later?

10        THE COURT:  1/15/15.  Maybe we should make it

11   1/31 in light of the holidays.  1/31/15, is that enough

12   time?

13        MR. BUCHMAN:  '16.

14        THE COURT:  '16.

15        MR. MILNE:  Your Honor, I thought what you were

16   suggesting is we get a month to take the depositions and

17   then 60 days to, you know, prepare our expert reports and

18   file them.  So we would have had a 90 day gap between when

19   their reports are due -- and I will tell you, just given

20   the number -- if we get there, because we still believe in

21   our motion to dismiss, but if we get there, having been

22   through many of these cases, there are going to be many,

23   many experts.  It is going to be a big exercise to get

24   depositions scheduled and get all of that done and then be

25   ready to file the reports running the other way.

1          THE COURT:  But here's the, I think the reality.

2     You'll have your expert in your pocket.

3          MR. MILNE:  Right.

4          THE COURT:  Right.  Your expert's going to sit

5     there at their expert's depositions, and we'll have a

6     draft report to you, if not before their depositions, a

7     week after their depositions.

8          MR. MILNE:  Well, you know, that hasn't been my

9     experience.  You know, because to a certain extent we're

10    in a reactive mode.  We don't know what their experts --

11    we have an idea but we don't, the getting into it and

12    doing the analyses that they have -- number crunching, for

13    example, will take time --

14         THE COURT:  All right, let's try this.  I hope

15    it works.

16         10/15/15, fact discovery.

17         12/15/15, plaintiffs disclose experts.

18         2/15/16, defendants disclose experts.

19         And their depositions have to be taken by

20    3/15/16.

21         That puts us at summary, filing of summary

22    motions by May 15, 2016.  That's two years from now.  That

23    seems overall to be a reasonable amount of time to get

24    where we have to get.

25         MR. SORENSEN:  Your Honor, if I may, I gather

```
1    we're putting off for a later time the issue of rebuttal

2    reports?  I just wanted to raise one point on that.

3              Under Actavis, in a rule of recent analysis as

4    Actavis mandates, in a typically rule of reason case, as

5    I'm sure you're aware, plaintiffs have the initial

6    showing.  The defendants will come back with whatever they

7    think is cognizable to justify what's at issue.  That

8    would show up logically in those reports.  And then under

9    the rule of reason balancing, you know, analysis that

10   occurs ultimately for a jury, once they come forward with

11   any cognizable co-competitive indications, it would then

12   be our burden and our obligation to respond, and that

13   would logically come at the rebuttal stage.

14             And, so, I just offer that as I think that --

15   whether you want to defer that decision, obviously do as

16   you wish, but that is something that will occur, and so,

17   we just ask you to consider that.

18             THE COURT:  So you want to disclose rebuttal

19   experts, 3/15/16?

20             MR. SORENSEN:  That is --

21             THE COURT:  Or 4/15/16?

22             MR. MILNE:  Logically it would be after they

23   react to ours.

24             THE COURT:  Right.  Well, it's either after the

25   report or it's after the deposition.
```

```
 1                MR. MILNE:  Right.

 2                MR. SORENSEN:  I would ask for after the

 3     depositions.

 4                THE COURT:  All right.  So, 4/15/16, rebuttal

 5     experts.  That pushes off to June 15th, '16, summary

 6     judgment deadline.

 7                Can everybody live with that?

 8                MR. NALVEN:  Yes, Your Honor.

 9                MR. BUCHMAN:  Yes, Your Honor.

10                MR. SORENSEN:  Yes, Your Honor.

11                MR. OPPER:  Yes, Your Honor.

12                MR. MILNE:  Yes, Your Honor.

13                THE COURT:  The trial-oriented deadlines will

14     hold:  Daubert, motions in limine, pretrial memo, et

15     cetera, et cetera.  Okay?

16                Are we generally clear on how discovery is going

17     to work?  Basically we're going to Rule 26 disclosures,

18     defendants are going to disclose what they're ready,

19     willing and able to disclose, and other than that, we're

20     going to work through discovery requests with a 60 day

21     deadline and we'll get objections and we'll take them up

22     in the ordinary course, but I'll know by the time that

23     occurs how strong or weak the motion is.

24                MR. MILNE:  That --

25                THE COURT:  Okay?
```

1              MR. MILNE:  -- we do understand that.

2              THE COURT:  All right.  I think electronic

3     discovery we've pretty much agreed on.

4              Foreign discovery, I'm not hearing anybody

5     saying we need foreign discovery anytime soon, and we'll

6     take that up as it arises.

7              Discovery motion practice.  Let me do, just do a

8     couple things right here.  First off, I do not refer

9     discovery motions to magistrate judges or special masters.

10    The reason I don't do that is because I really hate them.

11    Okay?

12             (Laughter)

13             THE COURT:  And I'll get a lot less of them if

14    you know those two facts, all right?  Okay.  So that's the

15    way I do it.

16             If you have a discovery problem, your obligation

17    under the local rules is to meet and confer.  That doesn't

18    mean sending nasty emails back and forth.  It means

19    actually talk to each other in person, over the phone, via

20    video conference, however you want to do it, but actually

21    talk and try to work out your differences.

22             Whatever you can't work out, or when you can't

23    work it out, and somebody believes they need to go to the

24    Court, contact chambers and we'll talk about how to take

25    it up.  Many things can be taken up in a phone conference.

```
1    Many things cannot be taken up in a phone conference and

2    actually need briefing, but we'll decide whether we need

3    briefing on an individual issue by issue basis, okay?

4    Everybody good with that?

5                MR. MILNE:  Yes.

6                MR. NALVEN:  Very good.

7                THE COURT:  In terms of the phone conferences,

8    one issue I wanted to raise is whether it made sense to

9    schedule a regular phone conference with, at a minimum --

10   well, any counsel who want to be on the phone frankly, it

11   doesn't have to be just the leadership groups, but anybody

12   who wants to be on the phone.  I'm thinking once every 60

13   days, every other month or so.

14               There are going to be issues.  There may be

15   discovery issues, there may be other issues.  I just think

16   if we have a plan for every sixty days we get on the

17   phone, it will just keep things moving.  Otherwise these

18   scheduling --

19               MR. OPPER:  I would endorse that completely,

20   Your Honor.  I think it's helpful to have the guidance of

21   the Court as we're proceeding, and it might even be

22   helpful if we could do them more often than that, but I

23   think 60 days makes a lot of sense.

24               THE COURT:  Okay, so let's do this.  We'll set

25   them up for every 60 days or so, and if anybody wants one
```

```
 1    in the meantime, just follow up with chambers, okay?

 2              MR. SORENSEN:  Your Honor?

 3              THE COURT:  Yes.

 4              MR. SORENSEN:  One thing in the proposed

 5    schedule I don't believe you addressed is class

 6    certification?

 7              THE COURT:  Oh, good.  Yes, yes, we need to take

 8    that up.  When do you want to --

 9              MR. SORENSEN:  We had proposed that we file a

10    motion for class certification at the same time as opening

11    expert reports, since these class motions will rely on

12    those same reports.  And then --

13              THE COURT:  So you're talking about filing class

14    certification 12/15/15?

15              MR. SORENSEN:  Yes.

16              MR. MILNE:  That's fine for the defense side,

17    Your Honor.

18              THE COURT:  All right, that's great.  And that's

19    going to put a number of duplicative timelines on you at

20    the same time.  In other words, you're going to be getting

21    your expert reports and your class cert motion together at

22    the same time, so it may make sense to stagger that by two

23    or three weeks.  Should we do that?

24              MR. SORENSEN:  Sure.

25              THE COURT:  So, how about --
```

 1              MR. SORENSEN:  First week after the New Year?

 2    January 7 or thereabouts?

 3              THE COURT:  Yes, January 7th, '16, for class

 4    cert.  And let's say April 7/16 for the opposition,

 5    because they are going to want to rely on their expert

 6    reports.

 7              MR. MILNE:  That's right.  I'm just looking --

 8    yes, that should work, Your Honor.

 9              THE COURT:  All right.  Okay?  And then any

10    reply would be due May 7.

11              MR. SORENSEN:  I'm sorry, what was that date?

12              MR. OPPER:  May 7.

13              THE COURT:  May 7.  All right?  Assuming

14    those -- I'm sorry?

15              UNKNOWN:  For the indirects, might have a

16    question, they might need more time than that.

17              THE COURT:  Okay.  Concerns?

18              MS. HART:  I don't speak on behalf of the

19    indirects, but perhaps a month is too soon since they will

20    have just reviewed their expert report as well, and we

21    might need to propose their opposition class expert, so

22    perhaps a month on the reply, that might be normal.  If it

23    was simply a brief, it might not be enough of a window of

24    time, but I don't speak on behalf of the -- I speak on

25    behalf of Humana, which may or may not be within the class

```
1    motions at all.  It's just in my experience, that's a very
2    short period of time for a reply brief.
3              THE COURT:  All right.  What is your name?
4              MS. HART:  My name is Barbara Hart.  I represent
5    Humana.
6              THE COURT:  Great.  Okay, I think that's a valid
7    point.
8              MR. BUCHMAN:  Your Honor?
9              THE COURT:  Yes.
10             MR. BUCHMAN:  Michael Buchman for the end payor
11   plaintiffs.  The directs are comfortable with the date
12   that we've discussed and we'll make that work for us as
13   well.  So we'd like to keep the dates with the directs.
14             THE COURT:  Okay, fair enough.  All right, we'll
15   stick with 5/7.
16             All right.  I'm told there are no pending
17   actions in state court that are in any way related to
18   these, is that right?
19             MR. MILNE:  That's our understanding.
20             MR. BUCHMAN:  To our knowledge, no.
21             THE COURT:  All right.  There was an issue -- go
22   ahead.
23             MR. SORENSEN:  I'm sorry.  On summary judgment
24   briefing, which our proposal that was in our proposed
25   order on summary judgment was not only the date that the
```

1    Court sets is the date that they can be filed, that no

2    motions be filed before that date, that it's not just a

3    due date, it's also parties can't unilaterally jump the

4    gun and file before that.

5         We've had that experience in some cases, so

6    that's prompting this.  Obviously if a party feels they

7    have good cause to file something earlier, they can always

8    approach the Court and I would think that would always

9    remain true, but --

10        THE COURT:  Well, you know -- fair enough.  I

11   don't like to tell people they can't file motions when

12   they want to file them.  And you've got 56(d) and you say

13   how can we possibly respond until we've done X, Y, Z.  And

14   so I have an old motion on my docket but I probably will

15   give you the time you want.

16        MR. OPPER:  Okay.

17        MR. SORENSEN:  Fair enough.

18        THE COURT:  Yes.  There was an issue about

19   foreign service.  I think two, two German entities, I

20   believe, have not been served.  And my only thought there

21   is get them served and we're not going to hold up things

22   until they are served.

23        MR. MILNE:  Well then, Your Honor, I think the

24   way we're structuring that should give us time for that to

25   happen.  I'm not sure what I'm rooting for, but --

1        MR. NALVEN:  Your Honor, we have that process,

2   you know, started sometime ago but service in Germany is a

3   complex matter.

4        THE COURT:  No, I understand.  Okay.

5        It's late, it's warm, but we're all here.  Other

6   issues anybody wants to -- I think we've kind of gone over

7   my list, unless I missed something.  Did anybody want to

8   raise anything else?

9        MR. ST. PHILLIP:  Only one thing.  In light of

10  Your Honor's decision on interim appointment, I want to

11  consult with Humana to determine whether it wants to

12  proceed individually or as class representative.  And I'll

13  report --

14        THE COURT:  Well, yes.  That issue is, you mean

15  individually rather than being represented by the --

16        MR. ST. PHILLIP:  Correct.

17        THE COURT:  -- interim lead counsel?

18        MR. ST. PHILLIP:  That is right.

19        THE COURT:  Okay, well, that's fine.

20        MR. ST. PHILLIP:  And if we -- we'll report to

21  Your Honor and if, if Humana does decide to proceed

22  individually, we'd like to be on the same schedule.

23        THE COURT:  Yes, I'm inclined to keep the same

24  schedule whatever your decision.

25        MR. ST. PHILLIP:  Thank you, Your Honor.

1          MR. BUCHMAN:  And, Your Honor, we will at end

2    payors coordinate with counsel for Humana in a collegial

3    and cooperative fashion.

4          THE COURT:  Okay, good.  All right.

5          Anything else we can usefully do today?  Did

6    everybody sign in with my court reporter as appearing

7    here?  I hope so.

8          Have a great Memorial Day weekend and what --

9    actually one last thing before we adjourn.  In setting the

10   schedule for these phone conferences, is there a preferred

11   day of the week, a preferred time of the month?  I mean

12   should I just pick them and then if anybody can't make it,

13   they can find somebody to cover for them?

14         MR. BUCHMAN:  Your Honor, we're currently under

15   a schedule in the Lipitor and Effexor cases that have

16   appearances in front of Judge Sheridan in New Jersey on

17   the first Thursday of every month, so I think we'd prefer

18   not to have that date.

19         MR. MILNE:  At least not the first Thursday of

20   the month.

21         THE COURT:  That's great.  All right, that's

22   helpful.  Great.  All right, be well.  Stand adjourned.

23         (Whereupon the above matter was adjourned at 5:10

24   o'clock, p. m.)

25

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



            /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917) 703-0761