UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE AGGRENOX ANTITRUST LITIGATION | Docket No. 3:14 MD 2516 (SRU) |
| THIS DOCUMENT RELATES TO: ALL DIRECT PURCHASER ACTIONS | **JURY TRIAL DEMANDED** |

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

<u>FILED UNDER SEAL</u>

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................1

II.   JURISDICTION AND VENUE ...............................................9

III.  PARTIES ...................................................................................9

IV.  CLASS ACTION ALLEGATIONS .......................................12

V.   REGULATORY AND ECONOMIC BACKGROUND ...........14

VI.  FACTUAL ALLEGATIONS ..................................................19

     A.    Barr's ANDA and Boehringer's Patent Infringement Suit ....................19

     B.    Barr and Boehringer's Illegal Market Allocation Scheme ...................20

     C.    ███████████████████████████████████████████

     D.    ███████████████████████████████████████████

     E.    An FTC Investigation has Uncovered Evidence That the Settlement Agreements were *Quid Pro Quo* For Barr's Agreement to Delay Generic Entry. ...................27

     F.    Boehringer has Admitted that the Continuing Payments Under the ███████ Agreement Are Compensation and Consideration that Boehringer Gave Barr as Part of the Reverse Payment Settlement Agreement, and that Boehringer would not Have Given Barr the ████████████████ Unless Barr Agreed to Delay the Launch of Its Competing Generic Product. ...................28

     G.    Boehringer and Barr Acted Fully in Accordance with the Agreements ...............30

VII.  ANTICOMPETITIVE EFFECT ............................................32

VIII. ANTITRUST IMPACT .........................................................33

IX.   EFFECT ON INTERSTATE COMMERCE .............................34

X.    MARKET POWER AND RELEVANT MARKET ..................35

XI.   CAUSES OF ACTION ..........................................................38

Direct Purchaser Plaintiffs Miami-Luken, Inc.; Rochester Drug Co-Operative, Inc.; American Sales Company, LLC; and Cesar Castillo, Inc.; (collectively "Plaintiffs") on behalf of themselves and all others similarly situated, bring this Consolidated Amended Class Action Complaint ("Complaint") against Defendants Boehringer Ingelheim Pharma GmbH & Co. KG ("BIPKG"), Boehringer Ingelheim International GmbH ("BI");  and Boehringer Ingelheim Pharmaceuticals, Inc. ("BPI");  (collectively, "Boehringer"); Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Limited (collectively, "Teva"); Barr Pharmaceuticals Inc. ("Barr"); Duramed Pharmaceuticals Inc. ("DPI"); and Duramed Pharmaceuticals Sales Corp. ("DPSC") (collectively "Duramed"); (all defendants collectively, "Defendants") and allege as follows based on: (a) personal knowledge; (b) the investigation of Plaintiffs' counsel, including a review of various court filings and hearing transcripts from *Federal Trade Comm'n v. Boehringer Ingelheim Pharms., Inc.*, No. 09-mc-00564 (JMF) (D.D.C.); and (c) information and belief:

## I.      NATURE OF THE ACTION

1.      This is a civil antitrust action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1-2, seeking treble damages arising out of Defendants' unlawful agreement to exclude generic competition from the market for capsules that combine 200 mg extended release dipyridamole and 25 mg acetylsalicylic acid– a product sold by Boehringer under the brand name Aggrenox. Aggrenox is indicated to reduce the risk of stroke in patients who have had a "mini-stroke" (transient ischemic attack or TIA) or stroke due to blood clot.

2.      Since Aggrenox's approval by the Food and Drug Administration ("FDA") in 1999, Boehringer has been able to charge monopoly prices (and earn monopoly profits) on Aggrenox. By 2008, Aggrenox had U.S. sales of approximately $366 million, which rose to approximately $404 million in 2009.

3.      Because generic versions of brand-name drugs are typically less expensive than their brand-name counterparts, and because purchasers typically switch rapidly from a brand to a generic once the generic becomes available, Boehringer's monopoly prices and profits would quickly come to an end once one or more lower-priced generic versions of Aggrenox entered the market.

4.      On or about May 31, 2007, Barr notified Boehringer that it had filed an Abbreviated New Drug Application ("ANDA") with a Paragraph IV certification (see infra at ¶55) seeking approval to launch a generic equivalent to Aggrenox which threatened to end Boehringer's Aggrenox monopoly profits.  Shortly thereafter, Boehringer sued Barr, alleging that Barr infringed Boehringer's U.S. Patent No. 6,015,577 (the "'577 patent") which expires in January 2017. By so doing, Boehringer triggered an automatic stay of the FDA's approval of Barr's generic Aggrenox product for up to 30 months.  During that patent suit, Barr raised a series of defenses that seriously threatened to invalidate Boehringer's '577 patent. The invalidation of Boehringer's '577 patent would not only enable Barr to start competing with its lower-priced generic Aggrenox product, but would also open the door to competition from other generic manufacturers (including, but not limited to, a less-expensive authorized generic sold by Boehringer itself).

5.      To avoid the loss of its '577 patent, and its Aggrenox monopoly profits, Boehringer and Barr (later acquired by Teva) engineered a scheme whereby Boehringer paid Barr large, unjustified payments in exchange for Barr's agreement to: (a) drop its challenge to Boehringer's '577 patent; and (b) keep Barr's lower-priced generic version of Aggrenox off the market for almost seven (7) years.  Absent the agreement, Barr would have launched its generic product as early as November 30, 2009, when the 30 month stay on FDA's ability to approve

Barr's generic Aggrenox ANDA expired.

6.      In August 2008, Boehringer and Barr entered into a reverse payment settlement

transaction ██████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ and a Co-Promotion

Agreement between Barr subsidiary Duramed and Boehringer (the "Co-Promotion Agreement")

(collectively, the "Reverse Payment Settlement Agreement")—in which Barr agreed to abandon

its challenge to the '577 patent, and not launch its generic version of Aggrenox until July 1,

2015.  In exchange for Barr's agreement to stay off the market until July 1, 2015, Boehringer

gave Barr, via the Reverse Payment Settlement Agreement, among other things, cash payments

and a ████████████████████████████████████████████████████

████████████████████████████████████████████████ The Reverse

Payment Settlement Agreement effectively improperly perpetuated Boehringer's monopoly for

approximately seven years (approximately 82% of the patent's remaining lifespan at the time of

the agreement), even though absent the Reverse Payment Settlement Agreement branded

Aggrenox would have faced generic competition much earlier.

7.      ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ s a vehicle to

provide Barr with large cash payments in exchange for Barr's agreement to delay launching its

generic Aggrenox product until July 1, 2015. These payments were far in excess of the value of

any co-promotion activities performed by Barr/Duramed. ████████████████████████

 Barr/Duramed was expected to receive approximately $120 million over seven years in guaranteed royalty payments in exchange for Barr's agreement not to compete with a generic Aggrenox product until July 1, 2015.

8.     The approximately $120 million being paid over time to Barr/Duramed constitutes a large reverse payment, within the meaning of *FTC v. Actavis, Inc*., 133 S. Ct. 2223 (2013), in that it significantly exceeds the sum of the litigation costs saved by Boehringer in settling the patent litigation and the fair value of the services received by Boehringer in exchange for the payment.

9. █████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████  As the first Paragraph IV
ANDA filer, Barr stood to receive a significant and potentially highly profitable benefit under 21
U.S.C. 355(j)(5)(B)(iv): 180 days of marketing exclusivity during which the FDA would not give
final approval to any other ANDA filer's generic Aggrenox product. The 180-day exclusivity
period could potentially provide Barr with an extremely valuable competitive advantage versus
other generics which would enable Barr to have 100% of the generic sales during this 180-day
period and charge higher generic prices during this period than it could charge in a market with
multiple generics. Furthermore, it is well-known in the industry that generics which can take
advantage of the 180-day exclusivity periods are able to get a "first mover advantage" resulting
in the permanent retention of a larger market share than later entrants, even after other generics
enter the market.

10.    However, the 180-day exclusivity period does not bar the brand company from
selling an "authorized generic" or licensing its product to another company to sell an "authorized
generic." An authorized generic is simply the brand product sold under generic trade dress at a
lower price than the brand.  If the brand company chooses to counter or preempt the initial
generic entry with an authorized generic, it can greatly diminish the first ANDA filer's  potential
profits, because the brand's competing generic product takes a significant amount of generic
sales away from the first filer and force generic prices down (to purchasers' benefit).  Here,
Barr's ability to exclude Boehringer's competing generic product from the market--gained by
agreement--meant that Barr could have higher sales volume at higher prices (to purchasers'

detriment).

11.    Boehringer has

a history of launching such competing authorized generic products, reflecting its understanding

that it financially benefits from doing so.  So abandoning that option was to Boehringer's

financial detriment, unless it was gaining something financially greater from Barr's delayed

market entry of its generic aggrenox product. 

12.    consideration for Barr's agreement to drop its legal challenge to Boehringer's patent

exclusivity, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

pretext for a series of ongoing payments to Barr for entering into, and perpetuating, an unlawful

market allocation agreement pursuant to which Barr agreed not to compete with Boehringer in

exchange for a continuing share of Boehringer's monopoly profits from the sale of Aggrenox.

13.   After reviewing various settlement-related documents, a federal court found that

the Co-Promotion Agreement was an "integral" part of the Reverse Payment Settlement

Agreement.  Boehringer itself has admitted that the Co-Promotion Agreement was tied not only

to the Settlement Agreement but also that: (a) the lucrative Co-Promotion Agreement was "part

of the flow of compensation" and "part of the consideration" that Boehringer gave to Barr for

agreeing to the settlement; and (b) the Co-Promotion Agreement "informed" the settlement terms. Finally, Boehringer has stated that the Co-Promotion Agreement was "inextricably intertwined" with the settlement, and that Boehringer would not have been willing to give Barr the initial and continuing payments under the Co-Promotion Agreement while the parties were in contentious litigation. In other words, Barr's ability to get the valuable $120 million payments through the Co-Promotion Agreement was contingent on its agreeing to settlement terms (and a delayed entry date) that were acceptable to Boehringer.

14.    The purpose and effect of the substantial payments to Barr/Duramed and Teva, ███████████████████████████████████████████ were to compensate Barr for keeping its lower-priced generic product out of the market for a longer period of time than Barr would have otherwise done. █████████████ Boehringer and Barr allocated the market for Aggrenox and its generic equivalents until January 2016. Had Barr refused the initial (and subsequent) payments and launched sooner, it would likely have faced stiff competition: (a) from an authorized generic version of Aggrenox that Boehringer could immediately start selling to compete with Barr[1]; and (b) later, from other generic entrants. This would have caused 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules to behave like a commodity and prices would have dropped for both Barr and Boehringer. Such unrestrained competition would have significantly benefitted consumers who would have purchased lower priced versions of Aggrenox, but it has been far more profitable for Barr and Boehringer to avoid competition and instead split the monopoly profits from Aggrenox.

15.    Despite having received final FDA approval of the ANDA for its generic Aggrenox product in August 2009, Teva (which acquired Barr in December 2009) has not yet

---

[1] Indeed, since brand companies can launch authorized generics at any time, Boehringer could choose to launch just before Barr launched.

launched its generic Aggrenox product in the United States. Absent the payments under the continuing Reverse Payment Settlement Agreement, Teva/Barr would already be competing in the market with a lower priced generic version of Aggrenox because either: (a) Teva/Barr and Boehringer would have agreed to a pro-competitive settlement that did not contain illegal financial inducements and as a result would contain a license with an earlier entry date than July 1, 2015; (b) Teva/Barr would have launched "at-risk" at or shortly after the 30-month Hatch-Waxman stay expired; and/or  (c)Teva/Barr would have prevailed in the patent litigation and then launched. It is well-known in the industry that: (a) Teva (Barr's successor in interest) is the most prolific launcher of generic versions of brand-name drugs at-risk[2], (b) launching at-risk is a core part of Teva's business strategy, (c) Teva possesses insurance covering portions of this risk, and (d) as a multibillion-dollar-per-year company, Teva possesses the financial wherewithal to cover any non-insured losses stemming from an at-risk launch.

16.     Because generic versions of brand-name drugs are typically much less expensive than their brand-name counterparts, and because purchasers typically switch rapidly from a brand to a generic once it becomes available, the wrongful suppression of generic competition, as occurred here, results in enormous overcharge damages to direct purchasers of the drug at issue.

17.     Absent the Reverse Payment Settlement Agreement between Boehringer and Barr/Teva, direct purchasers of Aggrenox would have paid substantially less for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules. Defendants have shared in the illegal profits reaped from this scheme. Defendants' agreement was intended to and has, in fact: (a) precluded entry into the market of less expensive generic versions of 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules in the United States; (b) fixed, raised,

---

[2] *See, e.g*., Press Release, "Teva and Barr Announce Launch of Generic Allegra Tablets By Teva Under Agreement With Barr," available at http://www.tevapharm.com/pr/2005/pr_544.asp.

maintained or stabilized the prices of 200 mg extended-release dipyridamole/25 mg

acetylsalicylic acid capsules; (c) permitted Boehringer to monopolize the market for 200 mg

extended-release dipyridamole/25 mg acetylsalicylic acid capsules in the United States; and

(d) allocated 100% of the 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid

capsule market in the United States to Boehringer.

## II.        JURISDICTION AND VENUE

18.     This Complaint is filed, and these proceedings are instituted, under Section 4 of

the Clayton Act, 15 U.S.C. § 15(a) to recover threefold damages and the costs of suit and

reasonable attorneys' fees, for the injuries sustained by Plaintiffs and other members of the Class

of direct purchasers of Aggrenox resulting from the violation by the Defendants, as hereinafter

alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The jurisdiction of this Court

is based upon 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

19.     Defendants transact business within this District, and the interstate trade and

commerce, hereinafter described, is carried out, in substantial part, in this District. Venue,

therefore, is appropriate within this District under 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and

(c).

## III.        PARTIES

20.     Plaintiff Miami-Luken, Inc. ("Miami-Luken") is a corporation organized under

the laws of Ohio and located at 265 Pioneer Blvd., Springboro, Ohio. During the Class Period, as

defined below, Miami-Luken purchased Aggrenox directly from one or more of the Defendants

and was injured as a result of Defendants' unlawful conduct.

21.     Plaintiff, Rochester Drug Co-Operative, Inc. ("RDC") is a stock corporation duly

formed and existing under the New York Cooperative Corporations Law, with its principal place

of business located at 50 Jet View Drive, Rochester, New York 14624. During the class period,

RDC purchased branded Aggrenox directly from one or more of the Defendants and was injured as a result of Defendants' unlawful conduct.

22.     Plaintiff American Sales Company, LLC ("American Sales") is a Delaware limited liability company with its principal place of business in Lancaster, Erie County, New York. American Sales brings this action on its own behalf and as an assignee of McKesson Corp. ("McKesson"). During the class period, McKesson purchased branded Aggrenox directly from one or more of the Defendants, and American Sales purchased branded Aggrenox from McKesson, and was injured as a result of Defendants' unlawful conduct.

23.     Plaintiff Cesar Castillo, Inc. ("Castillo") is a corporation organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business located at Bo. Quebradas Arena, Rd. #1 Km. 26.0, Rio Piedras, Puerto Rico, 00926. During the class period Castillo purchased branded Aggrenox directly from one or more of the Defendants and was injured as a result of Defendants' unlawful conduct.

24.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG ("BPIKG") is a limited partnership organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

25.     Defendant Boehringer Ingelheim International GmbH ("BII") is a private limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

26.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 900 Ridgebury Road, Ridgefield Connecticut 06877.

27.     Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation, having a

principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania 19454.

28.    Defendant Teva Pharmaceutical Industries, Ltd. is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Israel. Teva is a leading manufacturer of generic drugs, and it is one of the largest sellers of generic drugs in the United States. Teva purchased Barr in 2008, and Barr is now a wholly-owned subsidiary of Teva.

29.    Defendant Barr Pharmaceuticals Inc. ("Barr") is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Prior to 2004, Barr was known as Barr Laboratories, Inc. In 2008, Barr became a wholly-owned subsidiary of Teva.

30.    Defendant Duramed Pharmaceuticals Inc. ("Duramed"), is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Until 2008, Duramed was a subsidiary of Barr. In 2008, when Teva purchased Barr, Duramed became a subsidiary of Teva. Duramed is now known as Teva Women's Health Inc.

31.    Defendant Duramed Pharmaceuticals Sales Corp. ("DPSC") is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Until 2008, DPSC was a subsidiary of Barr. In 2008, when Teva purchased Barr, DPSC became a subsidiary of Teva.

32.    The actions taken by Defendants as described in this Complaint are part of, and were taken in furtherance of, the unlawful scheme alleged herein. These actions were authorized, ordered, and/or done by the Defendants' various officers, agents, employees, or other

representatives while actively engaged in the management of the Defendants' affairs (or the affairs of Defendants' predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

## IV.    CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action on behalf of themselves and, under Rule 23 of the Federal Rules of Civil Procedure, as representative of a class defined as follows:

> All persons or entities in the United States and its territories and possessions including the Commonwealth of Puerto Rico who directly purchased branded or generic Aggrenox from any of the Defendants at any time during the Class Period of November 30, 2009, until the effects of Defendants' conduct ceases (the "Class").

Excluded from the Class are Defendants and their officers, directors, management and employees, predecessors, subsidiaries and affiliates, and all federal governmental entities.

34.    Members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, the members of the Class are widely dispersed throughout the United States and its territories. Furthermore, the Class is readily identifiable from information and records in the possession of Defendants.

35.    Plaintiffs' claims are typical of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of the Defendants; *i.e.*, they have paid artificially inflated prices for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules and were deprived of the benefits of competition from less expensive generic versions of Aggrenox as a result of Defendants' wrongful conduct.

36.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

37.    Plaintiffs are represented by counsel who are experienced and competent in the

prosecution of class action antitrust litigation, particularly class action antitrust litigation in the pharmaceutical industry.

38.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because the Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

39.     Questions of law and fact common to the Class include:

a.      whether the conduct alleged herein constitutes a violation of the antitrust laws;

b.      whether Defendants conspired to suppress generic competition in the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules;

c.      whether Boehringer compensated Barr and/or Teva under the Agreement;

d.      whether the compensation Boehringer paid to Barr and/or Teva was for the purpose of an ongoing agreement to delay generic competition to Aggrenox, thereby prolonging Boehringer's monopoly in the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules;

e.      whether the Reverse Payment Settlement Agreement unlawfully delayed or precluded (and continues to delay or preclude) generic competitors not subject to the Agreement from entering the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules;

f.      whether there are legitimate, non-pretextual, justifications explaining Boehringer's payments to Barr and/or Teva,;

g.      whether the Defendants' conduct harmed competition in the market for

200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules;

       h.    whether Boehringer possessed market or monopoly power over the market for 200 mg extended-release dipyridamole/2 mg acetylsalicylic acid capsules;

       i.    whether the activities of Defendants as alleged herein have substantially affected interstate commerce; and

       j.    whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of its direct purchaser customers in the form of overcharges.

40.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

41.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### V.    REGULATORY AND ECONOMIC BACKGROUND

42.    Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301-392), a manufacturer who creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

43.    In 1984, Congress amended the Food, Drug and Cosmetics Act with the

enactment of the Hatch-Waxman Act ("Hatch-Waxman"). Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA in order to obtain FDA approval. Instead, the FDA provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA"). The ANDA is allowed to rely on the scientific findings of safety and efficacy included by the brand-name drug manufacturer in the original NDA if it is able to demonstrate that the proposed generic drug is "bioequivalent" to the corresponding brand-name drug, meaning it delivers the same amount of active ingredient into the body at the same rate as does the brand.

44.     As a counter-balance, Hatch-Waxman provided the brand-name manufacturer with what is essentially an automatic preliminary injunction, in the form of an up to 30-month stay of FDA approval of generic manufacturer's ANDAs if the brand sues the generic within 45 days of receiving notice of the ANDA.

45.     When the FDA approves a brand-name manufacturer's NDA, it publishes in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents which, according to information supplied to the FDA by the brand-name manufacturer: (1) claim the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1); 21 U.S.C. § 355(j)(7)(A)(iii).

46.     The FDA relies on the manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's representations. The FDA performs only a ministerial act in listing the patents identified by the

manufacturer in the Orange Book.

47.     To obtain FDA approval of an ANDA (and thus the right to sell a generic version of a brand-name drug), a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patent listed in the Orange Book as claiming the brand-name drug. Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

> a.     that no patent for the brand-name drug has been filed with the FDA (a "paragraph I certification");
>
> b.     that the patent for the brand-name drug has expired (a "paragraph II certification");
>
> c.     that the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "paragraph III certification"); or
>
> d.     that the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").

21 .S.C. §355(j)(2)(A)(vii).

48.     If a generic manufacturer files a paragraph IV certification that the listed patent is invalid or will not be infringed, it must promptly give notice to both the NDA owner and the owner of the patent(s) at issue. The filing of an ANDA with a paragraph IV certification gives the patentee standing to sue for patent infringement. 35 U.S.C. § 271(e)(2)(A). If the patent owner initiates an infringement action against the ANDA filer within 45 days after receiving notice of the ANDA, then the FDA may not finally approve the ANDA until the earlier of either 30 months from service of the notice or the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA (commonly called a "30-month stay"). 21 U.S.C. § 355(j)(5)(B)(iii). The patent owner can sue after 45 days, but if the patent

owner fails to file an infringement action within the 45-day period,  it loses the benefit of the 30-month stay and the FDA may grant final approval to the generic manufacturer's ANDA upon satisfying itself as to the safety and efficacy of the generic. Accordingly, the filing of an infringement action within the 45-day window provides the patent owner with the equivalent of an up to 30 month automatic preliminary injunction. Prompt disposition of such an action, as through a motion for summary judgment, may mean more rapid approval for a generic manufacturer subject to such a stay.

49.     To encourage generic manufacturers to challenge branded drug patents and/or design around them, Hatch-Waxman grants the first paragraph IV ANDA filer a 180-day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).  However, the 180-day exclusivity period does not bar an NDA holder from selling an "authorized generic" or licensing their product to another company to sell an "authorized generic", which is simply the brand product sold under generic trade dress at a less expensive price than the brand.

50.     Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts.  This is also typical true of "authorized generics" which are priced significantly below the brand-name counterparts so that the authorized generic can price compete against the first filer and other AB-rated generics.  Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions (including authorized generics) are rapidly and substantially substituted for their brand-name counterparts. When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic

manufacturers, and because the loss of sales volume by the brand-name drug to the corresponding generics is dramatic. According to an FTC study, within one year of generic entry, typically, 90% of prescriptions are filled with the brand's generic substitute, and at prices that "are, on average, 85% lower than the pre-entry branded drug price." FTC, "*Pay for Delay: How Drug Company Pay-Offs Cost Consumers Billions*," January 2010 at 8.

51.     An AB rating is particularly significant to a generic manufacturer because, under the statutory regime enacted by both Congress (*i.e.*, Hatch-Waxman) and most state legislatures (*i.e.*, Drug Product Selection laws, or "DPS laws"), pharmacists may (and, in most states, must) substitute an AB-rated generic version of a drug for the brand-name drug without seeking or obtaining permission from the prescribing doctor unless the doctor has indicated that the prescription for the brand product must be "dispensed as written." Indeed, both Congress and the state legislatures have actively encouraged generic substitution because of their recognition that the economics of the pharmaceutical industry prevent generic manufacturers from simultaneously: (a) engaging in the type of heavy promotion or "detailing" typically done by brand-name manufacturers; and (b) providing the enormous cost savings to purchasers and consumers generated by generic drugs.

52.     Generic competition enables direct purchasers to: (a) purchase generic versions of brand-name drugs at substantially lower prices; and/or (b) purchase the brand-name drug at reduced prices. However, until a generic manufacturer enters the market with an AB-rated generic, there is no bioequivalent generic drug which competes with the brand-name drug, and therefore, the brand-name manufacturer can continue to charge supra-competitive prices profitably without losing all or a substantial portion of its brand-name sales. Consequently, brand-name drug manufacturers have a strong incentive to use various tactics, including the

tactics alleged herein, to delay the introduction of AB-rated generic competition into the market.

## VI.     FACTUAL ALLEGATIONS

A.     **Barr's ANDA and Boehringer's Patent Infringement Suit**

53.     Boehringer is the holder of NDA No. 20-884, under which the FDA granted

approval in 1999 for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules.

The dipyridamole/25 mg acetylsalicylic acid capsules described in Boehringer's NDA are

prescribed to reduce the risk of stroke in patients who have had transient ischemia of the brain or

completed ischemic stroke due to thrombosis (*i.e.*, patients who have previously suffered a

stroke).

54.     Either directly or through affiliates BII and BIPI, Boehringer owns the '577

patent, which issued on January 18, 2000, and is entitled, "Pharmaceutical Compositions

Containing Dipyridamole or Mopidamol and Acetylsalicylic Acid of the Physiologically

Acceptable Salts Thereof, Processes for Preparing Them and Their Use in Treating Clot

Formation." After receiving FDA approval, Boehringer listed the '577 patent in the "Orange

Book" as pertaining to Aggrenox.

55.     In January 2007, Barr submitted ANDA No. 78-804 to the FDA, seeking approval

to market a generic equivalent of 200 mg extended-release dipyridamole/25 mg acetylsalicylic

acid capsules. On or about May 31, 2007, Barr notified Boehringer that it had filed ANDA No.

78-804. Barr's notice letter included a paragraph IV certification that the commercial

manufacture, use and/or sale of its generic Aggrenox product would not infringe any valid claim

of the '577 patent and challenging the validity of the '577 patent. As the first-filer of an ANDA

with a Paragraph IV certification for generic Aggrenox, Barr is potentially entitled to market its

generic Aggrenox for 180 days free of competition from other ANDA-based generic Aggrenox

products. This exclusivity would not, however, protect Barr from competition from a less

expensive authorized generic version of Aggrenox, sold by Boehringer or a licensee of Boehringer under Boehringer's NDA.

56.     On July 11, 2007, Boehringer sued Barr in the United States District Court for the District of Delaware (docketed as 07-cv-00432), alleging that Barr's filing of its ANDA infringed the '577 patent. Boehringer's infringement suit triggered the 30-month stay that prohibited the FDA from granting Barr final approval to launch a generic equivalent of Aggrenox until the earlier to occur of: (1) a final judgment that the '577 patent was invalid or not infringed; or (2) November 30, 2009.  Barr counterclaimed, seeking declaratory judgments that: (1) the '577 patent was invalid; (2) Barr's proposed generic product did not infringe the '577 patent; and (3) the '577 patent was unenforceable for inequitable conduct. Barr's defenses and counterclaims were strong and, absent a settlement, Barr would have prevailed in the litigation.

57.     A Barr patent victory would not only enable Barr to start competing with its lower-priced generic Aggrenox product, but would also open the flood gates to competition from other generic manufacturers (including, but not limited to, a potential authorized generic sold by Boehringer)[3]. Because generic versions of brand-name drugs are typically much less expensive than their brand-name counterparts, and because purchasers typically switch rapidly from a brand to a generic once the generic becomes available, Boehringer's monopoly prices and profits would quickly come to an end once Barr or other lower-priced generic versions of the product entered the market.

**B.    Barr and Boehringer's Illegal Market Allocation Scheme**

_____

[3] While brand companies can launch authorized generics under their NDAs at any time, and do not need to wait for a launch by an ANDA filer, brand companies have no economic reason to launch an authorized generic until facing  (or about to face) competition from an ANDA filer, because otherwise the authorized generic will simply cannibalize the brand sales and drive prices down.

58.     To avoid the loss of its Aggrenox patent and its Aggrenox monopoly profits, Boehringer and Barr engineered a scheme whereby Boehringer paid Barr large and unjustified amounts of money over a seven-year period, with the prospect of additional profits thereafter, as compensation and consideration for Barr: (a) dropping its challenge to Boehringer's '577 patent; and (b) refraining from selling a lower-priced generic version of Aggrenox until as late as July 1, 2015.

59.     On August 11, 2008,  while the litigation was in its early stages, Boehringer and Barr settled the '577 patent litigation, pursuant to which Barr agreed to drop its challenges to the '577 patent and to refrain from launching a generic equivalent of Aggrenox until as late as July 1, 2015.[4] A generic launch date as late as July 2015 would effectively ensure branded Aggrenox's market exclusivity for approximately 82% of the then-remaining patent life on the '577 patent (which expires in January 2017).

60.     In exchange for Barr's agreement to drop its challenge to Boehringer's patent, and forgo selling its generic product in competition with Boehringer's branded Aggrenox product until July, 2015, Boehringer agreed to share with Barr the monopoly profits from sales of branded Aggrenox.  This illegal market allocation was accomplished through: (1) the pretextual Co-Promotion Agreement between Boehringer and Barr subsidiary Duramed, whereby large, unjustified and unexplained payments were made to Barr and/or its affiliates and █████████

---

[4] On the same date, (August 11, 2008) Boehringer and Barr entered a settlement agreement related to another brand drug, Mirapex. Mirapex is used to treat Parkinson's disease and Restless Leg Syndrome. Barr had developed a generic version of Mirapex and was the first generic firm to file with the FDA an ANDA with a paragraph IV certification to Boehringer's Mirapex patent. In response Boehringer filed suit against Barr in relation to Mirapex on September 26, 2005. The Mirapex patent litigation proceeded to trial and on June 26, 2008, the court held that Boehringer's patent was invalid under the doctrine of non-statutory double patenting. Under the terms of the Mirapex settlement agreement, Barr agreed not to compete with Boehringer by forgoing market entry with its generic Mirapex until 2010.

 and the Co-Promotion Agreement

operated in tandem to allocate the market between Boehringer and Barr until as late as January

2016.

 61. The payments promised to Barr were a *quid pro quo* for the litigation settlement.

Thus, Barr could not get the Co-Promotion deal

(and the payments it promised) if it did not agree to Boehringer's settlement terms (including the

delayed entry date).

 62.

██████████████████████████████████████████████████████████

████████████ So long as Barr retained its first-filer status, and Boehringer prevented any

subsequent generic filer from invalidating the '577 patent (which Boehringer could arrange by

not permitting patent infringement suits against subsequent ANDA filers) to proceed to

judgment, Barr could act as a "cork in the bottle" preventing any subsequent generic ANDA

filers from launching. To date, no prospective generic competitor has obtained such a judgment,

and it is unlikely that any such judgment can be obtained prior to July 2015.

63.    Instead of competing, which would have resulted in lower prices of both generic

and branded Aggrenox, Barr and Boehringer agreed, using the Reverse Payment Settlement

Agreement, to keep prices at supracompetitive levels.  Initially, Barr would delay marketing its

generic product for seven years, while Boehringer continued to reap monopoly profits from the

sale of Aggrenox, which were then shared with Barr through ███████████████████

████████████ the Co-Promotion Agreement.

**C.    Under The Co-Promotion Agreement Barr is Paid Well in Excess of the Value of the Services it Provides**

64.    The Co-Promotion Agreement is to run through ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ The Co-Promotion Agreement engages Barr, through

Duramed to promote Aggrenox to doctors and other professionals in the obstetrics and

gynecology fields. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



65.

66.     Boehringer, purportedly sought Duramed' s services because Boehringer claimed it had had "no previous contact" with health care professionals in the obstetrics and gynecology fields.  This could be because "there are no adequate and well-controlled studies of the use of Aggrenox in pregnant women," and pregnant women are warned of possible fetal harm from using Aggrenox and are advised to avoid Aggrenox in their third trimesters and during labor and delivery.

**D.     The Terms of the Supply Agreement Allow Barr to Avoid Generic Competition from Boehringer**

67.     On the date that Barr is permitted, under the Settlement Agreement, to belatedly enter the market with its generic Aggrenox product



68.

69.

---

<sup>5</sup> For example, Boehringer has previously launched its proprietary authorized generics in response to generic competition through its subsidiary Roxanne Laboratories, Inc. ("Roxane") But under this agreement, if Barr ordered product from Boehringer, then Boehringer will not be able to launch its authorized generic through Roxane (or even directly itself).

70.     A brand company's launch of its own competing authorized generic is extremely costly to any first filer generic, such as Barr, because the authorized generic takes away generic sales that otherwise would go to the first filer *and* pushes down generic prices,  The authorized generic also cuts into the first-filer generic's long term "first mover advantage."  As the FTC noted in a June 2009 report on authorized generics, "consumers benefit and the healthcare system saves money during the 180-day exclusivity period when an [Authorized Generic] enters the market, due to the greater discounting that accompanies the added competition provided by the [Authorized Generic]."

71.     ███████████████████████████████████████ ████████████████████████████████████████████████ was an illegal, anticompetitive agreement by which the parties agreed to restrict competition until Boehringer's patent exclusivity expires. On information and belief, BI has launched at least four authorized generics between 1999 and 2012. On information and belief, in at least two of those instances, BI launched an authorized generic through its subsidiary Roxane Laboratories, Inc. On information and belief, these two launches were not the result of the settlement of patent litigation involving the presumed FTF. On information and belief, BI would have launched an authorized generic version of Aggrenox upon market entry by Barr/Teva in the absence of the anticompetitive agreement here.

73.     ████████████████████████████████████████ ████████████████████████████████████████ Boehringer was illegally agreeing to restrain or limit its ability to compete. In its June 2009 report, the FTC  noted:

> To prevent this loss of revenue, a generic may be willing to delay its entry in return for a brand's agreement not to launch an authorized generic – that is, a brand's agreement not to compete with the generic through an AG – during the generic's 180 days of marketing exclusivity…Such

agreements can harm consumers …

███████████████████████████████████████████████████████████

███████████ (a) was tantamount to Boehringer compensating Barr  for the revenue that Boerhinger could have generated from selling  a generic Aggrenox product between July 1, 2015 and January 1, 2016; and (b) would enable Barr to earn profits from higher, supracompetitive generic prices to the detriment of  purchasers.

74.     As  the first Paragraph IV ANDA filer, Barr  was potentially eligible to receive a significant and highly profitable benefit under 21 U.S.C. 355(j)(5)(B)(iv): 180 days of marketing exclusivity during which the FDA would not give final approval to any other ANDA filer's generic 200 mg extended release dipyridamole and 25 mg acetylsalicylic acid product. This would enable Barr to have 100% of the generic sales during this 180 day period and charge higher generic prices during this period than in a market with multiple generics.  But the 180 day exclusivity period does not bar a brand company from selling an "authorized generic" under its NDA either directly or through another company at any time. If a branded company chooses to launch an authorized generic, it will greatly diminish the profit potential of the first ANDA filer's product, which otherwise could have been the sole generic on the market.

**E.     An FTC Investigation has Uncovered Evidence That the Settlement Agreements were *Quid Pro Quo* For Barr's Agreement to Delay Generic Entry.**

75.     Under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), the settlement and commercial agreements were required to be filed with the FTC. On January15, 2009, the FTC opened a formal investigation of the Boehringer-Barr settlement. As a part of that investigation, on February 5, 2009, the FTC issued a subpoena *duces tecum* to Boehringer requiring Boehringer to produce documents and data relating to the patent

litigation regarding Aggrenox; documents regarding sales, profits, and marketing plans for

Aggrenox; documents relating to the agreements between Boehringer and Barr entered at the

time of the settlement of the patent litigations; documents relating to Boehringer's co-marketing

of products (including Aggrenox) with other firms; documents relating to the marketing of

authorized generic versions of Boehringer's products; and analyst reports relating to Aggrenox.

In October 2009, the FTC filed a Petition for an Order Enforcing the Subpoena *Duces Tecum*

against Boehringer in the U.S.D.C. for the District of Columbia. The discovery motion alleges

that Boehringer evaded/frustrated discovery through numerous dilatory tactics and that

Boehringer withheld documents improperly claimed to be privileged – most notably financial

analysis of the co-promotion agreement that Boehringer claims are protected work product

associated with the patent litigation.

77.     The filings in the FTC subpoena enforcement action reveal that the amounts being

paid to Teva/Barr under the continuing Co-Promotion Agreement were not based on the extent to

which to the Teva/Barr promotion services increased Aggrenox's sales.  Rather, as the FTC

stated, "Boehringer agreed to provide Barr with substantial compensation, including royalties

based on net sales of Aggrenox. . . . FTC estimates that the deal would ultimately cost

Boehringer over $120 million in royalties." *See* Memorandum in Support of Petition of the

Federal Trade Commission for an Order Enforcing a Subpoena *Duces Tecum* dated 10/23/2009

(Document No. 1-4), U.S.D.C., D.C., 09-mc-00564, at p. 5 and Brief of Appellant Federal Trade

Commission (Document #1444255), U.S.C.A., D.C. Circuit, Case No. 12-5393, at p. 36.

**F.     Boehringer has Admitted that the Continuing Payments Under the Co-Promotion
         Agreement Are Compensation and Consideration that Boehringer Gave Barr as
         Part of the Reverse Payment Settlement Agreement, and that Boehringer would not
         Have Given Barr the Co-Promotion Agreement Unless Barr Agreed to Delay the
         Launch of Its Competing Generic Product.**

78.     The record in the FTC subpoena enforcement action against Boehringer

underscores the fact that: (a) the idea of the Co-Promotion Agreement arose in conjunction with

the settlement negotiations; (b) the continuing payments under the Co-Promotion Agreement

were "inextricably intertwined with [the] settlement negotiations"; (c) the continuing payments

under the Co-Promotion Agreement were part of "the flow of compensation" and "part of the

considerations of the settlement"; and (d) Boehringer would not have agreed to make the initial

and continuing payments to Barr under the Co-Promotion Agreement if Barr did not agree to

settle the patent case and  delay the launch of its generic version of Aggrenox.For example,

during a December 9, 2011, hearing in connection with the FTC's motion to compel,

Boehringer's lawyer stated:

> We have always said that the Aggrenox co-promote was part of the
> settlement.
>
> It had – It absolutely was. It's plain from the face of the
> documents.

*See* Transcript of 12/09/2011 Status Hearing Before the Honorable John M. Facciola, United

States Magistrate Judge, U.S.D.C., D.C., Case No. 09-mc-00564, at 36:19-21.[6]

80.     He also stated that:

> It was part of the flow of compensation. It was part of the
> considerations of the settlement, and so it is really a
> mischaracterization or misdescription to say that we said it was a
> stand-alone.

*Id.* at 37:1-13.

81.     Magistrate Judge John M. Facciola , in his ruling on the the FTC's petition, found

that the continuing co-promote agreement, with its ongoing substantial payments to Barr, was

"integral" to the settlement:

---

[6] The Transcript of the 12/09/2011 Status Hearing did not become publicly available until
5/15/2012. *See* Case No. 09-mc-00564 (Doc. No. 59).

> BIPI [Boehringer] claims that, while the co-promotion agreement was "freestanding," in that it constituted a separate business arrangement, the terms of the co-promotion agreement were indeed part of the litigation settlement and the two processes informed one another. BIPI asserts that the co-promotion agreement arose during the settlement discussions and, in fact, was part of the settlement.
>
> After reviewing these documents, the status reports and oppositions, and affidavits accompanying the in camera submissions, I agree that the co-promotion agreement was an integral part of the litigation.

See Memorandum Opinion dated 09/27/2012, U.S.D.C., D.C., Case No. 09-mc-00564 (Doc. No.69), at p. 10.

82.     In 2012, the FTC appealed the district court's ruling denying the petition to the Federal Circuit. In its August 28, 2013, appellee brief, Boehringer stated that "it is not difficult to understand why parties engaged in contentious litigation would not otherwise be willing to do business with each other." See Brief of Respondent-Appellee Boehringer Ingelheim Pharmaceuticals, Inc., U.S.C.A., D.C. Circuit, No. 12-5393, at p. 42. What this statement reflects is that Boehringer "would not otherwise be willing" to enter into the co-promotion deal, with its ongoing, lucrative payments to Barr, as long as the patent case was pending – in other words, unless and until Barr agreed to settlement terms that Boehringer found acceptable, Barr would not be able to get the co-promotion deal and the continuing lucrative payments throughout the seven-year delay period. Indeed, the Co-Promotion Agreement was explicitly contingent on execution of the Settlement Agreement, and would have "no force or effect" until the patent litigation was dismissed. Thus, Barr could not get the Co-Promotion deal if it did not agree to Boehringer's settlement terms (including the delayed entry date). Similarly, Boehringer stated in that same brief that the co-promotion arrangement was "inextricably intertwined with settlement negotiations." Id.

G.     **Boehringer and Barr Acted Fully in Accordance with the Agreements**

83.     On August 14, 2008, the Delaware District Court dismissed the Aggrenox patent infringement litigation. The Delaware District Court played no role other than signing the proposed Joint Stipulated Order of Dismissal. The Delaware District Court did not draft the language contained in the proposed order, and it made no changes to the proposed order before signing it on August 14, 2008. Nor did the court hold any hearings or conferences in connection with the dismissal. The Court simply adopted the proposed Stipulated Order of Dismissal.

84.     On December 23, 2008, Barr became a wholly-owned subsidiary of Teva. Teva continued to perform under the terms of the Reverse Payment Settlement. Teva joined the unlawful agreement, collusion and conspiracy with respect to the suppression of generic competition for Aggrenox.

85.     On August 14, 2009, Teva received final FDA approval of ANDA No. 78-804, but continued to refrain from entering the market with a generic equivalent of Aggrenox. Boehringer has continued to make payments to Teva.

86.     During the period from the date of the Reverse Payment Settlement Agreement to the present, Boehringer has more than doubled the price for Aggrenox.

87.     But for the Defendants' ongoing performance under the Reverse Payment Settlement Agreement, generic competition for Aggrenox would have occurred earlier and prices for both branded and generic versions of Aggrenox would have been lower. As of today, there is still no generic equivalent of Aggrenox on the market in the United States.[7] Boehringer

---

[7] A second generic drug manufacturer, Kremers Urban Pharmaceuticals, Inc. ("Kremers") has filed an ANDA with the FDA for approval of a generic version of Aggrenox. On February 1, 2013, Kremers sent a letter to Boehringer notifying Boehringer of its ANDA filing. That letter contained a Paragraph IV certification. On March 14, 2013, Boehringer sued Kremers in the United States District Court for the District of New Jersey claiming infringement of the '577 patent. Neither expiration of the 30 month stay of approval of Kremers' ANDA that resulted

continues to sell branded Aggrenox at artificially inflated prices, and Plaintiffs and other direct purchasers have been overcharged, and will continue to be overcharged until at least July 1, 2015, as a result (and likely thereafter, since the effects of generic competition are not instantaneous).But for Defendants' ongoing, illegal anticompetitive conduct, generic versions of Aggrenox would have become available on or after November 30, 2009, and certainly before the filing of the first complaints in this litigation.  Plaintiffs and other members of the Class would have paid lower prices for Aggrenox. Defendants, by their conduct, have injured Plaintiffs and other members of the Class by causing them to pay hundreds of millions of dollars in overcharges on their purchases of Aggrenox.

## VII.   ANTICOMPETITIVE EFFECT

88.   The Reverse Payment Settlement Agreement has enabled the Defendants to: (a) prevent and delay the entry of less expensive generic versions of Aggrenox products in the United States; (b) fix, raise, maintain, or stabilize the price of Aggrenox products; and (c) allocate 100% of the U.S. market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules to Boehringer; and (d) allocate 100% of the 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsule market in the United States to Boehringer.

89.   Barr's ANDA was finally approved by FDA on August 14, 2009. But for the continuing illegal agreements between Barr and Boehringer ███████████████████████ ████████████████████████████████████████████████████████ Barr would have begun selling a less expensive AB-rated generic version of Aggrenox on or after November 30, 2009 (after the conclusion of the 30 month stay), but prior to the filing of the initial

---

from that suit nor conclusion of the litigation between Boehringer and Kremers is expected to occur prior to July 2015.

complaints in this litigation. Such sales would have occurred via market entry by Barr through: (a) an agreement between Boehringer and Barr which did not include illegal reverse payments to delay generic entry and thus would allow for earlier market entry;(b) a launch "at risk" by Barr upon termination of the 30 month stay on November 30, 2009; and/or (c) a launch after securing victory in the patent litigation. In addition, upon market entry by Barr, Boehringer would have begun selling its own less expensive authorized generic version of Aggrenox in direct competition with the Barr generic. Other ANDA-based generic versions of Aggrenox would have followed into the market as early as 180 days after the launch by Barr.

90.      An increasingly competitive market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules would have thereafter emerged as additional generic manufacturers entered the market.

91.      Defendants' unlawful concerted action has delayed or prevented the sale of generic Aggrenox in the United States, and unlawfully enabled Boehringer to sell Aggrenox at artificially inflated, supra-competitive prices. But for Defendants' illegal, ongoing conduct, generic competition to Aggrenox would have occurred already because one or more of the generic companies would have already entered with its generic version of Aggrenox, and Boehringer would have launched an authorized generic product contemporaneously with the first generic launch.

92.      Thus, Defendants' unlawful conduct deprived Plaintiffs and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## VIII.   ANTITRUST IMPACT

93.      During the relevant period, Plaintiffs and members of the Class purchased substantial amounts of Aggrenox directly from Boehringer.  As a result of Defendants' illegal conduct, Plaintiffs and members of the Class were compelled to pay, and did pay, artificially

inflated prices for their 200 mg extended-release  dipyridamole/25 mg acetylsalicylic acid

capsule requirements.  Those prices were substantially greater than the prices that plaintiffs and

members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the

price of Aggrenox was artificially inflated by defendants' illegal conduct, and (2) Plaintiffs and

Class members were deprived of the opportunity to purchase lower-priced generic versions of

Aggrenox and Plaintiffs and the Class would have purchased such lower-priced generic versions

of Aggrenox in place of branded Aggrenox had they had the opportunity. When generic versions

of Aggrenox are finally available, prices of generic Aggrenox likely will be higher than they

would have been had generic competition begun on or after November 30, 2009 (or prior to the

filing of the initial complaints in this litigation), and so Plaintiffs and the Class will incur

overcharges on their purchases of generic Aggrenox as well.

94.     As a consequence, Plaintiffs and members of the Class have sustained substantial

losses and damage to their business and property in the form of overcharges.  The full amount

and forms and components of such damages will be calculated after discovery and upon proof at

trial.

## IX.     EFFECT ON INTERSTATE COMMERCE

95.     At all material times, Boehringer, manufactured, promoted, distributed, and sold

substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across

state and national lines and throughout the United States, including its territories, possessions

and the Commonwealth of Puerto Rico. During the relevant time period, in connection with the

purchase and sale of Aggrenox, monies as well as contracts, bills and other forms of business

communication and transactions were transmitted in a continuous and uninterrupted flow across

state lines.

96.     During the relevant time period, various devices were used to effectuate the

illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged in this Complaint were within the flow of, and have substantially affected, interstate commerce.

## X.   MARKET POWER AND RELEVANT MARKET

97.     At all relevant times, Boehringer had market power over 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules because it had the power to maintain the price of the drug it sold as Aggrenox at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Aggrenox.

98.     A small, but significant, non-transitory price increase for Aggrenox by Boehringer would not have caused a significant loss of sales to other stroke medications sufficient to make such a price increase unprofitable.

99.     Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product (other than AB-rated generic versions of Aggrenox).

100.     There are no reasonably interchangeable drug products that are available to prescribing physicians for the indications for which extended-release 200 mg dipyridamole/25 mg acetylsalicylic acid capsules are prescribed. Aggrenox has attributes significantly differentiating it from other stroke medications and making it unique. Aggrenox is the only anti-platelet drug that is specifically indicated to reduce the risk of stroke in patients who have had transient ischemia of the brain (mini stroke) or completed ischemic stroke due to thrombosis.

101.     The existence of non-Aggrenox stroke medications did not constrain Boehringer's ability to raise or maintain prices without losing substantial sales, and therefore those other drug products are not in the same relevant antitrust product market with Aggrenox. Therapeutic alternatives are not the same as economic alternatives.

102.      To be a substitute for antitrust purposes, a functionally similar product must exert

sufficient pressure on prices and sales of another product, so that the price of that product cannot be maintained above levels that would be maintained in a competitive market. No other stroke medication (except for AB-rated generic versions of Aggrenox) will take away sufficient sales for Aggrenox to prevent Boehringer from raising or maintaining the price of Aggrenox above levels that would prevail in a competitive market.

103.     Price does not drive prescriptions for stroke medications. The pharmaceutical marketplace is characterized by a "disconnect" between the payment obligation and the product selection. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Aggrenox, to patients without a prescription written by a doctor. This prohibition introduces a disconnect between the payment obligation and the product selection. The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

104.     Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.

105.     Thus, unlike many consumer products where consumers are provided with a choice of functionally similar products at the point of sale and make purchasing decisions primarily based on price, the initial purchasing decision for prescription drugs, such as stroke medications, are made by the physician, not by consumers of those products.

106.     The existence of other stroke medications has not significantly constrained Boehringer's pricing of Aggrenox.

107.     The entry of other brand stroke medications (or generic versions of those other brands) did not take substantial sales from Aggrenox or cause Boehringer to lower its price. By

contrast, the competitive impact of an AB-rated generic version of Aggrenox on brand Aggrenox would be substantial. Among other things, the entry of an AB-rated generic Aggrenox product would deliver hundreds of millions of dollars of savings to consumers.

108.     Boehringer also sold Aggrenox at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

109.     Defendants have had, and exercised, the power to exclude and restrict competition to Aggrenox and AB-rated bioequivalents.

110.     Without the power to exclude and restrict competition to 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules (Aggrenox and AB-rated bioequivalent generics), and ability to sell Aggrenox at prices well in excess of marginal costs, it would not have been economically rational for Boehringer to provide Barr with the large financial inducements for the purpose of delaying Barr's launch of its AB-rated generic Aggrenox product.

111.     Boehringer, at all relevant times, enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

112.     To the extent that Plaintiffs are legally required to prove market power through circumstantial evidence by first defining a relevant product market, Plaintiffs allege that the relevant market is 200 mg extended-release  dipyridamole/25 mg acetylsalicylic acid capsules (*i.e.*, Aggrenox and its AB-rated generic equivalents). During the relevant time, Boehringer has been able to profitably maintain the price of 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules well above competitive levels.

113.     The relevant geographic market is the United States and its territories.

114.     At all relevant times, Boehringer's market share in the relevant market was and

remains 100%. Therefore, at all relevant times, Boehringer had monopoly power.

## XI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### (MONOPOLIZATION AND MONOPOLISTIC SCHEME – BOEHRINGER)

115.   Plaintiffs incorporate and reallege all paragraphs in this Complaint, as though fully set forth below.

116.   Boehringer used various willful and exclusionary means as part of a scheme described herein to improperly maintain and extend its monopoly power in the 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsule market, as detailed above.

117.   The goal, purpose and/or effect of the scheme was to prevent, delay and/or minimize the success of the entry of generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsule competitors which would have sold generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules in the United States at prices significantly below Boehringer's prices for Aggrenox, which would have effectively caused the average market price of 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules to decline dramatically.

118.   The goal, purpose and/or effect of Boehringer's scheme was also to maintain and extend Aggrenox's monopoly power with respect to 200 mg extended-release dipyridamole/25mg acetylsalicylic acid capsules. Boehringer continues to sell branded Aggrenox at artificially inflated prices, and Plaintiffs and other direct purchasers have been overcharged, and will continue to be overcharged until at least July 1, 2015, as a result (and likely thereafter, since the effects of generic competition are not instantaneous).

119.   But for Defendants' ongoing, illegal anticompetitive conduct, generic versions of Aggrenox would have become available on or after November 30, 2009, and certainly before the

filing of the first complaints in this litigation.  Plaintiffs and other members of the Class would have paid lower prices for Aggrenox. Defendants, by their conduct, have injured Plaintiffs and other members of the Class by causing them to pay hundreds of millions of dollars in overcharges on their purchases of Aggrenox.

120.    If manufacturers of generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules had entered the market and competed with Aggrenox in a full and timely fashion, Plaintiffs and the other members of the Class would have substituted lower-priced generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules for the higher-priced brand-name Aggrenox for some or all of their 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules requirements, and/or would have received lower prices on some or all of their remaining Aggrenox purchases.

121.    During the relevant period, the named Plaintiffs and the other Class members have purchased substantial amounts of Aggrenox directly from Boehringer. As a result of Boehringer's illegal conduct alleged herein, Plaintiffs and the other members of the Class have been compelled to pay, and have paid, artificially inflated prices for their 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsule requirements. Plaintiffs and the other members of the Class paid prices for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules that were substantially greater than the prices that they would have paid absent the illegal conduct alleged herein, because: (1) Class members were deprived of the opportunity to purchase lower priced generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules instead of expensive brand-name Aggrenox, which Plaintiffs and the Class would have purchased in place of branded Aggrenox had they had the opportunity; (2) Class members were or will be forced to pay artificially inflated prices for generic 200 mg

extended-release dipyridamole/25 mg acetylsalicylic acid capsules; and/or (3) the price of branded Aggrenox was artificially inflated by Boehringer's illegal conduct.

122.    Boehringer's scheme was in the aggregate an act of monopolization undertaken with the specific intent to monopolize the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules in the United States, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
## (ATTEMPT TO MONOPOLIZE - BOEHRINGER)

123.    Plaintiffs incorporate and reallege all paragraphs in this Complaint, as though fully set forth below.

124.    Boehringer, through its anticompetitive scheme, specifically intended to maintain monopoly power in the relevant market. It was Boehringer's conscious objective to control prices and/or to exclude competition in the relevant market.

125.    The natural and probable consequence of Boehringer's anticompetitive scheme, which was intended by, and plainly foreseeable to, Boehringer, was to control prices and exclude competition in the relevant market, to the extent that it did not succeed.

126.    There was a substantial and real chance, a reasonable likelihood, and/or a dangerous probability that Boehringer would succeed in and achieve its goal of maintaining monopoly power in the relevant market.

127.    As a direct and proximate result of Boehringer's illegal and monopolistic conduct, Plaintiffs suffered antitrust injury as alleged above.

## THIRD CAUSE OF ACTION
## VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
## (CONSPIRACY TO MONOPOLIZE - BOEHRINGER AND BARR/TEVA)

128.    Plaintiffs incorporate and reallege all paragraphs in this Complaint, as though

fully set forth below.

129.    Defendants Boehringer and Barr/Teva combined, conspired and contracted between and among themselves to unreasonably and unlawfully restrain and monopolize trade and to attempt to monopolize trade with specific intent, and Boehringer did, in fact, monopolize trade in the United States in the market for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules; and to eliminate competition in the sale of Aggrenox and its generic equivalents in the United States.

130.    Boehringer and Barr/Teva, their agents and affiliates and co-conspirators, both known and unknown, entered into and engaged in a continuing unlawful trust in restraint of trade and commerce in Aggrenox and its generic equivalents, in violation of the Sherman Act by entering into agreements to extend patent monopolies and to divide markets and allocate customers.

131.    Boehringer and Barr/Teva each committed at least one overt act in furtherance of the conspiracy.

132.    The purpose and effect of such agreements was to fix, raise, stabilize and maintain the prices for Aggrenox and its generic equivalents at supra-competitive levels, which increased prices paid by Plaintiffs and the Class.

133.    During the Class Period, Plaintiffs and the other members of the Class purchased substantial amounts of Aggrenox directly from Boehringer. As a result of Defendants' illegal conduct, alleged herein, Plaintiffs and the other members of the Class have been compelled to pay, and have paid, artificially inflated prices for their 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules requirements. Plaintiffs and the other members of the Class paid prices for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules that were

substantially greater than the prices they would have paid absent the illegal conduct alleged

herein because: (1) Class members were deprived of the opportunity to purchase lower-priced

generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules instead of

expensive brand-name Aggrenox and whould have purchased such lower-priced generic in place

of branded Aggrenox had they had the opportunity; (2) Class members were or will be forced to

pay artificially inflated prices for generic 200 mg extended-release dipyridamole/25 mg

acetylsalicylic acid capsules; and/or (3) the price of brand-name Aggrenox was artificially

inflated by Boehringer's and Barr's/Teva's illegal conduct.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(CONSPIRACY IN RESTRAINT OF TRADE - BOEHRINGER AND BARR/TEVA)**

134.    Plaintiffs incorporate and reallege all paragraphs in this Complaint, as though

fully set forth below.

135.    Boehringer and Barr/Teva, their agents and affiliates and co-conspirators, both

known and unknown, entered into and engaged in a continuing unlawful trust and agreement in

restraint of trade and commerce in Aggrenox and its generic equivalents, in violation of the

Sherman Act by entering into agreements to extend patent monopolies and to divide markets and

allocate customers.

136.    Beginning in or about August 2008, Boehringer and Barr (and successor Teva)

commenced a continuing illegal contract, combination and conspiracy in restraint of trade, the

purpose and effect of which was to: (a) allocate all sales of 200 mg extended-release

dipyridamole/25 mg acetylsalicylic acid capsules in the United states to Boehringer; (b) prevent

the sale of a generic version of 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid

capsules in the United States until as late as July 2015, and thereafter restrict the supply of

generic versions of Aggrenox, thereby protecting Aggrenox from any generic competition; and

(c) fix the price at which Plaintiffs  and the other members of the Class would pay for 200 mg

extended-release dipyridamole/25 mg acetylsalicylic acid capsules at the higher, branded price.

137.    By engaging in this unlawful and continuing conspiracy, Boehringer and

Barr/Teva have unlawfully conspired in restraint of trade and committed a violation of Section 1

of the Sherman Act, 15 U.S.C. § 1.  In the alternative, it is an unreasonable restraint of trade in

violation of Section 1 when viewed under a "rule of reason" mode of analysis. Plaintiffs and the

other members of the Class have been injured in their business and property by reason of

Boehringer's and Barr's/Teva's unlawful contract, combination and conspiracy.

138.    Starting with  the beginning of the Class Period, and continuing throughout the

Class Period, Plaintiffs and the other members of the Class have paid more on their purchases of

200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules than they would have

paid absent Boehringer's and Barr's/Teva's illegal conduct, and/or were prevented from

substituting a cheaper generic alternative for their purchases of the more expensive branded

Aggrenox.

139.    But for the continuing illegal agreements between Barr and Boehringer (which

included financial inducements to delay the launch of a less expensive generic version of

Aggrenox) Barr would have begun selling a less expensive AB-rated generic version of

Aggrenox on or after November 30, 2009 (after the conclusion of the 30 month stay), but prior to

the filing of the initial complaints in this litigation. Such sales would have occurred via market

entry by Barr through (a) an agreement between Boehringer and Barr which did not include

illegal reverse payments to delay generic entry and thus would allow for earlier market entry; (b)

a launch "at risk" by Barr upon termination of the 30 month stay on November 30, 2009; and/or

(c) a launch after securing victory in the patent litigation. In addition, upon market entry by Barr,

Boehringer would have begun selling its own less expensive authorized generic version of Aggrenox in direct competition with the Barr generic. Other ANDA-based generic versions of Aggrenox would have followed into the market as early as 180 days after the launch by Barr..

140.    If manufacturers of generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules entered the market and competed with Aggrenox in a full and timely fashion, Plaintiffs and the other members of the Class would have substituted lower-priced generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules for the higher-priced brand-name Aggrenox for some or all of their 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsule requirements, and/or would have paid lower prices on some or all of their remaining Aggrenox purchases.

141.    During the Class Period, Plaintiffs and the other members of the Class purchased substantial amounts of Aggrenox directly from Boehringer. As a result of Defendants' illegal conduct, alleged herein, Plaintiffs and the other members of the Class have been compelled to pay, and have paid, artificially inflated prices for their 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules requirements. Plaintiffs and the other members of the Class paid prices for 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules that were substantially greater than the prices they would have paid absent the illegal conduct alleged herein because: (1) Class members were deprived of the opportunity to purchase lower-priced generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules instead of expensive brand-name Aggrenox and whould have purchased such lower-priced generic in place of branded Aggrenox had they had the opportunity; (2) Class members were or will be forced to pay artificially inflated prices for generic 200 mg extended-release dipyridamole/25 mg acetylsalicylic acid capsules; and/or (3) the price of brand-name Aggrenox was artificially

inflated by Boehringer's and Barr's/Teva's illegal conduct.

142.    There is, and was, no legitimate, non-pretextual procompetitive justification for Defendants' actions comprising the anticompetitive scheme that outweighs their harmful effect. Even if there were some conceivable such justification, the scheme is and was broader than necessary to achieve such a purpose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed class, pray for judgment against all Defendants, jointly and severally, as follows:

A.    That the Court adjudge and decree that the Defendants and each of them have violated Sections 1 and 2 of the Sherman Antitrust Act;

B.    That the Plaintiffs, and all others similarly situated, be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

C.    That the Plaintiffs be awarded reasonable attorney's fees and costs; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated: June 16, 2014                    Respectfully Submitted

                                        /s/ Gerald C. Pia, Jr,

                                        Gerald C. Pia, Jr.
                                        Brian C. Roche
                                        Roche Pia LLC
                                        Two Corporate Drive, Suite 248
                                        Shelton, CT 06484
                                        Tel: (203) 944-0235
                                        Email: gpia@rochepia.com
                                        broche@rochepia.com

*Interim Co-Liaison Counsel for Direct Purchaser Class Plaintiffs*

Bruce E. Gerstein
Joseph Opper
Ephraim R. Gerstein
Garwin Gerstein & Fisher, LLP
88 Pine Street, 10th Floor
New York, NY 10005
Tel: (212) 398-0055
Email: bgerstein@garwingerstein.com
jopper@garwingerstein.com
egerstein@garwingerstein.com

*Interim Lead Counsel for Direct Purchaser Class Plaintiffs*

David F. Sorensen
Andrew C. Curley
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: dsorensen@bm.net
acurley@bm.net

Thomas M. Sobol
David S. Nalven
Edward Notargiacomo
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Email: tom@hbsslaw.com
davidn@hbsslaw.com
EdwardNotargiacomo@hbsslaw.com

Linda P. Nussbaum
Adam Steinfeld
Grant & Eisenhofer P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8504
Email: lnussbaum@gelaw.com
adamsteinfeld@gmail.com

*Interim Executive Committee for Direct Purchaser*

*Class Plaintiffs*

| | |
|---|---|
| David C. Raphael , Jr.<br>Erin R. Leger<br>Smith Segura & Raphael, LLP<br>3600 Jackson St., Suite 111<br>Alexandria, LA 71303<br>318-445-4480<br>Email: draphael@ssrllp.com<br>eleger@ssrllp.com | Stuart Des Roches<br>Chris Letter<br>Odom & Des Roches, LLP<br>Suite 2020, Poydras Center<br>650 Poydras Street<br>New Orleans, Louisiana 70130<br>504-522-0077<br>Email: sstuard@odrlaw.com<br>cletter@odrlaw.com |
| Peter Kohn<br>Joseph T. Lukens<br>Faruqi & Faruqi - PA<br>101 Greenwood Ave., Suite 600<br>Jenkintown, PA 19003-2793<br>215-277-5770<br>Email: pkohn@farquilaw.com<br>jlukens@faruqilaw.com | Barry S. Taus<br>Archana Tamoshunas<br>Taus Cebulash & Landau LLP<br>80 Maiden Lane, Suite 1204<br>New York, NY 10036<br>646-873-7651<br>Email: btaus@tcllaw.com<br>atamoshunas@tcllaw.com |
| Russell A. Chorush<br>Heim, Payne & Chorush<br>Chase Tower<br>600 Travis<br>Suite 6710<br>Houston, TX  77002<br>713-221-2000<br>Email rchorush@hpcllp.com | Brent W. Landau<br>Hausfeld LLP<br>1604 Locust Street<br>Philadelphia, PA 19103<br>Tel.: (215) 985-3273<br>E-mail: blandau@hausfeldllp.com |

*Counsel for Direct Purchaser Class Plaintiffs*