## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: AGGRENOX ANTITRUST LITIGATION | Docket No. 3:14 MD 2516 (SRU) |
| THIS DOCUMENT RELATES TO:<br><br>HUMANA INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>BOEHRINGER INGELHEIM PHARMA GmbH & CO. KG; BOEHRINGER INGELHEIM INTERNATIONAL GmbH; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; BARR PHARMACEUTICALS, INC. (n/k/a BARR PHARMACEUTICALS, LLC); BARR LABORATORIES, INC.; DURAMED PHARMACEUTICALS, INC. (n/k/a TEVA WOMEN'S HEALTH INC.); DURAMED PHARMACEUTICALS SALES CORP.; TEVA PHARMACEUTICAL INDUSTRIES LTD.; and TEVA PHARMACEUTICALS USA, INC.,<br><br>      Defendants. | Docket No. 3:14-cv-00572 (SRU)<br><br>**[REDACTED]**<br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## [REDACTED] FIRST AMENDED COMPLAINT

# Table of Contents

**Page**

I.     NATURE OF THE ACTION ............................................................... 1

II.    JURISDICTION AND VENUE ........................................................ 3

III.   PARTIES ......................................................................................... 4

IV.   REGULATORY AND ECONOMIC BACKGROUND ....................... 7

     A.     The Hatch-Waxman Act and FDA Approval Process ............ 7

     B.     The Economic Model of Prescription Drug Purchases and Sales ......... 11

V.     FACTUAL ALLEGATIONS CONCERNING DEFENDANTS' ANTITRUST CONSPIRACY AND RESTRAINTS OF TRADE ........................... 13

     A.     Barr's ANDA and Boehringer's Patent Infringement Suit ................ 13

     B.     Barr and Boehringer's Illegal Scheme to Thwart Generic Competition .............. 14

     C.     Boehringer Has Admitted that the Continuing Payments Under the Agreement Were Consideration for Barr's Agreement to Delay the Launch of Its Generic ......................... 19

     D.     Barr's Agreement to Delay Competition for Aggrenox in Exchange for Reverse Payments was Consistent with Its Historical Practices ................................................ 20

VI.   ANTICOMPETITIVE EFFECT ....................................................... 23

VII.   EFFECTS ON INTERSTATE COMMERCE ................................... 23

VIII.   MARKET POWER AND RELEVANT MARKET ........................... 24

IX.   ANTITRUST INJURY .................................................................... 26

X.     FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS .... 27

XI.   CLAIMS FOR RELIEF .................................................................. 28

     FIRST CLAIM FOR RELIEF - For Violations of Section 1 of the Sherman Act .................................. 28

     SECOND CLAIM FOR RELIEF For Conspiracy and Combination in Restraint of Trade Under State Laws ..................................................... 30

THIRD CLAIM FOR RELIEF
Unfair and Deceptive Practices Under State Laws ............................................... 35

FOURTH CLAIM FOR RELIEF
Restitution for Unjust Enrichment ....................................................................... 39

XII.   DEMAND FOR JUDGMENT ......................................................................... 40

XIII.  JURY DEMAND ............................................................................................ 41

Plaintiff Humana Inc. ("Humana"), for its First Amended Complaint ("Complaint") against Defendants Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH, Boehringer Ingelheim Pharmaceuticals, Inc. (collectively, "Boehringer"); Barr Pharmaceuticals, Inc. (n/k/a Barr Pharmaceuticals, LLC) and Barr Laboratories, Inc. (collectively, "Barr"); Duramed Pharmaceuticals Inc.( n/k/a Teva Women's Health Inc.) and Duramed Pharmaceuticals Sales Corp. (collectively "Duramed"); Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc. (collectively "Teva") (Boehringer, Barr, Duramed and Teva are herein collectively referred to as "Defendants"); alleges as follows based on: (a) first-hand knowledge; (b) the investigation of Humana's undersigned counsel; and (c) information and belief:

## I.    NATURE OF THE ACTION

1.    Aggrenox is a brand name prescription drug sold only by Boehringer, containing 200 mg extended release dipyridamole and 25 mg of aspirin (acetylsalicylic acid).  Aggrenox is used to decrease the risk of stroke in patients who have had a stroke or transient ischemic attack (a/k/a a "TIA" or "mini stroke").  Boehringer's patent for Aggrenox is U.S. Patent No. 6,015,577 (the "577 Patent").

2.    Boehringer's United States wholesale list price for a 30-day dose (60 capsules) of Aggrenox is more than $300.  Retail prices for a 30-day dose of Aggrenox for insured patients at the largest national chain pharmacies range from $326–$340.

*See* http.//www.goodrx.com/Aggrenox/price.

3.    Defendant Boehringer and its would be competitors entered into illegal agreements, beginning in August 2008, that have prevented less expensive generic versions of Aggrenox from becoming available in the United States.

4.  As a result of these illegal agreements, there is no generic version of Aggrenox available in the United States.

5.  Humana has paid more than $100 million to purchase Aggrenox in the United States since 2008.

6.  Since the United States Food and Drug Administration ("FDA") approved Aggrenox in 1999, Boehringer has charged monopoly prices for, and earned monopoly profits from, Aggrenox. By 2008, Boehringer's annual U.S. sales of Aggrenox were approximately $330 million, and are currently more than $400 million.

7.  Humana will switch almost all of its purchases of the drug from monopoly-priced brand Aggrenox to a lower-priced generic version once the first generic substitute enters the U.S. market, and will buy even lower-priced generics as more generics come to market and drive the generic price down further.

8.  Humana would have made these switches to generic Aggrenox as soon as it became available if Defendants had not illegally delayed generic competition by entering into a series of agreements, referred to herein as the "Reverse Payment Agreements," which consist of: (i) a "Co-Promotion Agreement" **REDACTED** between Barr's subsidiary Duramed Pharmaceuticals, Inc. and Boehringer Ingelheim Pharmaceuticals, Inc. (the "Co-Promotion Agreement"); (ii) a Settlement Agreement **REDACTED** between Boehringer and Barr Laboratories, Inc. **REDACTED** (the "Patent Settlement Agreement");

**REDACTED**

**REDACTED**

9.  As a result of the Defendants' illegal actions to delay availability of generic Aggrenox, Humana has been injured by having to pay supracompetitive prices for Aggrenox

since August 14, 2008, and Humana will continue to pay supracompetitive prices for Aggrenox until generic versions of Aggrenox become available.

10.     After generic entry belatedly occurs, Humana's purchases of generic versions of Aggrenox will include overcharges resulting from the Defendants' illegal scheme until the market for generic Aggrenox stabilizes to a "steady state," *i.e.*, a market where the prices for 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules are no longer affected by illegally delayed generic competition.[1]

11.     Humana seeks permanent injunctive relief to compel Defendants to forever discontinue actions illegally delaying the availability of generic Aggrenox, damages for its past, present and future overpayments for Aggrenox resulting from such illegal acts, and disgorgement from Defendants of the monies they made that are attributable to Humana's overpayments.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337. Humana asserts claims for relief arising under the laws of the United States, including under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

13.     The Court has supplemental jurisdiction over Humana's pendent state law claims under 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendants, because they are present in the United States and do business in the United States, including specifically the illegal acts complained of by Humana which occurred in the United States and were intended to and do

---

[1] The period beginning August 14, 2008, when Humana should have been able to begin purchasing generic Aggrenox, and extending until the date after which generic Aggrenox is available and the U.S. market for 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules reaches a "steady state," is referred to herein as the "Relevant Period."

restrain commerce throughout the United States.

15.     Defendants transact business within this District, and their interstate trade and commerce regarding Aggrenox is carried out in this District.  Venue, therefore, is appropriate within this District under 15 U.S.C. § 22, and 28 U.S.C. § 1391(b).

### III.     PARTIES

16.     (i) Humana Inc. is a Delaware corporation, with its principal place of business at 500 West Main Street, Louisville, Kentucky.  Humana provides prescription drug benefits to more than five million people throughout the United States through the following managed care subsidiaries: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc., Emphesys Insurance Company, Humana AdvantageCare Plan, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Health Plan, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Regional Health Plan, Inc., Humana Wisconsin Health Organization Insurance Corporation and M.D. Care, Inc.  Humana also purchases prescription drugs, including Aggrenox, at wholesale through its pharmacy subsidiaries, Humana Pharmacy, Inc. and Humana Pharmacy Solutions, Inc., which dispense the drugs to members of the prescription drug plans insured or administered by Humana's managed

care subsidiaries. Humana's subsidiaries have assigned the claims pleaded herein to plaintiff Humana Inc.

17.     Since August 14, 2008, Humana has already paid more than $100 million to purchase Aggrenox at supracompetitive prices in every state in the United States, and Humana will continue to have no choice but to continue to purchase monopoly-priced brand Aggrenox until the Defendants' illegal market allocation scheme ends.

18.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG is a limited partnership organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

19.     Defendant Boehringer Ingelheim International GmbH ("BII"), is a private limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

20.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc ("BIPI"), is a corporation organized and existing under the laws of Delaware, having a principal place of business at 900 Ridgebury Road, Ridgefield Connecticut 06877.

21.     Defendant Teva Pharmaceutical Industries, Ltd. is a corporation organized and existing ender the laws of Isreal, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Isreal ("Teva Israel"). Teva Israel has securities listed on the New York Stock Exchange and conducts business in the United States. Teva Israel is ranked among the 10 top pharmaceutical companies in the world.

22.     Defendant Teva Pharmaceuticals USA, Inc., a Delaware corporation ("Teva USA"), is a subsidiary of Teva Israel, with its principal place of business at 1090 Horsham Road,

P.O. Box 1090, North Wales, Pennsylvania 19454. Teva USA is the largest generic drug company by sales volume in the United States.

23.     Defendant Barr Pharmaceuticals, Inc. (n/k/a Barr Pharmaceuticals, LLC), is a limited liability company organized under the laws of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. In 2008, Barr Pharmaceuticals merged with Teva Israel's wholly-owned subsidiary, Boron Acquisition Corp. (a corporation organized under the laws of Delaware solely for the purpose of effecting the merger with Barr). As a result of the merger, Barr became a privately-held company, wholly-owned by Teva Israel.

24.     Defendant Barr Laboratories, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. As a result of the 2008 merger, Barr Pharmaceuticals Inc. became a wholly-owned subsidiary of Teva Israel.

25.     Defendant Duramed Pharmaceuticals Inc. (n/k/a Teva Women's Health Inc.) ("Duramed Inc."), is a corporation organized under the laws of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. Duramed Inc. was a subsidiary of Barr and by virtue of the 2008 merger, became a subsidiary of Teva Israel.

26.     Defendant Duramed Pharmaceuticals Sales Corp. ("DPSC") is a corporation organized under the laws of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey. DPSC was a subsidiary of Barr and by virtue of the 2008 merger, became a subsidiary of Teva Israel.

27.     Teva Israel, and its U.S. operating subsidiary, Teva USA, have controlled Barr and Duramed since the 2008 merger and directed, participated in, and/or authorized their actions

described herein. The actions taken by Defendants as described herein are part of, and were taken in furtherance of, the unlawful scheme alleged. All such actions were authorized, ordered, and/or done by the Defendants' officers, agents, employees, or other representatives while engaged in the management of the Defendants' affairs (or the affairs of Defendants' predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

28.     As sole stock holder and control person of Barr, Teva Israel is liable for all of Barr's anticompetitive conduct alleged in this Complaint in connection with Aggrenox, and by joining an ongoing unlawful agreement to restrain trade, Teva Israel is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. Teva Israel is also liable for its own unlawful conduct in its role as Barr's control person since its merger, whereby it has allowed and controlled Barr's continuing participation in the conspiracy.

## IV.     REGULATORY AND ECONOMIC BACKGROUND

### A.  The Hatch-Waxman Act and FDA Approval Process

29.     Under the Federal Food, Drug, and Cosmetics Act (21 U.S.C. §§ 301–392), a manufacturer that creates a new, pioneer drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and efficacy of the drug, as well as any information on applicable patents.

30.     In 1984, Congress amended the Food, Drug and Cosmetics Act with the enactment of the Hatch-Waxman Act ("Hatch-Waxman"). Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by replacing for them the lengthy and costly NDA approval process with an expedited Abbreviated New Drug Application ("ANDA")

review process. The ANDA applicant may rely on the safety and efficacy findings of the brand-name drug manufacturer in its NDA if the ANDA demonstrates its proposed generic drug is "bioequivalent" to the corresponding brand-name drug. Bioequivalence requires delivery of the same active ingredient into the body at the same rate as the brand.

31.     As a counter-balance, Hatch-Waxman provided the brand-name manufacturer with the ability, merely by filing a patent infringement lawsuit, to easily obtain what is essentially a preliminary injunction, in the form of an automatic stay of up to 30 months of the FDA's ability to approve a generic manufacturer's ANDA.

32.     When the FDA approves a brand-name manufacturer's NDA, it lists in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents which, according to information supplied to the FDA by the brand-name manufacturer: (1) claim the approved drug or its approved uses; and (2) for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(l); 21 U.S.C. § 355(g)(7)(A)(iii).

33.     To obtain FDA approval of an ANDA the generic manufacturer must certify that it will infringe no patent listed in the Orange Book claiming the brand-name drug, because either:

    a.   no patent for the brand-name drug has been filed with the FDA (a "Paragraph I Certification");

    b.   the patent for the brand-name drug has expired (a "Paragraph II Certification");

    c.   the patent for the brand-name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

d. the patent for the brand-name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV Certification").

21 U.S.C. § 355(g)(2)(A)(vii).

34.     When a generic manufacturer files a Paragraph IV Certification asserting that a patent listed in the Orange Book is invalid or will not be infringed—as is the case here with Aggrenox—it must promptly give notice of its certification to both the brand manufacturer and the owner of the patent. If either files a patent infringement lawsuit against the ANDA filer within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) 30 months after the lawsuit is commenced or (b) the court rules that the patent is invalid or not infringed by the ANDA. 21 U.S.C. § 355(j)(5)(B)(iii).

35.     During the 30-month stay, the FDA may grant "tentative approval" to an ANDA applicant if the FDA determines that the ANDA would otherwise qualify for final approval, but for the 30-month stay.

36.     Hatch-Waxman grants a 180-day period of market exclusivity to the first Paragraph IV ANDA applicant to file a substantially complete ANDA. During the 180-day exclusivity period (measured from the first commercial marketing of the generic or the date of a court decision finding the listed patent invalid, unenforceable, or not infringed, 21 U.S.C. § 355(j)(5)(B)(iv); *see also* 21 C.F.R. § 314.107(c)(1)), the first ANDA filer enjoys six months of freedom from competition from other generic versions of the drug, and during that period can capture almost all of the market for the drug while selling the generic for higher prices than the market will support after additional generics enter the market. However, during the 180 days of exclusivity (and at any time after), the brand drug manufacturer may also market its own generic equivalent of the brand name drug (an "authorized generic" or "AG"), resulting in even more competitive pricing.

37.     Either of these two events—commercial marketing by the first-filer or a court decision finding the patent invalid, unenforceable, or not infringed—triggers the first-filer's 180-day exclusivity.  Conversely, if the first-filer does not commercially market the generic drug and there is no court decision on the relevant Orange-Book-listed patent, the first applicant's 180-day exclusivity period will be delayed indefinitely, ultimately blocking final FDA approval of all subsequent ANDAs.  This block is colloquially referred to as "bottlenecking" or the "statutory block" of a subsequent ANDA.

38.     When an ANDA is approved by the FDA, the generic drug receives an "AB" rating from the FDA, signifying it is bioequivalent to the brand name drug.  Typically, AB-rated generic versions of brand-name drugs are priced significantly below the brand-name counterparts.  Because of the price differentials, and other institutional features of the pharmaceutical market, AB-rated generic versions are rapidly and substantially substituted for their brand-name counterparts.  When multiple generic manufacturers enter the market, prices for generic versions of a brand-name drug predictably decrease much more significantly because of price competition among the generic manufacturers.  The Federal Trade Commission ("FTC") estimates that the price for a generic version of a drug will drop more than 90 percent below the price of the branded product when multiple generics are on the market.  *See, e.g.,* http://www.ftc.gov/sites/default/files/documents/public_statements/pay-delay-settlements-pharmaceutical-industry-how-congress-can-stop-anticompetitive-conduct-protect/090623payfordelayspeech.pdf.

39.     A prescription drug may be dispensed in the United States to a patient only by a licensed pharmacist pursuant to a doctor's prescription which identifies the drug, and the prescription may be filled only with the brand name drug identified or an AB-rated generic

version of the brand name drug. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor.

40. Generic competition enables purchasers like Humana to purchase generic versions of brand-name drugs at substantially lower prices. However, until generic manufacturers enter the market with an AB-rated generic, there is no bioequivalent generic drug which competes effectively with the brand-name drug (like Aggrenox), and therefore, the brand-name manufacturer (here, Boehringer) can continue to charge and even increase supracompetitive prices without losing market share.

## B. The Economic Model of Prescription Drug Purchases and Sales

41. A prescription drug is typically sold in capsule (like Aggrenox) or tablet form by manufacturers to wholesalers, and by wholesalers to pharmacies that dispense the product to patients with prescriptions. The drug passes in unaltered form through the chain from manufacturer to patient. This is the case with Aggrenox.

42. Virtually all United States retail pharmacies have dispensing contracts with virtually every pharmacy benefit plan. Under these contracts, for drugs dispensed to pharmacy benefit plan members, retail pharmacies typically charge the dual endpayers (the third party payer pharmacy benefit plan (the "TPP") and its plan member, *i.e.*, the patient using the drug), a retail price based on (i) a percentage of the published "Wholesale Acquisition Cost ("WAC")," the manufacturer's catalog or list price it reports to First Data Bank (which publishes a compendium of the WACs of virtually all prescription drugs), plus (ii) a pharmacy dispensing fee of $1.00-$5.00 per prescription. The pharmacies collect a co-payment from the individual patient, which typically ranges from $3–$50, and the balance of the retail price from the TPP.

43.     Humana's pharmacy benefit plans, as TPPs, have purchased Aggrenox from pharmacies in every state, in transactions whereby Humana paid the majority of the retail pharmacy price for Aggrenox and the plan member patients paid smaller co-payments. Humana's pharmacy benefit plans continue to purchase Aggrenox from pharmacies in this manner.

44.     Humana also operates pharmacies which have bought, and continue to buy, Aggrenox at supracompetitive prices, which they then dispense to patients with Aggrenox prescriptions that are covered by pharmacy benefit plans insured or administered by Humana.

45.     The wholesale prices Humana's pharmacies pay, and the retail prices Humana and its pharmacy benefit plan members collectively pay, for any prescription drug are directly and inextricably intertwined with the wholesale prices charged by drug manufacturers. This is the case with Aggrenox, where the prices Humana pays are tied to Boehringer's WAC prices.

46.     After AB-rated generic bioequivalents of a branded drug become available, pharmacies can buy and substitute the cheaper generic for the brand drug, and TPPs reduce the price they will pay for either the brand or the generic drug based upon the lower price of the available generic.

47.     Thereafter, the TPP's pharmacy benefit plan members either accept the lower-priced generic (which generally also reduces the amount of his or her co-payment), or else pay a greater share of the price for the brand drug, generally measured by the difference between what the TPP would pay for the generic versus the branded drug.

48.     Some pharmacy benefit plan members have a dual-payment relation whereby, instead of paying a flat co-payment, the member pays a percentage of the prescription cost and the TPP pays the balance.

## V. FACTUAL ALLEGATIONS CONCERNING DEFENDANTS' ANTITRUST CONSPIRACY AND RESTRAINTS OF TRADE

### A. Barr's ANDA and Boehringer's Patent Infringement Suit

49. Boehringer is the holder of NDA No. 20-884, under which the FDA approved in 1999 for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules. The dipyridamole / 25 mg acetylsalicylic acid capsules described in Boehringer's NDA are prescribed to reduce the risk of stroke in patients who have had transient ischemia of the brain or completed ischemic stroke due to thrombosis.

50. Either directly or through affiliates BII and BIPI, Boehringer owns the '577 Patent, which issued on January 18, 2000, and is entitled, "Pharmaceutical Compositions Containing Dipyridamole or Mopidamol and Acetylsalicylic Acid of the Physiologically Acceptable Salts Thereof, Processes for Preparing Them and Their Use in Treating Clot Formation." After receiving FDA approval, Boehringer listed the '577 Patent in the Orange Book as claiming to Aggrenox. The '577 Patent expires on January 17, 2017.

51. On or about January 31, 2007, Barr submitted ANDA No. 78-804 to the FDA, seeking approval to sell 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules as AB-rated generic equivalents of Aggrenox. On or about May 31, 2007, Barr notified Boehringer it had filed ANDA No. 78-804, with a Paragraph IV Certification that the commercial manufacture, use and/or sale of its generic Aggrenox would infringe no valid claim of the '577 Patent. As the first-filer of an ANDA for generic Aggrenox, once its ANDA was approved by the FDA, Barr would have been entitled to market its generic Aggrenox for 180 days free of competition from other ANDA-based generic versions of Aggrenox. However, this exclusivity period would not have insulated Barr from competition by Boehringer with its own, less expensive, authorized generic.

52.     On July 11, 2007, Boehringer sued Barr in the United States District Court for the District of Delaware (Dkt. No. 07-cv-00432), alleging Barr's filing of its ANDA infringed upon the '577 Patent.  Boehringer's infringement suit triggered the automatic stay of the FDA's approval of Barr's generic product, which would remain in effect until the earlier of (i) 30 months or (ii) a court ruling that the '577 Patent was invalid or not infringed or dismissing Boehringer's '577 Patent infringement claims with prejudice.  Barr counterclaimed, seeking Declaratory Judgments that: (1) the '577 Patent was invalid; (2) Barr's proposed generic product did not infringe the '577 Patent; and (3) the '577 Patent was unenforceable for inequitable conduct.

### B. Barr and Boehringer's Illegal Scheme
### to Thwart Generic Competition

53.     On August 11, 2008, in order to avoid (i) adjudication of the invalidity or non-infringement of the '577 Patent, or (ii) the sale of generic Aggrenox in the U.S. after the expiry of the 30-month stay on FDA approval—either of which would have ended Boehringer's Aggrenox monopoly—Boehringer entered into **REDACTED**         Reverse Payment Agreements: (i) the Co-Promotion Agreement between Barr's subsidiary Duramed Inc. and Boehringer ; (ii) the Patent Settlement Agreement between Boehringer and Barr Laboratories, Inc.**REDACTED**

54.     Boehringer and Barr entered into the Reverse Payment Agreements, pursuant to which Barr agreed to drop its challenges to the '577 Patent and to refrain from launching a generic equivalent of Aggrenox for seven (7) years – until as late as July 1, 2015, effectively preserving Boehringer's branded Aggrenox's monopoly for approximately 82% of the then-remaining patent life on the '577 Patent (which expires on January 17, 2017).

55.     Under the Reverse Payment Agreements: (i) Barr agreed to discontinue its

challenge to Boehringer's '577 Patent; (ii) Boehringer agreed to pay **REDACTED** in "co-promotion" payments to Duramed through July 1, 2015, by way of the Co-Promotion Agreement; and (iii) **REDACTED** Barr was granted **REDACTED** permission to launch and market an "authorized generic" of Aggrenox **REDACTED**

**REDACTED** beginning on July 1, 2015

**REDACTED**

56.     The Reverse Payment Agreements preserved Boehringer's Aggrenox monopoly for approximately seven (7) additional years, or approximately 82% of the then-remaining life of the '577 Patent.

57.     Defendants attempted to disguise the market allocation objective of their agreements by characterizing Boehringer's payments to Duramed as consideration for its co-promotion of Aggrenox to obstetricians and gynecologists—doctors who treat a minute fraction of patient populations at risk for strokes and transient ischemic episodes—during the seven-year reverse payment period.

58.     Since August 2008, Boehringer has paid Duramed and Barr approximately $120 million under the Reverse Payment Agreements, and Defendants have delayed the launch of generic Aggrenox in the United States.

59.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") required the Reverse Payment Agreements to be filed with the FTC. On January 15, 2009, the FTC opened a formal investigation of the Boehringer-Barr settlement. As a part of that investigation, on February 5, 2009, the FTC issued a subpoena *duces tecum* to Boehringer requiring Boehringer to produce documents and data relating to the patent litigation regarding Aggrenox; documents regarding sales, profits, and marketing plans for Aggrenox; documents

relating to the agreements between Boehringer and Barr entered when the patent litigation settled; documents relating to Boehringer's co-marketing of products (including Aggrenox) with other firms; documents relating to the marketing of authorized generic versions of Boehringer's products; and analyst reports relating to Aggrenox.

60.     One of the FTC's top priorities in recent years has been to identify and challenge agreements between drug manufacturers to stifle generic competition. According to an FTC study, these anticompetitive deals cost endpayers and taxpayers $3.5 billion annually. *See* http://www.ftc.gov/news-events/media-resources/mergers-and-competition/pay-delay.

61.     In October 2009, the FTC filed a Petition to enforce the subpoena *duces tecum* against Boehringer in the United States District Court for the District of Columbia.

62.     The record from the FTC subpoena enforcement action confirmed that the monies Boehringer agreed to pay Barr under the Reverse Payment Agreements were not based on the extent to which to the Barr promotion services increased Aggrenox's sales, as would be expected with a fair value-for-services promotion agreement. **REDACTED**

# REDACTED

U.S. Federal Trade Commission ("FTC") stated:

> The terms of the co-promotion agreement reveal that it was a significant financial transaction. Under the agreement, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on total U.S. Aggrenox sales for a period of years. . . . In 2008, Aggrenox had total U.S. sales of about $366 million. . . . At this level of sales, the FTC estimates that the deal would ultimately cost Boehringer over $120 million in royalties.

*See Brief of Appellant Federal Trade Commission*, June 28, 2013, Case No. 12-5393 (D.C. Cir.), Dkt. No. 21, at 36, n. 12.

63.     The co-promotion payments were not intended to be fair value for "co-promotion" services, because Boehringer had no reasonable expectation of receiving equivalent financial benefit from the promotion of Aggrenox, a drug for patients who have suffered strokes, to obstetricians and gynecologists.  The FTC observed:

> At the same time [that the parties entered into the settlement agreements], Boehringer partnered with Barr to co-promote Aggrenox to women's health care professionals. Under that arrangement, Boehringer agreed to provide Barr with substantial compensation, including royalties based on net sales of Aggrenox.

*See Memorandum in Support of Petition of the Federal Trade Commission for an Order Enforcing a Subpoena* Duces Tecum, Oct. 23, 2009, Case No. 09- mc-00564 (D.D.C.), Dkt. No. 1-4, at p. 5.

64.     **REDACTED**

# REDACTED

65.     **REDACTED**

# REDACTED

66.     Boehringer's payments to Duramed far exceed the fair value of the services that it could reasonably provide.

67.     Aggrenox is not recommended for use by women who are pregnant, may become pregnant, or are nursing mothers.

68.     Aggrenox has significant health and safety risks for women who are pregnant or may become pregnant, and their unborn babies.

69.     The printed labeling information for Aggrenox approved by the FDA provides: (i) "Because AGGRENOX contains aspirin, AGGRENOX can cause fetal harm when administered to a pregnant woman;" (ii) "There are no adequate and well-controlled studies of the use of AGGRENOX in pregnant women. If AGGRENOX is used during pregnancy, or if the patient becomes pregnant while taking AGGRENOX, inform the patient of the potential hazard to the fetus;" (iii) "Combinations of dipyridamole and aspirin have not been evaluated for effects on fertility and reproductive performance;" and (iv) "Aspirin may produce adverse maternal effects: anemia, ante-or postpartum hemorrhage, prolonged gestation and labor. Maternal aspirin use during the later stages of pregnancy may cause adverse fetal effects: low birth weight, increased incidence of intracranial hemorrhage in premature infants, stillbirths, neonatal death."

70.     The printed labeling information for Aggrenox approved by the FDA also provides the following warning to women: "Tell your healthcare provider right away if you become pregnant while taking AGGRENOX are breast-feeding or plan to breast-feed. AGGRENOX can pass into your milk and may harm your baby."

71.     **REDACTED**

# REDACTED

72.     The amounts that Boehringer agreed to pay to Barr under the Reverse Payment Agreements were also far in excess of the litigation costs that Boehringer could reasonably have expected to incur from continuing to prosecute the '577 Patent litigation against Barr through final judgment.

### C. Boehringer Has Admitted that the Continuing Payments Under the Agreements Were Consideration for Barr's Agreement to Delay the Launch of Its Generic

73.      The record in the FTC subpoena enforcement action against Boehringer reveals:

(a) the co-promotion deal arose during the settlement of the '577 Patent litigation; (b) the "co-

promotion" deal payments were "inextricably intertwined with [the] settlement negotiations,"

part of "the flow of compensation" and "part of the considerations of the settlement" of the '577

Patent litigation; and (c) Boehringer would not have agreed to make the "co-promotion" unless

Barr agreed to the delay the launch of its generic version of Aggrenox.

74.      During a December 9, 2011 hearing in connection with the FTC's motion to

compel, Boehringer' s lawyer admitted:

> We have always said that the Aggrenox co-promote was part of the
> settlement. It had – It absolutely was. It's plain from the face of the
> documents.

*See Transcript of Dec. 9, 2011 Status Hearing Before the Honorable John M. Facciola, United*

*States Magistrate Judge*, Case No. 09-mc-00564 (D.D.C.), at 36:19-21.

39.      He also admitted that:

> The settlement documents make clear that the Aggrenox co-
> promote was part of the settlement, right, and our point has always
> been, look, it's not a quid pro quo in the sense that the FTC says it
> is somehow pernicious because it has independent value, right.
> Even apart from the settlement, it might have made sense to enter
> into the co-promote because both parties got value from that
> agreement, but it was certainly part and parcel of the settlement. **It
> was part of the flow of compensation. It was part of the
> considerations of the settlement and so it is really a
> mischaracterization or misdescription to say that we said it
> was a stand alone**.

*Id*. at 37: 1-13 (emphasis added).

75.      Magistrate Judge John M. Facciola found the continuing co-promotion payments

to Barr were "integral" to the '577 Patent settlement:

> **BIPI [Boehringer] claims that, while the co-promotion agreement was "freestanding," in that it constituted a separate business arrangement, the terms of the co-promotion agreement were indeed part of the litigation settlement and the two processes informed one another. BIPI asserts that the co-promotion agreement arose during the settlement discussions and, in fact, was part of the settlement.**

> After reviewing these documents, the status reports and oppositions, and affidavits accompanying the in camera submissions, I agree that the co-promotion agreement was an **integral part** of the litigation.

*See Memorandum Opinion* dated Sept. 27, 2012, Case No. 09-mc-00564 (D.D.C.), Dkt. No. 69, at p. 10 (emphasis added).

76.     In 2012, the FTC appealed the district court's ruling denying the FTC's petition to the United State Court of Appeals for the Federal Circuit. In its August 28, 2013 appellee brief, Boehringer admitted the Co-Promotion Agreement was "inextricably intertwined with settlement negotiations," of the '577 Patent litigation. *See Brief of Respondent-Appellee Boehringer Ingelheim Pharmaceuticals, Inc.*, Case No. 12-5393 (D.C. Cir.).

### D. Barr's Agreement To Delay Competition For Aggrenox In Exchange For Reverse Payments Was Consistent With Its Historical Practices

77.     These transactions were standard practice for Barr. Bruce Downey (Barr's CEO during the settlement negotiations with Boehringer) acknowledged in a January 17, 2007 written statement to the U.S. Senate regarding the topic, "Paying off Generics to Prevent Competition with Brand-name Drugs: Should It Be Prohibited?":

> Consideration in addition to early entry can be useful in bridging the gap between the generic company's proposed entry date and the branded company's proposed entry date. A branded company that is dead set against an earlier entry date may nevertheless be willing

to provide economic value other than early entry in order to persuade the generic company to accept a later entry date.

*See* http://www.judiciary.senate.gov/hearings/testimony.cfm?id=e655f9e2809e5476862f735dalle

5c9b&witid=e655f9e2809e5476862f735dalle5c9b-2-2.

78.     Downey also gave oral testimony at the Senate hearing on January 17, 2007 in which he admitted the following regarding Barr's practices:

> The collateral agreements that narrow the gap are not always cash payments. In fact, they rarely are in our case. They involve some other asset that has a different value for us than it does the brand. Sometimes, for example, we have purchased a product from the brand at a price we think is favorable - it is an asset that is not key to them-as part of the settlement where we have shortened the patent life. In other cases, we have licensed a patent from a brand as part of a settlement where we have shortened the patent life. In other cases, we have agreed to co-promote products for the brand company as part of the settlement where we have shortened the patent life. In other cases, we have entered into an R&D agreement with a brand company as part of a settlement where we shortened the patent life.

*See* "Paying Off Generics to Prevent Competition with Brand -name Drugs: Should it be Prohibited?" – Hearing Before the Committee on the Judiciary, United States Senate, One Hundred Tenth Congress, First Session, Jan. 17, 2007, Serial No. J-110-4 (U.S. Government Printing Office), at 28, *available at* http://www.gpo.gov/fdsys/pkg/CHRG- 1 10shrg33401/pdf/CHRG- 1 10shrg33401.pdf (emphasis added).

79.     On August 14, 2008, Boehringer's '577 Patent infringement action against Barr was dismissed with prejudice.

80.     On August 14, 2009, Barr received final FDA approval of ANDA No. 78-804.

81.     To date, Barr still has not begun selling its approved generic equivalent of Aggrenox, and Boehringer has continued to make the agreed-upon payments to Duramed, because Boehringer and Barr agreed to do all things reasonably necessary to further the intent

and purposes of the transactions contemplated by the Reverse Payment Agreements.

82. Since entering into the Reverse Payment Agreements, Boehringer has more than doubled the wholesale price for Aggrenox, with the costs paid by Humana's pharmacies, and retail prices have increased commensurately, with those costs paid by Humana's TPP benefit plans.

83. Defendants' Reverse Payment Agreements were intended to, did, and continue to: (a) preclude entry into the U.S. market of less expensive generic versions of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules; (b) enable Boehringer to fix, raise, maintain or stabilize the prices of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules at supracompetitive levels; (c) permit Boehringer to monopolize the market for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in the United States; and (d) allocate 100% of the 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsule market in the United States to Boehringer until July 2015.

84. But for the parties' ongoing performance under the Reverse Payment Agreements, generic competition for Aggrenox would have occurred as early as August 14, 2008, and thereafter the amounts paid by endpayers for the drug would have been lower than they were in 2008. As of today, there is still no generic equivalent of Aggrenox on the market in the United States. Boehringer continues to sell branded Aggrenox at artificially inflated prices, and Humana has been overcharged, and will continue to be overcharged, until there is steady state in the U.S. market for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules, *i.e.*, there is generic competition for Aggrenox unimpeded by the anticompetitive effects of the Defendants' agreement.

85. But for Defendants' ongoing, illegal anticompetitive conduct, Humana would

have paid lower wholesale and retail prices for Aggrenox since as early as August 14, 2008. Defendants, by their conduct, have injured Humana by causing it to overpay tens of millions of dollars for Aggrenox.

## VI.    ANTICOMPETITIVE EFFECT

86.    The Reverse Payment Agreements have enabled the Defendants to: (a) prevent and delay the entry of less expensive generic versions of Aggrenox in the United States; (a) fix, raise, maintain, or stabilize the price of Aggrenox; and (c) allocate among them, and share the profits from, 100% of the U.S. market for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules to Boehringer.

87.    But for the continuing illegal agreements between Barr and Boehringer (which included financial inducements to delay the launch of less expensive generic versions of Aggrenox) Barr would have sold a less expensive AB-rated generic version of Aggrenox on or after August 14, 2008, but prior to the filing of this Complaint. Other ANDA-based generic versions of Aggrenox would have followed into the market 180 days later and/or Boehringer would have launched an authorized generic product contemporaneously with the first generic launch.

88.    Defendants' unlawful concerted action has delayed or prevented the sale of generic Aggrenox in the United States, causing Humana to overpay hundreds of millions of dollars for Aggrenox at Boehringer's artificially inflated, supracompetitive prices.

## VII.    EFFECTS ON INTERSTATE COMMERCE

89.    At all material times, Aggrenox, manufactured and sold by Boehringer, was shipped across state lines and sold to customers located outside its state of manufacture.

90.    During the Relevant Period, in connection with the purchase and sale of

Aggrenox, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

91.     During the Relevant Period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged were within the flow of, and have substantially affected interstate commerce.

## VIII.  MARKET POWER AND RELEVANT MARKET

92.     At all relevant times, Boehringer and Barr have had power over the market for 200 mg extended- release dipyridamole / 25 mg acetylsalicylic acid capsules, which is still available only in the form of brand Aggrenox. Boehringer has had the power to maintain and increase the price of Aggrenox at supracompetitive levels without losing sales, because Defendants have successfully conspired to keep AB-rated generic versions of Aggrenox from reaching the U.S. market at all.

93.     A small, but significant, non-transitory price increase for Aggrenox by Boehringer would not have caused a significant loss of sales.

94.     If Humana is legally required to prove market power through circumstantial evidence by first defining a relevant product market, the relevant market is 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules, *i.e.,* Aggrenox and its AB-rated generic equivalents, which this Complaint will hereafter sometimes refer collectively for shorthand purposes as "Aggrenox therapy."

95.     Aggrenox is available only by doctor's prescription. The doctor's prescription defines the relevant product market, since a prescription for a prescription drug may be filled only with the brand name drug named in the prescription or its AB-rated, FDA-approved generic

equivalent. So if a doctor prescribes "Aggrenox," the prescription may be filled only with brand Aggrenox until there is an AB-rated bioequivalent available.

96. Aggrenox does not exhibit significant, positive cross-elasticity of demand regarding price with any other product, due to the FDA regulatory hurdles incident to securing this rating and laws allowing pharmacists to substitute only AB-rated generics for prescribed brand drugs.

97. There are no interchangeable drug products available to endpayers for prescribed Aggrenox.

98. Boehringer needed to control the output of Aggrenox and its AB-rated generic equivalents only, and no other products, to maintain the price of Aggrenox profitably at supra-competitive prices. Only the market entry of a competing, AB-rated generic version of Aggrenox would render Boehringer unable to profitably maintain its current prices of Aggrenox without losing substantial sales.

99. Boehringer also sold Aggrenox at prices well over marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

100. Defendants have had, and exercised, the power to exclude and restrict competition for Aggrenox therapy.

101. Without the power to exclude and restrict competition to 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules (Aggrenox and AB-rated bioequivalent generics), and ability to sell its own branded version of that drug, Aggrenox, at prices well over marginal costs, it would not have been economically rational for Boehringer to pay Barr up to $120 million to delay Barr's launch of its AB-rated generic Aggrenox.

102. Boehringer and Barr, at all times relevant, have enjoyed the benefits of high

barriers to entry with respect to competition to the above-defined relevant product market due to patent and other regulatory protections.

103.    Boehringer has been able to profitably double the price of Aggrenox therapy to levels well above what they would be in a market unaffected by the Reverse Payment Agreements, all the while increasing its sales. Barr and Duramed have benefited from these price increases and shared Boehringer's monopoly rents, pursuant to the Reverse Payment Agreements.

104.    The relevant geographic markets are (i) the United States and its territories, and (ii) each of the states in which Humana purchased Aggrenox and under whose laws Humana asserts claims for relief. At all times relevant, Boehringer's market share in the relevant market was, and remains, 100%, demonstrating market power.

## IX.    ANTITRUST INJURY

105.    Humana has already spent more than $100 million to purchase Aggrenox during the Relevant Period. Because of the Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for Aggrenox. Those prices have been substantially higher than the prices that Humana would have paid for generic Aggrenox but for the illegal conduct alleged.

106.    As a consequence, purchasers of Aggrenox have sustained substantial losses and damage to Humana's business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

107.    Defendants' efforts to restrain competition in the market for Aggrenox have substantially affected interstate and intrastate commerce throughout the United States.

108.    Excluding generic competitors in the market place prevented price competition for Aggrenox.

109.    Prices for 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules have been and will continue to be  inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.  The inflated prices that Humana has paid and will continue to pay are traceable to, and the foreseeable result of, the overcharges by Boehringer.

## X.    FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

110.    Humana did not know of the terms of Defendants' unlawful self-concealing Reverse Payment Agreements and could not have discovered the conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this complaint.

111.    This is true because Defendants' conspiracy was self-concealing and because the Defendants employed deceptive practices and techniques of secrecy to avoid detection of, and to fraudulently conceal, their contract, combination, and conspiracy. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Humana by, among other things:

a.    Concealing the amounts Boehringer was to pay and paid Barr under the Reverse Payment Agreements;

b.    Concealing that the purpose of the co-promotion payments was to pay Barr to drop its challenge to the '577 Patent and delay entering the market with its generic Aggrenox;

c.    Concealing that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr under the agreement; and

112.    Humana  did not know of the conspiracy more than four years prior to the filing

of this Complaint, nor the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

113. Humana also lacked the facts and information necessary to form a good faith basis for believing any legal violations had occurred, including the amounts of payments made from Boehringer to Barr under the Reverse Payment Agreement. Reasonable diligence by Humana would not have uncovered those facts more than four years prior to the filing of this complaint.

114. Because of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Humana's claims have been tolled.

115. Alternatively, if any statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Humana can recover damages they suffered during the limitations period.

## XI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### For Violations of Section 1 of the Sherman Act

116. Humana incorporates the preceding paragraphs by reference.

117. The Defendants knowingly, intentionally, and conspiratorially engaged in an anticompetitive scheme designed to delay availability of AB-rated generic equivalents of Aggrenox.

118. If Defendants had not illegally agreed not to compete, Humana would have bought lower-priced generic Aggrenox in place of the higher-priced brand name Aggrenox for most of its wholesale and retail purchases, and would have paid lower net prices for brand Aggrenox.

119.     The Defendants achieved a horizontal market allocation of the Aggrenox market, in violation of Section 1 of the Sherman Act.  By their agreement, the Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.  Because of this unreasonable restraint on competition, Humana has paid, and continues to pay, artificially inflated prices for Aggrenox.

120.     Even after generic competition begins, Humana will continue to pay supracompetitive prices for generic versions until the market achieves a steady state.

121.     Humana has suffered harm, and will continue to suffer harm in the future as a result of paying higher prices for Aggrenox and, after it belatedly becomes available, generic Aggrenox, than it would have absent Defendants' anticompetitive conduct and continuing anticompetitive agreements.

122.     Humana has purchased more than $100 million of Aggrenox to date during the Relevant Period.

123.     Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that the Defendants' conduct violates Section 1 of the Sherman Act.

124.     Humana also seeks permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to end forever the anticompetitive market effects caused by the Defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

125.     Humana has no adequate alternative form of relief in the United States for its overpayment for Aggrenox purchased indirectly in the states that do not provide damages remedies to indirect purchasers injured by anticompetitive conspiracies.

126.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for its pharmacies' purchases, directly from a Defendant, or by assignment from a wholesaler that purchased directly from a Defendant, of Aggrenox during the Relevant Period, and for its future overpayments for generic versions of Aggrenox, if and when they belatedly become available.

127.    All Defendants are jointly and severally liable for the violations of Section 1 of the Sherman Act.

## SECOND CLAIM FOR RELIEF

### For Conspiracy and Combination in Restraint of Trade Under State Laws

128.    Humana incorporates the preceding paragraphs by reference.

129.    In 2008, Boehringer, Barr and Duramed entered into the Reverse Payment Agreements to suppress generic competition with Aggrenox.  Teva Israel and Teva USA joined and continued the unlawful agreement to suppress generic competition.  The Reverse Payment Agreements are contracts, a combination, and/or a conspiracy that substantially, unreasonably, and unduly restrained trade in every state and territory in the United States, the purpose and effect of which was to:

    a.    Allocate all sales of Aggrenox and/or generic Aggrenox in the United States to Boehringer until at least July 1, 2015;

    b.    Prevent the availability of a generic equivalent of Aggrenox in the United States until July 1, 2015;

    c.    Enable Boehringer to charge supra-competitive prices for Aggrenox; and

    d.    Enable Barr to charge supra-competitive prices for generic Aggrenox if and when it is launched on or after July 1, 2015.

130.     The Reverse Payment Agreements have harmed and continue to harm Humana.

131.     The Reverse Payment Agreements allocate 100% of the relevant market and harm competition.

132.     The Reverse Payment Agreements are a horizontal market allocation and price fixing agreement between actual and potential competitors and are illegal under state antitrust laws.

133.     There is and was no legitimate, non-pre-textual, pro-competitive business justification for the Reverse Payment Agreements that outweighs their harmful effect.  Even if there were such a justification, the Reverse Payment Agreements are and were broader than necessary to achieve any pro-competitive purpose.

134.     The Defendants' conduct violated, and continues to violate, the following state antitrust or competition practices laws:

    a.    Arizona Rev. Stat. §§ 44-1402, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Arizona.

    b.    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in California.

    c.    D.C. Code Ann. §§ 28-4502, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in the District of Columbia.

    d.    Fla. Stat. §§ 501.201, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Florida, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

    e.    Fla. Stat. §§ 542.15, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Florida.

f.     740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Illinois.

g.     Iowa Code § 553.2, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Iowa.

h.     Haw. Rev. Stat. § 480-1, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Hawaii.

i.     Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Kansas.

j.     Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Massachusetts by Plaintiff, who paid/will pay substantially higher prices for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in actions and transactions occurring substantially within Massachusetts.

k.     Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Maine.

l.     Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Michigan.

m.    Minn. Stat. §§ 325D.51, *et seq.*, and Minn. Stat 8.31, et seq., with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Minnesota.

n.     Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Mississippi.

o.     Neb. Code Ann. §§ 59-801, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Nebraska.

p.     Nev. Rev. Stat. Ann. § 598A.060, *et seq.*, with respect to purchases of 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in Nevada by Plaintiff, who paid/will pay substantially higher prices for 200 mg extended-release dipyridamole / 25 mg acetylsalicylic acid capsules in actions and transactions occurring substantially within Nevada.

q.　N.H. Rev. Stat. Ann. §§ 356, 356:2, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in New Hampshire.

r.　N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in New Mexico.

s.　N.Y. Gen. Bus. Law § 340, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in New York.

t.　N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in North Carolina.

u.　N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in North Dakota.

v.　Ohio Rev. Code Ann. §§ 1331.01(B)(1), *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Ohio.

w.　Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Oregon.

x.　10 L.P.R.A. §§ 251, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Puerto Rico.

y.　R.I. Gen. Laws §§ 6-36-4, *et seq.*, (as amended by 2013 R.I. Pub. Laws, ch. 365), with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Rhode Island.

z.　S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in South Dakota.

aa.　Utah code Ann. §§ 76-10-911, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Utah.

bb.　Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Tennessee by Plaintiff, in that the actions and transactions alleged herein substantially affected Tennessee, whereby Plaintiff paid and will continue

to pay substantially higher prices for 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules at Tennessee pharmacies.

cc. Tex. Bus. & Com. Code Ann. §§ 15.01, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Texas.

dd. Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Vermont.

ee. W.Va. Code §§ 47-18-3, *et seq.*, with respect to Plaintiff's purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in West Virginia.

ff. Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules in Wisconsin by Plaintiff, in that the actions and transactions alleged herein substantially affected and continue to affect the people of Wisconsin, whereby Plaintiff paid and will continue to pay substantially higher prices for 200 mg extended release dipyridamole / 25 mg acetylsalicylic acid capsules at Wisconsin pharmacies

135. Humana purchased Aggrenox in each of these states.

136. Humana has been injured in its business or property by Defendants' antitrust violations. Its injuries comprise (1) being denied the opportunity to purchase lower-priced generic Aggrenox, and (2) paying higher prices for Aggrenox than it would have paid in the absence of Defendants' wrongful conduct. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

137. Defendants are jointly and severally liable for all injuries suffered by Humana.

138. Humana seeks damages and multiple damages as permitted by law for the injuries it suffered because of the Defendants' anticompetitive conduct, and permanent injunctive relief to end forever Defendants' anticompetitive practices alleged in this Complaint.

## THIRD CLAIM FOR RELIEF

### Unfair and Deceptive Practices Under State Laws

139.    Humana re-alleges the preceding paragraphs as though set forth herein.

140.    Defendants' conduct alleged constitutes unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

141.    As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana has been injured and will continue to be injured by being forced to pay higher prices for brand name Aggrenox, and eventually generic Aggrenox, during the Relevant Period.

142.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. §§ 45.50.471, *et seq.*

143.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq.*

144.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code §§ 4-88-101, *et seq.*

145.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§17200, *et seq.*

146.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat §§ 6-1-105, *et seq.*

147.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

148.    Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Fla. Stat. §§ 501.201, *et seq.*

149.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*

150.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code §§ 48-601, *et seq.*

151.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS §§ 505/1, *et seq.*

152.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code §§ 24-5-0.5-1, *et seq.*

153.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. §§ 50-623, *et seq.*

154.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. Ann. §§ 51:1401, *et seq.*

155.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*

156.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. §§ 207, *et seq.*

157.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. §§ 445.901, *et seq.*

158.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325D.43, *et. seq.*, Minn. Stat. §§ 325F, *et seq.*, and Minn. Stat. § 8.31, *et seq.*

159.   Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation of Miss. Code. Ann. §§ 75-24-1, *et seq*.

160.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. §§ 407.010, *et seq*.

161.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq*.

162.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq*.

163.    243.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, et seq

164.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. §§ 358-A:1, *et seq*.

165.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. §§ 57-12-1, *et seq*.

166.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq*.

167.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*.

168.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code §§ 51-15-01, *et seq*.

169.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, *et seq*.

170.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. §§ 201-1, *et seq*.

171.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Stat. Ann. §§ 39-5-10, *et seq.*

172.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws §§ 37-24-1, *et seq.*

173.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code §§ 13-11-1, *et seq.*

174.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code Ann §§ 59.1-196, *et seq.*

175.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*

176.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18; Wis. Stat. §§ 100.20, *et. seq.*

177.     Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of W.Va. Code §§ 46A-6-101, *et seq.*

178.     Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wyo. Stat. Ann. §§ 40-12-101, *et seq.*

179.     Humana purchased Aggrenox in each of these jurisdictions.

180.     Humana has been injured in its business and property by reason of Defendants' anticompetitive, unfair, or deceptive acts alleged in this Count. This injury is of the type the state consumer protection statutes were designed to prevent and proximately results from Defendants' unlawful conduct.

# FOURTH CLAIM FOR RELIEF

## Restitution for Unjust Enrichment
### (Fifty States and the District of Columbia, Except Ohio and Indiana)

181.    Humana incorporates the preceding paragraphs by reference.

182.    To the extent required, this claim is pled in the alternative to the other claims under Federal Rule of Civil Procedure 8(d).

183.    Defendants have benefited from the revenue they have generated from Aggrenox sales made as a result of the acts alleged in this Complaint.

184.    Barr and Teva have benefitted from the acts alleged in this Complaint to the extent of the payments they have received, and continue to receive, under the Reverse Payment Agreements since August 14, 2008 (approximately $120 million in total).

185.    Since August 14, 2008, Humana has paid more than $100 million to buy Aggrenox, all at monopoly prices.

186.    Humana has conferred an economic benefit upon the Defendants in the nature of revenue resulting from payments made during the pendency of the antitrust conspiracy, to Humana's detriment.

187.    The economic benefit of payments made by Humana is a direct and proximate result of Defendants' anticompetitive behavior restricting competition as set forth above.

188.    The benefit held by the Defendants rightfully belongs to Humana, as Humana paid these inequitable sums to Defendants during the Relevant Period, when Defendants used inequitable measures to prevent generic entry into the market.

189.    It would be inequitable for Defendants Barr and Teva to retain any of the proceeds of the Reverse Payment Agreements.

190.    It would be inequitable for the Boehringer Defendants to be permitted to retain

any of the revenue generated from Humana's payments from Aggrenox derived from their unfair, illegal and inequitable methods, acts, and trade practices, including, but not limited to, the Reverse Payment Agreements and the acts alleged herein, designed to prevent introduction by Barr and others of generic bioequivalents to Aggrenox.

191.    It would be futile for Humana to seek a remedy from any party with whom they had or have privity of contract. Defendants have paid no consideration to anyone for any of the illicit and inequitable benefits they received from Humana, except to each other.

192.    Defendants are aware of and appreciate the benefits they obtained inequitably that came from Humana.

193.    Defendants should be compelled to disgorge all proceeds they obtained inequitably as a result of the unjust conduct alleged herein in a common fund for the benefit of Humana.

194.    A constructive trust should be imposed upon all sums the Defendants obtained inequitably that are traceable to Humana.

195.    Humana has no adequate remedy at law.

## XII.    DEMAND FOR JUDGMENT

WHEREFORE, Humana respectfully prays that the Court:

A.    Enter Judgment against Defendants jointly and severally in favor of Humana;

B.    Adjudge and decree the acts alleged herein, pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), to be in violation of the Sherman Act and the state laws identified above;

C.    Award Humana actual damages and multiple damages or punitive damages where available by law in an amount to be determined at trial;

D.      Permanently enjoin the Defendants from continuing their unlawful conduct, to stop their illegal conduct and assure that similar anticompetitive conduct does not occur in the future;

E.      Disgorge from Defendants all sums received inequitably due to their improper conduct and establish a constructive trust over these monies;

F.      Award Humana its costs of suit, including reasonable attorneys' fees as provided by law; and

G.      Grant any such other further relief to which Humana may be entitled and/or is necessary to correct the anticompetitive effects caused by the unlawful conduct of Defendants and as the Court deems just and/or equitable.

## XIII.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Humana demands a trial by jury on all issues so triable.

Dated:   June 16, 2014
White Plains, New York

LOWEY DANNENBERG COHEN
& HART, P.C.

By: /s/ Peter D. St. Phillip
    Peter D. St. Phillip (District of Connecticut
    Bar No. ct29379
    Richard W. Cohen
    Gerald Lawrence
    Noelle Ruggiero
    One North Broadway
    White Plains, New York 10601
    Tel.: 914-997-0500
    Fax: 914-997-0035

RAWLINGS & ASSOCIATES PLLC
Mark D. Fischer
Robert Griffith
One Eden Way
LaGrange, KY 40031-8100
Telephone: 502-587-1279

*Attorneys for Plaintiff*