UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE AGGRENOX ANTITRUST LITIGATION | CASE NO: 3:14-md-2516-SRU |
| | JURY TRIAL DEMANDED |
| THIS DOCUMENT RELATES TO: ALL END PAYOR CLASS ACTIONS | CLASS ACTION |

## END-PAYOR CONSOLIDATED CLASS ACTION COMPLAINT

End-Payor Plaintiffs A.F. of L. – A.G.C. Buildings Trade Welfare Plan; AFSCME District Council 47 Health and Welfare Fund; AGC-International Union of Operating Engineers Local 701 Health & Welfare Trust Fund; International Union of Operating Engineers Local 49; International Union of Operating Engineers Local 132 Health and Welfare Fund; Man-U Service Contract Trust Fund; NECA-IBEW Welfare Trust Fund; Painters District Council No. 30 Health & Welfare Fund; Pipefitters Union Local No. 537 Health & Welfare Fund; Plumbers and Pipefitters Local 178 Health & Welfare Trust Fund; School Cafeteria Employees Local No. 634 Health and Welfare Fund; Twin City Iron Workers Health and Welfare Fund; United Food and Commercial Workers Local 1776 & Participating Health and Welfare Fund; and Welfare Plan of the International Union of Operations Engineers Locals 137, 137A, 137B, 137C, and 137R; (together, the "End-Payor Plaintiffs") on behalf of themselves and all others similarly situated, file this Consolidated Class Action Complaint against defendants Teva Pharmaceuticals USA, Inc., Teva Pharmaceuticals Industries Limited ("Teva"), Barr Pharmaceuticals Inc., Barr Laboratories, Inc. ("Barr"), Duramed Pharmaceuticals Inc., Duramed Pharmaceuticals Sales Corp. ("Duramed"), Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH, and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"), (together,

the "Defendants") and allege as follows based on (a) personal knowledge; (b) the investigation of counsel; and (c) information and belief.

## I.     NATURE OF THE ACTION

1.      This is a civil indirect purchaser antitrust class action seeking treble damages and other relief arising out of Defendants' anticompetitive agreements to allocate the market for 25 mg aspirin/200 mg extended-release dipyridamole capsules, which is sold by Boehringer under the brand name Aggrenox. Aggrenox is a combination antiplatelet agent used to reduce the risk of stroke in patients who have already suffered a "mini-stroke" (or transient ischemic attack) or a completed ischemic stroke due to thrombosis (i.e., blood clot).  Boehringer received approval to manufacture, market and sell Aggrenox in the United States from the United States Food and Drug Administration ("FDA") in 1999.

2.      Defendants have entered into an unlawful "reverse payment agreement" through which Boehringer paid Barr more than $120 million in cash and other valuable consideration in exchange for Barr's agreement not to launch a less expensive, bio-equivalent generic version of Aggrenox for up to seven years. No bio-equivalent generic version of Aggrenox is presently on the market and no generic will come to market until July 2015 as a direct and proximate result of Defendants unlawful market allocation agreement.  Simply put, this agreement not to compete has prevented less expensive generic versions of Aggrenox from entering the market, causing End-Payor Plaintiffs and the End-Payor Class (as defined below) to pay overcharges. Since 1999, Boehringer has charged supracompetitive prices and reaped a steady source of profits from Aggrenox, with sales reaching approximately $400 million.

3.      On February 1, 2007, Barr sought regulatory approval to manufacture, market and sell a generic version of Aggrenox before the expiration of any patents associated with Aggrenox

by filing an Abbreviated New Drug Application ("ANDA") with the FDA. As the first filer of a substantially complete generic Aggrenox ANDA, Barr may be entitled to 180 days of market exclusivity during which it is free from competition from other Aggrenox generics – with the exception of an authorized generic marketed by the brand company, Boehringer.

4. Boehringer sued Barr, alleging that Barr's generic Aggrenox product would infringe Boehringer's U.S. Patent No. 6,015,577 (the "'577 Patent")—even though the '577 Patent was likely invalid and/or unenforceable and thus unlikely to prevent any generic Aggrenox product from coming to market in advance of patent expiration in January 2017. Boehringer sued Barr solely to obtain an automatic stay under the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman Act") which prevented the FDA from approving Barr's generic Aggrenox product for up to thirty months.

5 Boehringer, however, had a problem. It could not rely on the weak '577 Patent to prevent generic competition to Aggrenox once the automatic stay of FDA approval of Barr's ANDA expired. And if it continued litigating its patent case against Barr, an invalidity or unenforceability ruling would have opened the floodgates to competition from Barr and other generic manufacturers.

6. Generic versions of brand drugs are typically priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical industry, generic versions are liberally and substantially substituted for their brand counterparts. As a result, Boehringer knew that the entry of one or more generic versions of Aggrenox would cause a drastic loss of its Aggrenox monopoly profits.

7.      To eliminate the risk that generic entry would devastate Aggrenox profits and to ensure its monopoly, Boehringer elected to share its monopoly profits with Barr in exchange for Barr's promise to drop its challenge to the '577 Patent and stay out of the market with a less expensive, bioequivalent generic version of Aggrenox for approximately seven years.  More specifically, on or about August 11, 2008, Boehringer and Barr entered a non-competition agreement (the "Exclusion Payment Agreement" or "Agreement"). Under this Agreement, Boehringer agreed to pay Barr in exchange for Barr's commitment to delay marketing generic Aggrenox until as late as July 1, 2015.  Boehringer's payment took two forms: (a) cash payments provided under the guise of a co-promotion agreement – an estimated $120 million in one-time and yearly royalty payments – that far exceed the fair value of the services provided by Barr; and (b) an agreement not to compete against Barr's generic Aggrenox product with Boehringer's own generic Aggrenox product once generic entry belatedly occurs.

8.      As a result of the Agreement, including the large unjustified payments from Boehringer to Barr provided for therein, Barr (and its successor Teva) has, in fact, delayed marketing less expensive generic Aggrenox, and continues to do so, despite having final FDA approval to market generic Aggrenox since August 2009.  And once generic entry finally occurs, consumers and other purchasers will still be paying artificially inflated prices because the Agreement eliminates inter-generic competition between Boehringer and Barr.  The purpose and effect of Boehringer's payments to Barr was to restrain competition in the market for Aggrenox and its AB-rated generic equivalents from the time of possible generic entry through the expiration of the '577 Patent.

9.      But for the Agreement, less expensive, generic versions of Aggrenox would have been available to End Payor Plaintiffs as early as November 2009. Had Boehringer not paid Barr

to drop its challenge to the '577 Patent and stay out of the market, Barr would have already launched its less expensive generic Aggrenox: (a) "at-risk" (i.e., while the patent litigation was pending); (b) upon winning the patent litigation; or (c) pursuant to a lawful settlement agreement without a large unjustified payment from Boehringer to Barr. Absent the Agreement, immediately upon Barr's launch, Boehringer, as a rational economic actor seeking to recoup lost branded sales, would have launched an authorized generic Aggrenox in competition with Barr, driving down prices even further.

10. The Agreement has caused and is causing End-Payor Plaintiffs and the proposed End-Payor Class to pay substantially more for 25 mg aspirin/200mg extended-release dipyridamole capsules than they would have absent Defendants' anti-competitive conduct. Defendants have shared in the illicit profits that have resulted from the artificially-inflated prices End-Payor Plaintiffs paid for Aggrenox.

11. Defendants' Exclusion Payment Agreement was designed to and did in fact: (a) delay the entry of less expensive generic versions of Aggrenox; (b) fix, raise, maintain or stabilize the price of 25 mg aspirin/200 mg extended-release dipyridamole capsules; and (c) allocate 100% of the market for 25 mg aspirin/200 mg extended-release dipyridamole capsules to Boehringer for up to seven years. Moreover, once generic Aggrenox entry finally occurs, the Agreement is designed to and will allocate 100% of the generic segment to Barr during the 180-day exclusivity period (July 2015 to January 2016) and reduce inter-generic competition for the remainder of the 577 Patent's term.

12. End-Payor Plaintiffs bring this action on their own behalf and on behalf of a proposed End-Payor Class comprised of consumers and third-party payors who indirectly purchased, paid and/or provided reimbursement for Aggrenox, other than for resale, since

November 30, 2009. End-Payor Plaintiffs seek a judgment declaring that the Exclusion Payment Agreement is unlawful under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1, 2. End-Payor Plaintiffs also seek an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, because, unless enjoined, the Defendants' unlawful conduct will continue unchecked and End-Payor Plaintiffs will continue to suffer financial harm as a result of Defendants' antitrust violations. End-Payor Plaintiffs also assert claims for compensatory and treble damages and equitable relief for continuing violations of state antitrust, consumer protection and unjust enrichment laws.

## II.     <u>JURISDICTION AND VENUE</u>

13.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the proposed class, and at least one member of the proposed class is a citizen of a state different from that of one of the Defendants.

14.     This Court also has jurisdiction over this matter under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 because End-Payor Plaintiffs bring claims under section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy the Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over End-Payor Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court has jurisdiction over Defendants because they are present in the United States, do business in the United States, have registered agents in the United States, may be found in the United States, and are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

16.     Venue is appropriate within this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §1391(b) and (c), because Defendants transact business within this district and because their interstate trade and commerce is carried out in substantial part in this district.  In addition, one of the Defendants is headquartered in this district and this action has been transferred to this division by the Judicial Panel on Multidistrict Litigation.

## III.     PARTIES

### A.     Plaintiffs

17.     A.F. of L. – A.G.C. Buildings Trade Welfare Plan (the "AFL Plan") is a welfare benefit plan with its principal place of business in Mobile, Alabama. The AFL Plan represents participants who have family coverage and indirectly purchased, paid and/or provided reimbursement for Aggrenox. During the Class Period, the AFL Plan and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. The AFL Plan sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Illinois, Pennsylvania, Texas and West Virginia during the class period.

18.     AFSCME District Council 47 Health and Welfare Fund ("AFSCME") is a trust Established and administered under the laws of the Commonwealth of Pennsylvania. It is a "governmental plan" as that term is defined in Section 3(32) of the Employee Retirement Income Security Act of 1974, as amended 29 USC 1002(32,) and Section414(d) of the Internal Revenue Code, 26 USC 414(d).  During the Class Period, AFSCME  and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. AFSCME sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in New Jersey, Pennsylvania, and Texas during the class period.

19.     AGC-International Union of Operating Engineers Local 701 Health & Welfare Trust Fund ("AGC") is a Taft-Hartley Trust Fund created pursuant to written collective bargaining agreements which are organized and existing pursuant to Section 302 of the LMRA (29 USC§ 186). AGC is also a multi-employer "employee benefit plan" for purposes of 29 USC § 1132(d)(1), in that it is established and maintained for the purpose of providing medical needs of employees and employers within the purposes of the Trust Fund.  Plaintiff has its principal place of business in Gladstone, Oregon and provides health benefits, including prescription drug benefits, to its active participants, plus their spouses and dependents. During the Class Period, AGC and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. AGC sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Oregon and Washington during the class period.

20.     International Union of Operating Engineers Local 49 Health and Welfare Fund ("Local 49") is a Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in Roseville, Minnesota, and  an employee welfare benefit plan as defined in Section 3(1) of ERISA.  Local 49 provides health benefits, including prescription drug benefits, to approximately 32,000 active participants and retirees, plus their spouses and dependents. During the Class Period, Local 49 and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Local 49 sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Florida, Minnesota, North Dakota and Wisconsin during the class period.

21.     International Union of Operating Engineers Local 132 Health and Welfare Fund
("Local 132") is an employee welfare benefit plan that has its primary office in Huntington, West
Virginia.  During the Class Period, Local 132 and its members were indirect purchasers of
Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Local 132
sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox
purchases in Illinois, Pennsylvania, Texas and West Virginia during the class period.

22.     Man-U Service Contract Trust Fund ("Manu-Serve") is a trust, maintaining its
principal place of business at 7130 Columbia Gateway Drive, Suite A, Columbia, MD 21046.
During the Class Period, Manu-Serve and its members were indirect purchasers of Aggrenox and
were injured by Defendants' unlawful conduct as alleged herein. Manu-Serve sustained injury
when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in
District of Columbia and Maryland during the class period.

23.     NECA-IBEW Welfare Trust Fund (the "Fund") provides health and welfare
coverage for its participants and their dependents.  The Fund acts as a customer for its
beneficiaries and their dependents and purchases services, including medical services, vision
services and prescription drug care. During the Class Period, NECA-IBEW Welfare Trust Fund
and its members were indirect purchasers of Aggrenox and were injured by Defendants'
unlawful conduct as alleged herein. NECA-IBEW Welfare Trust Fund sustained injury when it
indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Florida,
Georgia, Illinois, Indiana, Kentucky, New Jersey, Nevada, Ohio and Wisconsin during the class
period.

24.     Painters District Council No. 30 Health & Welfare Fund (the "Painters Fund") is
an "employee welfare benefit plan" and an "employee benefit plan" within the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002(1), 1002(3) and 1003(a) located in Aurora, Illinois. During the Class Period, the Painters Fund and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. The Painters Fund sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Florida, Georgia, Illinois, and Virginia during the class period.

25.     Pipefitters Union Local No. 537 Health & Welfare Fund ("Pipefitters") is a benefits fund that includes a health plan and is based in Allston, Massachusetts.  During the Class Period, Pipefitters and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Pipefitters sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Massachusetts during the class period.

26.     Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund ("Local 178") is located in Springfield, Missouri. During the Class Period, Local 178 and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Local 178 sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Missouri during the class period.

27.     School Cafeteria Employees Local No. 634 Health and Welfare Fund ("Local 634") is a trust/fund, maintaining its principal place of business at 421 No. 7 Street, Philadelphia, Pennsylvania. Local 634 is a trust established and administered under the laws of the Commonwealth of Pennsylvania. It is a "governmental plan" as that term is defined in Section 3(32) of the Employee retirement Income Security Act of 1974, as amended, 29 USC 1002(32,) and Section 414(d) of the Internal Revenue Code, 26 USC 414(d). During the Class Period,

Local 634 and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Local 634 sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in District of Columbia and Pennsylvania during the class period.

28.     Twin City Iron Workers Health and Welfare Fund  ("Twin City Iron Workers Fund") is a Taft-Hartley fund authorized pursuant to Section 302(c)(5) of the National Labor Relations Act, with its principal place of business in Bloomington, Minnesota, and an employee welfare benefit plan as defined in Section 3(1) of ERISA. Twin City Iron Workers Fund provides health benefits, including prescription drug benefits, to approximately 1,850 active participants and retirees, plus their spouses and dependents. During the Class Period, Twin City Iron Workers Fund and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Twin City Iron Workers Fund sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Minnesota and Wisconsin during the class period.

29.     United Food and Commercial Workers Local 1776 & Participating Health and Welfare Fund, ("Local 1776") is an employee health and welfare benefit plan that maintains its principal place of business at 3031-A Walton Road, Plymouth Meeting, Pennsylvania 19462 and is therefore a citizen of Pennsylvania. During the Class Period, Local 1776 and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Local 1776 sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in Florida, Pennsylvania and New Jersey during the class period.

30.     Welfare Plan of the International Union of Operations Engineers Locals 137, 137A, 137B, 137C, and 137R ("Locals 137") is a labor union with a principal address of 1360 Pleasantville Road, Briarcliff Manor, New York 10510. Plaintiff provides health benefits, including prescription drug benefits, to its members, plus their spouses and dependents. During the Class Period, Locals 137 and its members were indirect purchasers of Aggrenox and were injured by Defendants' unlawful conduct as alleged herein. Locals 137 sustained injury when it indirectly purchased, paid and/or provided reimbursement for Aggrenox purchases in the District of Columbia, Florida, Maryland, New Jersey and Pennsylvania during the class period.

**B.     Defendants**

31.     Defendant Teva Pharmaceuticals USA, Inc., a wholly-owned subsidiary of Teva Pharmaceuticals Industries Limited, is a Delaware corporation with its principal place of business at 1090 Horsham Road, P.O. Box 1090, North Wales, Pennsylvania.  It manufactures and distributes generic drugs for sale throughout the United States at the direction, under the control, and for the direct benefit of its parent company.

32.     Defendant Teva Pharmaceuticals Industries Limited is a corporation organized and existing under the laws of Israel, with its principal place of business at 5 Basel Street, P.O. Box 3190, Petach Tikva, Israel.  Teva is a leading manufacturer of generic drugs, and is one of the largest sellers of generic drugs in the United States.  Teva purchased Barr Pharmaceuticals Inc. on December 23, 2008.

33.     Defendant Barr Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.

34.     Defendant Barr Laboratories, Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.

35.     On December 23, 2008, Barr became a wholly-owned subsidiary of Teva.

36      Defendant Duramed Pharmaceuticals Inc. is a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr.  In December 2008, when Teva purchased Barr, Duramed became a subsidiary of Teva and is now known as Teva Women's Health Inc.

37.     Defendant Duramed Pharmaceuticals Sales Corp. is a corporation organized under the laws of the state of Delaware, with a principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  It was a subsidiary of Barr until December 2008, when it became a subsidiary of Teva.

38.     Defendant Boehringer Ingelheim Pharma GmbH & Co. KG is a limited partnership organized and existing under the laws of Germany, with its principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

39.     Defendant Boehringer Ingelheim International GmbH is a limited liability company organized and existing under the laws of Germany, having a principal place of business at Binger Strasse 173, 55216 Ingelheim, Germany.

40.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut.

41.     All of the Defendants' actions described in this complaint are part of, and were in furtherance of, the illegal restraint of trade alleged herein, and were authorized, ordered, and

performed by the Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the Defendants' affairs, within the course and scope of their duties and employment, and with the actual, apparent or ostensible authority of the Defendants.

## IV.    REGULATORY BACKGROUND

### A.    Generic Drugs Benefit Purchasers

42.    Generic competition allows purchasers at all levels of the pharmaceutical supply chain to purchase both the brand name drug and its generic equivalents at a reduced price. Generic competition to a single branded drug can provide billions of dollars in savings to consumers, insurers, pharmacies, and other drug purchasers.

43.    Generics that meet all of the requirements for approval are assigned an "AB" rating by the FDA. The AB rating permits the generic drug to be substituted for the brand name drug at the pharmacy counter. All states permit, and some states require, pharmacists to automatically substitute an AB-rated generic drug for the corresponding brand name drug unless the doctor has said that the prescription for the brand name product must be dispensed as written.

44.    Until a generic manufacturer enters the market, the brand name manufacturer can charge monopolistic prices without a material loss in sales volume because the drug faces no competition. Brand name drug manufacturers therefore have a strong interest in seeking to restrain generic competition.

45.    Many third-party payors (such as health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts. And many consumers routinely switch from a branded drug to an AB-rated generic drug once the generic becomes available. AB-rated generic drugs therefore capture a significant

share of their branded counterparts' sales, causing a significant reduction in the branded drug's unit and dollar sales.

46.     The first AB-rated generic drug is typically priced significantly below its branded counterpart.  As more AB-rated generics enter the market, the brand and generic drug prices usually continue to decline as the generics compete with one another and the brand name drug.

47.     The first generic equivalent to reach the market often captures 80% or more of the market within the first six months.  Within one year of market entry, the generic often accounts for 90% of the branded drug's unit sales and sells for 15% of the price of the brand name drug.

**B.     The FDA Approval Process**

48.     Under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), manufacturers who seek to market a new drug must apply for FDA approval to sell the drug by filing a New Drug Application, or NDA. 21 U.S.C. §§ 301-392.  NDAs must include specific data concerning the safety and effectiveness of the drug and identify applicable patents.  Id. at §§ 355(a) & (b).

49.     When the FDA approves a brand manufacturer's NDA, the brand name manufacturer lists any patents it contends apply to the approved drug in a publication called the "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."  21 U.S.C. §355(j)(7)(A)(iii).  The FDA does not confirm the accuracy of the information supplied by the brand manufacturer.  After the NDA is approved, the brand manufacturer may list additional patents relating to the drug in the Orange Book.

**C.     The Government Encourages and Facilitates the Approval of Generic Drugs Through the Hatch-Waxman Amendments**

50.     In 1984, Congress amended the FDCA with the enactment of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984), known as the Hatch-Waxman Amendments.

51.     The Hatch-Waxman Amendments simplify the regulatory hurdles that generic manufacturers have to clear to enter the market.  Instead of filing a lengthy and costly NDA, the Hatch-Waxman Amendments allow generic manufacturers to seek FDA approval on an expedited basis by filing an Abbreviated New Drug Application, or ANDA.

52.     If an ANDA applicant shows that the generic drug is "bioequivalent" to the brand name drug—that it contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug—then the ANDA may rely on the scientific safety and effectiveness findings included in the brand name drug manufacturer's original NDA.  21 U.S.C. § 355(j)(2)(A).  The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the Act's requirements.  21 U.S.C. § 355((j)(4).  The streamlined approval process under the Hatch-Waxman Amendments makes it easier for manufacturers to bring competing generic products to the market.

53.     While Hatch-Waxman seeks to facilitate generic competition, the brand name manufacturer retains the right to enforce any patents associated with the drug.  To gain regulatory approval, an ANDA application must also certify that the generic drug will not infringe the brand name drug's patents listed in the Orange Book, because either: (a) no patents exist on the brand name product; (b) the patents have expired; (c) the patents will expire by the time the generic product comes to market; or (d) the patents are invalid or will not be infringed by the sale of the generic product.  See 21 U.S.C. § 355(j)(2)(A)(vii)(I-IV).  The last certification, that the patents are invalid or not infringed, is known as a "Paragraph IV certification."

54.     When a generic manufacturer files a Paragraph IV certification asserting that a patent listed in the Orange Book is invalid or will not be infringed, it must promptly give notice

of its certification to both the brand manufacturer and the owner of the patent. If the brand manufacturer files a patent infringement lawsuit against the ANDA filer within 45 days of receiving the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) 30 months or (b) a court ruling that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. §355(j)(5)(B)(iii). During the 30-month stay, the FDA may grant "tentative approval" to an ANDA applicant if the FDA determines that the ANDA would otherwise qualify for final approval, but cannot authorize the generic manufacturer to market its drug before the 30-month stay expires or a court rules on invalidity and infringement.

55. Congress also created incentives for drug manufacturers to seek approval of generic alternatives to branded drugs and challenge weak patents. The Hatch-Waxman Amendments grant a 180-day period of market exclusivity to the first ANDA applicant to file a substantially complete ANDA containing a Paragraph IV certification. During the 180-day exclusivity period the first filer enjoys temporary freedom from competition from other generic versions of the drug, and is able to sell the generic for a higher price than when multiple generics enter the market. The brand name manufacturer may, however, market its own generic equivalent of the brand name drug (known as an "authorized generic") during the 180-day period.

56. The first-filed generic manufacturer can forfeit its right to the 180-day period of exclusivity. This can occur, for example, if the first-filer fails market its product under certain circumstances or fails to receive tentative approval of its ANDA from the FDA within 30 months of filing the ANDA, unless the failure is caused by a change in or review of the requirements for approval of the ANDA.

### D.     Pharmaceutical Manufacturers Game the Regulatory Structure

57.     Because the Hatch-Waxman regulatory scheme automatically delays approval of an ANDA whenever a brand name manufacturer sues the potential generic competitor for patent infringement, brand name manufacturers frequently take aggressive positions in listing patents in the Orange Book, and then bring patent lawsuits against any generic competitor that files an ANDA with a Paragraph IV certification.  Brand name manufacturers often sue generics simply to delay generic competition, rather than to enforce valid patents against infringing products.

58.     In connection with the resolution of patent litigation arising out of Paragraph IV Certifications, brand name manufacturers have also developed a practice of entering into "settlements" in which brand name manufacturer pays off its generic competitors in exchange for a delay in generic competition.  These exclusion payment agreements among horizontal competitors not to compete are commonly known as "pay-for-delay" or "reverse payment agreements." Brand and generic manufacturers execute exclusion payment agreements as purported settlements of patent infringement lawsuits that brand manufacturers file against generic manufacturers.  The brand name manufacturer preserves increased profits by keeping its monopoly intact via a payment of some of the monopoly profits to the generic manufacturer, which in turn agrees to delay marketing its product.  Initially these agreements took the form of a straight cash payment from the brand name manufacturer to the generic competitor.  As a result of regulatory scrutiny, congressional investigations, and class action lawsuits, brand name manufacturers and generic competitors have entered into increasingly elaborate agreements in an attempt to mask the fundamentally anticompetitive character of their agreements.  Because the profits to be gained by delaying generic competition are so great, however, drug manufacturers retain the incentive to enter into such agreements.

18

59.     The first generic filer's agreement to delay marketing its drug may also prevent other manufacturers of generics from bringing their own products to market. If the first-filed generic manufacturer is eligible for 180-days of marketing exclusivity, no other generic manufacturer can enter the market until the end of the exclusivity period. This "bottlenecking" tactic is known as exclusivity "parking."

**E.      Agreements Not to Compete Between the Brand's Authorized Generic and the First-Filing Generic's Product**

60.     The 180-day marketing exclusivity to which first-filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day period. Such an authorized generic is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer. Boehringer has traditionally marketed its authorized generic products in-house, through its wholly-owned subsidiary Roxane Laboratories, Inc. Competition from an authorized generic during the 180-day exclusivity period substantially reduces the first-filer's revenue, and substantially reduces drug prices for consumers.

61.     In its recent study, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (August 2011) (the "FTC Study"), the Federal Trade Commission ("FTC") found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average during the 180-day exclusivity period. The first-filing generic makes significantly less money when it faces competition from an authorized generic because: (a) the authorized generic takes a large share of unit sales away from the first filer; and (b) the presence of an additional generic in the market causes prices to decrease.

62.     Although first-filing generic manufacturers make significantly less money when they must compete with an authorized generic during the first 180 days, consumers and other

drug purchasers such as End-Payor Plaintiffs and the End-Payor Class benefit from the lower prices caused by competition between the authorized generic and the first-filing generic.

63.     Given the significant negative effect of an authorized generic on the first-filing generic's revenues, a brand manufacturer's agreement not to launch an authorized generic has tremendous value to the generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first-filer to delay entering the market.  Such non-competition agreements deprive consumers and other drug purchasers such as Plaintiffs and the End-Payor Class of the lower prices resulting from two forms of competition: (a) among the branded and the generic products; and (b) between the generic products.

64.     Agreements not to compete with an authorized generic can take many forms. According to the FTC Study, one such form includes agreements like the Agreement here whereby the brand manufacturer agrees to exclusively supply the first-filing generic with the authorized generic product.  As confirmed by the FTC, the result is the same as if the brand agreed not to launch any authorized generic: no competition between an authorized generic and the first-filing generic's product for a period of time.  See FTC Study at 146.

V.      **FACTS**

        A.      **Boehringer Starts Marketing Aggrenox in December 1999**

65.     Boehringer developed Aggrenox as a treatment to lower the risk of stroke in people who have had a transient ischemic attack (also known as a 'mini stroke') or stroke due to a blood clot.  A transient ischemic attack is similar to a stroke, except it usually lasts only a few minutes and does not result in permanent damage.  Aggrenox is a single gelatin capsule containing 200mg of extended-release dipyridamole and 25mg of immediate-release acetylsalicylic acid (aspirin).  Boehringer has previously marketed dipyridamole as a stand-alone

drug under the brand name Persantine to prevent clots from forming after heart valve replacements and aspirin has previously been prescribed for the prevention of strokes. Other drugs prescribed for the prevention of strokes are not AB-rated to Aggrenox, cannot be automatically substituted for Aggrenox by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Aggrenox at competitive prices, and thus are not economic substitutes for, nor reasonably interchangeable with, Aggrenox.

66.     On December 15, 1998, Boehringer filed NDA 20-884 seeking FDA approval to market Aggrenox to help reduce the risk of repeated strokes. The FDA approved the NDA on November 22, 1999.

67.     In connection with its Aggrenox NDA, Boehringer submitted Patent No. 6,015,577 (the '577 Patent) to the FDA for listing in the Orange Book. The purported invention described in the '577 Patent is a composition of dipyridamole and acetylsalicylic acid for oral administration. The '577 Patent is scheduled to expire on January 18, 2017.

68.     Boehringer began marketing Aggrenox in December 1999. Aggrenox was the only prescription drug for reducing the risk of subsequent stroke through a single aspirin and extended-release dipyridamole capsule. Boehrigner represented that studies submitted to the FDA by Boehringer showed that Aggrenox's combined dipyridamole-aspirin formulation is more effective at reducing the risk of future stroke than administration of either ingredient on its own.

69.      However, as described in Aggrenox's FDA-approved labeling, because Aggrenox contains aspirin, Aggrenox can cause fetal harm when administered to a pregnant or nursing woman. Boehringer states on its Aggrenox website that "Aggrenox should be avoided during pregnancy, especially in the third trimester."

70.     Aggrenox quickly became a steady source of profits for Boehringer. By 2008 Aggrenox sales in the United States had reached $366 million.

**B.      Barr Seeks FDA Approval to Market a Generic Equivalent to Aggrenox**

71.     On February 1, 2007, Barr submitted ANDA 78-804 to the FDA, seeking approval to manufacture, market and sell a generic, bioequivalent version of Aggrenox. Barr was the first manufacturer to submit a substantially complete ANDA for generic Aggrenox with a Paragraph IV certification for the '577 Patent. As the first-filing generic, Barr may receive 180-days of marketing exclusivity, free from other ANDA-based generic Aggrenox competition.

72.      On May 31, 2007, Barr notified Boehringer that it had submitted ANDA 78-804 with a Paragraph IV certification regarding the '577 Patent, asserting that its generic would not infringe the patent and/or that the patents was invalid or unenforceable.

73.     On July 11, 2007, Boehringer sued Barr for patent infringement in the United States District Court for the District of Delaware, alleging that Barr's filing of its ANDA infringed the '577 patent. Boehringer's lawsuit triggered an automatic 30-month stay that prohibited the FDA from granting final approval of Barr's ANDA until the stay expired in November 2009.

74.     Barr denied the allegations in Boehringer's complaint, and counterclaimed for declaratory relief of non-infringement, invalidity, and unenforceability of the '577 Patent. Barr argued that Boehringer had misrepresented to the United States Patent and Trademark Office the nature and materiality of a prior patent, Patent No. 5,694,024, and its related reference DE-A1-3,515,874. According to Barr, the properly disclosed patent and reference would have made the claims of the '577 Patent obvious. In light of these allegations, Barr asked the District Court to find the '577 Patent unenforceable.

75.     The patent lawsuit continued until August 2008 without any substantive rulings. Barr's defenses and counterclaims, however, were strong.  Absent a settlement, the '577 Patent was likely to have been adjudicated invalid, unenforceable, and/or not infringed.

## C.     Boehringer and Barr Enter Into the Exclusion Payment Agreement

76.     On August 11, 2008 Boehringer and Barr announced that they had settled the patent litigation and on or about that same time, Boehringer and Barr entered the Exclusion Payment Agreement.

77.     Under the terms of the Agreement, Boehringer and Barr agreed that Barr would drop its challenges to the '577 Patent, delay launching a generic equivalent of Aggrenox until as late as July 1, 2015, and act to preserve its 180-day exclusivity, in order to block other generic manufacturers from entering the market before Barr's delayed entry.  A generic launch date as late as July 2015 would effectively preserve 82% of the patent's remaining life – for which Boehringer was prepared to, and did, pay Barr handsomely.

78.     As the *quid pro quo* for Barr's agreement to drop its challenge to the '577 Patent and stay out of the market for almost seven years, Boehringer agreed to make cash payments to Barr estimated at $120 million dollars and to pay other valuable consideration that was as good as cash to Barr. Boehringer's payments to Barr under the Agreement took at least two forms.

79.     *First*, Boehringer agreed to pay Barr (through its subsidiary Duramed, now known as Teva Women's Health) under the guise of co-promotion services related to Aggrenox. For ostensibly promoting anti-stroke drug Aggrenox to obstetricians, gynecologists, and women's health care professionals from April 2009 and continuing until generic entry, Boehringer agreed to pay Barr millions in cash upfront plus substantial additional consideration,

including annual, increasing royalties on the total U.S. Aggrenox sales.  The total value of these payments is an estimated $120 million and counting.

80.     In litigation with the FTC regarding the agency's investigation of the Agreements, Boehringer's counsel admitted that the co-promotion agreement was not a stand alone business transaction, but rather the means by which Boehringer paid, and continues to pay, Barr to drop its patent challenge and stay out of the market. For example, Boehringer's counsel described the co-promotion arrangement as "part and parcel of the settlement.  It was part of the flow of compensation.  It was part of the considerations of the settlement, so it is really a mischaracterization or misdescription to say that we said it was stand alone." *Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc*., No. 1:09-mc-00564-JMF (D.D.C.), Docket No. 59, Hearing Transcript at 37:9-13.

81.     At other points during litigation with the FTC, Boehringer's counsel similarly explained that Boehringer's continuing payments to Barr for ostensibly co-promoting Aggrenox were consideration under the settlement and that the parties would not have entered the co-promotion agreement and/or would not have agreed to the price and/or other terms that they did absent Barr's agreement to delay entry into the market with generic Aggrenox:

82.     The settlement agreement and co-promotion agreement "were executed together. The evidence is replete that [the co-promotion agreement was] part of the settlement." (Id. at 18:16-18);

83. "We have always said that the Aggrenox co-promote was part of the settlement.  It had – It absolutely was."  (Id. at 36:19-21);

84.     The co-promote arrangement was "inextricably intertwined with settlement negotiations" (Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc., No.

12-5393 (D.C. Cir.), Brief of Respondent-Appellee Boehringer Ingelheim Pharmaceuticals, Inc., at p. 42); and

85.     But for the settlement, "parties engaged in contentious litigation would not otherwise be willing to do business with each other. . . ." (Id.).

86.     Moreover, the face of the Agreement itself makes explicitly clear that the co-promotion arrangement and settlement form one Agreement, not independent business transactions.

87.     Boeheringer's continuing payments to Barr under the Co-Promotion Agreement vastly exceed the fair value of the services provided by Barr and its subsidiaries.  Boehringer had no expectation of receiving significant financial benefit during the seven-year delay period from Barr's promotion of a drug for patients who have suffered strokes to a target group consisting primarily of gynecologists and obstetricians.  Indeed, Boehringer compensates Barr for ostensibly promoting Aggrenox to obstetricians even though Boehringer warns pregnant and nursing women and the doctors treating them not to take or prescribe Aggrenox because it poses a serious risk to fetal health.

88.     Moreover, Boehringer's payments to Barr under the Agreement are based on a percentage of total U.S. sales, not just on the far smaller percentage of sales resulting from Barr's promotion of anti-stroke drug Aggrenox to obstetricians, gynecologists, and women's health care professionals, as one would expect with a fair value for services promotion agreement.  Thus, the vast majority of Boehringer's multi-million dollar payments to Barr could have nothing whatsoever to do with any services purportedly performed by Barr.  Boehringer's payments to Barr were purely for delay.

89.     According to Boehringer's own counsel, documents related to the co-promotion

agreement "provide a blueprint for how a company can extract settlement payments out of not only our client, but virtually every branded pharmaceutical company."

90.     *Second*, the Agreement provides that Boehinger and Barr will not compete with respect to generic Aggrenox once a generic Aggrenox product finally enters the market.  Under the Agreement, Boehringer agreed to exclusively supply Barr with Boehringer's own authorized generic Aggrenox product at below-market rates, and not to supply any third-party with Boehringer's authorized generic product, until the expiration of the '577 Patent.  In return, Barr agreed not to launch its own ANDA generic product (for which it received final FDA approval in August 2009) until the expiration of the '577 Patent.

91.     The purpose and effect of these covenants is (a) no competition between a Boehringer authorized generic product and Barr's ANDA generic product for approximately one and a half years (from generic entry on July 1, 2015 to the end of the patent term on January 18, 2017) and (b) no competition between a Barr generic Aggrenox product and *any other* generic Aggrenox product (including those sold by Boehringer and/or third parties) during Barr's 180-exclusivity period (from generic entry until January 2016).  This aspect of the Agreement provides substantial compensation—many millions of dollars—to Barr, which could expect to make approximately double the unit sales, at a much higher price, absent competition between Barr's ANDA generic and Boehringer's authorized generic in the market, particularly during the 180-day exclusivity period.  These higher prices come at the expense of End-Payor Plaintiffs and the End-Payor Class.

92.     Boehringer's large payment to Barr via the exclusive supply and non-competition arrangement is unjustified and far exceeds the fair value of services (if any) provided by Barr.  Boehringer had no need to market its authorized generic Aggrenox product

through Barr. Boehringer has its own wholly-owned subsidiary, Roxane Laboratories, Inc., through which it has launched at least seven authorized generic versions of its brand name products, including before the Agreement with Barr. Absent Barr's agreement to delay generic entry, Boehringer would not have agreed to exclusively supply its authorized generic Aggrenox to its competitor Barr. Instead, Boehringer would have launched its authorized generic in competition with Barr. And absent payment from Boehringer, Barr would not have agreed to refrain from launching its ANDA product to market in competition with Boehringer's product. As Boehringer itself has said: "parties engaged in contentious litigation would not otherwise be willing to do business with each other. . . ."

93.     Nor was the supply agreement an independent business transaction. The face of the Agreement makes plain that the supply agreement, like the co-promotion agreement, was an integral part of the overall Agreement and consideration for Barr's agreement to drop its challenge to the '577 Patent and delay generic entry.

94.     Taken together, Boehringer's payments to Barr under the Agreement guaranteed two distinct periods of non-competition: (a) the period before generic competition, whereby Boehringer and Barr agreed to allocate 100% of the market to Boehringer; and (b) the period after generic competition, whereby Boehringer and Barr agreed not to sell competing generic versions of Aggrenox, with the intent to allocate 100% of the generic segment to Barr during the 180-day exclusivity period and reduce inter-generic competition for the duration of the patent term. Under the Agreement, there was no period of unrestrained competition between possible generic entry and the end of the patent term.

95.     Defendants' anticompetitive conduct is illustrated below:



96.     Defendants have no procompetitive explanation or justification for the payments. The total payments flowing from Boehringer to Barr had a cash value far above $120 million dollars and had no explanation or justification other than to induce Barr to stay out of the Aggrenox market.  These large, unjustified payments had no rational connection to, and far exceeds, any approximation of the costs of continuing the patent litigation.  The payment was not consideration for the fair value of services provided from Barr to Boehringer.

**D.     Teva Acquires Barr and Continues the Unlawful Agreement to Suppress Generic Competition**

97.     The Agreement contemplated that Barr might be acquired by Teva and bound Teva to its terms in the event of such an acquisition.

98.     On December 23, 2008, Teva acquired Barr by merging the two corporations, Teva, as the surviving entity,  assumed liability for the illegal conduct Barr engaged in before the merger and stepped into Barr's shoes with respect to the Exclusion Payment Agreement.  Teva has continued to refrain from entering the market with a generic equivalent of Aggrenox.  Teva thus joined the ongoing unlawful course of conduct—and joined the unlawful agreements,

collusion and conspiracy—to suppress generic competition of Aggrenox. Teva did not withdraw from the conspiracy, and instead continued to participate in it.

99. As a result of its merger with Barr, Teva would own (either directly or indirectly) ANDA 78-804 and the 180-day exclusivity period that Barr may be entitled to as the first filer.

100. Post-acquisition, Teva/Barr continued to pursue approval of ANDA 78-804. On August 14, 2009 the FDA granted final approval of ANDA 78-804 for a generic equivalent of Aggrenox. Because of the Exclusion Payment Agreement, no generic equivalent of Aggrenox is on the market and none will be so until July 1, 2015.

**E.      The Unlawful Agreement to Suppress Generic Competition Is Ongoing and Continues to Cause Harm**

101. Since the execution of the Agreement and continuing until today and beyond, Barr/Teva has continuously refused to enter the market with generic Aggrenox despite having FDA approval to do so, and Boehringer has continued to pay Barr/Teva for this delayed competition, including throughout the last four years.

102. The lack of generic competition is the direct result of the ongoing unlawful Agreement that began in 2008, has continued since then, and will continue at least through July 1, 2015. Boehringer continues to sell brand name Aggrenox at artificially inflated prices, and End-Payor Plaintiffs have been denied the lower prices that generic competition would have brought to the market. Moreover, even once a generic, bioequivalent version of Aggrenox enters the market, the Agreement will continue to harm End-Payor Plaintiffs and the End-Payor Class by depriving them of the benefits of inter-generic competition.

103. Since the Agreement, including during at least the four-year period prior to the filing of this complaint, Defendants' unlawful conduct was and continues to be ongoing and

End-Payor Plaintiffs and the End-Payor Class were injured, and continue to be injured, every day that the Defendants' unlawful agreement was and remains in place.

104.    But for the anticompetitive, illegal, and ongoing conduct alleged in this complaint, End-Payor Plaintiffs and the End-Payor Class would have had access to less expensive versions of Aggrenox, and would have substituted their purchases of branded Aggrenox  with generic Aggrenox, much sooner than they currently will.  The Defendants have injured End-Payor Plaintiffs and the End-Payor Class by causing them to pay substantial overcharges – potentially hundreds of millions of dollars—each time they purchased Aggrenox at artificially inflated prices during at least the last four years and continuing even today.

**F.    The Federal Trade Commission Opens an Investigation Into the Exclusion Payment Agreements**

105.    On January 15, 2009, the FTC issued a Resolution Authorizing Use of Compulsory Process in Nonpublic Investigation to determine "whether Boehringer Ingelheim Pharmaceuticals, Inc. and Barr Pharmaceuticals, Inc., and their affiliates, or any other person, has engaged or is engaging in unfair methods of competition . . . with respect to the sale of Aggrenox or its generic equivalents and Mirapex and its generic equivalents."  FTC File No. 091-0023; see Federal Trade Commission v. Boehringer Ingelheim Pharmaceuticals, Inc., Case No. 1:09-mc-oo564-JMF, Dkt. # 1-1, at 3 (D.C.).  As the FTC explained, "[c]ompensation rarely takes the form of explicit cash payments; instead, the settling firms typically include the payment in a separate business deal executed simultaneously with the settlement."  Case No. 12-5393 (D.C. Cir.), Brief of Appellant Federal Trade Commission, Doc. #1444255, p. 9 ("FTC Brief").

106.    Pursuant to Sections 3 and 9 of the FTC Act, 15 U.S.C. §§ 43 and 49, on February 5, 2009 the FTC issued a subpoena to Boehringer seeking 37 categories of documents, including documents related to the settlements of the Aggrenox litigation and the Co-Promotion

Agreement. The FTC subpoena seeks—and Boehringer has refused to provide—its internal financial analysis regarding whether the payments Boehringer made to Barr under the Co-Promotion Agreement were for promotional services alone, or "side-payments for an anticompetitive agreement to delay generic entry and share the ensuing monopoly profits?" FTC Brief, at p. 2. Boehringer refused to produce documents that would substantiate its assertion that the Co-Promotion Agreement provided Boehringer with substantial value aside from the benefits it derived from delaying generic competition for Aggrenox.

107. In light of Boehringer's refusal to turn over the relevant documents in response to the FTC's subpoena, on October 23, 2009 the FTC filed a petition with the District Court for the District of Columbia to enforce the subpoena. The FTC's petition did not specify the size of the payments from Boehringer to Barr under the Co-Promotion Agreement, and no other document filed publicly on the District Court docket contained this information.

108. On December 12, 2012, after the District Court had determined that Boehringer's internal financial analyses regarding the Co-Promotion Agreement were privileged and in large part denied the FTC's petition, the agency filed a Notice of Appeal with the Court of Appeals for the District of Columbia.

109. While Boehringer has not provided the FTC with its internal financial analyses, the FTC is in possession of the terms of the Co-Promotion Agreement. Based on this information, the FTC described the payments under the Co-Promotion Agreement as a "significant financial transaction." Id., p. 36, n. 12. In a June 28, 2013 brief before the circuit court, the FTC explained that:

> Under the agreement, Boehringer agreed to pay Barr a one-time fee plus annual, increasing royalties on the total U.S. Aggrenox sales for a period of years. . . . In 2008, Aggrenox had total U.S. sales of about $366 million. . . . At this level of sales, the FTC

estimates that the deal would ultimately cost Boehringer over $120 million in royalties.

*Id.* The litigation and the FTC's investigation are ongoing.

## VI. <u>MARKET POWER AND MARKET DEFINITION</u>

110. At all relevant times, Boehringer has had the power to maintain the price of Aggrenox at supracompetitive levels without losing substantial sales to other products.

111. Aggrenox does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than an AB-rated generic equivalent of Aggrenox.

112. Because of its unique profile as a combined aspirin and extended-release dipyridamole treatment for subsequent strokes, Aggrenox is differentiated from all products other than AB-rated generic equivalents of Aggrenox. Aggrenox's specific ratio of dipyridamole to aspirin and the release formulations of those components also differentiate it from products aside from AB-rated generic equivalents.

113. Boehringer needed to control only Aggrenox (and any AB-rated generic equivalents to Aggrenox), and no other products, to maintain the price of Aggrenox profitably at monopolistic prices. Only the market entry of a competing AB-rated generic equivalent to Aggrenox would render Boehringer unable to profitably maintain monopolistic prices of Aggrenox without losing substantial sales.

114. Boehringer also sold branded Aggrenox at prices well in excess of marginal costs and the competitive price, and enjoyed high profit margins.

115. The Defendants have had and continue to exercise the power to exclude generic competition to branded Aggrenox.

116. At all relevant times, the Defendants enjoyed high barriers to entry with respect to the market for Aggrenox products.

32

117. To the extent that End-Payor Plaintiffs are legally required to define a relevant product market. End-Payor Plaintiffs allege that the relevant market is all Aggrenox products (i.e., 25 mg aspirin/200 mg extended-release dipyridamole capsules), which includes Aggrenox and AB-rated bioequivalent products. During the relevant time period, the Defendants have been able to profitably maintain the price of Aggrenox well above competitive levels.

118. The relevant geographic market is the United States and its territories.

119. At all relevant times, Boehringer has had a 100% market share in the relevant market, and will continue to have that market share until as late as July 2015.

## VII. <u>MARKET EFFECTS</u>

120. Boehringer began marketing Aggrenox in December 1999. But, as a result of the Agreement, no generic equivalent of Aggrenox has ever been available for purchase in the United States.

121. Defendants' unlawful Exclusion Payment Agreement was designed to and did in fact: (a) preclude the entry of less expensive generic versions of Aggrenox products in the United States and its territories; (b) fix, raise, maintain or stabilize the price of 25 mg aspirin/200 mg extended-release dipyridamole capsules; and (c) allocate 100% of the United States and its territories 25 mg aspirin/200 mg extended-release dipyridamole capsules market to Boehringer. Moreover, once generic Aggrenox entry finally occurs, Defendants' Agreement is designed to and will allocate 100% of the generic segment to Barr during the 180-day exclusivity period and reduce inter-generic competition for the remainder of the 577 Patent's term.

122. Barr's generic Aggrenox ANDA received final FDA approval on August 14, 2009. But for the unlawful Exclusion Payment Agreement, Barr would have entered the market as early as November 30, 2009 through: (a) an "at risk" launch upon receiving final FDA

approval following the expiration of the 30-month stay; (b) earlier licensed entry via a lawful agreement with Boehringer that did not include unlawful payments to Barr; or (c) winning the '577 Patent litigation.

123.　It is well-known in the industry that due to its substantial resources Teva has a long history of "at risk" launches, including thirteen such launches between 2004 and 2008 alone. Many of Teva's "at risk" launches involved products with annual sales less than $500 million. It is also well-known in the industry that "at risk" launches are particularly likely when, like here, a company with a history of "at risk" launches is the first-filing generic.

124.　Absent an "at risk" launch, but for the large unjustified payments Boehringer made to Barr in exchange for Barr's agreement to delay launching generic Aggrenox, Defendants would have agreed to an unrestrained licensed entry date significantly earlier than July 1, 2015. Without the payments, which were the quid pro quo for the delay (and absent an at risk launch or litigation victory), Barr would have insisted on and received earlier, unrestrained licensed entry.

125.　In addition, but for the Agreement, Boehringer, as a rational economic actor seeking to recoup lost branded sales, would have launched an authorized, bioequivalent generic version of Aggrenox simultaneously with the launch of Barr's bioequivalent generic version of Aggrenox, as it has done numerous times, pushing generic prices lower. Indeed, Boehringer, through its wholly-owned subsidiary Roxane Laboratories, Inc., has launched authorized generic versions of at least seven of its brand drug products, including before the Agreement. Boehringer's launch of authorized generic products through Roxane include, but are not limited to: Atrovent, Metaprel, Micardis, Micardis HCT, Mobic, Persantine, and Viramune.

126.    But for the Defendants' illegal conduct, generic competition would have forced a decrease in the price of branded Aggrenox, and price competition among the suppliers of branded and generic Aggrenox would have been intense.

127.    But for the Defendants' illegal conduct, End-Payor Plaintiffs and End-Payor Class members would have paid less for Aggrenox or a generic equivalent. The Defendants' conduct directly injured End-Payor Plaintiffs and End-Payor Class members because it forced them to pay hundreds of millions of dollars in overcharges on their Aggrenox purchases and will force them to pay artificially inflated prices for generic Aggrenox as a result of the non-competition agreement between Boehringer and Barr.

128.    As a result of the delay in generic competition brought about by the Defendants' anticompetitive scheme, End-Payor Plaintiffs and End-Payor Class members paid more for Aggrenox products than they would have paid absent the Defendants' illegal conduct.

129.    Barr had, and Teva has, extensive experience in the pharmaceutical industry, including experience obtaining approval of ANDAs, manufacturing commercial launch quantities adequate to meet market demand, and marketing generic pharmaceutical products.

130.    Upon entering the market, generic equivalents of brand name drugs are priced significantly below the branded drug to which they are AB-rated. When multiple generic products are on the market, prices for the brand drug and its generic equivalents fall even further because of the increased competition.

131.    If generic competition for Aggrenox had not been unlawfully delayed, End-Payor Plaintiffs and the End-Payor Class would have paid less for Aggrenox by substituting purchases of less-expensive AB-rated generic equivalents of Aggrenox for their purchases of more-expensive brand Aggrenox.

132.     Thus, the Defendants' unlawful conduct deprived End-Payor Plaintiffs of the benefits of competition that the antitrust laws were designed to ensure.  The unlawful agreement also discouraged other generic companies from seeking to come to market.  As the "first filer" of an ANDA, Barr is eligible to obtain 180 days of market exclusivity which would only begin to run once it came to market. Only after the 180 day market exclusivity expired could other generic companies, obtain FDA final approval to manufacture, market and sell a bioequivalent version of Aggrenox in order to come to market.

## VIII.  ANTITRUST IMPACT

133.     During the relevant period, End-Payor Plaintiffs and End-Payor Class members purchased substantial amounts of Aggrenox indirectly from Boehringer.  As a result of the Defendants' illegal conduct, these purchasers were compelled to pay artificially inflated prices for Aggrenox.  Those prices were substantially higher than the prices that End-Payor Plaintiffs and End-Payor Class members would have paid absent the illegal conduct alleged in this complaint.

134.     As a consequence, End-Payor Plaintiffs and End-Payor Class Members as indirect purchasers of Aggrenox have sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

135.     Defendants' efforts to restrain competition in the market for Aggrenox have substantially affected interstate and foreign commerce.

136.     At all material times, Boehringer manufactured, promoted, distributed, and sold substantial amounts of Aggrenox in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

137.    Defendants' anticompetitive conduct had substantial intrastate effects in every state of purchase in that, among other things, retailers within each state were foreclosed from offering less expensive generic, bioequivalent versions of Aggrenox to purchasers within each state. This directly impacted and disrupted interstate and intrastate commerce for consumers and third-party payors within each state. During the relevant time period, Aggrenox has been shipped into each state and was sold to or paid for by end-payors. Defendants' unlawful conduct had substantial effects on intrastate commerce in each state because Aggrenox was sold to end-payors in each state and Defendants entered into an unlawful Agreement that affected commerce in each State and resulted in overcharges to end-payors in every state of purchase.

138.    At all material times, Defendants transmitted funds and contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Aggrenox.

139.    General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below.  See Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice (1994) at 624.  Professor Hovenkamp explains that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top.  He also says that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

140.  The institutional structure of pricing and regulation in the pharmaceutical drug industry ensures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Aggrenox to End-Payor Plaintiffs and End-Payor Class members.

141. Defendants' anticompetitive conduct enabled Boehringer to indirectly charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the Defendants' unlawful actions.

142. The prices were inflated as a direct and foreseeable result of Defendants' anticompetitive conduct.

143. The inflated prices that End-Payor Plaintiffs and End-Payor Class members have paid are traceable to, and the foreseeable result of, the overcharges by Boehringer.

## IX.     CLASS ACTION ALLEGATIONS

144. End-Payor Plaintiffs, on behalf of themselves and all proposed End-Payor Class members, seek injunctive and equitable relief and damages, measured as overcharges, trebled, against the Defendants.

145. End-Payor Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as representative of an End-Payor Class defined as:

> All persons or entities in the United States and its territories and possessions including the Commonwealth of Puerto Rico, who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Aggrenox, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, from November 30, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease.

146. The following persons or entities are excluded from the proposed End-Payor Class:

a.     Defendants and their counsel, officers, directors, management, employees, subsidiaries, or affiliates;

b.     All federal or state governmental entities, excluding cities, towns, or municipalities with self-funded prescription drug plans;

38

c.      All persons or entities who purchased Aggrenox for purposes of resale or directly from the Defendant or their affiliates;

d.      Fully insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members);

e.      Pharmacy Benefits Managers;

f.      Flat co-payers (consumers who paid the same co-payment amount for brand and generic drugs); and

g.      The judges in this case and any members of their immediate families.

147.    The End-Payor Class members are so numerous that joinder is impracticable. End-Payor Plaintiffs believe that there are thousands of End-Payor Class members.

148.    End-Payor Plaintiffs' claims are typical of the claims of the members of the End-Payor Class. End-Payor Plaintiffs and all End-Payor Class members were damaged by the same wrongful conduct by the Defendants in that they paid artificially inflated prices for Aggrenox and were deprived of the benefits of earlier and more robust competition from less expensive, bioequivalent generic versions of Aggrenox as a result of the Defendants' wrongful conduct.

149.    End-Payor Plaintiffs will fairly and adequately protect and represent the interests of the End-Payor Class. End-Payor Plaintiffs' interests are coincident with, and not antagonistic to, those of the End-Payor Class members.

150.    End-Payor Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation, and with experience in class action antitrust litigation involving pharmaceutical products.

151.    Questions of law and fact common to the End-Payor Class members predominate over questions that may affect only individual class members because Defendants have acted on

grounds generally applicable to the entire End-Payor Class, making overcharge damages with

respect to the End-Payor Class as a whole appropriate.

152.    Questions of law and fact common to all End-Payor Class members include:

a.    Whether Defendants entered into a contract, combination, or conspiracy to
restrain trade;

b.    Whether Barr unlawfully agreed to delay its entry into the market for Aggrenox
and its AB-rated generic bioequivalents (i.e., 25 mg aspirin/200 mg extended-
release dipyridamole capsules);

c.    Whether Boehringer paid Barr in exchange for delay in generic competition;

d.    Whether Boehringer's compensation to Barr was necessary to yield some
procompetitive benefit that is legally cognizable and non-pretextual;

e.    Whether Teva joined the unlawful agreement on its own behalf and on behalf of
Barr;

f.    Whether Defendants' Agreement harmed competition in the market for Aggrenox
and its AB-rated generic bioequivalents (i.e., 25 mg aspirin/200 mg extended-
release dipyridamole capsules);

g.    Whether Boehringer possesses market power in the market for Aggrenox and its
AB-rated generic bioequivalents (i.e., 25 mg aspirin/200 mg extended-release
dipyridamole capsules);

h.    Whether the relevant market (if a relevant market must be defined) is the market
for Aggrenox and its AB-rated generic bioequivalents (i.e., 25 mg aspirin/200 mg
extended-release dipyridamole capsules);

i.    Whether Defendants' conduct substantially affected interstate commerce; and

j.    Whether, and to what extent, Defendants' conduct caused antitrust injury to End-
Payor Plaintiffs and End-Payor Class members in the form of overcharges.

153.    Class action treatment is a superior method for the fair and efficient adjudication

of this case. Class treatment will permit a large number of similarly situated, geographically

dispersed persons and entities to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or

expense that numerous individual actions would engender. The benefits of proceeding through

the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practically be pursued individually, substantially outweighs any potential difficulties in the management of this class action.

154.     End-Payor Plaintiffs know of no special difficulty to be encountered in litigating its claims that would preclude the maintenance of this case as a class action.

## X.     FRAUDULENT CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

155.     End-Payor Plaintiffs and End-Payor Class members had no knowledge of the Defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this complaint.

156.     This is true because the nature of Defendants' conspiracy was self-concealing and because the Defendants employed practices and techniques of secrecy to avoid detection of, and to fraudulently conceal their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from End-Payor Plaintiffs and End-Payor Class members by, among other things:

a.     Requiring material provisions of the Agreement to be kept confidential under terms of the Agreement;

b.     Concealing the amounts that Boehringer was to pay and paid Barr/Teva under the Exclusion Payment Agreement and concealing that the payments were for the purpose of delaying the entry of lower-priced generics;

c.     Concealing the fact that the purpose of the payments under the Co-Promotion Agreement was to provide compensation to Barr/Teva in connection with the settlement of the '577 Patent litigation and the entry date for Barr/Teva's generic product;

d.     Concealing the fact that those amounts far exceeded any lawful economic benefit that Boehringer received from Barr/Teva under the agreement; and

e.  Filing documents with the SEC that failed to disclose the existence or nature of the Exclusion Payment Agreement. Teva's fiscal year 2008 20-F did not mention the settlement of the Aggrenox litigation. The 20-F also mentioned a co-promotion agreement for a different pharmaceutical product, but did not mention the Aggrenox Co-Promotion Agreement. Teva's 20-F filings for the fiscal years 2009, 2010, 2011, and 2012 similarly failed to disclose the Aggrenox settlement or the Co-Promotion Agreement.

157.  Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, End-Payor Plaintiffs and End-Payor Class members had no knowledge of the conspiracy more than any applicable statute of limitations period, including at least four years prior to the filing of this complaint, or of the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

158.  End-Payor Plaintiffs and End-Payor Class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred, including the amounts of payments made from Boehringer to Barr/Teva under the Co-Promotion Agreement. Reasonable diligence on the part of End-Payor Plaintiffs and End-Payor Class members would not have uncovered those facts more than any applicable statute of limitations period, including at least four years prior to the filing of this complaint.

159.  As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting End-Payor Plaintiffs' and End-Payor Class members' claims have been tolled.

160.  Alternatively, any applicable statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and End-Payor Plaintiffs and End-Payor Class members can recover damages they suffered during the limitations period.

# XI.     CONTINUING VIOLATIONS

161.     This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has included continuing and accumulating harm within the applicable statutes of limitations. Thus, End-Payor Plaintiffs and End-Payor Class members can recover damages they suffered during the applicable limitations periods.

162.     The most obvious continuing violation is Defendants' charging of supracompetitive prices to End-Payor Plaintiffs within the limitations periods. Every time End-Payor Plaintiffs were overcharged for branded Aggrenox, they suffered a cognizable injury.  In addition to inflicting overcharges, Defendants committed additional overt acts constituting continuing violations, including without limitation:

a.     *Teva/Barr's continuous refusal to enter the market.* Teva/Barr has continually adhered to the Exclusion Payment Agreement by refusing to launch generic Aggrenox before July 1, 2015. This continuous refusal to enter the market constitutes an ongoing series of overt acts that continually re-set the statute of limitations.

b.     *Boehringer's refraining from launching a competing generic.* Similar to Teva/Barr's refusal to enter the market is Boehringer's refraining from launching a competing generic. This refusal to enter with a competing generic results in End-Payor Plaintiffs incurring additional overcharges.

c.     *Boehringer's continuing payments under the Co-Promotion Agreement.* Each payment to Teva/Barr pursuant to the Co-Promotion Agreement constitutes an overt act justifying the application of the continuing violation doctrine. These

43

payments, which occur quarterly, are based on annual increasing royalties on the
total U.S. Aggrenox sales through July 1, 2015.

163.    As co-conspirators, Defendants share responsibility for each of these continuing
violations.

## XII.    CLAIMS FOR RELIEF

### COUNT ONE
### DECLARATORY AND INJUNCTIVE RELIEF AGAINST UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT
### (Against All Defendants)

164.    End-Payor Plaintiffs incorporate the preceding paragraphs by reference.

165.    The defendants knowingly, intentionally, and cooperatively engaged in an
anticompetitive scheme designed to delay and block entry of AB-rated generic equivalents of
Aggrenox.  The intended and accomplished goal of the scheme was to use restrictive and
exclusionary conduct to delay Barr and Teva's launch date for the first generic equivalent of
Aggrenox.  The defendants injured End-Payor Plaintiffs and the End-Payor Class through an
agreement to exclude generic Aggrenox products from the market in exchange for substantial
payments to Barr and Teva.

166.    Had manufacturers of generic Aggrenox products entered the market and
lawfully competed with Boehringer in a timely fashion, End-Payor Plaintiffs and the End-Payor
Class would have substituted lower-priced generic Aggrenox products for the higher-priced
brand name Aggrenox for some or all of their purchases.

167.    The defendants intended, and accomplished, a horizontal market allocation of
the Aggrenox market.  By their agreement, the defendants intentionally and wrongfully
conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the

Sherman Act. As a result of this unreasonable restraint on competition, plaintiffs and class members paid artificially inflated prices for Aggrenox.

168. Plaintiffs and class members have suffered harm, and will continue to suffer harm in the future. Plaintiffs and class members also face a continuing threat of injury from the unlawful conduct alleged in this complaint.

169. Plaintiffs and class members have purchased substantial amounts of Aggrenox indirectly from Boehringer.

170. As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox. And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. In addition, Teva is liable for its own unlawful conduct.

171. End-Payor Plaintiffs and End-Payor class members seek a declaratory judgment pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) that the defendants' conduct violates Section 1 and 2 of the Sherman Act.

172. End-Payor Plaintiffs and the End-Payor Class also seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the defendants' unlawful conduct, and other relief to ensure that similar anticompetitive conduct does not reoccur in the future.

**COUNT TWO**

## CONSPIRACY AND COMBINATION
## IN RESTRAINT OF TRADE UNDER STATE LAW;
### (Against All Defendants)

173.     End-Payor Plaintiffs incorporate the preceding paragraphs by reference.

174.     On or about August 11, 2008, Boehringer and Barr entered into the Exclusion Payment Agreement to suppress generic competition with Aggrenox.  Teva joined and continued the unlawful agreement to suppress generic competition.  The Exclusion Payment Agreement was and is a contract, combination, and/or conspiracy that substantially, unreasonably, and unduly restrained trade or commerce, the purpose and effect of which was to:

      a.      Allocate all sales of Aggrenox in the United States to Boehringer until as late as July 1, 2015;

      b.      Prevent Barr from selling a generic equivalent of Aggrenox in the United States until as late as July 1, 2015;

      c.      Prevent Boehringer from competing against Barr/Teva with an authorized generic version of Aggrenox once Barr/Teva launch on July 1, 2015;

      d.      Fix, raise, maintain or stabilize the price that End-Payor Plaintiffs and End-Payor Class members paid for Aggrenox and its AB-rated equivalents at supracompetitive levels; and

      e.      Fix, raise, maintain or stabilize the price that End-Payor Plaintiffs and End-Payor Class members will pay for generic Aggrenox at supra-competitive levels.

      f.      The Exclusion Payment Agreement has harmed End-Payor Plaintiffs and End-Payor Class members as set forth above.

      g.      The Exclusion Payment Agreement has covered a sufficiently substantial percentage of the relevant market to harm competition.

      h.      The Exclusion Payment Agreement is a horizontal market allocation and price-fixing agreement between actual and potential competitors that constitutes an illegal restraint of trade or commerce.

175.      There is and was no legitimate, non-pretextual, pro-competitive business

justification for the exclusion payments made by Boehringer to Barr that outweighs their harmful effect. Even if there were such a justification, payments were not necessary to achieve any conceivable pro-competitive purpose, nor were they the least restrictive means of achieving any such purported justification.

176.    By engaging in the anticompetitive conduct alleged herein, Defendants have intentionally and unlawfully engaged in one or more combinations and/or conspiracies in restraint of trade in violation of the following state laws:

a.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq*., with respect to purchases of Aggrenox in Arizona by members of the End-Payor Class.

b.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq*., and Code §§ 17200, *et seq*., with respect to purchases of Aggrenox in California by members of the End-Payor Class.

c.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-4503, *et seq*., with respect to purchases of Aggrenox in the District of Columbia by members of the End-Payor Class.

d.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Fla. Stat. §§ 542.18, *et seq*. and 501.201, *et seq*., with respect to purchases of Aggrenox in Florida by members of the End-Payor Class.

e.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Hawaii Code §§ 480, *et seq*., with respect to purchases of Aggrenox in Hawaii by members of the End-Payor Class.

f.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of 740 Ill. Comp. Stat. 10/3, *et seq.*, with respect to purchases of Aggrenox in Illinois by members of the End-Payor Class.

g.    Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Iowa Code §§ 553.4, *et*

*seq.*, with respect to purchases of Aggrenox in Iowa by members of the End-Payor Class.

h.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Aggrenox in Kansas by members of the End-Payor Class.

i.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.*, with respect to purchases of Aggrenox in Maine by members of the End-Payor Class.

j.      Defendant have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.*, with respect to purchases of Aggrenox in Massachusetts by members of the End-Payor Class with thousands of Massachusetts end-payors paying substantially higher prices for Aggrenox in actions and transactions occurring substantially within Massachusetts.

k.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of Aggrenox in Michigan by members of the End-Payor Class.

l.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq.*, with respect to purchases of Aggrenox in Minnesota by members of the End-Payor Class.

m.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Aggrenox in Mississippi by members of the End-Payor Class.

n.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*, with respect to purchases of Aggrenox in Nebraska by members of the End-Payor Class.

o.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Aggrenox in Nevada by members of the End-Payor Class, in that thousands of sales of Aggrenox took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

p.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Aggrenox in New Mexico by members of the End-Payor Class.

q.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Aggrenox in New York by members of the End-Payor Class.

r.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Aggrenox in North Carolina by members of the End-Payor Class.

s.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq.*, with respect to purchases of Aggrenox in North Dakota by members of the End-Payor Class.

t.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Or. Rev. Stat. §§ 646.725, *et seq.*, with respect to purchases of Aggrenox in Oregon by members of the End-Payor Class.

u.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Aggrenox in Puerto Rico by members of the End-Payor Class.

v.      Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-4, *et seq.*, with respect to purchases of Aggrenox in Rhode Island by members of the End-Payor Class.

w.      Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*, with respect to purchases of Aggrenox in South Dakota by members of the End-Payor Class.

u.      Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee by members of the End-Payor Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee  being forced to purchase a more expensive branded Aggrenox product.

y.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.*, with respect to purchases of Aggrenox in Utah by members of the End-Payor Class who reside in Utah.

z.  Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Aggrenox in Vermont by members of the End-Payor Class.

aa. Defendants have intentionally and unlawfully engaged in a combination and conspiracy in restraint of trade in violation of W. Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Aggrenox in West Virginia by members of the End-Payor Class.

bb. Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases of Aggrenox in Wisconsin by members of the End-Payor Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin being forced to purchase a more expensive branded Aggrenox product.

177. End-Payor Plaintiffs and End-Payor Class members have been injured in their business or property as a direct and proximate result by Defendants' anticompetitive conduct. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Aggrenox products, and (2) being forced to purchase a more expensive branded Aggrenox product. These injuries are of the type the above antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

178. As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox. And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. In addition, Teva is liable for its own unlawful conduct.

179. End-Payor Plaintiffs and End-Payor Class members seek damages and multiple damages as permitted by law for the injuries they suffered as a result of the Defendants' anticompetitive conduct.

180. Defendants are jointly and severally liable for all damages suffered by End-Payor Plaintiffs and End-Payor Class members.

181. Defendants have engaged in unfair competition or unfair acts or practices in violation of the above-listed state antitrust laws.

## COUNT THREE

### CONSPIRACY TO MONOPOLIZE UNDER STATE LAW
### (Against all Defendants)

182. End-Payor Plaintiffs repeat and reallege all preceding paragraphs in this Complaint as if fully set forth herein.

183. At all relevant times, Boehringer possessed monopoly power in the relevant market.

184. Boehringer entered into an illegal agreement (reverse payment settlement agreement) with Barr, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Aggrenox as described herein.

185. The goal, purpose and effect of the illegal agreement were for Boehringer to maintain and extend its monopoly power in the Aggrenox market.

186. End-Payor Plaintiffs and members of the End-Payor Class indirectly purchased substantial amounts of Aggrenox from Boehringer.

187. With timely competitive market entry by manufacturers of generic Aggrenox,

End-Payor Plaintiffs and members of the End-Payor Class would have substituted lower-priced generic Aggrenox for the higher priced branded version for some or all of their Aggrenox requirements, and/or would have paid lower net prices on their remaining purchases.

188.    Defendants each committed at least one overt act in furtherance of the conspiracy.

189.    As a result of Defendants' illegal concerted conduct, End-Payor Plaintiffs and members of the End-Payor Class were forced to pay, and did pay, more than they would have paid for Aggrenox or a generic equivalent.

190.    By engaging in the foregoing misconduct, Boehringer has violated the following state antitrust laws:

a.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Ariz. Rev. Stat. §§ 44-1402, *et seq.*, with respect to purchases of Aggrenox in Arizona by members of the End-Payor Class.

b.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases of Aggrenox in California by members of the End-Payor Class.

c.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Aggrenox in the District of Columbia by members of the End-Payor Class.

d.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Fla. Stat. §§ 542.19, *et seq.*, and 501.201, *et seq.*, with respect to purchases of Aggrenox in Florida by members of the End-Payor Class.

e.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Haw. Rev. Stat. §§ 480-9, *et seq.*, with respect to purchases of Aggrenox in Hawaii by members of the End-Payor Class.

f.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Iowa Code §§ 553.4, *et*

*seq.*, with respect to purchases of Aggrenox in Iowa by members of the End-Payor Class.

g.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Aggrenox in Kansas by members of the End-Payor Class.

h.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Aggrenox in Massachusetts by members of the End-Payor Class, with thousands of Massachusetts end-payors being forced to pay higher prices for Aggrenox in actions and transactions occurring substantially within Massachusetts.

i.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Aggrenox in Michigan by members of the End-Payor Class.

j.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of Aggrenox in Minnesota by members of the End-Payor Class.

k.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Aggrenox in Mississippi by members of the End-Payor Class.

l.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Neb. Rev. Stat. Ann. §§ 59-802, *et seq.*, with respect to purchases of Aggrenox in Nebraska by members of the End-Payor Class.

m.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Aggrenox in Nevada by members of the End-Payor Class, in that thousands of sales of Aggrenox took place in Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

n.  Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356, 356:2, 356:3, *et seq.*, with respect to purchases of Aggrenox in New Hampshire by members of the End-Payor Class.

o.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq*., with respect to purchases of Aggrenox in New Mexico by members of the End-Payor Class.

p.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*., with respect to purchases of Aggrenox in New York by members of the End-Payor Class.

q.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq*., with respect to purchases of Aggrenox in North Carolina by members of the End-Payor Class.

r.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq*., with respect to purchases of Aggrenox in North Dakota by members of the End-Payor Class.

s.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of R.I. Gen. Laws §§ 6-36-7, *et seq*., with respect to purchases of Aggrenox in Rhode Island by members of the End-Payor Class.

t.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq*., with respect to purchases of Aggrenox in South Dakota by members of the End-Payor Class.

u.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*., with respect to purchases of Aggrenox in Tennessee by members of the End-Payor Class.

v.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Utah Code Ann. §§ 76-10-3104, *et seq*., with respect to purchases of Aggrenox in Utah by members of the End-Payor Class who reside in Utah.

w.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*., with respect to purchases of Aggrenox in Vermont by members of the End-Payor Class.

x.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of W. Va. Code §§ 47-18-3,

*et seq.*, with respect to purchases of Aggrenox in West Virginia by members of the End-Payor Class.

y.    Defendants have intentionally and unlawfully engaged in a conspiracy to monopolize the relevant market in violation of Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Aggrenox in Wisconsin by members of the End-Payor Class in that the actions and transactions alleged herein substantially affected people of Wisconsin, with thousands of end-payors in Wisconsin being forced to pay substantially higher prices for Aggrenox at Wisconsin pharmacies.

## COUNT FOUR

### MONOPOLIZATION UNDER STATE LAW
### (Against All Boehringer Defendants)

191.    End-Payor Plaintiffs repeat and reallege all preceding paragraphs in this Complaint as if fully set forth herein.

192.    At all relevant times, Boehringer possessed monopoly power in the relevant market.

193.    Boehringer entered into an illegal agreement (Exclusion Payment Agreement) with Barr, as part of an overall scheme, to settle a patent infringement suit in order to maintain its monopoly power in the market for Aggrenox as described herein.

194.    The goal, purpose and effect of the illegal agreement was for Boehringer to maintain and extend its monopoly power in the Aggrenox market.

195.    End-Payor Plaintiffs and members of the End-Payor Class indirectly purchased substantial amounts of Aggrenox from Boehringer.

196.    As a result of Defendants' illegal conduct, End-Payor Plaintiffs and members of the End-Payor Class were forced to pay, and did pay, more than they would have paid for Aggrenox.

197.    Had manufacturers of generic Aggrenox entered the market and lawfully

competed in a timely fashion, End-Payor Plaintiffs and members of the End-Payor Class would

have substituted lower-priced generic Aggrenox for the higher priced branded version for some

or all of their Aggrenox requirements, and/or would have paid lower net prices on their

remaining Aggrenox purchases.

198.    By engaging in the foregoing misconduct, Boehringer has violated the following

state antitrust laws:

a.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Ariz. Rev. Stat. §§ 44-1403, *et seq.*, with respect to purchases of Aggrenox in Arizona by members of the End-Payor Class.

b.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases of Aggrenox in California by members of the End-Payor Class.

c.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of D.C. Code §§ 28-4503, *et seq.*, with respect to purchases of Aggrenox in the District of Columbia by members of the End-Payor Class.

d.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Fla. Stat. §§ 542.19, *et seq.* and 501.201, *et seq.*, with respect to purchases of Aggrenox in Florida by members of the End-Payor Class.

e.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Haw. Rev. Stat. §§ 480, *et seq.*, with respect to purchases of Aggrenox in Hawaii by members of the End-Payor Class.

f.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Iowa Code §§ 553, *et seq.*, with respect to purchases of Aggrenox in Iowa by members of the End-Payor Class.

g.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation

of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Aggrenox in Kansas by members of the End-Payor Class.

h.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. tit.10, §§ 1102, *et seq.*, with respect to purchases of Aggrenox in Maine by members of the End-Payor Class.

i.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Mass. Ann. Laws ch. 93A, *et seq.*, with respect to purchases of Aggrenox in Massachusetts by members of the End-Payor Class.

j.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases of Aggrenox in Michigan by members of the End-Payor Class.

k.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, *et seq.*, and Minn. Stat. §§ 8.31, *et seq.*, with respect to purchases of Aggrenox in Minnesota by members of the End-Payor Class.

l.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Miss. Code Ann. §§ 75-21-3, *et seq.*, with respect to purchases of Aggrenox in Mississippi by members of the End-Payor Class.

m.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Neb. Rev. Stat. Ann. §§ 59-802, *et seq.*, with respect to purchases of Aggrenox in Nebraska by members of the End-Payor Class.

n.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Nev. Rev. Stat. Ann. §§ 598A.060, *et seq.*, with respect to purchases of Aggrenox in Nevada by members of the End-Payor Class.

o.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of N.H. Rev. Stat. Ann. §§ 356, 356:2, 356:3, *et seq.*, with respect to purchases of Aggrenox in New Hampshire by members of the End-Payor Class.

p.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-2, *et seq*., with respect to purchases of Aggrenox in New Mexico by members of the End-Payor Class.

q.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of N.Y. Gen. Bus. Law §§ 340, *et seq*., with respect to purchases of Aggrenox in New York by members of the End-Payor Class.

r.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-2.1, *et seq*., with respect to purchases of Aggrenox in North Carolina by members of the End-Payor Class.

s.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of N.D. Cent. Code §§ 51-08.1-02, *et seq*., with respect to purchases of Aggrenox in North Dakota by members of the End-Payor Class.

t.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of R.I. Gen. Laws §§ 6-36-1, *et seq*., with respect to purchases of Aggrenox in Rhode Island by members of the End-Payor Class.

u.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of S.D. Codified Laws Ann. §§ 37-1-3.2, *et seq*., with respect to purchases of Aggrenox in South Dakota by members of the End-Payor Class.

v.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25- 101, *et seq*., with respect to purchases of Aggrenox in Tennessee by members of the End-Payor Class and Boehringer's unlawful conduct has had a substantial effect on Tennessee commerce.

w.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-1301, *et seq*., with respect to purchases of Aggrenox in Utah by members of the End-Payor Class who reside in Utah.

x.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation

of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*, with respect to purchases of Aggrenox in Vermont by members of the End-Payor Class.

y.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-3, *et seq.*, with respect to purchases of Aggrenox in West Virginia by members of the End-Payor Class.

z.      Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of Wis. Stat. §§ 133.03, *et seq.*, with respect to purchases of Aggrenox in Wisconsin by members of the End-Payor Class.

aa.     Boehringer has intentionally and unlawfully conspired with another person to maintain its monopoly power in the relevant market in violation of the Puerto Rico Antitrust Act 10 L.P.R.A. 263, *et seq.*, with respect to purchases of Aggrenox in Puerto Rico by members of the End-Payor Class.

199.      End-Payor Plaintiffs and members of the End-Payor Class have been injured in their business or property by reason of Boehringer's antitrust violations alleged herein. Their injury consists of being forced to purchase a more expensive branded Aggrenox product. This injury is of the type the antitrust and consumer protection laws of the above States, the District of Columbia and the territories were designed to prevent and flows from that which makes Boehringer's conduct unlawful.

## COUNT FIVE

## CONSUMER PROTECTION AND UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW
### (Against all Defendants)

200.      End-Payor Plaintiffs repeat and realleges all preceding paragraphs in this Complaint as if fully set forth herein.

201.      Defendants engaged in unfair competition or unfair acts or practices in violation of the state consumer protection statutes listed below.

202. There was a gross disparity between the price that End-Payor Plaintiffs and the End-Payor Class members paid for the brand product and the value received, given that a less expensive substitute generic product should have been available.

203. As a direct and proximate result of Defendants' unfair competition or unfair acts or practices in violation of the state consumer protection statutes listed below, End-Payor Plaintiffs and End-Payor Class members were deprived of the opportunity to purchase a generic version of Aggrenox and forced to pay higher prices.

204. By engaging in the foregoing conduct, Defendants have violated the following state unfair trade practices and consumer fraud laws:

    a.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Ariz. Rev. Stat. §§ 44-1522, *et seq.*

    b.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

    c.    Defendants have engaged in unfair competition or unfair acts or practices or made false representations in violation of D.C. Code §§ 28-3901, *et seq.*

    d.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.*

    e.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Haw. Rev. Stat. §§ 480, *et seq.*

    f.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Iowa Code §§ 714.16, *et seq.*

    g.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq.*

    h.    Defendants have engaged in unfair competition or unfair acts or practices in violation of 815 Ill. Comp. Stat. Ann. §§ 505/1, *et seq.*

    i.    Defendants have engaged in unfair competition or unfair acts or practices in violation of Kan. Stat. Ann. §§ 50-623, *et seq.*

j.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Me. Rev. Stat. tit. 5 §§ 207, *et seq.*

k.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Mass. Gen. Laws ch. 93A, *et seq.*

l.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

m.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Mo. Ann. Stat. §§ 407.010, *et seq.*

n.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Mont. Code Ann. §§ 30-14-101, *et seq.*

o.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.*

p.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, *et seq.*

q.      Defendants have engaged in unfair competition or unfair acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

r.      Defendants have engaged in unfair competition or unfair acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.*

s.      Defendants have engaged in unfair competition or unfair acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, *et seq.*

t.      Defendants have engaged in unfair competition or unfair acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq.*

u.      Defendants have engaged in unfair competition or unfair acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

v.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, *et seq.*

w.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Utah Code Ann. §§ 13-11-1, *et seq.*

x.      Defendants have engaged in unfair competition or unfair acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, *et seq.*

y.      Defendants have engaged in unfair competition or unfair acts or practices in violation of W. Va. Code §§ 46A-6-101, *et seq.*

z.      Plaintiff and the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair or unconscionable acts alleged herein.  Their injury consists of being forced to purchase a more expensive branded Aggrenox product.This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## COUNT SIX

### UNJUST ENRICHMENT
**(Against All Defendants)**

205.    End-Payor Plaintiffs incorporate the preceding paragraphs by reference.

206.    To the extent required, this claim is pled in the alternative to the other claims in this Complaint.

207.    Defendants have benefited from the overcharges on sales of Aggrenox made possible by the unlawful and inequitable acts alleged in this Complaint.

208.    Defendants' financial benefits are traceable to End-Payor Plaintiffs' and End-Payor Class members' overpayments for Aggrenox.

209.    End-Payor Plaintiffs and class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of End-Payor Plaintiffs and the End-Payor Class members.

210.    It would be futile for End-Payor Plaintiffs and End-Payor Class members to seek a remedy from any party with whom they had or have privity of contract.  Defendants have paid no consideration to anyone for any of the benefits they received indirectly from End-Payor Plaintiffs and End-Payor Class members.

211.    It would be futile for End-Payor Plaintiffs and End-Payor Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Aggrenox, as those intermediaries are not liable and would not compensate End-Payor Plaintiffs and the End-Payor Class members for Defendants' unlawful

conduct.

212. The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Aggrenox is a direct and proximate result of Defendants' unlawful practices.

213. The financial benefits Defendants derived rightfully belong to End-Payor Plaintiffs and End-Payor Class members, who paid anticompetitive prices that inured to Defendants' benefit.

214. It would be inequitable under unjust enrichment principles under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia and Puerto Rico for Defendants to retain any of the overcharges End-Payor Plaintiffs and End-Payor Class members paid for Aggrenox that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

215. Defendants are aware of and appreciate the benefits bestowed upon them by End-Payor-Plaintiffs and the End-Payor Class.

216. Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of End-Payor Plaintiffs and End-Payor Class members.

217. A constructive trust should be imposed upon all unlawful or inequitable sums the

Defendants received that are traceable to End-Payor Plaintiffs and End-Payor Class members.

218.     End-Payor Plaintiffs and End-Payor Class members have no adequate remedy at law.

219.    As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox.  And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct.  In addition, Teva is liable for its own unlawful conduct.

## COUNT SEVEN
## UNJUST ENRICHMENT
### (Connecticut Unjust Enrichment Count Against All Defendants)

191.     End-Payor Plaintiffs incorporate the preceding paragraphs by reference.

192.     To the extent required, this claim is pled in the alternative to the other claims in this Complaint.  Defendant Boehringher is headquartered in Ridgefield, Connecticut. Connecticut unjust enrichment law can be applied to a national class since the conduct in this case emanated from Boehringher's Connecticut headquarters.

193.     Defendants have benefited from the overcharges on sales of Aggrenox made possible by the unlawful and inequitable acts alleged in this Complaint.

194.     Defendants' financial benefits are traceable to End-Payor Plaintiffs' and End-Payor Class members' overpayments for Aggrenox.

195.     End-Payor Plaintiffs and class members have conferred an economic benefit upon the Defendants in the nature of profits resulting from unlawful overcharges, to the economic detriment of End-Payor Plaintiffs and the End-Payor Class members.

196.     It would be futile for End-Payor Plaintiffs and End-Payor Class members to seek

a remedy from any party with whom they had or have privity of contract.  Defendants have paid no consideration to anyone for any of the benefits they received indirectly from End-Payor Plaintiffs and End-Payor Class members.

197.    It would be futile for End-Payor Plaintiffs and End-Payor Class members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Aggrenox, as those intermediaries are not liable and would not compensate End-Payor Plaintiffs and the End-Payor Class members for Defendants' unlawful conduct.

198.    The economic benefit Defendants derived from charging monopolistic and artificially inflated prices for Aggrenox is a direct and proximate result of Defendants' unlawful practices.

199.    The financial benefits Defendants derived rightfully belong to End-Payor Plaintiffs and End-Payor Class members, who paid anticompetitive prices that inured to Defendants' benefit.

200.    It would be inequitable under unjust enrichment principles under the law of Connecticut for Defendants to retain any of the overcharges End-Payor Plaintiffs and End-Payor Class members paid for Aggrenox that were derived from Defendants' unfair and unconscionable methods, acts, and trade practices.

201.    Defendants are aware of and appreciate the benefits bestowed upon them by End-Payor-Plaintiffs and the End-Payor Class.

202.    Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of End-Payor Plaintiffs and End-Payor Class members.

203.    A constructive trust should be imposed upon all unlawful or inequitable sums the Defendants received that are traceable to End-Payor Plaintiffs and End-Payor Class members.

204.    End-Payor Plaintiffs and End-Payor Class members have no adequate remedy at law. As a successor in interest to Barr, Teva is liable for all of Barr's anticompetitive conduct in connection with Aggrenox. And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct that occurred prior to the date on which it joined the ongoing unlawful course of conduct. In addition, Teva is liable for its own unlawful conduct.

## XIV.  DEMAND FOR JUDGMENT

WHEREFORE, End-Payor Plaintiffs, on their own behalf and on behalf of the proposed End-Payor Class, demands a judgment that:

A.  Determines that this case may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), directs that reasonable notice of this case be given to class members under Rule 23(c)(2), and declares that End-Payor Plaintiffs are proper representative of the class;

B.  Declares that Defendants' conduct violated Sections 1 and 2 of the Sherman Act, the other statutes set forth above, and the common law of unjust enrichment;

C.  Enjoins Defendants from continuing their illegal activities;

D.  Enters joint and several judgments against Defendants and in favor of End-Payor Plaintiffs and the End-Payor Class;

E.  Grants End-Payor Plaintiffs and the End-Payor Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy the Defendants' unjust enrichment;

F.  Awards the End-Payor Class damages and, where applicable, treble, multiple, punitive, and other damages, in an amount to be determined at trial, including interest;

G.  Awards End-Payor Plaintiffs and the End-Payor Class their costs of suit, including reasonable attorneys' fees as provided by law; and

H.  Grants further relief as necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court deems just.

## XV.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, End-Payor Plaintiffs, on behalf of themselves and the proposed End-Payor Class, demand a trial by jury on all issues so triable.

June 16, 2014                                By:  */s/ Michael M. Buchman*

Michael M. Buchman
John A. Ioannou
**MOTLEY RICE LLC**
600 Third Avenue, Suite 2101
New York, NY 10016
Telephone: (212) 577-0040
Facsimile: (212) 577-0054
mbuchman@motleyrice.com
jioannou@motleyrice.com

William H. Narwold
Mathew P. Jasinski
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1676
bnarwold@motleyrice.com
mjasinski@motleyrice.com

*Liaison Counsel for the Proposed End-Payor Class*

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
mmiller@MillerLawLLC.com
lfanning@millerlawllc.com

Steve D. Shadowen
Anne K. Fornecker
**HILLIARD & SHADOWEN LLC**
39 West Main Street

Mechanicsburg, PA 17055
Telephone: (855) 344-3928
steve@hilliardshadowenlaw.com
anne@hilliardshadowen.com

Vincent Esades
David R. Woodward
Renae D. Steiner
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
vesades@heinsmills.com
dwoodward@heinsmills.com
rsteiner@heinsmills.com

*Interim Co-Lead Counsel for the Proposed
End-Payor Class*

Daniel C. Girard
Dena C. Sharp
Scott M. Grzenczyk
**GIRARD GIBBS LLP**
601 California Street
San Francisco, CA 94108
Telephone: (415) 981-4800
dcg@girardgibbs.com
chc@girardgibbs.com
smg@girardgibbs.com

J. Douglas Richards
Sharon K. Robertson
**COHEN MILSTEIN SELLERS &
TOLL, PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com
srobertson@cohenmilstein.com

David W. Mitchell
Brian O. O'Mara
**ROBBINS GELLAR RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101

Tel: (619) 231-1058
Fax: (619) 231-7423
davidm@rgrdlaw.com

Natalie Finkelman Bennett
James C. Shah
Eric L. Young
**SHEPHERD, FINKELMAN, MILLER & SHAH
LLP**
35 East State Street
 Media, PA 19063
(610) 891-9880
nfinkelman@sfmslaw.com
jshah@sfmslaw.com
elyoung@sfmslaw.com

*Executive Committee Members for the
Proposed End-Payor Class*