UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN RE AGGRENOX ANTITRUST
LITIGATION

No. 3:14-md-2516 (SRU)

THIS DOCUMENT RELATES TO:
ALL ACTIONS

## MEMORANDUM OF DECISION AND ORDER

This case aggregates numerous antitrust actions brought by numerous plaintiffs in various districts against several interrelated pharmaceutical companies, all transferred to this Court by the Judicial Panel on Multidistrict Litigation. Under a Practice and Procedure Order (doc. # 37), the actions are consolidated into two groups: all direct-purchaser actions, and all indirect-purchaser actions (the indirect purchasers also style themselves "end payors"). Two consolidated, putative class-action complaints have accordingly been filed. One of the indirect purchasers (or end payors), Humana, Inc. ("Humana"), which alleges that it has the greatest economic interest of any such plaintiff (and that it alone has standing in every state), is pursuing its claims individually. There are thus three current complaints: (1) the direct-purchaser plaintiffs' putative class complaint (doc. # 109); (2) the indirect-purchaser plaintiffs' (or end-payor plaintiffs') putative class complaint (doc. # 120); and (3) the Humana complaint (doc. # 93).

The defendants are also divisible into several groups: (1) Boehringer Ingelheim Pharma GmbH & Co. KG and Boehringer Ingelheim International GmbH, which are organized under German law, and Boehringer Ingelheim Pharmaceuticals, Inc., which is a Delaware corporation (collectively "Boehringer"); (2) Teva Pharmaceutical Industries, Ltd. ("Teva Israel"), which is organized under Israeli law, and Teva Pharmaceuticals USA, Inc. ("Teva USA"), which is a

Delaware corporation; (3) Barr Pharmaceuticals, Inc. and Barr Laboratories, Inc., which are both

Delaware corporations (collectively "Barr"); and (4) Duramed Pharmaceuticals Inc. and

Duramed Pharmaceuticals Sales Corp., which are both Delaware corporations (collectively

"Duramed"). In 2008, Teva USA acquired Barr Pharmaceuticals. Duramed was, in turn, a

subsidiary of Barr, and thus also became a subsidiary of Teva USA. Teva USA is a subsidiary of

Teva Israel, making all non-Boehringer defendants at least indirect subsidiaries of Teva Israel.

There are four pending motions to dismiss, three of them filed collectively by all

defendants except Teva Israel, and one filed by Teva Israel alone. Those motions are: (1) Teva

Israel's motion to dismiss all complaints against it under Rule 12(b)(2) and Rule 12(b)(6) (doc. #

150); (2) the defendants' motion to dismiss the direct-purchaser complaint under Rule 12(b)(6)

(doc. # 149; sealed mem., doc.168); (3) the defendants' motion to dismiss the indirect-purchaser

complaint under Rule 12(b)(6) (doc. # 151); and (4) the defendants' motion to dismiss the

Humana complaint under Rule 12(b)(6) (doc. # 152).

## I.   Standards of Review

### A.   Rule 12(b)(2)

A plaintiff bears the burden of showing that the court has personal jurisdiction over each

defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).

Where, as here, there has been no discovery on jurisdictional issues and the court is relying

solely on the parties' pleadings and affidavits, the plaintiff need only make a prima facie

showing that the court possesses personal jurisdiction over the defendant. *Bank Brussels Lambert*

*v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

### B.   Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed

"merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

## II.  Discussion

### A.  Factual and Legal Background

This case arises at the intersection of two areas of law that would seem to be naturally at odds with one another: antitrust law—procompetitive by design—which prohibits certain forms of anticompetitive conduct, and patent law—anticompetitive by design—which seeks to

encourage innovation by rewarding innovators with limited legal monopolies. The question at the heart of this case is whether a patent-litigation settlement—that is, an agreement to settle litigation that had put the legitimacy of a patent's grant of monopoly at issue—constituted a violation of antitrust law. Two features dominate the background: (1) the incentives to undertake patent litigation under the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act, and (2) the uncertain but disruptive effect on such litigation of the Supreme Court's recent decision in *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013). I discuss each in turn below, followed by a brief recitation of the central facts of this case.

      1.   *The Hatch-Waxman Act and "Pay for Delay" Settlements*

A pharmaceutical manufacturer seeking to introduce a new prescription drug to market must first obtain the approval of the FDA by filing a New Drug Application and undertaking an extensive and expensive testing process to demonstrate that the drug is safe and effective for its intended purpose. Under the Hatch-Waxman Act, a later manufacturer of a generic equivalent drug need not duplicate that effort, but may instead submit an Abbreviated New Drug Application that relies on the earlier scientific findings related to the already-approved brand-name drug. The abbreviated Hatch-Waxman process benefits consumers by expediting the introduction of low-cost generics to the market.

Hatch-Waxman also establishes special procedures relating to patent disputes and contains provisions that encourage patent challenges. A drug manufacturer filing a New Drug Application must list the number and expiration date of any relevant patent, and a manufacturer filing an Abbreviated New Drug Application must indicate the relationship of its generic drug to any such previously-listed patent in one of several ways. The manufacturer of the generic must certify either that no such patent has been filed, that such patent has expired, the date on which such patent will expire, or "that such patent is invalid or will not be infringed by ... the new

drug." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). That assertion of invalidity or non-infringement is known as "Paragraph IV certification," and insofar as it is inaccurate, it statutorily constitutes infringement, *see* 35 U.S.C. § 271(e)(2)(A), and may therefore provoke litigation; it thus provides a procedure for challenging drug patents without starting production and sales of a possibly-infringing drug and potentially accruing damages. After Paragraph IV certification, the brand-name manufacturer may bring an infringement suit within 45 days and trigger an automatic stay of FDA approval of the generic for 30 months or, if it requires less time than that, until adjudication of the validity of the challenged patent in a district court.[1] *See* 21 U.S.C. § 355(j)(5)(B)(iii).

As an incentive to make such challenges, Hatch-Waxman provides an exclusivity period of 180 days (from the first marketing of the generic) to the first manufacturer to file an Abbreviated New Drug Application with Paragraph IV certification, during which time no other Abbreviated New Drug Application will be approved. *See* § 355(j)(5)(B)(iv). The Supreme Court in *Actavis* observed that the 180-day exclusivity period can be tremendously valuable, possibly worth hundreds of millions of dollars and a majority of the potential profits for a generic drug. 133 S. Ct. at 2229 (citing scholarship and a statement of the Generic Pharmaceutical Association).

Manufacturers of generic drugs have obvious motivation to bring Paragraph IV challenges to patents they believe are vulnerable; and because brand-name drugs sell at such high premiums, their manufacturers have obvious motivation to meet those challenges with infringement suits. But defending patents can be expensive, so brand-name manufacturers may

---

[1] If the validity of the patent has not yet been determined after 30 months, the FDA can give approval to the generic irrespective of possible infringement, but the manufacturer who then begins production of the generic does so at risk of an unfavorable judgment and the accrual of damages to the vindicated patent-holder.

also be motivated to settle the suits—all the more so if they suspect their challenged patents may indeed be vulnerable. Such settlements result in unusual dynamics. For instance, it sometimes happens that the parties settle under terms that require *the plaintiff patent-holder* to pay *the defendant infringer*—sometimes called a "reverse payment" settlement agreement—and to permit the defendant to begin producing a generic at a future date, but a date that is earlier than the expiration of the patent, in exchange for the defendant dropping its patent challenge. Assuming the patent is valid, and that the patent-holder would ultimately prevail, such a settlement means that the patent-holder is avoiding the cost of litigation by agreeing to shorten the length of its legal monopoly and to share some of its monopoly profits with the challenger. Consumers benefit by enjoying the lower prices of generics sooner than they otherwise would under the patent. Assuming, however, that the patent is invalid, and that the challenger would ultimately prevail, then such a settlement amounts to a "pay to delay" agreement: the patent-holder's monopoly is illegitimate, and it is paying a would-be competitor to delay its entry into the market. Consumers who should enjoy competitive prices now will instead pay monopoly prices until the end of the term of the anticompetitive collusion. The availability of such settlements allows manufacturers of brand-name drugs to avoid the invalidation of potentially weak patents and keep prices high by sharing their monopoly profits with manufacturers of generics.

Is that an antitrust violation? Several courts of appeals, including the Second Circuit, have said no, at least absent fraud in obtaining the patent and so long as the settlement terms are within its scope (*i.e.*, consumers will not face a longer period of monopoly under the settlement than they would have faced under the patent, implicitly presuming the patent's validity). *See, e.g.*, *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187 (2d Cir. 2006); *In re Ciprofloxacin*

*Hydrochloride Antitrust Litig.*, 544 F.3d 1323 (Fed. Cir. 2008). Other courts of appeals have said yes, at least unless a presumption of unlawful restraint of trade is rebutted. *See, e.g.*, *In re K-Dur Antitrust Litig.*, 686 F.3d 197 (3d Cir. 2012); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003). The Supreme Court in *Actavis*, abrogating those decisions, said "sometimes."

    2.  *The* Actavis *Decision*

    The facts of *Actavis* in most essentials follow the discussion above: Solvay Pharmaceuticals filed a New Drug Application for a brand-name drug, obtained approval, and later a patent. Actavis, Inc. (among others) filed an Abbreviated New Drug Application for a generic equivalent and certified under Paragraph IV that Solvay's patent was invalid and the proposed generic would not infringe it. Solvay responded with litigation, which later settled, and the terms of the settlement guaranteed Actavis millions of dollars in annual payments from Solvay and allowed it to bring its generic to market at some time before the disputed patent expired, but not immediately. Actavis also agreed to provide some services, such as promoting the brand-name drug, and the companies described the payments as compensation for those services. The FTC sued, alleging that the services had little value and that the purpose of the payments was to compensate a would-be competitor for agreeing to delay competition. The district court held that the FTC failed to set forth an antitrust violation, *In re Androgel Antitrust Litigation (No. II)*, 687 F. Supp. 2d 1371, 1379 (N.D. Ga. 2010), and the Eleventh Circuit affirmed, writing that "absent sham litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent." *FTC v. Watson Pharmaceuticals, Inc.*, 677 F.3d 1298, 1312 (11th Cir. 2012).

    In a 5–3 opinion, the Supreme Court reversed the Eleventh Circuit, holding that such settlement agreements "can sometimes violate the antitrust laws," *Actavis*, 133 S. Ct. at 2227,

and that the plaintiff "should have been given the opportunity to prove its antitrust claim." *Id.* at
2234. The Court reasoned that referring "simply to what the holder of a valid patent could do
does not by itself answer the antitrust question," because *invalidated* patents confer no right to
exclude competition, and the Paragraph IV certification "put the patent's validity at issue, as well
as its actual preclusive scope." *Id.* at 2230–31. It cited legislative history from prior to the
enactment of the 2003 amendments—specifically, statements of Senator Hatch and
Representative Waxman—that clearly condemns reverse-payment settlements, and went on to
conclude that "a reverse payment, where large and unjustified, can bring with it the risk of
significant anticompetitive effects." *Id.* at 2237. It declined to adopt the "quick look" approach,
which would make such settlements presumptively illegal, because "the likelihood of a reverse
payment bringing about anticompetitive effects depends upon its size, its scale in relation to the
payor's anticipated future litigation costs, its independence from other services for which it
might represent payment, and the lack of any other convincing justification." *Id.* The Court
instead adopted the "rule of reason" approach, but as for more specific guidance on how to
analyze "the basic question—that of the presence of significant unjustified anticompetitive
consequences," the Court "leave[s] to the lower courts the structuring of the present rule-of-
reason antitrust litigation." *Id.* at 2238.

Several district courts have already applied *Actavis*, with not entirely consistent results.
*See King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06-CV-1797, 2015 WL 356913 (E.D.
Pa. Jan. 28, 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs
Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. 14-MD-02521-WHO, 2014 WL
6465235 (N.D. Cal. Nov. 17, 2014); *In re Effexor XR Antitrust Litig.*, No. CIV. 11-5479 PGS,
2014 WL 4988410 (D.N.J. Oct. 6, 2014); *In re Niaspan Antitrust Litig.*, No. 13-MD-2460, 2014

WL 4403848 (E.D. Pa. Sept. 5, 2014); *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472-S-PAS, 2014 WL 4368924 (D.R.I. Sept. 4, 2014); *In re Lamictal Direct Purchaser Antitrust Litig.*, No. 12-CV-995 WHW, 2014 WL 282755 (D.N.J. Jan. 24, 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013); *In re Lipitor Antitrust Litig.*, No. 3:12-CV-2389 PGS, 2013 WL 4780496 (D.N.J. Sept. 5, 2013). As of the date of this writing, at least one case applying *Actavis* has been argued before a federal Court of Appeals—*In re Lamictal* was argued at the Third Circuit in November 2014—but none of the circuits has yet issued an opinion interpreting it. There are some questions that arise in the application of *Actavis* that the district courts may answer in divergent ways—questions like what constitutes a reverse "payment," and what makes one "large" and "unjustified." Some of those questions will surely end up in the Courts of Appeals, and perhaps eventually back again at the Supreme Court. As one of the courts above observed, "[w]e are confronting this issue early in a law refinement process that will take some time to shake out." *In re Loestrin 24 Fe Antitrust Litig.*, 2014 WL 4368924, at *13.

    3.  *Aggrenox*

The facts of the Aggrenox litigation, as they appear in the pleadings, are virtually identical in essential respects to those of *Actavis*. Aggrenox is a brand-name prescription medication consisting of a particular combination of dipyridamole and aspirin. In January 2000, Boehringer obtained U.S. Patent No. 6,015,577 on the composition ("the '577 patent"), after having obtained FDA approval in November 1999 for its use to lower the risk of stroke in patients who have already had a stroke or transient ischemic attack. Boehringer listed the patent with the FDA and brought Aggrenox to market, where it has been a commercial success.

In January 2007—ten years before patent '577 is set to expire—Barr filed an Abbreviated New Drug Application seeking approval to market a generic equivalent of Aggrenox, with

Paragraph IV certification challenging the '577 patent. Boehringer brought suit in the District of Delaware. At the same time, Barr also intended to introduce a generic of another Boehringer product, Mirapex, and separate litigation on that issue was pending in the District of Delaware. In August 2008, Boehringer and Barr settled all patent litigation between them, with respect to both Aggrenox and Mirapex. They contemporaneously entered a settlement agreement, an Aggrenox license, a Mirapex license, and a Co-Promotion Agreement. Among other things, Barr agreed to drop its patent challenge and not market generic Aggrenox until July 2015 (eighteen months prior to the expiration of the patent), and that Duramed (a Barr subsidiary) would use its specialized sales force to educate obstetricians and gynecologists about Aggrenox. Barr would be compensated based on several factors, including net sales of Aggrenox, regardless of whether its co-promotion generated any additional sales (the FTC estimated that the deal would cost Boehringer over $120 million in royalties). The agreements were announced publicly in a press release. The FTC commenced an inquiry in January 2009, which is apparently ongoing.

In August 2009, at least some of the same parties and lawyers in the present litigation brought suit against Boehringer in the Western District of Pennsylvania, alleging that the 2008 settlement was intended to delay entry of generic Mirapex in violation of antitrust law. When the Federal Circuit upheld the validity of the Mirapex patent, the plaintiffs in that case dropped their suit. In 2013, the various suits consolidated here began to be filed, now alleging that the 2008 settlement was intended to delay entry of generic Aggrenox in violation of antitrust law.

B.  Federal Antitrust Claims

1.  *Statute of Limitations*

The defendants argue in all of their motions to dismiss (most extensively in their motion to dismiss the direct-purchaser complaint, and that discussion is incorporated by reference in the other motions) that the 2013 claims are time-barred. There is no dispute that the statute of

limitations for Sherman Act claims is four years from when "the cause of action accrued," 15 U.S.C. § 15b, and that an antitrust cause of action generally accrues "when a defendant *commits* an act that *injures* a plaintiff's business," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (emphasis added), but the parties differently emphasize the commission of the act itself and the consummation of the act in an injury, taking different positions on the applicability of *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).

The defendants offer two possibilities: the claims accrued in August 2008, when the Aggrenox settlement was reached and publicly announced; or in August 2009, when the FDA approved Barr's Abbreviated New Drug Application for a generic equivalent to Aggrenox. If the defendants committed some discrete anticompetitive act, then surely—as the complaints allege— it was the 2008 agreement. If injury was only speculative at that date, because Barr did not yet have approval to begin production of the generic, then surely it would become real in August 2009 when that approval was obtained. Both dates put the November 2013 filing of the first direct-purchaser complaint outside of the four-year window. The defendants also argue that the end of the automatic 30-month stay of FDA approval of a generic that was triggered by the filing of Boehringer's infringement suit—though falling just within four years of the filing of the first complaint—should not be taken as the accrual date. They argue that under the plaintiffs' theory of the case (at least as the defendants understand it), the invalidity of Boehringer's patent would have been determined in court (and the avoidance of this inevitability was the motivation for the settlement), and thus the stay would have ended prior to the 30-month period. The plaintiffs cannot be permitted, the defendants insist, to argue for an earlier date when arguing that the settlement caused the specific harm of delayed entry of a generic, but to argue for a later date for purposes of the statute of limitations.

11

The plaintiffs, however, believe the defendants are attempting to dodge *Berkey Photo*, which distinguishes injured rivals from injured purchasers in antitrust actions. "Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs," the Second Circuit reasoned, "a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. . . . So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. . . . The purchaser's cause of action, therefore, accrues only on the date damages are suffered . . . ." 603 F.2d at 295 (internal quotation marks omitted).

The defendants argue that *Berkey Photo* does not apply, because its analysis relied on circumstances in which plaintiffs might not yet have reason to believe they were injured within the limitations period. The case as they see it therefore stands for a narrow "speculative damages" exception, and more expansive language is mere dicta. Moreover, the defendants insist, this case and others that the plaintiffs cite rely on *ongoing* instances of discrete anticompetitive conduct within the limitations period, not merely carrying out the terms of an earlier agreement. They argue that the Second Circuit has distinguished between the new and independent acts needed to maintain a conspiracy and inertial consequences flowing from a discrete act. The defendants rely most heavily on *United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013), a criminal case dismissing a conspiracy-to-commit-wire-fraud indictment on grounds of a lapsed limitations period. The defendants also cite various other cases in addition to *Grimm* for the proposition that courts in the Second Circuit very strongly disfavor the "continuing violation" doctrine, and for the narrowness of the exception that the doctrine purportedly represents. *See, e.g.*, *Pressley v. City of N.Y.*, 2013 WL 145747 (E.D.N.Y. Jan. 14, 2013); *Trinidad v. N.Y. City*

*Dept. of Corr.*, 423 F. Supp. 2d 151 (S.D.N.Y. 2006); *In re Ciprofloxacin Hydrochloride*

*Antitrust Litig.*, 261 F. Supp. 2d 188 (E.D.N.Y. 2003); *Schultz v. Texaco Inc.*, 127 F. Supp. 2d

443 (S.D.N.Y. 2001). But the cited decisions are either not antitrust cases, or they do not

examine the issue pertinent here of purchasers alleging ongoing overcharges. None of them

abrogates or otherwise casts doubt on the authority or reasoning of *Berkey Photo*, and none of

them so squarely meets the allegations in this case as *Berkey Photo* does.

The defendants are correct that the *Berkey Photo* Court discusses speculative damages

and the potential of anticompetitive conduct to harm even businesses that do not yet exist at the

time of the conduct. It is inaccurate, however, to suggest that the court used any such limiting

language in its holding, or that the plaintiffs have misplaced reliance on its dicta. On the

contrary, cutting through any dispute about what is and is not mere dictum, the court expressly

flags its holding: "We hold, therefore, that a purchaser suing a monopolist for overcharges paid

within the previous four years may satisfy the conduct prerequisite to recovery by pointing to

anticompetitive actions taken before the limitations period." 603 F.2d at 296. That is precisely

the scenario that the plaintiffs allege. They allege, in fact, not just overcharges paid within the

previous four years, but overcharges that are ongoing. Even if, as defendants argue, the

prerequisite anticompetitive conduct occurred wholly outside of the four-year limitations period,

the plaintiffs' claims still fall clearly and squarely under the holding of *Berkey Photo*.

Courts in other districts and circuits have used the same reasoning applied in *Berkey*

*Photo*—a purchaser suing a monopolist for overcharges is injured anew by each overcharge—

and have come to the same result. *See, e.g.*, *In re Niaspan Antitrust Litig.*, 2014 WL 4403848, at

*7 (E.D. Pa. Sept. 5, 2014) ("Every court to have considered this issue in the pay-for-delay

context has held that a new cause of action accrues to purchasers upon each overpriced sale of

the drug.") (*citing In re K–Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 549 (D.N.J. 2004)

("Plaintiffs' claims are not barred by the statute of limitations to the extent that they bought and

overpaid for K–Dur within the applicable time limitations."); *In re Buspirone Patent Litig.*, 185

F. Supp. 2d 363, 378 (S.D.N.Y. 2002) ("[I]f a party commits an initial unlawful act that allows it

to maintain market control and overcharge purchasers for a period longer than four years,

purchasers maintain a right of action for any overcharges paid within the four years prior to their

filings."); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12–md–2343, 2013 WL 2181185

(E.D. Tenn. May 20, 2013) (holding that the plaintiffs' claims were timely because they were

"overcharged for metaxalone well into the limitations period")).

      I conclude that the federal antitrust claims are timely for all overcharges alleged to have

been incurred within the four years preceding the filing of the claims.

      2.  *Antitrust Injury Under* Actavis

      The defendants argue that the plaintiffs do not plausibly allege antitrust injury, because

any injury at all is predicated upon the assumption that Barr would have prevailed in its patent

challenge, and because the plaintiffs make only the conclusory allegation that the patent was

weak. The plaintiffs, they say, simply make no allegation meeting the plausibility standard on a

motion to dismiss that the '577 patent would have been found invalid, or that a generic would

have been introduced "at-risk," if only the defendants had not entered into the challenged

settlement agreement. There is thus no plausible allegation of actual injury, the argument goes,

because there is no plausible allegation of actual delay of the entry of a generic. That argument,

however logically compelling it might be in isolation, fails to engage seriously with the Supreme

Court's reasoning in *Actavis*, which poses an insurmountable obstacle to it.

      The essential problem with the divergent rules for the treatment of reverse-payment

patent-litigation settlements before *Actavis* is that they made (likely unjustifiable) presumptions

14

about the validity of the underlying patents, which was the very issue disputed in the underlying patent litigation. Under the old "scope of the patent" test, which was rejected in *Actavis*, any settlement less restrictive than the patent was immune from antitrust scrutiny. But "to refer . . . simply to what the holder of a valid patent could do does not by itself answer the antitrust question," the Court held, because the patent "may or may not be valid, and may or may not be infringed. A *valid* patent excludes all except its owner from the use of the protected process or product . . . . But an *invalidated* patent carries with it no such right." *Actavis*, 133 S. Ct. at 2230–31 (internal quotations and citation omitted). The patent's validity was precisely the disputed issue in the litigation, and the settlement ended that litigation. Taking the patent's exclusionary scope as the baseline does indeed make procompetitive any settlement that reflects any lesser exclusion; but that baseline presumes the validity of the patent. The opposite presumption—taking the invalidity of the patent as the baseline—would make any period of excluded competition that is agreed to in a settlement, no matter how much shorter than the patent's period of exclusion, necessarily anticompetitive. Both presumptions are impermissible.

The defendants, by expecting the plaintiffs to plead with specificity reasons to infer that the '577 patent would ultimately have been invalidated, appear to presume that the Supreme Court in *Actavis* favored a rule that required litigating the patent's merits, at least in some abbreviated fashion, in order to determine whether a settlement violates antitrust law. That would be a logical (however impractical) way to avoid presuming either the patent's validity or invalidity, but the Supreme Court expressly disclaimed it:

> [I]t is normally not necessary to litigate patent validity to answer the antitrust question . . . . An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival. And that fact, in turn, suggests that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what

> might have been a competitive market—the very anticompetitive consequence that underlies the claim of antitrust unlawfulness.

*Id.* at 2236. The "unexplained large reverse payment" serves as a proxy for the weakness of the patent, which thus need not be proved (or pleaded) directly. Moreover, the Court identified the pertinent "anticompetitive consequence," which does not appear to depend on the conclusive invalidity of the patent. The antecedent of the appositive clause identifying the anticompetitive consequence contains a telling subjunctive: "to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what *might have been* a competitive market" (emphasis added). The Court was still clearer a few sentences later:

> The owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely *seeks to prevent the risk* of competition. And, as we have said, *that consequence constitutes the relevant anticompetitive harm*. In a word, the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself.

*Id.* at 2236–37 (emphasis added). The anticompetitive harm is *not* that the patent surely would have been invalidated if not for the settlement, and that a generic therefore surely would have entered the market sooner; if that were the anticompetitive harm, a determination of a patent settlement's lawfulness under antitrust law would require the very same patent litigation that the settlement avoided. The anticompetitive harm, under *Actavis*, is that the reverse-payment settlement "seeks to *prevent the risk* of competition" (emphasis added). The plaintiffs thus need not plead (or prove) the weakness of the '577 patent, because the patent's ultimate validity is not at issue. Rather, they must plead facts sufficient to infer (and they must ultimately prove, within the rule-of-reason framework) that a large and otherwise unjustified reverse-payment was made as part of the settlement in order to shore up some perceived *risk* of the '577 patent's invalidity.

16

The rule of *Actavis* might seem unusual or counterintuitive given the typical settlement context. The value of a lawsuit is traditionally estimated as the expected value of judgment multiplied by the probability of liability, less litigation costs. The probabilities are of course always rough estimates, but the parties evaluate the favorability of potential settlements by their respective estimation of risk and the allocation of that value between them. In the Hatch-Waxman context, however, where litigation was provoked by Paragraph IV certification (and production of allegedly infringing product need not have begun), there may be no actual damages, and the adverse outcome for the patent-holder is measured not by the size of a potential judgment but by the forgone monopoly profits in the event of patent invalidation. Any settlement that takes the risk of patent invalidation into account will tacitly reflect the value of continuing the patent monopoly. Of course it will generally be in the interest of both patent-holder and patent-challenger to share the monopoly profits rather than compete:

> Indeed, there are indications that patentees sometimes pay a generic challenger a sum even larger than what the generic would gain in profits if it won the paragraph IV litigation and entered the market. The rationale behind a payment of this size cannot in every case be supported by traditional settlement considerations. The payment may instead provide strong evidence that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market.

*Id.* at 2235 (citation omitted). In such cases, the *ex ante* probability of patent invalidation will factor only into the allocation of monopoly profits between patent-holder and patent-challenger, while the consumer bears the cost of monopoly prices irrespective of the patent's strength or weakness.

Of course, the *actual* expected cost of litigation for the patent-holder necessarily includes the risk of invalidation and forgone monopoly profits, whether or not that is a permissible settlement consideration. It is thus no surprise if pre-*Actavis* settlements in the Hatch-Waxman

context frequently included large payments flowing from patent-holders to patent-challengers (that is, large "reverse" payments), and we might therefore expect *Actavis* to discourage many patent settlements, especially where the patent in question is very valuable. That may impose a cost on the judicial system, which, as the Supreme Court acknowledged in *Actavis*, prefers "a general legal policy favoring the settlement of disputes," *id.* at 2234, but it is consistent with what the Court observed were the purposes of the Hatch-Waxman Act and Paragraph IV certification. *Id.* (observing "the general procompetitive thrust of the statute," and "its specific provisions facilitating challenges to a patent's validity").

In sum, though the defendants are correct that the several complaints in the present case plead relatively bare allegations of the '577 patent's vulnerability and the hypothetical earlier entry of a generic if not for the settlement agreement, the sparsity of those allegations does not fatally undermine the claims of antitrust injury under *Actavis*. The salient question is not whether the fully-litigated patent would ultimately be found valid or invalid—that may never be known—but whether the settlement included a large and unjustified reverse payment leading to the inference of profit-sharing to avoid the risk of competition.

3. *"Large" and "Unjustified" Reverse "Payment" Under* Actavis

In *Actavis*, a brand-name manufacturer and a generic manufacturer settled a lawsuit provoked by Paragraph IV certification, and the settlement terms required the generic manufacturer to drop the patent challenge and provide promotional services for the brand-name drug. In exchange, the generic manufacturer received large payments and an entry date for the competing generic that was not immediate but still earlier than the expiration of the patent. The subsequent antitrust complaint alleged that the services were mere pretext for the payment, which was in truth a payment to delay competition. Nearly identical allegations are presented here. The Court in *Actavis* held that large and unjustified reverse payments bring with them the

18

risk of significant anticompetitive effects, that the plaintiffs should have been allowed to present their antitrust case, and that rule-of-reason analysis should be applied, but it did not discuss in any detail whether or why the reverse payment alleged in that case was "large" or "unjustified." District courts applying *Actavis* have thus had relatively little guidance on the question of what constitutes a "large" and "unjustified" reverse payment, and have diverged even on the issue of what constitutes "payment." The defendants here dispute the plaintiffs' characterization of their settlement agreement on all three grounds. The disputed "agreement" was in fact a complicated transaction involving a series of agreements settling separate litigation over two drug patents, and the defendants argue that nothing in any of it constitutes a reverse payment, but only compensation for services; and that even if some part of it does constitute a reverse payment, it is neither large nor unjustified.

The defendants emphasize that every settlement necessarily involves consideration on both sides, and that it therefore cannot be the case that a "reverse payment" of the sort contemplated in *Actavis* is present merely because an alleged patent infringer may be said to have received consideration as part of a settlement. That is doubtless correct—even a promise to stop litigating has value and may constitute consideration in a settlement agreement—but the defendants go altogether too far the other way in their attempt to read a maximally restrictive sense of "payment" into the *Actavis* decision. They make much of the fact that *Actavis* contains repeated examples and references to payments of money, and not to payments of some other form of consideration, and they dispute whether "payment" under *Actavis* comprises transfers of value in any form other than cash. As of the date of this writing, two courts have agreed with that view, *see In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-MD-2472-S-PAS, 2014 WL 4368924 (D.R.I. Sept. 4, 2014); *In re Lamictal Direct Purchaser Antitrust Litig.*, No. 12-CV-995 WHW,

2014 WL 282755 (D.N.J. Jan. 24, 2014), though one of them did so with "significant

reservations" and called that conclusion "vexing." *In re Loestrin*, 2014 WL 4368924, at *11. A

majority of courts to have examined the issue take the opposite position, that "payment" is not

limited to cash transfers. *See, e.g.*, *United Food & Commercial Workers Local 1776 &*

*Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. 14-MD-02521-

WHO, 2014 WL 6465235 (N.D. Cal. Nov. 17, 2014); *In re Effexor XR Antitrust Litig.*, No. CIV.

11-5479 PGS, 2014 WL 4988410 (D.N.J. Oct. 6, 2014); *In re Niaspan Antitrust Litig.*, No. 13-

MD-2460, 2014 WL 4403848 (E.D. Pa. Sept. 5, 2014); *In re Nexium (Esomeprazole) Antitrust*

*Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013). I must agree with the latter group.

Black's Law Dictionary defines "payment" as the "[p]erformance of an obligation by the

delivery of money *or some other valuable thing* accepted in partial or full discharge of the

obligation." (10th ed. 2014) (emphasis added). The Oxford English Dictionary defines it as a

"sum of money (*or equivalent*) paid or payable, esp. in return for goods or services or in

discharge of a debt." (3d ed. 2005) (emphasis added). Those definitions quite sensibly recognize

the substitutability of value, because the distinction between transfers of money and transfers of

things that are worth money is, in the words of the *Actavis* dissent, "a distinction without a

difference." *Actavis*, 133 S. Ct. at 2243 (Roberts, C.J., dissenting). Indeed, if antitrust scrutiny

can be avoided simply by making one's large and unjustifiable reverse-payment settlement in

gold bullion rather than dollars, then *Actavis* stands for nothing but an arbitrary restriction on the

form such payments can take. To read the decision that way is to cabin its reasoning to the point

of meaninglessness. I must conclude that large and unjustified reverse payments that "can bring

with [them] the risk of significant anticompetitive effects," *id.* at 2237 (majority opinion), can

bring those effects regardless of the particular form the transfer of value takes and thus are not

limited to cash payments. A settlement agreement may be very simple or tremendously complex, and it may involve all manner of consideration; and if, when viewed holistically, it effects a large and unexplained net transfer of value from the patent-holder to the alleged patent-infringer, it may fairly be called a reverse-payment settlement. Such a settlement, under *Actavis*, is not *ipso facto* unlawful: the parties to the settlement might be able to explain the apparent "missing" value for the patent-holder in a procompetitive way—and they will have an opportunity to do so under the rule-of-reason framework—in which case the reverse payment may turn out to be justified, or to be entirely illusory. But if otherwise unexplained, it "likely seeks to prevent the risk of competition. And . . . that consequence constitutes the relevant anticompetitive harm." *Id.* at 2236.

Under *Actavis*, "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Id.* at 2237. The plaintiffs here allege that the reverse payment was quite large, including a $4 million upfront cash payment and approximately $120 million in guaranteed royalties over time even in the absence of co-promotion efforts—and that being in addition to the up-to-$2.5 million per year of payments for those co-promotion efforts, which the plaintiffs also suggest exceeds the value of the services. The defendants argue that even those sums are small in relation to the value of the patent. That relation, by the logic of *Actavis*, may suggest confidence in the patent, but it does not mean that the alleged reverse payment is not "large." On the contrary, as the Supreme Court suggested in *Actavis*, *id.* at 2236–37, a patent-holder who has a high degree of confidence in a patent's strength may nevertheless be willing to share some portion of the monopoly profits in order to avoid even a small risk of invalidation if

21

the patent is especially valuable, and even a small portion of the profits on an especially valuable patent might indeed be quite large in absolute terms. I agree with the defendants that payments smaller than avoided litigation costs are presumptively not large and unexplained under *Actavis*, and represent a *de facto* safe harbor, and also that payments exceeding avoided litigation costs are not automatically deemed unlawful for that reason alone. Even if the payments exceed avoided litigation costs, the *Actavis* factors—the size of the payments, their scale in relation to litigation costs, their independence from other services for which they might be fair consideration, and any other convincing justification—still matter. But I cannot conclude that the size of the reverse payments in relation to the anticipated value of the patent is dispositive of the lawfulness of the agreement. Large reverse payments that are not particularly large in relation to the value of the patent may show confidence in the patent, but if they represent payment *to avoid the risk of invalidation*, then they still run afoul of *Actavis*.

The plaintiffs allege that the total payment is far greater than the fair value of the services falling under the Co-Promotion Agreement, and therefore constitutes a large and unjustifiable reverse payment, which they allege is especially clear since payment is guaranteed even without the generation of additional sales. They also allege that Boehringer agreed not to launch its own "authorized generic" during Barr's 180-day exclusivity period under the Hatch-Waxman Act, which further enlarged the reverse payment by constituting an additional unexplained transfer of value to Barr. The defendants dispute those allegations, and the sufficiency of the pleading, with several arguments: They argue that the Co-Promotion Agreement, as part of a complex transaction that settled litigation over two drugs, was somehow separate from the Aggrenox settlement, and that the plaintiffs have failed to sufficiently plead that it was made as consideration for that settlement (or they cannot so plead) because they

argued in prior litigation that it was made as consideration for delaying generic entry of the other drug. They argue that the plaintiffs fail to plead with sufficient specificity the fair value of the services, the excess of the payments over that value, or in some other way the total value of the alleged reverse payment. And they argue that any agreement not to introduce an authorized generic should not be considered part of a reverse payment because exclusive licenses are authorized by the Patent Act and are the kind of traditional form of settlement that *Actavis* permits, or because they only result in "payment" in the form of affirmative sales, or because they are otherwise procompetitive insofar as they represent an increase in competition compared to what competition otherwise would have been under the patent. I find none of those arguments persuasive.

First, and quite notably, the defendants do not agree among themselves whether the challenged settlement agreement actually does prevent Boehringer from introducing an authorized generic: by Boehringer's interpretation, it does not; but by Barr's reckoning it does. That disagreement is consonant with the plaintiffs' theory: Barr (the alleged infringer, and would-be generic manufacturer) sees a "no–authorized generic" agreement as a thing of value it received in the settlement and wishes to preserve it in this litigation, while Boehringer (the patent-holder and brand-name manufacturer) sees such an agreement as a cost it prefers not to incur and would happily disclaim. I need not determine now who is correct by ruling on the construction of the agreement, but the plaintiffs allege that there is such a provision and that it is very valuable, and at least on the latter point the defendants clearly agree.

The defendants are correct that the plaintiffs have not attempted to assign dollar values with significant precision or very obvious methodological justification to the various provisions of the settlement, and that is among the stronger of the defendants' arguments. Some other courts

interpreting *Actavis*, while holding that reverse "payments" are not limited to cash transfers, have observed the importance of the court's ability to calculate the value of any nonmonetary payments or have held that pleading an estimate of the total monetary value and a reliable foundation for that value are necessary to establish the plausibility required by Rule 12(b)(6). *See, e.g.*, *In re Effexor XR Antitrust Litig.*, No. 3:11-CV-5479 PGS, 2014 WL 4988410 (D.N.J. Oct. 6, 2014); *In re Lipitor Antitrust Litig.*, No. 3:12-CV-2389 PGS, 2014 WL 4543502 (D.N.J. Sept. 12, 2014). While I share the concerns expressed by those courts, it is also clear that very precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants, as well as expert analysis, and that these issues are sufficiently factual to require discovery. I cannot conclude simply from the absence of precise figures that the pleadings represent formulaic recitations of elements and allegations that fail to rise above the speculative; on the contrary, the complaints make specific allegations about the terms of the settlement and their relative value that are plausible on their face. Whether the plaintiffs can substantiate those allegations may be an issue for summary judgment or trial, but for purposes of the motions to dismiss, I must accept the allegations as true and draw all reasonable inferences in the plaintiffs' favor. While doing that, I cannot conclude that the plaintiffs fail to sufficiently plead a large and unjustified reverse payment.

Nor are the allegations of a large and unjustified reverse payment undermined by the permissibility of exclusive licensing under the Patent Act or in settlements generally. The defendants are surely correct that patent holders may legally grant exclusive licenses and that the particular restraint on competition such agreements represent is an exception to antitrust prohibition and expressly permissible by statute. That is not disputed. But such licenses can be worth money, and granting them can thus be the equivalent of transferring money. If some

particular transfer of money would be unlawful—for whatever reason—its unlawfulness is not cured merely because the value is transferred in the form of exclusive licenses instead of cash, irrespective of whether the grant of an exclusive license would otherwise be valid. The statutory authority to grant exclusive licenses no more immunizes reverse-payment settlements that include them from antitrust scrutiny under *Actavis* than the statutory authority to use cash as legal tender immunizes reverse-payment settlements made in cash from such scrutiny. The issue is not whether the *form* of the payment was legal, but whether the *purpose* of the payment was legal. The plaintiffs do not appear to allege that "no–authorized generic" agreements are *per se* unlawful, nor that any individual feature of the settlement agreement would have necessarily constituted an antitrust violation as part of some other agreement. Rather, they allege that Boehringer gave much more than it got in the settlement agreement; and under *Actavis*, that can constitute an antitrust violation if it did so in order to avoid the risk of patent invalidation.

It may also be true that granting an exclusive licensing agreement is procompetitive relative to not granting it, but the anticompetitive harm described in *Actavis* is not measured by the exclusionary scope of the patent—that test was explicitly rejected. The question is whether a large and unjustifiable reverse payment was made in order to avoid the risk of patent invalidation. If a settlement that grants an exclusive license violates the rule of *Actavis*, it is not saved by comparison to the exclusionary scope of the unlicensed patent, or by the licensing arrangement being more competitive than a settlement agreement that lacked one.

Rule-of-reason analysis proceeds in three steps:

> First, the plaintiff bears the initial burden of showing that the defendant's conduct had an actual adverse effect on competition as a whole in the relevant market. If plaintiff satisfies this burden, the burden then shifts to defendant to offer evidence that its conduct had procompetitive effects. If defendant is able to offer such proof, the burden shifts back to plaintiff, who must prove that any

> legitimate competitive effects could have been achieved through
> less restrictive alternatives.

*Ark. Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98, 104 (2d Cir. 2010) (internal

quotations and citations omitted). In the present context of a motion to dismiss, the plaintiffs

need only allege plausible facts that, if true, raise a reasonable expectation that discovery will

reveal sufficient evidence to prove their prima facie case. Under the treatment of reverse-

payment settlements in *Actavis*, they have done so.

    4.  *Monopoly Power*

    The defendants argue that the plaintiffs fail to state a claim because they do not

sufficiently define a relevant product market, and the single-product market of Aggrenox alone

(or of Aggrenox and potential generics) is overly narrow. Because Aggrenox is prescribed to

reduce the risk of stroke, they suggest Plavix—an FDA-approved antiplatelet therapy—as an

example of a pharmaceutical that shares the market with Aggrenox. The presence of that drug,

they argue, means that the defendants could maintain a monopoly on Aggrenox alone without

having monopoly power within a market sufficient to be governed by the Sherman Act. The

plaintiffs contend that a market of Aggrenox and Aggrenox generics is sufficiently defined, and

moreover that they need not define a market, because they plead actual detrimental effects, for

which market power is merely a surrogate.

    Monopoly power is a necessary element of Sherman Act claims, *United States v. Grinnell

Corp.*, 384 U.S. 563, 570 (1966), and the Supreme court has defined that power as "the power to

control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351

U.S. 377, 391 (1956). The plaintiffs are correct, however, that when direct evidence is available

that a party profitably charges supracompetitive prices, the existence of market power can be

established from that fact alone. *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97–98

(2d Cir. 1998) ("Monopoly power, also referred to as market power, is the power to control prices or exclude competition. It may be proven directly by evidence of the control of prices or the exclusion of competition or it may be inferred from one firm's large percentage share of the relevant market.").

The market for prescription pharmaceuticals is an unusual one, in part because consumers are typically insulated at least to some degree from both cost (which is often largely covered by an insurance plan) and choice (which is at least limited and more likely substantially directed by the prescribing physician), so market features such as cost-sensitivity and elasticity of demand might therefore defy reasonable expectations. It is nevertheless true in antitrust analysis that "as a general rule, the process of defining the relevant product market requires consideration of cross-elasticity of demand," *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 71 (2d Cir. 1984), because the boundaries of a particular product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008). The plaintiffs allege that there is no such cross-elasticity of demand between Aggrenox and other drugs sufficient to define any broader antitrust market, and that because Boehringer is able to charge supracompetitive prices for Aggrenox without losing sales, it does not share a market defined by interchangeability. That is clearly a fact-intensive inquiry, and for that reason "courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001); *see also Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984) ("It frequently has been observed that a pronouncement as to market definition is not one of law, but of fact.") (quotation and citation omitted). The Supreme Court has been clear that market definitions can sometimes only be

determined "after a factual inquiry into the commercial realities faced by consumers," *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992) (quotation omitted), and that "in some instances one brand of a product can constitute a separate market." *Id.* Perhaps because of the peculiar features of pharmaceutical markets, the Second Circuit has even held that the relevant market can sometimes be limited *to the generic* of a particular drug, excluding the chemically-identical brand-name version. *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496–500 (2d Cir. 2004).

The plaintiffs' allegations that Boehringer is able to charge supracompetitive prices for Aggrenox in a market with no cross-elasticity of demand with other drugs are highly plausible. If that were not the case, it is not clear why Boehringer would have sued to prevent entry of Barr's generic. The defendants are free to argue otherwise on an eventual summary judgment motion or at trial, but it is premature on a motion to dismiss for the court to make a more probing factual inquiry than that, and the defendants cannot persuasively argue that the complaints should be dismissed for failure to plead monopoly power within a sufficiently defined market.

5. *Attempt and Conspiracy*

Attempt and conspiracy to monopolize under the Sherman Act require specific intent to monopolize, and the defendants argue that the plaintiffs' pleading on intent amounts to mere recitation of the element. The facts as alleged, the defendants argue, merely reflect an effort to enforce a valid patent and later to settle the litigation, which judicial policy favors; and even if the settlement agreement is unlawful under *Actavis*, it was lawful under the Second Circuit "scope of the patent" test that was controlling at the time, so there can have been no unlawful intent. The alleged anticompetitive conduct is described at length above, and I do not recite it again here; but the plaintiffs do plead an anticompetitive scheme in significant detail, as already discussed, and they allege that the scheme was intentional. Moreover, it is clearly the law in the

28

Second Circuit that anticompetitive intent can be inferred from anticompetitive conduct. *Volvo North America Corp. v. Men's Int'l. Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988). The defendants' argument that unlawful intent is precluded by the lawfulness of the agreement under the now-abrogated test used in the Second Circuit at the time the agreement was made is compelling as an argument from basic fairness; but the defendants offer no support for the suggestion that the necessary intent under federal law is intent to monopolize *unlawfully*, rather than merely intent to monopolize (perhaps with a good-faith belief that patent law or some other antitrust exception provided safety from liability). If the settlement included a large and unjustified reverse payment that was made *in order* to avoid the risk of patent invalidation, then antitrust liability may attach under *Actavis*; and that particular anticompetitive harm is necessarily intentional (even if intent is proved by inference). The defendants offer no authority to suggest that that analysis changes because they believed they were acting lawfully at the time under the Second Circuit's rule.

C.   State-Law Claims

This case is rendered much more complicated by the rules of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and *California v. ARC America Corp.*, 490 U.S. 93 (1989). In the former case, the Supreme Court held that only the overcharged direct purchaser, and no one else in the chain of distribution, can recover damages under federal antitrust law; in the latter, the Supreme Court held that that "indirect-purchaser rule" does not prevent indirect purchasers from recovering damages under state antitrust laws where the state laws otherwise allow it (and many states have passed so-called "*Illinois Brick* repealers" in order to do so). Accordingly, the indirect purchaser complaint and the Humana complaint allege very many state-law claims; a few were withdrawn in the opposition memoranda to the defendants' motions to dismiss, but what remains includes claims under the law of nearly every state (and Washington, D.C. and

Puerto Rico), including state antitrust claims, consumer-protection claims, and unjust-enrichment claims. The defendants move that all be dismissed, for a variety of reasons that respectively apply to individual claims or to particular subgroups of them.

    1. *Statutes of Limitations*

The plaintiffs' theories of liability under the multiplicity of state claims do not significantly differ in substance from the theory underlying the federal claims; the allegedly unlawful conduct is the very same, and the multistate pleading headache appears to be a simple consequence of *Illinois Brick*'s bar on indirect purchaser recovery under the federal antitrust law. The defendants argue that the claims are time-barred, but in most essentials they make common arguments that both state and federal claims are barred—the latter question has already been addressed above—and there is no argument that the analysis of the state statutes of limitations should differ materially from the federal one already discussed. The salient difference is just the number of years: the federal statute of limitations discussed above is four years, and the statutes of limitations under the state laws vary—mostly either three or four years, but some longer and some shorter. The defendants include several pages of tables that helpfully summarize that (and other) information as attachments to their memoranda in support of their motions to dismiss the indirect purchaser and Humana complaints (doc. # 152-1, pp. A-12 to A-16; doc. # 151-1, pp.A-15 to A-18). In the absence of any argument that the legislatures or courts of any particular states reject the reasoning in the *Berkey Photo* analysis above as it would apply to their particular statutes, I conclude that the same reasoning should apply, and that a new claim accrues with each alleged overcharge. Claims are therefore not time-barred that stem from alleged overcharges incurred within the relevant statutory period, whatever that period may be for a particular statute, measured backward from the filing of the claims.

a.  Fraudulent Concealment

The indirect purchasers and Humana both initially alleged fraudulent concealment, presumably to reach overcharges otherwise outside the applicable statute of limitations. Partly in light of my ruling in *In re Publication Paper Antitrust Litigation*, No. 3:04-md-1631 (SRU), 2005 WL 2175139 (D. Conn. Sept. 7, 2005), the indirect purchasers dropped those allegations in their opposition brief (doc. # 182, p. 20 n.29), but Humana did not. Essentially for the reasons discussed in *Publication Paper*, I reject the argument that the statutes of limitations should be tolled because the defendants fraudulently concealed their allegedly unlawful conduct.

"[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *State of New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988). Concealment can be shown in one of two ways: either by demonstrating that the defendant took affirmative steps to prevent discovery of the claim or injury, or by demonstrating that the violation itself was "self-concealing"—that is, by showing that it is the type of violation that by its very nature is designed to appear innocent, essentially establishing fraud-by-omission. *Id.* at 1083–84. As a claim of fraud, the allegations that provide the factual basis for fraudulent concealment must meet Rule 9(b)'s heightened pleading standard.

Humana plausibly alleges that the defendants did not publicly disclose the precise terms of the challenged settlement or their associated dollar values—despite overtly publicizing the settlement in more general terms, and despite an FTC investigation and other litigation challenging the agreement—and that Humana did not know it contained a large and unexplained

reverse payment. Those allegations do not rise to the level of deliberate concealment, and do not suggest a self-concealing violation; nor has Humana sufficiently pleaded its own diligence. In short, Humana has failed to meet its pleading burden for tolling the statute of limitations. For the reasons discussed above, tolling is unnecessary for claims of alleged overcharges incurred within the relevant statutory period measured backward from the filing date; but any claims for overcharges outside of that window are untimely, and they are dismissed.

    2.  *Article III Standing*

    The defendants argue that all indirect-purchaser claims under the laws of states where the named indirect-purchaser plaintiffs do not allege they incurred overcharges must be dismissed for lack of standing. In making that argument, the defendants rely most heavily on *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59 (2d Cir. 2012). The indirect purchasers disagree, contending that the defendants confuse Article III standing with "class" standing. They rely most heavily on *Gratz v. Bollinger*, 539 U.S. 244 (2003), and *NECA-IBEW Health and Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012). Both sides are manifestly mistaken in their assertions that this is a straightforward question with an obvious answer. The Supreme Court acknowledged in *Gratz* that when there is "variation" between the claims of named plaintiffs and absent class members, "there is a question whether the relevance of this variation . . . is a matter of Article III standing at all or whether it goes to the propriety of class certification pursuant to Federal Rule of Civil Procedure 23(a)," 539 U.S. at 263, and that "there is tension in our prior cases in this regard." *Id.* at 263 n.15; *see also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768 (1st Cir. 2011) ("The issue looks straightforward and one would expect it to be well settled; neither assumption is entirely true.").

    The central question on this issue is what sort of "variation" matters. Some kinds of variation are not fatal to Article III standing, and some kinds are. The defendants point out that in

virtually all of the cases relied upon by the indirect purchasers, including *Gratz* and *NECA-IBEW*, the variation between the respective claims of named plaintiffs and absent class members is variation of damages or of other facts, but not of the law under which the claims are brought. On the other side, the indirect purchasers point out that the cases relied upon by the defendants examine different and arguably more significant variation in claims than present here, most notably a variation of defendants. The question before the Second Circuit in *Mahon* was whether a plaintiff who alleged she was injured by at least one defendant therefore had Article III standing to pursue claims in a putative class action against *other* defendants she did not allege injured her but who allegedly did injure absent class members (the Court held that she did not). 683 F.3d at 60. Here, the variation is of quite a different sort. Some of the claims of absent class members are brought under entirely different laws, and the laws of entirely different states, from the claims of the named plaintiffs. Still, the allegedly unlawful conduct is the same, and the different states' laws are versions of the same laws, or are least analogous laws that share essential similarities.

I generally agree with the indirect-purchaser plaintiffs' interpretation of class standing. The Second Circuit in *NECA-IBEW* announced a broad standard for class standing, consonant with *Gratz*, that turns on whether the "same set of concerns" is implicated by the defendants' allegedly injurious conduct toward the named plaintiffs and toward the absent class members. The named indirect-purchaser plaintiffs in the present case satisfy that standard, because the "same set of concerns" is implicated by the conduct of the defendants with respect to alleged overcharges incurred by indirect purchasers irrespective of the state of their residence. Still, there is a fundamental analytical distinction between class standing and Article III standing. And

Article III standing, as a fundamental constitutional requisite of federal judicial power, presents a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

      The indirect purchasers seem to analyze Article III standing on a case-wide basis. They argue that, once they have sufficiently pleaded that they have suffered harm as a result of unlawful conduct by the defendants, they have Article III standing to bring the case and are then over the threshold constitutional hurdle. Any subsequent claim-by-claim analysis, the argument goes, is properly the concern of class standing. The defendants offer forceful authority to the contrary. *E.g.*, *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("But standing is not dispensed in gross."); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (quotations omitted)). The indirect purchasers do not effectively rebut that authority. The pleadings plausibly allege that the indirect purchasers were harmed by the defendants' unlawful conduct, so it would be difficult to doubt that they present a live case or controversy for which they have standing under Article III. But the applicability to that case or controversy of the laws of states where the named plaintiffs do not (and perhaps cannot) plead harm is dependent upon harms caused to absent (and at this stage only putative) class members.

      The indirect purchasers point to numerous cases that have interpreted *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), to stand for the proposition that the question of Article III standing can be deferred until after class certification. In *Mahon*, however, the Second Circuit repudiated that interpretation of those cases, noting that the Article III issue was deferred in them not because it is always permissible to do so but because the class issue was dispositive. 683 F.3d at 63–66. The Court reasoned that "[a] federal rule cannot alter a constitutional requirement," and therefore "*with respect to each*

*asserted claim*, a plaintiff must always have suffered a distinct and palpable injury to herself." *Id.* at 64 (emphasis in the original, quotation omitted).

I therefore grant without prejudice the defendants' motion to dismiss the indirect-purchaser complaints with respect to all claims under the laws of states (or territories) where the named indirect-purchasers do not allege to have suffered injury. The indirect purchasers have leave to replead claims for any state where the named plaintiffs specifically can allege to have incurred overcharges.

Humana makes (essentially) the same state-law claims as the indirect-purchaser plaintiffs, but standing is uncomplicated because Humana pleads that it has been an indirect purchaser of Aggrenox in all fifty states. Humana and the indirect-purchaser plaintiffs each incorporate by reference the relevant portions of the other's opposition memorandum, and I will thus discuss the remaining arguments on both motions to dismiss collectively.

3. *State Antitrust Claims*

a. Standing in *Illinois Brick* States

In the wake of *Illinois Brick*'s announcement of the indirect-purchaser rule, many states passed "*Illinois Brick* repealers" to allow indirect purchasers to recover under their respective state antitrust laws, and the Supreme Court endorsed the permissibility of that approach in *ARC America Corp.* 490 U.S. at 105–06. Of course, there are also states that continue to follow the rule of *Illinois Brick*, so indirect purchasers cannot recover for overcharges under those states' antitrust laws. The defendants argue that Florida, Massachusetts, and Puerto Rico are *Illinois Brick* jurisdictions, and that Rhode Island was, too, until it passed an *Illinois Brick* repealer in 2013, which should not be applied retroactively here. They initially included Utah in that list as well, before admitting that it did pass an *Illinois Brick* repealer, but one that permits indirect-purchaser claims only by citizens or residents of the state. In response, the indirect purchasers

withdraw their claims under the antitrust laws of Florida and Massachusetts,[2] and dispute the plaintiffs' interpretation of the laws of the other jurisdictions.

i.   <u>Utah</u>

Utah has passed an *Illinois Brick* repealer, and its antitrust statute therefore does grant indirect purchasers the right to bring antitrust damages claims, but only if they are citizens or residents of Utah. *See* Utah Code § 76-10-3109. The indirect purchasers claim to be asserting claims under that law on behalf of residents of Utah, but they do not claim that any of the named plaintiffs are such residents. For the reasons discussed above, they lack Article III standing to assert such claims. Humana claims to be an indirect purchaser of Aggrenox in all fifty states, but does not claim to be a citizen or resident of Utah. All claims under the Utah antitrust statute are therefore dismissed without prejudice to repleading in the event that any named plaintiff is a citizen or resident of Utah.

ii.   <u>Puerto Rico</u>

Puerto Rico has not passed an *Illinois Brick* repealer, and its territorial courts have apparently not directly addressed the issue, but its antitrust law is generally construed "as essentially embodying the jurisprudence relevant to the parallel federal law." *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 754 (1st Cir. 1994). The defendants therefore urge the interpretation that *Illinois Brick* applies and bars indirect-purchaser actions, citing the persuasive authority of other district courts that have come to that conclusion. *See, e.g.*, *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. 14-MD-02521-WHO, 2014 WL 6465235, at

---

[2] In the opposition memoranda, the indirect-purchaser plaintiffs also withdraw unjust-enrichment claims under Pennsylvania law and claims under the antitrust laws of Kansas, New York, and Tennessee; and Humana withdraws its claims under the consumer-protection laws of Hawaii and Kansas, under the state antitrust laws of Florida, Ohio, and Texas, and under the Sherman Act (which includes all of its direct-purchaser claims).

*25–26 (N.D. Cal. Nov. 17, 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp.

2d 367, 409–10 (D. Mass. 2013); *In re Static Random Access Memory (SRAM) Antitrust Litig.*,

No. 07-md-01819 CW, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2010); *In re Digital Music

Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) (*citing In re TFT–LCD (Flat Panel)

Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185–87 (N.D. Cal. 2009)). The indirect purchasers cite

*Rivera-Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57 (D.P.R. 2010), a federal district court

case that came to the contrary conclusion on the basis that Puerto Rico liberally construes its

antitrust laws, and citing for that proposition *Pressure Vessels of Puerto Rico, Inc. v. Empire Gas

de Puerto Rico*, 137 P.R. Dec. 497, 1994 P.R.-Eng. 909,547 (P.R. 1994). As the defendants point

out, however, *Pressure Vessels* did not address indirect-purchaser standing or the rule of *Illinois

Brick*. And though I agree with the indirect purchasers' contention that the courts of a particular

jurisdiction can authoritatively interpret their laws as allowing antitrust recovery by indirect

purchasers even in the absence of an express *Illinois Brick* repealer by the legislature, I cannot

conclude that *Pressure Vessels* is such an authoritative statement. In the absence of a clear

decision—by either the legislature or by the jurisdiction's own courts—to allow indirect-

purchaser recovery, the antitrust laws of a state (or territory) are interpreted as presumptively

consistent with federal law. I therefore conclude that Puerto Rico follows the rule of *Illinois

Brick* and all indirect-purchaser claims under its antitrust law are dismissed.

> iii. <u>Rhode Island</u>

Rhode Island was an *Illinois Brick* state until its legislature enacted a repealer on July 15,

2013. *See* R.I. Gen. Laws § 6-36-7(d). The indirect purchasers urge (with little argument, and

less authority) retroactive application, citing cases for the proposition that such application is

*sometimes* permissible, but nothing to substantiate the claim that the Rhode Island statute is

"entitled" (doc. # 182, p.19) to such application. On the contrary, in Rhode Island as elsewhere,

"statutes and their amendments are presumed to apply prospectively." *Hydro-Mfg., Inc. v. Kayser-Roth*, 640 A.2d 950, 954 (R.I. 1994). Indeed, it is very widely recognized as an "almost universal rule that statutes are addressed to the future, not to the past." *Winfree v. N. Pac. Ry.*, 227 U.S. 296, 301 (1913). In the absence of evidence of the Rhode Island legislature's intent to the contrary, I conclude that the law applies only prospectively. All indirect-purchaser claims under the Rhode Island antitrust statute alleging overcharges before July 15, 2013 are dismissed. The motions to dismiss claims involving Rhode Island indirect purchases are denied, however, with respect to alleged overcharges incurred after that date.

   b.  Intrastate Conduct or Effects Requirements

  The defendants argue that the antitrust laws of Mississippi, New York, Tennessee, Wisconsin, and the District of Columbia "require that the challenged conduct take place, or that its effects occur, purely or primarily within the state" (doc. # 151-1, p.31).[3] None of the cited statutes contains so categorical a limitation by its plain text, however. It is true that all of the claims essentially allege national anticompetitive conduct, but it is not obvious why the *intra*state effect of anticompetitive conduct would not be reached by the cited statutes merely because *inter*state conduct predominates. A few of the cases that the defendants cite include dicta about the possibility of state antitrust laws violating the dormant Commerce Clause or being preempted by federal antitrust law, *e.g.*, *H-Quotient, Inc. v. Knight Trading Grp., Inc.*, No. 03 CIV. 5889 (DAB), 2005 WL 323750, at *4 (S.D.N.Y. Feb. 9, 2005); *Sun Dun, Inc. of Washington v. Coca-Cola Co.*, 740 F. Supp. 381, 396–97 (D. Md. 1990), but the defendants do not make those arguments. I cannot conclude on the basis of the arguments that have been briefed that any

---

[3] The defendants also make this argument with respect to the antitrust law of Massachusetts, but as mentioned above, the indirect-purchaser plaintiffs withdraw their claims under that law. Humana did not plead claims under it.

claims should be dismissed for failure to allege "purely or primarily" intrastate conduct or effects.

> c.   Hawaii Antitrust Act

Hawaii's antitrust statute has an "unfair or deceptive acts or practices" prong, and an "unfair methods of competition" prong. *See* Haw. Rev. Stat. § 480-2. Claims under the "unfair or deceptive acts or practices" prong can only be brought by "consumer[s], the attorney general or the director of the office of consumer protection," *id.* § 480-2(d), and the indirect purchasers do not allege that they are any of those things. Claims under the "unfair methods of competition" prong are not limited in that way, but class actions brought under that prong require pre-suit notice to the state attorney general, who has a right of first refusal to bring claims. *Id.* § 480-13.3. The indirect purchasers do not allege that they have satisfied that requirement, either, but they argue that they need not follow such pre-filing requirements because they are merely procedural and not necessary to maintain a class action in federal court.

The parties differ in their analysis of the applicability of *Shady Grove Orthopedic Associates v. Allstate Ins. Co.*, 559 U.S. 393 (2010), in which the Supreme Court held that Rule 23 applied in federal court to claims brought under New York law despite New York's general class action bar. It is difficult to isolate a holding in *Shady Grove* that is much broader than that, because the holding was announced by Justice Scalia in an opinion that garnered a majority only in part and a plurality in part. The fifth vote for the judgment was provided by Justice Stevens, who wrote a separate concurrence. When no single rationale garners a majority, the holding of the Court is "that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). The indirect purchasers argue for an expansive application of Justice Scalia's opinion, which would broadly eliminate state class-action restrictions in federal court. The defendants argue that the holding is narrowed

by the scope of Justice Steven's concurrence, which would allow state procedural rules to control in federal court when they are "part of a State's framework of substantive rights or remedies." *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring).

The defendants point out that many courts have adopted Justice Stevens's concurrence or found it to be controlling, and that they have held that state class-action bars apply in federal court if they are part of a state statute's substantive scope. The defendants have not, however, offered any authority for that conclusion as applied to Hawaii's law, or argued persuasively that the class-action prerequisites that it contains are part of Hawaii's "framework of substantive rights or remedies." From the language of the statute itself, it does not appear, for instance, to create a substantive right to recovery that only "vests" after some action or inaction of the state attorney general. Rather, it creates a right to "bring an action based on unfair methods of competition" in section 480-2, without any reference to notice, and delineates procedural prerequisites for class actions under the chapter in section 480-13.3. The defendants offer nothing from the legislative history or otherwise to complicate that plain reading. I need not wade any deeper into the difficult problem of what part of the reasoning in *Shady Grove* is or is not controlling, because I cannot conclude on the basis of the arguments before me that the section 480-13.3 procedural prerequisites are sufficiently a "part of a State's framework of substantive rights or remedies" to be controlling in federal court even under the Stevens concurrence.

### 4. *State Consumer-Protection and Unjust-Enrichment Claims*

The defendants make many arguments that the unjust-enrichment claims and the claims brought under state consumer-protection or unfair-trade-practices laws should be dismissed. Some of those arguments apply to all such claims, others to particular subsets, and still others to the laws of individual states. They argue, for instance, that some state consumer-protection laws

require pleading consumer deception or reliance; that some require pleading a specific consumer-oriented transaction or "nexus"; that some have been expressly held inapplicable to antitrust conduct; that some only allow suits in a consumer capacity; that some have unsatisfied pre-filing notice requirements; that some states require privity, a quasi-contractual or special relationship, or the absence of an adequate remedy at law in order to sustain the equitable remedy of an unjust-enrichment claim; and even that some states listed in the pleadings do not recognize an independent claim of unjust enrichment at all. The indirect payers and Humana respond with particular state-by-state arguments and caselaw, and the defendants reply with still more, disputing among themselves, for instance, whether particular states do or do not recognize independent unjust-enrichment claims, or whether there is a split of authority among California courts on whether a nonsemantic distinction exists between unjust enrichment, restitution, and quasi-contract (doc. # 182, p.66; doc. # 215, pp. 15–16).

Most of the defendants' arguments on this point can be reduced essentially to the assertion that the plaintiffs are not *really* pleading violations of all those state laws, which have various restrictions they ignore, because they are pleading a nation-wide antitrust case. The plaintiffs' argument in response is essentially that the state laws are exceedingly broad, the statutory ones generally written "in the disjunctive," and that they cover, very generally, all "*deceptive* acts, *unfair* practices or *unconscionable* acts" (doc. # 182, p.35). The defendants' arguments are persuasive on many particular points, but the more pressing issue is the broader one. The indirect purchasers and Humana have *listed* claims under very many state laws, but they have not truly *pleaded* claims under those laws sufficient to show their entitlement to recovery under them, as required by Rule 8. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or formulaic recitation of the elements of a cause of action will not do.").

Rather, they have pleaded federal antitrust claims and the factual foundation for them, viable

under *Actavis*, and they merely allege that those claims are also actionable under general

consumer-protection laws and as unjust enrichment.

The indirect-purchaser complaint, for instance, includes a paragraph alleging that the

defendants "have violated the following state unfair trade practices and consumer fraud laws,"

followed by twenty-five subparagraphs, each of which begins "[d]efendants have engaged in

unfair competition or unfair acts or practices in violation of" and ends with a citation to a

different state's statute, with no elaboration (doc. # 120, ¶ 204). The same complaint includes a

paragraph that begins "[i]t would be inequitable under unjust enrichment principles under the

laws of" and then lists forty-eight states, the District of Columbia, and Puerto Rico before

finishing the sentence, the end of which is similarly bare and conclusory (¶ 214). The Humana

complaint fares no better. For instance, it begins each of paragraphs 142 through 178 with the

words "[d]efendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or

practices in violation of" followed by a citation to a different state's statute, again with no

elaboration (doc. # 93). Even the state antitrust claims partly take this copy-and-paste form that

simply assumes that every one of the many cited statutes is the functional equivalent of the rest,

but at least those claims benefit from the very extensive pleading of factual allegations to show

entitlement to relief under federal antitrust law. The pleadings fail not only to account for any

consequential differences that may exist among the undifferentiated state-law claims, but they

fail to show that any but the antitrust laws entitle the plaintiffs to relief from antitrust violations.

The bald assertion that the alleged antitrust conduct violates dozens of non-antitrust laws, or the

implication that there are no consequential differences between those laws, is not entitled to

deference, because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

The problem for the indirect purchasers is that the indirect-purchaser rule of *Illinois Brick* blocks them from recovery under federal antitrust law. In an effort to get in on the *Actavis* game, they attempt to build a Frankensteinian equivalent of *Actavis* to reach the very same conduct but without that formidable obstacle, by stitching together a hodge-podge of state-law claims. But the plaintiffs cannot simply enumerate a long list of state-law claims for states where they might otherwise have no available antitrust recovery and rely on the defendants and the court to sort out whether or how those laws can act as surrogates for antitrust law. I need not rule on the many particular arguments the defendants make for individual state claims or subsets of them, because the indirect-purchaser plaintiffs and Humana have not pleaded state-law consumer-protection or unjust-enrichment claims sufficient to satisfy Rule 8 under *Twombly* and *Iqbal*. The defendants' motions to dismiss are granted with respect to all such claims, without prejudice to repleading in nonconclusory fashion.

D. Personal Jurisdiction Over Teva Israel

Teva Israel moves under Rule 12(b)(2) to dismiss all claims against it for lack of personal jurisdiction. It emphasizes that it is an Israeli company with no direct physical or corporate presence in the United States, and that it and its American subsidiaries vigorously maintain corporate formalities. The settlement agreement that is the subject of the plaintiffs' allegations was formed between Boehringer and Barr prior to Teva USA's acquisition of Barr, so no Teva entity was a party to it. And the presence of a subsidiary alone is not sufficient to establish personal jurisdiction over the parent company. *See Jazini v. Motor Co.*, 148 F. 3d 181 (2d Cir. 1998). Teva Israel therefore argues that, even if all the plaintiffs' allegations are true regarding the liability of the other defendants, and even if Teva USA is liable as a successor to Barr, the

mere fact of Teva Israel's ownership of Teva USA is not sufficient to subject Teva Israel to personal jurisdiction in this case.

The authority of a court to subject a particular defendant to personal jurisdiction has been analyzed as a constitutional question for well over a century. *See generally Pennoyer v. Neff*, 95 U.S. 714 (1877). The *statutory* authority for jurisdiction, though a necessary condition of it, is not a sufficient one. The plaintiffs seem to conflate the statutory authority for jurisdiction under the Clayton Act with the constitutional propriety. They also blur the distinction between the two forms of personal jurisdiction in the constitutional analysis: general, or all-purpose, personal jurisdiction; and specific, or case-linked personal jurisdiction. In order to show that an exercise of personal jurisdiction comports with Due Process, the plaintiffs must plead facts sufficient to support either general or specific personal jurisdiction, in addition to showing statutory authority.

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (quotation omitted). Being "essentially at home" in a place is a very high bar, almost never found for corporations where they are neither incorporated nor headquartered. "[E]ven a company's engagement in a substantial, continuous, and systematic course of business is alone insufficient to render it at home in a forum." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014) (quotation omitted). None of the complaints plead facts even close to a plausible claim of general jurisdiction over Teva Israel.

"Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy." *Goodyear Dunlop*, 131 S. Ct. at 2851 (quotation omitted).

Importantly, "[i]n contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (quotation omitted). Pleading specific jurisdiction does not present nearly so high a bar as pleading general jurisdiction, but unlike general jurisdiction, it depends on *case-specific* contacts. Even frequent, substantial contacts cannot confer jurisdiction in this case unless the contacts were made in connection with the specific controversy being litigated.

The plaintiffs emphasize how thoroughly entrenched in the American generic pharmaceutical industry Teva Israel is, and they cite SEC filings and corporate web pages to argue that the Teva entities play fast and loose with the "Teva" name. The broad general contacts that the plaintiffs describe do not rise to the very high "essentially at home" standard for general jurisdiction, and such generalized contacts are not useful for establishing specific personal jurisdiction, because they have nothing to do with the particular conduct giving rise to the claims here. Teva Israel's contacts with the United States are sufficient for specific personal jurisdiction to comport with constitutional requirements in *some* case, but this is not such a case. Apart from the bare, conclusory assertion that Teva Israel joined the antitrust conspiracy, the complaints do not allege any action by the Israeli company that is specifically in connection with this case. It is customary to analyze the issue of statutory jurisdictional authority before analyzing comportment with Due Process, but the pleadings are so obviously insufficient with respect to the latter that it is not necessary to examine the question of jurisdiction under the Clayton Act.

In their opposition memoranda, the plaintiffs argue that the conduct of Teva USA and Barr should be attributed to Teva Israel either because the latter is successor to the antitrust conspiracy or because it controls its American subsidiaries. Those arguments do not appear to correspond to a plausible factual foundation in the pleadings, and without more facts, the

45

prospects for repleading either a veil-piercing theory or a successor-in-interest theory do not seem bright. Limited jurisdictional discovery of Teva Israel is not appropriate because the plaintiffs failed to make a prima facie case for personal jurisdiction. *See Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). If discovery taken from the other defendants should turn up evidence of Teva Israel's contacts *specifically* in connection with the controversy underlying this case, then the plaintiffs may seek leave of the court to replead their claims against it. Accordingly, Teva Israel's motion to dismiss under Rule 12(b)(2) is granted without prejudice.

## III. Conclusion

In sum, for the reasons discussed above:

(1) Teva Israel's motion to dismiss all complaints against it under Rule 12(b)(2)  (doc. # 150) is granted without prejudice; the plaintiffs may seek leave to replead claims against it in the event that evidence of its participation in the specific agreements underlying this case are revealed in discovery taken from the other defendants.

(2) The defendants' motion to dismiss the direct-purchaser complaint under Rule 12(b)(6) (doc. # 149; sealed mem., doc.168) is denied in substantial part. It is granted with respect only to any claims made in connection with overcharges allegedly incurred more than four years prior to the filing of the claims.

(3) The defendants' motion to dismiss the indirect-purchaser complaint under Rule 12(b)(6) (doc. # 151) is granted in part and denied in part. It is granted without prejudice with respect to all state-law consumer-protection and unjust-enrichment claims. It is granted with prejudice with respect to any claims made in connection with overcharges allegedly incurred before the filing of the claims by a longer period than the relevant statute of limitations. It is granted with prejudice with respect to claims under the antitrust statute of Puerto Rico, and with

respect to claims under the antitrust statute of Rhode Island that are in connection with overcharges allegedly incurred before July 15, 2013. It is granted without prejudice with respect to claims under the antitrust statute of Utah; the indirect purchasers have leave to replead those claims only if some named plaintiff is a citizen or resident of that state. It is granted without prejudice with respect to other claims under the laws of states where the named plaintiffs do not plead injury; the indirect purchasers have leave to replead those claims only to the extent they can plead sufficient facts to allege harm to named plaintiffs in particular states.

(4) The defendants' motion to dismiss the Humana complaint under Rule 12(b)(6) (doc. # 152) is granted in part and denied in part. It is granted without prejudice with respect to all state-law consumer-protection and unjust-enrichment claims. It is granted with prejudice with respect to any claims made in connection with overcharges allegedly incurred before the filing of the claims by a longer period than the relevant statute of limitations. It is granted with prejudice with respect to claims under the antitrust statute of Puerto Rico, and with respect to claims under the antitrust statute of Rhode Island that are in connection with overcharges allegedly incurred before July 15, 2013. It is granted without prejudice with respect to claims under the antitrust statute of Utah; Humana has leave to replead those claims only if it is a citizen or resident of that state.

So ordered.

Dated at Bridgeport, Connecticut, this 23rd day of March 2015.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge