UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE AGGRENOX ANTITRUST LITIGATION | No. 3:14-md-2516 (SRU) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## <u>MEMORANDUM AND ORDER</u>

On March 23, 2015, I issued a Memorandum of Decision and Order (doc. # 229)

disposing of four motions to dismiss the various claims in this aggregation of pharmaceutical

antitrust cases.[1] One of those motions was granted without prejudice, one was substantially

denied, and two were granted in part and denied in part. In light of the Supreme Court's decision

in *FTC v. Actavis*, 133 S. Ct. 2223 (2013), the interpretation of which occupied a significant

portion of my decision, I left the federal antitrust claims mostly intact. The defendants have filed

a motion to certify the order for interlocutory review pursuant to 28 U.S.C. § 1292(b) (doc.

# 236). The putative class of direct purchasers, the putative class of indirect purchasers (or end

payors), and the opt-out plaintiff Humana Inc. have each filed a memorandum in opposition (doc.

## 246–48).

The defendants wish to raise two specific issues on appeal: (1) whether the statute of

limitations on the plaintiffs' antitrust claims begins to run anew from each alleged overcharge, or

from the date of the allegedly anticompetitive underlying conduct (or from the earliest that the

plaintiffs knew or should have known of that conduct); and (2) whether the plaintiffs' antitrust

claims should have been dismissed for failure to plead causation under Section 4 of the Clayton

---

[1] I assume familiarity with the factual and legal background of the case, which is discussed at much greater length in the March 23 decision. *See In re Aggrenox Antitrust Litig.*, __ F. Supp. 3d ____, 2015 WL 1311352 (D. Conn. Mar. 23, 2015).

Act, because—even if the defendants' conduct was an antitrust violation under *Actavis*—the plaintiff in *Actavis* was the FTC, and the Supreme Court therefore did not expressly address, and its reasoning does not extend to, the causation requirement for private antitrust plaintiffs under Section 4.

I do not agree with the defendants that either of those questions would satisfy the requirements for section 1292(b) certification. Nevertheless, because "section 1292(b) authorizes certification of *orders* for interlocutory appeal, not certification of *questions*," *Isra Fruit Ltd. v. Agrexco Agr. Exp. Co.*, 804 F.2d 24, 25 (2d Cir. 1986), and because I believe the March 23 order taken as a whole does satisfy the 1292(b) requirements, I grant the motion to certify for interlocutory review for the reasons discussed below.

## I.     Standard

Appellate review usually cannot proceed until after the entry of a final judgment, but 28 U.S.C. § 1292(b) allows a district judge to certify the discretionary interlocutory appeal of an order if the judge is "of the opinion" that the order (1) "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "that an immediate appeal may materially advance the ultimate termination of the litigation." Such certification "is entirely a matter of discretion for the District Court," *In re The City of New York*, 607 F.3d 923, 933 (2d Cir. 2010), and if granted, a party seeking review has ten days from the date of the certifying order to apply to the Court of Appeals. 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(3). "[E]ven if the district judge certifies the order under § 1292(b), the appellant still has the burden of persuading the court of appeals" to take the appeal, *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474–75 (1978) (quotation marks omitted), and "[t]he appellate court may deny the appeal for any reason, including docket congestion." *Id.*

2

The Second Circuit has noted "that section 1292(b) authorizes certification of *orders* for interlocutory appeal, not certification of *questions*," but also that "in certifying an order for interlocutory review it is helpful if the district judge frames the controlling question(s) that the judge believes is presented by the order being certified." *Isra Fruit Ltd.*, 804 F.2d at 25.

## II.    Discussion

This is a large and complex case, likely to require a significant amount of time and resources to litigate, and both of the issues that the defendants raise have the potential to be dispositive of at least a substantial portion of the claims. It is therefore clear that they present controlling questions of law and that an immediate appeal may materially advance the ultimate termination of the litigation. The first and third elements that are required for section 1292(b) certification are thus satisfied, and all that remains is whether there is "substantial ground for difference of opinion" about those questions of law. The answer to that question is less obvious, and I take each issue in turn below.

### A.  *Berkey Photo* and the Statute of Limitations

In *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), the Second Circuit announced its holding thus: "We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." 603 F.2d at 296. I held, therefore, that the plaintiffs in this case, who are purchasers suing an alleged monopolist for alleged overcharges paid within the previous four years, may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period. The defendants had argued, however, that the Second Circuit's holding was actually narrower than that, notwithstanding what it said after "We hold, therefore, that. . . ." Their argument, which I

rejected, was that *Berkey Photo* stands for a narrow "speculative damages" exception to a general presumption against "continuing violation" theories, and that it applies only when the damages cannot be known at the time of the allegedly anticompetitive conduct. As they would have it, the mere "inertial consequences" of antitrust violations, such as the carrying out of the terms of an anticompetitive agreement, cannot restart the statute of limitations, even for purchasers who face ongoing harm from continuing overcharges. The argument they make now, as they must in their current procedural posture, is that there is "substantial ground for difference of opinion" on this question of the interpretation or applicability of *Berkey Photo*.

In order to show that there is a difference of opinion, the defendants rely principally on decisions from other circuits, two decisions from other district courts in the Second Circuit—specifically, *In re Ciprofloxacin Hydrochloride Antitrust Litigation* ("*Cipro*"), 261 F. Supp. 2d 188 (E.D.N.Y. 2003), and *Allen v. Dairy Farmers of America, Inc.*, 748 F. Supp. 2d 323 (D. Vt. 2010)—and the antitrust treatise by Phillip Areeda and Herbert Hovenkamp. They also suggest that *Berkey Photo*, or my interpretation of *Berkey Photo*, is "in significant tension" with the decision of the Second Circuit in *United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013). Some of those authorities at least arguably indicate a difference of opinion. I do not agree, however, that any of them shows that there is "substantial ground" for that difference, nor that *Grimm* creates substantial ground to doubt the viability of my interpretation of *Berkey Photo* or its application in this case.

As an initial matter, most authority from other circuits is of limited use here, because it does not interpret *Berkey Photo*. There may be substantial ground for difference of opinion about whether *Berkey Photo* was correctly decided, and it may be that other circuits or other courts on which Second Circuit precedent is not binding have arrived at different answers to the same

4

question the Second Circuit faced in *Berkey Photo*. But whether or not there is substantial ground

for difference of opinion about *Berkey Photo*'s reasoning, its holding is binding in this

multidistrict litigation. *See, e.g.*, *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 391 F.3d 907,

911 (8th Cir. 2004) ("When a transferee court receives a case from the MDL Panel, the

transferee court applies the law of the circuit in which it is located to issues of federal law.");

*Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("[A] transferee federal court should apply

its interpretations of federal law, not the constructions of federal law of the transferor circuit.");

*In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987), *aff'd sub*

*nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989) (On federal questions, "[b]inding

precedent for all is set only by the Supreme Court, and for the [transferee] district courts within a

circuit, only by the court of appeals for that circuit."); *see also In re Methyl Tertiary Butyl Ether*

*Products Liab. Litig.*, No. 1:00-1898, 2005 WL 106936, at *3–*5 (S.D.N.Y. Jan. 18, 2005)

(discussing the continued vitality of *In re Korean Air Lines* and the Second Circuit cases that rely

on it and concluding that a transferee court in multidistrict litigation is bound in the interpretation

of federal law by the precedent of the transferee circuit). So the question before me is only

whether there is substantial ground for difference of opinion about how to interpret *Berkey*

*Photo*'s holding or whether it applies to the facts of this case. Cases from other circuits do not

have much to say about that question.

     Neither does *Cipro*. In that case, the District Court dismissed antitrust claims brought by

"Organizational Plaintiffs" (also identified as "advocacy groups," 261 F. Supp. 2d at 218) as

time-barred, *id.* at 230, but there is some confusion (and the parties here disagree in their briefs

on the present motion) about whether those plaintiffs were purchasers—as they would need to be

for *Berkey Photo* to apply. The claims of the Organizational Plaintiffs in *Cipro* were treated

separately from the direct- and indirect-purchaser complaints, and the defendants in that case maintained that the Organizational Plaintiffs "never purchased Cipro, directly or indirectly" and that "[t]hey do not allege otherwise." *Id.* at 220. The Court observed, however, that according to their complaint, four of the seventeen Organizational Plaintiffs were "third party payors for their members" and that in that capacity they "purchased Cipro other than for resale." *Id.* (brackets omitted). After noting that disagreement, the Court did not decide whether the Organizational Plaintiffs were purchasers under *Berkey Photo*, but only indicated that "it [was] not clear that Organizational Plaintiffs [were] even members of the putative class" of indirect purchasers.[2] *Id.* at 221. Perhaps uncertainty about whether those plaintiffs were purchasers contributed to reluctance to rely on *Berkey Photo*, or perhaps the application of that decision simply was not brought before the Court, but whatever the reason, *Cipro* does not discuss it. *Berkey Photo* is cited only once in *Cipro*, as part of an "accord" citation indicating agreement with *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321 (1971), for the proposition that a new cause of action accrues with each new injury in the context of continuing conspiracies to violate antitrust law. If the District Court in *Cipro* had an opinion that differed from mine on the interpretation of *Berkey Photo* or on *Berkey Photo*'s application to facts like those in this case—and it is not at all clear that it did—it did not describe a "substantial ground" for it.

*Allen* does at least discuss *Berkey Photo*, but my conclusion about that case is similar. The *Allen* District Court quoted the holding of *Berkey Photo* and its subsequent warning that the holding does not license plaintiffs to go "on a time-warped fishing expedition," because "[a] trial court in its discretion may always set a reasonable cutoff date, evidence before which point is to

---

[2] If the Organizational Plaintiffs were purchasers, the lack of clarity on that point is underscored by the fact that the West headnote got it wrong, summarizing one holding as: "Filing of antitrust class action, by indirect purchasers . . . did not toll statute of limitations in class action suit by advocacy groups which did not engage in actual purchases of drugs." 261 F. Supp. 2d at 190.

be considered too remote to have sufficient probative value to justify burdening the record with it," and because "the trial court might not be without flexibility to limit the proof where delay in bringing suit may have caused injustice to the defendants." 748 F. Supp. 2d at 349–50 (quoting *Berkey Photo*, 603 F.2d at 296). On the basis of that caveat, and without further explanation, the District Court opined that "[n]o reasonable reading of *Berkey Photo* would allow it to stand for the proposition that, at the pleading stage, an allegation of an anti-competitive, artificially depressed price paid to the producers of a product within the limitations period automatically brings within the limitations period any pre-limitations conduct that contributed to a purchaser's ability to extract that low price." *Id.* at 350. The *Allen* Court thus ruled that *Berkey Photo* did not resolve the statute-of-limitations question in that case; it then went on to discuss in detail the various continuing-violation arguments before it and ultimately denied the motions to dismiss on statute-of-limitations grounds. *Id.* at 354. I agree with the *Allen* Court that *Berkey Photo* does not stand for the proposition that an allegation of anticompetitive prices paid within the limitations period *automatically* brings within the limitations period *any* pre-limitations conduct that *contributed* to the ability to extract that price. Rather, *Berkey Photo* stands for the proposition stated in the holding it announced: "We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." 603 F.2d at 296. It is not clear that the *Allen* Court disagreed with my interpretation of *Berkey Photo* or its application to the facts of this case; if the *Allen* Court did disagree, it did not describe a "substantial ground" for that difference of opinion.

The defendants find a stronger argument in their reliance on the antitrust treatise by Phillip Areeda and Herbert Hovenkamp. There, we find a much clearer difference of opinion

specifically with respect to the interpretation of *Berkey Photo*, and from an eminent authority. The treatise quotes from *Berkey Photo* at length, and though it does not discuss it in great depth, its discussion does include a clear difference of opinion from my own on the interpretation and meaning of the decision.[3] In a crucial respect, however, the Areeda and Hovenkamp interpretation of *Berkey Photo* appears to me to be plainly incorrect, and the treatise does not elaborate on that interpretation in any way that would allow me to conclude that there is a "substantial ground" for the difference of opinion.

  The treatise quotes *Berkey Photo*'s discussion distinguishing competitor and purchaser antitrust lawsuits, and its reasoning that:

> So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. Thus, in this setting, as in the context of a continuing conspiracy to violate the antitrust laws, each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act.

Areeda & Hovenkamp ¶ 320c4 (quoting *Berkey Photo*, 603 F.2d at 295) (quotation marks and ellipses omitted). The treatise suggests, no doubt correctly, that "[t]hat language appears to conflict with numerous decisions of other circuits holding that a 'continuing violation' tolls the statute of limitation only if the acts that are alleged to continue the violation are sufficiently independent of the initial unlawful act." *Id.* The treatise then attempts to avoid or to minimize that apparent intercircuit conflict by adding "[b]ut the court also added this limiting language" and quoting a subsequent passage from *Berkey Photo* that does not appear to me to contain any limiting language, but, rather, explanatory language:

> Plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause

---

[3] It is worth noting that the interpretation offered in the Areeda and Hovenkamp treatise may also have influenced the district court opinions discussed above, since both cite the relevant section.

> its purchasers in the future. Indeed, some of the buyers who will later feel the brunt of the violation may not even be in existence at the time. Not until the monopolist actually sets an inflated price and its customers determine the amount of their purchases can a reasonable estimate be made. The purchaser's cause of action, therefore, accrues only on the date damages are suffered.

*Id.* (quoting *Berkey Photo*, 603 F.2d at 295) (quotation marks and ellipses omitted). That language, and the treatise's construal of it as "limiting" language, is apparently the source of the defendants' theory that *Berkey Photo* stands for a narrow "speculative damages" exception. But that passage, though discussing the speculative nature of future damages to purchasers at the time of anticompetitive conduct, does not include words like "if" or "only when" or "insofar as" or any other such limiting language. It merely provides further explanation of the Court's reasoning and an additional justification for its outcome. The use of "therefore" *might* be read to imply that the conclusion is limited to the rationale that precedes that word, and thus that the subsequent statement of the holding was expressed in overbroad language, but that excerpted passage does not represent the *entirety* of the Court's reasoning or the *only* justification for its outcome. The Court was unambiguous in its discussion of the distinction between purchaser claims and competitor claims, 603 F.2d at 295 ("Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price."), the nature and "fundamental principles" of the Sherman Act, *id.* at 296 ("[T]here can be no unfairness in preventing a monopolist that has established its dominant position by unlawful conduct from exercising that power in later years to extract an excessive price. . . . The taint of an impure origin does not dissipate after four years if a monopolist continues to extract excessive prices because of it."), and concerns about the Act's enforcement, *id.* ("[I]t would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market

control for four years after its last anticompetitive action, it may charge an exorbitant price . . . .
An unlawful monopolist must be deprived of the fruits of its wrongful conduct, and one of the
forbidden fruits is an excessive price. . . . So long as a monopolist enjoys the flower of evil at the
expense of its customers, those victims must have a remedy." (quotation marks and citation
omitted)). The treatise adds no additional analysis and does not engage deeply with this
reasoning, and it relegates the concluding sentence from *Berkey Photo* quoted above, which
begins "We hold, therefore, that . . . ." to a footnote, where it puzzlingly omits those first four
words. I can easily conclude that the treatise represents a difference of opinion regarding the
holding of *Berkey Photo*; I cannot conclude that it offers a "substantial ground" for that
difference. Absent further elaboration that the treatise does not provide, it appears the only
ground for the difference of opinion is a misinterpretation of one part of *Berkey Photo*'s rationale
as a limitation on its holding.

The defendants argue that the rule of *Berkey Photo*, as I have interpreted it (and as I have
Second Circuit expressly stated it), would "endlessly" or "indefinitely" extend the statute of
limitations, depriving a monopolist of the repose the statute of limitations should offer. That
view may be shared by Courts in other circuits or by the authors of the Areeda and Hovenkamp
treatise—but it is not correct. On the contrary, the rule of *Berkey Photo* extends the statute of
limitations no more endlessly than the monopolist extends the excessive price. When the price
stops being excessive—or when the monopolist stops enjoying the "flower of evil," as the
*Berkey Photo* Court put it—the statute-of-limitations clock starts ticking. So long as the
anticompetitive pricing remains, there can be no guarantee of repose from purchaser actions.
*Berkey Photo* is quite clear on that point, and whether or not a different court could reasonably

come to a different conclusion than the *Berkey Photo* Court did, I have seen no "substantial ground" for difference of opinion about the meaning or application of that decision.

Lastly, the defendants argue that my reading of *Berkey Photo* is "in significant tension" with the Second Circuit's decision in *United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013), in which the Court vacated a conviction on statute-of-limitations grounds in a criminal antitrust-conspiracy case. That decision, however, does not discuss or even mention *Berkey Photo*, and its reasoning is at least somewhat connected to the criminal character of that case. It followed the holding of two other criminal cases—*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003), and *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989)—which reasoned that a "[criminal] conspiracy ends notwithstanding the [later] receipt of anticipated profits where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions and there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." *Grimm*, 738 F.3d at 502 (quotation marks, ellipses, and brackets omitted).[4] That reasoning relies on the "typically noncriminal" character of the ongoing conduct (in contrast to the underlying criminal conduct) and the absence of evidence of activity "posing the special societal dangers" of the criminal conspiracy. The *Doherty* Court, on which the *Salmonese* and *Grimm* Courts relied, was particularly concerned with not "extending the conspiracy statute of limitations indefinitely beyond the period when the unique threats to society posed by a conspiracy are present," 867 F.2d at 62, and cited *United States v. Habig*, 390 U.S. 222 (1968), for the proposition that "criminal statutes of limitations are to be liberally construed in favor of repose." *Id.* To the extent that civil antitrust violations can be said to pose "unique threats to

---

[4] *Grimm* also summarized its conclusion with a quotation from *Fiswick v. United States*, 329 U.S. 211 (1946), which contains an internal quotation from *United States v. Kissel*, 218 U.S. 601 (1910). Those cases also both pertain to criminal conspiracies.

society" analogous to the threats posed by criminal conspiracies (and assuming that such a comparison is not overly strained), burdening the market with illicit monopoly prices is itself a manifestation of that threat, not a mere byproduct that persists after the threat has dissipated.

It would not require an extraordinary inferential leap to apply the *Grimm* reasoning in the civil context, but it is not clear that it should be so applied, and there is nothing to suggest that the Second Circuit in *Grimm* contemplated such application. As the District Court in *Cipro* recognized, "[p]olicy considerations justify different treatment" in criminal and civil cases, and "although the law in the criminal context is clear that the statute of limitations only starts to run from the last act in furtherance of the conspiracy," that is not so clear in the civil context. *Cipro*, 261 F.2d at 227. Subjecting a defendant to *criminal* liability is a profoundly different matter, and it implicates profoundly different interests, than subjecting a defendant to civil liability for the ongoing extraction of illicit monopoly prices.

Moreover, even if *Grimm* were to apply in the civil context, I am not persuaded that the alleged civil antitrust violation here is properly analogous to the criminal violation in that case. Following *Salmonese* and *Doherty*, the *Grimm* Court reasoned that:

> a conspiracy ends notwithstanding the receipt of anticipated profits where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place. Conversely, 'payoffs' could reasonably be viewed as part of a conspiracy where their receipt consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies remain present until the payoff is received.

738 F.3d at 502 (quoting *Salmonese*, 352 F.3d at 616) (quotations, citations, and modifications omitted). The Second Circuit summarized that "descriptive rather than exclusive" list of the features of "serial payments that do not constitute overt acts" by observing that "overt acts have

12

ended when the conspiracy has completed its influence on an otherwise legitimate course of common dealing that remains ongoing for a prolonged time." *Id.* at 503. The defendants here argue that any alleged anticompetitive conduct can only have been their entering into the challenged settlement agreement, and that the only subsequent "acts" were mere "inertial" consequences of carrying out the terms of the agreement. But the alleged anticompetitive conduct here was not *signing* the agreement, but *implementing* it; and the agreement was for a set term, not an indefinite one. The carrying out of the agreement's terms is not "an otherwise legitimate course of common dealing that remains ongoing for a prolonged time" after the anticompetitive "conspiracy has completed its influence" on it. *Id.* On the contrary, the carrying out of the terms—if those terms indeed violate the antitrust laws—is the very anticompetitive conduct complained of, and "the special dangers attendant" to such violations are surely present. *Id.*

The defendants do not argue that *Grimm* overruled *Berkey Photo*, and indeed, the Second Circuit follows a general rule that one panel "cannot overrule a prior decision of another panel" unless an intervening Supreme Court decision has cast doubt on the earlier holding. *Union of Needletrades v. USINS*, 336 F.3d 200, 210 (2d Cir. 2003). As a matter of strict jurisprudence, there may be some question whether that is a binding rule or merely a prudential one, *see, e.g.*, *McMellon v. United States*, 387 F.3d 329, 353–57 (4th Cir. 2004) (Niemeyer, J., concurring in part and dissenting in part) ("[T]hree-judge panels are [constitutionally and statutorily] authorized to exercise the judicial power conferred on courts of appeals, and that power includes the general power of the court to overrule its own earlier decisions."), but I cannot conclude that *Grimm* casts any meaningful doubt on the viability of *Berkey Photo* or its application to this case. The defendants may wish ultimately to seek *in banc* review to overrule or narrow the holding of

13

*Berkey Photo*, but I see no "substantial ground for difference of opinion" on what the holding of that decision was, nor for a difference of opinion about whether that holding applies to the allegations here. "[A] purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." 603 F.2d at 296.

    B.  <u>Causation and Liability Under *Actavis*</u>

       The Supreme Court held in *Actavis* that large and unjustified reverse-payment settlements, which sometimes appear in pharmaceutical patent litigation, can violate antitrust law. 133 S. Ct. at 2227. Moreover, while rejecting tests that would presume the underlying patent's validity or invalidity, the Court maintained that "[i]t is normally not necessary to litigate patent validity to answer the antitrust question" because a large and unjustified reverse payment can lead to the inference that the "payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market—the very anticompetitive consequence that underlies the claim of antitrust unlawfulness." *Id.* at 2236. The defendants now appear to argue that, though that all may be quite useful for the FTC (which was the plaintiff in *Actavis*), it is not so useful for the plaintiffs here, because unlike the FTC, private antitrust plaintiffs must plead not only substantive antitrust violations but also that the violations injured them. *See* 15 U.S.C. § 15 ("[A]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue therefor . . . ."). By the defendants' reckoning, the plaintiffs must therefore plead and ultimately prove that the alleged antitrust violation was the cause in fact and the proximate cause of actual injury to them, which in this context means they must show that *if not* for the challenged settlement agreement, there *would have been* earlier entry of generics into the market. The defendants argue that the Supreme Court

14

in *Actavis* did not address this but-for causation requirement in addition to the substantive liability standard, because the plaintiff in *Actavis* was the FTC and thus only the liability standard was necessary. Thus, they argue further, because I did not separately address both causation and liability in the March 23 order, I seemed to collapse the two private-action requirements, which ought to remain distinct.

I agree with the defendants that the plaintiffs must plead and ultimately must prove that they have been injured by the alleged antitrust violation in order to recover, and the March 23 order does not contradict that requirement. I thus do not believe that the defendants' second question, as framed, justifies certification of the order for interlocutory appeal. However, it is not clear whether the defendants agree that the plaintiffs' proof is an inherently probabilistic task and that, under *Actavis*, it does not require litigating the validity of the patent. If private antitrust plaintiffs must fully litigate the validity of the patent anyway in order to show but-for causation, then *Actavis*'s insistence that litigating the patent is not normally necessary to show that a large and unjustified reverse-payment settlement violated antitrust law would have no practical effect in private suits, and *Actavis* itself therefore would have no practical application except in suits by the government. That is not an impossible interpretation of the case—and it would act as a powerful brake to *Actavis*'s potentially disruptive impact in the world of pharmaceutical patent litigation—but I consider it dissonant with the decision's reasoning and on the whole a very unlikely interpretation. I agree with the California Supreme Court, which observed in one of the most thorough and thoughtful discussions of *Actavis* yet issued by any court that "nothing in [*Actavis*]'s discussion of the legal rules at the boundary between antitrust and patent law hinged on the happenstance that the case under review involved a public prosecutor." *In re Cipro Cases I & II* ("*California Cipro*"), 348 P.3d 845, 61 Cal. 4th 116, 142 (2015).

The probabilistic nature of the proof of injury is intractably connected to the substantive standard under *Actavis*. The defendants indicate that they respectfully disagree with my construction of the substantive standard in the March 23 order (among other aspects of the ruling), but that they do not seek interlocutory review of that question. That is curious, because I consider it the question that most justifies such review.

"[A] critical insight undergirding *Actavis* is that patents are in a sense probabilistic, rather than ironclad: they grant their holders a potential but not certain right to exclude." *Id.* at 142–43. That insight is not a new one, and there is much scholarship behind it, *see id.* at 144 n.9 (collecting scholarship), but neither is it without controversy. The *Actavis* dissenters, for instance, see patents as being simply "either valid or invalid" regardless of whether their validity or invalidity is known (or perhaps even knowable):

> First, a patent is either valid or invalid. The parties of course don't know the answer with certainty at the outset of litigation; hence the litigation. But the same is true of any hard legal question that is yet to be adjudicated. Just because people don't know the answer doesn't mean there is no answer until a court declares one. Yet the majority would impose antitrust liability based on the parties' subjective uncertainty about that legal conclusion.

133 S. Ct. at 2244 (Roberts, C.J., dissenting). But not only is there "no [definite and nonprobabilistic] answer until a court declares one," there is not even such an answer *after* a court declares one if the challenge to the patent fails. Because of the asymmetrical application of issue preclusion, a new party may always come along with a new challenge, and the most that a favorable ruling for the patent-holder can say is that the patent was not found to be invalid *this time*. A court can conclude that a patent is valid against this challenge or against that challenge, but it is beyond the ken of any court to conclude that a patent is valid against any and all challenges that may come. One might reasonably infer that a patent that survives substantial or

repeated challenges is comparatively strong, but that is still a probabilistic evaluation and not a conclusive statement of validity.

Such probabilistic evaluation is not discussed in depth or with great clarity in *Actavis*, but it inheres in the reasoning of the *Actavis* majority, which held that a large and unjustified reverse-payment settlement can give rise to an inference that the "payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face *what might have been* a competitive market," 133 S. Ct. at 2236 (emphasis added), and that that is "the very anticompetitive consequence that underlies the claim of antitrust unlawfulness." *Id.* It further clarified that the "relevant anticompetitive harm" is that the payment "seeks to *prevent the risk* of competition." *Id.* at 2237 (emphasis added). "[T]he law does not condone the purchase of protection from uncertain competition any more than it condones the elimination of actual competition," Areeda & Hovenkamp, ¶ 2030b, and I agree with the California Supreme Court that it follows necessarily from *Actavis* both that "the period of exclusion attributable to a patent is not its full life, but its expected life had enforcement been sought," and that "[t]his expected life represents the baseline against which the competitive effects of any agreement must be measured." 61 Cal. 4th at 149.

"Antitrust law condemns the purchase of freedom from competition; what matters is whether a settlement postpones market entry beyond the average point that would have been expected at the time in the absence of agreement." *Id.* at 159 (citing March 23 order). The defendants can certainly defend themselves in this case by arguing that generic entry for one reason or another would have been impossible at any particular time even in the absence of the agreement. But if the plaintiffs prove by the applicable standard at trial that the settlement included a large and unjustified reverse payment giving rise to an inference of payment in order

17

to avoid the risk of competition; and that the agreement did effectively extend the life of the patent beyond its expected life in the absence of settlement; and that a generic could have entered the market at that earlier time; and that the plaintiffs have instead paid monopoly prices since that time; then the plaintiffs will have proved an antitrust violation *and* causation of antitrust injury. To the extent that my March 23 order was not explicit about that conclusion, I amend and clarify it here with this amplification.

As of the date of this writing, only one federal court of appeals has issued a decision substantively examining *Actavis*. *See King Drug Co. of Florence v. Smithkline Beecham Corp.*, __ F.3d ____, 2014 WL 9954190 (3d Cir. 2015). That decision vacated the judgment of a district court and held (as I also held in the March 23 order) both that *Actavis*'s holding is not limited to reverse payments of cash and that agreements not to produce an authorized generic (or similar "exclusive licenses") can constitute reverse payments under *Actavis*.[5] The Third Circuit in that opinion agreed that "under the substantive standard [of *Actavis*], the question is . . . whether [the defendants] have acted unlawfully by seeking to prevent competition," *id.* at *15, but it expressly declined to "decide the question of antitrust injury in private actions," *id.* at *15 n.35, and no federal court of appeals has yet opined on the question.

Because *Actavis* is a new Supreme Court precedent with clear potential for a disruptive effect on very large-scale litigation, and because it provides limited guidance to the lower courts, an opinion from the Second Circuit could be useful both in this case and elsewhere. The question that most clearly warrants review is the substantive standard of *Actavis*, as that standard was applied in my rejection of several of the defendants' arguments in their motions to dismiss— which is to say, whether the enumeration above errs in its description of what constitutes proof

---

[5] The defendants indicate that they do not presently seek interlocutory review of those aspects of my March 23 order.

under *Actavis* of an antitrust violation and causation of antitrust injury. That is the most significant of a number of questions raised by my March 23 order that could benefit from review, and on which guidance from the Second Circuit could be helpful to this court and in the development of the law. Accordingly I grant the defendants' motion to certify my March 23 ruling for interlocutory appeal.

## III.    Conclusion

The defendants' motion (doc. # 236) to certify the March 23, 2015 Order (doc. # 229) for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) is granted. The March 23 order, as expanded and clarified by this order, is certified for interlocutory review. If a party wishes to pursue that appeal, that party has ten days from the date of this order to apply for review to the Second Circuit, which may, in its discretion, grant review on any portion of the order or none at all.

The defendants do not seek a stay of the district court proceedings, and I do not grant one.

So ordered.

Dated at Bridgeport, Connecticut, this 21st day of July 2015.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

19