```
                 UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

IN RE:                            :
                                  :  No. 3:14-MD-2516 (SRU)
                                  :  915 Lafayette Boulevard
                                  :  Bridgeport, Connecticut
                                  :
                                  :  September 24, 2015
AGGRENOX ANTITRUST LITIGATION     :

- - - - - - - - - - - - - - - - x



                      MOTIONS HEARING



B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.



A P P E A R A N C E S:

     FOR THE PLAINTIFFS:

               MOTLEY RICE LLC
                One Corporate Center, 17th Floor
                20 Church Street
                Hartford, Connecticut  06103
            BY:  MICHAEL M. BUCHMAN, ESQ.

               HILLIARD SHADOWEN LLC
                39 West Main Street
                Mechanicsburg, Pennsylvania  17055
            BY:  STEVE D. SHADOWEN, ESQ.
                D. SEAN NATION, ESQ.

               LOWEY DANNENBERG COHEN & HART, P.C.
                One North Broadway
                White Plains, New York  10601
            BY:  PETER ST. PHILLIP, ESQ.
                URIEL RABINOVITZ, ESQ.
                NOELLE RUGGIERO, ESQ.
```

GARWIN GERSTEIN & FISHER, LLP
            Wall Street Plaza
            88 Pine Street, 2nd Floor
            New York, New York  10005
      BY:  EPHRAIM R. GERSTEIN, ESQ.


FOR THE DEFENDANTS:

          WHITE & CASE
            1155 Avenue of the Americas
            New York, New York  10036-2787
      BY:  ROBERT A. MILNE, ESQ.
            ALISON HANSTEAD, ESQ.
            JACLYN EPSTEIN, ESQ.

      GOODWIN PROCTOR
            Exchange Place
            Boston, Massachusetts  02109
      BY:  CHRISTOPHER T. HOLDING, ESQ.

      PULLMAN & COMLEY LLC
            850 Main Street
            P.O. Box 7006
            Bridgeport, Connecticut  06601-7006
      BY:  JAMES T. SHEARIN, ESQ.

      DAY PITNEY LLP
            242 Trumbull Street
            Hartford, Connecticut  06103-1212
      BY:  BRYAN J. ORTICELLI, ESQ.




            Sharon L. Masse, RMR, CRR
             Official Court Reporter
             915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
                Tel: (917)703-0761

1           THE COURT:  Good afternoon.  I assume everyone

2    has provided their appearances to the court reporter.

3           MR. MILNE:  Yes, sir.

4           THE COURT:  All right.  Let me just, if I could,

5    be reminded of the names of who's going to be arguing.

6           MR. BUCHMAN:  Good afternoon, Your Honor.

7    Michael Buchman from Motley Rice.  We are counsel for the

8    end-payor plaintiffs, and with me today are Mr. Sean

9    Nation from Hilliard & Shadowen and Mr. Steve Shadowen

10   from Hilliard & Shadowen.  Mr. Shadowen will be arguing

11   for the end-payor plaintiffs this afternoon.

12          THE COURT:  All right, thank you.

13          MR. ST. PHILLIP:  Good afternoon, Your Honor.

14   Peter St. Phillip.  With me is Uriel Rabinovitz from Lowey

15   Dannenberg on behalf of Humana, Inc., and Mr. Rabinovitz

16   will be arguing today.

17          THE COURT:  Very good.  Thank you.

18          MR. MILNE:  Good afternoon, Your Honor.  Robert

19   Milne from White & Case on behalf of the Boehringer

20   defendants, and I'll be arguing today from the defense

21   side, and with me is my colleague Alison Hanstead and

22   Jaclyn Epstein.

23          THE COURT:  Okay.  Thank you.

24          MR. HOLDING:  Your Honor, Chris Holding with Jim

25   Shearin for the Barr and Teva defendants.  We're all

1    support for Mr. Milne.

2            THE COURT:  All right, sounds good.  We

3    obviously have two motions.  I'm assuming that the motion,

4    the class motion, related to the class plaintiffs will go

5    first, but if that's not what you plan, I'm happy to --

6            MR. MILNE:  No, that is what we plan.

7            THE COURT:  All right, sounds good.

8            MR. MILNE:  As you can probably tell from your

9    monitor, I think we have Powerpoint slides for you to kind

10   of guide the discussion, but we also have hard copies,

11   which we've provided to counsel.

12           THE COURT:  Okay.

13           MR. MILNE:  Good afternoon, Your Honor.

14           THE COURT:  Good afternoon.

15           MR. MILNE:  So just to set the context here, as

16   Your Honor knows, we're here first to discuss the class

17   plaintiffs' motion, the indirect purchaser class

18   plaintiffs, and the first couple of slides that we have

19   for you are just kind of to sort of remind us where -- how

20   we started and where we are.

21           So we started, that first chart that you should

22   see on your screen, is just an overview of the original

23   complaints as they were filed here.  So we had over 150

24   state law claims.  The causes of action indicated in red

25   are those that were withdrawn by the plaintiffs, and the

1   ones that have the green strike-throughs are the ones that

2   Your Honor dismissed on the March 23 motion.

3          The next slide gives an overview of where we are

4   today with the amended complaint.  So we have the causes

5   of action indicated, various state antitrust claims and

6   then the state consumer protection act claims.  The ones

7   that have red strike-throughs are the ones that the

8   plaintiffs have indicated that they have pled just for

9   purposes of preserving appellate rights, so it's

10  understood that those will just be dismissed as a matter

11  of course, and so we haven't briefed those or don't intend

12  to argue those today.

13         The ones that have the green strike-throughs are

14  the ones against which we're moving, so it's six causes,

15  state causes of action, and the one federal antitrust

16  injunction claim. The next slide just gives the high-level

17  overview of the states and the causes of action that we're

18  moving against.

19         So if it's acceptable to Your Honor, what I

20  propose to do is just kind of move through those and

21  answer any questions that you have along the way.

22         THE COURT:  Sure.I

23         MR. MILNE:  So starting with Illinois, the

24  Illinois antitrust statute, that claim should be dismissed

25  because the purchaser -- the indirect purchaser plaintiffs

1   here are proceeding on a class action basis, and the

2   Illinois antitrust act very explicitly in the next slide

3   sets forth the language.  It provides indirect purchasers

4   with the right to bring an action under the statute, but

5   it very explicitly says they can't proceed on a class

6   action basis; only the state attorney general has that

7   right.  And so for that reason, multiple courts have

8   dismissed class action claims attempted to be brought by

9   indirect purchasers under the Illinois antitrust statute.

10  In the next slide here we cite these cases in the brief,

11  but the *Lidoderm*, the *Nexium* case, the *Wellbutrin* case,

12  and there's some others that we included in the briefing,

13  all were dismissals, and these cases are dismissals as

14  against end-payor plaintiffs of the very same type that

15  are at issue here, these third-party payors and the like.

16          Now, the plaintiffs say this Illinois provision

17  should be trumped by Rule 23 because of the U.S. Supreme

18  Court's decision in the *Shady Grove* case.  Your Honor,

19  these courts, the courts that we've cited to you, are

20  courts that considered the application of these very same

21  types of claims in light of *Shady Grove* and ruled that

22  under the considerations in *Shady Grove*, Rule 23 should

23  not trump because in order to have Rule 23 apply, the

24  provisions of the Rules Enabling Act would be violated; in

25  other words, there would be an impingement on a

1   substantive state right is what these courts found with

2   respect to this Illinois statute.  And, Your Honor, what's

3   key to -- one of the keys to these decisions is that the

4   courts in them applied the test laid out by Justice

5   Stevens in his concurring opinion in *Shady Grove*, and the

6   next slide should have that, and what Justice Stevens said

7   is that where you have a state rule that on its face looks

8   procedural, but in its operation or it's so intertwined

9   with a right or a remedy that it basically functions to

10  define the scope of that right or remedy, then it should

11  be deemed substantive and not be trumped by the federal

12  civil procedure rule.  And so that's the test that these

13  courts that we've cited to you, Your Honor, considering

14  the Illinois statute, have adopted.  And that is the test

15  that has been adopted by the majority of courts around the

16  country, the Stevens concurrence.

17          So this next slide just gives an overview of the

18  courts that have adopted that test.  So it includes the

19  First, the Eighth, the Tenth Circuits, at least two courts

20  within this district and a couple of others within the

21  circuit and other courts from other jurisdictions have

22  said that when you're considering the *Shady Grove* issue,

23  it is the Stevens concurrence that should be -- you know,

24  drive the analysis.

25          And one case in point there, Your Honor, that I

1    think is important to keep in mind is the *Trilegiant* case.

2    That case was decided by Judge Bryant in this district

3    just, I guess, last year, and there she was considering

4    the Connecticut Unfair Trade Practices Act which has a bar

5    against class actions where one of the named plaintiffs is

6    not a resident of Connecticut.  So in the *Trilegiant* case

7    the issue was, well, in federal court does Rule 23 trump

8    that state rule.  And the judge, first of all, decided to

9    apply Justice Stevens' test and applying it concluded

10   that, as the quote there indicates, that the class action

11   restriction of the Connecticut act reflects a substantive

12   policy judgment by the Connecticut legislature, and

13   because it's substantive rather than procedural, Rule 23

14   doesn't control.

15        And that's what we have here with this Illinois

16   statute, Your Honor.  It is -- the provision in question

17   is the very provision by which indirect purchasers are

18   accorded the right to bring a private action under the

19   Illinois statute.  In other words, *Illinois Brick* is being

20   overruled, but the legislature said in only a limited way.

21   You don't get to proceed on a class action basis.  And

22   that is a substantive rule.  That is based -- that is

23   limiting the range of rights that plaintiffs -- indirect

24   purchasing plaintiffs in Illinois have, and that's to be

25   distinguished --

1              THE COURT:  Why isn't it simply limiting a

2    procedural vehicle?

3              MR. MILNE:  Well, I think when you're thinking

4    about antitrust in particular, Your Honor, it is that the

5    ability to bring a class action really is, as a practical

6    matter, a substantive right because you may have an

7    antitrust gripe as an individual indirect purchaser, but

8    you may not have the ability or the wherewithal to bring

9    an antitrust claim.  It's big, it's expensive, it's

10   different.  And the legislature in Illinois -- in the

11   federal courts, the courts say you don't ever get to bring

12   a cause of action like that.  Some states have said

13   indirect purchasers, you can bring causes of action like

14   that, and you can do it on a class basis or whatever basis

15   you want.  But the Illinois legislature said you can bring

16   an action if it's -- but you've got to do it alone.

17   But --

18             THE COURT:  Obviously, that's what they said.

19   What I'm trying to sort out is why should that be

20   characterized as a substantive provision of the Act rather

21   than a limit on a procedural vehicle that can be used to

22   bring an action?

23             MR. MILNE:  Well, I think when you -- when you

24   look at it through the lens of Justice Stevens' test, it

25   is effectively limiting a substantive right because you

1   may not have the ability to even bring an action if you

2   don't -- if you're not proceeding on a class basis in an

3   antitrust context, if you're an individual purchaser.

4   Now, the Illinois legislature made a policy judgment that

5   it's willing to accept that; that is, for at least the

6   state of Illinois, that's going to be the rule.  So --

7           THE COURT:  But a limitation on your ability to

8   bring a claim is not necessarily substantive.  If Illinois

9   set a two-week statute of limitations, it might have the

10  practical effect of precluding many people from bringing

11  claims, but I think we can agree that's a procedural

12  limitation, isn't it?

13          MR. MILNE:  I would not -- I haven't thought

14  deeply about the statute of limitations angle, but it

15  certainly would affect a substantive right, and what

16  Justice Stevens is saying is if -- certainly, you know,

17  the ability to bring a class action, you can't deny that

18  it's a procedural device, but what Justice Stevens was

19  saying is that there may be procedural devices that are so

20  tied up in the practicality of the substantive right that

21  you have to view it as de facto substantive.  And I think

22  this is a classic example of that.

23          THE COURT:  Right, but what I'm struggling with

24  is how do I tell one from the other?  In other words, what

25  are the indicia of it being so tied up that it becomes

1    substantive if on its face it appears to be a procedural

2    limitation?

3           MR. MILNE:  One of the key indicia, Your Honor,

4    is just how targeted is that, is that state rule.  So in

5    the *Shady Grove* case, the rule at issue was a rule of New

6    York procedural law that was actually part of the New York

7    civil practice rules that basically said you can't proceed

8    on a class action basis for any action involving a

9    penalty.  So it was a provision of wide application,

10   clearly part of the civil practice rules, didn't

11   specifically relate to any particular cause of action,

12   even could apply to non-New York causes of action, tort

13   actions or whatever else, so it was very broad in its

14   application.  So I think the more specific you get, and

15   with this Illinois statute and with, for example, the

16   Connecticut law that Judge Bryant considered, you have a

17   very focused decision being made by the legislature on a

18   particular type of right of action or right that's being

19   accorded to a universe of entities to bring a lawsuit, and

20   where it is targeted that way and where, as a very

21   practical matter, its application will determine is there

22   a cause of action or not a cause of action?

23          THE COURT:  So your view is if the procedural

24   limitation is set forth in the same statute that creates

25   the right of action, there's a greater likelihood it's a

1    substantive limitation than if it's maintained as some

2    more general rule of procedure?

3            MR. MILNE:  Absolutely, Your Honor, and I think

4    that that's on full display with respect to this Illinois

5    statute because, you know, it wasn't like -- it wasn't

6    like the indirect purchasers had had a right of action for

7    50 years before that and now the legislature comes in and

8    ingrafts something that limits class actions where you

9    might say, okay, well, that's something more procedural.

10   Here in the very act of according this right, the

11   legislature said it's tempered, it's limited, and in this

12   way.  And if Justice Stevens' test means anything, I think

13   it would apply to this situation, and I think it properly

14   applies in the situation of *Trilegiant*, which involved a

15   similar type provision that was part of the consumer

16   protection act regime in this state.

17           The other thing about the Illinois situation is

18   that in Illinois, it is not as though indirect purchasers

19   are prevented from ever recovering.  What the

20   legislature -- where there's a real antitrust violation,

21   what the legislature says is we want the state attorney

22   general to basically come in and decide when it's

23   appropriate to proceed on that basis.

24           And the other thing that makes the Illinois

25   situation very much more substantive than what was at

1    issue in *Shady Grove* is the fact that that legislation,

2    that same piece of legislation, very clearly indicated

3    that the legislature was concerned about issues of double

4    recovery.  So -- because when you have -- direct

5    purchasers always have the right of action, and now what

6    the legislature was doing was saying, okay, at least in

7    this limited way, indirect purchasers are going to have a

8    right of action, but we want to be very sure that when

9    both are suing that you don't have six-fold recovery or

10   that kind of thing.  So one of the ways in which it caused

11   that to be more front and center was to say, well, we're

12   not going to allow these big class actions to just be

13   brought by anybody and everybody when we're talking about

14   indirect purchasers.  It's the state attorney general;

15   that office can interact with the court and try to resolve

16   that.

17          So, Your Honor, our position is that consistent

18   with all the cases that we've cited and with the

19   Trilegiant case, this Illinois cause of action should be

20   dismissed.

21          Now, the plaintiffs, of course they're citing

22   *Shady Grove*.  They reference a recent Eleventh Circuit

23   case, the *Lisk* case.  Some of the colloquy we've just had

24   I think would give you our answer to the *Lisk* case.  I

25   mean, basically, *Lisk Corp.* did not apply the Stevens

1    test.  We think it should have.  We think had it applied

2    the Stevens test, it would have reached a similar result

3    to what Judge Bryant did in the *Trilegiant* case.

4           So unless Your Honor has any further questions

5    on that, I'd like to move on to the Illinois consumer

6    fraud --

7           THE COURT:  Yes, the only question I have is in

8    terms of kind of making sense of these arguments, there

9    might be some value in hearing from the other side --

10          MR. MILNE:  Sure.

11          THE COURT:  -- right after you present your

12   argument while things are fresh.  If we go through a

13   couple of other states, I'll be lost.

14          MR. MILNE:  I was wondering if you would have

15   that view.  Yes, that makes sense.

16          THE COURT:  So let's hear from --

17          MR. SHADOWEN:  Good afternoon, Your Honor.

18   Steve Shadowen on behalf of the end-payor plaintiffs.

19          The Court doesn't have to decide whether to

20   apply Justice Scalia's opinion or Justice Stevens' opinion

21   in *Shady Grove* because, in fact, all nine justices agree

22   with our argument, even the dissenters.  Every single one

23   of the opinions in *Shady Grove* says the very first thing

24   this Court should do is decide, by reading the text of the

25   state statute, and Rule 23 in this instance, to see

1   whether there's, in the Court's term, a direct clash

2   between the statutes, and there isn't any here, and you

3   didn't hear anything from the other side telling you that

4   there was because the Illinois statute says on its face

5   that the limitation on class actions applies to claims

6   brought in the courts of this state.

7           THE COURT:  Yes, I wanted to press you a little

8   bit on that --

9           MR. SHADOWEN:  Sure.

10          THE COURT:  -- because that's common language in

11  a state statute.  There are any number of Connecticut

12  state statutes that I've had to interpret.  One that comes

13  to mind is the prejudgment remedy statute in this state

14  says if you want to seek a prejudgment remedy, you can

15  apply to a court of this state, or something similar, and

16  obtain it, and yet --

17          MR. SHADOWEN:  Sure.

18          THE COURT:  -- there is great authority, great

19  practice and history of reading that language to mean any

20  court, in effect, located within the confines, geographic

21  confines of Connecticut, state or federal.  So I guess I'm

22  a little skeptical of the argument that that limitation is

23  a meaningful one.  It may mean it has to be brought in

24  Illinois federal court rather than Connecticut federal

25  court, but for the MDL that problem may be solved, too.

1    So help me understand --

2              MR. SHADOWEN:  Sure.

3              THE COURT:  -- why there's more here than --

4              MR. SHADOWEN:  Sure.  And here's why the sorts

5    of provisions you're talking about are different from this

6    provision.  This statute, Illinois statute, has in it the

7    provision of the type that you're referring to where it

8    gives the claim -- there's a venue provision that says you

9    can bring this claim in the circuit court.  That's the

10   venue provision.

11             THE COURT:  Right.

12             MR. SHADOWEN:  But then it goes on, when it's

13   talking about this specific limitation, specifically with

14   respect to the limitation on the class action procedure,

15   it says "a class action in a court of this state."  You

16   can compare that to lots of other of these consumer fraud

17   statutes throughout the country, and there are very few,

18   if any of them, that have this limitation in it.  They all

19   say -- and it would be very common and easy to say if --

20   if the intention of the Illinois legislature were to bar

21   class actions, they could have just said, "We bar class

22   actions," period.  Why did they go on and say "in the

23   courts of this state"?  And it really ties into, in fact,

24   one of Justice Stevens' criteria.  He said, One of the

25   things we're trying to figure out here is, is this a

1    substantive limitation or is the legislature really

2    talking about how they want the courts of their state to

3    operate.  And that limitation that says "in the courts of

4    this state" is clearly of the latter type.  They are

5    talking about they don't want a class action other than

6    ones brought by the state attorney general in the Illinois

7    courts.  They're agnostic about what happens if this

8    claim, substantive claim, is brought in any other court.

9            THE COURT:  Including a federal court in

10   Illinois?

11           MR. SHADOWEN:  I think the federal court in

12   Illinois, somebody would have to parse that, but certainly

13   my understanding would be they're talking about New

14   York -- I mean Illinois state courts.  And I think this is

15   really, really important because you have to take a step

16   back and say, What are we talking about here, when at the

17   end of the day we're saying when the Supreme Court adopted

18   Rule 23, did they act ultra vires?  That's what the

19   defendants have to convince you happened here.  And just

20   like finding a state -- or a federal statute or state

21   statute unconstitutional, the very first principle is you

22   only do that if you really have to do it.  Is there a

23   direct clash between Rule 23 in this instance and the

24   state statute?

25           I understand your point about there are lots of

1    statutes that give a venue provision.  This isn't a venue

2    provision.  The venue provision has already been given

3    earlier in the statute.  This is a direct limitation on

4    the proviso about class actions.

5            THE COURT:  So the statute, in your view,

6    authorizes a class action to be brought under Illinois and

7    the state courts of Indiana?

8            MR. SHADOWEN:  Yes, that's correct.  That's a

9    limitation on what is happening in Illinois state courts.

10    For whatever reason -- you know, I don't want to speculate

11    as to why they would do that, I can think of lots of

12    reasons, but rather than speculate, they just have a

13    limitation to say other people can do this; we don't think

14    we're equipped for it or we don't want that to happen

15    here.  Let other people decide if they're going to let

16    that happen.  But it would have been the very easiest

17    thing to do, and I'll admit that the other state where we

18    have to talk about this issue is South Carolina, and South

19    Carolina does not have that limitation.  Very easy thing

20    to do.  That just says no class actions.  That's a very

21    common thing to do, the most common thing with respect to

22    these sorts of limitations.  Illinois did not do that.

23    They said no class actions in the courts of this state.

24            THE COURT:  Okay.

25            MR. SHADOWEN:  So that's point number one.

1          THE COURT:  All right.

2          MR. SHADOWEN:  All nine justices are on our side

3     so you don't have to reach which one of the opinions is

4     the governing standard.

5          So now if you get past that, which is the

6     governing opinion in *Shady Grove*, a test often bandied

7     about is which you're supposed to apply the most narrow

8     decision.  Lots of courts have pointed out, commentators

9     have pointed out narrowness is in the eye of the beholder.

10    They say Justice Stevens is more narrow because he didn't

11    reach the ultimate rules enabling, that question that

12    Justice Scalia went on and reached.  I say that Justice

13    Scalia is more narrow because he didn't have to decide

14    whether the New York state limitation was procedural or

15    substantive.  So it's not a helpful test, frankly.

16         So what the court in *Lisk* did, which is the only

17    circuit court decision on these issues, recent decision a

18    couple of months ago in the Eleventh Circuit, said we're

19    going to do two things.  We're going to decide this for

20    ourselves, and we're bound by the holding in *Shady Grove*,

21    and the holding in *Shady Grove* is that Rule 23 was not

22    trumped by the New York procedural rules with respect to

23    class actions.  That's the holding.  Of course, in this

24    case we're not applying the New York statute, we're

25    applying the Illinois statute, so the holding, the narrow

1   holding is not determinative, but I think it says volumes

2   that plaintiffs here win outright under Justice Scalia's

3   opinion because he says if the procedural rule, Rule 23 --

4   if the rule, Rule 23 is determined to be procedural, then

5   it applies, period.  It doesn't matter whether the state

6   statute is considered to be procedural or substantive;

7   Rule 23 trumps.  Justice Stevens says, no, if the federal

8   rule is procedural, then you go on and determine even if

9   the state rule seems to be procedural on its face because

10   it's so intertwined with the state substantive right as to

11   define, in essence, the elements of the state claim.

12   And --

13            THE COURT:  If Justice Stevens' view prevails,

14   how do you win this argument?

15            MR. SHADOWEN:  Sure.  We start with two things:

16   one, he upheld Rule 23.  He said -- even in his opinion,

17   he says Rule 23 trumps that state statute, so we start

18   there.

19            Secondly, the standard is, is that state rule so

20   bound up with the substantive right as to define its

21   scope, and I'll tell you why that -- it doesn't define the

22   scope.

23            The other thing he says that's very, very

24   important is he says for the state rule to trump Rule 23,

25   it's, quote, a high bar.  There must be, quote, little

1      doubt.  And that Rule 23 wins if there are, quote, two

2      plausible narratives.

3              So here's our plausible narrative as to why the

4      Illinois statute is -- is not -- does not define the

5      substantive right.  And the courts already hit upon it,

6      and that is every single person for an entity in Illinois,

7      for whom we seek relief under the class action mechanism,

8      has exactly the same substantive right regardless of how

9      this dispute turns out; that is, Illinois does not strip

10     those people of a claim.  It doesn't alter any of the

11     elements of the claim, any of the methods of proof of the

12     claim, any of the relief that is available or any of the

13     defenses.  The substantive right in any common

14     understanding of that term is exactly the same.  The only

15     thing that's different is the procedural device to hear

16     all of those claims.  Is it by individual joinder?  We

17     trot all those people into this courtroom and say now we

18     want joinder, or do we do Rule 23?  And that is so

19     obviously a procedural rule, purely a procedural rule,

20     that it seems to me beyond dispute, not just a plausible

21     narrative but it seems to be right and incontrovertable.

22             The other thing I will say is I've been speaking

23     about the Illinois statute as if it were a bar on class

24     actions, but unlike the New York statute that was found to

25     be trumped in *Shady Grove*, this Illinois statute doesn't

1    even do that.  It just puts a limitation on the person who

2    can maintain a class action; that is, it doesn't even bar

3    class actions.  It just says in the state courts of

4    Illinois, the attorney general must bring the class

5    action.  That's all it says.  So that is so far from

6    defining or limiting the substantive right in such a

7    manner as to redefine the scope of that right it seems to

8    me just beyond dispute.

9            A couple of points about the *Lisk* decision.

10   There the Court concluded that it was irrelevant whether

11   or not the class action limitation was in the same statute

12   that created the right, and the Court there pointed out

13   the chaos that would ensue if any other rule applied.  You

14   can't have Rule 23 applying to one state's law because

15   they have their -- their statute -- their class action

16   limitation in some other statute and the exact same

17   language used in another state statute and they trump

18   Rule 23 because they put it in a different section.  They

19   said that's just not tenable.  You can't turn Rule 23 on

20   and off, such an important federal procedural rule, by a

21   mechanism of where you place the limitation.  And I'll

22   also point out the *Hydroxycut* decision and also the

23   *Lithium Ion* decisions that go our way.

24           So what you have is a handful of district courts

25   that have gone different ways on this issue.  You've got

1    one court of appeals that's gone solidly our way, and then

2    you have the fact that with respect to Illinois, you don't

3    have to deal with any of this stuff because, in fact,

4    there is no clash between Rule 23 and the Illinois

5    statute.

6                    THE COURT:  Okay.

7                    MR. SHADOWEN:  Thank you, Your Honor.

8                    MR. MILNE:  Your Honor, if I might respond to a

9    couple of the points Mr. Shadowen made with respect to

10   Illinois.  First of all, with respect to the issue about

11   the limiting language in the Illinois statute to the

12   courts of this state, I agree with Your Honor's analysis

13   that basically this is kind of common verbiage in state

14   statutes.  I don't think there's any hint in any court

15   decision, in any piece of legislative history or the like

16   that would suggest that the Illinois legislature

17   contemplated that so long as an action was brought in,

18   say, federal court in Illinois or federal court in Indiana

19   or some other court in some other place that that policy

20   judgment reflected in the legislation would just be thrown

21   out the window.  There's no suggestion of that, and to

22   sort of read that in I think I incredibly inappropriate.

23                    With respect to this issue about, well, you

24   know, the class action device is procedural and each

25   individual plaintiff has a right to come in and bring its

1    lawsuit, Your Honor, if you telescope down any -- what

2    Justice Stevens was dealing with was recognizing that

3    there may well be procedural rules that have significant

4    substantive implications.  That's what he was -- that's

5    what he was trying to address.  Now, he held and then

6    agreed with the plurality, so that's why the decision came

7    out that way, he held that that New York statute fell on

8    the line of being procedural.  But if you look at pretty

9    much -- I can't think of an example of something that

10   would be procedural on its face that you wouldn't be able

11   to make a similar argument to what Mr. Shadowen just did,

12   to basically say, Oh, well, the underlying substantive

13   right is the same across the board.  What Justice Stevens

14   was getting at is that in this balance between federal

15   civil rules and their application when considering a state

16   right of action is that you need to respect policy

17   judgments by the individual states that have substantive

18   implications, and admittedly it's a gray area, and there's

19   a spectrum.  But I think that this Illinois statute, and

20   the South Carolina statute we'll talk about in a little

21   bit, and the Connecticut statute, those ones dealing with

22   these very targeted decisions by legislatures with respect

23   to the ability to bring class actions, especially when

24   they're talking about an antitrust case, and that's what

25   makes, I think, Illinois very particularly relevant, is

1    substantive.

2           And one final point that I'd make is that

3    basically what Mr. Shadowen's argument boils down to is

4    that the Illinois legislature had really two choices.

5    They could have adopted *Illinois Brick* whole hog and said

6    nobody gets -- no indirect purchasers get to sue, or

7    overrule it entirely and that there's no gradation in

8    between that the legislature could have adopted that

9    wouldn't be disregarded in federal court.  And I don't

10   think that's a fair reading of *Shady Grove* or a fair

11   reading of the Rules Enabling Act.

12           Okay.  So, Your Honor, moving on to the Illinois

13   Consumer Fraud and Deceptive Practices Act, their consumer

14   protection statute, there are two basic reasons for

15   dismissing that one, Your Honor.  The first one is

16   basically it's very clear in the Illinois case law that

17   the Illinois courts do not regard the Illinois consumer

18   protection statute as an additional avenue for antitrust

19   enforcement.  Now, that's different from various other

20   states, but the most recent pronouncement from the

21   Illinois supreme court on this is very clear, and I have

22   some of the language pulled out here, Your Honor.  First

23   is no indication the supreme court said that the

24   legislation intended the consumer fraud act to be an

25   additional antitrust enforcement mechanism and that the

1    language of the act makes clear that its reach was to be

2    focused on conduct that defrauds or deceives consumers.

3             We don't have that here, Your Honor.  This is

4    not a deceptive practices claim.  As we've trumpeted in

5    our statute of limitations arguments, the terms of the

6    agreement were not kept hidden --

7             THE COURT:  Right.

8             MR. MILNE:  -- it was public, etc.  So what the

9    plaintiffs are doing here is basically taking an antitrust

10   claim, relabeling it consumer protection and saying now we

11   get to sue, and also we get to do it on a class action

12   basis, which we would submit is an end run around that

13   Illinois judgment as well.  So for that reason, that very

14   independent reason, this cause of action should be

15   dismissed.  The *Wellbutrin* and the cases that we cite in

16   the paper support that result.  And if we could go to the

17   next slide, there are a couple of other decisions that we

18   point out in the briefs where courts dismiss on the basis

19   of this end run idea, and that's exactly what we have

20   here.

21            So the second reason why this cause of action

22   should be dismissed is that under the consumer protection

23   act, these indirect purchasers, these 16 named plaintiffs,

24   do not qualify as consumers under the legislation.  Now,

25   under the statute, a consumer is defined as one who

1    purchases for his own use or that of a member of his

2    household.  That's what the statute says.  These union

3    trust fund entities are not buying for their own personal

4    use or the use of members of their household.  It's just a

5    misnomer.  It's a complete disconnect.  These are

6    basically insuring -- they're insurers.  They're insuring

7    a drug benefit.  They are providing reimbursement.  They

8    are functioning in a business capacity, not in a capacity

9    as a consumer.  So if you are a nonconsumer under the

10   state statute, it doesn't mean you don't get to bring a

11   cause of action; it means that you have to satisfy the

12   so-called consumer nexus test, and the consumer nexus test

13   says that the conduct that's at issue has to have been

14   directed to the market generally or it otherwise -- the

15   conduct has to relate to consumer protection issues under

16   the Illinois statute.  Neither prong of that test applies

17   here.

18          When you look at the Illinois case law, and we

19   cite some of it in the papers and others are referred to

20   in the cases that we cite, conduct that's directed to the

21   market is conduct that's consumer facing.  It is, you

22   know, the typical what you would think of as consumer --

23   what consumer protection act statutes are designed to

24   address, things like false advertising, misleading

25   consumers about your product or the qualities of it,

1    undertaking -- surreptitiously gathering data and then

2    providing unwanted services, that kind of thing.  They're

3    clearly directed to consumers.

4              THE COURT:  I get it.

5              MR. MILNE:  We don't have that here.

6              THE COURT:  I get it.

7              MR. MILNE:  Okay.  So that prong of the test is

8    not satisfied.

9              With respect to does the conduct implicate

10   consumer protection issues, what the courts in Illinois

11   have said interpreting Illinois law, one case we cite is

12   the *MacNeil* case, the reference is here, is the consumer

13   protection concerns are implicated with conduct that would

14   confuse or deceive consumers, which makes sense given the

15   focus that I mentioned before articulated in the *Laughlin*

16   case, the supreme court of Illinois case that said the

17   Illinois consumer protection law is focused on deception,

18   misleading and that kind of thing and not to antitrust

19   conduct more generally.  And so for that reason, Your

20   Honor, because these nonconsumer plaintiffs can't satisfy

21   the consumer nexus test, that's the second reason why this

22   cause of action should be dismissed.  And I would

23   otherwise move on, but if Your Honor has questions or if

24   you want to have Mr. Shadowen --

25             THE COURT:  Sure.

1             MR. MILNE:  -- respond.

2             THE COURT:  I'll hear a response.

3             MR. MILNE:  Okay.

4             MR. SHADOWEN:  Your Honor, defendants cannot win

5      both the *Shady Grove* argument and the consumer fraud

6      argument for this reason:  Their own brief says that under

7      this *Laughlin* standard that they've relied on, the

8      standard is whether or not there's complete overlap

9      between the two statutes.  So they come here on the first

10     argument we heard, and they're trying to convince you that

11     there is a different substantive development to the

12     antitrust claim in Illinois, and that is that that claim

13     cannot be brought as a class action.  We think that's

14     wrong.  But if it's right, that's a different element to a

15     substantive element of the claim, a different -- in the

16     language of *Shady Grove*, a different definition of the

17     scope of the claim than is in the consumer fraud statute.

18     So that's point number one.

19             Point number two is that they're also

20     different -- they're not complete overlap of the claims

21     because they're different remedies.  Under the antitrust

22     statutes, they're trouble damages.  There are not trouble

23     damages under the consumer fraud statute.  So you've got,

24     according to them, different substantive elements to the

25     claim, there are different remedies, and yet they want to

1    say there's a complete overlap between the statutes when

2    there clearly is not.

3           And then take a step back and think about the

4    bootstrap argument that's being made here.  There's the

5    antitrust statute with its trouble damages provisions and

6    other provisions, and they say the legislature very

7    carefully in that statute said no class actions.  A

8    different statute, in the case law we cite, says claims

9    that are competition claims, like antitrust claims, can be

10   brought if they otherwise fit under the consumer fraud

11   statute.  So different statute, no limitation on class

12   actions, presumably very intentionally, just like the

13   legislature did with respect to antitrust, and now they

14   want to bootstrap and say, well, because you can't have

15   the legislature put a specific limitation in that statute,

16   we're going to read it into another statute where it

17   doesn't exist.  That's just an extraordinary argument.

18           THE COURT:  Well, okay.  Let me focus you on

19   this idea that the act is only proscribing false and

20   deceptive conduct as opposed to unlawful or unfair

21   conduct.

22           MR. SHADOWEN:  Right.  That's clearly not the

23   case.  The statute in turn says that it covers unfair

24   competition.  And the *Robinson vs. Toyota* decision by the

25   Illinois supreme court talks about that prong of the

```
 1   statute and doesn't say anything about a consumer nexus.
 2   It says that the element is, is there substantial injury
 3   to consumers?  So under that prong -- so all the cases he
 4   talked about where they're talking about reliance, where
 5   they're talking about misrepresentations, that that's the
 6   focus of the statute, that's under the fraud element, the
 7   misrepresentation element of the statute, not the unfair
 8   competition.  So...
 9               THE COURT:  Well, I'm not sure I'm following
10   you, frankly.
11               MR. SHADOWEN:  Okay.
12               THE COURT:  We've got Laughlin --
13               MR. SHADOWEN:  Yes.
14               THE COURT:  -- right, where the Illinois supreme
15   court says -- at least I'm reading off his slide -- no
16   indication that the legislature intended the consumer
17   fraud act to be an additional antitrust enforcement
18   mechanism.
19               MR. SHADOWEN:  Right.
20               THE COURT:  So it's reaching conduct that
21   defrauds or deceives consumers.
22               MR. SHADOWEN:  Right.  When the underlying claim
23   there -- that was a claim of misrepresentations, that the
24   plaintiffs tried to shoehorn into an antitrust claim.  So
25   when the underlying conduct, the predicate conduct is
```

1    fraud or misrepresentation, that's the rule.  That's not

2    what we're relying on here.  We're relying on a different

3    provision of the statute having to do with unfair

4    competition, and the underlying predicate is not

5    misrepresentations; it's a payoff.

6              THE COURT:  So what provision are you relying

7    on?  Let's try it that way.

8              MR. SHADOWEN:  Okay.  So in *Robinson*, the

9    supreme court says a business practice violates the unfair

10   practice clause of the -- this is, I'm sorry, page 7 of

11   our brief.  So here are the elements when, as here, we're

12   proceeding under the unfair practice clause of the

13   statute, and here are the elements:  It defends public

14   policy, that it's immoral, unethical or oppressive,

15   unscrupulous or causes substantial injury to consumers.

16   And those are in the disjunctive, and they hit all three

17   of them here.

18             THE COURT:  Okay.  I got it.

19             MR. SHADOWEN:  Okay.  So, fundamentally, the

20   *Laughlin* case was talking about when the predicate act is

21   one of misrepresentation or fraud, you can't get around

22   limitations by trying to recast it.  This is not that

23   case.  When the case is unfair practice clause of the

24   statute, *Robinson* says these are the elements, and we meet

25   them.

1          THE COURT:  Okay.

2          MR. SHADOWEN:  With respect to there being a

3    nexus to consumers, that again all has to do with when

4    there's fraud and misrepresentation.  When it's unfair

5    competition, the standard is what you would think it would

6    be, did it injure consumers.  Thank you, Your Honor.

7          THE COURT:  Okay, thank you.

8          MR. MILNE:  Your Honor, I guess what I'll first

9    comment, to say that there is no attempt at bootstrap here

10   whatsoever.  What the Illinois legislature did with

11   respect to the antitrust act is to say we are according

12   private -- indirect person claims a right of action --

13         THE COURT:  No, I get -- I understand your

14   argument.

15         MR. MILNE:  Okay, okay.

16         THE COURT:  But help me understand the

17   distinction, and this goes through a number of the

18   states' --

19         MR. MILNE:  Right.

20         THE COURT:  -- statutes that you're challenging.

21   I'm with you on deceptive practices.

22         MR. MILNE:  Right.

23         THE COURT:  But why should I be with you on

24   unfair or unlawful practices?

25         MR. MILNE:  What we always -- what we see in

1    many of the states is that the state consumer protection

2    laws are modeled on the FTC act.

3              THE COURT:  Right.

4              MR. MILNE:  And the FTC act, generally

5    construed, does encompass antitrust type conduct.  So in

6    many, many states you see that that is something that's

7    fairly encompassed.

8              I would just urge Your Honor to look at the

9    *Laughlin* case because in that case one of the things that

10   was at issue was whether, basically, price

11   discrimination -- price discrimination type conduct,

12   antitrust conduct, was actionable under the act, and the

13   supreme court of Illinois goes through a discussion.  It

14   talks about the -- I won't read the whole thing here, but

15   I'm looking at -- there's so many page references, I don't

16   know what Reporter it is, but it's 550 N.E. 2d 986, in and

17   around 992, 993 where the Court is talking about giving

18   consideration to the Federal Trade Commission Act in

19   Section 5, and the Court goes on to say that under Section

20   5, it has been interpreted to include -- Section 5 of the

21   Federal Trade Commission Act -- interpreted to include

22   anticompetitive price discrimination, it cites cases, and

23   then the Court goes on to point out that the defendants

24   argue that the dominating legislative intention with

25   respect to the Illinois statute was the protection of

1    consumers and others against various species of fraud and

2    deceit.  The defendants have the correct understanding of

3    the consumer fraud act's intent.

4           It's not talking about any specific provision of

5    the consumer fraud act; it's talking about the overarching

6    intent of the legislature.  There is no indication that

7    the legislature intended the consumer fraud act be an

8    additional antitrust enforcement mechanism.  The language

9    of the act shows that its reach was -- its reach -- again,

10   not talking about a specific subpart -- was to be limited,

11   limited to conduct that defrauds and deceives consumers or

12   others.

13           THE COURT:  Do the Illinois courts apply the

14   cigarette rule when interpreting this act?

15           MR. MILNE:  The cigarette rule?

16           THE COURT:  The FTC's rule, without -- something

17   along the lines of without having previously been held to

18   be unlawful --

19           MR. MILNE:  Oh, yes, yes; no, I understand.

20   Your Honor, what I can say is that based on this

21   pronouncement from the highest court of the state of

22   Illinois, what the Court is saying is that it is deceptive

23   conduct that is the overarching focus of this act.  Does

24   that mean that an antitrust cause of action, something

25   that would traditionally be an antitrust cause of action

1    could never be simultaneously a violation of the consumer

2    fraud act?  No, it doesn't mean that.  But the cause of

3    action, the antitrust cause of action, would have to have

4    an element of deceit, deception, etc.

5            THE COURT:  That's what I'm trying to get at,

6    because if the cigarette rule applies, that would not be

7    true.  The cigarette rule would bar a broader range of

8    conduct than merely deceptive.  It would go into unfair,

9    unscrupulous, illegal, etc.

10           MR. MILNE:  Well, what the Illinois court is

11   saying is our statute is focused on deception, deceit,

12   fraud, those types of conduct.

13           THE COURT:  Yes, I understand that's your

14   interpretation --

15           MR. MILNE:  Right.

16           THE COURT:  -- of that decision.  I'll go back

17   and look at it.  I'm just trying to figure out and maybe

18   both sides can just report --

19           MR. MILNE:  Sure.

20           THE COURT:  -- whether the Illinois courts apply

21   the cigarette rule in --

22           MR. MILNE:  Okay.

23           THE COURT:  -- interpreting the statute.  It

24   would be helpful to me to know that.

25           MR. MILNE:  We'll be happy to do that.

1          THE COURT:  Okay.

2          MR. MILNE:  But just to finish my point so it's

3     clear, the *Siegel* case that the plaintiffs cite, which is

4     a Northern District of Illinois case, is a situation where

5     the court said that conduct that could sound an antitrust

6     might be able to be pled under the consumer fraud act;

7     but, again, it has to be through the lens of whether the

8     conduct at issue involves some form of deception, and in

9     that case there was an element of deception with respect

10    to what was at issue.  So I think that's the distinction.

11         THE COURT:  Okay.  All right.

12         MR. MILNE:  And to go back, you know, to the

13    boot -- we're not bootstrapping anything here, Your Honor.

14    I mean, there's the antitrust rules, and then there's the

15    interpretation -- the proper interpretation of the conduct

16    that's covered by the consumer fraud act.

17         THE COURT:  Okay.

18         MR. MILNE:  That's straightforward.  Okay.  So

19    that would conclude the discussion on Illinois.

20         So the next one on our list is South Carolina,

21    and South Carolina is -- you know, it's a similar analysis

22    to what we discussed with respect to the Illinois

23    antitrust statute.  And South Carolina, as Mr. Shadowen

24    foreshadowed, you have the consumer protection act allows

25    plaintiffs to bring actions individually but not in a

1    representative capacity, so it bars class action claims.

2    We have a class action claim here; therefore, our position

3    is that it should be dismissed, just as several other

4    courts have done.  On the slide that we're putting up on

5    the screen here, we cite several of those.  *Auto. Parts*

6    case, you know, the text of the South Carolina law that

7    prohibits class actions is part of the substantive

8    portions of South Carolina law and is not trumped by

9    Rule 23, even in light of the *Shady Grove* decision.  So it

10   goes back to those same points that we were making.  And

11   this case is very much analogous to the *Trilegiant* case

12   where you had an analogous type provision of the

13   Connecticut consumer protection statute.  So basically

14   that's our position.  I don't want to replay the

15   arguments.

16          THE COURT:  Perhaps we can group several states

17   because I think there are some overlapping issues here.

18   There are --

19          MR. MILNE:  We may have --

20          THE COURT:  Have we gotten past that?

21          MR. MILNE:  I think we may have gotten past most

22   of them here, Your Honor.

23          THE COURT:  I was wondering about the

24   Massachusetts.  Chapter 93A is often analogized to the

25   Connecticut Unfair Trade Practices Act.  I assume that it

```
 1    might well be similar to --
 2             MR. MILNE:  Well, we have a slight -- there
 3    isn't a class action bar in the Massachusetts context, so
 4    the arguments are a little bit different.
 5             THE COURT:  Fair enough.
 6             MR. MILNE:  And, I don't know, Mr. Shadowen, do
 7    you have anything specific on South Carolina?
 8             MR. SHADOWEN:  No, except we concede that we
 9    don't have all nine justices on our side with respect to
10    South Carolina.  You will have to decide which opinion to
11    apply.
12             THE COURT:  Got it.
13             MR. MILNE:  Okay.  Well, that does bring us to
14    Massachusetts, Your Honor.
15             THE COURT:  Okay.
16             MR. MILNE:  Actually, let me pause there.  I
17    apologize.  I do have a couple of other South Carolina
18    arguments, if I mightI
19             THE COURT:  Sure.
20             MR. MILNE:  So independent basis for dismissal
21    is the class action bar; but the second argument that we
22    have, Your Honor, is that there's authority under South
23    Carolina law that the consumer protection act cannot be
24    used as an end run around the *Illinois Brick* issue that
25    exists in South Carolina.  So the South Carolina
```

1    legislature has not repealed *Illinois Brick*.  So there is

2    an implicit, if not explicit, policy judgment that

3    indirect purchasers do not get to proceed for damages

4    under the antitrust -- state-specific antitrust law.  So

5    the question is whether you can just take and relabel as

6    an indirect purchaser that antitrust theory and proceed

7    under the consumer protection law.  And our position is

8    that you can't, you shouldn't be permitted to do that, and

9    we cite authority from -- actually, from other districts

10   dealing with other situations where there's an *Illinois*

11   *Brick* barring the state and this attempt at an end run.

12   So our position is that independent of the class action

13   bar, there's an independent basis for dismissal there.

14        We also have the argument on relation back, Your

15   Honor, which I don't propose to spend a lot of time on; if

16   Your Honor has questions.  We believe that the claim

17   should be dismissed.  If it is not dismissed because it is

18   a new cause of action brought by a new plaintiff for the

19   first time in this amended complaint, that it should not

20   be permitted to relate back to the finding of the original

21   complaints for purposes of if there ever is a recovery how

22   far the damage period would go back, etc.

23        THE COURT:  Okay.

24        MR. MILNE:  So with that, I can move on to

25   Massachusetts, the Massachusetts consumer protection act.

1          THE COURT:  Did you want to respond to any of

2     those points?

3          MR. SHADOWEN:  Yes, please.

4          THE COURT:  Okay, go ahead.

5          MR. MILNE:  Sure.  Apologies.

6          MR. SHADOWEN:  Very quickly, Your Honor, it's

7     not as if the South Carolina legislature said, you know,

8     we refuse to repeal the *Illinois Brick*.  They simply

9     haven't acted.

10          THE COURT:  I understand.

11          MR. SHADOWEN:  So I want to make sure that

12     that's clear.

13          Secondly, the very language of the South

14     Carolina statute says that any person injured can bring a

15     claim, whether they're injured directly or indirectly.

16     It's in the language of the statute itself.  And then we

17     have the *Lithium Ion Batteries* decision and the *Optical*

18     *Disk Drive* decision that say that language clearly allows

19     end payor plaintiffs, indirect purchasers to sue under

20     that statute.

21          With respect to the relation back to the

22     complaint as I was reading the briefs last night, I think

23     I'm going to tell the Court that we agree that that claim

24     does not relate back to the original filing of the

25     complaint.  We should be able to go back only three years

1    from the filing of the complaint, of the new complaint.

2              THE COURT:  All right, thank you.  We'll take as

3    many concessions as --

4              MR. SHADOWEN:  That's the only one.  Enjoy that

5    one.  We appreciate it.

6              MR. MILNE:  Okay, so moving on to Massachusetts,

7    Your Honor, we had two basic bases for dismissal with

8    respect to that cause of action, and the first one is that

9    these plaintiffs' claims, we would submit, are barred by

10   Section 11 of the statute.

11             THE COURT:  Let me pause right there.

12             MR. MILNE:  Sure.

13             THE COURT:  I thought I sensed in the briefs

14   another concession.  Are you suing under Section 11?

15             MR. MILNE:  Section 11 and Section 9, I believe.

16             THE COURT:  Well, I think Section 11 and

17   Section 9 come up in the complaint, but maybe I

18   misinterpreted the briefs.  I thought your argument was

19   we're not really pursuing Section -- maybe that was

20   Humana's brief.

21             MR. RABINOVITZ:  Yes, Humana is pursuing

22   Section 9.

23             THE COURT:  I'm sorry, okay.  All right.  Thank

24   you.

25             MR. MILNE:  So the issue here, Your Honor, is

1    your entitlement to sue under Section 9.  I mean, the way

2    it works is Section 11 is the only vehicle available under

3    the Massachusetts law for a business, as defined under the

4    law and rules, an entity in trade or commerce, to bring an

5    action under the statute.  If you are not a business, if

6    you don't satisfy that test, then you can and you must

7    proceed under Section 9.  The difference is that under

8    Section 9 there is no bar to indirect purchasers bringing

9    an action.  If you're a business and you're proceeding

10   under Section 11, there is a bar to an indirect purchaser

11   bringing a cause of action.  So the concession that

12   they're bringing their claim under Section 9 isn't really

13   a concession; it's a position that they're taking, and we

14   believe that it's an incorrect position.

15           So the question is, these plaintiffs, are they

16   businesses, are they engaged in trade or commerce, or are

17   they something else?  Are they consumers?  And the

18   courts -- and if we could just go to the next slide

19   here -- the courts have set out factors to consider with

20   respect to determining whether an entity is a business, is

21   in trade or commerce, and so the distinction is, as laid

22   out in the *Frullo* case, is whether a party, on the one

23   hand, has undertaken a transaction, the transaction in

24   question that's being challenged for business reasons, or,

25   on the other hand, has engaged in it for purely personal

1    reasons such as the purchase of an item for personal use.

2    So this is getting back to one of sort of the ideas we

3    were talking about before.  And the *Frullo* case also talks

4    about transactions in which a plaintiff is motivated by

5    business considerations is implicated under Section 11 and

6    not under Section 9.

7            So here, certainly as to Humana, but also as to

8    the 16 named plaintiffs in the class action case, these

9    are -- they're health plans.  They are not ones who

10   purchase purely for personal reasons; and, therefore, they

11   cannot qualify as nonbusinesses, if you will, to proceed

12   under Section 9.  The *Lidoderm* case that we cite deals

13   with these same types of entities involved in a class

14   action case, and there the courts dismissed under the

15   Massachusetts law saying, and I'm just reading from the

16   decision here:  The end-payor plaintiffs -- these same

17   types of entities -- did not purchase the products --

18   meaning the pharmaceuticals -- and/or provide

19   reimbursement for those products for their personal use

20   but for the use of their members.  Because those end

21   payors at issue were acting in trade or commerce when they

22   indirectly purchased to reimburse their employees or

23   members, they cannot state a claim under Section 9.

24           In other words, they're forced to go under

25   Section 11 as indirect purchasers; they can't proceed; so

1    the case is dismissed.  That's what the *Lidoderm* court

2    held.

3            Now, the plaintiffs, they focus on a decision

4    coming out of the AWP litigation in which the district

5    court there looked at various types of entities similar to

6    these and said, Well, if you're a charitable organization

7    and you're operating within your core charitable function,

8    you may not qualify as being under Section 11.  You may be

9    able to proceed under Section 9.

10            Now, here -- and if we could go to the next

11    slide -- here the claimed -- there's no pleading -- the

12    pleading in this case evinces nothing of this.  In order

13    to avoid -- these are entities on their face are

14    interacting in -- I mean, they're buying drugs; they're

15    reimbursing; they're functioning as insurance providers

16    for their members; and Humana is clearly a large, large

17    commercial insurance company.  In order to be able to

18    qualify for treatment as a charity, they would have to

19    meet their Twombly standard of saying this function --

20    making it plausible that whatever it is they're claiming

21    here is so critical to their core function that -- and/or

22    that they qualify as a charity to begin with.  That's

23    certainly not evinced in the class definition in this case

24    where there's no limitation on charitable function,

25    not-for-profit status or anything of the like.  There's no

1    pleading whatsoever on this.  And so -- it's not enough

2    just to say we're a Taft-Hartley plan or we're authorized

3    to operate under ERISA because, you know, the

4    Massachusetts courts have recognized that just the simple

5    status of being a not for profit or even being a

6    charitable organization in and of itself is not a free

7    pass.  You have to be able to show that the conduct in

8    question was to do -- was really central to your

9    charitable function, and you can't step outside that when

10   you're facing the marketplace and interacting with third

11   parties.

12           Our basic position here, Your Honor, is that

13   these entities shouldn't qualify.  We would submit that

14   the AWP court got it wrong even entertaining the idea that

15   a Taft-Hartley plan should be viewed analogously with a

16   charity; but even if that were correct, the plaintiffs

17   here need to plead more to be able to establish that they

18   qualify here, and inevitably if they're allowed to, it's

19   going to create huge issues with their proposed class,

20   which is not limited in any way in that respect.  So

21   for-profit insurance companies could be included, and if

22   they want to have a class action, that would encompass all

23   such entities that are ultimately end payors or that

24   reimburse.

25           So for the reason that these plaintiffs can't

1    qualify under Section 9 and should be viewed as businesses

2    or at least there's a failure of proof on those issues,

3    like the *Lidoderm* decision we would submit that this cause

4    of action should be dismissed.  That's the first reason

5    for dismissal.

6              The second reason for dismissal, Your Honor, and

7    if we could go to the next slide, is that under the

8    consumer protection act, there's authority for the

9    proposition that the challenged acts have to have occurred

10   primarily and substantially within the Commonwealth, and

11   the *Fishman* case that we cite from the First Circuit also

12   makes the point that where the alleged wrongdoing that's

13   at issue is not focused on Massachusetts but has relevant

14   and substantial impact across the country, the "primarily"

15   prong or aspect of that Massachusetts test can't be

16   satisfied.  And that's exactly what we have here.

17             THE COURT:  The response, as I remember it,

18   was -- and I forget which section, which section was

19   which, but one of these had a national scope and one of

20   them had a local scope, or a statewide scope.

21             MR. MILNE:  One of the provisions of the --

22             THE COURT:  Yes, Section 9, I think, or

23   Section 11, one of them the argument was would have been

24   permitted to apply nationwide.

25             MR. MILNE:  Well, Your Honor, if one is

1    permitted to sue under Section 9, this provision would not

2    apply.  We don't believe that these plaintiffs are

3    permitted to sue under Section 9.

4            THE COURT:  Okay, so this is a Section 11

5    limitation.

6            MR. MILNE:  Basically a Section 11 issue, Your

7    Honor.

8            THE COURT:  Okay.

9            MR. MILNE:  There are two independent reasons

10   why dismissal is appropriate, is they are indirect

11   purchasers and they can't claim that the conduct is

12   primarily focused on --

13           THE COURT:  Okay.

14           MR. MILNE:  -- the Commonwealth.

15           THE COURT:  Perhaps we should hear from both

16   groups of defendants.  I think this argument kind of plays

17   over.

18           MR. SHADOWEN:  Your Honor, Section 9 applies,

19   and that's the provision that we're proceeding under.

20   Judge, this distinction between consumers under Section 9

21   and businesses under Section 11 was sort of famously

22   difficult in Massachusetts law.  Thankfully, we have Judge

23   Saris, a very capable jurist in Massachusetts, who sorted

24   through all this very, very carefully in the AWP case; and

25   specifically with respect to Taft-Hartley plans, providing

1   drug benefits to their members, exactly what we have here,

2   she said this is not a Section 11, it's  Section 9.  And

3   she went through it chapter and verse, and if they want us

4   to plead more about Taft-Hartley, I don't know what more

5   we could plead.  That's what Taft-Hartley funds do.  The

6   name of the fund in Massachusetts is the Pipefitters Union

7   Local Number 537 Health and Welfare Fund.  That's all they

8   do.  They exist for the purpose of providing these sorts

9   of benefits to their members, and that's all by statute

10   they can do.  So we allege that they are Taft-Hartley

11   funds.  They are Taft-Hartley funds.  Taft-Hartley funds

12   are under Section 9.  Now, we'll let Humana talk about

13   their situation.

14             THE COURT:  Okay, thank you.

15             MR. RABINOVITZ:  Thank you, Your Honor.  Uriel

16   Rabinovitz from Lowey Dannenberg for Humana.  Just on

17   Massachusetts, so I think what we've heard so far is that

18   Section 9, Section 11 are mutually exclusive, can only be

19   under one.  Humana, as we made clear, is under Section 9.

20   The first thing I would point Your Honor to is the text of

21   Section 9 begins with "any person," other than someone

22   under Section 11, any person.  First thing I would note is

23   that "person" includes corporations.  So it's clearly --

24   you know, there's clearly a scenario where corporations

25   are purchasers under Section 9.  We think we fit very well

1    under that model.  The question before the Court is

2    whether Humana engages in trade or commerce under

3    Section 11.  There's no doubt that we do engage in trade

4    and commerce generally, but not in the scope of what we

5    pay for the drug.  Our trade is to have self-funded plans

6    and fully insured plans, and we market ourselves and

7    recruit them and sell our product and our business to

8    them.  Once we've already been engaged with them, at that

9    point we're purchasers.  When someone -- when a member,

10   one of our members, goes to the pharmacy counter, they

11   take out their card; they pay $20; we pay $80 right then

12   and there.  For $100 Aggrenox, $20 is the member, $80 is

13   Humana.

14         Defendants use the language of we are

15   reimbursed, implying that there's some kind of after the

16   fact, that we're not the point of purchasing.  Maybe that

17   was the case years ago when a member would go to the

18   pharmacy and then have to submit a receipt to get money

19   back.  That's not the case anymore with the way electronic

20   records are kept.  He goes to the pharmacy, and we pay at

21   that point $80.

22         The definition of trade and commerce -- and this

23   is in Section 1 of Chapter 93 -- focuses on who offers to

24   resell.  We're not offering to resell Aggrenox.  We

25   purchase Aggrenox, we pay for it for our member as we

1    contract with our member, pay for their prescription

2    drugs, including Aggrenox, and they consume it.  The trade

3    or commerce is not happening at that point.  We're not

4    offering to resell Aggrenox then to someone else to make a

5    profit on it.  We pay for it because that's what we've

6    contracted to do.

7             The next thing I would point to is that -- and

8    this applies to all the states that we're talking about

9    here -- is that we're not going on a blank slate here.

10   There have been cases in the past, reverse selling cases

11   that have been going on for 15, 16 years now.   In

12   Massachusetts, in at least two that we could find, in

13   *Relafen*, which is Judge Young in Massachusetts, who's

14   acutely aware of the dichotomy of Section 9 and Section

15   11, allowed -- certified a class of end payors including

16   consumers and TPPs under Massachusetts law, and he cited

17   the *Ciardi* case, that was referenced but maybe not

18   mentioned, that found that *Illinois Brick* is not a bar

19   under Section 9.  So he clearly was going under Section 9

20   because he certified an indirect class, and under

21   Section 11 that couldn't happen under *Ciardi*, and under

22   Section 9 he allowed TPPs to be certified for a class of

23   prescription drugs.  He found it was within the statute as

24   any person, even a corporation, because in the purchase of

25   prescription drugs, Humana TPPs are consumers.

1          The next one I would just make is, you know,

2     there's a strong policy argument on this.  As I just

3     described, we call it a dual purchaser, a two-headed

4     purchaser on our papers, right?  There's $80, $20 at the

5     same time.  It would be a great anomaly that the $20, like

6     Ms. Ciardi in the Ciardi case, is allowed to collect, but

7     the $80 on the same transaction is not recoverable.  And

8     if you find a violation and you find an egregious wrong

9     that the $20 must be returned to the purchaser, defendants

10    in such cases can get away with $80; that's theirs.

11    There's an imbalance here that, well, it's the same

12    purchase; you have $20 are covered, but $80 are not.  We

13    don't think that adds up.

14          And just to respond to the last point of

15    primarily and substantially Massachusetts, that doesn't

16    apply to us.  That's only a limitation, as Your Honor

17    referenced, to Section 11.  It's not a limitation to

18    Section 9.

19          And the last thing I would just address is

20    *Lidoderm*.  We're eminently familiar with *Lidoderm*.  We are

21    counsel to Government Employee Health Association, one of

22    the TPP plaintiffs in *Lidoderm*.  We argued this

23    Massachusetts point to Judge Orrick out there.  We think

24    respectfully that he got it wrong.  You know, I note I a

25    little bit of humor, I guess, or irony that he also found

1   portions of Your Honor's decision of a motion to dismiss

2   also, you know, he didn't agree with, so reasonable and

3   educated minds can disagree.

4           THE COURT:  He's not the first.  Won't be the

5   last.

6           MR. RABINOVITZ:  I'll ask if Your Honor has any

7   questions for us.

8           THE COURT:  No, I understand.  Thank you.

9           MR. RABINOVITZ:  Thank you.

10          MR. MILNE:  Your Honor, with respect to the AWP

11  decision, I would just note that, number one, we disagree

12  with the Court's conclusion that -- the district court's

13  conclusion in the AWP case.  I will note that that

14  issue -- the opinion, the decision of the District Court

15  did go up to the First Circuit, and the First Circuit

16  didn't reach this specific issue, but in commenting on it

17  and describing it, the Court, if you will, I would say

18  commented negatively on the Court's -- the District

19  Court's conclusion that sort of a fortiori, after

20  analyzing much more closely a Blue Cross/Blue Shield

21  entity that was a creature of -- a statute created it and

22  very much more clearly a charitable institution, the Court

23  then said, the First Circuit said:  And then the Court

24  without any significant explanation just said a fortiori,

25  a Taft-Hartley plan, we'll treat the same way.

1          So I think there's room to think that the AWP

2    court did not engage in the kind of analysis necessary to

3    determine whether those entities, those, say, Taft-Hartley

4    entities should qualify as charitable entities for

5    purposes of this consumer protection argument.  And I

6    would also note that not all of these -- there are 16, I

7    believe, 16 named plaintiffs -- not all of them even

8    allege that they're Taft-Hartley plans.  So there's not

9    even uniformity in pleading with respect to those named

10   plaintiffs let alone the members of class.

11         To the argument that was made about Humana being

12   present at the point of sale, I would just note *Lidoderm*,

13   again, and let me just -- there are a couple of decisions

14   in that case, the *Lidoderm* decision from 2015, which I

15   believe is cited in our briefs, 2015 Westlaw 28 -- 2089223

16   considered the very issue that counsel raised, and the

17   Court sort of described the argument that this particular

18   entity, GEHA, asserts that it was not engaged in trade or

19   commerce when purchasing or reimbursing its members

20   because it was acting as a dual end payor along with its

21   plan members in consumer retail transactions, so basically

22   the point that, you know, you bring your card in and

23   there's a transaction.  The Court says, However, because

24   GEHA did not engage in the transaction for its own purely

25   personal reasons but instead acted in its business

1    interests of providing healthcare coverage for its

2    members, I find the GEHA's purchases were for business

3    reasons that fall within the business or trade exception

4    and basically governed by rule -- Section 11.

5           The Relafen decision, Your Honor, Judge Young

6    never considered -- the argument was a class action

7    determination and not a consideration of the implications

8    of Section 11 of the Massachusetts law.  It was just a

9    generalized class certification decision.  So we would

10   submit that the Massachusetts claim should be dismissed on

11   the two reasons that we lay out and have discussed here.

12   So unless Your Honor has more questions, I would move on

13   to California.

14           THE COURT:  Sure.

15           MR. MILNE:  So California, I would just note

16   there are California Cartwright Act claims here, antitrust

17   claims here which we are not moving against, and so this

18   group of class plaintiffs is going to be proceeding under

19   their Cartwright Act claim in any event.  What we're

20   focused on here is the unfair competition law claim, 17200

21   under California code, and that claim, Your Honor, should

22   be dismissed for failure of these plaintiffs to allege the

23   proper causal nexus between the claimed wrongdoing and

24   their harm.  And key to this analysis is this

25   Proposition 64, which was enacted by the voters of

1    California and became effective in 2004.  And

2    Proposition 64, its purpose was to limit standing of

3    plaintiffs to bring actions under the unfair competition

4    law, and what it said was -- before it was a much more

5    open-ended, you barely needed to plead injury at all --

6    but what it said was that in order to have standing, you

7    had to have suffered injury in fact, lost money or

8    property as a result of the claimed unfair competition,

9    the challenged conduct.

10              And it's clear in the case law that

11   Proposition 64 applies to all prongs of the unfair

12   competition law, not just to the unfairness prong or any

13   particular prong, and California courts have said two

14   things, and in particular this *Durell* case that we cite.

15   First of all, they've said that because it's clear that

16   this overriding purpose of Proposition 64 was to impose

17   limits on private enforcement of actions under the

18   statute, courts -- and the Court's clear -- must construe

19   the phrase "as a result of" in light of that intention.

20   So you have to kind of have that as your mindset, that the

21   citizens of California have said, We want to limit who

22   gets to bring causes of action.  And in the *Durell* case,

23   the Court rejected the argument that that "as a result of"

24   language, that bringing in of the causal linkage

25   requirement could be satisfied by merely alleging a

1    factual nexus between injury and claimed wrongdoing.  So

2    just saying the defendant did something bad, it affected

3    me, I paid more or I didn't get a quality product,

4    whatever it may be, that's not enough.  Something more

5    needs to be pled and ultimately proven.  And --

6              THE COURT:  Help me understand that because it's

7    fairly classic causal connection here.  They did something

8    bad, and I suffered economic harm.  What more would be

9    required?

10             MR. MILNE:  Well, I would say I would agree with

11   that analysis under the Cartwright Act, that is, the kind

12   of causal and it has to be antitrust injury and all that;

13   we would dispute that here --

14             THE COURT:  Right.

15             MR. MILNE:  -- but under the Cartwright Act, I

16   agree with you.  Under the unfair competition law, the

17   courts have said just mere causal connection isn't enough.

18   Now, the courts are not clear.  There are dozens, hundreds

19   of unfair competition law decisions in California, and I

20   can't say that it's all uniform and totally a discernible

21   or bright line rule; but in the context of claims

22   involving some form of deception or misleading or the

23   like, the courts have very clearly said you've got to have

24   some form of reliance; you know, that the wrongdoing has

25   to -- you have to have relied in some manner to your

1 detriment on misrepresentation or the like.  But to be

2 sure, the courts have said that not every cause of action

3 would qualify for a reliance type standard and the

4 plaintiffs point out with gusto those kinds of parts of

5 California opinions.  But I'm not aware of any case that

6 specifically deals with a situation like this.  I mean,

7 the unfair competition laws in California do contemplate

8 that antitrust wrongdoing can be a cause of action, but

9 I'm not aware of a case where under the unfair competition

10 law, you know, the courts have laid out exactly what that

11 causal nexus needs to be, especially where the -- if it's

12 price fixing, surreptitious price fixing and you had to

13 pay too much, I think it's easier to conclude, well,

14 that's, you know, more like an antitrust causal connection

15 is appropriate.  But here where we have a situation of, as

16 I've said before, a publicly announced settlement

17 agreement, you don't have any customer facing

18 misrepresentations, it's not secret, backroom antitrust

19 wrongdoing, we do have the California court saying

20 generally speaking mere causal link isn't enough, what is

21 appropriate here?  And we would submit that it's something

22 more than just straight, you know, a mere factual nexus,

23 that it's got to be something more.

24    Now, the courts -- like I say, I haven't seen a

25 court that's really grappled with that issue, and we would

1      submit Your Honor should do that, and that particularly

2      since these plaintiffs are going to get their day in court

3      under California law under the Cartwright Act, we

4      shouldn't be doubling up in a situation where there is a

5      very debatable question or a serious lack of an

6      appropriate causal link for the unfair competition law.

7                    THE COURT:  Okay.

8                    MR. SHADOWEN:  I think you just heard the second

9      concession of the afternoon.  That one was a little longer

10     than mine.  So their brief said that the standard is we

11     had to prove reliance.  That clearly can't fly.  Even

12     under the *Durell* case that they cite, the Court very, very

13     carefully says this reliance element applies only to those

14     sorts of claims that are under the fraud prong of the

15     statute; specifically, expressly, very, very carefully

16     saying that doesn't apply under the unfair competition

17     prong of the statute.

18                    So, okay, the voters in California adopted

19     Proposition 64 that said you have to show that the injury

20     was a result of the bad conduct.  To my mind, that sounds

21     a whole lot like Section 4 of the Clayton Act that says

22     the people get to sue for damages in antitrust law if they

23     are harmed by reason of anything forbidden in the

24     antitrust statutes.  It's the same standard.  So I think

25     Your Honor had it exactly right.  "As a result of," this

1    is a classic antitrust situation where they fixed prices,

2    it raised the price, our plaintiffs purchased the product,

3    what more is there to it?  So their argument in their

4    brief about reliance, I understand them to be, you know,

5    not pressing that today, and I think wisely so as a result

6    of *Durell*.  He never answered your question about what is

7    the standard other than to say it's something more.  I

8    think the answer is right in the antitrust statute,

9    Section 4 of the Clayton Act.  "By reason of" is the same

10   thing as "as a result of."  There's no California court,

11   no other court who puts any other higher burden than that.

12          There are two post-Prop 64 antitrust type cases

13   brought under the unfair competition prong of the consumer

14   fraud statute in California.  That's *Processed Eggs* in

15   2012 and *Ditropan* in 2007.  They're cited in our brief,

16   and they both say it's the ordinary standard for

17   causation, just like in an antitrust case and that the

18   plaintiffs can proceed.  I think that's it.  Proposition

19   64 requires causation, not reliance.

20          THE COURT:  Okay.

21          MR. MILNE:  Your Honor, with respect to

22   California, the reason we cited the reliance type case law

23   is precisely the one I mentioned earlier, is that we don't

24   have -- we don't have -- really, like I say, I'm not aware

25   of any case that really grapples with that causal -- that

1    causality requirement, particularly in light of *Durell,*

2    which, like I say, rejected that strict factual nexus as

3    being enough in light of Proposition 64.  The Court didn't

4    say how you apply that in every possible manifestation of

5    a cause of action under 17200, but -- but -- and you

6    didn't hear Mr. Shadowen say that they've alleged anything

7    more than that, so our position is that something more is

8    needed, whether it amounts to full reliance or something

9    less than that, but particularly where you don't have

10   antitrust wrongdoing that's in secret -- again, we don't

11   think there was antitrust wrongdoing at all and we'll

12   prevail on the merits ultimately, but where that's the

13   claim and there is no claim of -- that the conduct itself

14   involved misrepresentation, that it was in secret, that it

15   was per se unlawful conduct, under the concept of

16   Proposition 64 something more should be required.

17            So with that, I'll move on to Florida.  And if

18   we could advance the slides here.  So here we're focusing

19   on the Deceptive and Unfair Trade Practices Act claim, and

20   Florida is another situation where the state has not

21   enacted an *Illinois Brick* repealer, so indirect purchasers

22   are not permitted to bring antitrust -- bring a cause of

23   action under the state antitrust law in Florida.  So here

24   again the plaintiffs are just recasting what's plainly an

25   antitrust case and trying to call it a consumer protection

1   or unfair trade practices act claim.  And our position is

2   that in order for them to do that, Florida is not a state

3   like Illinois that focuses on deception and the like, so

4   we're not making that argument, but what we are saying is

5   that the courts are clear in Florida that pleading with

6   particularity is required.  And if we could just advance

7   the slide.  So a Rule 9 specificity is required.  And our

8   position is that here the plaintiffs -- they've alleged --

9   we're not going to stand before you and say they haven't

10  alleged a lot of detail about the transactions that

11  they're challenging, clearly they have, and much of that

12  was in the public domain, so there was no secret about it,

13  and there is a lot of detail in the complaint, but what's

14  lacking is why is that -- you know, plausible facts to

15  help us understand why that is a consumer protection act

16  issue versus an antitrust issue, because if it's an

17  antitrust issue, that is barred to these indirect

18  purchasers under Florida law.

19            THE COURT:  But it can be both.

20            MR. MILNE:  Pardon me?

21            THE COURT:  It can be both antitrust and --

22            MR. MILNE:  It can be, but I think with that

23  requirement of pleading with specificity that Florida does

24  impose, we would submit it puts more of an onus on the

25  plaintiffs to explain why the conduct that would otherwise

1    be not permissible under the antitrust law should qualify

2    here.

3            THE COURT:  Does that rule of state procedure

4    apply here?  Why wouldn't Rule 9 of the federal rules

5    govern and require specificity with respect to --

6            MR. MILNE:  I guess I would say probably Rule 9

7    of the federals then should apply.

8            THE COURT:  Well, maybe it does, but isn't that

9    the rule that I would have to look to?

10           MR. MILNE:  I have to confess, Your Honor, I

11   haven't analyzed this from the *Shady Grove* perspective,

12   and the plaintiffs didn't make that argument, and we'd be

13   happy to address that, but, you know, our basic position

14   is that given the intention of Florida, that causes of

15   action under this statute be pled with specificity, that

16   that requirement should carry over into a federal court

17   version of that --

18           THE COURT:  Okay.

19           MR. MILNE:  -- that statute.

20           THE COURT:  All right.

21           MR. SHADOWEN:  Your Honor, I'm not aware of any

22   decision that says that claims sounding in competition

23   cannot be brought under the Florida consumer protection

24   statute, and we have three cases, the *Suboxone, Wellbutrin*

25   *XL* and *Processed Eggs* decisions that say that they can't.

 1    There are cases outside of antitrust-type cases that say

 2    that especially when there's fraud and misrepresentation

 3    are the predicates for the claim, there's a trend in the

 4    case law in Florida of requiring specificity in pleading.

 5    That simply doesn't apply here.  The claim doesn't sound

 6    in fraud and misrepresentation; it sounds in unfair

 7    competition.  And if Rule 9 did apply, we met it in

 8    spades.  We have a 70-page complaint, chapter and verse as

 9    to what they did that's anticompetitive.

10             In their brief they complain that we

11    incorporated by reference when we got to the individual

12    state pleading the claims.  We say, you know, as we

13    alleged in the foregoing, you did the following wrong, and

14    they complained about that, but they are clearly on notice

15    as to what it is we're complaining about here.  Paragraph

16    205 of the complaint says we're complaining about your

17    price-fixing conspiracy.

18             THE COURT:  Okay.  Thank you.

19             MR. RABINOVITZ:  Your Honor, if I may?

20             THE COURT:  Sure.

21             MR. RABINOVITZ:  I would just add a couple of

22    points to what Mr. Shadowen said.  First, we agree with

23    Your Honor that Rule 9, what Florida courts say about

24    pleading requirements wouldn't apply here.  It's

25    completely procedural.

 1          In the motion to dismiss, Your Honor, I'm

 2     quoting now:  The facts of the Aggrenox litigation as they

 3     appear in this pleading are virtually identical in

 4     essential respects to those of *Actavis*.

 5          *Actavis* was an FTC act.  It was an antitrust

 6     case.  We view Florida as a -- there's really a case right

 7     on point.  In *Mack*, which is an intermediate appellate

 8     decision in Florida, the Court goes through what is --

 9     quotes the statute, what's an unfair method of

10     competition, and notably in Section 2 -- I'm looking now

11     at Florida statute 501.204, unfair methods of competition

12     is unconscionable act...hereby declared unlawful.

13     Number 2:  It is the intent of the Legislature that in

14     construing the subsection (1), due consideration and great

15     weight shall be given to interpretation of the Federal

16     Trade Commission.

17          The FTC, in the supreme court case we cite on

18     this, the FTC says that unfair methods of competition

19     include antitrust violations.  Your Honor, I said this

20     case is on all fours with *Actavis*.  The FTC brought that

21     case under the FTC Act.  This is an antitrust case, and

22     the Florida court on point said that our statute, because

23     it adopts the FTC Act, encompasses violations of antitrust

24     laws.  And I would just add what we point out in the

25     footnote, that it's not the Florida supreme court, but the

1    supreme court says in the absence of a decision from the

2    highest court -- and this *is Fidelity v. Union Trust* from

3    1940 -- that the federal court under Erie looks to the

4    intermediate court of that state, and it must be followed

5    by federal court in deciding a state question.  So *Mack* is

6    on point, and our position is it really has to be

7    followed.

8                    THE COURT:  All right.  Let me just give you a

9    little notice.  I'm going to raise, when we get to the

10   injunctive relief issue, I'm going to raise an issue with

11   you that really isn't contemplated in the briefs, so I

12   want to give you a minute to think about it.  It's this:

13   If I conclude that the injunctive relief claims are moot,

14   is there subject matter jurisdiction over claims brought

15   by Humana, because the federal question hook would be

16   gone.

17                    MR. RABINOVITZ:  Right.

18                    THE COURT:  You don't have complete diversity,

19   and you've opted out of the CAFA class.

20                    MR. RABINOVITZ:  That's right.

21                    THE COURT:  So I'll be interested in hearing.

22                    MR. RABINOVITZ:  Okay, we'll contemplate that.

23                    THE COURT:  Okay.

24                    MR. RABINOVITZ:  Thank you, Your Honor.

25                    MR. MILNE:  *** start proof I'll just finish off

```
 1    Florida, Your Honor.  I would submit that the authority
 2    that the Court should follow here is that discussed in the
 3    Russell Union case that we cite, which in turn cites --
 4    well, it cites federal courts that are referencing Florida
 5    law, but which makes clear that courts construing claims
 6    under the Florida Deceptive Trade Practices Act claim
 7    impose this requirement of heightened pleading, and it is
 8    not limited -- there's nothing in this language that would
 9    suggest that it's limited to claims sounding in fraud or
10    some other subset of claims under -- so the -- obviously
11    the Actavis decision did not address the pleading
12    standards under Florida law.  Even though Florida looks to
13    the substantive standard of the Federal Trade Commission
14    Act, it doesn't speak to the pleading standards at all.
15         So, Your Honor, moving on here, the last issue
16    that we have with respect to the -- we have an issue with
17    respect to the Vermont claim brought by Humana only, but
18    the last issue that we have with respect to the indirect
19    purchaser class complaint is the injunctive relief issue,
20    and as Your Honor knows, our position is that given the
21    fact that in these complaints the alleged thing that
22    didn't happen in the marketplace that should have happened
23    in the marketplace sooner, that is, the entry of
24    Barr/Teva's generic and/or the entry of an authorized
25    generic from Boehringer, both of those events have
```

1   occurred, and as a result of that, a claim for injunctive

2   relief is mooted because the plaintiffs cannot satisfy the

3   standard that basically says you have to show a

4   probability of future harm, of conduct that can be

5   enjoined leading to future harm.  And they can't do that

6   here.  This whole case is about alleged delay in the entry

7   of those two types -- those two generic products.  They

8   are now in the marketplace.  We can fight about whether

9   it's a violation, whether those agreements are a violation

10  at all, and if so, what are the retrospective damages or

11  even if there's some, you know, as I know was discussed at

12  the last hearing, is there some lingering effect which I

13  understand is a position that the plaintiffs will take,

14  you know, the market will not have reached equilibrium for

15  some period of time.  That is a question that can be

16  fought over in the litigation.  It has nothing to do with

17  this court enjoining conduct, make the generic come on the

18  market.  In essence, that's what -- if there's injunctive

19  relief to be had here, it's hard to see what it would be

20  other than that.  Bring the generic on.

21          Now, I'm not saying that relief like that would

22  be -- we would fight over that because obviously there are

23  requirements and the like for ordering injunctive relief,

24  but in the most extreme case that's what we're talking

25  about, and that is -- you know, that's mooted out now by

1    the fact that these products are on the market.

2              So that's our position in a nutshell, Judge.  If

3    you have any questions, I'm happy to address.

4              THE COURT:  Well, is there open and free

5    competition in the generic market at this point?

6              MR. MILNE:  Yes.

7              THE COURT:  Anybody that wants to come out in

8    generic?

9              MR. MILNE:  Well, there is certainly no

10   restraint on any competition in the generic market caused

11   by the agreements that are being challenged here.  The

12   only -- the only thing that limits any other generic from

13   coming into the marketplace is its ability to get

14   approval, status of patent litigation that may be going on

15   between that generic and patent holders.  So in terms of

16   is there any limitation on competition caused by what's

17   challenged here?  No.

18             THE COURT:  Okay.  All right.

19             MR. SHADOWEN:  Very briefly, Your Honor.  When

20   these complaints were filed, Teva had taken the position

21   that there was a no-AG clause in the agreement that

22   Boehringer was bound to respect.  Boehringer disagreed.

23   Now within the last month something has occurred in the

24   marketplace.  The plaintiffs have not had discovery into

25   what that something is.  They contend that there's been

1    full and free entry into the market.  We don't know as we

2    stand here today whether or not there is vigorous

3    competition, whether there's sham competition, whether

4    there's something in between.  We simply don't know.  What

5    we do know is that there was a raging antitrust violation

6    here that was alleged and that we were entitled to

7    discovery into, and that's what we would like to do, is to

8    get some discovery as to what exactly is going on in the

9    market.  So I think it would be premature, to say the

10   least, to dismiss the injunctive relief claim at this

11   moment.

12          THE COURT:  Well, let me try to distinguish

13   between the injunctive relief claim that was brought and

14   some other injunctive relief claim that might some day be

15   brought.  The one that was brought appears to have been

16   mooted out by the appearance of the generic, and so what

17   you're basically saying is we might have some other

18   injunctive relief claim that we want to bring, don't stop

19   us from bringing that claim.  You haven't brought it yet.

20   Is that fair?

21          MR. SHADOWEN:  Respectfully, no, I don't think

22   that it is, on two grounds.  One, we complained in the

23   injunctive relief count with respect to the withholding of

24   an authorized generic into the market.  They say that that

25   has happened.  We say we don't know as we stand here today

```
 1    without discovery whether and to what extent that has

 2    happened.  So even with respect to the specifics that we

 3    put around our claim of injunctive relief, we think that

 4    that is not moot.

 5              THE COURT:  Well -- okay.  Let's take a look at

 6    your complaint.  I mean, if you look at page 64, your

 7    demand for judgment, the only injunctive relief you claim

 8    is you demand a judgment that enjoins defendants from

 9    continuing their illegal activities.

10              MR. SHADOWEN:  Yes.

11              THE COURT:  Right.  So the illegal activities

12    that I understood you're complaining about there was the

13    settlement that delayed the introduction of the authorized

14    generic.

15              MR. SHADOWEN:  That is correct.

16              THE COURT:  So if an authorized generic has

17    actually been introduced, as the defendants claim and as

18    they claim the FTC website shows, what is the -- I think

19    you said something about the extent of the --

20              MR. SHADOWEN:  Yes.

21              THE COURT:  -- generic, what does that matter?

22              MR. SHADOWEN:  Yes, so let me get very specific.

23    So let -- I'm not saying this happened; I say we want

24    discovery into whether and to what extent it happened.

25    These people, we say, were in a conspiracy.  Now they're
```

1    in a lawsuit with a spotlight shining on them, and the

2    date comes for entry of the generic.  One possible thing

3    that could have happened is they say, We better get some

4    generic product out into the market to look good in the

5    litigation.  And so they come in with not -- you know,

6    instead of actively, affirmatively, fully marketing the

7    way they would if there were no unlawful agreement, they

8    come in with something less than that that they've agreed

9    to among themselves.

10           Has that happened?  I don't know.  I would like

11   to get discovery into whether that is happening, what

12   exactly the circumstances were in which the generic entry

13   occurred.

14           THE COURT:  Right.  But that's an allegation you

15   haven't yet brought.  In other words, the complaint as

16   pled doesn't say in order to circumvent or to create an

17   improper impression that everything was copacetic, they

18   kind of introduced a fake or a halfhearted generic onto

19   the market.  We don't have that allegation here.  I'm not

20   saying you can't bring it; I'm just saying it's not there.

21   So what I don't see is that there's anything left to the

22   injunctive relief claim that was actually brought, and you

23   may want to amend or whatever, but that's the distinction

24   I'm trying to draw, is what's in the complaint versus what

25   you might bring some day in the future.

1            MR. SHADOWEN:  Well, in our view, "to enjoin

2      defendants from continuing their illegal activities," the

3      illegal activities were the unlawful agreement that they

4      reached.  We think fairly read that would encompass any

5      sequela of that agreement, but I hear you saying you

6      want --

7            THE COURT:  You're basically positing that

8      there's a second illegal agreement that they've said,

9      Let's pretend to introduce a generic to reduce the

10     pressure on us in this case, and so we'll, even though we

11     want to maintain our illegal monopolistic position, we're

12     going to announce that we have a generic, and we're going

13     to do a halfway job of trying to let people know --

14           MR. SHADOWEN:  And we would like discovery into

15     whether that occurred, but I hear you saying that you've

16     got to plead it first specifically.

17           THE COURT:  Right.

18           MR. SHADOWEN:  Fair enough.

19           THE COURT:  Yes, and I assume the discovery you

20     would need to look into that is going to occur as a

21     practical matter on your other claims, on your damages

22     claim.

23           MR. SHADOWEN:  I think that's right.

24           THE COURT:  Okay.

25           MR. SHADOWEN:  Thank you.

1          THE COURT:  All right.  Humana wants to be

2     heard.

3          MR. ST. PHILLIP:  Your Honor, Peter St. Phillip

4     from Lowey Dannenberg.  I I have much to say in connection

5     with the injunction claim beyond what Mr. Shadowen said.

6     The injunctive relief that we plead, however, goes a

7     little bit beyond just enjoining the conduct but to invoke

8     the Court's equitable jurisdiction under the Sherman Act

9     to prevent future harm, future similar harm.  There have

10    been cases, obviously merger cases and others, where the

11    courts have put -- and Microsoft is an example, of course,

12    where under the Sherman Act the courts found violations

13    and have structural impositions with respect to that

14    violation.  We think the injunctive power of this Court

15    under the antitrust laws can allow this Court to do that,

16    so we think that has not been mooted.

17         And I'll just leave that argument there and go

18    to the question of subject matter jurisdiction that Your

19    Honor raised.  If you recall, Humana filed this case first

20    as a class action.  The first amended complaint, we had

21    the arguments about lead counsel and we decided to proceed

22    individually.  So at the institution of the action -- and

23    I don't recall standing here today whether we invoked

24    CAFA, but to the extent that we did, the question that I

25    have not focused on is whether subsequent events such as

1    the movement of the injunction claim and how those events

2    affect subject matter jurisdiction, which is traditionally

3    evaluated at the beginning of the action, I know that

4    there's sometimes events that can occur that can divest

5    the court of that, so I have to brief that or understand

6    that and give that to Your Honor, and I don't have that

7    knowledge today.

8            The other point I would take, the Court, of

9    course, has discretion to keep the claims under 1367, even

10   in the event that the federal claim has been dismissed,

11   and those are the two points I would make.

12           If Your Honor does agree with the defendants as

13   to the mootness of the injunction claim, and I think, and

14   we said in our brief, the procedural mechanism for that

15   should be based on evidence, we don't think it's proper

16   for a motion to dismiss, the only thing that can be

17   judicially noticed is the fact that the FDA has approved

18   it, so there's no evidence beyond that in the record under

19   Rule 12(b)(6).  But to the extent you disagree with that,

20   we think that -- and we would ask the Court for an

21   opportunity to brief the question if Your Honor does not

22   find it in your discretion to keep the case under the

23   supplemental jurisdiction statute.

24           THE COURT:  Okay.  I'm not sure what, if

25   anything, I'm going to do about subject matter

1    jurisdiction.  I wanted to raise it --

2              MR. ST. PHILLIP:  I'm not sure, either, of our

3    position.

4              THE COURT:  I guess, thinking out loud, there's

5    a couple of ways to cure any problem.  One of those is for

6    you to -- your client to become part of the class again or

7    to bring your claims as class claims again.  At that point

8    you get the benefit, I think, of CAFA, and you don't have

9    to have complete diversity at that point, so --

10             MR. ST. PHILLIP:  That's right.

11             THE COURT:  I'm not suggesting that you're going

12   to be out of this litigation anytime soon, but --

13             MR. ST. PHILLIP:  No, I appreciate --

14             THE COURT:  -- I think it's something you have

15   to --

16             MR. ST. PHILLIP:  I appreciate you raising it,

17   and I think that in the event -- and I don't know what

18   Mr. Milne's position would be, but in the event that Your

19   Honor would agree with the substantive argument that we

20   could brief the question for you at that time.

21             THE COURT:  Sure, sure.

22             MR. ST. PHILLIP:  Thank you.

23             THE COURT:  The only thing I wanted to press you

24   on in terms of the scope of your request for injunctive

25   relief is I don't recall whether there are allegations in

1   your complaint that would basically give rise to a need to

2   enjoin, quote, similar anticompetitive conduct, unquote,

3   in the future.  So that, in other words, if you have a

4   serial violator, somebody who is repeatedly violating

5   antitrust laws, then it seems to me that a complaint can

6   be brought saying they did it here, they did it there,

7   they're going to do it again, stop them.  And I'm just

8   thinking out loud again, but maybe some of those

9   allegations need to be in your complaint if you hope to

10  avoid mootness by arguing that your requested injunctive

11  relief is broader.

12          MR. ST. PHILLIP:  Right.  I assume I understand

13  the Court's view on that.  My belief standing here -- and

14  this has not been briefed by us -- but my belief standing

15  here is there's not a necessity in the legal construct of

16  once you find a violation for a finding of multiple

17  violations for the Court to exercise its equitable power

18  under the Sherman Act and provide whatever --

19          THE COURT:  Oh, fair enough.  At the end of a

20  case, if I find a violation, through a request for relief

21  or such other relief as the Court may enter, I can say

22  you're enjoined from doing this again.  The question is

23  from in a complaint if you're seeking that as an

24  independent basis for an injunction, don't you have to

25  plead enough to give rise to it in your complaint?

1          MR. ST. PHILLIP:  Well, I think it's a matter of

2     relief, right, and certainly in our complaint there's not

3     fulsome discussion of it, but in connection with our

4     Sherman Act claim, we do plead in our addendum clause that

5     we would like the Court to assure that similar

6     anticompetitive conduct does not occur in the future.

7     That's all the complaint says.  Whether that is

8     appropriate or not is Your Honor's determination, but we

9     certainly would like the opportunity to make application

10    for leave in the event a finding has been made by the

11    Court or a jury on that.

12         THE COURT:  Sure.  And in the event that I

13    dismiss as moot the injunctive relief claims, you'll have

14    an opportunity to provide a brief about what impact that

15    has on your client in terms of subject matter

16    jurisdiction.

17         MR. ST. PHILLIP:  I thank you for that, Your

18    Honor.

19         THE COURT:  Sure.

20         (A discussion was held off the record.)

21         MR. MILNE:  I'm virtually done, Your Honor.

22         THE COURT:  Yes, the court reporter has been

23    going for a little over two hours.  I know you've got the

24    Vermont issue, and you've got the issue you mentioned

25    earlier about the claims that were brought for purposes of

1    reserving appeal.

2            MR. MILNE:  I mean, we can either take a break.

3    I'm happy to stand on the papers with respect to the

4    Vermont, unless you had particular questions.

5            THE COURT:  I think I'm going to have to sort

6    through all of this stuff, so I think the briefing is

7    fine.

8            MR. MILNE:  It lays out the issues.

9            THE COURT:  It lays out the issues.

10            MR. MILNE:  I mean, I only have one or two

11    points on the injunctive relief issue, Your Honor, if

12    that's okay.  That will take just a couple of minutes.

13            THE COURT:  All right.  How about two minutes?

14            MR. MILNE:  Okay.  Your Honor, number one, on

15    this question of whether there needs to be some particular

16    discovery as to whether there was some kind of halfhearted

17    authorized generic in the marketplace, I would just simply

18    respond that these plaintiffs are themselves -- they are

19    in the pharmaceutical marketplace, they are out there

20    reimbursing for products for their patients, so they

21    presumably have their fingers on the pulse of what's going

22    on in the market, and if they have some issue, they're

23    more than capable of bringing that to the Court's

24    attention.

25            On the issue of whether there needs to be sort

```
 1     of fencing-in relief or could possibly be, I would just

 2     note, Your Honor, that cases like Microsoft and I know

 3     last time there was discussion about a consent decree in

 4     an FTC action involving Cephalon, those obviously are very

 5     different situations where there's a negotiated consent

 6     situation.  Here, in a world where -- when these

 7     agreements were entered into, it was a whole different

 8     legal regime.  Now we're dealing with *Actavis* and what

 9     that means.  There's simply no good faith basis to say

10     that any of these pharmaceutical companies, certainly not

11     my client, needs to be enjoined from doing an agreement

12     that violates the teachings of *Actavis*.  We're all trying

13     to figure out exactly what *Actavis* means.  But what we're

14     focusing on in these cases are settlements that were done

15     years and years ago.

16                THE COURT:  Sure.

17                MR. MILNE:  I know that may be for another day,

18     but I just wanted to make that point.

19                THE COURT:  I understand.  Well, thank you all.

20     This was a helpful argument, and I'll get you a decision

21     when I can.  Thank you very much.

22                MR. SHADOWEN:  One housekeeping matter, Your

23     Honor.  You raised the question about possible letter

24     briefs on the cigarette issue.  Would you like those in

25     seven days, ten days or --
```

1              THE COURT:  Ten days would be fine.  The better

2    practice is probably not to do a letter brief but to do a

3    so-called supplemental brief.  So let's keep them short,

4    though.  It's a very limited question.  I don't need 20

5    pages on what Massachusetts has done.  A couple of

6    citations is probably plenty.

7              MR. SHADOWEN:  Thank you, Your Honor.

8              THE COURT:  All right.  Anything further?

9              (No response.)

10             THE COURT:  Thanks so much.  We'll stand in

11   recess.

12             (4:07 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


         I, Sharon L. Masse, RMR, CRR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.




                    /S/ Sharon L. Masse

                    _____

                    Sharon L. Masse, RMR, CRR
                     Official Court Reporter
                     915 Lafayette Boulevard
                  Bridgeport, Connecticut  06604
                       Tel: (917) 703-0761