```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

IN RE:                           :  No. 3:14-MD-2516(SRU)
                                 :  915 Lafayette Boulevard
AGGRENOX ANTITRUST LITIGATION    :  Bridgeport, Connecticut
                                 :
                                 :  November 30, 2015

- - - - - - - - - - - - - - - - x
```

                        MOTIONS HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.



A P P E A R A N C E S:

     FOR THE PLAINTIFFS:

          FARUQI & FARUQI, LLP
               101 Greenwood Avenue
               Jenkintown, Pennsylvania  19046
           BY:  PETER KOHN, ESQ.

          MOTLEY RICE LLC
               600 Third Avenue
               New York, New York  10016
          BY:   MICHAEL BUCHMAN, ESQ.

          LOWEY DANNENBERG COHEN & HART, P.C.
               One North Broadway
               White Plains, New York  10601-2310
          BY:   PETER ST. PHILLIP, ESQ.

          YOUNG, COTTER & MEADE
               909 Poydras Street #1600
               New Orleans, Louisiana  70112
          BY:   JOHN ALDEN MEADE, ESQ.

GARWIN GERSTEIN & FISHER, LLP
        88 Pine Street
        New York, New York  10005
BY:  JOSEPH OPPER, ESQ.
     EPHRAIM R. GERSTEIN, ESQ.

HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
        147 North Broad Street
        P.O. Box 112
        Milford, Connecticut  06460-0112
BY:  MEAGHAN McGURRIN EHRHARD, ESQ.

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
        4400 Deer Path Road, Suite 200
        Harrisburg, Pennsylvania  17110
BY:  MONICA L. REBUCK, ESQ.

KENNY NACHWALTER
        1100 Miami Center
        201 South Biscayne Boulevard
        Miami, Florida  33131-4327
BY:  SCOTT E. PERWIN, ESQ.


FOR THE DEFENDANTS:

WHITE & CASE LLP
        701 Thirteenth Street, NW
        Washington, DC  20005-3807
 BY:  PETER J. CARNEY, ESQ.

WHITE & CASE LLP
        1155 Avenue of the Americas
        New York, New York  10036-2787
BY:  ALISON HANSTEAD, ESQ.
     ROSS E. ELFAND, ESQ.

GOODWIN PROCTER LLP
        Exchange Place
        Boston, Massachusetts  02109
BY:  CHRISTOPHER T. HOLDING, ESQ.

NORTON ROSE FULBRIGHT US LLP
        666 Fifth Avenue
        New York, New York  10103-3198
BY:  DAVID J.KESSLER, ESQ.

PULLMAN & COMLEY LLC
     850 Main Street
     P.O. Box 7006
     Bridgeport, Connecticut  06601-7006
BY:  ASSAF Z. BEN-ATAR, ESQ.

DAY PITNEY LLP
     242 Trumbull Street
     Hartford, Connecticut  06103-1212
BY:  RICHARD COLBERT, ESQ.

1          (Whereupon, the following proceedings commenced

2   at 2:19 p.m.)

3          THE COURT:  Good afternoon.  Let me apologize

4   for the delay.  It's been a difficult day, but I think

5   we're ready to go.  It looks like someone is ready to go.

6          MR. CARNEY:  We took the liberty, Your Honor, of

7   putting up slides we will use for the IPP motion because

8   that's one of the substantive motions before the Court.

9          THE COURT:  Sure.  Let me just note, we have

10  some folks on the phone, and they can hear you only if you

11  speak into the mike, so that would be useful to keep in

12  mind.  I think they're muted so we won't hear from them,

13  although I'm sure they'll text you anything they want you

14  to say, so we'll pick that up in due course.

15          I'm going to forego appearances.  Maybe when you

16  stand up for the first time, give me your name.  That

17  would be helpful.  Okay, take it away.

18          MR. CARNEY:  Ms. Hanstead for Boehringer will

19  speak on the IPP motion to dismiss, Your Honor.

20          THE COURT:  All right.  I'm sorry, one more

21  time, your name.

22          MS. HANSTEAD:  Sure.  Alison Hanstead from

23  White & Case.

24          THE COURT:  Hanstead?

25          MS. HANSTEAD:  Yes.

1            THE COURT:  Thank you.

2            MS. HANSTEAD:  Good afternoon, Your Honor.

3    Defendants have moved to dismiss a number of state law

4    claims in Louisiana Health's amended complaint.  On the

5    next slide we have a list of those claims we move to

6    dismiss:  Two antitrust claims brought under Rhode Island

7    and Louisiana law, all of Louisiana Health's unjust

8    enrichment and consumer protection claims and their claims

9    for injunctive relief.

10           A number of these claims have already been

11   considered by the Court.  Those fall into two categories.

12   The first, on the next slide, would be claims that are

13   identical or nearly identical to claims in the 2014

14   complaints and should therefore be dismissed for the

15   reasons set forth in this Court's March 23 order.  So that

16   would include Louisiana Health's Rhode Island antitrust

17   claim to the extent that they're seeking damages prior to

18   July 15, 2013 and would include their unjust enrichment

19   claim and a number of their consumer protection claims.

20   So they list the laws of 19 states but elsewhere in their

21   complaint only attempt to plead four of those, so 15 of

22   those should be dismissed.

23           The second bucket of claims that have already

24   been considered on the next slide are those that are the

25   subject of the pending IPP and Humana motions to dismiss,

1    and that includes four consumer protection -- sorry, three

2    consumer protection claims under Illinois, Massachusetts

3    and Florida law and the injunctive relief claim.

4            So we would propose not to focus on those today

5    but to focus on the claims that are really new here, and

6    that's on the next slide, and those are claims that

7    Louisiana Health asserts under Louisiana state law, and

8    that's an antitrust claim and a consumer protection claim.

9    So if we could skip ahead a couple of slides.

10           So as this Court recognized in the March 23

11   order, there has to be a clear decision either from the

12   state legislature or the state's own courts permitting

13   indirect purchaser recovery; and in the absence of such a

14   clear decision, indirect purchasers like Louisiana Health

15   cannot recover under the Supreme Court's decision in

16   Illinois Brick.  Here Louisiana Health admits that there

17   is no Louisiana repealer statute.  They cite to no clear

18   statement of the Louisiana legislature permitting indirect

19   purchaser recovery, and indeed there are no clear

20   decisions from Louisiana state courts that would permit

21   such recovery.  What we do have, on the next slide, is a

22   Fifth Circuit decision, Free v. Abbott, in which the Court

23   there that regularly interprets Louisiana law held that

24   Louisiana courts would follow Illinois Brick, and they

25   noted the policy reasons underlying Illinois Brick.

1           There are also a number of subsequent District

2    Court decisions that have similarly dismissed indirect

3    purchaser claims, including a few generic delay cases, and

4    those include K-Dur, Relafen and the *F.T.C. v. Mylan* case.

5           Louisiana Health also cites *F.T.C. v. Mylan*.  In

6    that case the Court dismissed damages claims under the

7    antitrust act but did permit the state to pursue a

8    restitution claim, but it did so looking at a provision of

9    the statute that only applies to the state, and I think

10   there's no basis here to extend that to private plaintiffs

11   like Louisiana Health.

12          Louisiana Health also conflates the antitrust

13   statute with the consumer protection statute, but there's

14   really no basis for doing so, and certainly there are a

15   number of states that permit indirect purchasers to

16   recover under consumer protection laws but not the

17   antitrust statute.

18          So I think, unless Your Honor has questions,

19   that covers Louisiana antitrust claim.

20          THE COURT:  Okay.  But you're moving also on the

21   consumer protection?

22          MS. HANSTEAD:  We are, and we'll move to that --

23          THE COURT:  Okay.

24          MS. HANSTEAD:  -- next.  So under the Louisiana

25   consumer protection laws, the range of prohibited

1   practices, it has been described by courts as extremely

2   narrow.  Generally it's been limited to allegations

3   involving fraud or misrepresentation or deception, and

4   here we have allegations that sound entirely antitrust,

5   and the courts have held -- if you can move ahead a couple

6   slides -- that indirect purchasers should not be permitted

7   to pursue such claims because to do so would be an

8   impermissible end run around Illinois Brick and the Fifth

9   Circuit's decision in *Free v. Abbott.*  So it's our

10   position that both the Louisiana antitrust claim and the

11   consumer protection claim should be dismissed under

12   Illinois Brick.

13                THE COURT:  Okay.

14                MS. HANSTEAD:  Thank you, Your Honor.

15                THE COURT:  Thank you.

16                MR. MEADE:  Good afternoon, Your Honor.

17                THE COURT:  Good afternoon.

18                MR. MEADE:  My name is John Alden Meade.  I'm

19   here on behalf of Blue Cross/Blue Shield of Louisiana.

20   It's the same entity referred to as -- technical name --

21   as Louisiana Health Indemnity Insurance Company, but the

22   trade name is Blue Cross, and that's kind of a little

23   easier to go by.

24                Let's see.  With respect to what makes our claim

25   unique, we accept the general proposition that where our

1    claims are the same, this Court is, in all likelihood,

2    going to apply the same decision to our claims that are

3    substantially similar to those asserted by the other end

4    payor plaintiffs.  But because we're from Louisiana, we

5    felt like that part of the briefing could have used a

6    little bit more.  The bulk of our purchasers are there,

7    and of course that's the law we're most familiar with.

8    And what you essentially have here is just a disagreement

9    about the way the analysis is supposed to take place.  You

10   know, the Sherman Act and the Louisiana Monopolies Act

11   were both enacted at the turn of the -- right before the

12   20th century, 1890s, somewhere around there, and up until

13   the Illinois Brick decision of '77, both the federal and

14   the state rule law provided both direct and indirect

15   purchasers with standing because there was no

16   differentiation.  When the U.S. Supreme Court in Illinois

17   Brick changed that rule, it only changed the federal rule,

18   and it didn't do so based on the language of the statute,

19   it's a big policy consideration.  It says, We need to

20   concentrate enforcement incentive with the first line of

21   purchasers.  We're worried about duplicative recovery.

22          And so that was very much a policy rationale,

23   and subsequent to that decision the Supreme Court in the

24   *Arc America* case made very clear that they were only

25   speaking about federal law and that nothing in that

1    decision should be taken to mean that federal courts, when

2    looking at state law, should apply the federal policy rule

3    because it was a nonstatutory interpretation rule.  And

4    that's, unfortunately, exactly what the Court in *Free v.*

5    *Abbott* did, the Fifth Circuit.  They actually -- they

6    acknowledged that there was no direct court decision in

7    place, and they said, Well, we predict that it would

8    follow the federal rule, and it really wasn't done with

9    much analysis, but it's hung on and it's still out there,

10   and it gets cited a lot.  But, unfortunately, what the

11   *Free* Court failed to recognize was that the statutory

12   language in Louisiana Monopolies Act and as well as the

13   Unfair Trade Practices Act, which we'll get to, says "any

14   person"; and, generally speaking, federal standing is more

15   narrow, you know, case or controversy, limited

16   jurisdiction and all of that, whereas states have much

17   more general applicability.  But, more recently, the

18   Louisiana Supreme Court, in interpreting what "any person"

19   means, it did so in the case of *Cheramie* -- which we've

20   cited in our brief -- *vs. Shell Deepwater*.  In 2010 it

21   kind of brought to task our own appellate courts in

22   Louisiana who had started to work in some restrictions on

23   standing for under the Unfair Trade Practices Act for

24   business and competitors, and the Louisiana Supreme Court

25   said, No, "any person" means any person.  When you see a

1    statute, a Louisiana statute that says that, that's what

2    it means.  That's the end of it.  It's not ambiguous.

3    Don't go any further.

4          And that's the same "any person" language you

5    see in the Louisiana Monopolies Act.  So you have the

6    Louisiana Supreme Court giving direct guidance as to what

7    "any person" means, in particular on the Unfair Trade

8    Practices Act, but it's the same language in Monopolies.

9    So we think that settles it from the court standpoint, but

10   also the Senate Concurrent Resolution Number 39 done in

11   1997 is the Louisiana legislature talking about how while

12   it's generally the rule that Louisiana will follow federal

13   guidance, it won't do it where it restricts the relief

14   available to Louisiana, and it says that Louisiana law

15   provides for greater freedom and protection of individual

16   liberties.  So we have both our Supreme Court and our

17   legislature talking about how Louisiana law is -- gives

18   more in terms of standing.

19         So I think when you look at what *Free* is -- and

20   that's really what it all hangs on for the defendants --

21   it's a federal court making kind of an offhand prediction

22   of what it thinks might be the case, versus Louisiana

23   Supreme Court and legislature saying what's actually the

24   rule.  So if Your Honor --

25         THE COURT:  But the context in which they say

1    what is actually the rule is not antitrust, or at least

2    with respect to the "any person" language.  That

3    interpretation from the Louisiana Supreme Court was not in

4    an antitrust case, was it?

5            MR. MEADE:  That's correct, Your Honor.  It was

6    in the Louisiana Unfair Trade Practices Act, but it's the

7    same language, and the analysis of the Court applies with

8    equal force because they weren't saying in the specialized

9    context of the Unfair Trade Practices Act; no, they were

10   saying as a matter of simple statutory interpretation

11   where Louisiana statute says "any person," it means any

12   person.  So while that particular case was just unfair

13   trade practices, we think it applies with equal force in

14   the antitrust context.

15           And, once again, you know, I was thinking about

16   this on the way here, and something counsel said struck

17   me.  When they talked about how Louisiana is not an

18   *Illinois Brick* repealer state, and I have a problem with

19   that construction because it presupposes that there's

20   something to repeal, and some states that may be the case,

21   some states it might not be, but there is nothing to

22   repeal in Louisiana.  There is no rule that says indirect

23   purchasers don't have standing, so there doesn't need to

24   be a separate statute after the fact.  It's only the

25   federal rule, which in '77 restricted it, and/or federal

1    law.  So that restriction never existed, and there's

2    nothing you can point to that shows a restriction, so I

3    don't think that's a helpful way to look at it.  And

4    *Illinois Brick* repealer is just what you read about in a

5    law review article; it's not in a statute itself anywhere.

6                THE COURT:  Okay.

7                MR. MEADE:  And if I might just address a few

8    other things counsel noted.  With respect to the

9    availability of other forms of relief, in particular,

10   restitution and disgorgement, it is true that the

11   statutory regime allows the attorney general to file suit

12   as well as individual citizens, but where the attorney

13   general is doing that, he's doing that in a parens patriae

14   fashion.  It's not asserting new causes of action.  So

15   where we have relied on those statutes, these are not

16   causes of action unique to the state.  This is just --

17   it's a reference to all the claims available to the

18   citizens of Louisiana.  So we don't think that distinction

19   is meaningful here.

20                And, lastly, in the bullet point or I guess the

21   header of one of these slides, it talks about an end run.

22   Once again, I don't think it's appropriate to consider

23   something an end run.  When we're suing under state law,

24   if state law provides relief thereunder, if there's a

25   conflict with federal law, then fine, that's kind of more

1    to our point, that that's why we shouldn't be following

2    the federal circuit's rule when they're just

3    hypothesizing.  It's not an end run; it's Louisiana law.

4    That's all I have with respect to Louisiana.

5           But Rhode Island, it's not -- it's the same

6    argument I have to make here.  Unfortunately, not all of

7    it is in our brief, so I don't know how much you'd be

8    willing to entertain argument on it, but it's the same

9    language in Rhode Island's statute.  The 1979 antitrust

10   statute, coincidentally, two years after *Illinois Brick*

11   they come out with this statute, and it gives us this

12   plenary description of what the point of their Rhode

13   Island antitrust act is for, that everybody should have

14   the benefit of open and fair competition.  There's -- and

15   it uses the word -- the words "any person" again, and

16   Rhode Island is replete with several other examples of how

17   "any person" is supposed to just mean any person.

18          So when in July of 2013 there's a new statute,

19   it's essentially interpretive, and you don't really need

20   to worry about it having retroactive application.  It's

21   not changing the law.  It's saying, no, this is -- there's

22   no description under it that says we're changing the law,

23   it's just that it is interpretive, and so we don't believe

24   that the question of retroactivity even comes up.  But

25   like I said, that's not thoroughly briefed in our brief,

1    and if Your Honor would like supplemental briefing on it,

2    we can do that.  But in all events, the law -- I think

3    defendants do concede that as of 2013 there is standing

4    for Rhode Island indirect purchasers.

5           THE COURT:  Okay, thank you.

6           MS. HANSTEAD:  Thank you, Your Honor.  I'll just

7    briefly respond.

8           First of all, with respect to that *Cheramie*

9    case, Your Honor is correct; that wasn't an antitrust

10    case.  It wasn't looking at indirect purchaser standing.

11    The question before the Court was whether or not persons

12    under the consumer protection laws were limited to

13    consumers and business competitors, and the majority

14    opinion there held that it was not, but there's a

15    concurring opinion that disagreed with that in some

16    subsequent case law, so we could argue about the import of

17    that case, but certainly it says nothing about indirect

18    purchaser standing under the antitrust laws.

19           Second, the *F.T.C. v. Mylan* case, the A.G. there

20    was bringing suit on behalf of indirect purchasers, but

21    the Court there did dismiss the damages claim.  It

22    dismissed the claim under the consumer protection laws as

23    impermissible end run and only again permitted

24    restitution, and I think we can argue about whether or not

25    the statute actually permits restitution, and the Court

1   there held that the statute didn't preclude restitution

2   and allowed the claim to proceed on that basis.

3          And then, finally, with respect to this "any

4   person" language, I mean, that's not unique to Louisiana.

5   That's not unique to Rhode Island.  I think if we looked

6   at most of these statutes, they'd have similar language.

7   One example would be the Puerto Rico statute, and Your

8   Honor held in March that indirect purchasers could not

9   recover under that statute, so it's certainly not unique.

10  And if you look at what the *Free* Court said, the issue in

11  *Illinois Brick* isn't the breadth of any person but what

12  injury is recoverable under the antitrust laws.  So,

13  again, there's just no clear decision that indirect

14  purchasers can recover in Louisiana.

15         THE COURT:  Okay, thank you.  Obviously, I'm

16  going to write on that, so -- all right.  We've got three

17  discovery --

18         MR. CARNEY:  I think that's right, Your Honor,

19  we have three discovery motions and a scheduling issue.

20  We were going to propose to take those -- the first motion

21  by defendants is on product market discovery, then there's

22  a sort of sales and pricing information motion.

23  Plaintiffs call that downstream.  I was going to start

24  with the product market motion, Mr. Elfand will talk a

25  little bit about downstream, and Mr. Kessler will address

1   the motion -- the third motion on the search terms for the

2   DPPs.  I'm happy to report that half of that motion has

3   been resolved on part of it, we have made some progress --

4            THE COURT:  Good.

5            MR. CARNEY:  -- if that pleases Your Honor.  So

6   good afternoon, Your Honor.  Peter Carney for White &

7   Case.  This is a little bit of déjà vu.  We were here two

8   months ago, on August 18, in a different context with

9   nonparties.  We brokered kind of an agreement with Your

10  Honor's help that we would address these issues among the

11  parties, the product market and the downstream.  We

12  promptly set out to do that.  The plaintiffs did not want

13  to have further meet and confers on the scope of the

14  products at issue.  We had in July said that there were

15  six products basically, antiplatelet treatments that we

16  wanted discovery on, and we believe this is a critical

17  issue for the case.  It is of the utmost relevance and

18  importance.  It offsets any of the burden arguments

19  they've made.  I'd like to highlight some of the evidence

20  that we've put in the briefs; and there's been a lot of

21  briefs, I know, and I can do that quickly.

22            THE COURT:  Let me start because I have a

23  fundamental question --

24            MR. CARNEY:  Yes, Your Honor.

25            THE COURT:  -- for you, and you can answer it

1    now or work it into your argument, however you want.

2             I don't see this as a traditional antitrust

3    case.  I see it as the intersection of patent law and

4    antitrust law.  And the claim, as I understand it, is that

5    the antitrust laws were violated in the manner in which

6    patent litigation was resolved.  So to be completely

7    frank, it's not clear to me that the antitrust market can

8    be, as a matter of law, anything other than Aggrenox and

9    its generics because there isn't a claim that the broader

10   antiplatelet market was or could have been affected by the

11   resolution of the patent litigation.  There's not a claim

12   that the makers of Aggrenox had market power in the

13   antiplatelet market that they were wielding unlawfully.

14   It really comes down to, doesn't it, whether the patent

15   claim was resolved in a manner that amounted to an illegal

16   effort to eliminate risk that the patent monopoly would be

17   eliminated.

18             And so in thinking about this motion to compel,

19   I'm just -- I'm really struggling to -- to come to terms

20   with what you seem to argue the relevant market is.  So --

21             MR. CARNEY:  Yes, Your Honor, and I'll go

22   directly to that then.

23             THE COURT:  Okay.

24             MR. CARNEY:  That's the core question.  It's

25   not the plaintiff's say-so as to what the market is, and

1  in any case like this the Supreme Court is clear under

2  *Brown Shoe,* the Second Circuit under *Chapman*, and this

3  Court quoted *Chapman*, that the boundaries of a particular

4  product market are determined by the reasonable

5  interchangeability of use or the cross-elasticity of

6  demand between the product itself and the substitutes for

7  it, and that product market includes anything that's

8  reasonably interchangeable, and the plaintiffs have a

9  burden to show market power, monopoly power.  The

10  antitrust laws don't care about this offense unless there

11  is market power.

12          THE COURT:  But then the Supreme Court got it

13  wrong in *Actavis* because they don't suggest that there is

14  a claim that arises, only when there's both a large

15  reverse payment and some minimal amount of proof that

16  there's an oligopoly in the relevant market and there's

17  market power and everything else.  They only rely upon the

18  fact that there's a large reverse payment.  So how can it

19  matter -- I mean, do you see my struggle here?

20          MR. CARNEY:  I think so, Your Honor, but I do

21  think that it's black letter law looking at *Brown Shoe,*

22  *Chapman*, *Geneva Pharmaceuticals*, and Your Honor recognized

23  in the motion to dismiss that you do look at whether

24  there's an effect, and the plaintiffs can argue there's

25  some sort of direct effect, all the case law recognizes

1    that might be a possibility, but that you then have to

2    look, if that's inconclusive or not available, that you

3    have to look at whether there is some impact in the

4    relevant market.  If there's --

5           THE COURT:  Well, okay, but we'll take this

6    scenario.  Your client has a 3 percent market share, and

7    that 3 percent market share is based upon a patented

8    pharmaceutical.  It resolves a patent suit challenging the

9    validity of the patent, and it paid 75 percent of the

10   amount of the annual profits to the generic challenger.

11   Impossible to prove oligopoly, impossible to prove market

12   power.  Why don't we just dismiss the claim?  In other

13   words, what was the Supreme Court thinking?

14          MR. CARNEY:  There is -- it's absolutely

15   necessary to show up front under the antitrust law that

16   there is some sort of monopoly power, market power, and we

17   raise that --

18          THE COURT:  But there is, there is.  A patent is

19   a legal monopoly.

20          MR. CARNEY:  It is a legal monopoly, yes.

21          THE COURT:  It's a legal monopoly.  And so isn't

22   the argument here that there's been illegal -- an illegal

23   agreement to affect that monopoly, to extend that

24   monopoly.  That's the whole case.  This is not a case

25   where they're saying that your client has 60 percent of

1    the oligopolistic market for antiplatelets and was

2    throwing its weight around.  That's a different antitrust

3    case.  The patent aspect has nothing to do with that.

4         MR. CARNEY:  Right, but the plaintiffs don't get

5    to define the product market by their say-so.  There's an

6    analysis that's done in terms of effect.

7         THE COURT:  Okay, but this comes down to what is

8    the Supreme Court trying to do in *Actavis* because I don't

9    read that decision as saying if both there's a large

10   reverse payment and an oligopoly in the market, the

11   broader market, then you got to proceed.  The Supreme

12   Court seems to assume that there's a hundred percent

13   monopoly in the patented pharmaceutical and that the

14   question comes down to whether that monopoly was

15   wrongfully extended into the future because of a large

16   reverse payment to the proposed generic manufacturer.  So

17   there's -- there's no inquiry discussion or even mention

18   of market -- traditional antitrust concepts of market

19   power, and so forth, in *Actavis*.

20        MR. CARNEY:  I don't think there's anything

21   within *Actavis* that reads out what has been black letter

22   law since *Brown Shoe*, *Grinnell* and cases since then that

23   under -- for a Sherman Act claim, under Section 1,

24   Section 2, there's got to be market power.  You can look

25   to the direct effects --

1           THE COURT:  No, but --

2           MR. CARNEY:  -- if they're there.

3           THE COURT:  Okay.  But the market power is

4    implicit in the patent ownership.  So in a cause of action

5    under *Actavis*, isn't the market, by definition, as a

6    matter of law, given what the Supreme Court has told us,

7    which is admittedly not fantastic guidance, but --

8           MR. CARNEY:  Yes.

9           THE COURT:  -- that had to be what they meant.

10           MR. CARNEY:  They were coming off, though -- the

11    parties going into that case had two distinct positions.

12    There was the accepted, in the Second Circuit scope of the

13    patent case, basically, and if you settle within the scope

14    of the patent, it was pens down, case was over, and that

15    was the law that governed when this case was settled, and

16    the FTC had a position they should be per se unlawful or a

17    quick look, and the Court came down in the middle with a

18    rule of reason analysis.  And from that we're now at a

19    point where we're doing the rule of reason analysis under

20    *Actavis*, which makes it very hard for defendants to move

21    to dismiss as Your Honor noted.  There just has to be a

22    plausible allegation of market power.

23           We're certainly entitled in a rule of reason

24    case to mount the defense to show that in fact the product

25    market is not limited to a narrow drug, and we've got

1  extensive evidence that in fact here antiplatelets really

2  is.  What we're talking about at this phase is really

3  getting discovery on that issue.  Your Honor has made it

4  clear that that's an issue that you can't decide on a

5  motion to dismiss floating these issues, but this is

6  something more for summary judgment.

7       THE COURT:  Well, again, in a traditional

8  antitrust case that's true; but the more I thought about

9  it, reading the papers, the more I became concerned that

10  the traditional antitrust market definition problem

11  doesn't exist in an *Actavis* decision.  An *Actavis* decision

12  is all about what happened in the resolution of the patent

13  case.

14       MR. CARNEY:  There's a lot going on in *Actavis*,

15  and there's a lot we're still all trying to figure out

16  what it means, the Court is trying to figure out.  I don't

17  think there's anything in *Actavis* that erases years of

18  black letter law on this.  *Independent Ink* from the

19  Supreme Court is a case that held that the patent by

20  itself doesn't mean market power.  Market power is about

21  price control.  And this is a situation where we've shown

22  through extensive evidence already that there was price

23  competition between Aggrenox and Plavix, that the price of

24  Plavix constrained at all times the price for Aggrenox.

25  We've submitted documents that show that we were looking

1    at that.  So I think it's reading too much into *Actavis* to

2    say that it's erased the whole market power screen that is

3    the basis of an antitrust claim under the Sherman Act.

4              THE COURT:  No, no, that's not what I'm

5    suggesting.  What I'm suggesting is *Actavis* tells us, as a

6    matter of law, what the market is, and the market on an

7    *Actavis* claim is the patent and the generic.  Isn't it?

8    In other words, if there was a traditional antitrust

9    claim, it would have been brought as a traditional

10   antitrust claim.  There's an oligopoly in the antiplatelet

11   market, and the defendants are conspiring, blah blah blah,

12   to raise prices, etc., etc.  That's not the claim we have

13   here, though.  The claim we have is that this was an

14   effort to restrict a generic from entering the market for

15   Aggrenox, and so the market power is the power to exclude

16   the generic because the patent gives you that power.

17             MR. CARNEY:  And I think that is certainly what

18   is alleged by the plaintiffs, but the inquiry is whether

19   that is a relevant antitrust market, and *Actavis* doesn't

20   reach that.  I think the *Independent Ink* case makes clear

21   that a patent isn't itself sufficient.  There are a litany

22   of cases that granted this kind of --

23             THE COURT:  And that makes sense.  A patent in

24   itself isn't enough if we're looking at the antiplatelet

25   market.  The fact that you got a patented drug, and Plavix

1    is a patented drug, and so on and so forth, doesn't mean

2    anybody has market power in the antiplatelet market.  You

3    obviously have market power in the market for your

4    patented drug.

5            MR. CARNEY:  And the question is whether that is

6    truly a relevant antitrust market, and I don't think that

7    there's anything in *Actavis* that says that's the case and

8    would upend years of federal law on that point.

9            THE COURT:  Well, you keep saying upend years of

10   federal law.  I haven't seen a case, frankly, that takes

11   on this question post-*Actavis*.

12           MR. CARNEY:  Post-*Actavis*, whether there's

13   been -- I guess my co-counsel handed me a note that is

14   clear, that makes this point -- he may want to address it

15   too -- and that is that *Actavis* -- Section 2 requires two

16   things, market power and conduct, and absent conduct --

17   *Actavis* was about the conduct, not about the market power

18   issues, and maybe --

19           MR. HOLDING:  Yes, I'll address that.

20           THE COURT:  But you have both.  You have market

21   power because you have a patent on your drug, so you have

22   market power within the market of your drug and generics,

23   and the alleged conduct is you took a large -- you made a

24   large reverse payment to keep the generics from entering

25   the market.

1           MR. HOLDING:  So first of all, good afternoon,

2     Your Honor.  Chris Holding for Teva and Barr.

3           THE COURT:  Thank you.

4           MR. HOLDING:  I hear what you're saying.  You've

5     seen me hopping out of my seat because I wanted to

6     respond.  With all due respect, I don't think that's

7     right.  I don't think that's what *Actavis* could hold.  The

8     issue wasn't even before it.  So with my scrawl --

9           THE COURT:  I agree.  It's not a clear -- it's

10    not a clear holding.  The problem is the Supreme Court

11    left it to poor district judges to figure out.

12          MR. HOLDING:  But what they said to you -- and

13    they expressed your pity -- is it's an antitrust case, and

14    I agree with my co-counsel, you can't think of an

15    antitrust case without thinking of the market, and I

16    understand that you're saying but what is the market.  But

17    at least I hear you starting from the premise of, well,

18    this isn't just an antitrust case, it's antitrust and IP,

19    and these two things are coming together.  And so what

20    I've been thinking as I heard you is, But there have been

21    a lot of situations where something like that has

22    happened.  So *Independent Ink* is one.  Another is a

23    category of cases called the Walker Process cases.  I

24    don't know if you've had a Walker Process case, but the

25    theory of a Walker Process case is that somebody commits

1    fraud in the patent office and obtains a patent that they

2    shouldn't have gotten because they defrauded the patent

3    office, and then they use that patent to exclude people

4    from the market wrongfully because they should haven't a

5    patent.  And what the Supreme Court said in Walker Process

6    was first you have to prove the actual fraud; but, second,

7    you also have to demonstrate all of the other elements of

8    a traditional Section 2 claim, including market power; and

9    they wouldn't have said that if the fact that the patent

10    defined the market.  And we could give you a litany of

11    federal circuit cases that have said in Walker Process

12    decisions even though there has been proof of fraud on the

13    patent office, the antitrust claim fails because this

14    person doesn't have power in a properly defined relevant

15    market.

16           And I think you're saying, well, but isn't the

17    market that patent that they shouldn't have gotten?  And

18    the courts have said, no, you have to do a separate market

19    inquiry.  And so what I think was before the Supreme Court

20    in *Actavis* was not the market issue but the conduct issue,

21    is a reverse payment even actionable?  And the courts have

22    said no, and the Supreme Court said, well, maybe, in some

23    cases.  So this is an antitrust case; go do an analysis.

24           And so one thing that the plaintiffs would have

25    to prove is that there was a reverse payment for the

1    conduct, but another and I would submit completely

2    separate thing they need to prove is that there is market

3    power in a properly defined market.

4         Now, we clearly disagree on what that definition

5    is, but I don't think there's anything specific in *Actavis*

6    that says the market definition for this kind of case is

7    just going -- basically doesn't exist, that there is no

8    separate inquiry, it will always just be the patented

9    product itself.  So, I'm sorry, I didn't mean to step in

10   for you.

11        THE COURT:  No, it's not the patented product;

12   it's the patented product and any generics, and the patent

13   gives the patent holder the right to exclude the generic.

14        MR. HOLDING:  Sure, it can, but that doesn't

15   mean that there's no competition.  When Pfizer -- so let

16   me just give you one quick example.  When Pfizer was

17   selling Lipitor, and it didn't go generic till about six

18   years after other competing brands went generic, Symbicort

19   went generic six years ago, what happened was the payors

20   wanted people to use the generic and so they -- of the

21   other drug, not of the Lipitor, and so they created

22   incentives for people to move, and Lipitor sales went down

23   by 50 percent on a volume basis because people moved to

24   this other generic.  So that goes to show you, you can

25   have movement, which would suggest that there wasn't

1    market power for Lipitor because they lost half of their

2    sales to something that wasn't covered by it.  So I don't

3    think that there's something about this industry or this

4    kind of claim that removes the market power analysis.

5              THE COURT:  All right.  Let me just suggest

6    this.  I think this issue is potentially dispositive.  I

7    think if the defendants are right, then there's no claim

8    here, no federal claim here, there can't be, because no

9    one has ever suggested that there's market power in the

10   traditional antitrust sense of market power.  If you

11   broaden the market to antiplatelets, of course there's not

12   market power, I mean I'm assuming there's not.

13             MR. CARNEY:  I think that's exactly --

14             THE COURT:  But if the proper market is the

15   patent and the generic, then almost certainly this case

16   comes down to not an antitrust case in the traditional

17   sense but a look-back at what happened in the patent

18   litigation and what was the risk and what was the

19   reasonable value of that risk, etc., etc.

20             MR. CARNEY:  I think that's correct generally

21   speaking, Your Honor, and many of the lawyers here were in

22   the Doryx case recently.  In that case summary judgment

23   was granted on the product market issue, and the

24   defendants won that because -- and the appeal is

25   pending -- but we won that because the Court found partly

1   because the product market was oral tetracyclines.  It

2   wasn't the Doryx antibiotic.  And as soon as that happens,

3   the Doryx market share shrunk tremendously.  That was a

4   post-*Actavis* ruling.  We had a lot of wrangling about

5   that.  The Court ordered the discovery of all the oral

6   tetracyclines, and that's how that record developed.

7          That's no different than what happened in a lot

8   of pre *Actavis* cases, such as *Cardizem, Wellbutrin, Ofcon,*

9   *Androgel, Flonase*, all cases where product market

10  discovery was granted and between two and 13 drugs were

11  allowed in.  In some cases defendants didn't win the case

12  because of some factual issue that the Court found that

13  wasn't the right product market, but in some they do.  So

14  that's why this product -- under pre *Actavis* it would be

15  very clear that this is very relevant information for the

16  product market and market power and we think also *Actavis*.

17          THE COURT:  Why don't you bring this on by early

18  motion for summary judgment.  If you're confident that

19  you've got the right market definition, this case is going

20  to go away, and everybody is going to be spinning their

21  wheels for a long time to get to that point.  I mean,

22  you're either right or you're wrong, who knows, but --

23          MR. CARNEY:  I could make you a very strong

24  showing, I think we have in the brief, that we are right

25  based on our internal documents, based on public

1    formularies, based on a number of things, but I know that

2    the plaintiffs typically come forward and say they need

3    all kinds of discovery.

4            THE COURT:  But let me hear from the plaintiffs.

5    I don't think they're even claiming, I don't think they

6    have any intention of claiming that you dominate or have

7    market power in the antiplatelet market.  I think their

8    claim is the way I've described it, that you've got market

9    power because you have a patent.

10           MR. CARNEY:  Well, I -- okay.

11           THE COURT:  And you've got a patent, and the

12   market is the patented product and the generic.  I mean,

13   am I wrong?

14           MR. KOHN:  You're not wrong, Your Honor.

15           THE COURT:  All right.  Boy, I love hearing

16   those words.

17           MR. KOHN:  Peter Kohn, Your Honor.  I don't

18   think we've had the pleasure yet.  I represent the direct

19   purchaser plaintiffs, and I work with Mr. Opper.

20           THE COURT:  Right.

21           MR. KOHN:  And I have a feeling that not because

22   of where we sit in the market, I think that simply as

23   antitrust attorneys I'm going to have something to say

24   about this issue, I know Mr. Perwin is going to have

25   something to say about this issue, and I'm sure Mr. St.

1   Phillip for Humana will have something to say about this

2   issue because the market power issue, it's a fascinating

3   issue.

4           I think in this case the Supreme Court made it

5   very clear that the market does have to be, it's almost

6   predetermined that it's going to be the brand, the

7   patented brand and the generic because, as the Supreme

8   Court said, the size of the payment is a strong indicator

9   of market power; that is, what Justice Breyer was saying

10   was that no brand company in its right mind would bother

11   paying a would-be generic competitor to stay off of the

12   market unless that would-be generic competitor had the

13   capacity to do something that no other existing drug could

14   have done.  In this case Boehringer Ingelheim didn't sue

15   Bristol Myers Squibb, the manufacturer of Plavix and maybe

16   Sanofi -- and I may have that wrong -- okay, Boehringer

17   Ingelheim didn't pay anybody, except Boehringer Ingelheim

18   paid Barr and made a large reverse payment, we allege, to

19   Barr, and it did that, and the only way that one can make

20   sense of doing that, of Boehringer Ingelheim's doing that,

21   is to realize that there was something special and

22   especially threatening to Boehringer's ability to maintain

23   its sales in the face of that generic competition

24   without -- without losing so many of those sales that it

25   had to keep that competitor out.  And in fact we've seen

1    it, we've seen the effects, we've seen the evidence of the

2    dissipation of Boehringer Ingelheim's market power in this

3    case because once generic entry belatedly occurred, what

4    has happened -- and it's in Boehringer's data and it's in

5    Barr/Teva's data -- is all of the sales that were formerly

6    enjoyed by Aggrenox went away and are now enjoyed by

7    generic dipyridamole plus 25- milligram acetylsalicylic

8    acid or salicylic acid.  And the reason that that

9    happened, the reason that the competitive price level for

10   dipyridamole plus 25-milligram salicylic acid is now the

11   generic price is because previous to Barr/Teva's entry

12   into the market, Boehringer Ingelheim had all of this

13   market power.  It was able to maintain high branded prices

14   without -- without the threat of losing its sales.  Only a

15   generic dipyridamole plus 25-milligram salicylic acid

16   product had the capacity to force Boehringer Ingelheim

17   into the position of either lowering its prices or losing

18   all of its sales.  No other drug had that capacity.  And

19   that is why Boehringer had to pay Barr to stay off the

20   market in order to maintain its monopoly power, and that

21   is why Justice Breyer observes in *Actavis* that the -- that

22   the size of the payment, the fact that the brand is going

23   to be paying just this generic and nobody else is a strong

24   indicator of market power, and it's a way of, with direct

25   evidence, showing that prior to and during the payoff,

1   prior to the entry of a generic, of course the brand has

2   market power because otherwise it wouldn't make any

3   economic sense to be paying the generic to stay off.

4            I'm going to sit down now.  There may be some

5   other answers.

6            THE COURT:  Well, the other question I have for

7   you really is your analysis begs the question a little

8   bit, I think.  The fact that they have market power

9   doesn't mean that they have market power only within the

10  market for the patented drug and its generic.  In other

11  words, it may imply that they have market power in the

12  broader antiplatelet market, and that may still leave you

13  having to prove that that is the case before you have --

14  before you have an antitrust claim even under the *Actavis*

15  decision.

16           MR. KOHN:  If you think about a relevant market

17  as a numerator and a denominator, the denominator is given

18  in the Second Circuit and most circuits by the question

19  posed thusly:  What is the narrowest set of products such

20  that a rational monopolist would need to control in order

21  to raise or maintain the price of the product at issue 5

22  percent above the competitive level?  In this case we know

23  the answer to that question.  We know what that

24  denominator consists of.  We know that it consists solely

25  of brand and generic Aggrenox because that is the

 1    narrowest set of products that Boehringer would need to

 2    and, in fact, did control in order to keep high branded

 3    Aggrenox prices where they were; and, in fact, we see the

 4    evidence of that very clearly once that control was lost;

 5    that is, once the generic came onto the market, Boehringer

 6    lost all of its sales.  Boehringer did not need to control

 7    brand or generic Plavix, brand or generic -- this

 8    antiplatelet agent, that antiplatelet agent, aspirin,

 9    whatever.  It had no need to control any of those products

10    in order to maintain its high branded prices.  And those

11    other products did not force Boehringer Ingelheim into the

12    position of either lowering its Aggrenox prices or losing

13    all of its sales, only Barr's generic did, and that, Your

14    Honor, is proof positive.  And I think -- I think that

15    what I'm saying and what Your Honor has said are roughly

16    the same things.  I detect, though, that Your Honor thinks

17    that what I'm saying is a little bit different from what

18    Your Honor has been saying.

19         THE COURT:  Well, I'm just -- you know, I'm

20    still trying to sort it out, frankly.  But my question to

21    you then is, why shouldn't we bring this on as an early

22    dispositive motion and get a 1292(b) certification so that

23    we can sort this out.  In other words, as I see it, if

24    they win the product market definition, you lose.  If you

25    win the product market definition, many -- much of their

1   discovery and their defenses go away, and we have a very

2   narrow case focused more on the patent situation than on

3   the traditional antitrust market power.

4            MR. KOHN:  I am not co-lead counsel in this case

5   and so I don't have that call, so I'm going to stand down

6   right now.

7            THE COURT:  All right.

8            MR. PERWIN:  Good afternoon, Your Honor.  Scott

9   Perwin for the Walgreens plaintiffs.  I agree with

10  everything that Mr. Kohn said.  I just want to emphasize a

11  couple of points.

12           One is that *Actavis* specifically addresses this

13  issue and says that a rational company doesn't pay a

14  single competitor a bunch of money to stay out of the

15  market if they have 99 other competitors because there's

16  no reason to.  No difference between having 99 competitors

17  and having a hundred competitors.  So the branded

18  companies who do this, who pay their generics to stay off

19  the market, perceive that the generic is a threat, that

20  other branded drugs are not, and that's important.

21           Second, there is something different about the

22  pharmaceutical industry than other industries, and that's

23  part of what *Actavis* recognized when it came up with this

24  legal rule.  Patients don't go into a Walgreen drugstore

25  and look at a shelf and pick out an antiplatelet drug to

1    take like they do shampoo or toothpaste.  They need a

2    prescription.  They have to get the prescription from

3    their doctor.  The doctor decides what drug they're going

4    to take, and doctors don't pay for the drug, and research

5    has shown that doctors don't know a lot about the

6    difference in price between different drugs that may do

7    similar things, that may have similar effects on the human

8    body.  And what that means is that companies can raise --

9    branded drug companies can raise the price of their drug

10   without losing sales because it doesn't affect the

11   doctor's prescribing patterns.  And that is market power.

12   If you have the ability to raise prices above cost,

13   without losing sales to other products, you have market

14   power, and the reason that the antitrust laws are

15   concerned about that is because we don't want companies to

16   take money out of the pockets of buyers and put it in

17   their own pockets by raising prices without any effect on

18   their sales.

19          And so in that respect you end up with

20   therapeutic classes, like this one or like statins or like

21   other therapeutic classes in which you have a bunch of

22   drugs that may be relatively similar, but they're all very

23   expensive.  They're all sold at prices that are way above

24   cost, and they don't compete with each other on the basis

25   of price.  They compete with each other by sending detail

1    people into doctors' offices and trying to convince them

2    to write prescription for those drugs, not by saying,

3    We're going to drop our price and therefore you'll write

4    more prescriptions for us.  So that's what you have.  And,

5    therefore, even if a particular branded drug has 5 or 10

6    percent of the therapeutic class, it can still have market

7    power, and that means that there is a market in which it

8    is a dominant seller, and that market is not the

9    therapeutic class because it's not the dominant seller in

10   that market, but economic theory says there must be some

11   market in which it's a dominant seller, and that's the

12   market for that molecule.  It is the dominant seller in

13   that market, and that's what allows it to raise prices,

14   and it's partly because of the peculiar features of the

15   pharmaceutical industry, and that needs to be taken into

16   account.

17          So we have no objection to an early summary

18   judgment motion, but in most cases this is going to be an

19   issue that's not resolved on summary judgment, it's going

20   to be resolved at trial.  We're perfectly happy to put

21   forward our position and have Your Honor rule as a matter

22   of law that the relevant market is the Aggrenox plus

23   AB-rated generics, and in fact in the *Geneva* case the

24   Second Circuit approved a market definition that was

25   smaller than that.  It was just the generic of warfarin,

1    not even the brand.  But the Court may in the end decide

2    that it can't be decided as a matter of law and that the

3    jury will have to decide.  Thank you.

4              THE COURT:  Thank you.

5              MR. ST. PHILLIP:  Almost everything that I

6    wanted to say was said.  There's only one other point.

7    The reason that there is this dramatic cliff after the

8    generics enter the market is that the pharmacy laws in all

9    the 50 states require, at the pharmacy, automatic

10   substitution.  When you come in with a ticket for the

11   brand, they automatically substitute the generics.  So

12   when you have multisource products, in the literature, in

13   all the other cases that Your Honor sees in this area, the

14   price of any brand after there's a generic entry falls off

15   a cliff such that, you know, when the Second Circuit was

16   looking at warfarin sodium after generic entry, not in the

17   period before, it sees the precipitous decline.  You

18   cannot have that unless you have market power beforehand

19   because there's no -- a decline once the generic comes

20   into the market only takes place because there was a

21   restriction before.  And so you're not going to see these

22   precipitous levels of falling prices for this drug.  And

23   in the antiplatelet category where you have generic entry

24   of other antiplatelet drugs, you don't see the same type

25   of decline.

1          So whether you call it a relevant market, a

2     submarket, in *Geneva* in the Second Circuit's decision they

3     said, well, it's really not the right term, but what's the

4     narrowest product and what do we know is going to restrain

5     the falling of prices, and that's what happens in the

6     generic -- in this type of context.

7          MR. BUCHMAN:  Good afternoon, Your Honor.

8     Michael Buchman from Motley Rice on behalf of the end

9     payor plaintiffs.

10          I'm not going to belabor this point.  I will

11    adopt the direct purchasers' comments, Mr. Kohn's,

12    Mr. Perwin's and Mr. St. Phillip's, and I will also note

13    that with regard to your question about summary judgment

14    on product market definition that I'm local counsel, I do

15    not have authority to make a representation, but I will

16    certainly go back to the co-leads, and we can certainly

17    either write a letter to Your Honor addressing our point

18    on that or otherwise contact the Court and convey that

19    information.

20          THE COURT:  Okay.  Thanks.

21          MR. BUCHMAN:  Thank you.

22          MR. OPPER:  Your Honor, if I may, I'm Joseph

23    Opper for the direct purchaser class.  I believe the Court

24    has raised a very intriguing possibility of early briefing

25    of summary judgment with respect to market power.  I, too,

1    would have to confer with my co-counsel, but I would think

2    that in order for us to proceed, we would at a minimum

3    need the purchase and sale data -- or the sales data from

4    Boehringer and Teva after generic entry did occur in this

5    case, because as Mr. Kohn has asserted, the best evidence

6    we have that Aggrenox and its generic substitute is the

7    market -- the proper market for antitrust analysis is the

8    fact that once generic entry occurs, the brand share of

9    the market plummets and the price of generic -- and the

10   price of the generic product is substantially below the

11   branded price, which is the sine qua non of the definition

12   of market monopoly power.

13           THE COURT:  Well, presumably that can be done by

14   stipulation.  I mean, the numbers are what they are.  You

15   don't need discovery; you need to know the number, right?

16           MR. OPPER:  Well, we would need to know the

17   number, but I think it would be more helpful if it was

18   based on the actual experience of what occurred in the

19   marketplace.

20           THE COURT:  No, that's what I'm saying.  In

21   other words, you can get a letter from defense counsel

22   that says, you know, whatever the dates are, in July the

23   sales were "X" and in August they were "Y," and so forth.

24           MR. OPPER:  Yes, Your Honor.  That --

25           THE COURT:  For present purposes.  I mean, I'm

1    not saying you wouldn't get that discovery later, but we

2    don't need to -- we don't need to have three months of

3    discovery so that you can write this brief, I assume.

4         MR. OPPER:  Yes, Your Honor.  I think that might

5    suffice.  But as I said, I would need to discuss whether

6    we think that's the appropriate way to go with my

7    co-counsel.

8         THE COURT:  Okay.  Mr. Carney?

9         MR. CARNEY:  Thank you, Your Honor.  Mr. Holding

10   may have some things to say, too.  So this is kind of a

11   radical departure from what is pre *Actavis* world, where

12   it's always been a highly factual, intensive analysis.  I

13   think some of Mr. Perwin's comments went to that.  I have

14   a number of slides that I could do that show that Humana

15   and the retailers at different times were moving, through

16   formularies, through therapeutic interchange, patients

17   away from Aggrenox and to Plavix once it became generic, a

18   competing drug.  That's -- that's reality.  It's a very

19   factual intensive thing.  I heard Mr. Opper say, look, he

20   needs facts on what happened basically.  So then you get

21   to a question of how much discovery, how many facts.

22        I don't think -- Mr. Holding said this, and I

23   second this as well -- that *Actavis* really addresses this

24   issue.  I think the language in *Actavis* -- and there's a

25   lot of things in *Actavis* that are tough to read, for

1    everybody to parse out, but where it's talking right

2    before III, a reverse payment, where large and

3    unjustified, can bring with it the risk of significant

4    anticompetitive effects for those who make the payment,

5    may be unable to explain or justify it, and it says such a

6    firm or individual may well possess market power derived

7    from the patent.  It doesn't say that they do.  It leaves

8    complete room for the fact that they do not, and that's

9    consistent with the *Independent Ink*, I think it's *Illinois*

10   *vs. Independent Ink* case that says that a patent by itself

11   doesn't give price control.  It doesn't give market power.

12            So this would be a radical departure, I think,

13   from all the law that has looked at the market power

14   screen, and I don't think *Actavis* goes that far.  Whether

15   our clients would be willing to forego the discovery that

16   has been permitted in the half dozen cases I've mentioned

17   traditionally because the stakes are extremely high in

18   this case for our clients, we think there's very clear

19   evidence that we have so far, but there's extensive

20   evidence in the hands of the retailers, the direct

21   purchasers and the payors that they realize that there is

22   reasonable interchangeability between Plavix, Aggrenox and

23   other drugs.  Those documents have -- as good as ours are,

24   and they're great, we put a lot of them in our briefs,

25   those documents have more power, especially in a summary

 1    judgment footing where they are admissions of the other

 2    party.  It's undisputed.

 3              THE COURT:  That just goes back to my point.  I

 4    expect, if you win the market definition, the case is

 5    over.  That's the point.  They're not even claiming that

 6    you have market power in that broader market.  So it's an

 7    early dispositive issue.  If you lose the issue, then it's

 8    not clear to me how the discovery is important.  If I rule

 9    that the market is Aggrenox and its generics, why does it

10    matter what Plavix -- how much Plavix they sell?  It

11    doesn't.  So either way you don't need discovery before

12    the motion because you either win, in which case the case

13    is over, or you'll lose, in which case it's irrelevant.

14              MR. CARNEY:  I want to understand a little bit

15    Your Honor's proposal because if it's simply that we're

16    going to look at a summary judgment motion and brief it

17    based on what does *Actavis* say and as a legal issue, you

18    know, take that up on a 1292(b) as to whether the Court in

19    *Actavis* said that, that's one thing.

20              THE COURT:  Well, obviously, if it said that, we

21    wouldn't be talking about it, right?

22              MR. CARNEY:  Well, in terms of determining that,

23    I realize, I realize, but I guess what I'm hearing Your

24    Honor propose instead is that the defendants kind of

25    forego their discovery on what is a very important issue.

1        THE COURT:  Here's the point.  Here's the point.

2   The claim, as I understand it, is abuse of the settlement

3   in the patent invalidity litigation.  It's not a claim

4   that you and all the other manufacturers in the

5   antiplatelet market got together and artificially

6   increased prices.  That's not the claim here.

7        MR. CARNEY:  It's an assertion to monopolize a

8   market, basically, and we've got to determine what the

9   appropriate antitrust market is.

10       THE COURT:  Exactly, that's the point.  So my

11  question is, why isn't, in a case where the only claim is

12  that there was a large reverse payment in a patent

13  invalidity suit, why isn't the relevant market the

14  patented pharmaceutical and its generic?  That's the

15  question.  And if you win, it's game over, and if you

16  lose, you don't need to know how much Plavix they sold.

17  So we're saving ourselves tons and tons, months and months

18  and probably millions of dollars in litigation costs to

19  figure out if this is really the issue or not.  Maybe I'll

20  agree with you, in which case presumably the claim will be

21  withdrawn or it will be appealed or whatever.

22       MR. CARNEY:  Right.  But I hear in Your Honor's

23  proposal that it is a fact issue.  It's not just

24  determination of what *Actavis* said or a legal ruling.

25       THE COURT:  The fact issue is going to become

1    whether there's market power.  What I'm trying to sort out

2    is what is the market that we have to be concerned with.

3    And so if there's some minimal amount of discovery that

4    has to get done in order for everybody to meaningfully

5    brief that issue, then let's figure out what that

6    discovery is and get it exchanged, or, as I suggested

7    before, have it done informally, you know, discovery will

8    show here's the sales for Aggrenox month by month.  I

9    mean, you could pull that off -- folks at your client

10   could pull that off in about 25 seconds off of their

11   computer screens, so there's no discovery needed to convey

12   that information.  If you've got something similar that

13   you need to get from the plaintiffs, then let's figure

14   that out.  But it just seems to me that we're -- we're

15   digging ourselves into a deep, deep hole that really has

16   no purpose, depending on which way this comes out, really

17   regardless of which way this comes out, because it has no

18   purpose if you win, because the case goes away.  It has no

19   purpose if you lose because that market is not the market

20   that we're fighting about.

21             MR. CARNEY:  Yeah, I guess -- and so this is

22   something that I think we'll need to confer with our

23   clients about.  I think my initial reaction, without that

24   guidance, is this really is a fact thing.  We don't have

25   any of the information or data from the big three

1    wholesalers to kind of bear on how these drugs interact.

2    We don't --

3              THE COURT:  No, no, no.  I think I'm talking

4    about, I think I'm talking about as a matter of law where

5    the claim is you made a large reverse payment in order to

6    maintain the patent monopoly, the patent monopoly is not a

7    monopoly in antiplatelet drugs, it's a monopoly in

8    Aggrenox and maybe Aggrenox and its generics since the

9    value of the patent is to exclude the generics.

10             MR. CARNEY:  And I may be being dense here, and

11   I'm sorry, Your Honor.  Let me try and repeat back.  So

12   the proposal would be that we would do some sort of

13   briefing now on that narrow issue of law, hearing you say

14   about what the product market is.

15             THE COURT:  When a plaintiff's claim is that

16   there was an antitrust violation in the manner in which

17   patent invalidity litigation was resolved, does the

18   plaintiff have to allege and prove that the defendants

19   have market power in the broader market, that is, the

20   market of the class of drugs rather than in the single

21   patented drug and its generics?  That's the best I can say

22   it.  And I don't --

23             MR. CARNEY:  Okay.

24             THE COURT:  I don't understand why either side

25   needs discovery on that question.  Maybe I'm missing

1    something.  And there may be factual discovery necessary

2    later about where the precise boundaries of that market

3    are, but it's either a really big market or it's a really

4    narrow market.

5              MR. CARNEY:  I guess it would be interesting to

6    hear, as I'm understanding Your Honor's proposal, and that

7    is -- I'm not sure we have this yet, but if the way you're

8    viewing it is if we were to win that as a question of law

9    basically, whether they've got to show the broader market

10   of antiplatelets or just the product market being

11   Aggrenox --

12             THE COURT:  They have not alleged that you have

13   market power in the antiplatelet market.

14             MR. CARNEY:  I guess my concern --

15             THE COURT:  And therefore you win unless they

16   amend their complaint and bring a different claim than

17   they've brought so far.

18             MR. CARNEY:  It's been known to happen.  It's

19   certainly something I need to confer with my clients.  I'm

20   sure Mr. Holding does as well.  I guess I would be

21   interested to hear the plaintiffs' views on whether to

22   them that is actually outcome dispositive because I think

23   we'll continue to see arguments from them about a broader

24   market, quite frankly.

25             THE COURT:  Well, I'll be surprised if they

1  stand up and say that their current complaint alleges an

2  antitrust claim in a traditional sense of showing market

3  power within the broader antiplatelet market.  Is anybody

4  going to be able to make that with a straight face?

5          MR. OPPER:  We do not allege monopoly power in a

6  broader antiplatelet market.

7          THE COURT:  Yes, right.

8          MR. ST. PHILLIP:  We don't, and much of the

9  facts that are in the papers that you see, their

10  suggestion that there's some cross-competition in the

11  broader market and our position that the generic market

12  does this to the generic and premolecule, there's not

13  really much in dispute about what those facts are.  On the

14  margin we may have some, but I think the point is well

15  made, but it's a question of what the legal implications

16  of those facts are.

17          THE COURT:  So if I hold one way or the other on

18  this, then whoever loses, I mean I'll certify it right

19  away because it's going to -- it's going to dispose of

20  this case one way or the other.  So let's get it decided.

21  I know the Second Circuit kind of ducked before, but this

22  literally is the case.

23          MR. CARNEY:  Okay, and what I may do -- do you

24  want to say something, Chris?

25          MR. HOLDING:  If I may, and I will apologize

1    again if I'm being also not quite following you, because

2    it does seem to me that either this is truly a purely

3    legal question or we have to do all of the fact discovery

4    that we're frankly here asking for.  I don't think that

5    there's a middle ground option.  So, for example, the

6    question of what the sales show since we launched I think

7    is not relevant to what you're proposing because as I

8    understand it, if it's a purely legal question, then the

9    certified question might read something like:  In a case

10   brought under *Actavis*, is it always the case as a matter

11   of law that the only relevant market is no broader than

12   the brand and its A-rated generics.  That would be --

13            THE COURT:  Well, I think I would add "in a

14   pharmaceutical case."  I do think there's --

15            MR. HOLDING:  Okay, pharmaceutical case under

16   *Actavis*.  I don't disagree.  That at least strikes me as a

17   pure legal question.  But if we're going to talk -- no,

18   but the reason I say that, Your Honor --

19            THE COURT:  I agree.

20            MR. HOLDING:  -- if we're going to talk about

21   they want discovery about what happened to us, then

22   there's a million other things that we equally want

23   back --

24            THE COURT:  Of course.

25            MR. HOLDING:  -- because there's a huge amount

```
 1   of facts.
 2              THE COURT:  All the lawyers want to be fully
 3   employed for the next five years.  I get that.
 4              MR. HOLDING:  I know, but seriously, I don't
 5   mean just that because --
 6              THE COURT:  I know.  I'm being facetious.
 7              MR. HOLDING:  -- the only relevant fact is not
 8   what happened when we entered.  The relevant fact is when
 9   Mr. St. Phillip's client took Aggrenox off formulary and
10   all the cases moved to Plavix, that's relevant.
11              THE COURT:  The only relevant fact is the
12   allegations of the complaint.  The allegations of the
13   complaint are not that you have market power in the
14   antiplatelet market.  It's not alleged.  If that's the
15   only legally permissible market, you win.
16   Congratulations.
17              MR. HOLDING:  But -- well --
18              THE COURT:  If there is a legally permissible
19   narrower market, which is what their theory is based upon,
20   then we have a litigation, but let's sort that out.  The
21   Second Circuit could well agree with you.  Whichever way I
22   come out, let's get it figured out because if you're
23   right, it has one implication on discovery, and if you're
24   wrong, it has a very different implication on discovery.
25   Why should we sort through months and months and months of
```

1    discovery problems when this is, I think, a matter of law

2    based upon what they alleged.

3         MR. HOLDING:  Well -- so it's interesting.  I'm

4    a little bit with Mr. Carney in that you can see it throws

5    me off my loop a little bit because every case I've ever

6    read, Mr. Perwin I think had it right when he said almost

7    all the cases have said even at summary judgment -- the

8    *Ofcon* case, if you want to read one, is a perfect example

9    where they said they put it on their side; we put it on

10   our side; the Court said, I hear you both; it goes to the

11   jury.  And so --

12        THE COURT:  Fair enough.

13        MR. HOLDING:  -- I don't know what the Second

14   Circuit is supposed to say other than go back and do

15   relevant market discovery.

16        THE COURT:  They are claiming, as I understand

17   it, a particular market.  If that's a legally insufficient

18   claim, you win.  Can I make it any simpler than that?

19   They are not alleging the broad market.  Therefore, if

20   it's required to prove the broad market, it's game over.

21   Why should we go into discovery into a claim that is not

22   being brought?

23        MR. HOLDING:  Because --

24        THE COURT:  They -- like it or not, they brought

25   a claim that I understand to be extremely narrow.  We have

1    to sort out whether that's a legally sufficient claim.

2    You can do it by way of motion to dismiss.  Don't make it

3    a summary judgment issue; make it a motion to dismiss.

4    Motion to dismiss because the product market alleged is

5    legally insufficient, and they are required under the

6    antitrust laws to allege an antiplatelet market, which

7    they have not done, therefore defendants win.  That's the

8    issue.  It's not even summary judgment.  So you don't need

9    discovery on a motion to dismiss.  It's a matter of law.

10            MR. CARNEY:  I guess a couple of questions, Your

11    Honor, because I know my clients have questions.  I think

12    we would have to go back, talk to our clients, perhaps

13    confer with the plaintiffs, and if there's some agreement

14    on something, come back to you with a proposal.  And I

15    think two questions.  One, I feel like we made that motion

16    to dismiss, and Your Honor denied it.  We basically said

17    it's not a plausible market, and Your Honor, pages 27 to

18    28 of the slip opinion, basically said, you know, that

19    under the law they have, and so we need to go back in the

20    facts.  It's an unusual market, as Your Honor said --

21            THE COURT:  Here's the problem.

22            MR. CARNEY:  Yes.

23            THE COURT:  Neither side has yet addressed the

24    issue.

25            MR. CARNEY:  Okay.

```
 1              THE COURT:  I have not had any help with this
 2     issue --
 3              MR. CARNEY:  Okay.
 4              THE COURT:  -- all right?  This is something
 5     that bothers me when I go to sleep at night, okay?
 6              MR. CARNEY:  Okay.
 7              THE COURT:  All right?  And so I'd like your
 8     help.  Maybe you're precisely right and I missed the point
 9     before.  Maybe they're right.  Who knows.  I'm just saying
10     it is an issue that is going to dog this case from now
11     until appeal following a verdict if we don't get it
12     resolved early.  I understand I'm throwing you a curve
13     ball, everybody a curve ball.  I understand you need to
14     confer with your clients.  Fine, let's do that.  But how
15     can I rule on this request for a massive discovery when it
16     appears to me that that discovery is not pertinent to any
17     claim actually being made?  And once you start thinking
18     about it in that way, it becomes, well, if the defendants
19     are right that they need all of this discovery because you
20     are required to bring the claim in this way, then it's a
21     fault in the complaint.  So we don't have a lot of
22     guidance.  We've got to sort this out.  And it seems to me
23     it's a ruling on that as a matter of law that is
24     immediately appealable to the Second Circuit, hopefully
25     they'll actually decide it, and we'll be able to have a
```

```
 1    case or not.
 2              MR. HOLDING:  May I make a request?
 3              THE COURT:  Yes.
 4              MR. HOLDING:  Could we have a couple minutes
 5    recess to talk about this?  I can't promise you we're
 6    going to make any progress, but I would really like to
 7    talk to Peter a little bit, and I can come back to you in
 8    a couple minutes.
 9              MR. CARNEY:  I guess one question I would have
10    is under this efficiency kind of approach we would pause
11    discovery in the meanwhile?
12              THE COURT:  I don't see any need for any
13    discovery.  The only thing that I was going to say is on
14    the search terms, if that's still going on, frankly, the
15    plaintiffs ought to give you the misspellings, but we can
16    talk about whether any discovery is necessary or not.
17    Look, I don't want to hold the case up, but I think this
18    is actually going to speed the case one way or the other.
19    The last thing I want to do is go through four years of
20    litigation, have a jury verdict and then be told you got
21    the product market wrong, let's go back and do it again.
22    That's not in anybody's interest, frankly.  So let's get
23    it right early on, and we can focus the case one way or
24    the other on the correct market.
25              MR. CARNEY:  I understand Your Honor's concern,
```

1    and our view traditionally is you need those facts to get

2    the product market right.  But if you will, let us take a

3    couple of minutes to confer and see what we can do.

4              THE COURT:  Yes, I agree with you, in a

5    traditional antitrust case you need the facts to get the

6    market right.  The question is whether this is a

7    traditional --

8              MR. CARNEY:  And Your Honor sort of started with

9    traditional antitrust case, and the pharmaceutical cases

10   are a different breed from a price fixing case.  I mean,

11   this is very much a traditional, you know, pharmaceutical

12   reverse payment case, which we've got 15 years of history

13   with.  The Supreme Court has oscillated on different

14   things.  But if Your Honor could give us ten minutes to

15   confer, maybe come back at quarter of or something like

16   that.

17             THE COURT:  Yes.  Is that enough time?

18             MR. HOLDING:  We could certainly try, yes.

19             THE COURT:  Well, I mean, take 15, whatever.

20             MR. CARNEY:  Yes, Your Honor.  Okay.

21             THE COURT:  And if you've got a cell phone,

22   check in with your client maybe.

23             MR. CARNEY:  See what we can do, Your Honor.

24             THE COURT:  All right.  Good luck.  I'll tell

25   you what, I'll give you 20 if you're going to make a call.

```
 1           MR. CARNEY:  Okay.

 2           THE COURT:  We'll stand in recess.

 3           (Recess:  3:37 p.m. - 4:00 p.m.)

 4

 5           MR. CARNEY:  Thank you, Your Honor, for the

 6    break.  We had an opportunity to confer.  We were able to

 7    get the decision-makers on the spot, and there's a lot to

 8    think about.  I think what we'd like to ask is to have a

 9    few days, maybe until Tuesday, the 8th, to try to come

10    back to Your Honor, consider this, perhaps talk to the

11    plaintiffs in the meanwhile about how this would work and

12    then report on Tuesday, the 8th.  And we'd be willing, I

13    think, to table the pending motions on discovery as it

14    will all depend on what we do here, and we'd probably

15    revisit the scheduling order issue.  We've all kind of

16    agreed more time is needed, but what it will actually mean

17    will depend on how we all come out on this issue.

18           MR. OPPER:  Your Honor, certainly I think that

19    makes sense for us to think about this very carefully, and

20    December 8 makes sense.  We'll confer with defense

21    counsel.  I'm not so sure I agree with everything else he

22    said beyond that, but I don't think that's necessary or

23    relevant at this time, so...

24           THE COURT:  Okay.  So I'll wait to hear back.  I

25    think we should -- I think we should just hold the
```

1    discovery until we sort this out.

2              MR. CARNEY:  Yes, Your Honor.

3              THE COURT:  As I've said, I think it's

4    dispositive, not necessarily one way or the other, but

5    it's dispositive one way; it changes the case the other

6    way.

7              Okay.  You mean we don't get to talk about

8    discovery?

9              MR. CARNEY:  I think you said they have to give

10   us the spelling errors, Your Honor.  Other than that, Your

11   Honor --

12             THE COURT:  Okay, all right.  Well, good to see

13   everybody again.  We'll stand in recess.

14             (Whereupon, the above proceedings were adjourned

15   at 4:01 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


December 1, 2015


/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177