# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE:  AGGRENOX ANTITRUST LITIGATION | ) |
| | ) |
| | ) |
| | ) |
| THIS DOCUMENT RELATES TO: | )  C.A. No. 3:14-MD-2516 (SRU) |
| | ) |
| ALL DIRECT PURCHASER ACTIONS | )  **PUBLIC REDACTED VERSION** |
| | ) |
| ALL INDIRECT PURCHASER ACTIONS | ) |
| | ) |
| *Humana Inc.*, C.A. No. 3:14-CV-00572 (SRU) | ) |
| | ) |

## DEFENDANTS' MEMORANDUM IN RESPONSE TO THE

## COURT'S ORDER TO SHOW CAUSE

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

ARGUMENT ........................................................................................................................6

I.    The Law Does Not Support a Categorical Rule Limiting Discovery On Market Power to a Brand Pharmaceutical Product and AB-Rated Generics of that Product .....................6

    A.    General Principles Concerning Proof of Market Power .........................................6

    B.    Response to Question 1: A Price Differential, Such as the Difference in Price Between a Brand and Its AB-Rated Generics, Does Not, on Its Own, Show Market Power ........................................................................................................8

        1.    Price Differential Alone Is Insufficient.......................................................9

        2.    To Make Out a Prima Facie Case Under the Direct Evidence Approach, a Plaintiff Must Couple Evidence of Higher Prices with Additional Evidence of Restricted Output or Abnormally High Profit Margins ........................................................................................................16

    C.    Response to Question 2: The Same Principles Apply in Cases Under *Actavis*, So Evidence of a Price Differential Between a Brand and Its AB-Rated Generics Would Not Show Market Power in This or Any Similar Case..............20

    D.    Response to Question 3: Discovery Concerning the Definition of an Antitrust Relevant Market Is Material and Necessary—Even If a Plaintiff Makes a Prima Facie Showing of Market Power with Direct Evidence, Defendants Must Be Permitted to Rebut Such Evidence, Including with Traditional Evidence....................................................................................................22

    E.    The *Cellophane* Fallacy Concept Provides No Basis for Limiting Relevant Market Discovery—Indeed, It Supports Discovery...............................................25

II.    Existing Evidence Shows the Materiality of Discovery About Other Antiplatelet Products..........................................................................................................................29

    A.    In This Case, There Is Ample Basis for Market Discovery That Is Broader than Aggrenox and AB-Rated Generics ............................................................29

        1.    Institutions in the Pharmaceutical Marketplace Create Strong Price Competition Across Branded Products, Even When They Are Protected by Patents.....................................................................................29

        2.    There Already Is Substantial Evidence Showing That Aggrenox Competes in a Broader Market in Which Aggrenox Lacks Market Power ...............................................................................................................32

        3.    Denying Defendants the Requested Discovery of Other Products Would Raise Significant Due Process Concerns ......................................36

i

B.      Defendants Have Narrowed Their Requests About Products Other than
        Aggrenox to Reduce the Discovery Burden .........................................................38

CONCLUSION....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Labs. v. Sandoz, Inc.*,
500 F. Supp. 2d 807 (N.D. Ill. 2007) ......................................................................30

*American Sales Co., Inc. v. AstraZeneca AB*,
No. 10 Civ. 6062, 2011 WL 1465786 (S.D.N.Y. Apr. 14, 2011) ............................14

*Apotex, Inc. v. Cephalon, Inc.*,
No. 06-cv-2768, 2014 WL 5354243 (E.D. Pa. Aug. 19, 2014) ("*Provigil*") ......................7, 25

*Astrazeneca AB v. Apotex Corp.*,
985 F. Supp. 2d 452 (S.D.N.Y. 2013), *aff'd in part, rev'd in part*, 782 F.3d 1324
(Fed. Cir. 2015) ......................................................................................................31

*AstraZeneca LP v. Apotex, Inc.*,
623 F. Supp. 2d 579 (D.N.J. 2009), *supplemented* 623 F. Supp. 2d 615 (D.N.J. 2009),
*aff'd*, 633 F.3d 1042 (Fed. Cir. 2010) ....................................................................30

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995), *rev'd* 883 F. Supp. 1247 (W.D. Wis. 1995) ................10, 18, 28

*In re Brand Name Prescription Drugs Antitrust Litig.*,
186 F.3d 781 (7th Cir. 1999) ..................................................................................14

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................................................26

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*,
996 F.2d 537 (2d Cir. 1996) ......................................................................................7

*Caraco Pharm. Labs v. Novo Nordisk*,
132 S. Ct. 1670 (2012) ............................................................................................12

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ....................................................................................26

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*,
912 F. Supp. 747 (D.N.J. 1995) ..............................................................................33

*Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*,
696 F. Supp. 97 (D. Del. 1988) ..............................................................................33

*Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co.*,
974 F.2d 450 (4th Cir. 1992) ..................................................................................37

*Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
   271 F.3d 374 (2d Cir. 2001).................................................................................38

*In re Complaint of Bankers Tr. Co.*,
   752 F.2d 874 (3d Cir. 1984)...............................................................................37

*Dominick v. Collectors Universe, Inc.*,
   No. 2:12-cv-04782, 2012 WL 4513548 (C.D. Cal. 2012) ....................................17

*E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*,
   683 F. Supp. 2d 401 (E.D. Va. 2009), *rev'd* 637 F.3d 435 (4th Cir. 2011)............................28

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)........................................................................... passim

*Farouki v. Petra Int'l Banking Corp.*,
   705 F.3d 515 (D.C. Cir. 2013) ...........................................................................38

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) ........................................................................9, 16

*FTC v. Actavis, Inc.*,
   133 S. Ct. 2223 (2013)......................................................................... passim

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)...........................................................................................22

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
   386 F.3d 485 (2d Cir. 2004).................................................................. passim

*Gray v. Bd. of Higher Educ., City of New York*,
   692 F.2d 901 (2d Cir. 1982)...............................................................................37

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005)..........................................................................6, 9, 16

*Heerwagen v. Clear Channel Commc'ns.*,
   435 F.3d 219 (2d Cir. 2006)..................................................................................6

*IGT v. Alliance Gaming Corp.*,
   No. 2:04-CV-1676, 2008 WL 7071468 (D. Nev. Oct. 21, 2008) ...........................23

*Ill. Tool Works Inc. v. Indep. Ink*,
   547 U.S. 28 (2006)...............................................................................................14

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
   713 F. Supp. 2d 286 (S.D.N.Y. 2010).....................................................................7

*Kaiser Found. v. Abbott Labs.*,
   No. 02-cv-2443, 2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) ....................................12, 17, 25

*Long Island Lighting Co. v. Barbash*,
   779 F.2d 793 (2d Cir. 1985)....................................................................................................37

*Meijer, Inc. v. Barr Pharms., Inc.*,
   572 F. Supp. 2d 38 (D.D.C. 2008) ("*Ovcon*") .............................................................. passim

*Mylan Pharm. v. Warner Chilcott Public Ltd.*,
   No. 12-3824, 2015 WL 1736957 (E.D. Pa. April 16, 2015) ("*Doryx*") ...............14, 16, 18, 25

*In re Neurontin Antitrust Litig.*,
   No. 02-1390, 2013 WL 4042460 (D.N.J. Aug. 8, 2013) .........................................9, 16, 19, 24

*New York ex rel. Schneiderman v. Actavis*,
   787 F.3d 638 (2d Cir. 2015)...........................................................................................13, 30

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015).............................................................................................13, 25

*PepsiCo, Inc. v. Coca-Cola Co.*,
   114 F. Supp. 2d 243 (S.D.N.Y. 2000)...............................................................................27, 28

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)..................................................................................................6, 7

*In re Remeron Direct Purchaser Antitrust Litig.*,
   367 F. Supp. 2d 675 (D.N.J. 2005) ........................................................................... passim

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) ...............................................................................................24

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ......................................................................9, 16, 19

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*,
   No. C93 20613 RMW, 1995 WL 853037 (N.D. Cal. Sept. 7, 1995)................................27, 28

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
   806 F.3d 71 (2d Cir. 2015).....................................................................................................13

*Shalala v. Ill. Council on Long Term Care, Inc.*,
   529 U.S. 1 (2000)...................................................................................................................21

*In re Subpoena Issued to Dennis Friedman*,
   350 F.3d 65 (2d Cir. 2003).....................................................................................................37

v

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................7, 24

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
    142 F.3d 90 (2d Cir. 1998) ...............................................................................6

*Trebor Sportswear Co. v. The Ltd. Stores, Inc.*,
    865 F.2d 506 (2d Cir. 1989) .............................................................................38

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) (L. Hand, J.) .......................................................7

*United States v. E.I. DuPont de Nemours & Co.*,
    351 U.S. 377 (1956) .............................................................................21,26, 28

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (1995) ....................................................................................passim

*United States v. Eastman Kodak Co.*,
    853 F. Supp. 1454 (W.D.N.Y. 1994) ...............................................................26

*United States v. Generix Drugs Corp.*,
    460 U.S. 453 (1983) ....................................................................................11, 12

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................................6

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .....................................................27, 28

*In re Wireless Tel. Servs. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. 2005) ..............................................................10

*ZF Meritor, LLC v. Eaton Corp.*,
    769 F. Supp. 2d 684 (D. Del. 2011) ..................................................................28

## STATUTES AND RULES

21 U.S.C. § 355(j)(2)(A)(ii) ......................................................................................12

2B Areeda & Hovenkamp, Antitrust Law, ¶ 516 .....................................................18

Fed. R. Civ. P. 56(f)(3) ..............................................................................................38

## OTHER AUTHORITIES

David B. Ridley, *Payments, Promotion, and the Purple Pill*, 24 Health Econ. 86 (2015)............31

Ernst R. Berndt et al., *A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets* 16 (NBER, Working Paper No. 16879, 2011) ............31

M. Howard Morse, *Product Market Definition in the Pharmaceutical Industry*, 71 Antitrust L.J. 633 (2003) ................................................................................................. passim

Michael Boudin, Book Review, *Forensic Economics Folded, Spindled, and Mutilated: Economic Analysis and U.S. v. IBM*, 97 Harv. L. Rev. 835, 837 (1984) ................................19

Scott Morton et al., "Markets for Pharmaceutical Products," *Handbook of Health Economics* (2d ed. 2012) ............................................................................................11, 17, 31

William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases,* 94 Harv. L. Rev. 937 (1981) ......................................................................................................................18

## INTRODUCTION

The Court asked the parties to address three specific questions related to whether the Court should categorically limit product-market discovery in this case to Aggrenox and AB-rated generic counterparts.  For the reasons set forth more fully below, the Court should not take the unprecedented step of preemptively limiting product market discovery in this antitrust rule of reason case.  Plaintiffs say that they can show market power through purported direct evidence (*i.e.*, the mere fact that generics are priced lower than brands and take sales from the brand when they enter).  Defendants dispute that any proper direct evidence will support a showing of market power in this case, but no matter how Plaintiffs may choose to proceed, Defendants are entitled to obtain discovery and present evidence about market definition and market share to rebut whatever case Plaintiffs present.

The courts are clear that direct evidence of market power is "rarely available."  Plaintiffs must do far more than compare prices and claim, for example, that any price differential between a brand and a generic drug product must be a supracompetitive "overcharge."  Rather, to prove market power directly, plaintiffs must provide evidence not only of price differentials, but also of output restrictions or persistently high profit margins after accounting for both variable costs, like marketing, and fixed costs, like research and development ("R&D")—including the billions of dollars routinely invested in R&D that does not yield any marketable products.  This is especially so as to pharmaceuticals, where the price differences between brands and generics are driven by the governing regulatory structure: generics are priced lower because (1) under the Hatch-Waxman Act, a generic's path to approval is substantially less expensive than a brand's, and (2) state generic substitution laws (and the actions of insurers) automatically convert sales from the brand to the generic, thus allowing generics to avoid the marketing and educational expenses incurred by innovator firms.

1

Given that true direct evidence is rare, the courts have long looked to market shares in properly defined antitrust markets to assess whether there is even the possibility of an antitrust violation. For example, the Second Circuit has applied a market share screen, holding that where a defendant had a small market share no antitrust claim could succeed in either the Section 1 rule of reason or Section 2 monopolization context.

Plaintiffs are free to forgo traditional market analysis in their affirmative case and to try to prove market power by using direct evidence. And certainly one part of Defendants' case likely will be to challenge Plaintiffs' purported direct evidence and demonstrate that it does not create a triable issue of market power. But even if Plaintiffs are able to make a prima facie case with direct evidence, Defendants are entitled to use the market-share evidence they seek in discovery to contest Plaintiffs' case, by showing that Aggrenox competes against other products (such as Plavix and its generic equivalents) in a broader relevant market in which it is a minority player. Courts routinely allow defendants to rebut purportedly direct evidence of market power with evidence that the product in question faces competition in a broader market. Nor are Defendants aware of a single case, involving pharmaceuticals or otherwise, in which market definition discovery was barred because a plaintiff indicated an intent to rely on purported direct evidence of market power.

Accordingly, limiting product market discovery to the brand and its AB-rated generics as part of a discovery order would be inappropriate. Such an order would be tantamount to deciding as a matter of law the heavily factual issues of market definition and market power, and ruling in Plaintiffs' favor on an element of their claims, before the relevant discovery has even occurred. Indeed, if Plaintiffs' view is accepted, then every branded pharmaceutical product that is not yet subject to AB-rated generic competition would be a monopolist—no matter how

crowded the therapeutic category—and every pharmaceutical antitrust case would automatically involve a single-product market.

To this point in the litigation, product market discovery has been very limited, but even still, available evidence strongly suggests that the relevant market extends beyond Aggrenox and AB-rated generics.  In particular, existing evidence strongly suggests that the product market includes other antiplatelet treatments such as Plavix, whose sales dwarf those of Aggrenox, and against which Aggrenox has always had to compete.[1]  This evidence—and the additional evidence Defendants seek—is crucial, because it suggests that Aggrenox likely falls well below any reasonable market share threshold for market power.

Defendants therefore respectfully submit that an order preventing Defendants from pursuing standard market discovery would be profoundly unfair to Defendants and would constitute reversible error.

As to the Court's specific questions:

1.    The existence of a price differential between the branded product and its generic counterpart is not enough, on its own, to establish that the branded product possesses market power.  Courts have consistently recognized that more is required to even begin to establish market power.

2.    The Supreme Court's decision in *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), did not create a special rule for reverse-payment cases; on the contrary, the Court confirmed that standard rule-of-reason analysis controls.  *See id.* at 2237-38.  And in the pharmaceutical context, price differentials between brand and generic drugs are largely driven by the relevant regulatory structure—not market power—based on the Hatch-Waxman Act and state substitution laws, which together artificially decrease the costs generic manufacturers incur for R&D and marketing.

3.    Even when a plaintiff proffers some direct evidence that may imply market power, there is no case holding that the defendant may not rebut such evidence by demonstrating robust competition in a broader market; indeed, that is just what occurs in many cases.  The *Cellophane* fallacy does not change this, but is merely a factor that must be considered in any

---

[1] Pace Decl. Ex. 1 (article listing Plavix as number two on Forbes' "Pharma's Biggest Blockbusters" list of best-selling drugs of all time).

market definition analysis, and thus developed in discovery.

Defendants attach declarations from two experts to assist the Court on these issues:  (1) Dr. Sumanth Addanki is an expert economist who has written extensively on the dynamics of the pharmaceuticals market and has testified in other pharmaceutical and antitrust cases;[2] and (2) Professor Robert P. Navarro is a pharmaceutical industry expert who has developed and managed pharmacy benefit plans.[3]

Defendants recognize and appreciate this Court's efforts to advance this litigation efficiently and minimize the burdens of discovery.  *See* Order to Show Cause at 1, dated January 8, 2016, ECF 432 ("Order to Show Cause").  To that end, Defendants have worked diligently to narrow their product market discovery requests to minimize the burden on Plaintiffs (and third parties).  But Defendants respectfully submit that market power disputes in this case are too fact-dependent and too crucial to be resolved prior to discovery by an unprecedented bright-line rule.[4]

## BACKGROUND

Whether BIPI had market power is an essential element of Plaintiffs' claims in these cases.  In their various complaints, Plaintiffs allege that they can establish market power by purported direct evidence, *i.e.*, by establishing that generic Aggrenox is priced lower than branded Aggrenox and takes sales from the brand when it enters the market.  By contrast, Defendants maintain that they lack market power, that any properly defined relevant market for this dispute must include several products beyond Aggrenox (including but not limited to Plavix and its generic equivalent, clopidogrel), and that Defendants had a very small share in that market, negating any allegation of market power.

---

[2] *See* Declaration of Dr. Sumanth Addanki ("Addanki Decl.").

[3] *See* Declaration of Robert P. Navarro ("Navarro Decl.").

[4] Defendants can provide courtesy copies of any sources cited herein at the Court's convenience as needed.

As discovery commenced, Defendants sought information from Plaintiffs relevant to market definition and market power.[5]  In general, Plaintiffs objected to producing documents concerning products other than Aggrenox and its AB-rated generics, citing their direct evidence theory.  After significant efforts at compromise failed, Defendants filed motions to compel product market discovery in August, including discovery about other antiplatelet medicines that Defendants believe should be included in the relevant market.  The parties continued to try to reach a compromise throughout the fall, with Defendants agreeing to narrow their requests but still seeking targeted discovery for a narrowed group of products other than Aggrenox.  Despite substantial progress, the parties have not been able to reach agreement.

At the November 30, 2015 argument, the Court raised certain questions regarding market definition in pharmaceutical reverse-payment cases under *Actavis*, including whether it was possible to resolve the market definition issue at a preliminary phase of the case, based on limited or no discovery.  The parties responded with written submissions dated December 8, 2015.  Pls.' Submission Concerning Adjudication of Pls.' Market Power Allegations (Dec. 8, 2015), ECF 425 ("Pls.' Dec. 8, 2015 Letter"); Statement of Defs.' Position on Market Definition (Dec. 8, 2015), ECF 426 ("Defs.' Dec. 8, 2015 Letter").  Thereafter, the Court issued the Order to Show Cause to which this submission responds.

---

[5] Defendants also sought discovery from various third parties, including the manufacturers of branded drugs that compete with Aggrenox and from the Big Three Wholesalers.  Based on the Court's suggestion during the hearing on August 18, 2015, at which the Court held that discovery from the Big Three would be appropriate, the parties have held off pursuing that discovery until the Court rules on the pending motions, to clarify the scope of the discovery that would proceed.

## ARGUMENT

## I.  THE LAW DOES NOT SUPPORT A CATEGORICAL RULE LIMITING DISCOVERY ON MARKET POWER TO A BRAND PHARMACEUTICAL PRODUCT AND AB-RATED GENERICS OF THAT PRODUCT

### A.  General Principles Concerning Proof of Market Power

All agree that, because Plaintiffs are pursuing antitrust claims (or state-law analogues), Plaintiffs must demonstrate that Defendants possessed market power, that is, "the ability of a single seller to raise price and restrict output." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (defining market power as "the ability to raise price by restricting output"); *see also* Order to Show Cause at 1.  Market power cannot be presumed in a rule-of-reason case, and the burden of proving market power rests with the Plaintiffs.  *See Actavis,* 133 S. Ct. at 2237 (a plaintiff in this type of action "must prove its case as in other rule-of-reason cases").

While acknowledging the theoretical possibility of direct proof of market power,[6] courts have consistently recognized that such evidence rarely carries the day.  *See, e.g.¸ Heerwagen v. Clear Channel Commcn's*, 435 F.3d 219, 227 (2d Cir. 2006) (direct evidence of market power is "often difficult or impossible to prove"); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Because 'direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power.'") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)).  In fact, the courts much more often evaluate the defendants' position in a properly defined relevant market.  *See Harrison*, 423 F.3d at 381.  And the courts are clear that defendant's market share must be

---

[6] *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500, 509 (2d Cir. 2004) (market power can be established either directly, through proof of an "actual adverse effect on competition, such as reduced output," or indirectly through proof of a substantial share in a properly defined relevant market); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (finding purported direct evidence "too speculative").

sufficient to establish market power in both the Section 1 rule of reason and Section 2 monopolization contexts, and have not hesitated to grant summary judgment where the evidence shows that the market share is insufficient to do so. *See, e.g.*, *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 547 (2d Cir. 1996) (granting summary judgment where market share was too small to support finding of § 1 market power); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (L. Hand, J.) ("[I]t is doubtful whether sixty or sixty-four percent would be enough [to constitute a § 2 monopoly]; and certainly thirty-three per cent is not.").

Courts likewise reject the notion of single-product monopolies.  *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 200 n.3 (2d Cir. 2001) (collecting decisions); *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010) ("Courts in this district have consistently held that [a] single brand name product cannot define a relevant market."). Therefore, in practice, market power is almost always tested by first defining the relevant market and then determining the defendants' share of that market—evidence that courts recognize as "highly relevant" to assessing market power.  *See, e.g.*, *PepsiCo*, 315 F.3d at 108 ("defining a relevant market is generally a necessary component" of market power analysis); *Geneva Pharm.*, 386 F.3d at 500 (market share evidence "highly relevant" to market power).

The situation is no different in the pharmaceutical industry.  Indeed, no pharmaceutical case—before or after *Actavis*—has **ever** granted summary judgment to a plaintiff on the issue of market power based on direct evidence.  *See Apotex, Inc. v. Cephalon, Inc.*, No. 06-cv-2768, 2014 WL 5354243, at *2 (E.D. Pa. Aug. 19, 2014) ("*Provigil*") ("[Plaintiff] has cited no case granting summary judgment to an antitrust plaintiff on the issue of market power based on direct evidence."); *accord Meijer, Inc. v. Barr Pharm., Inc.*, 572 F. Supp. 2d 38, 55 (D.D.C. 2008)

("*Ovcon*").  And Defendants are aware of no case in which a court foreclosed discovery

concerning other products that may compete in a potential market simply because a plaintiff

professed to rely on a direct-evidence approach.  On the contrary, courts consider proffers of

both direct and indirect evidence, at summary judgment and trial, which necessarily means that

the courts had permitted discovery concerning both direct and indirect evidence.  *See* Defs.' Dec.

8, 2015 Letter at 8-10, ECF 426.

Notably, Plaintiffs themselves are unwilling to walk away entirely from the task of

defining a relevant market.  *See* Pls.' Dec. 8, 2015 Letter at 5-6 & n.4, ECF 425.  Moreover, as

noted, their complaints include allegations regarding the relevant market.  *E.g.*, DPPs'

Consolidated Amended Compl. ¶¶ 97-114 (June 16, 2014), ECF 98; EPPs' First Amended

Consolidated Compl. ¶¶ 112-21 (May 15, 2015), ECF 263; Humana's First Amended Compl. ¶¶

92-104 (June 16, 2014), ECF 93.

### B.     Response to Question 1: A Price Differential, Such as the Difference in Price Between a Brand and Its AB-Rated Generics, Does Not, on Its Own, Show Market Power

In Question 1, the Court asked "whether an antitrust plaintiff's proof of overcharges

(which, by definition, constitutes proof of supracompetitive prices) necessarily proves market

power, because the extraction of supracompetitive prices is itself an exercise of market power."

The answer to the Court's question is emphatically "no."  As an initial matter, a price

difference between a brand and generic drug, standing alone, is neither an "overcharge" nor

proof of market power.  A higher price, without more, is no more proof of market power than a

lower price is proof of "competitive" pricing.  For example, the fact that branded Advil is priced

higher than the generic store-brand ibuprofen does not mean that Advil had market power (the

power to control price) before the store brand entered.  Of course it didn't, because branded

Advil must compete against branded (and store brand) Tylenol, Aleve, Aspirin, as well as

generic store brand versions and myriad other pain relievers.  The generic store brand Advil's low price is simply a reflection that it got to piggyback on, among other things, the marketing efforts of the branded firm, and does not, without more, establish the "competitive" price for the "market."  These considerations apply with even more force for prescription drugs given the regulatory backdrop, which ensures a price differential between brand and AB-rated generics regardless of the competition faced by the brand before the generic entered.

        1.    <u>Price Differential Alone Is Insufficient</u>

An antitrust plaintiff offering proof of nothing more than the fact that the defendant's product sold at a higher price than an allegedly excluded product has not established a prima facie case of market power.  Courts are consistent and unambiguous on this point.  *See, e.g.*, *Geneva Pharm.*, 386 F.3d at 500; *Harrison*, 423 F.3d at 381; *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997).  Even proof of "supracompetitive pricing, on its own, is not direct evidence of monopoly power."  *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011); *see also In re Neurontin Antitrust Litig.*, No. 02-1390, 2013 WL 4042460, at *3 (D.N.J. Aug. 8, 2013) ("While there may be other ways to prove monopoly power, proof of supracompetitive pricing cannot stand alone . . . .").  In *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, a case involving pharmaceuticals, the Second Circuit concluded that evidence that the defendant's product was priced higher before the entry of additional generics was "at best ambiguous" as direct proof of market power; as a result, "indirect evidence" of market power in a properly defined antitrust relevant market was necessary.  *See Geneva*, 386 F.3d at 500.

The reason for this rule is straightforward:  a court or jury cannot properly find (or even infer) market power from a higher price without knowing ***why*** the defendant's price was higher. *See, e.g.*, *Harrison Aire*, 423 F.3d at 381 ("uncontested fact" that the defendant's product was

"more expensive than that of its . . . competitors" did "not support a reasonable inference of monopoly power"); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411-12 (7th Cir. 1995) ("[A] reasonable finder of fact cannot infer monopoly power just from higher prices—the difference may reflect a higher quality more costly to provide[.]").  As detailed below, Part II, *infra*, many factors may lead to a higher price, even where a defendant operates in a highly competitive market and lacks market power.  Perhaps most important for these purposes, a proper analysis of ***all*** costs—both the marginal costs of production and marketing and fixed costs such as R&D—is essential.  As the Second Circuit has made clear, "[c]ertain deviations between marginal cost and price, such as those resulting from high fixed costs, are not evidence of market power."  *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995); *see also In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 422 (S.D.N.Y. 2005) (market power not established "*simply* [*by showing*] *pricing a product above marginal cost when that price differential can be explained by the existence of economic realities entirely separate from the existence of market power*, for instance, the presence of high fixed costs") (emphasis added); Addanki Decl. ¶¶ 20-25.

Therefore, pricing data is only the ***start*** of the inquiry.  To succeed on a direct evidence theory, plaintiffs must present additional evidence showing that a price differential reflects market power.

Pricing evidence is particularly ambiguous in the pharmaceutical industry.  Brand and generic companies have dramatically different cost structures and risk profiles, with brand manufacturers systematically incurring substantial R&D and marketing costs that generic manufacturers do not.  As the Supreme Court has recognized, generic pharmaceuticals "are usually marketed at relatively low prices *because* their manufacturers do not incur the research,

development, and promotional costs normally associated with the creation and marketing of an original product." *United States v. Generix Drugs Corp.*, 460 U.S. 453, 455 n.1 (1983).

Some of the major institutional factors driving branded prescription drugs to be priced higher than their generic counterparts, as well as driving brand-to-generic switching, are as follows:

***Brand-Side Pharmaceutical Research Is Extraordinarily Expensive and Risky***. Estimates place the R&D cost at $2.6 billion or higher per drug that actually makes it to market, and billions more are spent on drugs that are never sold.  Navarro Decl. ¶ 9.  Indeed, Boehringer Ingelheim invested close to $3 billion in R&D in 2014 alone.[7]  Brand companies must fund ongoing R&D, not just recoup costs for products that make it to market.  The vast majority of pharmaceutical R&D initiatives never come close to a marketable medicine—one study showed that fewer than 5% of development candidates proceed from preclinical studies to market.  *See, e.g.*, 2 Scott Morton et al., "Markets for Pharmaceutical Products," in *Handbook of Health Economics*, at 773-774 (2d ed. 2012) (hereinafter "Markets for Pharmaceutical Products"); *accord* M. Howard Morse, *Product Market Definition in the Pharmaceutical Industry*, 71 Antitrust L.J. 633, 636-37 (2003) (hereinafter "Morse") (analogizing drug development to wildcatting in Texas, "with many dry holes and a few gushers").

***Brand-Side FDA Safety and Efficacy Studies Are Expensive and Uncertain in Outcome.***  Even "successful" products must go through rigorous and lengthy safety and efficacy studies to secure approval from the FDA.  Navarro Decl. ¶¶ 8-9.  Such studies and clinical trials are both very costly.  For example, a single drug may cost $2.6 billion to bring to market.  Navarro ¶ 9.

---

[7] *See* Pace Decl., Ex. 2 at 12 (Boehringer Ingelheim Annual Report 2014).

***Generic Firms Face No Such R&D Expenses or Risks.***  R&D expenses for generic firms are a small fraction of the brand manufacturer's outlay.   Navarro Decl. ¶ 10; *see also Generix,* 460 U.S. at 455 n.1; *Kaiser Found. v. Abbott Labs.*, No. 02-cv-2443, 2009 WL 3877513, at *9 (C.D. Cal. Oct. 8, 2009) ("[C]ompanies that produce generics do not incur the substantial research and development expenses incurred by companies that develop and produce brand name drugs.").  These lower costs result from the generic company's ability, under the Hatch-Waxman Act, to "piggy-back[]" on the safety and effectiveness studies that the brand already performed, so the generic entrant needs to demonstrate only that its product is bioequivalent to the brand.  *Caraco Pharm. Labs v. Novo Nordisk*, 132 S. Ct. 1670, 1676 (2012); *see* 21 U.S.C. § 355(j)(2)(A)(ii).

***Brand Firms Must Educate Healthcare Professionals and Patients About Their Products.***  Brand firms engage in extensive efforts to educate physicians about their products to generate demand, leading to prescriptions.  Addanki Decl. ¶ 10; Navarro Decl. ¶ 12.  Such marketing efforts, including the retention of nationwide field sales organizations to call on healthcare professionals, are extremely costly.  Navarro ¶ 12.

***Generic Firms Generally Need Not Perform Such an Educational Function.***  Generic firms generally do not perform a similar educational function—for example, they do not employ national sales teams to "detail" physicians and pharmacists on the benefits of their products.  Generic firms rely on the marketing and education efforts of branded firms, as well as state generic substitution laws (discussed next).  *See also Generix*, 460 U.S. at 455 n.1; *Ovcon*, 572 F. Supp. 2d at 55 ("Manufacturers of generic drugs . . . do not engage in the substantial marketing and promotion activities undertaken by manufacturers of branded drugs . . . .").

***State Generic Substitution Laws Drive Brand to Generic Switching with No Effort***

*from Generic Firms.*  Nor does the fact that generics take sales from the brand when they enter establish that the brand had market power.  State laws permit—and in many states require—a pharmacist to dispense an AB-rated generic drug when a patient presents a prescription for the brand.  *See New York ex rel. Schneiderman v. Actavis*, 787 F.3d 638, 644-45 (2d Cir. 2015) (noting that all 50 states have such laws); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 30 (1st Cir. 2015) (same); *see also* Navarro Decl. ¶ 14.  Where, as here, switching to a generic product in substantial measure is ***mandated by law***, the mere fact of such switching says nothing about whether the incumbent brand had market power—it is the product of government policy, not market forces.

    ***Private and Government Health Plans Favor Generic Firms.***  Private and government health plans also drive switching to generics, again without the need for generic firms to incur marketing expenses.  Most health plans use preferred drug lists (called formularies) and tiered co-pays (*e.g.*, $0 to $4 for the generic; $30 to $55 for the brands) to drive switching to the generic.  *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 79-80 (2d Cir. 2015) (explaining how health plans drive switching); Navarro Decl. ¶¶ 15, 24.

    Failure to account for these industry characteristics guarantees false positives.  Indeed, because the cost disparities and the institutional factors driving switching in favor of generics apply to all branded drugs, under this logic every branded drug product would be a monopolist.  *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 683 (D.N.J. 2005) ("Plaintiffs' approach, if applied beyond this case, would render most brand name pharmaceutical companies as *per se* monopolists prior to generic entry.").  Not surprisingly, then, courts have rejected just the sort of "direct evidence" arguments Plaintiffs advance here.

*See, e.g.*, *Ovcon*, 572 F. Supp. 2d at 55 (it is "difficult to imagine" a direct evidence approach working as a substitute for market definition in a pharmaceuticals case); *Mylan Pharm. v. Warner Chilcott Public Ltd.,* No. 12-3824, 2015 WL 1736957, at *7 (E.D. Pa. April 16, 2015) ("*Doryx*") (noting "[d]irect evidence of monopoly power is 'only rarely available'" and holding plaintiff "has not presented plausible direct evidence of market power" without a showing of "abnormally high" margins or "restricted output"); *Remeron*, 367 F. Supp. 2d at 683 ("Plaintiffs do not cite a case finding market entry of lower priced products to be indicative of a prior monopoly.").[8]

In *American Sales Co., Inc. v. AstraZeneca AB*, an antitrust case claiming delayed generic entry, the court rejected Plaintiffs' conclusory attempts to label the heartburn remedy Prilosec OTC (and its generics) a market unto itself. *See* No. 10 Civ. 6062, 2011 WL 1465786, at *3 (S.D.N.Y. Apr. 14, 2011). Given the ubiquity of brand and generic heartburn drugs (both patented and unpatented),[9] plaintiffs had "failed to allege any product characteristics or evidence of consumer buying patterns that limit Prilosec OTC's interchangeability of use or the cross-elasticity of demand." *Id.* at *3. The court held that their attempts fell "well below the threshold

---

[8]   *In re Brand Name Prescription Drugs Antitrust Litig.* (relied on Plaintiffs in earlier briefing) is not to the contrary. 186 F.3d 781 (7th Cir. 1999). There, the Seventh Circuit addressed whether one could infer collusion among branded pharmaceutical companies because they did not charge the same price to all customers (*i.e.*, that they engaged in price discrimination). *Id.* at 787-88. The court merely observed that because branded drug products are differentiated and some are protected by patents, individual brands may have some ability to charge above a perfectly competitive price and/or to price discriminate. The Seventh Circuit did not hold that all branded drugs possess market power merely by virtue of patents. Even if the court had, the Supreme Court has since squarely rejected such an artificial view of market power. *See Ill.Tool Works Inc. v. Indep. Ink*, 547 U.S. 28, 31, 45-46 (2006) (recognizing "that a patent does not necessarily confer market power upon the patentee" and holding that the "mere fact that a tying product is patented does not support" any "presumption of market power").

[9] Pace Decl. Ex. 3 (Bruce Japsen, "Generic could be painful to heartburn-drug firms," Chicago Tribune (Aug. 16, 2007), http://www.chicagotribune.com/business/chi-thu_notebook_0816aug16-story.html (discussing various prescription, over-the-counter, and generic drugs that treat heartburn).

to allege a relevant product market," *id.* at *4, despite plaintiffs' argument, as here, that the price differential between brand and generic made such interchangeability arguments unnecessary.

      ***Intense Brand-to-Brand Competition Is Triggered by Third-Party Payors.*** In addition to the institutional factors driving price differentials between brand and generic drugs, institutional factors drive intense competition between brand pharmaceuticals used to treat the same or similar ailments. These market realities further undermine the notion that every branded pharmaceutical can be viewed as a monopolist.

      There is no dispute that many therapeutic categories feature extensive competition among branded drugs, and that third-party payors—usually acting through pharmacy benefit management companies ("PBMs")—take advantage of multiple branded alternatives to force bidding situations for access to covered patients. Navarro Decl. ¶¶ 21, 23. Where multiple brands treat the same ailment, PBMs force competing branded manufacturers to offer significant price concessions (usually in the form of rebates) to avoid being disadvantaged on a formulary. Navarro Decl. ¶¶ 23, 26; *see* Part II.A(2), *infra* (for evidence presently in record showing competition between Aggrenox and other brands). Branded firms subjected to such competitive rigors can hardly be called monopolists. Any assessment of market power must take into account the degree of competition between different brands (and/or their generic equivalents), which will vary from category to category—there may be multiple brand and generic products to treat condition A but only one brand for condition Z, with every combination in between. Ignoring such competition, and focusing only on the fact that generic alternatives to all branded products have lower price points, sidesteps the key issue: whether the product at issue has the power to dictate price by limiting output.

2.      To Make Out a Prima Facie Case Under the Direct Evidence Approach, a
        Plaintiff Must Couple Evidence of Higher Prices with Additional
        Evidence of Restricted Output or Abnormally High Profit Margins

To state even a prima facie case of market power under the direct evidence approach, a plaintiff cannot rely on the existence of higher prices or a price differential alone, but also must show that the defendant restricted output on a market-wide basis, or had abnormally high profit margins (properly measured to include all costs, including fixed costs, as well as the risks inherent in a business based on R&D).  *See, e.g.*, *Harrison Aire*, 423 F.3d at 381 (plaintiffs' contention that defendant "charged supracompetitive prices . . . . alone d[id] not support a reasonable inference of monopoly power"); *Geneva*, 386 F.3d at 500 (holding that plaintiff's lack of direct evidence of restricted output asked the court "to infer the basis for the higher prices"); *Forsyth*, 114 F.3d at 1476 (rejecting purported direct evidence of market power where higher prices and high profits were not accompanied by "showing of restricted output"); *Kodak*, 63 F.3d at 109 ("Certain deviations between marginal cost and price, such as those resulting from high fixed costs, are not evidence of market power."); *Neurontin*, 2013 WL 4042460, at *5 ("While there may be other ways to prove monopoly power, proof of supracompetitive pricing cannot stand alone"); *Safeway*, 761 F. Supp. 2d at 887 ("supracompetitive pricing, on its own, is not direct evidence of monopoly power").

And courts have specifically rejected efforts by plaintiffs to avoid showing restricted output or abnormally high margins in addition to a price differential.  *See, e.g.*, *Doryx*, 2015 WL 1736957, at *7 (holding that plaintiff failed to present a triable issue of market power based on direct evidence when it presented no facts to show an abnormally high profit margin or restricted output); *Neurontin*, 2013 WL 4042460, at *4-5 (rejecting argument that plaintiffs "need not offer independent proof of restricted output"); *Safeway*, 761 F. Supp. 2d at 887 ("To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output."); *Ovcon*,

16

572 F. Supp. 2d at 55 ("Without a showing that Warner Chilcott's higher prices were the result of restricted output . . . Plaintiffs' [purported direct] evidence cannot unambiguously establish Warner Chilcott's market power."); *Remeron*, 367 F. Supp. 2d at 682 (rejecting direct evidence because "[p]laintiffs here provide no evidence of excessive price-cost margins or restricted output but merely rely on the fact that later generic manufacturers could enter the market more cheaply than Remeron's price to establish monopoly power").

**Output Often Falls When a Generic Pharmaceutical Enters.** It is by no means clear, for example, that conduct which allegedly delays generic entry will have the effect of restricting output.[10] Just the opposite often is true. Substantial empirical evidence shows that generic entry does not cause overall use of the drug (*i.e.*, output) to expand and in fact may cause it to decline, likely because the brand company usually discontinues marketing upon generic entry. *See, e.g.*, Markets for Pharmaceutical Products, § 7, at 816 ("[O]n average, the total number of units of the drug consumed, both brand and generic, also falls noticeably" when patent expires and generics enter); Morse, *supra*, at 642 (noting that "net effect" of generic entry may be "a decline in total output"); Addanki Decl. ¶ 14. And preliminary data here indicates that the market for Aggrenox and any AB-rated generics *has not* expanded since the introduction of generics in June 2015; if anything, it has shrunk. *See* Appendix A.

Thus, the available evidence belies any reasonable presumption that a "delay" in generic entry will lead to a restriction in output, and there is no basis for skipping this required element.

**Higher Prices for Branded Pharmaceuticals Do Not, Without More, Reflect**

---

[10] The relevant question is not whether generic output was delayed; it is whether overall output (at a minimum, the sum of the brand plus AB-rated generics) was restricted. *See, e.g., Dominick v. Collectors Universe, Inc*., No. 2:12-cv-04782, 2012 WL 4513548, at *7 (C.D. Cal. 2012) ("Restrictive output exists only when a defendant can limit **marketwide** output by reducing its own output.") (emphasis added); *Kaiser*, 2009 WL 3877513, at *9; Addanki Decl. ¶¶ 11, 14.

***Abnormally High Margins.***   It is notoriously difficult to determine a company's true profit

margin, which generally makes such evidence, at best, a highly ambiguous indicator of market

power.  *See, e.g.*, *Marshfield Clinic*, 65 F.3d at 1412 ("[I]t is always treacherous to try to infer

monopoly power from a high rate of return."); *Doryx*, 2015 WL 1736957, at *7 (plaintiffs'

expert conceded that "margins are 'difficult to measure' and 'imperfect indicators of market

power'").   One major part of the challenge is that standard accounting margins (on which

Plaintiffs have suggested they hope to rely[11]), such as analyzing price relative to marginal cost,

cannot be used for this analysis.  Standard accounting margins, for example, do not appropriately

account for fixed costs, which must be factored in when evaluating market power.  Addanki

Decl. ¶¶ 22-23; *see also* Morse, *supra*, at 674.  The Second Circuit addressed this issue directly

in *Kodak*, holding:

> [E]ven if we were to accept the government's contention that Kodak's short-run
> marginal costs equal one-half of the product's sales price, we do not think that it
> necessarily follows that Kodak is earning monopolistic profits.  Certain deviations
> between marginal cost and price, ***such as those resulting from high fixed costs***,
> are not evidence of market power.

63 F.3d at 109 (emphasis added); *accord Marshfield Clinic*, 65 F.3d at 1412 ("measured rates of

return reflect accounting conventions more than they do real profits (or losses), as an economist

would understand these terms.").

        The need to account for fixed costs in calculating profit margins is settled.  *See, e.g.*, 2B

Areeda & Hovenkamp, Antitrust Law, ¶ 516, at 148 (4th ed. 2014) ("No matter how accurately

measured, of course, a substantial excess of price over marginal cost does not necessarily bring

excess returns on investment. A firm generates excess profit only if price exceeds its average

*total* cost, including its cost of capital."); William M. Landes & Richard A. Posner, *Market*

---

[11] *See* Pls.' Dec. 8, 2015 Letter, at 4, ECF 425.

*Power in Antitrust Cases,* 94 Harv. L. Rev. 937, 939 (1981) ("When the deviation of price from marginal cost . . . simply reflects certain fixed costs, there is no occasion for antitrust concern."); Michael Boudin, Book Review, *Forensic Economics Folded, Spindled, and Mutilated: Economic Analysis and U.S. v. IBM,* 97 Harv. L. Rev. 835, 837 (1984) ("[W]hatever role high profits may play as an indicator of monopoly power, such profits prove nothing if they are simply derived from a company's books through ordinary accounting principles . . . . [A]ccounting conventions produce profit figures that bear little relation to the 'economic profits' that an economist would measure to determine whether the company was making more than a competitive rate of return."); Morse, *supra*, at 671 ("[A]mple literature . . . demonstrates that standard accounting data used to report corporate profits is an unreliable indicator of true economic profits.").

The need to account for fixed costs is even more pronounced in pharmaceutical cases, given the enormous up-front R&D investments and other fixed costs associated with brand pharmaceutical development. *See* Addanki Decl. ¶¶ 10, 22-23. Courts have made clear that any attempt to avoid doing so must be rejected. *See, e.g.*, *Neurontin*, 2013 WL 4042460, at *4 (assessing, among other factors, "sunk R & D costs" in evaluating whether evidence of the brand product's price created a triable issue of market power); *Safeway*, 761 F. Supp. 2d at 887 ("Plaintiffs do not offer evidence that pricing above average marginal cost was necessarily supracompetitive, particularly in the pharmaceutical industry."); *Remeron*, 367 F. Supp. 2d at 681 n.10 ("[W]ithout evidence that sheds light on material factors such as [the brand company's] price relative to its total costs (marginal *and* fixed) and whether output was restricted, monopoly power cannot be found as a matter of law.") (emphasis in original); *accord Ovcon*, 572 F. Supp. 2d at 56. Even normally "high" margins do not imply market power when earned by a company engaged in a high risk business, such as research-based pharmaceutical development. *See*

Addanki Decl. ¶ 10-11, 23.

Focusing on marginal costs in industries with high fixed costs such as pharmaceuticals would find market power in cases where the price is needed to sustain product development. Consider, for example, a company selling a copyright-protected movie that cost more than $100 million to make but for which the incremental cost of producing each new DVD is less than $1. If the company sells the movie for more than $1, it will not necessarily suggest that the company possesses market power, but rather simply reflects the fact that the price must cover all costs, not just marginal costs, *and* allow a reasonable return on investment.  A company that contemplated selling copies of the movie at marginal cost "would never have made [it] in the first place." Herbert Hovenkamp et al., IP and Antitrust § 4.1c, at 4-6 (2d ed. 2015) (using this example). The relationship between price and marginal cost simply does "not provide useful evidence about market power" for products with high fixed costs.  *Id.* at 4-8.

The conclusion is clear: price differences between brand and generic products are insufficient, as a matter of law, to establish market power.  Plaintiffs may rely on such price differences as part of a direct-evidence case, but only in combination with *additional* evidence about restricted output or the defendant's unusually (and persistently) high profit margins.  This additional direct evidence is often highly ambiguous, which is why courts (in pharmaceutical cases and elsewhere) routinely consider indirect evidence of market power as well to place any "direct" evidence in a more realistic market context.  *See* Defs.' Dec. 8, 2015 Letter, at 8-10, ECF 426 (collecting post-*Actavis* decisions considering indirect evidence to evaluate market power).

C.     <u>**Response to Question 2: The Same Principles Apply in Cases Under *Actavis*,**</u>
       <u>**So Evidence of a Price Differential Between a Brand and Its AB-Rated**</u>
       <u>**Generics Would Not Show Market Power in This or Any Similar Case**</u>

In Question 2, the Court asked: "whether, in this case (or in any case brought under *FTC*

*v. Actavis, Inc.,* 133 S. Ct. 2223 (2013)), an allegation of supracompetitive prices can be proved
or disproved directly with sales and pricing data regarding only the allegedly supracompetitively
priced product and its generic(s)."

Once again, the answer to the Court's question is "no."  The rules discussed above apply
with full force to a pharmaceutical reverse payment case brought under *Actavis*.  The legal and
economic principles that do not allow a fact-finder to find market power (let alone compel such a
finding) based solely on price differentials have no less bearing on a case such as this.  Notably,
several cases—decided both before and ***after*** *Actavis*—have applied these same principles in
pharmaceutical reverse payment cases to hold that such evidence is insufficient.  *See supra* at 25.

The Supreme Court in *Actavis* did not discard the antitrust principles that govern all other
§ 1 rule-of-reason cases and instead develop a special rule for market power unique to reverse
payment cases.  Indeed, the Supreme Court disfavors the use of special rules based on formalistic
distinctions for assessing market power.  *See Image Tech. Servs.*, 504 U.S. at 466-67 (rejecting
categorical rule that a company lacking market power in an equipment market cannot have
market power in the aftermarket for service and parts as a matter of law).  The Supreme Court
likewise has disavowed the use of different market-power tests for different industries.  *See
United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 404 (1956).  Against this
backdrop, there is no reason to believe that the Court *sub silentio* adopted a special market power
rule concerning brand and AB-rated products that applies only to pharmaceutical reverse
payment cases.  *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)
("This Court does not normally overturn, or so dramatically limit, earlier authority *sub
silentio*.").

On the contrary, the Supreme Court held that a plaintiff bringing a reverse payment claim

"must prove its case *as in other rule-of-reason cases*."  *Actavis*, 133 S. Ct. at 2237 (emphasis

added).  And the Court squarely rejected the FTC's argument that a "quick look" analysis should

apply to reverse payment claims—a mode of analysis that allows the plaintiff to dispense with

proof of market power and anticompetitive effects.  *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476

U.S. 447, 460-61 (1986).  The Court's embrace of the ordinary rule-of-reason as the framework

for reverse-payment claims demonstrates that market power analysis must proceed under *Actavis*

as in other antitrust cases.  *See* Defs.' Dec. 8, 2015 Letter at 3, ECF 426.  Therefore, just as in

other rule-of-reason cases, including those involving pharmaceuticals, sales and pricing evidence

for a brand product and its generics cannot, without more, establish market power in a case

brought under *Actavis*.  *See supra,* Part I.B.  And if a plaintiff in a case under *Actavis* offered

nothing else to prove market power, its case should be dismissed, as the *Remeron* court properly

concluded.  *See* 367 F. Supp. 2d at 680-84.[12]

> ### D.    Response to Question 3: Discovery Concerning the Definition of an Antitrust Relevant Market Is Material and Necessary—Even If a Plaintiff Makes a Prima Facie Showing of Market Power with Direct Evidence, Defendants Must Be Permitted to Rebut Such Evidence, Including with Traditional Evidence

In Question 3, the Court asked: assuming that sales and pricing data regarding the

allegedly supracompetitively priced brand product and its generics can prove or disprove market

power in a case under *Actavis*, "whether, in such a case, an explicit articulation of (and discovery

and argument on) antitrust market definition is necessary or material."

The answer to the Court's question is "yes."  An explicit articulation of (and discovery

---

[12] In *Actavis*, the Supreme Court discussed that the size of a reverse payment may provide some evidence of market power.  We do not understand the Order to Show Cause to ask for further briefing on that issue, so we have not addressed it further here.  In any event, as Defendants showed in the prior briefing, the discussion in *Actavis* shows that the Supreme Court did not intend for the presence of even a large and unjustified reverse payment to provide *conclusive* evidence of market power, because the Court suggested only that the size of a payment may be an "***indicator***" of such power.  *See* Defs.' Dec. 8, 2015 Letter at 3, ECF 426.

and argument on) the relevant antitrust market is material and necessary in any rule-of-reason

case – including an *Actavis* rule-of-reason case.  As the previous discussion shows, the answers

to Questions 1 and 2 are "no," which alone means that discovery about relevant market is

necessary.  In this section, Defendants focus on the point that relevant market discovery remains

material and proper even if the Court were to disagree with Defendants about Questions 1 and 2.

Even if a plaintiff could make a prima facie showing of market power with direct

evidence (for example, with evidence of a price differential and evidence suggesting an

abnormally high profit margin that accurately accounts for fixed costs), it does not follow that

such evidence is dispositive and cannot be rebutted.  Indeed, the Second Circuit has ***rejected*** that

very argument.  *See Kodak*, 63 F.3d at 109 ("Even if the government's evidence [based on profit

margins] in this regard supported an inference of market power, and we are not persuaded that it

does, it certainly did not compel such an inference."); *Geneva*, 386 F.3d at 497 ("Nor do we treat

pricing as dispositive . . . ."); *accord IGT v. Alliance Gaming Corp.*, No. 2:04-CV-1676, 2008

WL 7071468, at *8 (D. Nev. Oct. 21, 2008) (holding that "higher profit margins may be

considered by a jury as evidence of wheel games being the relevant market" but are "not

dispositive").  Direct evidence is "rarely available" (*supra* Parts I.A & I.B), is always subject to

challenge, and certainly will be in this case.  In such situations, as the Second Circuit recognized

in *Geneva*, evidence of market definition and market share is necessary to properly analyze the

state of competition.  *See* 386 F.3d at 500 ("Where direct evidence is unavailable or

inconclusive, as here, monopoly power may be inferred from high market share"); *see also

Remeron*, 367 F. Supp. 2d at 680 n.8 (even where courts have considered direct evidence, they

have found such evidence inconclusive and ultimately turned to "traditional market power

analysis instead").

And while a plaintiff may assert that its direct evidence will be unambiguous (a concept that courts have treated with skepticism), a court cannot preemptively assume the correctness of plaintiff's **contention** when making decisions about permissible discovery.  Therefore, even if a plaintiff were to make such a claim, it is no reason to foreclose discovery for the defendant seeking to mount a proper rebuttal.  As the Second Circuit recognizes, market share evidence is "highly relevant" to market power.  *Geneva*, 386 F.3d at 500.

Defendants have found no case in which discovery on market definition was foreclosed (or indirect evidence was deemed inadmissible) simply because a plaintiff proposed that it would rely on direct evidence.  Indeed, even when the plaintiff relies on direct evidence, courts hold that the evidence must be evaluated against at least "rough contours" of a relevant market.  *See, e.g.*, *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) ("antitrust plaintiff [may not] dispense entirely with market definition," but rather, direct evidence may establish market power if "a plaintiff can show the rough contours of a relevant market"); *Neurontin*, 2013 WL 4042460, at *3 ("Plaintiffs must define, at least with a degree of approximation, the relevant market in their analysis under the direct evidence method.").[13]  Nor have we found a case granting summary judgment to a plaintiff on the issue of market power based on direct evidence.  Evidence that a defendant has only a modest share of a properly defined market, which is inconsistent with market power, necessarily casts doubt on any proffered direct evidence, especially the simplistic price differential data advanced by Plaintiffs

[13] The sole authority in Plaintiffs' December 8 submission for their contention that indirect evidence "is not necessary to prove, and cannot disprove, Defendants' market power"—*Todd*, 275 F.3d at 206—does not support that assertion.  *See* Pls.' Dec. 8, 2015 Letter at 6 n.4.  *Todd* merely noted, on a 12(b)(6) motion, that direct evidence of an actual adverse effect on competition "**arguably**" can be more persuasive than market share evidence.  The court certainly did not hold that direct evidence is irrefutable, let alone that it precludes discovery on relevant market issues.

here.  *See, e.g.*,  *Kodak*, 63 F.3d  at 109 (rejecting direct evidence based on the "Lerner Index," which measures the difference between prices and marginal cost, because it was "contradicted by . . . findings" concerning "the elasticities of supply and demand" that were used to determine the relevant market); *Kaiser*, 2009 WL 3877513, at *9 (holding that the plaintiff's "direct evidence" concerning drug pricing was unpersuasive and could not overcome "the insurmountable obstacles presented by the undisputed evidence in this case in defining the relevant market").

Indeed, numerous courts in pharmaceutical cases have entertained "market definition" evidence in the face of purported direct evidence and found triable issues based on such competing evidence.  *See* Defs.' Dec. 8, 2015 Letter at 8-10, ECF 426 (discussing *Nexium, Provigil, Ovcon*, and *Doryx* cases).  In *Nexium*, the only post-*Actavis* case yet to reach trial, the court admitted defendants' market-share evidence and instructed the jury to weigh it against plaintiffs' purported direct evidence.  Jury Charge Tr. at 31:15-17; 32:6-14; 33:1-6, *Nexium Antitrust Litig.*, No. 12-md-02409-WGY (Dec. 3, 2014), ECF 1441 (instructing jury that to answer whether AstraZeneca "exercise[d] market power within the relevant market," it had to consider indirect evidence from AstraZeneca "that the market isn't just Nexium, but the whole market for proton pump inhibitors").

In short, in a case under *Actavis*, as in other rule of reason cases, defendants should be permitted discovery into the competition between their products and other competing products— here, for example, competition between Aggrenox and other antiplatelet agents, including Plavix and generic clopidogrel.

###  E.    The *Cellophane* Fallacy Concept Provides No Basis for Limiting Relevant Market Discovery—Indeed, It Supports Discovery

Nothing about the "*Cellophane* fallacy" limits the product market inquiry or otherwise suggests that discovery on relevant market is unnecessary here.  As the Order to Show Cause

notes, the *Cellophane* concept arose from academic critique of the Supreme Court's ruling in *United States v. E.I. DuPont de Nemours & Co. See* Order to Show Cause at 2 n.1 (citing 351 U.S. 377 (1956)).  As the Second Circuit noted, in discussing criticisms of the decision, the insight provided by the *Cellophane* fallacy is that the existence of high cross-elasticity of demand between a defendant's product and other products—normally understood as powerful evidence that the products compete in the same relevant market[14]—"may, in some cases," be consistent with the existence of market power.  *See Kodak*, 63 F.3d at 105.  The *Cellophane* concept is an interpretive aid in the market power analysis—a reminder that high cross-elasticities might not rule out market power in some cases.  In short, the mere possibility of a *Cellophane* issue is no reason to foreclose discovery, but instead is reason to allow discovery to inquire into *Cellophane* issues.  Addanki Decl. ¶¶ 26-29.

***Kodak* Shows that Mere Possibility of a *Cellophane* Issue Cannot Bar Inquiry into Broader Market.**  The *Kodak* case itself demonstrates that a fact-finder can reasonably conclude that a defendant lacks market power, even when one party presents supposed direct evidence and then invokes the *Cellophane* fallacy to counter a broader market definition.  There, the government asserted that it had direct evidence of Kodak's market power.  *See* 63 F.3d at 105-09 (discussing "three types of direct evidence of market power offered by the government").  But, after hearing all the evidence, the trial court credited the defense expert's explanation about why he had not committed the *Cellophane* fallacy, and held that Kodak competed in a broader market in which it lacked market power.  *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1470-

---

[14] *E.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008); *Kodak*, 63 F.3d at 104; FTC & DOJ, Horizontal Merger Guidelines at 7 (Aug. 19, 2010) ("Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase . . . .").

71 (W.D.N.Y. 1994).  On appeal, the Second Circuit affirmed, specifically noting that "we do not believe that the district court fell victim to the *Cellophane* fallacy."  *Kodak*, 63 F.3d at 105.

The Second Circuit's decision makes clear that direct evidence does not automatically trump indirect evidence, and that the *Cellophane* fallacy does not mandate finding market power whenever one product is priced higher than another.  Instead, courts simply note that the *Cellophane* fallacy is a concept to keep in mind to avoid over-interpreting market share evidence.  *See, e.g.*, *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) (noting that *Cellophane* fallacy "may complicate matters" but considering plaintiff's proposed market definition and defendant's evidence in opposition); *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 257-58 (S.D.N.Y. 2000) (considering PepsiCo's invocation of the *Cellophane* fallacy alongside Coca-Cola's evidence regarding the relevant market and rejecting PepsiCo's argument); *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C93 20613 RMW, 1995 WL 853037, at *10 (N.D. Cal. Sept. 7, 1995) (finding genuine issue of material fact regarding monopoly pricing despite plaintiff's invocation of *Cellophane* fallacy).  As one commentator has explained:  "Where a plaintiff merely presumes the existence of the *Cellophane* fallacy, rather than proving its applicability to the case at hand, courts should continue to reject the argument." Morse, *supra*, at 673.

***No Court Has Used Cellophane Fallacy to Bar Discovery.***  Our research uncovered no case holding that the potential for a *Cellophane* issue provided a reason to deny discovery or limit the relevant product market as a matter of law.   In *Blue Cross & Blue Shield of Wisconsin v. Marshfield Clinic*, the district court relied on the *Cellophane* fallacy to find market power, but was reversed.  883 F. Supp. 1247, 1254 (W.D. Wis. 1995) (*Marshfield I*) ("HMOs may be interchangeable with indemnity insurance when they are priced at monopolistic levels, as is

[defendant] HMO . . . ."), *rev'd in part*, 65 F.3d at 1409-12 (concluding defendant was not a monopolist of HMO services because HMOs did not constitute a separate market). While it is possible that proper application of the *Cellophane* fallacy ***could*** result in a narrow market definition, that merely proves Defendants' point—in some cases the market may be narrow despite apparent price competition, but in other cases the market is broader. Discovery is needed to determine which is the right result.

The Second Circuit's decision in *Kodak* and the other cases also show that, to the extent the *Cellophone* fallacy is relevant to assessing market power, it is appropriately considered only after a full record is developed in discovery. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 769 F. Supp. 2d 684, 697 n.16 (D. Del. 2011) (briefly discussing *Cellophane* fallacy in opinion denying motion for a new trial); *Oracle*, 331 F. Supp. 2d at 1121 (briefly discussing *Cellophane* fallacy in opinion following trial and additional post-trial evidentiary proceedings); *PepsiCo*, 114 F. Supp. 2d at 257-58 (rejecting *Cellophane* fallacy at summary judgment stage); *Santa Cruz*, 1995 WL 853037, at *10 (rejecting plaintiff's *Cellophane* fallacy argument at summary judgment); *Marshfield I*, 883 F. Supp. at 1255 (post-trial motion for judgment as a matter of law); *but see E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 683 F. Supp. 2d 401, 411 (E.D. Va. 2009) (dismissing amended counterclaim for monopolization and attempted monopolization for failure to sufficiently plead a relevant geographic market), *rev'd* 637 F.3d 435 (4th Cir. 2011) (reversal of decision was not based on *Cellophane* fallacy analysis).[15]

**_Cellophane Fallacy Unlikely to Apply Here._** There is also good reason to believe that the *Cellophane* fallacy will not apply to the facts of this case. The *Cellophane* fallacy typically

---

[15] Although the Supreme Court seemed to recognize the *Cellophane* fallacy principle in *Image Technical. Services*, the Court did not decide the scope of the relevant market; rather, it found that there was a triable *issue of fact*. 504 U.S. at 477. Nor did the Court comment on the scope of appropriate discovery, but remanded in part because the record was too "sparse."

raises concerns in cases where the allegedly competing products are poor substitutes for each

other, but the monopolist's products "are so overpriced that even inferior substitutes begin to

look good to consumers." *Kodak*, 63 F.3d at 103.  For example, in the Supreme Court case that

gave birth to the fallacy, cellophane was highly differentiated from other alleged substitutes like

wax paper because cellophane alone "combine[d] the desirable elements of transparency,

strength and cheapness."  351 U.S. at 398.  Thus, there was reason to believe that cellophane

consumers would not have switched to, say, wax paper unless the cellophane was priced at

monopoly levels.  By contrast here, Defendants submit that the evidence will show that

Aggrenox is not highly differentiated in an economic sense from therapeutic substitutes like

Plavix, and that the requested discovery will help to confirm that decision-makers—such as

physicians and PBMs—regard the products as substantially interchangeable.

      In short, the *Cellophane* fallacy does not restrict the categories of evidence a jury may

consider or the range of conclusions a jury may draw from that evidence.  If anything, the

possible application of the *Cellophane* fallacy is a reason to *obtain* discovery to allow the fact-

finder to consider all the evidence, not to limit it.

## II.      EXISTING EVIDENCE SHOWS THE MATERIALITY OF DISCOVERY ABOUT OTHER ANTIPLATELET PRODUCTS

### A.      In This Case, There Is Ample Basis for Market Discovery That Is Broader than Aggrenox and AB-Rated Generics

#### 1.      Institutions in the Pharmaceutical Marketplace Create Strong Price Competition Across Branded Products, Even When They Are Protected by Patents

Generic drugs are by no means the sole source of price competition for branded

pharmaceuticals.  Before (and after) generic entry, branded drugs that treat the same ailments

compete along multiple dimensions, including price.  The degree of such competition varies

from category to category depending on the number of different drugs competing to treat the

condition, the degree each drug differs (in terms of efficacy, side effects, etc.), and the size of the

patient base, among other factors.   Competition across branded products in a particular category

can be fierce, even while all the products remain under patent protection. And a brand still under

patent protection will often also have to compete vigorously with generics for other drugs in the

category.   Such cross-drug competition is particularly likely when the products are not highly

differentiated in therapeutic effect.   Unless they can find a way to differentiate themselves, the

products in that category likely lack appreciable pricing power.   Addanki Decl. ¶ 9.   By contrast,

the competition may be more muted when a particular brand is more highly differentiated in its

therapeutic profile, and/or when there are fewer close therapeutic alternatives.   In short, the

market power inquiry is highly fact-specific.

As discussed, price competition among prescription drugs is driven largely by third-party

payors or "TPPs," such as insurance companies—including Humana and other Plaintiffs in this

case.   Most patients in this country are covered by some form of health insurance, and most

insurance plans operate their drug benefits using a formulary—a list of drugs—that places drugs

on different coverage tiers.   *See generally Abbott Labs. v. Sandoz, Inc*., 500 F. Supp. 2d 807, 844

(N.D. Ill. 2007).   One court aptly described the system as follows:

> Each TPP maintains a formulary that ranks pharmaceutical drugs by tiers. Tier 1
> has the lowest co-pay, followed by Tier 2, and so on.   These tiers enjoy relatively
> high patient demand.   Tier 1 consists primarily of generic drugs, while Tier 2
> consists of preferred branded drugs.   Tier 3 pharmaceuticals are typically branded
> products that have a generic alternative; they are assigned a higher co-pay and
> face reduced patient demand.   Sometimes there is another tier that is non-
> reimbursed where the patient is required to pay 100% of the cost.   Pharmaceutical
> companies . . . must negotiate prices with these TPPs to be placed on the
> preferred, or second, tier. . . .   TPPs wield considerable leverage in negotiating
> with pharmaceutical companies.

*AstraZeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 579, 609 (D.N.J. 2009), *supplemented*, 623 F.

Supp. 2d 615 (D.N.J. 2009), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010); *see also Schneiderman*, 787

F.3d at 655 n.29; Markets for Pharmaceutical Products, § 6.2.1, at 810 (insurers and PBMs "create price competition among branded therapeutic substitutes by means of formulary tiers").

Even before generics enter, TPPs use their buying power to extract price concessions from branded drug manufacturers in return for favorable formulary placement, *i.e.*, for placement on tier 2 (preferred brand) rather than tier 3 (non-preferred brand). *See, e.g.*, *Astrazeneca AB v. Apotex Corp.*, 985 F. Supp. 2d 452, 467-68 (S.D.N.Y. 2013), *aff'd in part, rev'd in part*, 782 F.3d 1324 (Fed. Cir. 2015) ("Managed care health plans and PBMs often use formularies to encourage doctors and pharmacists . . . to prefer one branded drug over another."). Drug makers, in turn, compete by offering lower prices (usually in the form of more significant rebates), to protect access to the patients covered by the TPPs. As one paper describes this dynamic:

> When negotiating with a plan with a multiple-tier formulary, if the manufacturer insists on a high drug price it risks banishment to the third tier, where patients have the largest copayment, or not even being on the formulary, in which case the consumer pays the entire price out-of-pocket. Offering a low price to the plan buys favorable formulary placement, with the lower patient copayments increasing the quantity demanded of the drug.

Ernst R. Berndt et al., *A Primer on the Economics of Prescription Pharmaceutical Pricing in Health Insurance Markets* 16 (NBER, Working Paper No. 16879, 2011). This ability of formularies to steer utilization is often referred to as "moving market share" or "shifting share." Navarro Decl. ¶ 21. Empirical studies show that—again, depending on the degree of therapeutic similarity across products—these types of formulary controls can have a significant effect on which products get used. *See, e.g.*, Markets for Pharmaceutical Products, § 4.2.3 at 791 ("[E]lasticities in response to co-payments have been shown to be substantial.").[16]

These institutional features of pharmaceutical markets can lead to intense price

---

[16] *See also* David B. Ridley, *Payments, Promotion, and the Purple Pill*, 24 Health Econ. 86, 98 (2015) (concluding "when a drug has branded substitutes, its relative copayment can have a considerable effect on demand").

competition between branded drugs (as well as, say, branded drug A and the generic equivalent of branded drug B), and evidence of such competition is directly relevant to assessing whether a particular product has market power in an antitrust sense.

> 2. There Already Is Substantial Evidence Showing That Aggrenox Competes in a Broader Market in Which Aggrenox Lacks Market Power

The relatively small sample of evidence already before the Court on Defendants' Motion to Compel Product Market Discovery, Dkt. 348—including evidence from Plaintiffs' own documents and BIPI's contemporaneous business records—shows that Plaintiffs, Defendants, third parties in the industry, and medical authorities all consider several other oral antiplatelet treatments to be significant competitors to Aggrenox, and that Aggrenox's pricing is significantly constrained by the presence of these competitors.

***Plaintiff Humana's Documents Admit Plavix and Its Generic Equivalents Are Substitutes for Aggrenox.*** To take just one example, Plaintiff Humana's own publicly available documents demonstrate that managed care payors view Aggrenox and Plavix as substitutes and head-to-head competitors. These payors have actively required substitution of Aggrenox with Plavix, shifting patients from Aggrenox to generic Plavix based on price differential. *See* Pace Decl. Ex. 36 at ██████████████████████████████████████████████ ██████████████████████████████████████████████████████); Ex. 4 at 42 (2015 Humana Walmart Rx Formulary, Prescription Drug Guide, requiring step therapy for Aggrenox); Ex. 5 at 2 (Humana patient drug guide listing generic clopidogrel (Plavix) as an "alternative" for branded Aggrenox).[17]

---

[17] Pace Decl. Ex. 6 at 96 (2015 Humana Illinois List of Covered Drugs, which includes Plavix but excludes Aggrenox, demonstrating health insurer's power to force consumers to use Aggrenox substitutes); Ex. 7 (Humana's Maximize Your Benefit RX program, showing how health insurer TPPs like Humana actively encourage pharmacists to work with patients, ***after a prescription has been written***, to contact doctors to switch prescription to therapeutic

The minimal discovery from Humana thus far confirms that Humana possesses non-public documents recognizing that Aggrenox competes with antiplatelet treatments.  Since the motion to compel, Humana produced documents showing ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████[18] ██ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████[19] ████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ *See* Pace Decl. Ex. 10 at ██ ████████████████████████████████████████████████████████ ████████████████████████████████████.  Where, as here, ***plaintiffs' own business documents*** recognize a broader market, courts have rejected the plaintiffs' attempt to claim the opposite in litigation.[20]

---

alternative); *see also* Defs.' Mem. in Support of Mot. to Compel Product Market Discovery at 9-10 (Aug. 29, 2015), ECF 348-1 ("Mot. to Compel"); Defs.' Reply In Supp. of Defs.' Mot. to Compel Product Market Discovery at 1-2, 4 (Oct. 9, 2015), ECF 386.

[18] Pace Decl. Ex. 8 at ████████████████████████████████████████████ ██████████████.

[19] Pace Decl. Ex. 9 at ████████████████████████████████████████████

[20] *See, e.g.*, *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 769-70 (D.N.J. 1995) (dismissing plaintiff's Section 1 claim for failing to establish a product market of a single brand when deposition testimony of plaintiff's president undermined such a theory); *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97, 130, 132 (D. Del. 1988) (granting summary judgment on plaintiff's Section 2 monopolization claims and finding

**_BIPI Documents Confirm Aggrenox Competes in Broader Market._**  BIPI's
contemporaneous business records confirm that it did not view itself as a monopolist and that it
faced (and faces) vigorous competition from other non-AB rated drugs.[21]  For example,



Indeed, BIPI attempted to unseat Plavix by investing in the world's largest study on
secondary stroke prevention.[27] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

persuasive the argument that a "product cannot constitute a relevant product market where
plaintiffs' own allegations show that there is vigorous competition from substitute products of
other manufacturers").

[21] Mot. to Compel at 11-14.

[22] Pace Decl. Ex. 11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[23] Pace Decl. Ex. 12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[24] Pace Decl. Ex. 13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[25] Pace Decl. Ex. 14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; _see also_ Mot. to
Compel at 12-13.

[26] Pace Decl. Ex. 11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[27] _See_ Pace Decl. Ex. 15 (PharmaTimes, _Patient Recruitment Complete in Stroke Mega-Trial_
(Oct. 27, 2006); Ex. 16 (_PROFESS Trial Published: Combination Therapy Falls Short of
Noninferiority vs Clopidogrel_, Medscape Medical News (Aug. 28, 2008)).



***Public Industry Documents Confirm Aggrenox Competes with Other Antiplatelets.***

Moreover, a wide range of publicly available material from government and private sources

underscores the competition between Plavix and Aggrenox and the implausibility of portraying

Aggrenox as a "monopolist."  *See* Mot. to Compel, 14-16.  For example, state Medicaid

Pharmacy and Therapeutics ("P&T") Committee materials from around the country include

Aggrenox within the same market as other antiplatelets such as Plavix.[30]

Likewise, public materials from prominent third-party payors (and members of the

putative end-payor class) recognize that Aggrenox is interchangeable with other antiplatelets and

promote physician and patient switching from Aggrenox to other non-AB rated drugs, including

Aspirin and generic Plavix.  Pace Decl. Ex. 21 (2009 Aetna Preferred Drug List, listing, among

---

[28] Pace Decl. Ex. 17 at ███████████████████████████████████
███

[29] *Id.*

[30] *See* Mot. to Compel at 1-2 & n.1; Pace Decl. Ex. 18 (Ohio Dep't of Job and Family Servs. P&T Comm. Minutes, 2010, including a pie chart of "Platelet Aggregation Inhibitors: Market Share" including ***Plavix, Aggrenox, Cilotazol*** and "other,"— and listing for ***Plavix a 91% market share*** and ***Aggrenox at only 3%*** market share); Ex. 19 (Magellan Medicaid Administration Report, 2013, defining *Aggrenox*, *Plavix*, *Persantine*, *Effient*, *Brilinta*, *and ticlopidine* as within the same "Therapeutic Class Review" of "Platelet Aggregation Inhibitors"); Ex. 20 at 9 (Alaska Medicaid P&T Comm. Minutes, 2014, listing *clopidogrel*, *Plavix*, *dipyridamole*, *Aggrenox*, *Brilinta*, *Prasugrel*, *ticagrelor* (*Brilinta*), and *Effient* in the same class of "Platelet Aggregation Inhibitors").

others, Plavix, Pletal and Ticlid as alternatives to Aggrenox), Ex. 22 (Anthem Blue Cross Blue

Shield Provider Bulletin (May 14, 2009), advising providers to "transition your members to the

Formulary alternatives" and listing Aspirin and Plavix as formulary alternatives to non-

formulary Aggrenox), Ex. 23 (2015 AARP Comprehensive Formulary, identifying coverage for

"Platelet Modifying Agents" including Aggrenox (tier 4 – least favorable), Brilinta (tier 3),

generic Pletal and generic Plavix (tier 2 – most favorable); *see also* Pace Decl. Ex. 24 at 23

(Blue Cross Blue Shield of Michigan Custom Drug List, July 2015).  Medical literature and

standards of care are to the same effect.[31]

In short, the available evidence strongly supports that Aggrenox cannot be viewed as a

monopolist, but rather is a small player forced to compete against a much larger player (Plavix).

This evidence underscores the need for fuller discovery to delineate the contours of the market

and rebut Plaintiffs' attempt to rely on direct evidence.

> 3.   Denying Defendants the Requested Discovery of Other Products Would
>       Raise Significant Due Process Concerns

Although Defendants already have developed significant evidence reflecting the

competition faced by Aggrenox, it is far from comprehensive.  Defendants are confident that

further targeted discovery will only enhance the case that Aggrenox cannot be viewed as a

monopoly.  Foreclosing access to discovery will prevent Defendants from maintaining a defense

to an essential element of Plaintiffs' case that may be dispositive of this litigation.

Although district courts have broad discretion in ruling on discovery matters, discovery

---

[31] *See* Pace Decl. Ex. 25 (*Aspirin Should be First-Line Antiplatelet Therapy in the Secondary Prevention of Stroke*, 33 Stroke 1943, 2137-40 (Am. Heart Assoc. Aug. 2002) 2137-40); Ex. 26 (*Guidelines for Prevention of Stroke in Patients with Ischemic Stroke or Transient Ischemic Attack, A Statement for Healthcare Prof'ls from the Am. Heart Assoc./Am. Stroke Assoc. Council on Stroke* (2006)); Ex. 27 (*Antithrombotic Therapy and Prevention of Thrombosis, American Coll. of Chest Physicians Evidence-Based Clinical Practice Guidelines* (9th ed. Feb. 2012 Supplement)); Mot. to Compel at 16.

rulings based on errors of law are *per se* abuses of discretion.  *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68 (2d Cir. 2003); *Gray v. Bd. of Higher Educ., City of New York*, 692 F.2d 901, 905-06 (2d Cir. 1982).  As shown above, a ruling foreclosing product-market discovery based on the view that market power can be established based on price differentials between brand and generic pharmaceuticals alone would be a reversible error of the law.

A district court also commits reversible error "when the discovery is so limited as to affect a party's substantial rights," including the rights of the defendant to rebut an essential element of a plaintiff's claim.  *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir. 1985).  Moreover, "[d]ue process mandates that a judicial proceeding give all parties an opportunity to be heard on the *critical and decisive allegations* which go to the *core* of the parties' claim or defense and to present evidence on the contested facts."  *Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir. 1992); *accord In re Complaint of Bankers Tr. Co.*, 752 F.2d 874, 890 (3d Cir. 1984) (same).  There is no question that market power is a critical issue in this case.  Indeed, this Court has indicated that the issue has the potential to be dispositive.  *See* Nov. 30, 2015 Tr. at 29 ("I think this issue is potentially dispositive."), 44 ("So it's an early dispositive issue."), 58 ("As I've said, I think it's dispositive, not necessarily one way or the other, but it's dispositive one way; it changes the case the other way.").  If Defendants are not allowed to discover evidence on the contours of the product market, they will be severely hamstrung, raising significant due process concerns.

If this Court rules that discovery into the broader market is foreclosed because, in the Court's view, the relevant market in this case is limited to branded Aggrenox and its generic equivalents, the ruling would be tantamount to partial summary judgment for Plaintiffs on an

essential element of their case.  Rule 56(f) requires that summary judgment not be granted without "notice and a reasonable time to respond" and only "after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f)(3); *see also Farouki v. Petra Int'l Banking Corp.*, 705 F.3d 515, 516-17 (D.C. Cir. 2013) (vacating sua sponte summary judgment for failure to provide sufficient "notice and opportunity to respond").  Under Rule 56(d), Defendants may request additional "time to . . . take discovery," and Defendants believe such additional time is necessary here.  *See Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 386 (2d Cir. 2001) (vacating district court's summary judgment for failure to provide a fair "opportunity to take discovery and rebut the motions"); *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) (finding that a "nonmoving party should not be 'railroaded' into his offer of proof").

## B.     Defendants Have Narrowed Their Requests About Products Other than Aggrenox to Reduce the Discovery Burden

Defendants believe their discovery requests are reasonable in light of the dispositive nature of the market power issue, but have been working diligently to narrow their requests further and to reach reasonable accommodations with Plaintiffs.  To date, however, Plaintiffs have insisted on limiting their searches to those documents that mention Aggrenox or dipyridamole.  After the November 30, 2015 hearing on Defendants' motions to compel, Defendants further narrowed their requests by agreeing, as part of a potential compromise, to drop all requests relating to Brilinta, Persantine, Effient, Pletal, and Ticlid.  Plaintiffs would need only search their files for documents relating to Aggrenox, Plavix, and Aspirin, and the generic equivalents of those drugs, and produce transactional data for Aggrenox and Plavix and their generic equivalents.  Plaintiffs would not need to produce any transactional data for Aspirin.[32]

---

[32] *See* Pace Decl. Ex. 28 (Email from P. Carney to P. Kohn, dated December 8, 2015).

On December 17, 2015 the parties conferred again on the phone.  Defendants agreed to send separate proposals to each Plaintiff group, further narrowing the relevant categories of documents at issue in their motions to compel; Plaintiffs agreed to consider Defendants' proposal, and DPPs expressed a willingness to produce some transactional data on Plavix sales. On January 4, 2016, Defendants sent each set of Plaintiffs a separate email specific to that Plaintiff group narrowing Defendants' requests even further.[33]

In response, certain Plaintiffs agreed to produce, or assess their burden relating to producing, certain material regarding Plavix and its generic equivalents, but demanded limitations that are unacceptable to Defendants.[34]  Putting aside the back and forth, the parties have come a long way toward resolving their dispute since Defendants filed their motions to compel, but disagreements remain.  Defendants have worked to narrow the requested materials down to the bare essentials that they and their experts believe is necessary.  While some Plaintiffs have conditionally agreed (as part of a potential compromise) to produce some of this

---

[33] *See* Pace Decl. Ex. 29 (Email from P. Carney to S. Perwin, dated Dec. 23, 2015); Ex. 30 (Email from P. Carney to P. Kohn, dated Dec. 23, 2015); Ex. 34 (Email from C. Holding to S. Shadowen, dated Dec. 23, 2015); Ex. 35 (Email from C. Holding to P. St. Philip, dated Dec. 23, 2015).  Additionally, CVS has just filed a complaint in this case (Complaint, *CVS Pharmacy, Inc. v. Boehringer Ingelheim Pharma GmbH & Co. et al.*, No. 16-cv-00159 (M.D. Pa. Jan. 29, 2016); CVS operates one of the largest PBMs in the country and will undoubtedly have responsive information.

[34] *See* Pace Decl. Ex. 31 (Email from S. Perwin to P. Carney, dated Jan. 4, 2016); Ex. 32 (Email from P. St. Philip to C. Holding, dated Jan. 8, 2016); Ex. 33 (Email from P. Kohn to P. Carney, dated Jan. 4, 2016).  For example, Retailer Plaintiffs insist on limiting their searches for responsive documents (even those related to Aggrenox) to employees in their purchasing departments.  Thus, the files of employees in sales and marketing on the consumer-facing side of Retailer Plaintiffs' businesses—the people most likely to have documents relating to the interchangeability of Plavix and Aggrenox—would be immune from discovery.  Retailer Plaintiffs even refused to produce documents relating to their PBM businesses.  As described above, PBMs create and enforce drug formularies, and are central to fostering intense brand-to-brand competition in pharmaceutical markets.  Navarro Decl. ¶¶ 21-30.  But Retailers have refused to produce any documents, or indeed even provide any information (including organization charts) regarding their extensive PBM operations.  Pace Decl. Ex. 31 (Email from S. Perwin to P. Carney, dated Jan. 4, 2016).

material, none have agreed to produce all of it.  But in essence, Defendants have narrowed their

market definition requests to the following main categories of documents and data:[35]

- Sales, purchase, and reimbursement data, including contracts, for branded Aggrenox and Plavix, and their generic equivalents, including profitability, relative profitability, and any adjustments to price data such as rebates, chargebacks, or other discounts;

- Documents concerning the market share, promotion or marketing of Aggrenox, Plavix, or Aspirin, or their generic equivalents;

- Documents concerning comparisons, competition, substitution, potential competition or substitution, or interchangeability between and among Aggrenox, Plavix, and Aspirin, and their generic equivalents; and

- For plans that utilize formularies, step edits, step therapy, or preferred drug lists, all documents concerning review, analysis, or consideration of Aggrenox, Plavix, or Aspirin, or their generic equivalents for inclusion thereon, including the formularies.

Defendants submit that such narrowed requests are reasonable and appropriate given the

importance of the issues to the case and the stakes involved in this litigation.

## CONCLUSION

The answers to the questions posed by the Court point to a single conclusion.  Even

though Plaintiffs are permitted to proceed under a direct evidence approach, and even assuming

*arguendo* that Plaintiffs could present sufficient direct evidence to survive summary judgment,

Defendants still have a right to challenge Plaintiffs' evidence in part by showing that Aggrenox

competes rigorously in a broader market and never possessed market power.  Defendants

therefore must be permitted discovery on a broader range of products than Aggrenox and AB-

rated generic equivalents.

---

[35] For the sake of brevity, Defendants describe the market definition documents and data they seek at a high level.  The specifics are delineated in emails they recently sent to Plaintiffs.  *See* Pace Decl. Ex. 29 (Email from P. Carney to S. Perwin, dated Dec. 23, 2015); Ex. 30 (Email from P. Carney to P. Kohn, dated Dec. 23, 2015); Ex. 34 (Email from C. Holding to S. Shadowen, dated Dec. 23, 2015); Ex. 35 (Email from C. Holding to P. St. Philip, dated Dec. 23, 2015).

Dated:  February 5, 2016       Respectfully submitted,

*/s/  Robert A. Milne*
Robert A. Milne (pro hac vice)
Jack E. Pace III (pro hac vice)
Alison Hanstead (pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

J. Mark Gidley (ct 22743)
Peter J. Carney (ct 24721)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355

Richard P. Colbert (ct 08721)
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, CT 06901
Telephone: (203) 977-7300
Facsimile: (203) 977-7301

*Counsel for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*

*/s/  Christopher T. Holding*
Christopher T. Holding (ct 29474)
Robert D. Carroll (pro hac vice)
Sarah K. Frederick (pro hac vice)
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231

James T. Shearin (ct 01326)
PULLMAN & COMLEY, LLC
850 Main St., P.O. Box 7006
Bridgeport, CT 06601-7006

41

Telephone: (203) 330-2000

*Counsel for Defendants Teva Pharmaceuticals USA, Inc., Barr Pharmaceuticals Inc. (n/k/a Barr Pharmaceuticals, LLC), Barr Laboratories Inc., Duramed Pharmaceuticals Inc. (n/k/a Teva Women's Health Inc.), and Duramed Pharmaceuticals Sales Corp. (n/k/a Teva Sales and Marketing, Inc.)*

# APPENDIX A
# (Filed Under Seal)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 5, 2016, I caused a true and correct copy of the foregoing Defendants' Memorandum in Response to the Court's Order to Show Cause, Declarations in support thereof, and Exhibits to be served through the CM/ECF system and by e-mail upon all counsel of record.

Copies of the unredacted Memorandum, Declarations in support thereof, and supporting Exhibits will be served manually on the Court and have been or will be served by email to counsel of record and/or parties, as applicable.

Date:  February 5, 2016

By:  _____/s/ *Teddy Kristek*_____
     WHITE & CASE LLP
     701 Thirteenth Street, NW
     Washington, DC 20005
     Telephone: 202-626-3600
     Facsimile: 202-639-9355

43