UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: AGGRENOX ANTITRUST LITIGATION <br><br> This document relates to: <br><br> *Walgreen*  (No. 3:15-cv-559) <br> *Rite Aid*  (No. 3:15-cv-618) | MDL DOCKET NO. 2516 <br><br> Case No. 3:14-md-02516-SRU |

**RETAILER PLAINTIFFS' MEMORANDUM**
**IN RESPONSE TO ORDER TO SHOW CAUSE**

## TABLE OF CONTENTS

ARGUMENT ........................................................................................................................... 3

  I.   PROOF OF SUBSTANTIAL MARKETWIDE OVERCHARGES CAN ESTABLISH
       THAT THE DEFENDANT HAS EXERCISED MARKET POWER ................................. 3

  II.  SUPRACOMPETITIVE PRICING AND MARKET POWER CAN BE PROVEN
       DIRECTLY FROM PRICING AND COST DATA ....................................................... 9

  III. THE DISCOVERY SOUGHT WOULD NOT ASSIST THE PARTIES OR THE
       COURT IN DEFINING THE RELEVANT MARKET .................................................. 11

     A.  Partial Data Cannot Be Used To Define the Relevant Market ................................... 13

     B.  Cross-Elasticity At Current Prices Is Irrelevant to Market Definition ...................... 14

CONCLUSION ...................................................................................................................... 16

CERTIFICATE OF SERVICE ............................................................................................... 17

TABLE OF AUTHORITIES

**Cases**

*AD/SAT v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ................................................................. 13

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ......................................................... *passim*

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) ................................................................................ 7

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ................................................................. 11

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
132 S. Ct. 1670 (2012) ............................................................................ 8

*Eastman Kodak Co. v. Image Tech. Services, Inc.*,
504 U.S. 451 (1992) .............................................................................. 15

*Federal Trade Comm'n v. Actavis, Inc.*,
133 S. Ct. 2223 (2013) .................................................................. *passim*

*Fortner Enterprises, Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969) ................................................................................ 5

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
386 F.3d 485 (2d Cir. 2004) ................................................................. 10

*Geneva Pharm. Tech. v. Barr Labs.*,
386 F.3d 485 (2d Cir. 2004) ................................................................... 7

*In re Aggrenox Antitrust Litigation*,
94 F. Supp. 2d 224 (D. Conn. 2015) ...................................................... 7

*In re ATM Fee Litigation*,
2010 WL 2557519 (N.D. Cal. 2010) ...................................................... 6

*In re Brand Name Prescription Drugs Antitrust Litigation*,
186 F.3d 781 (7th Cir. 1999) ................................................................ 1

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
363 F. Supp. 2d 514 (E.D.N.Y. 2005) .................................................. 10

*In re K-Dur Antitrust Litigation*,
2007 WL 5302308 (D.N.J. 2007) ......................................................... 14

*In re Neurontin Antitrust Litigation*,
2013 WL 4042460, *5 (D.N.J. 2013) ...................................................... 5

*In re Vitamins Antitrust Litigation*,
198 F.R.D. 296 (D.D.C. 2000) .............................................................. 14

*Irvin Indus. v. Goodyear Aerospace Corp.*,
    974 F.2d 241 (2d Cir. 1992) ............................................................................... 10

*MacDermid Printing Solutions, Inc. v. Cortron Corp.*,
    2014 WL 2615361 (D. Conn. 2014) .................................................................... 10

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................................ 2, 3, 6

*Safeway, Inc. v. Abbott Labs.*,
    761 F. Supp. 2d 874 (N.D. Cal. 2011) .................................................................. 5

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................................... 11

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) ....................................................................... 6, 14, 16

*United States v. Eastman Kodak Co.*,
    853 F. Supp. 1454 (W.D.N.Y. 1994) ................................................................. 16

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................................................. 4

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ............................................................. 15

## Other Authorities

A. Katz, *Making Sense of Alleged Nonsense: Intellectual Property, Antitrust and Market Power*, 49 ARIZ. L. REV. 837 (2007) ..................................................................... 11

Abba P. Lerner, *The Concept of Monopoly and the Measurement of Monopoly Power*, 1 REV. ECON. STUD. 157 (1934) ............................................................................. 9

F. Fisher, *Detecting Market Power*, in ABA Section of Antitrust Law, ISSUES IN COMPETITION LAW AND POLICY 355 (2008) ........................................... 11

F. Scherer & D. Ross, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE (1990) .. 3

F. Scherer, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE (1970) ................... 3

F. Scherer, *The Pharmaceutical Industry—Prices and Progress*, 351 NEW ENG. J. OF MED. 927 (2004) ............................................................................... 6

P. Areeda & H. Hovenkamp, ANTITRUST LAW (2014) ........................................................ *passim*

R. Larner & C. Nelson, *Market Definition in Cases Involving Branded and Generic Pharmaceuticals*, ABA ECON. COMM. NEWSLETTER, Vol. 7, No. 2 .......................... 12

## Rules

Fed. R. Civ. P. 26(b)(1) ......................................................................................... 1, 12

Fed. R. Civ. P. 26(b)(2)(C) .................................................................................... 1, 12

Plaintiffs in the *Walgreen* and *Rite Aid* actions ("Retailer Plaintiffs") join and agree with the memoranda submitted by the other Plaintiffs in response to the Court's Order to Show Cause. We submit this memorandum to provide additional argument and to emphasize that the Court need not make any sweeping legal rulings in order to deny Defendants' expansive discovery requests relating to other products in the same therapeutic class as Aggrenox. The Rules of Civil Procedure are sufficient authority to deny Defendants' requests. *See* Fed. R. Civ. P. 26(b)(1), 26(b)(2)(C).[1]

First, as the Court noted on November 30, 2015, Plaintiffs do not contend that Boehringer's share of the anti-platelet therapeutic class is sufficient to create an inference of market power. As Defendants acknowledge (Def. Mem. 6 n.6), market power may be proven directly (by showing the power to control prices or exclude competition) or indirectly (by defining a relevant market and calculating the defendant's market share). While all anti-platelet drugs could be a relevant market in another case (*e.g.*, a merger between Boehringer and Bristol-Myers), it is not the market relevant to this case. To the extent that Defendants are seeking discovery that will allow them to calculate Boehringer's share of the sales of anti-platelet drugs in the U.S., Plaintiffs' acknowledgement that they do not intend to prove market power by showing that Boehringer has a large share of those sales renders that discovery unnecessary.

Second, while the existence of market power and the definition of the relevant product market *are* issues in this case, they are not difficult issues and do not require extensive discovery. "Everyone knows" that manufacturers of brand-name drugs "have market power." *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 786 (7th Cir. 1999). The

---

[1]     The Retailer Plaintiffs also submit the accompanying Declaration of Keith Leffler ("Leffler Dec."), which addresses economic issues raised by the Order to Show Cause and responds to the declaration submitted by Dr. Addanki.

whole purpose of the various Hatch-Waxman and patent-based exclusivities that apply to branded and generic pharmaceuticals is to give branded pharmaceutical manufacturers market power as an economic incentive to invest in the research and development necessary to bring new drugs to market, and to give generic pharmaceutical manufacturers an economic incentive to challenge pharmaceutical patents.  Those exclusivities are based on the proposition that drug companies (both branded and generic) can exercise market power and earn supracompetitive returns if they are able to sell their products without AB-rated generic competition.  Otherwise, the existence of such exclusivities would not create any such incentive.  The proper conclusion to be drawn from the existence of such exclusivities is that pharmaceutical companies typically have (and in some cases are intended to have) market power in the absence of AB-rated generic competition—not that they lack market power.  And the fact that a brand pharmaceutical company has market power in the absence of AB-rated generic competition implies that the branded drug and its AB-rated equivalents can constitute a relevant product market.  *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("A 'market' is any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers").

Third, while Defendants claim that they need purchase and sales data for other drugs to determine whether the relevant market is Aggrenox and its AB-rated equivalents or is instead all anti-platelet drugs, the data they are seeking will not in fact be useful in answering that question, for two reasons.  One, the parties to this case cannot provide nationwide purchase or sales data and partial data is not useful in measuring cross-elasticities of demand.  And two, the existence of cross-elasticity at *current* prices will merely confirm that Boehringer has *already* raised the price of Aggrenox to its profit-maximizing level—the level at which it begins to lose

2

sales to other products.  This is a reflection of Boehringer's market power, not a refutation of it.

The requested discovery is therefore irrelevant in light of the Cellophane Fallacy.

ARGUMENT

I.  PROOF OF SUBSTANTIAL MARKETWIDE OVERCHARGES CAN ESTABLISH THAT THE DEFENDANT HAS EXERCISED MARKET POWER

The first question posed by the Court was "whether an antitrust plaintiff's proof of overcharges (which, by definition, constitutes proof of supracompetitive prices) necessarily proves market power, because the extraction of supracompetitive prices is itself an exercise of market power."  Order to Show Cause 2.  The answer to that question is a qualified "yes." Market power is "the power to charge prices higher than the competitive level."  *Federal Trade Comm'n v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013).  The "competitive level" in this context is the "socially optimal level that would prevail in a purely competitive market" since "[t]here is little disagreement that a profit-maximizing monopolist will maintain his prices higher and his output lower" than that level.  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979) (citing F. Scherer, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE 13-19 (1970)).  Economic textbooks like Professor Scherer's teach us that, in purely competitive markets, prices are equal to marginal cost.  Thus, any elevation of price over marginal cost indicates some degree of market power.  *See Berkey Photo*, 603 F.2d at 274 n.12 ("the differential between price and marginal cost is used as an indication of the degree of monopoly power"); F. Scherer & D. Ross, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE 21 (1990) ("For the competitor, price equals marginal cost; for the monopolist, price exceeds marginal cost").  As the Ninth Circuit explained in *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 n.4 (9th Cir. 1995): "Social welfare is maximized when the price of a good equals its marginal cost—the cost of producing the last unit of output.  When a firm with market

3

power cuts output to increase prices, price exceeds marginal cost." Of course, some degree of market power is not unusual and merely possessing market power is not illegal under the Sherman Act. *See Berkey Photo*, 603 F.2d at 275. "We tolerate the existence of monopoly power . . . insofar as necessary to preserve competitive incentives and to be fair to the firm that has attained its position innocently." *Id.* The Sherman Act only proscribes the improper acquisition or maintenance of monopoly power. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Market power is therefore equivalent to pricing above marginal cost. As the Second Circuit recognized in *Berkey Photo*, "[e]xcessive prices . . . constituted one of the primary evils that the Sherman Act was intended to correct," and "[w]here a monopolist has acquired or maintained its power by anticompetitive conduct, . . . a direct purchaser may recover the overcharge caused by the violation." 603 F.2d at 294. In cases where the market would be perfectly competitive in the absence of the unlawful conduct, marketwide overcharges will be equivalent to the excess revenue the monopolist is able to extract above the competitive price on the goods actually sold—*i.e.*, will measure the monopolist's market power. *See* IIA P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 395 at 428 (2014). In those cases, proof of the overcharges would be tantamount to direct proof that the defendant has exercised market power.

However, overcharges and the extent of market power will not be identical in cases where prices are substantially above marginal cost but the defendant's allegedly unlawful conduct does not account for all of the elevation. In those circumstances, a purchaser seeking overcharges cannot recover "the entire excess of the monopolist's price over that which would prevail in a competitive market," but only "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market." *Berkey Photo*,

603 F.3d at 297-98.  As applied to this case, if a jury were to find that the price Plaintiffs would have paid for generic Aggrenox but for Defendants' unlawful agreement would have been a price above the marginal cost of producing the drug (as is likely), Plaintiffs would only be entitled to recover the difference between the actual price of branded Aggrenox and the but-for price rather than the "entire excess" of the actual price over marginal cost.[2]

The cases cited in Defendants' response to the Order to Show Cause do not contravene these well-established principles.  As explained above, the relevant comparison in determining the existence of market power is *not* the price of the defendant's product to the price of an excluded product, but rather the price of the defendant's product to the price at which that product would have been sold in a purely competitive market (its marginal cost).[3]  *See* IIB ANTITRUST LAW ¶ 516g at 148 ("The degree of market power is measured by the excess of the profit-maximizing price over marginal cost").  To the extent that "supracompetitive pricing" means pricing above marginal cost, it is synonymous with market power.  The two authorities cited by Defendants—*Safeway, Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011), and *In re Neurontin Antitrust Litigation*, 2013 WL 4042460, *5 (D.N.J. 2013)—held only that supracompetitive pricing must be accompanied by restricted output to establish market power.  While there are cases that support this proposition, the sounder rule is that either is sufficient because higher prices necessarily reduce output and lower output necessarily raises prices.  *See Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969) ("Market power is

---

[2]     Proof of overcharges and proof of market power can also diverge when the defendant has market power but has not violated the Sherman Act, or when the violation has not resulted in injury to purchasers.  In either circumstance there will be no overcharges.

[3]     The price of the generic product generally provides a ceiling for marginal cost.  Branded companies have higher promotional costs than generics but often have lower unit manufacturing costs.

usually stated to be ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices"); *Berkey Photo*, 603 F.2d at 272 ("There is little disagreement that a profit-maximizing monopolist will maintain his prices higher and his output lower [than] the socially optimal levels that would prevail in a purely competitive market"); *Rebel Oil*, 51 F.3d at 1434 ("A [defendant] has sufficient market power when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices"); *In re ATM Fee Litigation*, 2010 WL 2557519, *10-*11 (N.D. Cal. 2010) ("because price and output are inversely correlated," proof of supracompetitive prices "implies that marketwide output . . . has been lower than it would have been"); IIB ANTITRUST LAW ¶ 501 at 109 ("Market power is the ability to raise price profitably by restricting output").

Defendants suggest that brand-name drugs like Aggrenox may not be priced above cost when "*all* costs—both the marginal costs of production and marketing and fixed costs such as R&D—" are included.  Def. Mem. 10.  But the Second Circuit has held that marginal cost is the appropriate competitive benchmark.  *See Berkey Photo*, 603 F.2d at 272 & 274 n.12. And while it is true that high fixed costs can explain "[c]ertain deviations between marginal cost and price," *United States v. Eastman Kodak*, 63 F.3d 95, 109 (2d Cir. 1995), the fixed costs referred to in the *Eastman Kodak* case were *current* fixed costs—not historical costs.  *See id.* At the time a branded drug is launched, the R&D costs relating to that drug are not fixed costs but "sunk" costs and have no impact on the manufacturer's profit-maximizing price.  *See* Leffler Dec. ¶ 19; F. Scherer, *The Pharmaceutical Industry—Prices and Progress*, 351 NEW ENG. J. OF MED. 927, 928 (2004) ("Sunk research-and-development costs are bygones and are therefore irrelevant in current pricing decisions").  This makes common sense: pharmaceutical companies want to earn the highest profits they can whether they spent $1 million to bring the drug to

market or $500 million.  They do so by charging the highest price the market will bear (*i.e.*, by raising prices until they lose more in sales to other drugs than they gain in higher profit margins). If that profit-maximizing price is above marginal cost, the seller has market power and can use its supracompetitive profits to fund current R&D costs relating to future drugs (drugs that the manufacturer expects to be able to sell at supracompetitive prices in the future).  Rather than negating market power, the prospect of having market power is what motivates branded pharmaceutical companies to make R&D investments in the first place.[4]

This fundamental economic premise lies at the heart of the Hatch-Waxman Act—the "*Drug Price Competition* and Patent Restoration Act of 1984," Pub. Law 98-417.  Hatch-Waxman relies on the patent system and additional non-patent exclusivities to create market power and encourage investments in both brand and generic drugs.  *See Actavis*, 133 S. Ct. at 2231 ("An important patent helps to assure" the existence of market power); *id.* at 2229 (180-day Hatch-Waxman exclusivity protects the first-filing generic from generic competition and can be worth several hundred million dollars to the first filer);[5] *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989) ("The federal patent system . . . embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years"); *In re Aggrenox Antitrust Litigation*, 94 F. Supp. 2d 224, 234 (D. Conn. 2015)

---

[4]     To the extent that high fixed costs present a challenge to market power methodologies, that challenge is the same whether direct or indirect evidence is used.  *See* IIB ANTITRUST LAW ¶ 520b at 218.

[5]     The effectiveness of 180-day exclusivity presupposes that a generic manufacturer can earn supracompetitive profits if it can sell its product free of competition from another AB-rated generic version of the same drug, which in turn presupposes that there can be a relevant market consisting of AB-rated generic versions of a particular drug but excluding the branded drug.  The Second Circuit reached this same conclusion in *Geneva Pharm. Tech. v. Barr Labs.*, 386 F.3d 485, 500 (2d Cir. 2004).

(purpose of 180-day exclusivity is to create "an incentive to make [paragraph IV] challenges");
Leffler Dec. ¶ 19.  The whole purpose of these exclusivities is to protect the innovator from
competition—*i.e.*, to create market power.  If they did not do so they would be ineffective.  The
proper conclusion to be drawn from the ability to recoup investments in R&D is that branded
pharmaceutical manufacturers have market power for whatever period of time they are able to
avoid AB-rated generic competition, either lawfully or unlawfully—not the opposite.

   Defendants also make the perverse suggestion that the massive loss of brand sales
that results from generic entry is irrelevant to the issue of market power because it is mandated
by state generic-substitution laws and is therefore "the product of government policy."  Def.
Mem. 13.  Generic competition is "the product of government policy" because the government
recognizes that generics are much less expensive than but otherwise identical to their brand-
name counterparts—*i.e.*, their entry terminates the branded company's exercise of market power.
*See Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670, 1676 (2012) (federal
regulatory "process is designed to speed the introduction of low-cost generic drugs to market").
The fact that generic competition is encouraged by state substitution laws and Hatch-Waxman as
a means of dissipating market power hardly means that branded companies lack market power.
*Actavis* expressly recognized that brand-name manufacturers can earn supracompetitive profits
prior to the commencement of generic competition and that efforts to maintain those profits by
delaying generic entry can violate the antitrust laws.  *See Actavis*, 133 S. Ct. at 2231 ("there is
reason for concern that [reverse-payment] settlements . . . tend to have significant adverse effects
on competition").  Defendants are wrong to suggest that the Court should ignore this form of
market power because its elimination is encouraged by state and federal law.

Finally, Defendants' assertion that Plaintiffs would make every branded drug manufacturer a monopolist (Def. Mem. 13) is a red herring.  In the context of reverse-payment cases, it is likely that every branded manufacturer *is* a monopolist.  *See Actavis*, 133 S. Ct. at 2236 (firms without market power do not pay large sums to keep competitors out of their market).  And being a monopolist is not illegal.  Monopolists are not subject to antitrust liability unless they acquire or maintain their monopoly power unlawfully.  *See Berkey Photo*, 603 F.2d at 275.

## II.   SUPRACOMPETITIVE PRICING AND MARKET POWER CAN BE PROVEN DIRECTLY FROM PRICING AND COST DATA

The Court's second question was "whether, in this case (or in any case brought under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013)), an allegation of supracompetitive prices can be proved or disproved directly with sales and pricing data regarding only the allegedly supracompetitively priced product and its generic(s)."  The answer to this question is also a qualified "yes."  Supracompetitive pricing and market power can be proven directly by comparing the defendant's prices to an estimate of its marginal cost.  There is an established economic formula that measures this difference, known as the Lerner Index.  *See* IIB ANTITRUST LAW ¶ 503b; Abba P. Lerner, *The Concept of Monopoly and the Measurement of Monopoly Power*, 1 REV. ECON. STUD. 157 (1934); Leffler Dec. ¶ 20.  The Lerner Index is defined as the difference between price and marginal cost divided by price ((Price-Marginal Cost)/Price).  The Lerner Index takes on values between zero and one.  As Areeda and Hovenkamp explain, "[t]he index is zero when prices are at the competitive level, which is marginal cost."  IIB ANTITRUST LAW ¶ 503b at 119.  When marginal cost is very small in comparison to price, the Index approaches one.  In a number of prior cases, Plaintiffs' economic expert has found that the Lerner Index for branded drugs typically falls in the range of .7 to .9.  Leffler Dec. ¶ 21.

The Lerner Index is a simple arithmetic calculation involving two numbers: price and marginal cost. While there can be practical difficulties in determining each of these values, *see* IIB ANTITRUST LAW ¶ 504, those difficulties are relatively minimal in cases involving delayed generic competition. One difficulty identified by Areeda and Hovenkamp is that "[m]any firms do not sell their products at a single price." *Id.* ¶ 504a at 120. But brand-name pharmaceutical companies largely *do* sell their products at a single price: Wholesale Acquisition Cost, or WAC. Likewise, while it is true that "[m]arginal cost does not appear in business accounts," *id.* ¶ 504b at 121, average variable cost (total variable cost divided by output) is a reasonable surrogate for marginal cost and is the surrogate used in other kinds of antitrust cases, such as predatory pricing cases. *See Irvin Indus. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 245 (2d Cir. 1992) ("we have adopted the test set forth by Phillip Areeda and Donald F. Turner in their seminal 1975 article: predatory pricing is presumed to occur when a seller prices below reasonably anticipated average variable cost") (footnote omitted).

Contrary to the suggestions in Defendants' memorandum, courts in this Circuit have had no difficulty accepting high Lerner Indices as evidence of market power. *See Berkey Photo*, 603 F.2d at 274 n.12 ("the differential between price and marginal cost is used as an indication of the degree of monopoly power"); *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) (market power can be proven by showing an "abnormally high price-cost margin"); *MacDermid Printing Solutions, Inc. v. Cortron Corp.*, 2014 WL 2615361, *5 (D. Conn. 2014) (profit margin of more than 50% was "suggestive of market power" and supported a narrow product market definition); *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 363 F. Supp. 2d 514, 523 (E.D.N.Y. 2005) (evidence that "Bayer was reaping an abnormally high price-cost margin" made it "reasonable to accept plaintiffs' contention and

conclude both that the relevant market is . . . ciprofloxacin and that Bayer had market power within that market").

III.    THE DISCOVERY SOUGHT WOULD NOT ASSIST THE PARTIES OR THE COURT IN DEFINING THE RELEVANT MARKET

The third question posed by the Court was whether, assuming an affirmative answer to Question 2, "an explicit articulation of (and discovery and argument on) antitrust market definition is necessary or material."  The answer to this question is "no."  Once market power has been proven directly by comparing price to marginal (or average variable) cost, market definition, which is merely a "surrogate[] for determining the existence of monopoly power," *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007), is unnecessary. *See Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (proof of actual control over price "arguably is more direct evidence of market power than calculations of elusive market share figures").  *See also* Leffler Dec. ¶ 10.

Plaintiffs intend to rely on direct evidence of Boehringer's market power (including the difference between the price of Aggrenox and its marginal cost and Boehringer's large payment to delay generic competition).  The fact that there are other drugs that can be used to treat the same condition might be relevant in determining whether a merger of Boehringer and another anti-platelet manufacturer would *increase* those companies' market power, but it is not relevant when considering whether Boehringer was able to continue selling Aggrenox at supracompetitive prices by delaying the entry of generic Aggrenox.  A "relevant market" is the market *relevant* to the "potentially anticompetitive act."  F. Fisher, *Detecting Market Power*, in ABA Section of Antitrust Law, Issues in Competition Law and Policy 355 (2008).  *See* A. Katz, *Making Sense of Alleged Nonsense: Intellectual Property, Antitrust and Market Power*, 49 Ariz. L. Rev. 837, 880 (2007) ("Without a specific challenged conduct, a specific context and an

11

identified antitrust question that demands an answer, the 'market' is an empty concept in antitrust analysis"); R. Larner & C. Nelson, *Market Definition in Cases Involving Branded and Generic Pharmaceuticals*, ABA ECON. COMM. NEWSLETTER, Vol. 7, No. 2, p.5 ("the proper antitrust market in a case is the market relevant to an analysis of the competitive effects of the alleged behavior," which in cases involving allegations of a delay in the entry of the first generic manufacturer "is likely the molecule, because the alleged anticompetitive effect is suppression of competition between the brand and the generic"); Leffler Dec. ¶ 10 n.7.  Defendants have not explained how the therapeutic class of anti-platelet agents is relevant to assessing the competitive impact of delaying the entry of generic Aggrenox.

Nevertheless, the discovery sought by Defendants should be denied not simply because it is easy to prove Boehringer's market power based on direct evidence and because the market proposed by Defendants is not relevant to the alleged anticompetitive conduct, but also because the discovery requested is not "proportional to the needs of the case" in that it is not useful and is unduly burdensome in light of its limited benefit.  Fed. R. Civ. P. 26(b)(1).  *See also* Fed. R. Civ. P. 26(b)(2)(C) (the court "must limit the . . . extent of discovery . . . if it determines that . . . the discovery . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive").  The December 2015 amendment of Rule 26 moving the proportionality factors from Rule 26(b)(2) to Rule 26 (b)(1) was intended to reinforce the "obligation of the parties to consider these factors in making discovery requests."  Fed. R. Civ. P. 26, Advisory Committee Notes.[6]

---

[6]     The implementing order provides that it governs cases commenced after December 1, 2015 and "insofar as just and practicable, all proceedings then pending."  *See* Order Implementing Amendments to Federal Rules of Civil Procedure, April 29, 2015.  In any event, "[r]estoring the proportionality calculation to Rule 26(b)(1) [did] not change the existing responsibilities of the court and the parties."  Fed. R. Civ. P. 26, Advisory Committee Notes.

Discovery regarding Plaintiffs' purchases (or sales) of other anti-platelet drugs is not useful in defining a relevant product market because (i) it is only partial data, and comprehensive, nationwide data is available from other sources; and (ii) economic theory tells us that cross-elasticity between Aggrenox and other drugs is *expected* if Aggrenox is being sold at supracompetitive prices.

A.    Partial Data Cannot Be Used To Define the Relevant Market

Relevant markets are typically defined in terms of cross-elasticity of demand. If a small but significant increase in the price of one product causes consumers to stop buying that product and start buying another product instead, then the two products are said to exhibit cross-elasticity and are likely in the same market. *See AD/SAT v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). However, it is impossible to measure cross-elasticity using only a portion of the market. The Retailer Plaintiffs collectively represent approximately one third of the retail pharmacies in the United States. *See* Defendants' Response to Retailer Plaintiffs' Notice of Supplemental Authority 5 & n.4, Doc. 328 (under seal) (Retailer Plaintiffs represent about 30% of the U.S. retail pharmacy market). The other named Plaintiffs are small wholesalers (one level up the distribution chain from Retailer Plaintiffs) or individual end payors (one level down). Even when aggregated, the named Plaintiffs' purchase data will represent only a fraction of sales made at three different levels of the pharmaceutical distribution chain and will omit the vast bulk of the nationwide market.

Such data is not useful in measuring cross-elasticity of demand. For example, if Walgreen's data were to show a decrease in purchases of Aggrenox after a price increase on Aggrenox, it would be impossible to tell whether that decrease represents patients who switched to a different drug or patients who began filling their Aggrenox prescriptions at a pharmacy other

13

than Walgreen's.  And the same is true of the other Retailer Plaintiffs.  The only way to draw

reliable cross-elasticity conclusions is to review sufficient data to conclude that *total* purchases

of Aggrenox went down and *total* purchases of another anti-platelet drug went up as a result of

Aggrenox becoming more expensive relative to the price of the other drug.

Data on total sales of anti-platelet drugs is available to all of the parties in this

case from IMS Health, a commercial vendor that sells data on pharmaceutical sales.  This data is

used on a day-to-day basis by Defendants, and has been used in other pharmaceutical antitrust

cases to investigate market definition issues.  Defendants' motion should be denied because IMS

data is a far better resource for market definition studies than the incomplete data that

Defendants seek from Plaintiffs.  *See In re Vitamins Antitrust Litigation*, 198 F.R.D. 296, 299

(D.D.C. 2000) (production of individualized data by the plaintiffs was unnecessary where the

parties had access to market-wide information to assess demand); *In re K-Dur Antitrust

Litigation*, 2007 WL 5302308, *14 (D.N.J. 2007) ("It also appears that the information the

Defendants seek is available from IMS Health on a market-wide basis").

    B.   Cross-Elasticity At Current Prices Is Irrelevant to Market Definition

As the Court recognized in its Order to Show Cause, the Cellophane Fallacy

limits the usefulness of conducting a cross-elasticity study at current prices in cases where the

plaintiff alleges that the defendant's prices are *already* supracompetitive.  This is because "cross-

elasticity of demand is high when prices are already monopolistic."  IIB ANTITRUST LAW ¶ 539 at

317.  *See also Eastman Kodak*, 63 F.3d at 105 ("a high cross-elasticity of demand may, in some

cases, be the product of monopoly power rather than a belief on the part of consumers that the

products are good substitutes for one another"); Leffler Dec. ¶¶ 23-24.  Defining the relevant

market by measuring cross-elasticity of demand is useful in cases where the alleged

14

anticompetitive conduct has not yet occurred, such as merger cases.  *See* IIB ANTITRUST LAW ¶ 539 at 317.

>This makes intuitive sense.  As Areeda and Hovenkamp point out, "in seeking out a profit-maximizing price the monopolist . . . finds a price so high that a still further price increase would be unprofitable because too many sales would be lost."  *Id.*  Thus, in a case such as this, a cross-elasticity study is relevant only if it can be conducted *at the competitive price* (marginal cost)—*i.e.*, to determine whether raising price above marginal cost will cause so many consumers to switch to other drugs that the price increase cannot be maintained.  Prices above the competitive level are the harm antitrust law seeks to prevent.  *See Actavis*, 133 S. Ct. at 2236; *Berkey Photo*, 603 F.2d at 272.  There is no reason to conduct a cross-elasticity study *at the monopoly price* because monopolists, by definition, have already raised prices to the level at which consumers start to switch to other products.  *See* Leffler Dec. ¶ 24.

>Defendants cannot plausibly contend that Boehringer sells Aggrenox at marginal cost, and, in any event, Boehringer's records will answer that question one way or the other.  The important point for present purposes is that a cross-elasticity study at current prices will not tell us whether Boehringer has market power, and so there is no reason to conduct the study.  *See Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 471 (1992) ("[T]he existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power") (internal quotations omitted; emphasis in original); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) ("because a monopolist exercises market power by increasing price until . . . a further price increase would be unprofitable, a high cross-elasticity of demand at current prices . . . does not demonstrate that the seller lacks market power").

15

Far from avoiding the Cellophane Fallacy, Defendants' memorandum falls further into it.  For example, the carefully selected end payor documents discussed in Defendants' memorandum (Def. Mem. 32-33) show only that, "at the margin"—*i.e.*, for price-sensitive consumers who have some ability to influence physician prescribing patterns—the current price of Aggrenox is to some extent constrained by the price of other anti-platelet drugs (principally generic clopidogrel).  This is exactly what economic theory would predict if Aggrenox is being sold at monopoly prices.  As Plaintiffs contend, Boehringer has raised the price of Aggrenox so far above marginal cost that, at current prices, "'even poor substitutes look good to the consumer.'"  *Eastman Kodak*, 63 F.3d at 105 (quoting *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994)).  The fact that some consumers consider clopidogrel an economic substitute for Aggrenox when Aggrenox is being sold at monopoly prices does not show that it would be an economic substitute if Aggrenox were sold at marginal cost, nor does it show that the existence of generic clopidogrel has prevented Boehringer from raising the price of Aggrenox above marginal cost; if Aggrenox is being sold at prices above marginal cost, it obviously has not.  In short, the existence of substitution at current prices is irrelevant to the actual question before the Court.

<u>CONCLUSION</u>

For the reasons stated above, the Court should limit discovery to Aggrenox and its AB-rated equivalents.

Dated: February 26, 2016                    Respectfully submitted,

                                            /s/ Scott E. Perwin
                                            Scott E. Perwin
                                            Lauren C. Ravkind
                                            Anna T. Neill
                                            KENNY NACHWALTER P.A.
                                            1100 Miami Center
                                            201 South Biscayne Boulevard
                                            Miami, FL 33131
                                            Telephone: (305) 373-1000
                                            Facsimile: (305) 372-1861
                                            Email: sperwin@knpa.com
                                            Email: lravkind@knpa.com
                                            Email: aneill@knpa.com
                                            *Attorneys for Walgreen Plaintiffs*

                                            Barry L. Refsin
                                            Monica L. Rebuck
                                            HANGLEY ARONCHICK SEGAL PUDLIN &
                                            SCHILLER
                                            One Logan Square, 27th Floor
                                            Philadelphia, PA 19102
                                            Tel.: (215) 568-6200
                                            Fax: (215) 568-0300
                                            Email: brefsin@hangley.com
                                            Email: mrebuck@hangley.com
                                            *Attorneys for Rite Aid Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2016 the foregoing Retailer Plaintiffs'

Memorandum in Response to Order to Show Cause was filed electronically and served on all

counsel of record by operation of the Court's CM/ECF system.

                                            /s/ Scott E. Perwin
                                            Scott E. Perwin