# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE AGGRENOX ANTITURST LITIGATION | C.A. No. 3:14-MD-2516 (SRU) |
| THIS DOCUMENT RELATES TO:<br><br>DIRECT PURCHASER ACTIONS | |

## DIRECT PURCHASER CLASS PLAINTIFFS' REPLY TO DEFENDANTS' MEMORANDUM IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE (REDACATED PUBLIC VERSION)

TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ....................................................................................................... 5

A.  A Large Reverse Payment Shows Market Power, Without Resort to "Relevant Market" Discovery ................................................................................. 5

B.  Higher Prices As a Result of Delayed Generic Competition Show Market Power, Without Resort to "Relevant Market" Discovery ....................................... 7

C.  Direct Evidence of "Before and After" Pricing Shows Market Power, Without Resort to "Relevant Market" Discovery ................................................... 7

D.  Specific Answer to Question No. 1: "Whether an antitrust plaintiff's proof of overcharges (which, by definition, constitutes proof of supracompetitive prices) necessarily proves market power, because the extraction of supracompetitive prices is itself an exercise of market power?" ....................................................... 9

1.  BI Was Able to Price Its Product Above the Competitive Level and Enjoyed Abnormally High Profit Margins ................................................... 10

2.  R&D and Promotional Costs Are Not Relevant to the Market Power Analysis ............................................................................... 12

3.  Showing A Restriction on  Output is Unnecessary ........................................ 14

E.  Question No. 2: "[W]hether, in this case (or in any case brought under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013)), an allegation of supracompetitive prices can be proved or disproved directly with sales and pricing data regarding only the allegedly supracompetitively priced product and its generic(s)" ............................ 16

F.  Question No. 3: "[W]hether, in such a case, an explicit articulation of (and discovery and argument on) antitrust market definition is necessary or material".. 17

G.  GPhA's Amicus Brief Offers Nothing New ......................................................... 22

H.  Defendants Are Not Entitled to the Burdensome Discovery They Seek ................ 23

III.  CONCLUSION................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) ............................................................... 18

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.,*
784 F.2d 1325 (7th Cir. 1986) ............................................................ 15

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
603 F.2d 263 (2d Cir. 1979) ......................................................... 10, 16

*Bonnie & Co. Fashions v. Bankers Trust Co.,*
945 F. Supp. 693 (S.D.N.Y. 1996) ...................................................... 23

*Brown v. Coleman,*
514 Fed. Appx. 6 (2d Cir. 2013) ......................................................... 23

*Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.,*
974 F.2d 450 (4th Cir. 1992) .............................................................. 24

*Crenshaw v. Herbert,*
409 Fed. Appx. 428 (2d Cir. 2011) ..................................................... 25

*Eastman Kodak Co. v. Image Tech. Services, Inc.,*
504 U.S. 451 (1992) ........................................................................... 20

*Fed. Hous. Fin. Agency v. UBS Ams. Inc.,*
2013 U.S. Dist. LEXIS 92081 (S.D.N.Y. June 28, 2013) ..................... 24

*Fortner Enters, Inc. v. U.S. Steel Corp.,*
394 U.S. 495 (1969) ........................................................................... 15

*FTC v. Actavis, Inc.,*
133 S. Ct. 2223 (2013) ................................................................ passim

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) ......................................................................... 5, 6

*FTC v. Lundbeck, Inc.,*
650 F.3d 1236 (8th Cir. 2011) ............................................................ 19

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,*
386 F.3d 485 (2d Cir. 2004) ........................................................ passim

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.,*
423 F.3d 374 (3d Cir. 2005) ................................................................. 8

*Hayden Pub. Co., Inc. v. Cox Broadcasting Corp.*,
730 F.2d 64 (2d Cir. 1984)................................................................................................19

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006)................................................................................................8

*In re "Agent Orange" Prod. Liab. Litig.*,
517 F.3d 76 (2d Cir. 2008)................................................................................................23

*In re Aggrenox Antitrust Litig.*,
No. 3:14-md-2516, 2015 U.S. Dist. LEXIS 35634 (D. Conn. Mar. 23, 2015)...................9, 14

*In re ATM Fee Antitrust Litig.*,
No. C 04–2676 CRB, 2010 WL 2557519 (N.D. Cal. June 21, 2010)....................................16

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
363 F. Supp. 2d 514 (E.D.N.Y. 2005) ................................................................................11

*In re Complaint of Bankers Trust Co.*,
752 F.2d 874 (3d Cir. 1984)...............................................................................................24

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009)...................................................................................6, 7, 10

*In re Lorazepam & Clorazepate Antitrust Litig.*,
467 F. Supp. 2d 74 (D.D.C. 2006) .....................................................................................19

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) .............................................................................................12

*In re Subpoena Issued to Dennis Friedman*,
350 F.3d 65 (2d Cir. 2003).................................................................................................24

*In re Vitamins Antitrust Litig.*,
198 F.R.D. 296 (D.D.C. 2000)............................................................................................24

*K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995).................................................................................................17

*King Drug Company of Florence, Inc., v. SmithKline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015)...............................................................................................22

*Long Island Lighting Co. v. Barbash*,
779 F.2d 793 (2d Cir. 1985)...............................................................................................24

*Marathon Oil Co. v. Mobil Corp.*,
669 F.2d 378 (6th Cir. 1981) .............................................................................................15

*N.Y. v. Anheuser-Busch, Inc.*,
   811 F. Supp. 848 (E.D.N.Y. 1993) ........................................................5

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.*,
   265 F.3d 97 (2d Cir. 2001).................................................................23

*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
   468 U.S. 85 (1984)............................................................................10

*New York v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)...............................................................13

*New York v. Kraft Gen. Foods, Inc.*,
   926 F. Supp. 321 (S.D.N.Y. 1995) .....................................................18

*Rebel Oil Co. v. Atlantic Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) .............................................................15

*Rome Ambulatory Surgical Ctr. v. Rome Mem. Hosp.*,
   349 F. Supp. 2d 389 (N.D.N.Y 2004) ..................................................7

*Ryko Mfg. Co. v. Eden Servs.*,
   823 F.2d 1215 (8th Cir. 1987) ...........................................................15

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
   305 F.3d 1124 (10th Cir. 2002) .........................................................19

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)...........................................................9, 17

*Toys "R" Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000) ...............................................................9

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) ...............................................................10

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
   986 F.2d 589 (1st Cir. 1993)................................................................2

*United States v. Eastman Kodak Co.*,
   63 F.3d 95 (2d Cir. 1995)..................................................................12

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)......................................................................5, 15

*United States v. Line Material Co.*,
   333 U.S. 287 (1948)..........................................................................13

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........................................................................................8

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ........................................................................21

*Valley Drug Co. v. Geneva Pharms., Inc.*,
344 F.3d 1294 (11th Cir. 2003), *overruled on other grounds*, *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) ........................................................................................17

**Statutes**

Rule 26 ........................................................................................................................24

Rule 26(e) ...................................................................................................................11

Rule 56(f) ...............................................................................................................23, 24

**Other Authorities**

Aaron E. Carroll, *$2.6 Billion to Develop a Drug? New Estimate Makes Questionable Assumptions*, N.Y. TIMES (Nov. 18, 2014) ..........................................14

Ariel Katz, *Making Sense of Alleged Nonsense: Intellectual Property, Antitrust and Market Power*, 49 ARIZ. L. REV. 837 (2007) .......................................................2

D. Carlton and J. Perloff, MODERN INDUSTRIAL ORGANIZATION (3d ed. 2000) ...........................10

Donald W. Light & Rebecca Warburton, *Demythologizing the High Costs of Pharmaceutical Research,* BIOSOCIETIES, Mar. 2011 ............................................14

F. Fisher, *Detecting Market Power*, in ABA Section of Antitrust Law, ISSUES IN COMPETITION LAW AND POLICY (2008) ....................................................................2

F. Scherer "The Pharmaceutical Industry--Prices and Progress," 351 NEW ENG. J. MED. 927 (2004) ......................................................................................................12

Fiona M. Scott Morton, *Barriers to Entry, Brand Advertising, and Generic Entry in the U.S. Pharmaceutical Industry,* 18 INT'L J. INDUS. ORG. 1085 (2000) .............13

John A. Rizzo, *Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs*, 42 J.L. & ECON. 95 (1999) ............13

Marcia Angell, THE TRUTH ABOUT DRUG COMPANIES (2004) ......................................14

Merrill Goozner, THE $800 MILLION PILL: THE TRUTH BEHIND THE COST OF NEW DRUGS (2004) ..........................................................................................................14

Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 2046d4 (Supp. 2015) ................................................................................................................2,6

Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 506d ..........................................10

Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 507a ..........................................18

Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 520b2 (Supp. 2015) ................................................................................................................12,15

Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 536 ............................................18

Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 539 ...........................................20

Richard A. Posner, ANTITRUST LAW (2d ed. 2001) ...................................................21

U.S. Department of Justice & Federal Trade Commission, HORIZONTAL MERGER GUIDELINES § 1.11 (2010) ...........................................................................................18

# I.      INTRODUCTION

Defendants were ordered to show cause why the Court should not deny defendants'
requests for "extensive" discovery and "restrict[] discovery and evidence in this case to the
market in Aggrenox and any AB-rated bioequivalent substitute for Aggrenox."  Order to Show
Cause, ECF No. 432 at 1, 2 (Jan. 8, 2016).  Defendants' Memorandum in Response to the Order
to Show Cause (Feb. 5, 2016) ("Response") fails to establish why they should be entitled such
extensive discovery.  As the Court observed, direct evidence is available here of defendants'
ability to set prices at supracompetitive levels.  And as this case centers on defendants' reverse
payment agreement, the only prices at issue are those for branded and generic Aggrenox -- the
only products and prices affected by the agreement.

In their Response, defendants offer demonstrably disingenuous arguments, supported not
by factual evidence, but by the expert declaration of Dr. Summanth Addanki, who alternates
between denying that defendant Boehringer Ingelheim ("BI") had market power and admitting in
other sections of his report that BI, in fact, enjoyed premium pricing on Aggrenox.[1]  And rather
than offering actual data within defendants' possession concerning BI's research and
development ("R&D") costs for Aggrenox (a drug combining two molecules that have been
marketed for decades), defendants rely on a study evaluating the cost to develop new chemical
products – a study which itself has been criticized for vastly inflating R&D costs.

Defendants say that this Court must allow their extensive discovery on relevant market
issues, but they discuss the concept of market definition in the abstract.  This is a mistake:  any
analysis of market power must be assessed in the context of the restraint at issue.  *See*, *e.g.*,
*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 496 (2d Cir. 2004) (purpose of

---

[1] Declaration of Summanth Addanki, Ph.D. (Feb. 5, 2016) ("Addanki Decl.").

analyzing market power is to "provide[] the context against which to measure the competitive effects of an agreement."); *U.S. Healthcare, Inc. v. Healthsource, Inc*., 986 F.2d 589, 598 (1st Cir. 1993) (one must ask "why we are [asking the question in the first place]: that is, what is the antitrust question in this case that market definition aims to answer?").[2]  Here, the question the jury must ultimately address is whether defendants' reverse payment agreements caused anticompetitive effects (higher prices for dipyridamole/aspirin). *See FTC v. Actavis*, *Inc.*, 133 S. Ct. 2223 (2013).[3]  The answer does not require the definition of a relevant market and thus does not require discovery on that point.   This is because, as *Actavis* observed, a large reverse payment is a "'strong indicator'" of market power.   133 S. Ct. at 2236 (citation omitted)..[4]  Discovery regarding the "relevant market" is certainly not necessary to evaluate whether a reverse payment is large.   Defendants do not address this authority.

The Supreme Court's observation make perfect sense.   If a large reverse payment was not sufficient evidence that BI had market power over Aggrenox, it would have made no sense at all for BI to pay Barr/Teva to delay generic Aggrenox marketing.   The Supreme Court recognized this expressly.  *Actavis*, 133 S. Ct. at 2236 ("Neither is a firm without [market] power likely to pay large sums to induce others to stay out of its market.")  (quotes omitted).  Delaying a drop in dipyridamole/aspirin prices preserved BI's control over Aggrenox pricing.   Control over pricing

---

[2] *See also* F. Fisher, *Detecting Market Power*, in ABA Section of Antitrust Law, ISSUES IN COMPETITION LAW AND POLICY 355 (2008) ("relevant market" is the market *relevant* to the "potentially anticompetitive act."); Ariel Katz, *Making Sense of Alleged Nonsense: Intellectual Property, Antitrust and Market Power*, 49 ARIZ. L. REV. 837, 880 (2007) ("Without a specific challenged conduct, a specific context and an identified antitrust question that demands an answer, the 'market' is an empty concept in antitrust analysis").

[3] Dipyridamole and aspirin are the active ingredients in Aggrenox.

[4] *See* Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 2046d4 (2015 Supp.) (noting the Supreme Court's observation "should dispense with any requirement of a relevant market definition" because "a large payment surely indicates power" and is "a better estimator of power than traditional market definition approaches.").

is, by definition, market power.

This is not just theory.  The undisputed facts follow the Supreme Court's teachings about large reverse payments and market power.  Once less-expensive generic Aggrenox belatedly entered in June 2015, it quickly captured a large share of sales of the brand and caused prices for dipyridamole/aspirin to plummet.  *See* Expert Report of Jeffrey J. Leitzinger, Feb. 26, 2016, at ¶ 28 ("Leitzinger Decl.").  Even defendants' own expert, Dr. Addanki, concedes that brand drugs are able to command a "premium price" until a generic enters and offer the same product at a discount.  Addanki Decl. at ¶¶ 9, 15. This undisputed end to BI's pricing power from generic entry vividly shows BI's ability to control the price of dipyridamole/aspirin by delaying that entry.  Relevant market definitions or discovery about the relevant market cannot change that.

Nor can defendants' suggestion that Aggrenox faced price competition prior to generic entry.  Perhaps Aggrenox did face some degree of price competition.  Even if that is true, it is undisputed that whatever price competition Aggrenox might have faced was insufficient to cause prices of dipyridamole/aspirin to fall to the competitive levels to which the parties agree generic Aggrenox competition caused them to fall.  Again, BI's power to prevent those price drops by delaying generic Aggrenox entry is, by definition, market power.  No competition from a drug other than generic Aggrenox was ever capable of causing dipyridamole/aspirin prices to fall to those low levels, and neither defendants nor their experts suggest otherwise.  Discovery concerning those other drugs cannot change the fact that, by delaying generic Aggrenox entry, BI kept control of dipyridamole/aspirin pricing.  Discovery concerning those other drugs is therefore irrelevant.  The only market power discovery that is necessary, in addition to the size of the reverse payment, is discovery that permits a comparison between BI's Aggrenox prices before generic competition and BI, Teva, and other generics' dipyridamole/aspirin prices after

3

generic competition began.

In response to the overwhelming reasons why market definition is irrelevant, defendants offer dubious economic analysis by Dr. Addanki to create a veneer of a true factual dispute.  But there is no true dispute and no need for discovery.  Defendants say R&D costs matter, but although ordered to show cause to justify the discovery they seek, BI has failed to put forward its actual R&D costs for Aggrenox, instead relying on generalized and highly criticized studies of how much was spent to develop other drugs.

Moreover, for all of the smoke and mirrors in his report, Dr. Addanki concedes that prior to generic entry, BI could command a "premium" price, Addanki Decl. at ¶¶ 9, 15; that, despite defense claims that promotion and R&D benefits consumers, such spending ultimately enables the brand to "charge a higher price than it might otherwise have been able to charge," by differentiating the product from other branded products, *id.* at ¶ 11, and that the brand cannot sustain premium pricing once an AB-rated generic enters at a discounted price. *Id.* at ¶ 15.[5]

And the fact that promotional efforts by the brand only strengthen BI's ability to charge supracompetitive prices illustrates why the Cellophane fallacy is in full play here. BI is already exercising market power.  The Cellophane fallacy acknowledges that even at monopolistic prices, a firm may face some limited measure of price competition.   Order to Show Cause at 2 n.1.  It is that effect that is observed in the small selection of indirect purchasers' documents cited by defendants, and it is precisely for that reason that one cannot use drug pricing before the entry of generic Aggrenox as a baseline to define and assess whether substantial market power is being exercised.

---

[5] Although Dr. Addanki insists that R&D and promotion efforts benefit consumers, he admits that a brand company is unable to sustain pricing to support these alleged benefits following generic entry.

In sum, defendants have offered nothing necessitating the extensive discovery they seek from plaintiffs.

## II.     ARGUMENT

### A.     A Large Reverse Payment Shows Market Power, Without Resort to "Relevant Market" Discovery

Market power is the ability to control price *or* restrict output (for instance, by excluding competition).  *See*, *e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (defining monopoly power as "the power to control prices or exclude competition") (internal quotes and citation omitted); *Geneva Pharm. Tech. Corp.*, 386 F.3d at 500 (market power "can be proven directly through evidence of control over prices or the exclusion of competition"); *id*. at 496 ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output."); *N.Y. v. Anheuser-Busch, Inc.*, 811 F. Supp. 848, 871 (E.D.N.Y. 1993) ("Market power is the ability to raise unilaterally prices and profitably maintain those prices above competitive levels and/or restrict output in the market.").

Defendants note that a plaintiff in a rule of reason case must prove market power (Response at 6), but a plaintiff can establish market power via either direct (control over pricing or output) or indirect proof (share of a relevant market).  *See*, *e.g.*, *Geneva Pharm.*, 386 F.3d at 500 (market power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market.").[6]  In *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), the Supreme Court made clear that "elaborate market analysis" is not required where direct evidence of

---

[6] *See also* Direct Purchaser Class Pls.' Surreply Mem. In Opp'n To Defs.' Mot. To Compel Product Market Discovery, ECF No. 396 at 2 n.1 (collecting cases).

anticompetitive effects (e.g., higher prices due to the challenged conduct) is available.  *Id*. at 460-61.  The Court reaffirmed this principle in *Actavis*, 133 S. Ct. at 2236, where it explained that direct evidence of anticompetitive effects is sufficient to show market power.  The Court noted that the fact of the large payment itself is a "'strong indicator of [market] power.'"  *See id*. at 2236 (citation omitted).

While defendants suggest that market power must also be proven separately from a large reverse payment under *Actavis* (Response at 6), there is no support for this.  On the contrary, leading antitrust scholars Professors Herbert Hovenkamp, Scott Hemphill, Carl Shapiro and Aaron Edlin interpret *Actavis* as dispensing with the necessity of a showing of market power (much less a relevant market), because a large reverse payment is a proxy for such power:

> Under the Court's focused rule-of-reason inquiry, no separate showing of market power is necessary. Economically, this is appropriate. Market power is but a proxy to identify when anticompetitive effects are plausible. As the Court points out, ***market power may likewise be inferred from payment size***, and ***without any need to define a relevant market***. A producer in a highly competitive market would not pay anything to keep a rival out because price-cost margins are already low and keeping one firm out would not improve that situation. In contrast, a firm with market power typically will enjoy high margins, and protecting those margins by excluding rivals can be very valuable. Following this logic, ***a large reverse payment indicates that market power exists***, just as it indicates that the settlement is anticompetitive.

Aaron Edlin, Scott Hemphill, Herbert Hovenkamp, and Carl Shapiro, *Activating* Actavis, 28 Antitrust 16, 17 (Fall 2013) (emphasis added) (citing *Actavis*, 133 S. Ct. at 2237).    What is relevant is whether there is a large reverse payment, which indicates that the value of keeping out a generic competitor is high, which in turn reveals the pricing control (i.e., market power) the brand company is exercising. *See* Leitzinger Decl. at ¶¶ 34-35; *see also* Areeda and Hovenkamp, Antitrust Law ¶ 2046d4 (Supp. 2015).  Discovery of the "relevant market" is not necessary to conduct, or rebut, this analysis.

**B.      Higher Prices As a Result of Delayed Generic Competition Show Market Power, Without Resort to "Relevant Market" Discovery**

Even without *Actavis*'s observation that a large reverse payment demonstrates market power, defendants would still be wrong that a showing of market power separate from overcharges is necessary.  This is a case under Section 1 of the Sherman Act, and the Second Circuit has expressly held that in such a case market power is *not* a separate element:

> Plaintiffs bear the initial burden to demonstrate an actual adverse effect on competition.  ***We have not required proof of market power in § 1 cases.*** If plaintiff can demonstrate an actual adverse effect on competition...  there is no need to show market power in addition.

*Geneva Pharm. Tech. Corp.*, 386 F.3d  at 509 (emphasis added).  Plaintiffs will show the actual adverse effect in this case by demonstrating that as a consequence of delayed generic Aggrenox competition brought about by BI's reverse payment to Teva/Barr, prices for dipyridamole/aspirin were higher than they otherwise would have been.  That higher prices show anticompetitive effects is uncontroversial.  *Actavis*, 133 S. Ct. at 2236 (maintenance of supracompetitive prices is the anticompetitive effect of a reverse payment); *Rome Ambulatory Surgical Ctr. v. Rome Mem. Hosp.*, 349 F. Supp. 2d 389, 409 (N.D.N.Y 2004) ("Plaintiff may demonstrate actual adverse effects on the market by a showing reduced output, increased prices, decreased quality, or the imposition of entry barriers.").  Higher prices are overcharges.  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) ("overcharges are the difference between the defendants' supra-competitive price and the competitive price").  There is no need for "relevant market" discovery to show or rebut overcharges, and defendants do not argue otherwise.

**C.      Direct Evidence of "Before and After" Pricing Shows Market Power, Without Resort to "Relevant Market" Discovery**

Even if a showing of market power in addition to a large reverse payment must be made under *Actavis*, plaintiffs can amply demonstrate the existence of BI's market power via direct

proof, rendering irrelevant the "relevant market" discovery that defendants are requesting.

Defendants had previously disputed whether market power could be proven via direct proof, but now concede the point.  Response at 6.  And while defendants cite cases where direct proof was unavailable, those cases did not arise in the pharmaceutical context,[7]  where the price-reducing effects of generic entry have been well-studied and documented and are available in the form of sales data for brand and generic Aggrenox in this very case.   In fact, in the only pharmaceutical case decided by the Court of Appeals assessing the viability of direct proof of market power, the Second Circuit explicitly held that "plaintiffs' pricing proof may of course be indicative of monopoly power."  *Geneva*, 386 F.3d at 500.[8]  Defendants also accuse plaintiffs of advancing a single-product market,[9] but as plaintiffs have already successfully argued in opposing defendants' motion to dismiss, because plaintiffs are not alleging that just BI's sales of Aggrenox is the relevant market (Teva and other generics' sales of generic Aggrenox are, too), the argument is misplaced.[10]

Direct proof of market power is more probative than taking burdensome "relevant market" discovery.  The Court of Appeals has held that evidence of "an actual adverse effect on

---

[7] *See*, *e.g.*, *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374 (3d Cir. 2005); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).

[8] While the Court in *Geneva* may have found the evidence lacking in that case because of the lack of "any analysis of [defendant's] costs," that was not a reverse payment agreement case, and in any event plaintiffs offer precisely that sort of proof here.

[9] Response at 7.

[10] ECF No. 175 at 65 n.161 (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 200 n.3 (2d Cir. 2001) (single product market cases "would be applicable to this case if plaintiff were alleging that Exxon alone constitutes the relevant product market, but plaintiff does not so allege") and *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 384 (S.D.N.Y. 2007) ("the replacement solid ink sticks themselves are not single brand products in that both plaintiff and defendant manufacture and market them")).  *See also id.* at 65-66 & nn. 162-163 (cases where the market was properly limited to the brand and generic versions of a single drug).

competition… arguably is more direct evidence of market power than calculations of elusive market share figures[.]" *Todd*, 275 F.3d at 206.  The Seventh Circuit has also expressly rejected the notion that a plaintiff must prove a high share within a relevant market:

> TRU seems to think that anticompetitive effects in a market cannot be shown unless the plaintiff, or here the Commission, first proves that it has a large market share. This, however, has things backwards. As we have explained elsewhere, the share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration.

*Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000).  We reviewed these cases for the Court in our opposition to defendants' motion to dismiss.  ECF No. 175 at 57-60, 70-71.  The Court agreed with this analysis, writing "when direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone." *In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516, 2015 U.S. Dist. LEXIS 35634, at *52 (D. Conn. Mar. 23, 2015).

Plaintiffs intend to show, as we have done in innumerable past cases, that the difference between the higher Aggrenox prices that class members actually paid and the lower dipyridamole/aspirin prices that they would have paid had generic competition not been delayed shows an actual adverse effect on competition.  "Relevant market" discovery can neither prove those pricing effects nor refute them.

> **D.** **Specific Answer to Question No. 1: "Whether an antitrust plaintiff's proof of overcharges (which, by definition, constitutes proof of supracompetitive prices) necessarily proves market power, because the extraction of supracompetitive prices is itself an exercise of market power?"**

The answer is "yes." The substantial fall in prices for dipyridamole/aspirin following the beginning of generic Aggrenox competition powerfully demonstrates BI's control over the price of Aggrenox, and hence, BI's market power.  The analysis of that substantial fall in prices does not simply involve looking at BI's branded Aggrenox price and inferring market power, as

defendants suggest.  Rather, it involves tracing dipyridamole/aspirin prices before, and then after, generic Aggrenox entry, and analyzing the timing, dynamics, and magnitude of that fall, to evaluate the control over pricing (i.e., market power) that the delay in generic Aggrenox competition conferred upon BI.

### 1.    BI Was Able to Price Its Product Above the Competitive Level and Enjoyed Abnormally High Profit Margins

Market power is "the power to charge prices higher than the competitive level."  *Actavis,* 133 S. Ct. at 2236.[11]  Competitive price levels must be assessed within a "purely competitive market," that is, a market without the alleged restraint in place.  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979) ("competitive level" is the "socially optimal level that would prevail in a purely competitive market" because "[t]here is little disagreement that a profit-maximizing monopolist will maintain his prices higher and his output lower" than such a level).  Overcharges are "the difference between the defendants' supra-competitive price and the competitive price."  *DDAVP*, 585 F.3d at 689.    "The ability profitably to charge a supracompetitive price indicates market power[.]"  Areeda and Hovenkamp, ANTITRUST LAW ¶ 506d.

Here, in just the few months following (belated) generic entry, the price of dipyridamole/aspirin fell by 36%, and 75% of the market converted to the lower priced generic

---

[11] *See also NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109 n.38 (1984) ("[m]arket power is the ability to raise prices above those that would be charged in a competitive market"); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) ("Monopoly power is the power to raise prices to supra-competitive levels or … the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market") (quotes omitted); D. Carlton and J. Perloff, MODERN INDUSTRIAL ORGANIZATION 8 (3d ed. 2000) ("The ability to price profitably above the competitive level is referred to as market power").

product.  *See* Leitzinger Decl. at ¶ 30.[12]  This pattern conforms with numerous and repeated studies of the pharmaceutical industry bearing out the same pattern – prices for the drug fall following generic entry, and purchasers switch from the brand product to the less expensive generic.  *See* Leitzinger Decl. at ¶¶ 23-28.  After the generic enters, the price starts to fall to competitive levels, that is, to prices closer to the marginal cost of producing the drug.  And the Second Circuit has explicitly noted that "plaintiffs' pricing proof may of course be indicative of monopoly power."  *Geneva*, 386 F.3d at 500.  What is required to analyze this drop to the competitive level of dipyridamole/aspirin prices is transactional sales and adjustments (returns, chargebacks, etc.) data from defendants and other generic Aggrenox sellers.  Discovery concerning the "relevant market" is not necessary to perform the analysis, nor does it have the capacity to rebut it.

Defendants claim that supracompetitive pricing on its own is not be sufficient to demonstrate market power.  *See* Response at 9.  That is incorrect, but no matter:  if necessary plaintiffs can show supranormal profits, too.[13]  ███████████████████████████

████████████████████  *See* Leitzinger Decl. at ¶ 33.[14]  Margins of such magnitude indicate market power.  *See id.*; *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F. Supp. 2d 514, 523 (E.D.N.Y. 2005) (95% price drop following generic entry indicated an "abnormally high price-cost margin[.]").  More important to the issue before the Court, no

---

[12] These figures are preliminary (only a small amount of data is available at this early date), and the generic discount (relative to brand price) typically increases substantially over time.  Plaintiffs eagerly await defendants' production of sales and adjustment data under Rule 26(e).

[13] The Court in *Geneva* declined to rely on the plaintiff's proffer of direct proof due to the absence of "any analysis of Barr's costs."  386 F.3d at 500.  Plaintiffs have adduced precisely such information here.

[14] The analysis was performed based on figures for 2006-10.  Defendants have not yet produced profit and loss information through the present.  These documents are within defendants' possession, and yet they did not discuss their own cost information in their Response.

discovery of "relevant market" is required to establish or rebut BI's margins.

> ### 2. R&D and Promotional Costs Are Not Relevant to the Market Power Analysis

Obviously knowing that Aggrenox in fact does earn supranormal profits, defendants try to lower those margins by raising the measure of their costs, citing supposed research and development and promotional costs (but curiously not Aggrenox's). But consideration of fixed or sunk costs is not appropriate. *See* Areeda and Hovenkamp, ANTITRUST LAW ¶ 520b2 (Supp. 2015) ("[W]hile high fixed costs may both explain and justify high margins... that observation says nothing about the antitrust significance of payments to another firm to stay out of one's market.").

In general, as a matter of law and economics, it is inappropriate to include sunk costs when evaluating defendants' market power. Market power generally looks to a firm's marginal cost, that is, the added cost associated with producing and selling the last or incremental unit of output. *See* Leitzinger Decl. at ¶ 31; *see also In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014) ("Market power is defined as the ability to charge a supracompetitive price—a price above a firm's marginal cost.") (citing Herbert Hovenkamp, FEDERAL ANTITRUST POLICY: THE LAW OF COMPETITION AND ITS PRACTICE, §§ 3.1, 3.1a (4th ed. 2011)).

In general, a firm that is able to price above marginal cost profitably indicates that competitors' ability to capture customers is limited. *See* Leitzinger Decl. at ¶¶ 31-32. In certain cases, ongoing fixed costs might be included in the analysis, *see*, *e.g.*, *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995), but historical or sunk costs do not impact forward-looking pricing decisions and therefore are irrelevant to whether a firm currently maintains market power. *See* F. Scherer "The Pharmaceutical Industry--Prices and Progress," 351 NEW ENG. J. MED. 927, 928 (2004) ("Sunk research-and-development costs [in the pharmaceutical

industry] are bygones and are therefore irrelevant in current pricing decisions.").

Moreover, rather than negating a finding of market power, BI's ability to recoup its R&D suggests that it is *exercising* market power. Indeed, the patent laws and the Hatch Waxman Act are specifically designed to give the brand company market power: the ability to charge premium prices as an incentive to engage in R&D. *See New York v. Actavis PLC*, 787 F.3d 638, 644 (2d Cir. 2015). Thus, a drug firm that is able to recapture its sunk R&D as a result of Hatch-Waxman is enjoying the benefits of its ability to exclude potential (and less expensive) generic competitors. *Cf. United States v. Line Material Co.*, 333 U.S. 287, 305 (1948) (holder of valid, non-infringed patent had right to "control of the sale price of the patented devices."). It may not extend that exclusivity by paying otherwise ready, willing, and able generic competitors to delay entry into the market under the rubric of "fixed cost recovery."

Promotional costs are likewise irrelevant, and for an additional reason: promotion *increases* market power, by lowering the price elasticity of demand for the drug. *See* John A. Rizzo, *Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs*, 42 J.L. & ECON. 95, 99-100, 104-05, 107 (1999); Fiona M. Scott Morton, *Barriers to Entry, Brand Advertising, and Generic Entry in the U.S. Pharmaceutical Industry*, 18 INT'L J. INDUS. ORG. 1085, 1097 (2000). Dollars spent on advertising thus make the price for the drug *inelastic*, tending to *increase* the firm's market power. Leitzinger Decl. at ¶¶ 6, 49-50. Dr. Addanki agrees, noting that such spending permits the brand to "charge a higher price than it might otherwise have been able to charge," *id.* at ¶ 11, and that the brand cannot sustain premium pricing once an AB-rated generic enters at a discounted price. *Id.* at ¶ 15.

Finally, although the Court put defendants to the proof why the discovery they seek is necessary, and although the "relevant market" discovery sought from plaintiffs has zero to do

13

with BI's costs (which are known to BI and not to plaintiffs), it is notable that defendants have

not provided the R&D costs for *Aggrenox*.   Rather, they have cited to generalized (and much

criticized) studies purportedly estimating R&D costs for some set of new, unidentified drugs at

the cost of $2.6 billion.   But the record is devoid of what *BI* spent to develop Aggrenox, a

follow-on combination product composed of two long-since discovered, older drugs

(dipyridamole, approved by the FDA in 1961 as "Persatine," having been discovered by BI in the

1950s; and aspirin, invented in 1897).   The $2.6 billion figure that defendants cite is highly

misleading and irrelevant to the facts here.[15]   The actual price to research and develop Aggrenox,

to the extent it is even relevant, is far lower than the figure cited by defendants.

### 3.   Showing A Restriction on Output Is Unnecessary

Defendants also suggest that, to show BI's market power, plaintiffs must show not only

that BI was able to control the price of dipyridamole/aspirin, but also that BI restricted output.

Of course, nothing about the "relevant market" discovery sought by defendants shows restricted

or enhanced output of dipyridamole/aspirin.   Moreover, such a showing of restricted output is

---

[15] First, the $2.6 billion figure is based on drugs that are original developments by the brand firm. In other words, the study (and predecessor studies by the same authors) focus on the most expensive drugs. *See* Aaron E. Carroll, *$2.6 Billion to Develop a Drug? New Estimate Makes Questionable Assumptions*, N.Y. TIMES (Nov. 18, 2014); Marcia Angell, THE TRUTH ABOUT DRUG COMPANIES 42 (2004). Second, the methodology behind the estimates has been criticized for *inter alia*: (1) calculating "opportunity costs" based on hypothetical returns on alternate investments for R&D expenditures; (2) failing to recognize that much of the initial research for new chemical entities is performed by the National Institutes of Health or universities; and (3) ignoring R&D-related tax credits received by pharmaceutical firms. *See The Truth About Drug Companies* at 44-65. *See generally* Merrill Goozner, THE $800 MILLION PILL: THE TRUTH BEHIND THE COST OF NEW DRUGS (2004); Donald W. Light & Rebecca Warburton, *Demythologizing the High Costs of Pharmaceutical Research*, BIOSOCIETIES, Mar. 2011, at 34-50. Hence, the actual price to research and develop a drug is likely far lower than the figure cited by defendants. For instance, one of the authors of the study that defendants cite, Henry G. Grabowski, admitted in a prior case that the R&D costs for the brand drug Neurontin were $225 million, yet the drug earned $12.5 billion in sales. *See* Declaration of Daniel C. Simons, Exh. 1, *In re Gabapentin Patent Litig.*, Civ. A. No. 00-2931 (FSH) (D.N.J.), Trial Tr. May 19, 2011, at 25.

superfluous on the issue of market power, when evidence of control over prices is abundant.

First, the Supreme Court in its seminal decision in *U.S. v. E.I. duPont de Nemours & Co.*, held that "[m]arket power is defined as the power to control prices *or exclude competition*." 351 U.S. 377, 391 (1956) (emphasis added). *See also United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (market power is the "the power to control prices *or exclude competition*.") (emphasis added); *Geneva*, 386 F.3d at 500 (same). A restriction of output is not a necessary prerequisite to a finding of harm to competition or market power; the power to raise price is sufficient. *E.g.*, *Geneva*, 386 F.3d at 496 ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices *or* restrict output.") (emphasis added); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 n.10 (9th Cir. 1995) ("restrict output *or* raise prices") (emphasis added); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir. 1987) ("restrict output *or* raise prices") (emphasis added); *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1331 (7th Cir. 1986) ("the power to restrict output in the market *or* to raise price") (emphasis added); *Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 380 (6th Cir. 1981) ("market power [is] the power to raise prices above *or* restrict output below levels that would occur in a competitive marketplace") (emphasis added).

Second, even if reduced output were required, BI's demonstrated ability to delay the market entry of potential generic rivals by making a reverse payment directly manifests its ability to exclude competitors and reduce *their* output. That is what matters. "A high payment to another firm to stay out of one's market is typically... an indicator that the payor gains from excluding the output of a rival." Areeda & Hovenkamp, ANTITRUST LAW ¶ 520b2.

Third, the ability to control prices is inherently the ability to restrict output. *See Fortner*

*Enters, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969) ("reduced output is the almost inevitable result of higher prices"); *Berkey Photo*, 603 F.2d at 272 ("There is little disagreement that a profit-maximizing monopolist will maintain his prices higher and his output lower [than] the socially optimal levels that would prevail in a purely competitive market"); *In re ATM Fee Antitrust Litig.*, No. C 04–2676 CRB, 2010 WL 2557519, *10-11 (N.D. Cal. June 21, 2010) ("because price and output are inversely correlated," proof of supracompetitive prices "implies that marketwise output... has been lower than it would have been").

    **E.**    **Question No. 2: "[W]hether, in this case (or in any case brought under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013)), an allegation of supracompetitive prices can be proved or disproved directly with sales and pricing data regarding only the allegedly supracompetitively priced product and its generic(s)"**

The answer is "yes." As described above, market power can be proved or disproved with defendants' (and other generic drug companies') transactional sales and adjustments data. Such data can be used to demonstrate directly BI's market power over dipyridamole/aspirin because that data directly shows BI's power over dipyridamole/aspirin prices, and the end to that power when generic Aggrenox belatedly entered the market. Plaintiffs' economic expert, Dr. Leitzinger, says exactly this. Leitzinger Decl. ¶¶ 21-30.

Either alternatively or in addition to permitting a direct examination of the price effects of generic Aggrenox competition (and drawing the conclusions those observations compel in terms of BI's control over prices), the transactional sales data and other data can also allow an economist to use the well-known Lerner Index to determine whether BI has (or had) market power. As Dr. Leitzinger explains:

> From this perspective, a Lerner Index that is substantially above zero can provide direct evidence that a firm has substantial market (monopoly) power. In particular, one would not expect to observe a firm charging prices that were consistently and substantially in excess of marginal costs unless it was profitable to do so. The fact that prices reflecting a substantial premium over marginal costs

have proved profitable for the firm in question would mean that the ability of
competition to divert customers is meaningfully limited.  As noted above, that is
the very definition of monopoly power.

*Id*. at ¶ 32 (footnote omitted).[16]

**F.      Question No. 3: "[W]hether, in such a case, an explicit articulation of (and
discovery and argument on) antitrust market definition is necessary or
material"**

The answer is "no."  As plaintiffs have set forth extensively above, if plaintiffs are able to

prove their case through direct proof of a large reverse payment or direct proof of

anticompetitive effects (here, higher dipyridamole/aspirin prices as a result of the challenged

conduct), there is no additional need to define the relevant market to prove market power, nor

can discovery over the relevant market rebut that direct proof.  *E.g.*, *Geneva*, 386 F.3d at 509

("We have not required proof of market power in § 1 cases."); *Todd*, 275 F.3d at 206 (evidence

of "an actual adverse effect on competition … arguably is more direct evidence of market power

than calculations of elusive market share figures[.]"); *K.M.B. Warehouse Distributors, Inc. v.

Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) ("This court has not made a showing of market

power a prerequisite for recovery in all § 1 cases. If a plaintiff can show an actual adverse effect

on competition… we do not require a further showing of market power.").

Indeed, given that "the anticompetitive effects of [delaying generic entry] cannot be

seriously debated," *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1311 n.27 (11th

Cir. 2003), *overruled on other grounds*, *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013), were

defendants' experts to conclude that the market were something other than Aggrenox and its AB-

rated generics, they must necessarily have performed the market definition exercise incorrectly.

For the ultimate goal behind the market power question is to determine whether BI had the

---

[16] Plaintiffs also continue to request BI's cost and profit information, if the Court deems such
information necessary to prove market power.

power to keep prices from falling to the competitive level, something the transactional sales data will show it did (or did not).  *See* Areeda & Hovenkamp, ANTITRUST LAW ¶ 507a (goods not in the same market "unless the availability of one effectively limited the price of the other to the competitive level or something slightly above").

And even if conducting a "relevant market" definition exercise were thought to be useful, there is no need for anything other than defendants' sales data to perform it.  A "relevant market" is "any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228-29 (2d Cir. 1999) (citing Areeda and Hovenkamp, ANTITRUST LAW ¶ 533b (2002)).  The market is the "smallest possible group of products" that satisfies this test.  *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 360 (S.D.N.Y. 1995); Areeda & Hovenkamp, ANTITRUST LAW ¶ 536; U.S. Dep't of Justice & Federal Trade Comm'n, HORIZONTAL MERGER GUIDELINES § 1.11 (2010).  All that is needed to evaluate this question — whether BI (or BI and Teva together), by controlling just dipyridamole/aspirin sales *and the sales of no other product*, could profitably raise or maintain dipyridamole/aspirin prices significantly above the competitive levels generic Aggrenox competition belatedly produced — is transactional sales data from BI, Teva and other generic Aggrenox sellers.  Plaintiffs have already been able to discern that, by delaying generic Aggrenox competition, BI was able to maintain pre-generic dipyridamole/aspirin prices for the entire period the reverse payment agreements were in effect.  Leitzinger Decl. ¶ 48 n.60.   Relatedly, the record here already discloses that, even before generic competition belatedly began, BI continued to raise prices for Aggrenox over the years.  *Id.*  If Aggrenox were in the same relevant antitrust product market with other drugs, these price increases would have by definition led to the evisceration of

18

Aggrenox sales when sales and prescriptions switched away from Aggrenox due to those price increases.  Yet, it was only the advent of AB-rated generic competition in June 2015 that caused Aggrenox to lose 75% of its sales volume.  The other "relevant market" discovery defendants seek cannot confirm or rebut these facts.

Defendants say that Aggrenox competed with other drugs on therapeutic or other bases. But it is simply an error to seek to include in the relevant product market pharmaceuticals that might function similarly to Aggrenox, but which did not constrain Aggrenox prices down to the competitive level that generic Aggrenox competition produced.  *See Hayden Pub. Co., Inc. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) (district court committed reversible error in "neglect[ing] the factor of cross-elasticity of demand," which directs that the court determine not just functional substitutability, but primarily "how *far* buyers will go to substitute one commodity for another") (emphasis supplied).[8]  Even close therapeutic equivalents have been deemed to be in separate markets.  *See FTC v. Lundbeck, Inc*., 650 F.3d 1236, 1240 (8th Cir. 2011)  (because of "low cross-elasticity of demand between Indocin IV and Neoprofen, [] the drugs are not in the same product market," although they were the only two drugs available to treat the disease); *Geneva*, 386 F.3d at 496 (Coumadin and generic warfarin are in separate markets despite being chemically identical); *In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 81 (D.D.C. 2006) ("The fact that products are just functionally interchangeable does not compel a finding that they belong in the same market.").  Discovery has to be more beneficial than burdensome to be allowed, and even if the Court believed that relevant market discovery was appropriate, unless defendants can show that there was a drug out there that constrained dipyridamole/aspirin prices down to the levels that generic Aggrenox competition

---

[8]*See also Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co*., 305 F.3d 1124, 1132 (10th Cir. 2002) ("[r]easonable interchangeability does not depend on product similarity").

produced, no benefit can be shown.

Defendants effectively concede the absence of any such benefit.  Defendants' discussion of competition with branded drugs such as Brilinta (e.g., Response at 35) is largely devoid of actual *price competition*.  Defendants also frequently mention aspirin (and their request for aspirin products yield some of the most burdensome discovery requests now at issue), yet defendants cite no evidence that Aggrenox competed with aspirin on price.  This is not a sufficient basis to warrant discovery from wholesalers, insurers, and other market participants.

Defendants' insistence at looking at certain documents from indirect purchasers to suggest there is global price competition between Aggrenox and other drugs also runs afoul of the Cellophane fallacy.  One cannot use drug pricing before the entry of generic Aggrenox as a baseline to define and assess whether substantial market power is being exercised.  Indeed, the Cellophane fallacy occurs precisely when one attempts to compare products already priced at monopolistic levels, *i.e.*, priced above marginal cost.  Areeda & Hovenkamp, Antitrust Law ¶ 539 ("Actual trading patterns, cross-elasticity, and hypothetical price increases all delineate the market correctly when actual *A* prices are at (or near) the competitive level but indicate overly broad markets when those prices have been significantly supracompetitive. The reason is easy to see. Buyers may have shifted to the *B* firms precisely because the *A* price has been monopolistic and, therefore, has not been adequately constrained by competition from the *B* firms. * * * The observed high 'cross-elasticity of demand' between A and B then reflects not the absence of market power, but its existence and exercise.").  Even for monopolists, there are always sources of discipline limiting further price increases. All firms, even those presently exercising monopoly power, face pricing discipline at some level.  *See Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 471 (1992) ("[T]he existence of significant substitution in the event of *further*

price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power") (emphasis in original; internal quotes omitted); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1121 (N.D. Cal. 2004) ("because a monopolist exercises market power by increasing price until... a further price increase would be unprofitable, a high cross-elasticity of demand at current prices... does not demonstrate that the seller lacks market power"); Richard A. Posner, ANTITRUST LAW 150 (2d ed. 2001) ("[A] monopolist always tries to sell in the elastic portion of his demand curve" and therefore "at a high enough price, even poor substitutes look good to the consumer.").

Defendants attempt to cabin the Cellophane fallacy to only products that are differentiated. Addanki Decl. at ¶ 27; Response at 30. There is no support for this limitation. *See* Leitzinger Decl. at ¶¶ 47-49. And, as noted above, brand companies' marketing efforts already tend to differentiate one branded drug from another, and therapeutic interchangeability alone is insufficient for inclusion in the relevant market. *See supra* at 13-14; *see also* Addanki Decl. at ¶ 11 (promotion activities may allow "a brand-name manufacturer… to charge a higher prices that it might otherwise have been able to charge.").

Nor do defendants' cherry-picked documents from indirect purchasers or insurers change the story. To the contrary, they simply demonstrate the commission of the Cellophane fallacy. Even monopolists are forced to compete on price at the periphery, for instance, to retain sales to price sensitive entities such as certain health plans. But that is a hallmark of the Cellophane dynamic. Aggrenox prices were raised so high above marginal costs that certain purchasers sought to switch to less-than-desirable alternatives. But any price effects brought about by such market interactions are dwarfed by the substantial discounts and market switching associated with generic entry.

### G.      GPhA's Amicus Brief Offers Nothing New

The Generic Pharmaceutical Association ("GPhA") has submitted an amicus curiae brief in response to the January 8, 2016 Order to Show Cause.[17]  The GPhA previously submitted an amicus curiae brief in *FTC v. Actavis*, 133 S. Ct 2223 (2013) in which it urged (unsuccessfully) the Supreme Court to adopt the "scope of the patent test" that would permit a brand-name drug company to pay its generic competitors to stay out of the market as long as the agreement not to compete did not extend beyond expiration of the brand's patent or the patent was not obtained by fraud or the basis for sham litigation.[18]  The GPhA also submitted an amicus curiae brief in *King Drug Company of Florence, Inc., v. SmithKline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) in which it argued (unsuccessfully) that a brand's agreement not to market an authorized generic during the generic's 180-day exclusivity period was a "common bargaining term" that should not be considered a "reverse payment."[19]

In its proposed amicus curiae brief in this case, the GPhA states that it "has member interests that align with each side," ECF No. 441 at 18, but fails to articulate or explain the "interests that align" with the plaintiffs here.  Presumably, it is the acknowledgement that "GPhA members save consumers nearly $200 billion each year," ECF No. 441 at 18 and that GPhA members "provide American consumers with generic drugs that are as safe and effective as their brand-name counterparts, but substantially less expensive."  In any event, the proposed brief fails to provide any "unique information or perspective that can help the court beyond the help the

---

[17] Br. of Generic Pharm. Ass'n as Amicus Curiae in Support of Defendants in Response to the Court's January 8. 2016 Order to Show Cause, ECF No. 441, at 5-6.

[18] Br. for Generic Pharm. Ass'n as Amicus Curiae Supporting Resp'ts, *FTC v. Actavis, Inc.*, No. 12-416 (S. Ct.), filed Feb. 28, 2013, *available at* http://www.scotusblog.com/case-files/cases/federal-trade-commission-v-watson-pharmaceuticals-inc/ (last visited Feb. 26, 2016).

[19] Br. of Generic Pharm. Ass'n as *Amicus Curiae* in Support of Defendants-Appellees, *In re Lamictal Direct Purchaser Antitrust Litig.*, No. 14-1243 (3d Cir.), filed Jun. 3, 2014.

22

lawyers for the parties are able to provide," the GPhA's statements to the contrary. ECF No. 441 at 3. While the GPhA could have been expected to offer statistical data or studies demonstrating the price-constraining effect generic entry has on drugs other than the brand -- assuming, of course, that such data exists -- it has not done so. In fact, the GPhA provides no statistical data or actual analysis informative of the questions the Court posed. Rather, the brief merely presents the same argument offered by the lawyers for the defendants that are addressed above.

### H.   Defendants Are Not Entitled to the Burdensome Discovery They Seek

However the Court ultimately decides the issue regarding methods of proving market power, defendants are not entitled to the sprawling and overly burdensome discovery that they seek. There is an obvious disconnect between defendants' appeal to "due process" and the discovery sought from the Direct Purchaser Plaintiffs ("DPPs") – defendants have not demonstrated that discovery *from DPPs* is necessary, or even relevant, to their relevant market theories. Due process does not require that the court impose burdensome discovery requirements on DPPs in order to satisfy defendants' speculation that DPPs might have documents that might be relevant. *See, e.g., Brown v. Coleman*, 514 Fed. Appx. 6, 9 (2d Cir. 2013) (A party's "substantial rights" not infringed by denial of discovery where producing party represented that the sought information was unavailable); *In re "Agent Orange" Prod. Liab. Litig*., 517 F.3d 76, 103 (2d Cir. 2008) (substantial rights not infringed by limits on discovery where court determined that "likely the best source regarding the information" sought was already available to the movant).[20] Defendants' cited cases do not counsel otherwise, nor divest the court of its

---

[20] Defendants' appeal to Rule 56(f) is equally unavailing. The opportunity to take discovery in response to a motion for summary judgment is not a license for a fishing expedition. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos*., 265 F.3d 97, 117 (2d Cir. 2001) ("Even where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discovery if it deems the request to be based on speculation as to what potentially could be discovered."); *Bonnie & Co. Fashions v. Bankers Trust Co.,* 945 F. Supp. 693, 706 (S.D.N.Y. 1996) ("while

23

discretion to effective manage discovery.[21]  *See In re Subpoena Issued to Dennis Friedman*, 350

F.3d 65, 69 (2d Cir. 2003) ("[T]he federal rules give district courts broad discretion to manage

the manner in which discovery proceeds."); *Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 2013 U.S.

Dist. LEXIS 92081, *42 (S.D.N.Y. June 28, 2013) ("The Advisory Committee notes show that

Rule 26 has several times been amended with the aim of giving judges the discretion to limit

discovery in the interest of conserving resources, and of encouraging judges to use that discretion.").

The irrelevance of DPPs' data and documents is further supported by defendants' own

expert.  In his report submitted in connection with defendants' motions to compel, Dr. Addanki

concedes that he has no methodology for which DPPs' purchase or sales data would be useful.

As Dr. Addanki admitted, DPPs' data "may be" useful, but he "cannot determine the full

relevance and significance of information that these entities may possess until it is obtained."[22]

"Only by examining the data can it be determined if they are usable for relevant analyses," he

candidly admits.  *Id.* ¶ 14.  Such speculative or theoretical benefits simply do not meet a

discovery proponent's burden under Rule 26. *See, e.g., In re Vitamins Antitrust Litig.*, 198 F.R.D.

296, 303 (D.D.C. 2000) (denying discovery of direct purchaser data where defendants' expert

could state only that he was "interested" in such data, and not that it was necessary for his

---

Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps
in its case... it does not permit a plaintiff to engage in a fishing expedition.") (internal cite and
quotes omitted).

[21] S*ee Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir.
1992) (while delay from "unnecessary or unreasonable" discovery is to be avoided, it was error
to compel intervenor "to begin trial without any discovery."); *Long Island Lighting Co. v.
Barbash*, 779 F.2d 793, 795 (2d Cir. 1985) (district court erred when it ordered party to examine
a witness "without notice or an opportunity to review the documents that had just been
produced"); *In re Complaint of Bankers Trust Co.*, 752 F.2d 874, 890 (3d Cir. 1984) (error when
court abused its "*limited* discretion to deny applications for the issuance of a commission" to
take discovery abroad) (emphasis in original).

[22] Addanki Decl., at ¶ 12 (emphasis added).

analysis).  Notably, while DPPs pointed out all of these failings months ago, Defendants have not sought to cure them.  In fact, as with their most recent brief, the reports of their experts are devoid of any mention of documents or data which could be obtained from the DPPs.

The Court is not obligated to compel discovery where a party represents that relevant material is unlikely to be found, and the Court should not do so here.  *See e.g., Crenshaw v. Herbert*, 409 Fed. Appx. 428 (2d Cir. 2011) (substantial rights not impugned where denied discovery was "highly unlikely" to contain relevant information).

### III.    CONCLUSION

Defendants have failed to demonstrate their need for the far-reaching and burdensome discovery they seek.  Therefore, the Court should "restrict[] discovery and evidence in this case to the market in Aggrenox and any AB-rated bioequivalent substitute for Aggrenox." Order to Show Cause, ECF No. 432 at 2.


Dated: February 26, 2016                    Respectfully Submitted,

                                            */s/ Joseph Opper*

                                            Bruce E. Gerstein
                                            Joseph Opper
                                            Noah Silverman
                                            Ephraim R. Gerstein
                                            Garwin Gerstein & Fisher
                                            88 Pine Street Fl. 10
                                            New York, NY 10005
                                            212-398-0055
                                            Email: jopper@garwingerstein.com
                                                    bgerstein@garwingerstein.com
                                                    nsilverman@garwingerstein.com
                                                    egerstein@garwingerstein.com


                                            *Interim Lead Counsel for Direct Purchaser Class Plaintiffs*

David F. Sorensen
Daniel C. Simons
Nicholas Urban
Berger & Montague, P.C.
1622 Locust Street20
Philadelphia, PA 19103
Tel:  (215) 875-3000
Email:  dsorensen@bm.net
          dsimons@bm.net
          nurban@bm.net


Thomas M. Sobol
David S. Nalven
Edward Notargiacomo
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Email: tom@hbsslaw.com
davidn@hbsslaw.com
EdwardNotargiacomo@hbsslaw.com


Linda P. Nussbaum
Bradley J. Demuth
Nussbaum Law Group, P.C.
570 Lexington Avenue, 19th Floor
New York, NY 10022
Tel: (212) 702-7054
Email: lnussbaum@nussbaumpc.com


*Interim Executive Committee for Direct
Purchaser Class Plaintiffs*


Gerald C. Pia, Jr.
Brian C. Roche
Roche Pia LLC
Two Corporate Drive, Suite 248
Shelton, CT 06484
Tel: (203) 944-0235

26

Email: gpia@rochepia.com
broche@rochepia.com


David R. Schaefer
Brenner, Saltzman & Wallman LLP
271 Whitney A venue
New Haven, CT 06511
Telephone: (203) 772-2600
Facsimile: (203) 562-209821
Email:  dschaefer@bswlaw.com


*Interim Co-Liason Counsel for Direct
Purchaser Class Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Joseph Opper, hereby certify that the foregoing Direct Purchaser Class Plaintiffs' Reply to Defendants' Memorandum in Response to the Court's Order to Show Cause was electronically filed and served using the Court's CM/ECF system and via email.

Dated:  February 26, 2016                    */s/ Joseph Opper*
                                             Joseph Opper