UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                              :
IN RE: AGGRENOX               :  No. 3:14-MD-2516(SRU)
ANTITRUST LITIGATION          :  915 Lafayette Boulevard
                              :  Bridgeport, Connecticut
                              :
                              :  March 31, 2016
- - - - - - - - - - - - - - - - x


             ORAL ARGUMENT ON ORDER TO SHOW CAUSE


B E F O R E:

      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

            BERGER & MONTAGUE, P.C.
                 1622 Locust Street
                 Philadelphia, Pennsylvania  19103
            BY:  DAVID F. SORENSEN, ESQ.


            GARWIN GERSTEIN & FISHER, LLP
                 88 Pine Street, 10th Floor
                 New York, New York  10005
            BY:  JOSEPH OPPER, ESQ.
                 EPHRAIM R. GERSTEIN, ESQ.


            HILLIARD & SHADOWEN LLC
                 39 West Main Street
                 Mechanicsburg, Pennsylvania  17055
            BY:  STEVE D. SHADOWEN, ESQ.
                 D. SEAN NATION, ESQ.

```
                    HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
                         4400 Deer Path Road, Suite 200
                         Harrisburg, Pennsylvania  17110
                    BY:  MONICA L. REBUCK, ESQ.


                    KENNY NACHWALTER P.A.
                         1100 Miami Center
                         201 South Biscayne Boulevard
                         Miami, Florida  33131
                    BY:  SCOTT E. PERWIN, ESQ.


                    MOTLEY RICE LLC
                         600 Third Avenue, Suite 2101
                         New York, New York  10016
                    BY:  MICHAEL M. BUCHMAN, ESQ.


                    LOWEY DANNENBERG COHEN & HART, P.C.
                         One North Broadway
                         White Plains, New York  10601-2310
                    BY:  PETER ST. PHILLIP, ESQ.
                         URIEL RABINOVITZ, ESQ.


                    MILLER LAW LLC (appearing telephonically)
                         115 S. LaSalle Street, Suite 2910
                         Chicago, Illinois  60603
                    BY:  MARVIN A. MILLER, ESQ.


              FOR THE DEFENDANTS:

                    WHITE & CASE LLP
                         1155 Avenue of the Americas
                         New York, New York  10036
                    BY:  ROBERT A. MILNE, ESQ.
                         PETER J. CARNEY, ESQ.
                         ROSS E. ELFAND, ESQ.

                    GOODWIN PROCTOR LLP
                         Exchange Place
                         Boston, Massachusetts  02109
                    BY:  CHRISTOPHER T. HOLDING, ESQ.
                         SARAH FREDERICK, ESQ.
```

PULLMAN & COMLEY LLC
      850 Main Street
      P.O. Box 7006
      Bridgeport, Connecticut  06601-7006
BY:  JAMES T. SHEARIN, ESQ.
      ASSAF BEN-ATAR, ESQ.


DAY PITNEY LLP
      One Canterbury Green
      201 Broad Street
      Stamford, Connecticut  06901
BY:  RICHARD P. COLBERT, ESQ.

 1          (Whereupon, the following proceedings commenced

 2  at 12:34 p.m.)

 3          THE COURT:  Good afternoon.  We're here in the

 4  Aggrenox MDL.  I know both sides have some thoughts about

 5  how you want to present your case.  I've got probably

 6  about two hours for you, so if you could try to be fair to

 7  your opponent in terms of your use of that time, that

 8  would be great.  And I've got a bunch of questions, but

 9  I'm sure they'll come up as we go along.  So who wants to

10  go first?

11          MR. MILNE:  Well, Your Honor, I think it's our

12  motion initially, so maybe the defendants should go first.

13          THE COURT:  That's fine.  Let me just quickly

14  confirm that whoever is on the phone can actually hear

15  what's going on.

16          MR. MILLER:  It's Marvin Miller, Judge, on

17  behalf of the end-payors.  It's difficult to hear at this

18  point.

19          THE COURT:  Okay.  We'll all try to speak into

20  the mike and keep our voices up.

21          MR. MILLER:  Thank you, Your Honor.

22          MR. MILNE:  And, Your Honor, for those on the

23  phone, this is Robert Milne standing at the podium for

24  Boehringer.  And, Your Honor, first, as we often do, we

25  have slides that we'll be projecting on the screen, but we

1    also have hard copies for Your Honor and clerks.  We've

2    distributed those to our adversaries.

3              THE COURT:  Very good.  Thank you.

4              MR. MILNE:  You're welcome.  And just one other

5    issue about the slides.  So some of the slides that are in

6    the hard copy deck that you received contain materials

7    that were filed originally under seal, so they are found

8    in the hard copy set, but when we get to that point on the

9    screen, they won't go up, it will just be a blank screen,

10   and I'll try to direct you to the slide number.

11             THE COURT:  That's fine.

12             MR. MILNE:  Okay.  So, Your Honor, Robert Milne,

13   again, on behalf of the defendants.

14             We began this process back in the fall with the

15   discovery motion in the rule-of-reason case, and we

16   understand that in this is rule-of-reason case that the

17   type of discovery that we're seeking would not be

18   controversial in a typical rule-of-reason proceeding, but

19   Your Honor has raised questions about whether there's

20   something about the decision in *Actavis*, something about

21   the way the plaintiffs have pled their case here, or maybe

22   even something about the pharmaceutical market that makes

23   this different.  And we believe that the answer to those

24   questions is no; that *Actavis* does not establish a new

25   approach for the rule of reason; that market power is

1    something that should be inquired into in the usual way;

2    even if the plaintiffs are purporting to rely upon a

3    narrower market, that we should be, as the defendants,

4    permitted to come in and persuade the fact-finder that no,

5    no, no, it is a broader market; that there is vibrant

6    competition and an inability to exercise market power in

7    that broader market.  And especially at this stage where

8    we're just focusing on discovery, we think that discovery

9    should not be narrowed -- or should not be prevented from

10   us to be -- to pursue.  So -- and we --

11           THE COURT:  Let me just jump in right there.

12   Obviously, market definition is important to this case;

13   and, obviously, we have competing views about what that

14   market definition should be.  If the prices charged for

15   Aggrenox were supracompetitive in the narrow market,

16   weren't they, by definition, supracompetitive in the

17   broader market?  In other words, they're either

18   supracompetitive or they are not; and if the approach is

19   to prove prices are supracompetitive, then why do we need

20   to worry about precisely defining the market?

21           MR. MILNE:  Well, I think, Your Honor, that goes

22   to the first question that you identified in your order to

23   show cause, which goes to the question of whether -- you

24   know, asks the question of whether if you can establish

25   supracompetitive pricing, is that all you need to do.  And

```
 1    while I would say that it may be true that

 2    supracompetitive pricing, if it can be established,

 3    reflects the operation of market power, the question is

 4    how do you do that?  How do you establish what

 5    supracompetitive pricing is?

 6            Now, the plaintiffs in this case are -- and in

 7    all of these reverse payment cases and all of these

 8    delayed generic entry cases that are pending around the

 9    country, they say the generic price is the competitive

10    price; and, therefore, anybody who prices above that

11    generic price is necessarily exercising market power.

12    That's their theory.  But if that were true, then

13    literally every brand of pharmaceutical manufacturer,

14    brand of pharmaceutical product, no matter what kind of

15    market it competed in, would, by definition, be a

16    monopolist, be exercising market power.

17            THE COURT:  I'll just say both sides are trying

18    to prove too much in this case --

19            MR. MILNE:  Well --

20            THE COURT:  -- at various points.

21            MR. MILNE:  Right.

22            THE COURT:  But here's the thing.  What we have

23    here is -- and I want you to, if you would during your

24    discussion, distinguish between branded pharmaceuticals

25    and patented pharmaceuticals, because in your papers
```

1    there's a very seemingly careful effort to say "branded,"

2    which I understand makes your argument more sympathetic,

3    but what I'm worried about is a patented pharmaceutical.

4    So we have a patented pharmaceutical, and it's sold at a

5    particular price.

6             MR. MILNE:  Uh-huh.

7             THE COURT:  The generics come in, and that price

8    falls by a third, at least.

9             MR. MILNE:  Right.

10             THE COURT:  What more has to be shown?

11             MR. MILNE:  Well, Your Honor, okay, so with

12    respect to -- first of all, stepping back on the patents,

13    I know you're well aware that under Supreme Court

14    authority and various other authorities that we cite in

15    the papers, the mere fact that you have a patent doesn't

16    mean that you have market power or monopoly power.  That

17    needs to be assessed in the context of a market definition

18    exercise.

19             THE COURT:  You have a monopoly, and the

20    question is whether that monopoly allows you to charge a

21    supracompetitive price.

22             MR. MILNE:  Well --

23             THE COURT:  So what is being offered here is, as

24    soon as that monopoly was broken, there was a dramatic

25    price decrease.

1          MR. MILNE:  Right.

2          THE COURT:  It's a res ipsa loquitur theory.

3          MR. MILNE:  So, Your Honor, let me respond in a

4    couple of ways to that question.  First of all, I would

5    just -- I would just point out that it is well accepted,

6    and we cite the authority for this, including Second

7    Circuit authority in the *Geneva* case, the *Kodak* case, that

8    says that a mere differential in price isn't enough to

9    establish market power.  We cite the authority from the

10   Supreme Court saying a patent doesn't do it, and I want to

11   make sure that that's --

12         THE COURT:  I have been completely convinced --

13         MR. MILNE:  Okay.

14         THE COURT:  -- that a branded product can be

15   sold at a higher price than a generic product without

16   antitrust problem.  That's not really what we have going

17   on here.

18         MR. MILNE:  Well, what I would just point out is

19   that -- maybe this is what you're saying -- is that a

20   branded product can be priced above the generic product

21   without exercising market power depending on the situation

22   in the broader market.

23         THE COURT:  Well, yes, depending on a lot of

24   things, absolutely, of course.

25         MR. MILNE:  Right, and that's the type of

1    inquiry that we're looking to undertake through the

2    discovery, is to understand what's happening in the

3    broader market.  But let me -- let me go at this in two

4    different ways, Your Honor.

5              First is I think it's a very relevant analogy to

6    look at a longer standing body of jurisprudence that

7    started in the Supreme Court, which is the *Walker Process*

8    body of jurisprudence.  So we talked about this back in

9    November when you were talking with Mr. Holding.  So in

10   that case you have -- in *Walker Process* the issue was

11   could the exercise of a fraudulently procured patent be an

12   antitrust violation, and the Supreme Court said, yes, it

13   could.  And -- but so the issue was -- and the Supreme

14   Court said, Even where you have a patent that is procured

15   by fraud, never should have been issued, and that patent

16   holder enforces the patent against an alleged infringer,

17   just like we have the argument here that you've got an

18   alleged infringer being held off the market for some

19   inappropriate reason, there the inappropriate reason was a

20   fraudulent patent, but you have held that infringing

21   competition off the market, that -- those two facts alone

22   are not enough to win the antitrust case.

23             And, Ross, if you could pull up the slide we

24   have on this.  It is probably around Slide 31.

25             MR. ELFAND:  Yes, it's up.

1          MR. MILNE:  Okay, it's not coming up at mine.

2     So, Your Honor, in the *Walker Process* case the Supreme

3     Court said even where you have those -- you've established

4     those facts, you've established exclusion, which you could

5     make the same argument that by keeping out an infringing

6     competitor you are having the same kind of effect as you

7     have with keeping out -- that's all we're talking about in

8     the context of these reverse payment cases is an

9     infringing competitor being kept off the market, and the

10    Supreme Court is saying that's not enough.  It would then

11    be necessary for the plaintiff to appraise the

12    exclusionary power of the illegal patent claim -- excuse

13    me -- in terms of the relevant market.  Without a

14    definition of that market, there's no way to measure the

15    defendant's ability to lessen or destroy competition.

16          So what it's saying, Your Honor, is that you may

17    have a competitive exclusion, just like a noncompete

18    agreement or an exclusive agreement on a key input

19    supplier, you're restricting competition, and the rule of

20    reason, part of the rule-of-reason inquiry is to say what

21    kind of impact does that have in whatever we would define

22    as the appropriate market?  And if there's vigorous -- if

23    that excluded *Walker* -- if that fraudulently procured

24    patent excludes competition that only affects, say, ten

25    percent or five percent of a market, then there's enough

1   competition going on more broadly where, under the rule of

2   reason, you may say that it's up to the fact-finder to

3   assess all of that in context.

4           THE COURT:  The difference in the pharmaceutical

5   context is it is a molecule.

6           MR. MILNE:  Right.

7           THE COURT:  The patent is a molecule.  It's not

8   a process or a machine or something else, some other

9   invention that gives one, i.e., the patent holder, some

10  slight economic advantage over someone else in the market,

11  and so the analysis becomes very difficult.  When you're

12  talking about the same molecule, it is -- it is -- a

13  patent monopoly gives the owner of that pharmaceutical

14  patent, it's the only game in town.  Now, there may be

15  other products, patented or otherwise, that compete, but

16  what I'm really having trouble understanding the defense

17  argument here is --

18          MR. MILNE:  Right.

19          THE COURT:  -- whatever impact that broader

20  market has on Boehringer's ability to price Aggrenox when

21  it's patented has been worked out in the market.  It gets

22  patented in whatever it was, 2000, they try different

23  pricing, and they kind of end up where they're happy at

24  the price they've got, okay?  So whatever the cross

25  elasticities are, they've been worked in.  Those cross

1    elasticities don't change the day that the generic comes

2    on the market.  That same impact on pricing ability on

3    market power has already been factored in.  But what

4    happens is you have a drop in the price immediately,

5    significant drop in the price, and so it's very hard for

6    me to understand how this broader market can explain the

7    drop in the price that occurs when you go generic.

8                MR. MILNE:  Well, there are two -- there are

9    many issues raised by your question.  So, first of all, if

10   in a *Walker Process* context you can have -- there are lots

11   of kinds of patents out there.  There are product patents,

12   there are process, there are all kinds of patents, so

13   there's no distinction in *Walker Process*, and there are

14   *Walker Process* cases involving pharmaceuticals.  The

15   *Kaiser* case, which we cite in our briefs, is a *Walker*

16   *Process* case where the case was dismissed.  The claim was

17   that the branded company had a patent.  It was the kind of

18   patent you talked about, a molecule patent, procured by

19   fraud, and it kept out, it delayed the entry of a generic

20   competitor, and the Court dismissed that case under this

21   *Walker Process* doctrine on the idea that there was other

22   competition, that the plaintiff had not come forward with

23   any kind of evidence to suggest that the branded product

24   was a monopolist or could exercise market power in some

25   kind of properly defined market.

1          THE COURT:  But here, whatever happened in

2    *Kaiser* --

3          MR. MILNE:  Yes.

4          THE COURT:  -- here why don't we have that clear

5    evidence because of the price drop?  In other words, we

6    might be in that situation if we still had no generics on

7    the market.  We'd have a patent; we'd be wondering, Well,

8    gee, what would be the impact; and we'd look at this broad

9    market.  But now the generics are out there, and we see

10   what happened.

11         MR. MILNE:  But, Your Honor, it's the same

12   thing.  It was the same thing in *Kaiser*.  They made the

13   same argument.  The plaintiffs in every single one of

14   these cases made the same argument because it is -- no one

15   can deny that when a generic comes into the marketplace --

16   in the pharmaceutical context when a generic comes into

17   the marketplace, it prices the product -- its product at a

18   much lower level.  There's no denying that.  And that was

19   the situation in *Kaiser* as well, and it's the situation in

20   the *Nexium* case, it's the situation in the *Modafinil* case,

21   both post-*Actavis* cases where the courts allowed the

22   defendants to present broader market evidence against the

23   plaintiffs' arguments of the sort that you were just

24   making, Your Honor, saying we have direct evidence, we can

25   show that the price fell.  And the defendants come in and

1   say, No, there's more to the story here.  You need to

2   understand how competition existed, how vigorous

3   competition was at that branded level.  And then on this

4   issue of, well, the price is lower for the generic, that

5   gets back to the discussion we had at the beginning of

6   this argument, Your Honor, which is that the price

7   difference alone can't tell you that there's market power

8   because of the cost differentials.  The Second Circuit --

9          THE COURT:  No, but wait, wait, wait.  The cost

10  differentials --

11         MR. MILNE:  Right.

12         THE COURT:  -- might matter, but they don't --

13  they don't matter in terms of market definition.  They

14  matter in terms of whether there's market power in this

15  molecule or not.

16         MR. MILNE:  Well, what I understand you to be

17  raising the question of is, well, we have this situation

18  where the generic comes in, in the pharmaceutical context,

19  and the price is much lower, and doesn't that tell us

20  something about market power.

21         THE COURT:  What happened -- just somebody

22  clarify my recollection --

23         MR. MILNE:  Sure.

24         THE COURT:  -- what happened to the price of

25  Aggrenox when generics came on the market?

1          MR. MILNE:  The price of the branded Aggrenox?

2          THE COURT:  Yes.

3          MR. MILNE:  Off the top of my head, I'm not sure

4    I have that information right at hand.  I don't believe it

5    fell significantly.  There may have been additional

6    discounting, but I don't think you would see the price of

7    the branded Aggrenox going down to the generic level or

8    anything like that.

9          THE COURT:  No, it wouldn't.  No, it wouldn't go

10   all the way down to the generic level.

11         MR. MILNE:  But, generally speaking, the branded

12   product stays at more or less the branded price, except,

13   except that there are these competitive situations set up

14   by the third-party payors, and this is part of what we

15   need to take discovery on, is that there is a lot of

16   competition that goes on in these markets, not just brand

17   to brand but brand to generic, brand to the generic of

18   another brand, and all of those things go to say that this

19   is not a monopoly.  And even though we haven't had the

20   full discovery that we seek, one of the things that we

21   think is very telling here -- and, Ross, if you could

22   bring up the slide on this -- is Boehringer, with respect

23   to Aggrenox, you know, if the theory is Aggrenox is a

24   monopoly, not affected by any of these other products,

25   pricing at a high level, it's been not impacted, we would

1    not expect to see Aggrenox to be discounted.  Nonetheless,

2    in 2010, 2011, and the slide -- what is the slide number?

3              MR. ELFAND:  Slide 14.

4              MR. MILNE:  Slide 14 in your deck, Your Honor,

5    gives some specific numbers.  They are substantial numbers

6    in terms of price concessions, discounts, rebates that had

7    to be offered --

8              MR. ELFAND:  Slide 11, sorry.

9              MR. MILNE:  Slide 11 -- that had to be offered,

10   Your Honor, because Aggrenox was competing against

11   products like Plavix and others for inclusion on managed

12   care formularies.  They look at what are reasonably

13   substitute products, and they say, You have to bid.  You

14   want to be on the formulary, you want to be reimbursed or

15   you want to be in a preferred position on our formulary

16   versus a nonpreferred position, you have to come in and

17   give your best price; and, otherwise, it's going to be

18   Plavix that gets listed, or it's going to be aspirin, or

19   it's going to be some other product.  And so in 2010, 2011

20   Aggrenox is having to compete that way.  And then in 2012

21   something interesting happens because in that year a

22   generic form of Plavix comes into the marketplace; and,

23   here again, Aggrenox has to react.  The discounts go up by

24   like 50 percent thereafter.  So this is not a siloed

25   market, and we need to understand all those linkages.

1          And just to be clear, too, Your Honor, it is a

2    discovery motion and burden is an issue.  The discovery

3    requests that we started with here are very, very

4    different.  We have come a long way toward narrowing it,

5    and I can talk to you about that.

6          THE COURT:  Yes, I do want to hear about that

7    because I was concerned about the breadth of the original

8    discovery requests.  I've seen in the papers that you are

9    cutting back, but it still isn't clear to me --

10         MR. MILNE:  Right.

11         THE COURT:  -- turning briefly to discovery, why

12   you need aspirin, I'll say that, and why you need the

13   discovery from various of these plaintiffs as opposed to

14   getting market-wide research or data from an independent.

15         MR. MILNE:  Well, I can talk to you about that.

16         THE COURT:  Sure.

17         MR. MILNE:  I want to make sure I've answered

18   your question, your more fundamental question.

19         THE COURT:  Well, that's going to keep coming

20   back.

21         MR. MILNE:  Okay, well, I don't want to leave it

22   altogether, though, and then I'll come to the narrowing

23   issue and why we need the discovery.

24         But, Your Honor, so this kind of situation

25   exists in all of these cases, in the *Nexium* case and in

1    the *Modafinil* case, both post-*Actavis*.  Like I say, the

2    courts in those cases said, even though the defendants

3    were making the same arguments, the same predictable fall

4    in -- you know, the generic coming in at the lower price,

5    and they said, you know, you, the defendants, get to

6    present that evidence.  Maybe the jury won't believe it.

7    Maybe the fact-finder at the end of the day will accept

8    the rationale that you're articulating, Your Honor.  But,

9    on the other hand, like I say, that difference in price,

10   what seems to be Your Honor's concern is that, Oh, my

11   goodness, look at this difference in price, doesn't that

12   suggest there's some market power here and it's being

13   exercised.  And I understand that, but that's why I keep

14   coming back to the authority that --

15            THE COURT:  Well, you have already your marginal

16   cost information.  My bet is people are reporting that

17   every week or certainly every month within Boehringer.  I

18   mean, some product brand manager is running that every

19   week.  So why isn't that marginal cost information

20   vis-a-vis pricing what we're looking at in terms of

21   deciding whether, in fact, the patent monopoly allowed

22   Boehringer to charge a supracompetitive price?  I

23   understand the sunk costs arguments, and so forth, and so

24   forth, but I've seen a lot of information from economists

25   in cases that basically say it's the marginal cost that

1    determines whether something is supracompetitive or not.

2              MR. MILNE:  Well, your Honor, on the sunk

3    cost -- on the cost issue, on the profit margin issue,

4    again, the authorities are very clear.  And, Ross, if we

5    could pull up the slide.

6              MR. ELFAND:  It's Slide 7.  It should be on the

7    screen.

8              MR. MILNE:  So, Your Honor, in terms of not just

9    the Second Circuit but economic authorities and the like,

10   marginal cost -- pricing above marginal costs or having a

11   too high profit margin alone is not enough to establish

12   market power.  You have to look at things like sunk costs,

13   R&D costs, that kind of thing.  It's a very factual issue,

14   and it's only part of the story, too, because there are

15   two ways in which we will defend here, Your Honor.  One is

16   the plaintiffs have this direct evidence.  They say the

17   price -- look at this price effect.  The generic came in

18   much lower.  That must be the exercise of market power.

19   We will say -- and we have said this in many other cases,

20   and these were the types of defenses in *Nexium* and in

21   *Modafinil* -- we will say, first of all, they're wrong.

22   They haven't properly accounted for the sunk costs.  They

23   haven't properly accounted for R&D costs.  They haven't

24   properly accounted for output effects.  So we'll fight

25   them on four corners of their direct evidence, but we get

1    to do more than that, and I think the *Geneva* case, which

2    is Slide 9 in the deck, speaks to this issue directly.

3            THE COURT:  That's the market was defined as the

4    generics only.

5            MR. MILNE:  The generics only.  But, Your Honor,

6    but here's the thing.  You may say, Well, *Geneva* is a bad

7    case for us.  It's a great case for us.  Why?  Because the

8    Court, first of all, said -- and, Ross, if we could go to

9    Slide 5.  The first reason why *Geneva* is a very good case

10   for us, Your Honor, is that the plaintiff in that case --

11   and we were actually involved in that case -- the

12   plaintiff in that case came in and said that the defendant

13   had market power because of direct evidence, because of a

14   price differential, because the second generic -- the

15   issue in that case was a first generic was said to be

16   doing bad things to stop second and third generics from

17   coming into the market, and the plaintiff said that first

18   entering generic has market power because look at its

19   price.  When the second generic comes in we can cite

20   academic studies and forecasts that say that the later

21   generics are going to -- the prices are going to be much

22   lower.  Ah-hah, there's market power.

23           The Second Circuit said, First of all, direct

24   proof of a price differential is at best ambiguous.  You

25   have to look at costs.  You have to look at whether there

1    was a restriction in output.  And then the Second Circuit

2    also said --

3              THE COURT:  But there's a difference between a

4    price differential between or among competitors, here the

5    generics, and a differential between Boehringer's selling

6    price and its marginal cost of production.  So if

7    *Boehringer* is making 90 percent profit on Aggrenox, would

8    you concede that it has market power in the market for

9    Aggrenox and its generics?

10             MR. MILNE:  Your Honor, I would not concede it

11   just without knowing what was built into that margin.

12   That's where the rub is, and the slide we put up a couple

13   of minutes ago that cited the *Kodak* case and the various

14   economic authorities that all say you need to factor in

15   other costs.  And a marginal cost that you get off of an

16   accounting spreadsheet in the normal course, the

17   marginal -- the margin, the profit margin, is not likely

18   to account for those sorts of things.  And when you

19   account for those costs, very often those margins become

20   much less significant than they are made to appear at

21   first blush when those things aren't accounted for.  And

22   that's part of, if you will, that first bucket of our

23   defense, which is to say they're wrong that we have an

24   abnormally high profit margin, and they're wrong on the

25   way they're accounting for output effects or the various

1    other -- the price differential.  So that's all to say

2    their direct evidence isn't persuasive.  But another way

3    that we're allowed --

4         THE COURT:  Well, of course, their other direct

5    evidence is the reverse payment itself.

6         MR. MILNE:  If they can establish that there was

7    a large reverse payment, whatever that means under

8    *Actavis*, that is a factor that would go into the analysis

9    to be sure.  We think at the end of the day they're not

10   going to be able to show a large reverse payment, but

11   that's another factual issue.

12        But my point, Your Honor, in coming back to the

13   *Geneva* case is *Geneva* was, again, a situation where you're

14   dealing with exactly the same molecule, exactly the same

15   product, just the first generic against the second and

16   third generics, and the Second Circuit did not stop at

17   saying, Okay, you've got to take into account costs,

18   you've got to take into account output effects and those

19   sorts of things before you just jump to the conclusion

20   that a price differential or a seemingly high profit

21   margin reflects market power.  The Second Circuit went

22   further than that.  It did this in the *Kodak* case, too.  I

23   just focus on *Geneva* because *Geneva* is a pharmaceutical

24   case, but same in both cases.

25        The Court, first of all, said -- and if we go to

1    Slide 9.  The overarching thing that the Second Circuit

2    said is that the emphasis should always be on the actual

3    dynamics of the market rather than some application for

4    rote formula.

5         Like here, okay, the generic always comes in at

6    a lower price; that means there must be market power.  If

7    that logic applies, every single case, every single

8    reverse payment case, every single *Walker Process* case,

9    there's no difference in the logic if it involves

10   pharmaceuticals, no difference in the logic.  The branded

11   pharmaceutical will always be deemed a monopolist under

12   that logic.

13        But the Court said we don't -- we look at the

14   actual dynamics of the market, and what do we look at?  We

15   look at the kinds of things, the very kinds of things

16   we're asking for in discovery, Your Honor.  Is there

17   competition among products that the defendants are saying

18   should be included in the market?  What kind of

19   competition actually exists?  Are there bidding

20   situations?  What is happening in the marketplace?  What

21   about output effects?  The Court specifically identifies

22   that as an issue that needs to be considered.  What are

23   the members of the industry saying about who competes with

24   who, what products compete against what other products?

25   Those are the sorts of things that need to be looked at in

1    a case where the defendant has come -- where the plaintiff

2    is coming in and saying, We don't need to do that.  We can

3    prove our case on direct evidence alone, and look at this,

4    this is a pharmaceutical situation.

5              THE COURT:  Well, that raises another thing I

6    wanted to ask you about.  Why can't the plaintiff choose

7    the claim they want to bring?  Their claim is you have

8    market power in Aggrenox, and you charge supracompetitive

9    prices for Aggrenox vis-a-vis the market of Aggrenox and

10   its generics, and we're going to win or lose on that

11   theory.  So the fact that you might be able to come in and

12   say there's another larger market that we think is

13   relevant in which Aggrenox does not have any market power,

14   why would that matter?  The plaintiffs have kind of picked

15   their poison, and it's either going to work or not work

16   for them.  Aren't they allowed to do that as the master of

17   their complaint?

18             MR. MILNE:  They are definitely allowed to pick

19   their theory, Your Honor, but *Kodak* is a great example of

20   this, in my view, and I think *Geneva* is as well.  They can

21   say that.  They can come in and say, We're going to rely

22   exclusively on direct evidence.  We are going to say it's

23   the product defined by the patent -- or the market defined

24   by the patent or by the branded product and its generic

25   counterparts, however they want to articulate it.  But one

1    of the ways -- like I say, we have two ways of defending

2    against it.  One is to challenge it on its four corners,

3    which we will, things like challenging what is the proper

4    way to look at profit margin, what is the proper way to

5    look at output effects and things like that.  But then the

6    other way is to say they're not factoring in the whole

7    picture, and that's one of the reasons a jury, or a judge

8    on summary judgment, you should not accept as a legitimate

9    articulation of a market this narrow thing that they've

10   articulated.  The *Kodak* case was a very good example where

11   the Court came in saying the Kodak -- I'm sorry, the

12   government came in saying that Kodak had monopoly power,

13   market power because it was able to charge more than its

14   competitors, and it had significant profit margins.  And

15   the Second Circuit looked at that evidence, considered

16   some of the problems with the evidence itself, but then

17   was -- then looked at, for example, cross elasticity

18   information and found that more persuasive, so it weighed,

19   it weighed this direct evidence against the --

20            THE COURT:  Okay, but that goes back to the

21   point I was trying to make before.  If the plaintiffs

22   define the market as Aggrenox and its generics --

23            MR. MILNE:  Right.

24            THE COURT:  -- and if they can demonstrate, and

25   I know you don't concede this, but if they can demonstrate

1    that Boehringer was charging supracompetitive prices for

2    Aggrenox, I don't understand why it matters that there's

3    cross elasticities because that's already been worked in,

4    whatever the price is.  They don't have to prove, for

5    example, that Boehringer had complete control of some

6    broad market and could charge whatever it wanted to.  They

7    have to show that whatever the competitive pressures were,

8    they were still able to charge a supracompetitive price;

9    and if they can do that, then why does it matter what

10   those pressures were?  Why isn't that just complicating

11   unnecessarily the context of this lawsuit?

12            MR. MILNE:  Well, Your Honor, I would come back

13   to the fact that I think embedded in your question and

14   what we would be presenting evidence to rebut is the idea

15   that you can establish supracompetitive pricing by simply

16   saying that I take the difference between the generic

17   pricing and the branded price or I --

18            THE COURT:  No, I'm not saying how you do it.

19   I'm not saying how you do it because that's a different

20   issue, but let's assume they can do it.  They are able to

21   show that the price for Aggrenox before the patent

22   basically expired was supracompetitive.  Now, the relevant

23   market definition is the narrowest market in which they

24   have market power, right?  So if you're charging

25   supracompetitive prices, by definition you have market

 1    power.

 2              MR. MILNE:  And one of the ways that we -- one

 3    of the ways that we test whether there is a

 4    supracompetitive price is by looking at what's going on in

 5    the broader market, Your Honor, because the only --

 6              THE COURT:  But no, no, no.  That's where I

 7    think we're maybe differing.

 8              MR. MILNE:  Okay.

 9              THE COURT:  What I'm saying is the broader

10    market that you want to prove may limit your ability to

11    charge as high a supracompetitive price as you want, but

12    if the price despite that competition is still

13    supracompetitive, then it seems to me there's an antitrust

14    problem, or at least there's market power.  The first part

15    of the antitrust problem has been resolved.  That's what

16    I'm trying to get at.  So, in other words, why do you need

17    all this discovery if, in fact, all it's going to do is

18    point out you couldn't charge $500 per pill; you could

19    only charge $300 per pill?

20              MR. MILNE:  Well, Your Honor, I think the if's

21    in your question illustrate why we need the discovery,

22    because we need to have the economists look at the market

23    more broadly --

24              THE COURT:  No, no, no.  Let's pause.

25              MR. MILNE:  Okay.

1          THE COURT:  How are you going to attack -- well,

2   let me back up.

3          MR. MILNE:  Okay.

4          THE COURT:  You have all of your pricing and

5   cost information.

6          MR. MILNE:  We do.

7          THE COURT:  You don't need any discovery on

8   that.  And you know what your profit margin is, and you

9   know what your sunk costs are, presumably, or you could

10  calculate them even if we include those.  We look at all

11  those numbers.  You don't need discovery for any of that

12  because you have it all.  They need discovery maybe, but

13  you don't.  We look at all of this.  There either is or is

14  not a supracompetitive price being charged back before the

15  generics.  If there is, I don't understand why you need

16  anything broader.  If there isn't, it's game over.  You

17  walk away and say thank you very much.

18         MR. MILNE:  Well, Your Honor, I think what I

19  would say to that is, first of all, on the first part of

20  what you said, you know, we have all that information,

21  we'll fight over it because we are not going to concede

22  and we believe we'll be able to show that we didn't have

23  supracompetitive margins, that we -- that any price

24  differentials are accounted for by the cost differences.

25  Those are the sorts of things that we'll be fighting

1    about.  But in the meantime, let's say we create a fact

2    issue or there is an open fact issue for trial on those

3    issues.  Then you can't ignore the rest of the market.

4    You can't ignore it because if there's a question about

5    whether --

6                THE COURT:  But when we talk about Rule 26(b) --

7                MR. MILNE:  Right.

8                THE COURT:  -- proportionality, right, shouldn't

9    we be structuring this case in a way that resolves issue

10   one at the beginning before we have five, ten,

11   fifteen million dollars worth of discovery on this broad

12   pharmaceutical market?

13               MR. MILNE:  Well, a couple of reactions.  First

14   of all, on the overall proportionality issue, Your Honor,

15   these plaintiffs are claiming billions of dollars of

16   damages against us, and especially given the way we've

17   narrowed the discovery, we believe that there isn't going

18   to be a disproportionate burden, so that's issue number

19   one.

20               Issue number two is we're with you a hundred

21   percent in looking for ways to resolve issues early that

22   may be dispositive or may be narrowing, and I would submit

23   that the best way to do this is, like I say, we've

24   narrowed the requests substantially, from ten products

25   that we think legitimately qualify as therapeutic

 1    alternatives based on documents we've seen, and I can --

 2    they're in your slide deck, they're in the materials, we

 3    can talk about those, but we narrowed them down to just

 4    two, Plavix and aspirin.

 5              THE COURT:  And the generics.

 6              MR. MILNE:  And the generics, of course.

 7              THE COURT:  I mean the Plavix generics.

 8              MR. MILNE:  Plavix and its generic.  So we think

 9    that's very much constricted what we're asking for now,

10    and we would be -- we would be very -- we think it's

11    better and more efficient to let's take the discovery --

12    you may disagree with us on some of this now, but I think

13    we'll be able to persuade you when we have a fuller

14    factual record, just like the judges allowed this to occur

15    in *Nexium* and *Modafinil*, and we could even do it on an

16    expedited basis.  We could --

17              THE COURT:  And why do you want it from the

18    plaintiffs as opposed to market-wide?  The argument -- I

19    forget who raised it -- in one of the plaintiffs' briefs

20    basically says go to whatever the entity is, IMG, and get

21    the market research for the entire market, just go get it.

22              MR. MILNE:  Well, Your Honor, I think there are

23    a couple of issues there.  The first thing that we -- and

24    I don't think that comment in the briefs was directed to

25    this -- to that factor that the *Geneva* court identified of

1   industry perception about who's competing with whom and

2   the degree of competition and the degree of

3   substitutability, and there you kind of need it from the

4   horse's mouth.  I mean, what are the PBMs saying, what are

5   the third-party payors saying competes against Aggrenox or

6   competes against Plavix?  What are the doctors saying?

7   What are the medical associations saying?  What are the

8   governmental entities saying?  And we, in this slide that

9   I won't take time walking through it, but you can page

10  through it, Your Honor, we already have a significant

11  amount of material, but it's not complete.  We want to

12  take the discovery to understand these plaintiffs that are

13  suing us for all this money, what are they saying in their

14  PBM operations, in their business about what is a real

15  substitute and what degree of substitution occurs and how

16  vigorous is the competition.  So we need that kind of

17  material.

18          The other piece of it is data so that we can do

19  the kinds of elasticity studies.  There is a service

20  called IMS.  That provides a lot of sales-type data, but

21  it doesn't account for all discounts and rebates, and

22  there are some issues about the IMS data.  But one thing

23  that we have tried to do to meet the plaintiffs, again,

24  more than halfway, is we have agreed to do some sampling.

25  We will definitely seek to utilize IMS data, but we'll

1   also talk with them about doing sampling of various types

2   where we don't necessarily need to get information

3   company-wide.  Maybe we can do it for particular states or

4   particular locations.  So we are willing to work on that.

5   But to your point of looking for issues that are

6   dispositive, if we do this discovery, tee up an early

7   summary judgment motion on whatever schedule we think we

8   can work out, that way you can rule on it with a fuller

9   record, and then anything that goes to the Second Circuit

10  can have the benefit of that record, because I think the

11  problem now is if we go down the road that we were talking

12  about at the end of the November 30 hearing where you tee

13  up a legal issue that's sort of all or nothing, you know,

14  under *Actavis* do you ever get to have market definition

15  discovery or get to consider evidence beyond the brand and

16  its generic counterparts, first of all, the Second Circuit

17  may not take, you know, the statistics, we'll just say we

18  don't know if they're going to take it, either way there

19  will be a delay as they consider it.  If they don't take

20  it, then we go to the end of this case without that whole

21  issue, which we think is very central to our ability to

22  defend this case, without any of that being done, and then

23  we go up on appeal at the end of the case, and what if the

24  Second Circuit says, Well, you know, the defendants were

25  right.  Now we have to go back and do it all over again.

1   Whereas if we take this -- you know, we've tried to

2   litigate as mature litigators, and throughout this case

3   we've gone more than halfway here with the plaintiffs, if

4   we can get this discovery, we, on the defendants' side,

5   are more than willing to try to work out a schedule where

6   we can tee that issue up earlier, Your Honor, and we can

7   get that resolved without having to do tons of additional

8   burdensome discovery.  We think what's on the table is

9   very targeted and is very reasonable, and to speak of

10   Rule 26, very much proportional in light of the scope or

11   the size of the claims that are being asserted against us

12   here.

13           But I would just go back, Your Honor, on this,

14   and I know I've been up here for a while so I probably

15   need to cede the podium, but I would just urge Your Honor

16   to think about the cases like *Nexium*, like *Modafinil*, like

17   the *Kaiser* case, like *Walker Process* where you have those

18   very same types of allegations.  In each one of those

19   cases you have the claim of a branded pharmaceutical

20   delaying the entry of a generic with those, quote unquote,

21   predictable price effects, which we think will be

22   accounted for by cost differences and the like and by

23   looking at the broader degree of competition in the market

24   that needs to be defined.  The Second Circuit said -- and,

25   Ross, please bring up the case about prima facie -- the

1  Second Circuit has even said that where you have -- where

2  a plaintiff is able to come up with prima facie direct

3  evidence of market power, that it's still appropriate to

4  have that considered against the backdrop of what is the

5  relevant market here so that we can understand, as the

6  Court said in the *Geneva* case, the competitive dynamic.

7  That's what we need to understand here, Your Honor.

8  There's a lot of competition going on here, we think.  We

9  haven't gotten the full discovery to get the full picture.

10  The economists need to review this material, tell us what

11  the answer is, but when you look at the information that's

12  out there and we see that rebating and discounting

13  information that I mentioned, which suggests real

14  competition going on here, when you look at how Plavix and

15  its generic counterpart by most measures control well over

16  90 percent of this antiplatelet category, it is a real

17  issue, and it's a defense that we're entitled -- here

18  we're just talking about discovery -- entitled to take the

19  discovery.  We can deal with all these weighting issues on

20  the meaning of *Actavis* and the scope of the rule of reason

21  as a matter of law once we do this discovery in an

22  efficient way.

23          So if Your Honor has any more questions, I'm

24  happy to address, but I think my colleague Mr. Holding

25  probably wants some time at the podium as well.

```
 1              THE COURT:  Sure, okay.

 2              MR. HOLDING:  I do, but I recognize the time and

 3   I will be quite brief, Your Honor.

 4              THE COURT:  Okay.

 5              MR. HOLDING:  To that point, just while we have

 6   the slide deck in front of you, Slide 14, which is one of

 7   the ones that's highly confidential, but it's one I do not

 8   want to get lost in the shuffle because that's an example

 9   where you see these plaintiffs in their operations using

10   generic Plavix to impose a very significant price

11   constraint on what BI could do with its product, and so

12   this is the kind of thing we want more of because the

13   plaintiffs in this case are among the most important

14   drivers of competition the way the pharmaceutical industry

15   works these days.  This is not 30 years ago.  Generics

16   matter clearly, but they're not the only people.  It's the

17   PBMs, it's these kinds of formularies that drive huge

18   price competition, and so we can't get all of that from

19   our own internal documents or from BI's internal

20   documents.  That's what we're asking for.  These are the

21   people who drive competition.  That's why they use

22   formularies.  They do that to drive people to lower cost

23   alternatives when they can, when products are sufficiently

24   therapeutically similar, and we think the evidence will

25   show that that was going on here and that's relevant.
```

1          You know, you asked the question did the generic

2     price come in below the branded price, and I think the

3     answer is yes.  I actually don't know by exactly how much

4     because we'd have to compare our contract prices against

5     their rebated prices, and the IMS data that their expert

6     used doesn't capture any of that, so the one thing we know

7     is that's wrong because it doesn't get behind to see the

8     rebates in the contracts and all the nonpublic, but I'm

9     sure that at some level we are pricing below where they

10    were.  And I am not suggesting that the discovery we're

11    seeking is going to make that price difference go away.  I

12    think the question here is what do we make of that?  Is

13    it, in fact, supracompetitive?  All the stuff they're

14    talking about in terms of margins and the price cap, we

15    call that direct evidence because that's what the cases

16    say, but there's still an inference involved, and we know

17    that because *Eastman Kodak* told us that.  There's still a

18    question of, okay, if you see that price gap or if you

19    account for the margins, what do you make of that?  It's

20    not dispositive.  It's not conclusive.  Every case agrees

21    with that, every case.  No one has said it's dispositive.

22    They've all said you have to look at it.  And so because

23    this is an inferential process, I agree, they're entitled

24    to define the market they want to, but the big question

25    is, is that definition sustainable on the facts?  You can

1     say it's an Aggrenox-only market, but factually can you

2     support that?  And what we want to do --

3              THE COURT:  Okay, but -- all right, this goes to

4     the heart of it.  When you say can you support that, if

5     they can show supracompetitive prices for Aggrenox, why

6     doesn't that support that market regardless of what's

7     happening elsewhere in the broader market?  For all I

8     know, Plavix is being sold at a 90 percent margin, and

9     Aggrenox is being sold at a 90 percent margin, and they

10    compete with each other, and in that sense both of them

11    are charging supracompetitive prices.  That's a

12    theoretical possibility.  And so the point is, we don't

13    have to worry about that necessarily if they can

14    demonstrate that the marginal cost is dramatically

15    exceeded by the price.

16             MR. HOLDING:  But, respectfully, that's where we

17    disagree, and I think your question assumes what does a

18    supracompetitive price mean, pricing above marginal cost,

19    there are some cases that say that's supracompetitive;

20    there are lots of cases like *Eastman Kodak* that say that

21    isn't; there are a lot of authorities that talk

22    specifically about --

23             THE COURT:  So what's the answer?  What is a

24    supracompetitive price?

25             MR. HOLDING:  I think the answer is you have to

 1    look at a number of factors.  You have to say, are there

 2    reasons that justify the price difference based on costs

 3    and other things.  And you would say is there enough

 4    existing price constraint that even though you see a price

 5    difference, that doesn't mean it's supracompetitive?

 6    That's exactly the fact in dispute.  It would be so easy

 7    if it were the way they say it.

 8              THE COURT:  All right, listen.  I'm not talking

 9    about price difference now.  I'm talking about difference

10    between price and marginal cost.  If it costs a dollar to

11    make a pill and they're being sold for ten dollars, that's

12    a supracompetitive price, I think by definition.

13              MR. HOLDING:  Okay, but I think that the cases

14    we put in front of you say that that's not correct,

15    because if that were the case, we would never be able to

16    recover the money we've spent, and we wouldn't have any

17    products left.  That's why people say in the

18    pharmaceutical industry or any other industry in which you

19    have these huge fixed costs to develop the product in the

20    first place, you can't look at it that way or you don't

21    have a product.  That is not a justification.  It means

22    it's not supracompetitive.  Just by definition, pricing --

23    because then we're a monopolist, every generic is a

24    monopolist, let alone every brand being a monopolist.

25              THE COURT:  Every patented pharmaceutical is a

1    monopolist.

2            MR. HOLDING:  I think that -- I'm sorry, I don't

3    agree, and I think it can take --

4            THE COURT:  It's a legal monopoly.

5            MR. HOLDING:  It's a legal monopoly.

6            THE COURT:  It's a legal monopoly.  I'm not

7    saying every patented pharmaceutical manufacturer has

8    violated the antitrust laws, but the patent creates a

9    monopoly.  The patent creates the ability to charge a

10   supracompetitive price.

11           MR. HOLDING:  The patent creates a legal

12   monopoly.

13           THE COURT:  Right.

14           MR. HOLDING:  It does not create in itself an

15   antitrust monopoly.  So --

16           THE COURT:  That's what I just said.

17           MR. HOLDING:  This is Judge Posner's point in

18   *Asahi*, right, when he talks about the SSRIs.  And he said,

19   Sure, that patent there meant nobody else could make

20   Paxil, but Paxil competes with Prozac, and it competes

21   with all of these other things, and you have to look and

22   say what is the level of competition amongst those to see

23   is there actually market power being exercised here, and

24   that's what we're saying; that, you know, sure, that

25   patent didn't exclude Plavix, and the Plavix patent didn't

1     exclude us, but these guys are driving intense price

2     competition between those products, and if you have that

3     intense price competition and you have the ability to

4     substitute consumers between one another, and if they

5     charge higher prices --

6               THE COURT:  Well, doctors, not consumers.

7               MR. HOLDING:  But it's both, Your Honor, because

8     what these documents show is that, you know, so the litany

9     you hear is doctors don't care about prices, but what

10    their own documents show is they influence doctors'

11    decisions based on price.  That's what the formulary does.

12    That's what the slides in here say.  And then their own

13    documents say they talk to pharmacists and say to

14    pharmacists, We trust your judgment.  Here's our -- here's

15    our list.  Call the doctor and get him to change.  And

16    that's all price competition before and after the

17    prescription is written, and that's what we're looking to

18    explore.

19              THE COURT:  All right.  In your view, can there

20    be price competition and the charging of a

21    supracompetitive price or are those null sets?

22              MR. HOLDING:  I think it's a matter of degree.

23    I think you would have economists legitimately debate the

24    matter of degree, how much there is.  That's what I think.

25    I don't think there's a binary either/or answer to that

1    question.  That's why this is hard.  That's why this is

2    intensely factual.  I certainly am of the view that the

3    generic can come in at a price somewhat lower than the

4    brand, and the brand --

5            THE COURT:  I'm with you on that.  I'm with you

6    on that.  But what I'm not with you on is whether there's

7    a monopoly from the patent and whether, even after --

8    certainly before, but even after the generics show up,

9    whether the price for Aggrenox is a supracompetitive price

10   or not.  That's what we need to figure out, I think.

11   Otherwise, if the answer is yes, then all of this other

12   market research and discovery doesn't matter.

13           MR. HOLDING:  So I understand we're not agreeing

14   on this, but I want to be sure I've conveyed my thought to

15   you on this.  I'm not disagreeing with the premise that

16   part of what we're doing in defining markets and looking

17   at all this stuff is determine is there a supracompetitive

18   price, which is the same as saying is there market power

19   and all these sorts of things.  What I think I'm trying to

20   convey is that what we're asking for in assessing the

21   degree of competition among therapeutic alternatives is as

22   relevant to answering that question as what they're

23   claiming for, because an economist can properly and

24   legitimately look at those issues and say, okay, there are

25   some inferences that I would draw here from margins and

1    changes in price, this is what the Second Circuit upheld

2    in *Kodak*, but there's other evidence of cross

3    elasticities, and based on all of that, a fact-finder

4    could legitimately say despite that difference in price,

5    there's no market power here.  *Eastman Kodak* told us that,

6    that you could do that, and that's what we're asking to

7    do.

8                THE COURT:  Well, there's a difference between

9    complete market power and market power.

10               MR. HOLDING:  Market power is a range.  I don't

11   disagree with you about that.

12               THE COURT:  Okay.

13               MR. HOLDING:  So the other thought, and my

14   colleague expressed what I wanted to address, you asked

15   the question in November, or maybe you posed the concern,

16   let's do this right so we don't have to do it all over

17   again, and I know you've been thinking about that.  I want

18   to reiterate the point, the biggest risk of the do-over is

19   that we can't develop the evidence, because there's no

20   undoing -- there's no ability to unring that bell if

21   that's what happens now.  If we can develop the evidence

22   like in all these other cases and present it, and then

23   when the full record is in front of you we'll have this

24   same fight, I am sure, and the question will be is it a

25   triable issue or where does this go, but then you've got

1    the whole record, and that minimizes the risk that we're

2    going to be back here five years from now taking discovery

3    again and doing this all over again.  So from that

4    perspective on the question you raised, as well as the

5    reason I think we're right on the law, I think the prudent

6    thing to do, out of respect, is to allow us to take this

7    evidence -- discovery where we have dramatically limited

8    what we're asking for.

9              I wanted to talk very briefly about the IMS data

10   that you talked about.  I just want to emphasize, IMS is

11   great when you want to know how many prescriptions were

12   filled, and it's great when you want to know how many

13   units were sold, but this is about price competition,

14   that's what we're talking about, and the truth is IMS

15   isn't very good on price, and I think everybody in the

16   industry knows it.  I'll give you an example.  I'm doing a

17   case right now on a very big pharmaceutical product called

18   Abilify.  If you look at IMS, it says they had $7.9

19   billion in sales last year.  If you ask publicly, What

20   were your net sales, they say $4.9 billion last year.  And

21   the reason is IMS can't capture so many of these rebates

22   and price discounts and other things that go into it, and

23   that's why from a price perspective IMS data is not a

24   substitute for their internal pricing information.  And if

25   you want more authority for that, the article that we

1    cited in our papers by Professor Scott Morton at Yale, I

2    didn't put this point in it, but she talks about exactly

3    if you're going to look at these things, you've got to

4    look at the price correctly, and you have to be very

5    careful because so many of the public data sets don't

6    capture that information, and she specifically calls out

7    IMS as an example.  So that's the reason why we need that

8    data, and there's no public data source that captures it

9    precisely because all of this stuff is not public in the

10   industry.

11            In view of what time it is, I'm going to sit

12   down.  Thank you.

13            THE COURT:  Thank you.

14            MR. SORENSEN:  Good afternoon, Your Honor.

15            THE COURT:  Good afternoon.

16            MR. SORENSEN:  David Sorensen for the direct

17   purchaser class plaintiffs.  I have hard copies of our

18   slides.  (Handing.)

19            Your Honor, I've moved to Slide 7.  If you could

20   turn to 7, I think this one slide captures much of what

21   I'd like to focus on.

22            What are you seeing in Slide 7?  You're seeing

23   some information and some quotes from the defense at the

24   November hearing.  So this is a before-and-after

25   comparison based on IMS data.  It is not based on actual

1    sales data.  We don't have that yet.  So this was

2    presented in the Dr. Leitzinger declaration.  Before

3    generic Aggrenox entered, the average price was $5.79 per

4    capsule.  Afterwards, within six months, very quickly, the

5    price dropped 36 percent, and there was 75 percent

6    substitution; that is, 75 percent, seven or eight out of

7    every ten purchasers switched to the generic -- from the

8    brand to the generic.  That's in six months.

9            THE COURT:  Let me just clarify what you're

10   saying because I don't understand you to say that Aggrenox

11   was at $5.79 and Aggrenox then went to $3.70.

12           MR. SORENSEN:  No, that's the generic price.

13           THE COURT:  Right, so what happened to the

14   Aggrenox price?

15           MR. SORENSEN:  I don't believe that

16   Dr. Leitzinger analyzed that based on IMS data, and

17   ultimately we will look at that based on the actual

18   manufacturing data.  I think the defense counsel indicated

19   that the brand price often either does not change,

20   sometimes it goes up -- that is our experience --

21   sometimes they give some discounts.  We will look at that

22   in the actual data.

23           THE COURT:  Right, but how does this show, in

24   other words, supracompetitive pricing?

25           MR. SORENSEN:  Sure.

1          THE COURT:  Because if the marginal cost to make

2     Aggrenox is $5.69 per capsule, then they're not charging

3     supracompetitive prices.

4          MR. SORENSEN:  Sure.  Well, first it's not, of

5     course.  They don't claim it's anywhere close to that.  We

6     do have some documents from them already that shows over

7     90 percent.  Generics, as more generics enter, drive the

8     price down to marginal cost.  That's the experience that's

9     happened repeatedly for the last 30 years since

10    Hatch-Waxman was passed.  The first generic comes in 10 to

11    15 to 20 percent below, doesn't need to discount more

12    because so much substitution occurs anyway, and then what

13    happens is the price drops, on average, 85 percent down to

14    marginal cost.

15         THE COURT:  But whose marginal cost?

16         MR. SORENSEN:  Well, marginal costs of both

17    companies are typically very similar.  We're talking about

18    the price to produce the last unit.  Their marginal

19    cost -- in terms of this discussion about discovery, they

20    know the marginal cost.

21         THE COURT:  No, of course they do, but you get

22    my point.  In other words, you need to show not that the

23    industry's average marginal cost is "X"; you need to show,

24    I think, Aggrenox's marginal cost is significantly below

25    its sales price.  In other words, otherwise it's not

1    supracompetitive price from their point of view.

2              MR. SORENSEN:  Well, two things.  First, it's

3    not -- I don't think it's definitive that we have to show

4    marginal cost because competitive price is the price of

5    competition.  The price that competition produced is what

6    you're seeing with generic competition.  That's why they

7    paid the generics to stay off the market.  That's why they

8    do it.  That's what, in *Actavis*, the Supreme Court

9    observed.  That's why brand companies pay generics,

10   because that would produce a competitive price, and the

11   competitive price is the generic price, and stopping the

12   generic from coming to market is maintaining a

13   noncompetitive, supracompetitive price.  If it didn't

14   drop, then you wouldn't -- I couldn't say that, but it is

15   dropping.  The control of the generic is what's enabling

16   them to charge $5.79.  The only thing that is enabling

17   them to charge that price is to stop the generic.  As soon

18   as the generic comes on, they lose their sales, and the

19   price drops.  If this entry date --

20             THE COURT:  Okay, but you just told me you

21   didn't know if the price of Aggrenox dropped.  So, in

22   other words, you see my point, right?  For all I know,

23   Aggrenox cannot make any money unless they charge $5.79 a

24   capsule.  For all I know, they've got really expensive

25   manufacturing and whatever, whatever.  And so the generic

1    comes in, and they're facing a choice.  Well, we're going

2    to lose money on every pill if we charge $3.70 a capsule.

3    We can't do that.  So we're going to stay at our marginal

4    cost, which is $5.79, and we're just going to hope we hang

5    on, that somebody likes our product better than generic

6    just because it's a branded product, and we'll have lower

7    sales, but it's not a supracompetitive price at that

8    point, is it, or are you saying that the supracompetitive

9    price ignores what their marginal cost is and looks only

10   at what the market, the overall market price for this drug

11   is?

12          MR. SORENSEN:  I'm saying the first thing it

13   looks at is the control that keeping the generic enabled

14   them to have over price.

15          THE COURT:  Okay, but we don't know what that

16   was.

17          MR. SORENSEN:  Right, and that's shown by the

18   difference in the brand price and the post-generic-entry

19   generic price because that's the price that they're

20   stopping by keeping the generic off the market.  And the

21   only thing that's allowing them to keep their sales at

22   $5.79 is to keep the generic off the market.

23          THE COURT:  Well, that may be true, but if their

24   marginal cost is $5.75, then they're not exercising any

25   market power.  They have a patent monopoly, but they

1    haven't done anything wrong, have they?

2              MR. SORENSEN:  Well, yes, if they keep a

3    generic -- yes, they have done something wrong.  If, in a

4    hypothetical world that has never existed to anyone's

5    knowledge, the marginal cost of a brand drug is close to

6    what it's selling at pre-generic, let's just assume

7    hypothetically, and they come into court and say, We did

8    pay that generic to stay off the market, we did, we admit

9    it, and they would have entered, we admit it, it's not an

10   antitrust problem, Your Honor, to the Court.  Why?  Well,

11   because we were charging close to our marginal cost.

12             Now you've kept off the market a lower cost

13   provider of that same drug, more efficient, better,

14   whatever, whatever is enabling the generic to sell it at a

15   much lower price compared to this hypothetical brand

16   company that has extremely unrealistically high marginal

17   cost.  You still have an antitrust problem.  You have

18   imposed tremendous consumer harm, which is what antitrust

19   laws are designed to prevent, by paying them to stay off

20   the market and preventing -- but consumers are like, We

21   don't care if you're an inefficient brand company.

22             THE COURT:  Just to be clear, then, your

23   definition of supracompetitive is unrelated to the actual

24   marginal cost of the branded manufacturer.

25             MR. SORENSEN:  It is not dependent on it.  It is

1      not dependent on it.  It is bolstered by evidence and

2      analysis of their marginal cost, which is, in this case,

3      less than 10 percent of the selling price, as it is in

4      many of these cases.

5              THE COURT:  All right, and what authority do you

6      have that supports the idea that the competitive -- it's a

7      supracompetitive price if you're merely charging more than

8      the generic price?

9              MR. SORENSEN:  Well, *Actavis* itself says, Your

10     Honor, that the size of the payment is itself a strong

11     indicator of power, market power, namely, the power to

12     charge prices higher than the competitive level.  Prices

13     higher than the competitive level is supracompetitive.

14     And the Supreme Court is observing that if you can prove a

15     payment, that itself is a strong indicator that the brand

16     was charging above the competitive level, a

17     supracompetitive price.  Why?  Because the obvious reason

18     is otherwise they wouldn't pay them.  They wouldn't get

19     anything out of it.  Why does the brand company say to

20     itself, I'm going to pay this generic a hundred million

21     dollars of our hard-earned money?  For what reason?  If

22     the brand price is already being kept down to a

23     competitive level, it's as low as they can go given all

24     the price competition they're experiencing, they don't pay

25     the generic a hundred million dollars to stay off the

1    market.

2              THE COURT:  So, in your view, this case and

3    every reverse payment case comes down to a determination

4    of whether the reverse payment was, quote unquote, large

5    and, in effect, represents something other than the value

6    of services obtained as part of that agreement.  Is

7    that --

8              MR. SORENSEN:  That is the nub of these cases.

9    There are causation issues, when generic would have

10   entered, that has to be shown.  But if plaintiffs prove a

11   large -- under *Actavis* -- above saved litigation costs of

12   the brand, the defendants can't justify it, it's their

13   burden to try to justify it and they can't, or they try to

14   and it can be rebutted, and so what you have left,

15   hypothetically, is a large and unjustified payment for

16   delay, the Supreme Court said in *Actavis* that is likely an

17   antitrust violation.  They didn't say you can pay for

18   delay, but, you know, there may be reasons why we're going

19   to say that's okay.  The justifications, the theoretical

20   justifications the Supreme Court noted were two, and

21   there's something that links both of them I think that is

22   very important:  One, that the payment is at or below the

23   brand's saved litigation costs, the brand, what they saved

24   by settling; two, that the brand and the generic can prove

25   that the payment is equal to the fair value of the

1    services the generic is giving back.

2         Now, what links both of those is that if the

3    defendants can prove that, both of those at least arguably

4    can say to a fact-finder they didn't pay for delay.  They

5    paid for something else.  They paid to save litigation

6    costs that they would have expended anyway.  They paid for

7    this other product they're getting back from the generic.

8         Now, put aside for the moment whether you can

9    have an antitrust violation even if there's fair value,

10   which is another issue, but let's just stick to these two.

11   These two justifications, if proven, show there isn't pay

12   for delay at least arguably.  Those are the only two

13   justifications the Supreme Court offered.  They never said

14   anywhere that the defendant could walk in front of you and

15   say, I paid for the delay, I did, and they would have

16   entered, and they would have entered at a lower price, we

17   have these justifications.

18        In fact, on Slide 7 one of the things I want to

19   bring your attention to are two statements from defense

20   counsel.  One is:  Market power is about price control.

21        We agree.  And again, not to repeat it, but the

22   only thing that allowed them to keep their price at $5.79

23   without losing sales is to keep the generic off.  That's

24   price control.

25        Above it they say:  The antitrust laws don't

1   care about this offense unless there is market power.

2          That's another way of saying that through the

3   various anecdotal pieces of information that they want to

4   present, what their payors are doing or what's happening

5   in some committee, link together a lot of anecdotes, what

6   they ultimately want to say to you on summary judgment, a

7   jury, is even if we admit we paid for delay, we did, we

8   paid them, they stayed off, they would have entered, there

9   is no antitrust problem here because the antitrust laws

10  don't care about what we did.  Why?  Well, because we've

11  cobbled together various anecdotes about things that are

12  happening out there.

13         That is not correct.  There's nothing in *Actavis*

14  that suggests that.  If they can come in and say, Our

15  pre-generic brand price was already constrained at

16  competitive levels, I've never seen that happen, but if

17  they could do it in theory, and if they could show that,

18  that when the generic enters there is no change in price,

19  the generic is priced pretty much the same as the brand

20  name, that's a different case.  It's not what goes on.

21  They know it.  None of their discovery can change it.

22  They don't need the discovery to fight it.  They can fight

23  us and litigate the payment and causation.  We can quibble

24  about what these exact pre- and post-generic prices, you

25  know, are when the experts look at the numbers.  There

1   might be some disputes about that.  They don't need any

2   discovery from the plaintiffs about that.  They have all

3   that information, and they can try to make of it what they

4   will.  But there's a whole -- there's a whole series of

5   cases that were decided interestingly in some different

6   contexts where courts were clear that if you keep a

7   brand -- if a brand keeps a generic off, that difference

8   is an overcharge.  That's an antitrust problem.  Case

9   after case held that.

10          So I'm going to turn to Slide 14.  So Slide 14,

11   a whole series of cases where this issue came up, is the

12   difference in price between a branded generic an antitrust

13   injury.  Well, what is an antitrust injury?  An antitrust

14   injury is an injury of the type that the antitrust laws

15   were intended to prevent -- this is from *Brunswick*,

16   Supreme Court -- and that flows from that which makes

17   defendant's acts unlawful.  That's an antitrust injury,

18   right?  So we're familiar that not every kind of harm

19   qualifies as an antitrust harm.  Correct.

20          So every case that's addressed, every single one

21   that has looked at whether an allegation that a purchaser

22   has been injured by being prevented from purchasing a less

23   expensive generic instead of the brand, has held that

24   that's an antitrust injury, that's a quintessential

25   antitrust injury, that's the strongest type of antitrust

1   injury you can imagine.  In fact, the Eleventh Circuit, in

2   an early -- it's a little bit of irony -- the Eleventh

3   Circuit in an early reverse payment case, the *Valley Drug*

4   case, this is long before, obviously, *Actavis* and a lot of

5   the other circuit decisions, was looking at what to do.

6   The district court had held reverse payment per se

7   unlawful.  The Eleventh Circuit took a look at it, and

8   they were discussing whether the rule of reason should

9   apply, and they rejected the rule of reason in that case,

10   and one of the reasons they rejected it is because they

11   said, quote:  The anticompetitive effects of delaying

12   generic entry cannot be seriously debated.

13          And they used that as a reason in that opinion

14   to say, Well, we can't cobble up a reason because

15   obviously it's anticompetitive, we're going to do

16   something else, and they constructed their own looking at

17   the patent that's been subject to a lot of debate on what

18   they meant.  But they recognized, every court that has

19   looked at this has recognized this, and yet at the end of

20   the day, they want to bring in various snippets of things

21   and say it doesn't matter.  We delayed them, we did it, we

22   paid them, the price would have dropped, consumers were

23   harmed by that, it doesn't matter.

24          That can't be right.  That's not the law.

25   Nothing in *Actavis* suggests that.  They can litigate on

1    the numbers, they can say there is cross price elasticity,

2    we did compete on price, the price of Aggrenox was down at

3    a competitive level, look at all this evidence.  When we

4    raised our price, we lost all of our sales, and we had to

5    do this.  They know all that.  It's never going to change

6    the difference in price between the brand and the generic,

7    first; and, second, they have all the information they

8    need to make that argument.  They need nothing from the

9    plaintiffs, and nothing from the plaintiffs can affect

10   what they already know.

11           THE COURT:  So how do you deal with the fact

12   that the Supreme Court in *Actavis* describes this type of

13   case as one subject to the rule of reason?  You're

14   basically saying it's per se.

15           MR. SORENSEN:  No, no, I'm not saying it's per

16   se.  Per se would say that as soon as we prove the

17   payment, everything is done.  They don't get to justify.

18   You can't justify a per se violation.

19           They can attempt to justify -- first of all,

20   they can test if the payment was made, obviously.  Second,

21   it has to be large.  Now, I think that just means above

22   the saved litigation costs, but there would be some

23   payments that are below that, that according to the

24   Supreme Court are okay.  They can justify it as fair

25   value.  They can argue that.  They can go on to debate

1    about that.  So it's not per se just because money is

2    passing, right?  They can defend themselves on that.  They

3    can try -- they can try, the Supreme Court didn't rule out

4    the possibility of some other pro-competitive arguments,

5    they didn't name any, and we haven't seen any court accept

6    any, but didn't rule it out.  That's not per se.

7           Now, what they did say is on the element of

8    market power, the payment is strong evidence; not just the

9    payment, they also suggested -- this is on Slide 4 -- so

10   this is the quote from *Actavis*:  The size of the payment

11   is a strong indicator of market power, the ability to

12   price above the competitive level.  Then they say:  An

13   important patent itself helps to ensure such power.  They

14   say that in the same paragraph.

15          So, no, are we saying that every single patent

16   that comes out of the patent office conveys market power?

17   No.  There are all kinds of patents in other fields that

18   may not do much of anything.  Patents on brand drugs that

19   get sold at the 14 million-dollar level are not those

20   kinds of patents.  These are patents that, as the Supreme

21   Court observed, helps to assure market power.

22          Next observation.  It doesn't make sense for a

23   company that isn't exercising market power to pay

24   competitors to stay out of the market, right, because

25   otherwise they're already selling at a competitive level,

1    they're not getting anything out of it, they're just

2    wasting their money.

3         And then fourth, the commission -- that's the

4    FTC -- has referred to studies showing that reverse

5    payment agreements are associated with the presence of

6    higher than competitive profits, a strong indication of

7    market power.  That's the second strong indication that

8    they've mentioned, higher than competitive profits.

9         What is that study that the FTC presented in

10   their brief?  If you go look at the FTC's brief to the

11   Supreme Court on the page that the Supreme Court cites,

12   there's a study called "FTC Pay-for-Delay, How Drug

13   Company Payoffs Cost Consumers Billions," that the FTC put

14   together in 2010, and it has two very important pieces of

15   information that are on this slide.  One, on average --

16   this is average over a year and with multiple generics,

17   and I mentioned that you get the big effects or the bigger

18   effects when you have more than one generic.  Within a

19   year, prices drop 85 percent, and 90 percent of sales go

20   from brand to generic.  And it also concluded based on

21   that information, in other words, taking those two pieces

22   of information and taking their conclusion that reverse

23   payment agreements on average delay generic competition 17

24   months, doing the math they stated that reverse payment

25   agreements cost consumers $3.5 billion per year.  And

1    that's the difference between the brand and the generic

2    price.  That's what was put in front of the Supreme Court.

3    That's what they're talking about when they mention that

4    the FTC has presented studies showing that reverse payment

5    agreements are associated with higher-than-competitive

6    profits.

7           So the Supreme Court is not -- we're not

8    advocating a per se rule.  We're saying take seriously

9    what *Actavis* itself said about these particular types of

10   cases in this industry, reverse payment agreements in the

11   pharmaceutical industry.  And the Supreme Court has laid

12   out multiple reasons why you can -- the jury or on summary

13   judgment you can reach a finding of direct anticompetitive

14   effects and market power without, quote, the traditional

15   going-around-and-looking-at-everything-under-the-sun

16   approach that occurs in some other cases.

17           I think that's about what I have, Your Honor,

18   unless you have questions.

19           THE COURT:  Well, how do you think this type of

20   case should be handled by the Court?  I mean, what you're

21   basically saying is let us file a motion for summary

22   judgment on the theory that it was a large payment, place

23   the burden on the defendants to come up with the

24   explanation for it and enter summary judgment, without

25   further discovery, presumably.

1          MR. SORENSEN:  Well, Your Honor, I would say

2     that we would probably move for summary judgment on market

3     power with fully developed pricing information that I just

4     indicated in IMS but with actual data from the defendants.

5     That's a piece that we need in discovery.  We can't just

6     hypothesize about it.  We have to present that.  Insofar

7     as the Court is interested in marginal costs, we have to

8     get that from the defendants.  But we could move for

9     summary judgment on market power, sure, yes.

10          Now, we could move for summary judgment on the

11     payment.  There may or may not be disputed facts that you

12     think need to go to the jury on that, either the size of

13     it, was it made, were there justifications.  I mean, I

14     understand that that might go to a jury, so it's not that

15     we'd move automatically for summary judgment either.  It

16     might be.  And the rest of the information about

17     competition and price effects is something the defendants

18     should have or they may need to subpoena a third-party

19     manufacturer if there's another generic company out there

20     that is not a defendant.  I mean, both sides have to do

21     that sometimes.  But, you know, they have to explain why

22     the discovery they want from plaintiffs has any bearing on

23     these issues, and I don't think it does, and they haven't

24     shown that it does or can.

25          THE COURT:  So if we're thinking about rule of

1    reason and we're thinking the three elements being

2    monopoly power, kind of illegality and competitive

3    effects, you're saying one and three are subject to

4    summary judgment?

5            MR. SORENSEN:  I'm sorry?

6            THE COURT:  Monopoly power you're going to

7    show -- you think can be shown, and there's no reason to

8    do anything other than show through the existence of a

9    large payment?

10           MR. SORENSEN:  I think it can be shown with the

11   existence of a large payment, yes.  I think we would also

12   show it with the price change from the brand to the

13   generic once the generic enters.

14           THE COURT:  Right, presumably that is also your

15   competitive effect.

16           MR. SORENSEN:  Yes.

17           THE COURT:  Right.

18           MR. SORENSEN:  Yes.

19           THE COURT:  And so really what you're saying is

20   the only thing that matters in this case is the liability

21   question of whether the reverse payment was a misuse of

22   the monopoly power reflected by the patent such that the

23   payment was too large to be explained as a legitimate

24   payment to resolve the pending lawsuit and/or to pay for

25   services.

1          MR. SORENSEN:  Right, it was not a payment below

2    saved litigation costs, number one; and, yes, it was not a

3    payment for legitimate services.

4          Now, I will add on the services point an

5    important point that may come up.  Judge Young in the

6    *Nexium* case observed that even the defense that the

7    payment was fair value is, in his words, not a silver

8    bullet to liability in his view because you do have this

9    issue that if the only reason that the brand made this

10   deal with the generic, let's say the generic is doing

11   something for the brand, giving it a product or service,

12   and the brand is paying the generic a hundred million

13   dollars, and let's say it's conceivable that that's,

14   quote, fair value, but the only reason the brand is giving

15   that opportunity to the generic and not some other

16   company, that service or buying that product from them as

17   opposed to some other, is because the generic is promising

18   to delay its entry, right, there's still a quid pro quo

19   even though fair value.  Judge Young, I think, in one of

20   his pretrial decisions recognized that that could also be

21   an antitrust issue and a violation.  We don't have to get

22   into that right here, but I just want to flag that as an

23   issue.

24          The other issue, of course, would be entry date.

25   There's often quite a debate between plaintiffs and

1    defendants about what would have happened but for the

2    payment, when would the generic have entered and what --

3    what is the theory and what's the proof, and there's a lot

4    of litigation around that issue, and I'm not assuming that

5    away, right?  I mean, that has to be proven, and the

6    defense can argue about that as well.  And then obviously

7    you have other issues about calculation of damages, and

8    there can be some debates about that.  But, I mean, that's

9    basically it.

10                THE COURT:  And what's your position on

11   discovery?  I've heard a lot about let us have

12   the pared-down discovery so we have what we need in the

13   event that we end up having to go to trial.

14                MR. SORENSEN:  Well, I'll return to what I've

15   said earlier, I don't think they need anything, certainly

16   from the direct purchaser plaintiffs, at all, and their

17   anecdotal information about third-party payors I don't

18   think they need either since it doesn't go to anything.

19   It doesn't change any facts on the ground.  And they know

20   whether the price of branded Aggrenox, when you factor in

21   all the price concessions that the branded company made,

22   whether you call it rebates or discounts or anything you

23   want to call it, they know what goes into the net price of

24   each capsule.  They have all that information, and their

25   expert can use it and say, Here's the true price of

1    branded -- of Aggrenox.  You plaintiffs are getting it

2    wrong.

3              THE COURT:  But they don't have the same

4    information for Plavix or the Plavix generics.

5              MR. SORENSEN:  They don't have the same

6    information for the internal information from the

7    manufacturers of Plavix and generic Plavix.  They know

8    whether the entry of generic Plavix caused them to lower

9    the price of Aggrenox.  They know whether they raised the

10   price of Aggrenox repeatedly over the years despite other

11   drugs.  They know that.  They know what effect or not

12   effect those other drugs had on their prices.  They know

13   all that.  If they want to know something, for example,

14   about the marginal cost of Plavix, well, everyone would

15   have to subpoena the manufacturer of Plavix, right?  No

16   one in the room has that information internally.  So they

17   would get it from the same place we would if that's

18   something that they want to get.

19             So returning to a point I think you mentioned of

20   portionality, I don't think they've shown that the

21   continued pursuit of anecdotal evidence that they're

22   seeking is worth the burden.

23             THE COURT:  Well, I haven't heard a lot about

24   the burden either, so, I mean --

25             MR. SORENSEN:  Fair enough.  On the direct

1    purchaser side, Your Honor, in the course of this, in the

2    motion to compel stage, we presented a series of

3    affidavits about the burden of the discovery as it existed

4    then.  I know there's been some subsequent meet and

5    confers.  I apologize, Your Honor, I personally was not

6    involved in all of those discussions.  I have read the

7    email traffic going back and forth.  It is correct the

8    defendants have offered to reduce what they're seeking,

9    but we haven't reached agreement.  There was an exchange

10   of emails, I believe, on December 16 and early 17 back and

11   forth between one of my colleagues, Peter Kohn, and the

12   defendants about the direct purchasers I'm talking about,

13   where they presented -- the defendants presented a

14   proposal.  We responded saying, well, you know, perhaps

15   some of these are okay, but others are not.  My

16   understanding is that discussions stopped at that point

17   between at least the direct purchasers and the defendants

18   in light of this hearing and the Court's order.

19             THE COURT:  Okay.  Thank you.

20             MR. ST. PHILLIP:  Your Honor, could I be heard

21   just for a second on this particular point?  I represent

22   Humana, and you have our rebate agreement with Boehringer

23   in the record.  That rebate agreement provides that we

24   will, on a periodic basis, provide to Boehringer all of

25   our individual retail transactions for Aggrenox, Plavix

1    and other products that they want to be included in that

2    data transmission.  That is not just what happens with

3    respect to Humana, but with all the PBMs and all of the

4    large payors of any size.  So in the ordinary course of

5    business -- and this has been discussed in connection with

6    our discovery meet and confers -- in the ordinary course

7    of business, they have who the -- where the pharmacy was,

8    who the doctor was, who the patient is, what the amount of

9    co-pay was, what the amount of the payor, Humana, paid for

10   that script, what the dosage is line by line.  So what

11   we've said to the defendants is, You have this.

12            In connection with Mr. Holding's statement that

13   IMS data is not a substitute for internal price data, we

14   say, Okay, but you have it.

15            So we don't really understand, particularly with

16   respect to Plavix that's in the gathering process that

17   Boehringer has in the ordinary course, and so what we've

18   said in connection with this discovery motion is, You have

19   it.

20            They have our rebate information with respect

21   to -- with respect to Aggrenox, so we're not really sure

22   what else they need.

23            THE COURT:  Okay.  Thank you.

24            MR. SHADOWEN:  Good afternoon, Your Honor.

25   Steve Shadowen on behalf of the end-payor plaintiffs.

1    I'll keep my remarks brief.  Since so much has gone

2    before, as I sat there I just tried to take in where there

3    seemed to be disconnects between people or analytic

4    ambiguity.

5          The Court raised the issue what happens if the

6    brand manufacturer turns out at a very high price, but

7    he's very inefficient.  Is that a supracompetitive price

8    or not?  And that's an issue that economists face when

9    deciding whether or not there's market power based on

10   price being in excess of marginal cost.  What do you do

11   about the inefficient monopolist?  One of the problems of

12   monopoly is that it encourages manufacturers to become,

13   you know, fat, dumb and happy.  They get bloated.  We

14   don't -- that's a theoretical problem.  We don't think

15   it's going to be an issue here because the price is so far

16   in excess of short-run marginal manufacturing costs, which

17   is the proper cost to consider.  So that's one issue.

18         But leaving that aside, the case law is clear.

19   *Indiana Federation of Dentists* and also *Todd vs. Exxon*

20   from the Second Circuit, the plaintiffs can make that

21   first element of their claim by proving either market

22   power or direct evidence of anticompetitive effects, and

23   the example that you gave and that we have here,

24   theoretically could have here, is a great example of that.

25   Let's say that the -- that Boehringer were a very

1   inefficient producer for some reason, but yet kept out of

2   the market a generic competitor who, as we know, reduced

3   the price by 50 percent when they entered.  Under the

4   authority of *Indiana Federation of Dentists* and *Todd vs.*

5   *Exxon* and other cases in the Second Circuit, the

6   plaintiffs can prove the first element of the rule of

7   reason case by proving anticompetitive effects.  Why is

8   that?  Why is the plaintiff allowed to prove direct

9   evidence of anticompetitive effects rather than market

10  power?  And the answer is very simple.  The reason that

11  you ask the market power question in many cases is you're

12  trying to predict does this manufacturer have the ability

13  to inflict anticompetitive effects on consumers?  Does --

14  you know, can -- if he took this action, would there be

15  anticompetitive effects?  And I think so we come back to

16  right where Your Honor started the whole session by saying

17  this is not a case where we're trying to predict, gee,

18  what would happen if Boehringer paid a generic competitor

19  to stay out of the market.  We know what happened when the

20  generic competitor finally entered.  We think based on the

21  anecdotes that we have so far it's going to turn out there

22  was a 50 percent price decrease compared to the net, after

23  rebate, after discount price of branded Aggrenox, a

24  50 percent price reduction.  So all this toing and froing

25  about market power is sort of, you know, it's interesting,

```
 1    and we will go through the process of doing it because

 2    it's very simple to do, to show that their price is far in

 3    excess of marginal cost, we'll do that to show market

 4    power, but we're also going to prove the first element of

 5    our rule of reason case by showing here was the

 6    anticompetitive effect.  You kept out generic competition.

 7              And in the end-payors' brief we really walk the

 8    Court through, tried to walk the Court through the

 9    Schering-Plough decision by the FTC, and we did that not

10    because the Court is bound by that, you're clearly not,

11    it's the Federal Trade Commission in an administrative

12    proceeding, but we thought it was very illustrative of,

13    you know, everybody has a common sense reaction, obviously

14    it's anticompetitive to keep out a generic, obviously you

15    had market power or you wouldn't have paid them, and what

16    about these price reductions?  And the benefit of walking

17    through that Schering-Plough decision is they do it, you

18    know, lock, stock and barrel.  They go very systematically

19    through to say here's Indiana Federation of Dentists,

20    here's Todd vs. Exxon saying you can prove market power,

21    satisfy that element by direct -- evidence of direct

22    effects of the anticompetitive effects.  And they go

23    through that, and they say the price effect of keeping out

24    the generic is the anticompetitive effect.

25              Then the other reason we rely on that decision
```

1    so heavily is they had the same economist who submitted

2    the declaration to the Court in this case, the same

3    economist who came in and said, Well, that's not an

4    anticompetitive effect because brands have all these R&D

5    costs that they incur that the generics don't incur.  And

6    there are all these state substitution laws that encourage

7    the use of generics, so that's really -- that price effect

8    isn't a competitive effect, it's an artifact of

9    regulation.  And the FTC took that on and said wrong and

10   wrong.

11          With respect to it being an artifact of

12   regulation, they said, You've got it backwards.  The

13   regulations or the state substitution laws that encourage

14   generic competition exist because generic -- lower generic

15   prices are good for consumers.  That's why they exist.

16   And so when you undermine that regulatory structure

17   through these payments, that's anticompetitive.

18          With respect to R&D costs, the FTC made a really

19   important point, and it's a point that Professor Hovenkamp

20   has made in his most recent supplement to his treatise,

21   and we cite it, we discuss it in footnote 23 of our brief,

22   a very important point, because there is straight language

23   in all these cases about, well, you don't have market

24   power if there's high fixed costs.  And what the FTC said

25   and what Professor Hovenkamp said is, Well, that may be,

1    depending on the reason you're asking the market power

2    question.  If you're looking at a merger between two brand

3    firms and you're trying to predict what would happen and

4    whether or not these prices are supracompetitive compared

5    to one another, that may be well and good to include -- to

6    take account of the fact that there are large R&D costs.

7    But you have to attack or analyze the market power

8    question in light of what's the antitrust question being

9    posed.

10              Here we're not posing a merger between two

11   branded companies.  We're saying is it okay, is it good or

12   bad for consumers for a brand company to pay the generic

13   company to stop challenging its patent?  And the obvious

14   point that Hovenkamp makes, that the FTC made is you can't

15   point to high R&D costs as a reason to define -- to

16   include R&D costs in the definition of costs in doing the

17   price cost analysis when the question you're asking is, is

18   it anticompetitive to pay a competitor to stop the process

19   that would determine whether or not your patent that

20   allows you to recover those R&D costs is valid and

21   infringed.  That would be crazy.  That would be tantamount

22   to saying because of the fact that you incurred those R&D

23   costs, we're going to give you antitrust immunity --

24   because that's what happens when you decide that there's

25   not market power, there's antitrust immunity -- we're

1    going to give you antitrust immunity because you incurred

2    the costs for paying somebody not to challenge whether or

3    not you legitimately, through this patent, are recovering

4    those costs.

5         The incurrence of R&D costs is a risk that

6    companies incur.  They may or may not get to recover them,

7    depending upon whether or not the patents are valid and

8    infringed by their competitor.  And so when you're asking

9    the question is it anticompetitive to pay a competitor to

10   stop that process that would determine whether the patents

11   are valid and infringed, you cannot say, oh, it's okay to

12   pay them because you in fact incurred the R&D costs.  The

13   question being asked in the patent litigation is, are you

14   legitimately recovering those costs?

15        So I just make that point.  I hope it's clear,

16   it's long-winded, but it's a very important point that you

17   can simplify by saying how you define the costs that go

18   into the costs when you're determining the margin of price

19   over cost is determined by the antitrust question that

20   you're asking, and Professor Hovenkamp does a much better

21   job than I did in explaining that.

22        With respect to the discovery, I think the

23   Court's inclination, at least some of the comments that

24   you made, are spot on.  There are two things that matter

25   here:  What was the net price of Aggrenox from whatever

1    formularies, step processes, competition, in the

2    therapeutic class what did that competition drive the net

3    price of branded Aggrenox down to, and then what was the

4    price of generic Aggrenox when it entered?  And all they

5    want to do is -- you know, there are 3,000 third-party

6    payors in this country.  The net effect of whatever

7    competition they generated within the therapeutic class by

8    formularies resulted in one thing we need to know, what

9    was the net price of generic -- of branded Aggrenox, and

10   then you compare that to the price of generic Aggrenox

11   when it entered, and you say, Well, whatever all that

12   competition was, it ended up here, and generic Aggrenox is

13   here.

14           And so what they're doing, they want this

15   discovery, basically, to just collect anecdotes.  Of the

16   3,000 payors in this country, let's get discovery from two

17   or three or four or five or ten of them and put that in

18   front of the jury.  I think the Court would not allow that

19   at trial, even if they were entitled ultimately to talk

20   about the broader class, therapeutic class.  We would

21   object to that on 403.  If you're going to talk about

22   these ten, what about the other 2,900, you know, 2,900?

23   So we think both analytically the Court's instincts are

24   correct, that the FTC decision in *Schering-Plough* walks

25   right through how you do it, and that even leaving that

1    aside, they're after anecdotes when what matters is the

2    market price.

3              THE COURT:  Thank you.

4              MR. PERWIN:  Good afternoon, Your Honor.  Very

5    briefly.  This is Scott Perwin for the Walgreen

6    plaintiffs.

7              First of all, Mr. Shadowen was absolutely

8    correct in the first point he made.  The appropriate

9    comparator for purposes of market power is the marginal

10   cost.  That's what the *Berkey Photo* case holds.  The

11   appropriate comparator for purposes of anticompetitive

12   effects is the but for price, in this case the generic

13   price.  Either of those, as Mr. Shadowen pointed out, is

14   sufficient under case law, under *Indiana Dentists* and

15   under *Todd v. Exxon*, but they're different things.  One of

16   them depends on whether or not the price that's been

17   charged by the monopolist is substantially above their own

18   marginal cost.  The other is -- determines whether or not

19   consumers are being injured by the absence of the lower

20   price product on the market.

21             Second, I just want to emphasize, Your Honor,

22   that this issue, the issue should be decided under

23   Rule 26.  Rule 26 gives Your Honor ample authority to,

24   informed by the economics and the law of this issue, to

25   determine whether or not the discovery that's being sought

1    is appropriate, whether the burden outweighs -- whether

2    the benefit outweighs the burden, whether there are better

3    sources elsewhere, and for all of those reasons this

4    particular discovery of the products from the plaintiffs

5    should be denied.  We emphasized in our briefs the data

6    that they're asking for is fragmented.  IMS data is not

7    fragmented.  The only thing I heard from the defense side

8    about IMS data is it doesn't capture all the rebates.  As

9    Mr. St. Phillip said, they know what the rebates are.

10   They pay the rebates, and they certainly don't need data

11   from my clients, Walgreen, Kroger, to find out what the

12   rebates are.  We're not the ones that are getting paid the

13   rebates.  So we pay WAC, wholesale acquisition cost, so

14   there's no reason to take discovery from my clients or the

15   other direct purchasers in order to find out the rebates

16   that they pay that they know about already.

17           And second, Your Honor, the Cellophane Fallacy

18   shows us that the discovery they're asking for isn't going

19   to be of any use anyway.  As Your Honor pointed out, and

20   this is in fact the case we believe, Aggrenox is being

21   sold at a 90 percent profit margin, Plavix is being sold

22   at a 90 percent profit margin, it may be that if it

23   weren't for Plavix, Aggrenox would be sold at a 95 profit

24   margin, but who cares?  Ninety percent is sufficient to

25   show that the competition that exists is not constraining

1   the price to marginal cost, and that's what the antitrust

2   laws are concerned about.  So we think Your Honor should

3   decide this issue under Rule 26.  If either side wants to

4   file a motion for summary judgment, they can do that, but

5   at the moment the issue is what discovery should be

6   allowed, and Rule 26 says that the discovery they want is

7   inappropriate.

8                   THE COURT:  Thank you.

9                   MR. MILNE:  Your Honor, if I may.  Your Honor, I

10  think stepping back from all of this, obviously there's a

11  lot going on here, a lot in the arguments factually,

12  legally, etc.  What this underscores to me, I think when

13  you look at the cases, when you look at cases like --

14  really look at *Actavis; Actavis*, for example, in the

15  *Indiana Federation* case that the plaintiffs talk about,

16  was the case that the Supreme Court identified as

17  reflecting that quick-look analysis that the FTC was

18  advocating before the Supreme Court and rejected.  So the

19  Supreme Court in *Actavis* said a rule of reason case like

20  any other rule of reason case.  That's what it said.  It

21  did say that the size of any proveable payment could be a

22  strong indicator.  It said that a brand may well -- that

23  was a quote, may well -- not would or should be presumed.

24  But what is being advocated on this side is tantamount to

25  a presumption.  They're saying, in effect, that the fact

1    that the generic comes in at a lower price because of the

2    regulatory structure gives them a presumption, de facto.

3    We don't even get to look at the broader market.  We would

4    submit to you that's not right.  That's not right when you

5    look at this case in the light of *Walker Process*, the

6    *Walker Process* case which we would submit raises very

7    analogous analytical issues and where the Supreme Court

8    was crystal clear that you have to look at things in a

9    broader market.  In a *Walker Process* case where

10   pharmaceuticals are in question, where the branded company

11   has a patent and keeps out generic competition with that

12   patent because it was allegedly fraudulently procured, the

13   courts say we can't just -- even though all the same

14   things we've been talking about today apply, the fact of

15   lower prices, you know, if you will, what the plaintiffs

16   have picked as a special relationship between the brand

17   and the generic of a pharmaceutical, the *Kaiser* case said,

18   no, we still have to look at the broader market.

19            So there are disputes here on the law.  We

20   certainly dispute many, many of the facts here.  We would

21   dispute this whole issue about marginal cost.  We're

22   throwing around, oh, they know if the marginal cost is 90

23   percent, then for sure we're monopolists.  Well, what the

24   courts say and what Judge Posner says is when the

25   deviation of price from marginal cost simply reflects

1    certain fixed costs, there is no occasion for antitrust

2    concern.  That's what Judge Posner says.  So we need to

3    look at that, and we will look at that.  And when we

4    factor in all the appropriate costs, which aren't factored

5    into the normal accounting things that a company does in

6    its day-to-day business, we will have a fight over that.

7            THE COURT:  That's all information you have.

8            MR. MILNE:  Part of it is, but then --

9            THE COURT:  What aspect of your costs do you not

10   have?

11           MR. MILNE:  I don't know the answer to that

12   question sitting here, Your Honor, but we would have most

13   of it and -- if not all of it, but the point of it is,

14   Your Honor, is that that's just a piece of the inquiry.  I

15   would really commend to Your Honor cases like *Geneva,*

16   cases like *Kodak*, cases like *Kaiser* where the courts say

17   that -- where the Second Circuit has said even where you

18   have that direct evidence, if you have some direct

19   evidence that would suggest simply having a high profit

20   margin in and of itself doesn't mean you're a monopolist

21   either, you have to look at the broader market.

22           And we heard from, I think it was Mr. Shadowen,

23   about the *Schering* case, the FTC proceeding.  In that

24   situation, that was a case that was litigated -- we

25   actually litigated it way back in the early 2000s, and the

1    Eleventh Circuit, first of all, found that the FTC

2    basically ignored all of the ALJ's actual fact findings.

3    The ultimate result in the *Schering* case was rejected by

4    the Supreme Court in *Actavis*, and when you talk about

5    where the FTC -- what the FTC is doing these days, in the

6    *Actavis* case itself, in a complaint that the FTC filed

7    just yesterday claiming reverse payment patent

8    settlements, the FTC includes -- to be sure, it's arguing

9    for the brand and generic-only market, but it includes in

10   its complaint and puts into issue factually the broader

11   market definition questions, making allegations about the

12   lack of substitutability between the products at issue

13   there and other products in the therapeutic category.  If

14   *Actavis* was so clear on this issue, there would be no need

15   for those allegations.  These plaintiffs have those types

16   of allegations in their complaints.

17            THE COURT:  So a representation was made, I

18   think by Humana's counsel, that you already have all the

19   sales information in great detail.

20            MR. MILNE:  Your Honor, I don't believe that

21   that gives the full picture, and my colleague Mr. Carney

22   can speak to that, but I want to make a point first.

23   Whatever we have in terms of the utilization data, rebate

24   data and whatnot for our products relate to our products,

25   and maybe we might get relative utilization but not net

1   pricing information from our third-party payor

2   counterparts.  We won't get it for Plavix.  We won't get

3   it for generic Plavix.  We only get, you know, the

4   information that relates directly to us.  And one of the

5   key things in this discovery, and this is why we've been

6   focusing on the other products, we're focusing on what is

7   the competitive dynamic involving Plavix, involving the

8   aspirin product, and they talk about it being anecdotal

9   what we're looking for.  Well, first of all, we do want

10  data, but the Second Circuit was very clear in the *Geneva*

11  case saying that industry recognition about the nature of

12  competition, who competes with who, is relevant even where

13  a plaintiff is coming in and saying they're relying on

14  direct evidence.  So it's the recognition that this

15  product competes with this product, and we need to drive a

16  lower price -- we can drive a lower price by playing

17  Aggrenox off of Plavix, or Aggrenox off of aspirin, or

18  Aggrenox off of generic Plavix.  So it's that kind of, if

19  you will, qualitative information that is critical, and

20  the economists will review it, and it will be factored

21  into the economic analysis.  And we will take third-party

22  discovery as well to try to get this in a more broad-based

23  way.  Will we take discovery from 3,000 third-party

24  payors?  No, but we will have our experts tell us what is

25  the level of information they need to be able to draw

1   reasonable economic conclusions, and then we'll litigate.

2   And if they think it's too anecdotal, we'll fight over

3   that before Your Honor when the time comes for summary

4   judgment or before the jury if the time comes for trial.

5          But the bottom line is that there certainly are

6   real disputes here on the law, but it's very much informed

7   by the facts, and I don't think you really heard from

8   these plaintiffs any serious burden argument.  And I think

9   for all of those reasons and for the reasons that

10  Mr. Holding mentioned and I did as well, that I think

11  we're much better off taking the discovery, developing a

12  record, teeing up whatever summary judgment motions make

13  sense to tee up at whatever point.  And I won't belabor

14  with Your Honor, unless you'd like to hear about it, our

15  views about what are the requisite elements of the overall

16  claim and what other summary judgment motions might be

17  appropriate because I think that may be getting beyond

18  what we're focusing on, and I know time is short.  But the

19  point here is, Your Honor, we've come 80 percent of the

20  way toward narrowing this discovery dispute.  We think

21  we've more than adequately, in light of the stakes in this

22  case, satisfied our Rule 26 obligations, and we would

23  submit that discovery should be allowed.

24          THE COURT:  And what's the factual basis for

25  suggesting that aspirin is a realistic substitute for a

```
 1    prescription medication?  Do you have a doctor saying, You
 2    know what, forget a prescription, just go buy some aspirin
 3    at Stop & Shop and take one of the aspirin?
 4              MR. MILNE:  So, Your Honor --
 5              MR. ELFAND:  Twenty-two.
 6              MR. MILNE:  Okay, apologies, I need to get to
 7    the right slide.
 8              THE COURT:  And assuming it's right, how do you
 9    factor out of the aspirin sales documents the people who
10    are taking it because they have high cholesterol, and
11    people who are taking it because they're concerned about a
12    heart attack, the people who are taking it because they
13    have a headache, people who are taking it because their
14    children have headaches.
15              MR. MILNE:  Well, Your Honor, first of all, we
16    lawyers all think we're getting headaches dealing with
17    this issue, but, first of all, we need to understand
18    pricing and substitution information.  It's pricing, it's
19    substitutability data, and what we're really --
20              THE COURT:  That's what I'm asking you for.  Why
21    should I believe that a doctor is going to say, Ah, forget
22    Plavix, forget Aggrenox, all you have to do is take
23    aspirin?
24              MR. MILNE:  Well, if you look at Slide 22, Your
25    Honor, this is the American Heart Association guidelines
```

1    for the prevention of stroke, which you can see in the

2    highlighted is that what it's identifying as reasonable

3    substitutes, first of all, aspirin, and then the

4    combination of aspirin and extended-release dipyridamole,

5    which is Aggrenox, and then --

6         THE COURT:  So if this was easily substitutable,

7    no one would buy Plavix and no one would by Aggrenox

8    because aspirin is about one-twentieth the cost, maybe

9    one-fiftieth the cost.  I really don't -- I don't see

10   how --

11        MR. CARNEY:  Your Honor, if I may, Slide 17, and

12   this goes to a point Mr. Milne raised earlier, this is a

13   slide based on Humana's formularies.  So we were talking

14   earlier about Humana's documents, and it's actually true

15   that we have had discussions and they have produced some

16   data in the normal course to us, and it's not just

17   about -- normally we don't have information on Plavix and

18   other drugs, but we do have some information from Humana,

19   and we're talking about doing more with the right data.

20   Why do we have that?  We have that because the Humana

21   contract says that Plavix, that Brilinta, that Aggrenox

22   are in a competitive basket of drugs, and so as part of

23   the contract they provide us information on the rebates

24   because they concede that the rebates are necessary to

25   make Aggrenox competitive with those other drugs.  And so

1    we do have some of that because we have those admissions.

2            So the documents we're seeking are not

3    anecdotes.  They're actually admissions from the parties.

4    Some of them are public, and some of the slides we've got,

5    from about 17 to 22, are admissions by Humana where

6    they're basically saying you've got to try aspirin or

7    you've got to try another drug before Plavix first, and if

8    they fail on that, then you can get what may be a more

9    expensive treatment.  And so Humana, Blue Cross, for years

10   they were pushing patients to the less expensive drug.

11   Clearly they thought it was as good a treatment, and

12   that's their decision, but they were trying to save their

13   money, but that's the substitution Mr. Milne was

14   discussing, and that has been the basis for product market

15   cases, and it's been the basis for allowing such discovery

16   of the sort we're seeking in Cardizem, Wellbutrin,

17   Doryx --

18           THE COURT:  I'm asking about aspirin.

19           MR. CARNEY:  So aspirin, I think, is on

20   Slide 17.

21           THE COURT:  I don't see it.  That's the word I'm

22   looking for.

23           MR. CARNEY:  Okay, then let me grab another one

24   from Blue Cross.

25           MR. MILNE:  So Slide 20, Your Honor,

1    identifies --

2            MR. CARNEY:  Yes, Slide 20.

3            MR. MILNE:  -- OTC aspirin as a preferred

4    alternative.

5            MR. CARNEY:  So Plavix, Persantine and OTC

6    aspirin are alternatives.  We dropped our request for

7    Persantine.  We agreed out of those seven drugs, four --

8            THE COURT:  Correct me if I'm wrong.  That's

9    giving two alternatives, not three.  Alternative one is

10   Plavix, generic; alternative two is a combination of

11   Persantine plus over-the-counter aspirin.

12           MR. CARNEY:  That's certainly one way to read

13   that, and there are treatments that talk about aspirin

14   plus another drug.

15           THE COURT:  They use "or" and then they use

16   "plus."

17           MR. CARNEY:  So if you go to Slide 22, Your

18   Honor, there -- this is back to the AHA guidelines.  These

19   are guidelines you were asking for, who says this to

20   doctors.  Basically they're saying that aspirin, the

21   combination of aspirin and extended-release dipyridamole,

22   that's basically what the Aggrenox product is.  So, again,

23   it's not just a simple molecule here that's under the

24   patent.  There's a patent around that combination.  And

25   dipyridamole, which is Plavix, so I think that's why we

1    have it, but we've narrowed it to those two.  And we're

2    not seeking the sales data.  Your question was very much

3    on point about how we disaggregate for headaches, you

4    know, that kids cause them.  We've dropped that, so we're

5    only asking for the transactional data as to Plavix.  We

6    are interested in what other documents Humana and their

7    therapeutic committees have saying patients can really

8    just take aspirin instead of Aggrenox and that's a good

9    substitute, or that plus something else that's generic.

10   So it all factors into that market, and those are

11   admissions, so that's why it's important coming from their

12   documents and from the Big Three as well for analysis of

13   this.

14           The other slide is Slide 25 which talks about

15   the product Aggrenox, and this is Anthem, another insurer,

16   a major insurer that says the alternatives include

17   aspirin; Plavix is available if efficacy cannot be

18   achieved with aspirin.  So these insurers, to save money

19   on their part and surely without putting patients at risk,

20   right, are saying you've got to try these other drugs,

21   they could be suitable substitutes, and these are major

22   insurers that are rolling this out across the country and

23   did for years, and certainly did it when generic Plavix

24   came on.

25           MR. MILNE:  And I think one of the things, Your

1    Honor, that we need to explore in the market power inquiry

2    as it relates to aspirin is that since the third-party

3    payors are factoring aspirin in, we need to understand

4    whether there are any price effects and product

5    switching --

6              THE COURT:  Well, I just heard you weren't going

7    to get transaction data on aspirin.

8              MR. MILNE:  Right, we may not get the

9    transaction data --

10             THE COURT:  So how are you going to perform

11   that?

12             MR. MILNE:  Well, we'll see it in the documents

13   from the companies, the anecdotal or -- not anecdotal --

14   the business planning, the business reporting documents

15   where we will hopefully see or will be able to assess how

16   they are viewing, so we're driving patients toward

17   aspirin; or we are -- as a result of the price of aspirin,

18   Plavix has given an increased discount, or something like

19   that, or has increased the rebate level so that it's

20   getting off of a less preferred position on the formulary.

21   So even though aspirin is out there at a lower price, the

22   question is how are the other -- the other competitors in

23   this space reacting to that and are there price effects?

24   And if the price of aspirin shifts, does it cause any

25   changes in either the pricing or the sales of the branded

1    products?

2            So it's those sorts of factual issues that the

3    economists look at and that we then fight over.  And,

4    again, we're not looking to make work.  We're not looking

5    to, you know, get every -- you know, do scorched earth on

6    every little bit of transactional data.  As Mr. Carney

7    said, we may not even be seeking transactional data on the

8    aspirin.  We need to consult with our economists and make

9    sure that they're getting the information they need to do

10   valid analyses, but that is the nature of discovery, and

11   if there are specific issues with a specific -- you know,

12   one of the specific plaintiffs and they say, Well, this

13   thing that's being sought is just too much, we're happy

14   either to work with them, as we think we have been doing,

15   or if we have disputes we can bring them to Your Honor

16   right away.  We're not -- again, this isn't -- we're not

17   just trying to, you know, make work, but we think we're

18   entitled to this.

19           THE COURT:  Do you want to comment on the

20   argument that the drop in market price when the generics

21   entered the market essentially demonstrates

22   anticompetitive effect and market power?

23           MR. MILNE:  Well, this gets back, Your Honor,

24   first of all, that slide that Mr. Sorensen started with,

25   Number 7, is based on IMS data.  It doesn't contain all

1    the discount and rebating information, so there is that

2    issue.  But I think what you heard him say is we're not

3    really worried about profit margins, we're only worried

4    about that price differential, the fact that the generic

5    is priced lower.

6              THE COURT:  Right.  His argument is that

7    demonstrates antitrust competitive harm.

8              MR. MILNE:  And if that is the case, then every

9    single branded company is a monopolist, is exerting market

10   power, because as a result of the drastic cost differences

11   between the way a branded company has to operate and the

12   way a generic company gets to operate, where it gets the

13   free ride on the R&D, the efficacy studies, doesn't have

14   to do any marketing and education of its own, there is

15   this drastic cost difference, and the Second Circuit in

16   *Kodak,* the Second Circuit in *Geneva* said that cost

17   differences alone can't answer the question.

18             THE COURT:  Answer what question?

19             MR. MILNE:  Whether that difference reflects a

20   supracompetitive price, that question we started with

21   today, which is the heart of the issue.  Their whole

22   theory is based upon the idea that that price differential

23   reflects the -- reflects a supracompetitive price, that we

24   deem the generic price the competitive price, and then by

25   definition because the brand is priced higher, it has a

1    supracompetitive price, and the Second Circuit tells us

2    no.  The Second Circuit couldn't be clearer in *Geneva*, I

3    think couldn't be clearer in *Kodak* and in other cases as

4    well that we cite in the papers.  So you have to factor in

5    these other things.  You have to factor in costs.  You

6    have to factor in output effects, which we really haven't

7    talked about today.

8              And then in the *Geneva* case even where -- let's

9    say we lose on that stuff.  Let's say you're persuaded

10    that we have a high profit margin, that output effects

11    suggest the exercise of market power, we still as a matter

12    of evidence, and certainly as a matter of discovery

13    because we're not aware of any case that has -- in a

14    pharmaceutical antitrust case, and there are dozens of

15    them out there, you know, these lawyers in the room are

16    representing plaintiffs in practically every single one of

17    them, and there's not one case involving delayed generic

18    entry and the exercise of this same kind of alleged market

19    power where this type of market assessment, market

20    definition type discovery has been cut off in its entirety

21    simply because of this idea that there's a difference in

22    the price.  The plaintiffs come in all the time and make

23    these same arguments, but what the courts do is they let

24    the discovery happen, let the economists fight it out.

25              THE COURT:  That's the easy way to go,

1    certainly.

2            MR. MILNE:  Well, Your Honor, I think it's the

3    right way to go.  I think you need to manage discovery in

4    the appropriate way and not let it -- not let it get out

5    of hand where there's no basis for it, but I would submit,

6    Your Honor, especially with the narrowing that we've done

7    and with the documents that we have that show that the

8    third-party payors are viewing these products, that the

9    medical associations, doctors are viewing these products

10   as substitutes, and we see real indications of price

11   competition going on between them, this isn't some

12   trumped-up thing where we're just making work.  It's not

13   the easy way out.  It's the right way out.  And then we

14   tee it up before Your Honor on summary judgment, and then

15   the Second Circuit can do what it wishes thereafter, or we

16   have a trial and we deal with it.  But we're not going to

17   try to slow things down.  I think this is the way it,

18   frankly, we would submit, needs to be done.

19           THE COURT:  Okay.  All right.

20           MR. ST. PHILLIP:  Your Honor, can I just give

21   you a cite to the evidence in connection with the rebate

22   agreement?  It's Exhibit 36 of Mr. Pace's declaration, and

23   you'll see the class of drugs, including the ones we've

24   been talking about here that have been submitted and the

25   type of data that's been submitted is in that document.

1          THE COURT:  Thank you.

2          MR. SORENSEN:  Just a couple of brief comments,

3     Your Honor.  One, on aspirin, aspirin costs pennies

4     compared to Aggrenox.  If aspirin was in the relevant

5     market of Aggrenox, Aggrenox wouldn't exist.  It would

6     have disappeared a long time ago.  So, again, this is

7     straight anecdotal information, and it has nothing to do

8     with demonstrating that Aggrenox's price was constrained

9     through competition.  As you know and I think you

10    indicated earlier, the relevant market is the smallest

11    market you need to control to impose basically a SSNIP, a

12    five percent price increase.  You maintain a five percent

13    price increase for about a year is the kind of standard

14    way of looking at that.  They only need to do that, the

15    five percent price increase above competitive levels, the

16    only products they needed to control were branded and

17    generic Aggrenox.  They didn't have to control aspirin, as

18    they didn't, to keep that price high.  So all of their

19    discussion on aspirin kind of proves our point that this

20    discovery goes nowhere.

21          And second, this general point that we've heard

22    a number of times, oh, plaintiffs are right, every brand

23    company is a monopolist.  Well, you know what?  The reason

24    that these companies go into the business they're in,

25    spend whatever they spend -- and they don't spend anything

1    close to this general number that they keep throwing

2    around, but that's an issue for another day -- the reason

3    they invest is because they get patents, and the reason

4    they invest in those patents is because in this world

5    those patents are worth a fortune if they produce

6    something that is worthwhile.  Because why?  Because it

7    keeps everyone else out, and they can charge a high

8    monopoly price.  We're not challenging that, other than

9    *Walker Process* sham issues.  We're not saying there's

10   something wrong with that system; you know, you've got a

11   patent, you're making a fortune, shame on you.  We're not

12   saying that.  Absent misconduct in the patent itself,

13   that's great.  Go cure another disease, make another

14   billion dollars.  That's not what's going on.  They are

15   paying people to stay out.  So the fact that, yes, if they

16   have a patent for a drug that has high sales, probably

17   indicates that every drug company that has that kind of

18   patent is exercising market power, that would not be

19   shocking.  That is what attracts all these companies to do

20   what they're doing.  That's what patents are supposed to

21   give them if they produce something that's worthwhile.

22   That's not -- it doesn't go to what's in front of us, so I

23   just wanted to make that point.

24            MR. SHADOWEN:  Very briefly, Your Honor, in

25   terms of authority for cutting off discovery on this

1   issue, I think the best thing that we have, again, is the

2   *Schering-Plough* administrative decision because what

3   happened there was there was discovery into the broader

4   market.  There was all kinds of findings of fact that

5   there were 23 other competitors in the market, basically

6   it was a formulation of salt, everybody in the world made

7   this stuff, findings of fact by the ALJ saying there was

8   this broader market, but then the commission unanimously,

9   all five commissioners said, We don't reject those

10  findings of fact as wrong, they're just irrelevant because

11  whatever competition there was within the therapeutic

12  class, the price dropped by some 30 percent in that case

13  when the generic came in.  So you have sort of the flip

14  there.  There was the discovery, and then it turned out

15  all to be for naught because it was irrelevant, which is

16  what we're saying here.

17          I think to put a further point on that, I want

18  to at least mention the *Namenda* decision by the Second

19  Circuit.  That was a case where the brand manufacturer

20  tweaked the chemical entity itself in order to impair

21  generic competition, and the brand manufacturer came into

22  court and said, Well, that's not anticompetitive because

23  we have all these R&D costs and marketing costs that

24  generics don't have, and so when we keep them out of the

25  market, that's not anticompetitive, it's procompetitive.

 1    And the Second Circuit said, What, are you crazy?  We've

 2    got 50 states that have enacted generic substitution laws,

 3    we've got the Hatch-Waxman Act, we have 180-day

 4    exclusivity for the first generic to challenge the patent.

 5    We put a bounty on these patents because it's so important

 6    to see whether or not they're valid patents.  So it's

 7    clearly anticompetitive, despite your R&D costs, despite

 8    your marketing costs.  If you cannot legitimately keep a

 9    generic out of the market, it's anticompetitive.

10              THE COURT:  All right.

11              MR. HOLDING:  May I?  I promise it will be

12    brief.  So Mr. Shadowen talks about the FTC's decision,

13    and it's there; it's reversed, but it's there.  As long as

14    we're going to talk about those things, I know you're

15    aware of them, but I just want to bear in mind you are

16    obviously not the first court to be asked this question,

17    and it's telling to me that among all of your colleagues,

18    all of them needed to realize this can't even be decided

19    at summary judgment, by and large, and I think that bears

20    on this issue.

21              The *Namenda* point, let me talk about it for a

22    moment.  I had mentioned it earlier.  I think *Namenda* is a

23    perfect example of why we need this discovery.  The Second

24    Circuit, of course, didn't deal with the market power

25    issue; it was stipulated on appeal.  What you need to look

1    at is what happened at the trial court, and what I invite

2    you to do is look at the trial court's decision on *Namenda*

3    on one hand and the trial court's decision on the *Doryx*

4    case on the other hand because what you will see, which

5    proves our point, is these markets are not all the same.

6    They're very different.  So in both of those cases the

7    courts asked the same questions.  They said, Is there

8    therapeutic similarity between these products and others

9    in the class.  Namenda is one of several multiple

10   sclerosis drugs.  Doryx is one of several Tetracyclines.

11   And then they also said, Is there cross price elasticity

12   between that product and other products in the therapeutic

13   class?  So they asked the same questions, exactly the

14   questions we want to discover here.  They reached

15   different conclusions.

16            In *Namenda,* and my colleagues here who

17   represented Namenda probably don't agree, but what the

18   trial court found in *Namenda* was, yes, there's a multiple

19   sclerosis class, but there are actual differences between

20   Namenda and the other drugs, so they're not seen as

21   therapeutic substitutes.  And then they looked at cross

22   price elasticity and said, We don't see it.  And then the

23   Court said on those bases, not on the fact that generic

24   prices are different, but on those bases the Court said,

25   We view that as a single molecule case.

1          Over in *Doryx,* same questions, but the evidence

2     showed that that product was very substitutable

3     therapeutically and, not surprisingly, as a result of

4     that, there was a lot of cross price elasticity between

5     the two.  In that case the judge granted summary judgment

6     in the defense favor that you could not find a narrow

7     market of the one that they're trying to allege here --

8     I'm sorry, not that they allege, that they're trying to

9     prove.  So *Doryx* proves the point.  Did they allege a

10    narrow market?  Yes, they set their case, the question you

11    asked.  Can they try to prove that case?  Yes.  But then

12    you have to put it to the proof.  Can you sustain, on the

13    facts, from looking at competition on a horizontal level,

14    can you sustain that market?  And there they found no, and

15    in *Namenda* they said yes.  And we're saying we think the

16    facts here look an awful lot more like *Doryx* than they do

17    like *Namenda,* but it's a fact dispute.  Let's jump into it

18    and see where it goes.  Thank you.

19         MR. SORENSEN:  Your Honor, *Doryx* is on appeal,

20    number one; and number two, the discovery he's referring

21    to is from the excluded competitor.  The direct purchaser

22    case settled, so there was no summary judgment ruling

23    against the direct purchasers.  And as we pointed out in

24    the motion to compel brief in this case, the discovery

25    that's from the same lawyers who are here, who were in

1   *Doryx*, obtained from the direct purchasers was never used

2   by them or their experts, so it was a waste of time, and

3   we pointed that out.  They didn't deny that.  They didn't

4   say they used it.  They just tried to sidestep it.  So

5   that's a different lesson than they're trying to draw.  I

6   just wanted to make that clear.

7           THE COURT:  All right, a lot to think about.

8   Thank you very much.  I appreciate it.

9           (Whereupon, the proceedings were adjourned at

10  2:54 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Sharon L. Masse, RMR, CRR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.


                    April 1, 2016


                    /S/ Sharon L. Masse
                Sharon L. Masse, RMR, CRR
                 Official Court Reporter
                 915 Lafayette Boulevard
              Bridgeport, Connecticut  06604
                   Tel: (860)937-4177