```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

IN RE:                          :  No. 3:14-MD-2516(SRU)
                                :  915 Lafayette Boulevard
AGGRENOX ANTITRUST LITIGATION   :  Bridgeport, Connecticut
                                :
                                :  October 14, 2016

- - - - - - - - - - - - - - - - x


                      MOTIONS HEARING


B E F O R E:

      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.



A P P E A R A N C E S:

      FOR THE PLAINTIFFS:

            FARUQI & FARUQI, LLP
                  101 Greenwood Avenue
                  Jenkintown, Pennsylvania  19046
             BY:  PETER KOHN, ESQ.

            MOTLEY RICE LLC
                  600 Third Avenue
                  New York, New York  10016
            BY:   MICHAEL BUCHMAN, ESQ.

            LOWEY DANNENBERG COHEN & HART, P.C.
                  One North Broadway
                  White Plains, New York  10601-2310
            BY:   PETER ST. PHILLIP, ESQ.
                  URIEL RABINOVITZ, ESQ.

(continued)
```

YOUNG, COTTER & MEADE
        909 Poydras Street #1600
        New Orleans, Louisiana  70112
BY:   JOHN ALDEN MEADE, ESQ.


GARWIN GERSTEIN & FISHER, LLP
        88 Pine Street
        New York, New York  10005
BY:   JOSEPH OPPER, ESQ.
        EPHRAIM R. GERSTEIN, ESQ.


HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
        147 North Broad Street
        P.O. Box 112
        Milford, Connecticut  06460-0112
BY:   MEAGHAN McGURRIN EHRHARD, ESQ.


HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
        4400 Deer Path Road, Suite 200
        Harrisburg, Pennsylvania  17110
BY:   MONICA L. REBUCK, ESQ.


KENNY NACHWALTER
        Four Seasons Tower
        1141 Brickell Avenue, Suite 1100
        Miami, Florida  33131
BY:   SCOTT E. PERWIN, ESQ.


HILLIARD & SHADOWEN
        719 S. Shoreline Boulevard, #500
        Corpus Christi, Texas  78401
BY:   STEVE SHADOWEN, ESQ.


ODOM & DES ROCHES, LLC
        650 Poydras Street, Suite 2020
        New Orleans, Louisiana  70130
BY:   DAN CHIOREAN, ESQ.

(continued)

```
            SMITH SEGURA & RAPHAEL, LLP
                 3600 Jackson Street, Suite 111
                 Alexandria, Louisiana  71302
            BY:  SUSAN SEGURA, ESQ.


            HAGENS BERMAN SOBEL SHAPIRO, LLP
                 55 Cambridge Parkway, Suite 301
                 Cambridge, Massachusetts  02142
            BY:  DAVID S. NALVEN, ESQ.


            ROCHE PIA LLC
                 Two Corporate Drive, Suite 248
                 Shelton, Connecticut  06484
            BY:  GERALD C. PIA, JR., ESQ.


        FOR THE DEFENDANTS:

            WHITE & CASE LLP
                 701 Thirteenth Street, NW
                 Washington, DC  20005-3807
             BY:  PETER J. CARNEY, ESQ.


            WHITE & CASE LLP
                 1155 Avenue of the Americas
                 New York, New York  10036-2787
            BY:  ALISON HANSTEAD, ESQ.
                 ROSS E. ELFAND, ESQ.


            GOODWIN PROCTER LLP
                 Exchange Place
                 Boston, Massachusetts  02109
            BY:  CHRISTOPHER T. HOLDING, ESQ.


            NORTON ROSE FULBRIGHT US LLP
                 666 Fifth Avenue
                 New York, New York  10103-3198
            BY:  DAVID J.KESSLER, ESQ.

(continued)
```

PULLMAN & COMLEY LLC
        850 Main Street
        P.O. Box 7006
        Bridgeport, Connecticut   06601-7006
BY:   ASSAF Z. BEN-ATAR, ESQ.


FOR THIRD-PARTY GYMA LABORATORIES:

BLANK ROME LLP
        The Chrysler Building
        405 Lexington Avenue
        New York, New York   10174-0208
BY:   ROBERT J. KENNEY, JR., ESQ.


Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut   06604
Tel: (860)937-4177

```
 1              (Whereupon, the following proceedings commenced
 2    at 1:14 p.m.)
 3              THE COURT:  Good afternoon.  I think we have
 4    three distinct motions to take up today.  My thought would
 5    be, unless there's objection, to start with the Rule 45
 6    issue so that counsel for the third party can leave and
 7    not have to stay through everything else.  Anybody
 8    concerned about that?
 9              (No response.)
10              THE COURT:  No?  All right.  So we have the
11    motion of the direct purchaser class to compel production.
12              MR. OPPER:  Good afternoon, Your Honor.  I'm
13    Joseph Opper from Garwin Gerstein & Fisher for the direct
14    purchaser class plaintiffs.  This is my colleague, Dan
15    Chiorean, who will be arguing the motion for the
16    plaintiffs.
17              THE COURT:  All right, great.
18              MR. CHIOREAN:  Good afternoon, Your Honor.
19              MR. KENNEY:  Your Honor, Robert Kenney from
20    Blank Rome for third party GYMA Laboratories, pro hac
21    vice.
22              THE COURT:  Very good.  I've read the papers, so
23    maybe we can just jump right into it.
24              MR. CHIOREAN:  Sure.  Good afternoon, Your
25    Honor.  Dan Chiorean from Odom & DesRoches for the direct
```

1    purchasers class.

2              THE COURT:  So I think I want to hear first from

3    Mr. Kenney about the difficulties that his client believes

4    it will have in obtaining these documents.  What I don't

5    have -- what I have is statements in the briefs that, for

6    example, the Eudora email server is no longer manufactured

7    or serviced, which, to be frank, is a somewhat meaningless

8    statement.  What I need to know is, is it up and running?

9    Can you retrieve things off of the server?  And I don't

10   have even a statement in a brief, much less an affidavit,

11   that says we can't get the emails we want to get off of

12   this server.

13             So I don't have any sense right now that there's

14   a record supporting the resistance or the difficulty even

15   of getting these documents.  So do you want to start

16   there?

17             MR. KENNEY:  Yes, Your Honor.

18             THE COURT:  You can speak from wherever.  You

19   don't have to swap places, wherever is easier.

20             MR. KENNEY:  Since we're in the middle, I might

21   as well.

22             MR. CHIOREAN:  Sure.

23             MR. KENNEY:  Your Honor, we can get documents

24   from the Eudora server.  It just presents greater

25   difficulty and greater cost.  We have initially hired an

1    outside provider to go and get the documents, and as I'm

2    sure the Court is aware, once you get an outside provider

3    involved, it becomes an enormous project, and it becomes

4    extremely expensive.  One of the first things they do is

5    they go in, they get all of the raw data, and they pull it

6    back, and they store it at great expense, and then they

7    run searches, and then they have to generate the documents

8    back into readable form.  We, or GYMA, has always been

9    happy to produce documents.  This is not the issue.  The

10   issue is that we have asked repeatedly from the beginning

11   that the issuing plaintiff, or whoever wants to join them,

12   defray the cost, and that's really what the motion is

13   about.

14            THE COURT:  Well, that's what your motion is

15   about, but how can we make a ruling on costs if we don't

16   know what the costs are?  I mean, the 176,000 seems

17   outrageously high.

18            MR. KENNEY:  And let me explain that, Your

19   Honor.

20            THE COURT:  I'm not even worried because,

21   frankly, both of these sets of briefs are just complaining

22   about the other side.  I just want to get this done, okay?

23            So we have a server that your client can access

24   presumably without even a third party, right?  In other

25   words, it's an operating server.  It's old, but it's their

1    archive server, right?

2              MR. KENNEY:  That's right, Your Honor.

3              THE COURT:  So if they need a document from five

4    years ago, six years ago, somebody is able to type in

5    whatever they have to type in, and the document comes out.

6              MR. KENNEY:  That's right.  We've offered a lot

7    of different ways to keep the costs lower, and all we've

8    asked for is just a commitment that when we go and do

9    this, that there would be some defrayment of the cost.

10             THE COURT:  Okay.

11             MR. KENNEY:  We're not telling them -- we're not

12   asking for a blank check, frankly, as --

13             THE COURT:  No, no --

14             MR. KENNEY:  -- I'm sure the Court is aware.

15             THE COURT:  -- I know.  Look, the rule provides

16   for reasonable costs.  You're going to get your reasonable

17   costs either by agreement or you'll come back here.

18             MR. KENNEY:  Correct.

19             THE COURT:  So let's not worry about that.  What

20   I don't understand is why you had to hire a third party.

21   If you've got a server that's operating, why doesn't

22   somebody just search for the documents?  Why do you need a

23   third party to take control of this, copy it, do all of

24   those things?  It seems unnecessary.

25             MR. KENNEY:  The reason we typically do that,

1    Your Honor, is because that is the optimal way to collect

2    all the information and not miss anything.  However, we

3    came up with that one seventy-six number.  The other side

4    didn't like the number.  So what we've done is we've said,

5    Listen, we're willing to do it a different way.  We're

6    willing to have our employees, or GYMA's employees, go and

7    do the searches themselves, and it may not turn up as many

8    documents, but it would certainly limit the costs, and

9    we're more than happy to do that.  We just are seeking

10   some defrayment of the costs.

11           THE COURT:  Okay.  Like I said, you're going to

12   get your reasonable costs.  I just want them to be

13   reasonable.

14           MR. KENNEY:  I understand, Your Honor.

15           THE COURT:  And let's figure this out.  I don't

16   understand, really, what the objections are, if any, to --

17   I mean, it's not really burdensome to type in searches

18   into an email server.

19           MR. KENNEY:  No, Your Honor.  It's just that the

20   amount of documents, just because of the broadness of the

21   subpoena, the number of years, we're talking about nine

22   years --

23           THE COURT:  Right, but -- okay.  It's nine years

24   with a relatively narrow search, right?

25           MR. KENNEY:  When we look at -- when we look at

1    the subpoena and we compare it to how it was narrowed, it

2    really is about the same thing.  It's asking basically for

3    all the documents.  It's asking for documents with some of

4    the parties to this litigation, which, frankly, you know,

5    that in and of itself is a little bit overbroad and

6    burdensome.  But, once again, we're happy to do whatever

7    they want us to do so long as they're going to pay some

8    portion of the costs, including reviewing those documents

9    and creating a privilege log.  And that's really where our

10   negotiations broke down, Your Honor.

11            THE COURT:  Okay.  Where are we?

12            MR. CHIOREAN:  Your Honor, just a couple --

13   couple small things.  We have never disagreed to help GYMA

14   with their costs.

15            THE COURT:  Yes, let me just -- let's not --

16   let's not look backwards.  I know both of you have

17   complaints about how the other has acted, okay?  We're

18   here; we've got to get this done.  So let's not worry

19   about who is going to get paid.  Of course you're going to

20   pay them reasonable costs.  Let's not worry about how they

21   were difficult.  How are we going to get this done?  What

22   do you need and why -- is there anything about what

23   Mr. Kenney just said that isn't going to give you what you

24   need?

25            MR. CHIOREAN:  Yes, Your Honor.  So what we

1    would need and what we've asked for previously is a

2    breakdown of those costs because the case law and Rule 45

3    and 26 are pretty clear that they're certainly entitled to

4    reasonable costs for production, but we don't know what

5    those costs are.

6                THE COURT:  Let's put the costs aside.

7                MR. CHIOREAN:  Okay.

8                THE COURT:  I'm talking about the document

9    request.

10               MR. CHIOREAN:  Oh, I see.

11               THE COURT:  Are you getting, based on what

12   Mr. Kenney just said, are you getting the documents you

13   need?

14               MR. CHIOREAN:  Not as far as we've been told.

15   We've narrowed our request --

16               THE COURT:  Well, he just said we're going to

17   run the searches.  Are the two of you clear enough on what

18   you're searching for that you're going to get results, and

19   then if there's costs associated with producing those

20   documents, the two of you are going to talk about that?

21               MR. CHIOREAN:  I believe from our standpoint

22   that we are clear about what we need, and if GYMA is

23   willing to produce those documents and we are happy with

24   our narrowed scope of the subpoena, the only thing we'd

25   ask for and we have asked for is a breakdown of the costs

1   so we understand what they are --

2              THE COURT:  Well, of course you'll get that.

3              MR. CHIOREAN:  -- before they go ahead and run

4   the searches.  We simply didn't want to agree to pay

5   without knowing what the costs were going to be --

6              THE COURT:  Right.

7              MR. CHIOREAN:  -- and what the breakdown was.

8              THE COURT:  He just said that his employees are

9   going to run the search, okay, and presumably review the

10  documents.  Obviously counsel will be involved in

11  reviewing documents, so there will be some expense

12  associated with that.  I want to make sure, first off,

13  that you're both in agreement about what the search is

14  going to be, the scope of it, and so forth, and then

15  presumably, once that's resolved, everybody can say, Well,

16  it's going to cost us probably about "X" hours of attorney

17  time looking at these documents.

18             MR. CHIOREAN:  So what we provided, Your Honor,

19  to help GYMA, is we've provided some suggested custodians

20  for them to search --

21             THE COURT:  I understand.

22             MR. CHIOREAN:  -- and some timeline.  What we

23  would need from GYMA is some suggested search terms from

24  them for how exactly they're going to search.  We

25  understand that they are going to actually find the

1   documents that we're seeking, that's our first need, and

2   then our second need would be, of course, the breakdown of

3   the costs.

4   　　　　　THE COURT:  Okay.  Why don't we do this.  Why

5   don't you two just go out in the hall -- this is what they

6   used to do in state court all the time, right -- just go

7   out in the hall.  I mean, I could come up with search

8   terms in about 15 minutes.  I think you probably can come

9   up with search terms in less than that.  And then set up

10  some arrangement where there will be, based upon what the

11  scope of the search is going to be, some estimate of what

12  is going to be involved by way of costs.  Once you have

13  that, you're both on the same page, the search will be

14  done, you'll get presumably some statement of what the

15  actual costs are, hopefully they'll be consistent, and

16  everybody will be happy.  You'll have your documents;

17  they're not going to do this at their own expense, right?

18  　　　　　MR. CHIOREAN:  I understand, Your Honor.

19  　　　　　THE COURT:  Shall we try that?  Can you two just

20  literally step outside and try to work it out?

21  　　　　　MR. KENNEY:  We can, Your Honor.  The only issue

22  that's holding this next piece up is who's going to

23  provide search terms.  I don't know that we are the

24  appropriate party to do that because we're not part of the

25  case.  We don't know what they're looking for.  Search

1    terms should be coming from them.  I know that they've

2    done the search with Barr/Teva already, so they should be

3    very familiar with what terms should be brought.

4            THE COURT:  I tend to agree with that.  There's

5    been a number of third-party searches already done.

6    Presumably there were search terms involved in those

7    third-party searches.  Presumably, since I'm not hearing

8    about a dispute, you got a sense of what you wanted.

9            MR. CHIOREAN:  Yes, Your Honor.  The only

10   caveat --

11           THE COURT:  Is there any reason why you can't do

12   the same search terms?

13           MR. CHIOREAN:  Yes, Your Honor.  However, the

14   caveat that I have to that is although we know the basic

15   terms that we've used before, because we are not inside

16   GYMA's company, we don't know how they refer to some of

17   the things, if there are certain, for instance, shorter

18   ways that they refer to certain --

19           THE COURT:  Right.

20           MR. CHIOREAN:  -- terms, so there's no way for

21   us to know that without them telling us that ahead of

22   time, and that's where we sort of need to cooperate on

23   that.

24           THE COURT:  Fair enough.

25           MR. CHIOREAN:  We can only provide them with the

1    basic term, basically just dipyridamole, but we don't know

2    how else they discuss Teva and other things within their

3    company.

4              THE COURT:  So if they call Teva "T," you need

5    to know that so that it will come up; I get that.  But why

6    don't you come up with the first list and basically say,

7    We need this and any equivalents.  In other words, if you

8    guys happen to always refer to Teva as "T," or "TV," we're

9    going to get that.  I mean, that just means talking to

10   each other, right?  But you should come up with the first

11   list, and then it'll be supplemented by their actual

12   practices.  Okay?

13             MR. CHIOREAN:  Yes, Your Honor.

14             THE COURT:  So why don't you guys get started

15   with that, and meanwhile we'll take up these other

16   motions, okay?

17             MR. CHIOREAN:  Yes, Your Honor.  Thank you.

18             THE COURT:  Mr. Kenney, you don't need to stick

19   around.  So if the two of you reach an agreement and

20   you're both happy with it, you can get back to work.

21   Otherwise, come back and just report where you are, and

22   we'll figure out where we're going, okay?

23             MR. KENNEY:  Thank you, Your Honor.

24             MR. CHIOREAN:  Thank you, Your Honor.

25             THE COURT:  All right.  I'm open to suggestion

1   about which motion to compel we ought to hear first.

2        MR. HOLDING:  Good afternoon, Your Honor.  Chris

3   Holding for Teva and Barr.

4        We were going to suggest starting with the

5   motion behind the sales, pricing and premium information,

6   if that's all right with you.

7        THE COURT:  That's fine.

8        MR. HOLDING:  We're dividing up, in a little

9   bit, among us, so Russ Elfand is going to take the first

10  part, which is going to be for the retailers and

11  wholesalers, and I'll be talking about the end-payors and

12  the premiums in the second part, if that works for you.

13       THE COURT:  That's fine.

14       MR. HOLDING:  Okay, thank you.

15       MR. ELFAND:  Good afternoon, Your Honor.  Russ

16  Elfand with White & Case on behalf of the Boehringer

17  defendants.

18       So the defendants' motion against the

19  wholesalers and the retailers is necessary because both

20  sets of plaintiffs have asserted a broad objection to

21  producing any sales or pricing or contract information

22  that they allege is downstream or that they allege is

23  downstream from themselves, but there's no such thing as a

24  complete bar on downstream discovery where it's --

25       THE COURT:  Let me just --

1          MR. ELFAND:  Sure.

2          THE COURT:  -- see if I can cut through this

3     one.  Would you be satisfied with receiving documents

4     sufficient to show the annual unit sales and the average

5     price?  And if not, why not?

6          MR. ELFAND:  Annual wouldn't be enough.  I think

7     we would certainly be open to narrowing our request.  I

8     don't think annual would do it because -- for several

9     reasons.  First of all, in order to avoid --

10          THE COURT:  Quarterly, monthly?  The point is

11     this.

12          MR. ELFAND:  Sure.

13          THE COURT:  Every organization, in one form or

14     another, accounts for sales, purchases, flow of money,

15     right?

16          MR. ELFAND:  Right.

17          THE COURT:  You don't need every document

18     relating to those issues to make the defense you're

19     talking about making, I don't think.  I think what you

20     need are documents sufficient to show what the sales price

21     was, what the volume was, and then you can do the math

22     yourself.

23          MR. ELFAND:  I agree that we would be satisfied

24     with documents sufficient to show.  I think we would want

25     it to be a little more granular.  There's really no

1    burden, as to the data, there really is no burden here on

2    the data.  The direct purchaser plaintiffs, the wholesaler

3    class representatives, have already said, We're willing to

4    produce it.  That was contingent on us withdrawing

5    everything else.  So the transactional data is not

6    burdensome for them to produce.  It may even be more

7    burdensome for them to produce an annual set rather than

8    transaction based at least for the wholesalers.

9              THE COURT:  Why do you need it?  In other words,

10   we're talking about a thousand pages versus five million

11   pages.  Why do you need five million pages?

12             MR. ELFAND:  Right.  First of all, I don't think

13   it's five million pages.  It's a spreadsheet, and it goes

14   into a single document, which then will have a lot of

15   rows, and this can all be done, as you said earlier, from

16   a search that they can run in their databases, they pull

17   the data, it all goes into a single file, and it's

18   produced.

19             THE COURT:  That's what I'm talking about.  So

20   documents sufficient to show --

21             MR. ELFAND:  Exactly.

22             THE COURT:  So it's a spreadsheet that shows in

23   April of 2009, we sold 50,000 bottles at an average price

24   of --

25             MR. ELFAND:  Right.

1          THE COURT:  -- whatever.

2          MR. ELFAND:  That would be fine with us.  Just I

3    wouldn't want an average on a monthly or annual basis.

4    They have that transactional data row by row.

5          THE COURT:  Okay, but why do you need bottle by

6    bottle as opposed to this month we sold 60,000 bottles at

7    an average price of $7.27?  It's the same number at the

8    end --

9          MR. ELFAND:  Right.

10          THE COURT:  -- whether you have all 60,000

11    bottles and the actual price for each bottle or whether

12    you have the average price.  I don't understand the

13    difference.

14          MR. ELFAND:  At the wholesaler level -- the

15    retailer is the only one that's actually selling to each

16    individual consumer and patients with insurance companies

17    reimbursing.  At the wholesaler level that would work,

18    that certainly would work, because each transaction is

19    going to be to a single, large retailer customer.  But the

20    reason we need it customer by customer is in order to

21    avoid duplicative recovery.  In the end, if only a subset

22    of the direct purchasers are able to recover, then we're

23    going to need to know who their customers are in order to

24    find out whose recovery downstream from them at the

25    indirect purchaser level is going to be duplicative then

1    of the recovery at the upstream.  That's for purposes of

2    duplicative recovery.  For purposes of --

3             THE COURT:  Let me just make sure I understand.

4    What you're saying is a spreadsheet that shows sales to a

5    particular wholesaler on, say, a monthly average basis is

6    sufficient as long as you get all the wholesalers?

7             MR. ELFAND:  As long as we get the fields I

8    would want for the data, which is -- which is in a single

9    row, and the column fields would be the average price per

10   month, the customer, the location, the state, the type --

11   the Aggrenox, the product, the skew, the bottle, whether

12   there's variation, whether it's generic Aggrenox or

13   Aggrenox, and that would be -- that would be sufficient at

14   the wholesaler level.

15            It is different at the retailer level.  At the

16   retailer level we would need to know the insurance company

17   reimbursing, the co-pay amount -- and this could be done

18   on an average basis per month, but it would be for each --

19   for each insurance company the reimbursement amounts, the

20   quantity of Aggrenox.  We don't need the name of the

21   consumer.  We don't need the name of each person who's

22   actually filling the prescription.  But we do need --

23   monthly averages would work for insurance company,

24   averages for co-pay amounts and the retail, the actual

25   real-world retail price, not the IMS data, which they

1    claim is the gold standard and sufficient for their

2    purposes, but it's not for ours.

3              THE COURT:  I understand your point there, but

4    the point is if you have CVS April 2010 with the data we

5    just talked about, average price, average co-pay amount, I

6    mean, you can do the math, right?

7              MR. ELFAND:  Yes, and the insurance company,

8    average amount per insurance company per plan, per PBM,

9    the pharmacy benefit manager.  So, yes, average would

10   work, that would work for us as long as those other fields

11   are in there.

12             THE COURT:  So you need customer, state, average

13   price, number of units?

14             MR. ELFAND:  Right.

15             THE COURT:  Let me hear why that's a problem.

16   Actually, before you start, let me just find out if we've

17   resolved our subpoena issue.

18             MR. CHIOREAN:  Yes, Your Honor, we'd just like

19   to put it on the record when we're at a moment.

20             THE COURT:  Yes, we're at kind of a break.

21             MR. CHIOREAN:  Your Honor, Dan Chiorean again

22   for the direct class.  I conferred with counsel from GYMA

23   outside, and we came to the agreement that we would

24   provide a set of initial search terms to GYMA.  GYMA would

25   then supplement those terms with other reasonable

1    additions that they find that are responsive to our

2    document requests.  GYMA would then provide us with a

3    breakdown of the costs that it would take to comply with

4    the production, and we would take a look at that and come

5    to an agreement on the costs, and then GYMA has agreed to

6    produce documents pursuant to the subpoena.

7              THE COURT:  Okay, and where are we on the

8    custodian issue?  There was a question about six

9    custodians or broader, and so forth.

10             MR. CHIOREAN:  With respect to custodians, Your

11   Honor, we suggest the same thing, which is that we have

12   given GYMA six custodians to begin with, but if GYMA feels

13   that there are other custodians that are relevant, that

14   they should let us know.

15             MR. KENNEY:  That's fair enough, Your Honor.

16             THE COURT:  Okay, sounds good.  So I'm hoping

17   not to hear from you again, but if I do, we'll deal with

18   it, okay?

19             MR. KENNEY:  Thank you, Your Honor.

20             MR. CHIOREAN:  Thank you.

21             THE COURT:  All right, good luck.  Thanks for

22   coming in.  Take care.

23             MR. CHIOREAN:  Thank you.

24             MR. PERWIN:  Good afternoon, Your Honor.  Scott

25   Perwin for the Walgreen plaintiffs.

1          I just want to start by responding to

2   Mr. Elfand's statement that we didn't offer to produce any

3   sales data.  That's not true.  And he said in his

4   affidavit that we offered to do it and they rejected --

5          THE COURT:  Whatever.  You know, again, we're

6   here; let's just --

7          MR. PERWIN:  We did.  We offered to do sample

8   data.  The compromise that Your Honor has suggested is

9   certainly better than every single prescription that our

10  clients have sold for the past ten years, but it's still a

11  lot of work, and I don't know whether we can sort it by

12  insurance company, if that's what he's asking for.  When

13  we sell to individual patients, we sell 30 pills to a

14  patient, we get paid generally a co-pay by the patient,

15  and we get reimbursed the remainder of the retail price,

16  which is set by a contract, we get from the insurance

17  company.

18          I think that if we were to do average monthly

19  units and pricing, as I said, it would be certainly better

20  than every single prescription.  I can't tell you that it

21  would be an easy thing to do, and it might be that we

22  would have to run the same searches that we would

23  otherwise have to run and then do some calculations to

24  figure out the averages.  I don't know whether we maintain

25  in our systems an average retail price by month.  I'd be

 1    kind of surprised if we do.  So it might be that we would

 2    have to do all of the same work that we described that

 3    Kroger, for example, would have to do to pull all of the

 4    prescription sales data, and then do calculations to add

 5    up the volumes and to average the pricing, and it may not

 6    save any work at all.  I don't know the answer to that, to

 7    that question sitting here today.

 8              THE COURT:  Yes, I'm willing to bet that there

 9    are, you know, I'll call them "quants," that there are

10    I.T. people or accountants or whatever who know how to

11    manipulate your computer system to create a document that

12    would show that information.  I'm --

13              MR. PERWIN:  I'm sure there are, Judge.  I'm

14    just questioning whether we would have to probably --

15    probably have to pull every prescription and then do the

16    calculations to come up with an average monthly price, for

17    example.  I don't know --

18              THE COURT:  Well, when you say "pull every

19    prescription" --

20              MR. PERWIN:  Yes.

21              THE COURT:  -- I mean, they're in their system.

22              MR. PERWIN:  Well, we submitted an affidavit

23    from a gentleman at Kroger.  They have 20 operating

24    divisions.

25              THE COURT:  Yes, but you're not talking for

1   Kroger right now, are you?

2           MR. PERWIN:  Yes, I represent Kroger and

3   Walgreen and Safeway and other retailers, and they've

4   asked us all to produce every transaction that involves a

5   sale of Aggrenox or generic Aggrenox over a long period of

6   time --

7           THE COURT:  Right.

8           MR. PERWIN:  -- and they've asked for names.  He

9   says, Oh, we don't need the names.  Well, they asked for

10  the names.

11          THE COURT:  Okay, okay, I know, and that's why

12  we're here, right --

13          MR. PERWIN:  Okay.

14          THE COURT:  -- because we have a difference of

15  opinion.  I don't think that's appropriate, but I'm trying

16  to come up with a way that is reasonably calculated to get

17  them documents sufficient to make the arguments they want

18  to make about limitations on damages.

19          MR. PERWIN:  I understand that, and we're happy

20  to talk about it.  We did make an offer to produce sample

21  sales data for some of the states that they're interested

22  in that have to do with the end-payor cases if that would

23  resolve the motion, and they rejected that offer.

24          THE COURT:  Well, okay.  But let's talk about

25  the compromise I'm proposing.  Maybe the way to do this is

1    for you to go back and figure out can your clients

2    reasonably do this with some keystrokes and the printing

3    out of a report?  I'm going to guess yes.  Maybe I'm

4    wrong.  Maybe it's going to turn out to be somebody has to

5    manually look at microfiche for every single prescription.

6              MR. PERWIN:  It's not going to be manual, Judge,

7    but like, for example, in the Kroger affidavit, we put in

8    an affidavit saying it was going to take 162 hours to pull

9    every prescription for Aggrenox or generic Aggrenox.  Now,

10   it may be that there's some way to bypass that and just

11   get monthly averages, monthly totals for units and monthly

12   averages for prices, but I suspect --

13             THE COURT:  Here's my point.

14             MR. PERWIN:  -- we're going to have to pull all

15   the data and then do the calculations.

16             THE COURT:  Here's my thought on that.  Kroger

17   may be an outlier because of their unique situation and

18   the way that they've got their information.  They may be

19   an outlier.  Let's figure out whether, with respect to

20   your other clients, you can produce what is requested, and

21   maybe at that point, if Kroger is able to produce some

22   subset of what the others are doing, we can have some

23   extrapolation.  In other words, Kroger's total sales were

24   "X" units at "Y" average price.  We don't know exactly

25   which states were which, but we can make some assumptions

1    because 34 percent of their business is in this state or

2    whatever.  There may be ways around it for Kroger.  But we

3    shouldn't let Kroger interfere with a reasonable

4    approach --

5              MR. PERWIN:  We didn't cherry-pick Kroger,

6    honestly, Judge.

7              THE COURT:  I got it.

8              MR. PERWIN:  It may be harder on some other

9    clients; it may be easier on others.  But let me just

10   suggest another potential compromise --

11             THE COURT:  Okay.

12             MR. PERWIN:  -- which is what we offered, which

13   is they're interested in five states in particular that

14   they think have a lot of consumers that are relevant to

15   the end-payor cases, and we pick Walgreen in one state and

16   CVS in another state and give you -- give them all of the

17   sales in that state during the time period, but not for

18   every client in that state, just one of them, which we'll

19   pick, somebody who has coverage in the state.  We'll pick

20   a different client in a different state.  And then that

21   way each client doesn't have to do the entire range of

22   searches that they want, but one client can do it in one

23   state, and another client can do it in another state, and

24   that will give them sample data.  There's no reason to

25   think that Michigan is going to be that much different

1    than Arizona, and they can do their calculations, they can

2    figure out what the average price is, they can figure out

3    what the units are, and they can make whatever arguments

4    they think they can make out of that.  We offered to do

5    that, in fact.

6              THE COURT:  Okay, but here's what's going to

7    happen down the road.  We're going to be at trial, and

8    there's going to be an offer of evidence.  What we have is

9    this sample, which is what they gave us in discovery, you

10   know?  Objection.  We don't know that that sample carries

11   over to all these other states.

12             MR. PERWIN:  Judge, we're not going to be

13   objecting because this is third-party discovery.  This is

14   discovery that they want to defend against the claims of

15   other plaintiffs, and that's important.  That's an

16   important argument.

17             THE COURT:  Okay.

18             MR. PERWIN:  That's why we have to try to

19   minimize the burden on my clients, who are not parties.

20   This is not one big civil action; this is a bunch of

21   different civil actions.

22             THE COURT:  I get that --

23             MR. PERWIN:  Okay.

24             THE COURT:  -- but whether you're objecting,

25   somebody on that side is going to be objecting, right?

1          MR. PERWIN:  Maybe; maybe not, Judge.  Who

2     knows.

3          THE COURT:  Well, that's what we've got to

4     figure out.  I don't want to get two years down the road,

5     have a jury here for however many months it's going to

6     take to try this case, and have a big fight over we don't

7     have the information that we need, and these samples

8     shouldn't be admitted into evidence because X, Y and Z.  I

9     mean --

10          MR. PERWIN:  I mean, I don't expect the samples

11     to be.  They'll be used probably for an expert report,

12     that's what the samples would be used for.  The same as

13     when you use IMS data for an expert report.  It typically

14     doesn't go into evidence.  It's used as a basis for expert

15     opinions.

16          THE COURT:  So we get a Daubert motion about

17     whether this expert can testify.

18          MR. PERWIN:  Well, you know, you can't always

19     get perfect data.  I mean, experts have to deal with

20     imperfect data.

21          THE COURT:  No, but this raises the question why

22     isn't my compromise going to have fewer problems down the

23     road than your compromise?

24          MR. PERWIN:  Well, your compromise, your Honor's

25     compromise, is still going to be a lot of effort and

1    burden on my clients, and I don't think it's going to give

2    them a whole lot more than what I've offered, what we've

3    offered to give them, which is samples.

4         THE COURT:  Well, I think we should --

5         MR. PERWIN:  It's going to be samples anyway

6    because we don't represent every pharmacy in the United

7    States.  We represent 35 percent of the pharmacies in the

8    United States.

9         THE COURT:  Right.  So I think you should go

10    back to your clients and we should figure out how

11    troublesome this is going to be, how burdensome it's going

12    to be.  My guess is this is somebody sitting down at a

13    computer terminal, manipulating a few numbers and walking

14    over to the adjacent printer and picking it up.

15         MR. PERWIN:  It's definitely going to be at a

16    computer terminal.  Nobody is going to be doing this

17    manually.

18         THE COURT:  Right.

19         MR. PERWIN:  But if it's at a computer terminal

20    and they have to pull all the prescriptions, they don't

21    keep, for example, monthly averages, monthly totals -- or

22    monthly average prices, which I don't think they do, I

23    don't see any reason why you would keep a monthly average

24    price for Aggrenox in a system, so that means you have to

25    pull all the raw data first, and then you have to focus on

1    the prescriptions in April 2009.  You have to add up --

2    somebody has to add up -- write a spreadsheet that will

3    add up the units in April 2009 --

4              THE COURT:  Right.

5              MR. PERWIN:  -- and calculate the average price

6    in April 2009.  And so that's not easier than pulling all

7    the data.  It's harder because it requires an additional

8    step after they pull the data.

9              THE COURT:  Okay.

10             MR. PERWIN:  That's what I'm talking about.

11             THE COURT:  When you say "pull the data" --

12             MR. PERWIN:  It means run a query on a big

13   database --

14             THE COURT:  Right.

15             MR. PERWIN:  -- to get all the Aggrenox

16   prescriptions.

17             THE COURT:  Right.  In other words, the

18   information is in the computer.  And what the operator is

19   doing is saying create a mini database from this big

20   database, a mini database --

21             MR. PERWIN:  Just Aggrenox.

22             THE COURT:  Right.  Boom, boom, boom.

23             MR. PERWIN:  But it's going to take Kroger 162

24   hours to do that.

25             THE COURT:  Put Kroger aside.  I haven't heard

```
 1    it's going to take Wal-Mart more than an hour and a half.

 2              MR. PERWIN:  I don't represent Wal-Mart.

 3              THE COURT:  Walgreen's, Walgreen's.  I haven't

 4    heard it's going to take Walgreen's more than an hour and

 5    a half.

 6              MR. PERWIN:  Well, it's going to take more than

 7    an hour and a half.  But I'm happy -- if Your Honor wants

 8    me to find out how long it's going to take everybody,

 9    we'll do that.  I just don't want --

10              THE COURT:  What I want you to do is not just

11    find out.  Go try doing it.

12              MR. PERWIN:  Can we do it for one client in one

13    state, for example?

14              THE COURT:  Do it for one client in one state,

15    or if you can have a column of states, in other words,

16    pull all the data and just have an indication in one of

17    those spreadsheet columns this is from Connecticut, this

18    is from New York, this is from Wyoming.  In other words,

19    it may be simpler to start big rather than to start

20    little.

21              MR. PERWIN:  Well, the only point I'm making,

22    Judge, is that somebody is going to have to run queries.

23    This is not their normal job.  Somebody, in each of these

24    companies, is going to have to be assigned --

25              THE COURT:  Right.
```

1          MR. PERWIN:  -- to run queries against their

2     retail sales data, however far it goes back, and pull all

3     the Aggrenox, and that's going to take a lot of time and

4     effort.

5          THE COURT:  When somebody runs it up the

6     flagpole and says, We're in this multi-hundred million

7     dollar litigation, should we spend a day trying to get

8     this information so that we can proceed to trial?

9          MR. PERWIN:  We don't need it, and they don't

10    need it for our case.  They need it for somebody else's

11    case.  So, again, I'm going back, repeating myself, but

12    this is Rule 45 discovery --

13         THE COURT:  I got it.

14         MR. PERWIN:  -- not Rule 26 discovery --

15         THE COURT:  Yes, okay.

16         MR. PERWIN:  -- and we'll obviously do whatever

17    Your Honor would like us to do, but I do think it would

18    serve the same purpose and take less time and money for us

19    to do samples.  They can tell us what states they think

20    are the most relevant.  We can pick a client in each state

21    and we can run -- pull the data that they're interested

22    in.

23         THE COURT:  Go back, have your people try it,

24    see what you get, how hard it is.  My guess is it's not

25    that hard.

1          MR. PERWIN:  Well, I can tell you the one

2     company I know, it's very hard.  I don't know about the

3     others.

4          THE COURT:  Well, if you have to do it 23 times,

5     it's going to be harder than if you have to do it one

6     time.  I get that.

7          MR. PERWIN:  All of these companies have

8     operating divisions.

9          THE COURT:  Right, but some of the companies

10     presumably have aggregated their databases already.

11     Kroger apparently hasn't.

12          MR. PERWIN:  Well, actually, Kroger maintains

13     this all centrally, but for some reason that I can't

14     explain, it would have to be done in segments.

15          THE COURT:  All right.

16          MR. PERWIN:  And it would take a long time.

17          THE COURT:  All right.  Well, let's figure it

18     out.  I mean, I don't have an affidavit saying this is

19     going to take us 3,000 man hours.

20          MR. PERWIN:  Well, you have one that says it's

21     going to take 162 man hours.

22          THE COURT:  For Kroger, right?  162 man hours, I

23     get it.

24          MR. PERWIN:  That's four weeks of somebody's

25     life.  Judge, we'll -- we'll do what you ask us to do.

1          THE COURT:  All right.

2          MR. PERWIN:  Thank you.

3          MR. SHADOWEN:  Your Honor, Steve Shadowen on

4    behalf of the end-payor plaintiffs.  I'm in sort of the

5    converse situation to Mr. Perwin; that is, these discovery

6    requests are all about my clients' damages, but those

7    documents they're not requesting for me.  But I would like

8    to pick up on a point that I think is very, very central,

9    whether we deal with it today or whether we deal with it

10   down the road, and that is the question of all we're going

11   to end up with are samples, and there's going to be either

12   Daubert motions and/or objections at trial to the use of

13   samples.

14         THE COURT:  Well, hold on, hold on.  If we do

15   what I'm talking about, it's not a sample.  It's a

16   summary.

17         MR. PERWIN:  It is a sample because we don't own

18   every pharmacy in the United States.

19         THE COURT:  No, no.  Wait, wait.  Two different

20   issues.  The information may be incomplete, but it's not a

21   sample for the entities that are running these programs.

22   It's a summary of what that client has, and it's less than

23   a hundred percent of the market, but it's not a sample of

24   what Walgreen's has.

25         MR. SHADOWEN:  Exactly right.  I agree with

1    that.  But here's the point.  Why are we doing this?  Why

2    is the data that they are seeking from Kroger and the

3    others at all relevant, or to the extent that it's

4    relevant at all, how does that weigh into the burden on

5    these entities producing it?

6              Here's the issue.  There is nationwide data that

7    is a hundred percent of the market.  It's IMS data, and

8    both case law and researchers refer to it as the gold

9    standard.  They put a footnote in their brief, footnote 10

10   that says, look, the IMS data has confidence intervals,

11   that is, you have to know whether or not there's a margin

12   of error in it.  Well, there's a margin of error in any

13   data.  If you look at the document that they show as an

14   example, the margin of error for IMS data, you look at the

15   document they cited, it's 2 percent, a 2 percent margin of

16   error.  That's the data that we use, that all researchers

17   in this field use and that they already have and can use

18   in this litigation.  What they're asking the Court to do

19   now is instead of using the data that's a hundred percent,

20   that has a margin of error of 2 percent, they want to

21   create from ground zero a new database of 35 percent of

22   the pharmacies in the country that would have a margin of

23   error in excess of 50 percent.  It's just what we're doing

24   here, when you step back, it doesn't make any sense.

25              And so we are going to come to a fork in the

1    road, I think it should be now before anyone incurs any

2    burden of producing this stuff, of saying, What are we

3    doing here?  There's publicly available data that's

4    subject to all kinds of checks and balances that people do

5    for a living.  That's what IMS does.  They sell these

6    databases.  It's the gold standard in this industry, and

7    they want to build from the ground up some jerry-rigged

8    thing that represents 35 percent of the sales in the

9    country.  It doesn't seem to me to make any sense.

10             THE COURT:  Does IMS break out the data by

11   pharmacy, by -- in other words, will you see Kroger data,

12   will you see Walgreen's data, will you see CVS data?

13             MR. SHADOWEN:  I don't know the answer to that

14   question, Your Honor, how fine it can go, but I can get an

15   answer to that and supply it to the Court.  I think that's

16   a good question.  But I think we have put in an affidavit,

17   which they haven't done, from an expert who says that the

18   IMS data is perfectly acceptable for any purposes in this

19   litigation.

20             And I want to address one other issue.  They say

21   that they need the retail data because it may turn out

22   that if we trace the overcharge through the chain of

23   distribution, they say two things.  They're not

24   responsible if somewhere along the line some retailer

25   marks up the generic or the brand price more than the

1    generic.  Number one, we think that's wrong as a matter of

2    law; but, more importantly, the example that they give

3    where you could end up with a higher -- a bigger

4    overcharge at the retail level than the overcharge that

5    they impose at the wholesale level, that happens only if

6    the retailer marks up the brand to a greater degree than

7    the generic, okay, and that's why they don't have an

8    affidavit from an expert in this case.  The example that

9    they give that could cause this problem is the exact

10   opposite of what happens in this industry.  In this

11   industry, retailers mark up generics more than they mark

12   up brands.  That's why retailers get really unhappy when

13   generics are excluded from the market.  They make more

14   money on generics than on brands.  Everybody knows that,

15   and that's why they don't have an expert affidavit in here

16   supporting their need for these documents.

17            So I would just ask the Court to step back.  I

18   know that, you know, obviously you always want to avoid,

19   to the extent that you can, these discovery disputes and

20   narrow down the focus as you were doing with Mr. Perwin,

21   but it happens in this particular instance there's no need

22   whatsoever for any of the data that they seek.  It's

23   publicly available.  It's the gold standard.  Everything

24   they say they want to do they can do with IMS data.  Thank

25   you.

1          I've been handed a note that we believe that the

2   IMS data is broken down by zip code, so that you'd be able

3   to get it to a pretty fine geographic specification.

4          THE COURT:  Okay, thank you.

5          MR. ELFAND:  Your Honor, zip code obviously

6   would not be CVS versus Walgreen's.  They're both in the

7   same zip code.  It's aggregated data.  I have hard copy

8   slides if you want, Your Honor.  I can hand them up --

9          THE COURT:  Yes, sure.

10         MR. ELFAND:  -- or if you want them on the

11  screen.  So slide 8, Your Honor, shows that IMS data, it's

12  aggregated.  It relies on projections.  It uses national

13  averages and masks state variability.  It lacks

14  information on whether the PBMs are going to retain some

15  of the rebates that the manufacturers pay or they pass

16  them on.

17         It's not just the markup issue, which is an

18  issue, and the only way we can know whether they're

19  marking up the brand more than the generic is by looking

20  at the data, which they won't give us the real data.

21  They're going to only give us the IMS data, which is

22  incomplete.  And they're seeking tens to hundreds of

23  millions of dollars.  Fine, IMS is pretty good at

24  projecting.  If they're 5 percent off, 5 percent of

25  hundreds of millions of dollars is real money.  We are

1    entitled to rebut their calculations and say, Look, it's

2    inflated a little bit.  What they did is inflate it.  You

3    shouldn't recover "X" amount; you should recover 5 percent

4    less than that.  That's a significant amount of money when

5    you're talking about the amount of money the plaintiffs

6    are seeking in this case.

7         And they're claiming burden.  I think you hit

8    the nail on the head, Your Honor.  They only submitted an

9    affidavit from Kroger.  We are completely willing to work

10   with Kroger, to work with them on their burden, like what

11   Your Honor suggested with aggregation.  We haven't heard

12   anything about burden from the other plaintiffs, and we

13   don't think there is one.  These are multi-billion dollar

14   retailers.  They know their data.  They have not just one

15   person sitting at a terminal with their data, they have

16   multiple people.  They've got employees managing this

17   data.  It's part of their business.  In fact, some of them

18   resell the data and make a ton of money off of it.  They

19   know their data, and they're able to pull it and do what

20   they can to give us the data that we need.

21        Here's what they've produced thus far.  This is

22   a list of the plaintiffs, and this is a list of the

23   documents that they've produced.  Some of them haven't

24   even produced a hundred documents yet.  They don't want to

25   do the work that's necessary for the defense to rebut

1   their damages estimate.  There's hardly any documents from

2   some of these plaintiffs, including Kroger.

3           We've produced, the defendants collectively

4   produced almost 700,000 documents, and some of the

5   retailer plaintiffs have done nothing.  I don't think that

6   they should be allowed to give a sample from the easiest

7   one with the least amount of data.  Each one of those

8   plaintiffs who are seeking tens of millions of dollars in

9   this case have to go into their databases, run the queries

10  that you suggested.  We're willing to work with them to

11  limit it.  If Kroger is going to take 160 hours, which

12  frankly, when they're seeking tens of millions of dollars,

13  for one person in a multi-billion dollar company, I don't

14  think that's the worst thing in the world.  So we're

15  willing to work with them, we're willing to be reasonable,

16  but their suggestions have been inadequate.  Their offers

17  have been, We'll give you a sample, we'll give you a tiny

18  piece of data, but then you have to drop your motion and

19  we'll give you nothing else.  That's not acceptable to the

20  defendants.

21          This is also relevant.  This data is not

22  third-party discovery for the retailers and the

23  wholesalers.  We do have -- we're in discovery right now,

24  we don't know how this case is going to play out, but

25  right now the defendants are facing, what their position

1    is, the direct purchasers are entitled to 100 percent of

2    the overcharge, 100 percent regardless of whether they

3    pass it on, regardless of whether they were really

4    injured, and that *Hanover Shoe* rule says there's no pass-

5    on defense unless the cost-plus exception applies, which I

6    would like to get into as well, Your Honor.

7         Their position is that regardless of whether

8    they pass that on, the indirect purchasers are also

9    entitled to 100 percent of the overcharge because they're

10   going to say the pass-through was a hundred percent.

11   That's the exact same overcharge.  That's six-fold

12   damages, and that's the exact kind of thing that the

13   Supreme Court in *Illinois Brick* said was unacceptable to

14   them.  That would be a due process violation.  Whether

15   that happens or not, we'll see.  We think we're not even

16   going to get to damages because obviously our position is

17   that there's been no violation, but just as Your Honor

18   suggested, if we get down to trial and we don't have the

19   data we need and we're facing six-fold damages, that would

20   be a due process violation.  That applies to both sets of

21   cases.

22        This is a multidistrict litigation.  It's an

23   MDL.  It's consolidated for purposes of creating

24   efficiencies.  They're not the usual -- this is not a

25   Rule 45 situation.  These plaintiffs are seeking a lot of

1    money, and they don't want to do any of the work.

2            The other thing is -- briefly, I just want to

3    address it -- they claim that their data is not a hundred

4    percent of the market.  At the wholesaler level, if Your

5    Honor recalls, there's the absent class members through

6    the big three wholesalers.  We intend to seek data from

7    them as well.  We've held off because Your Honor suggested

8    that we first deal with the parties.  The wholesalers

9    represent over approximately 90 percent of the market, so

10   it is almost market-wide, complete industry-wide.  And

11   just as Your Honor suggested, for purposes of duplicative

12   recovery, we don't need market-wide information.  For that

13   purpose, we need it plaintiff by plaintiff in order to

14   make sure we know where their customers are.  We don't

15   have to trace every pill, but we need to know the amount

16   of overlap, and that could be done in an aggregate way,

17   plaintiff by plaintiff.

18           I'd like to turn to the contracts that we're

19   also seeking, unless you have questions.

20           THE COURT:  Well, the only thing I would say is

21   it seems to me that we ought to step back, figure out how

22   difficult it's going to be to get this done.  I want the

23   plaintiffs to go back, and if it's going to be crazy

24   ridiculous, we'll revisit it, but my guess is it's not

25   going to be, so I think we ought to try to get those

1    summaries and make them available.  And let's put Kroger

2    aside again, confer some more and figure out what is the

3    best way in their particular situation to get what the

4    defense needs without imposing undue burden.

5           MR. PERWIN:  We're happy to do that, Judge.

6    Just, again, what the defense needs is already available

7    publicly, as Mr. Shadowen emphasized.

8           THE COURT:  Yes, well --

9           MR. PERWIN:  And the other thing is Mr. Elfand

10   keeps saying that we're refusing to produce documents that

11   would rebut our damage calculations.  That's just

12   nonsense.  These documents are not needed -- have nothing

13   to do with our damage calculations, they have to do with

14   other people's damage calculations, and that's why this is

15   Rule 45 discovery and not --

16          THE COURT:  Yes, right.

17          MR. PERWIN:  -- plaintiffs' discovery.

18          THE COURT:  I understand the point, but we're

19   all kind of in this together, as a practical matter.

20          MR. PERWIN:  That's right, we are, and we're

21   happy to do what -- Your Honor, we actually offered to do

22   something a little less than that, and they turned it

23   down.

24          THE COURT:  Okay, but we're good now, right, on

25   that issue, on the first issue?

```
 1            MR. ELFAND:  I'm not going to go back and

 2   explain why the previous offer was unacceptable --

 3            THE COURT:  No.

 4            MR. ELFAND:  -- but I can if you want to.

 5            THE COURT:  No, we'll go forward.  We're going

 6   to move forward.  Was there another comment on that issue?

 7            MR. KOHN:  Your Honor, I represent the direct

 8   purchaser plaintiffs.  I have not been heard on this issue

 9   yet, so I would like to be briefly heard.  My name is

10   Peter Kohn.

11            The direct purchaser plaintiffs, who are

12   composed almost entirely of wholesalers, the named ones,

13   did make this offer that we would produce our sales data

14   in order to make this issue go away.  So the compromise

15   that Your Honor was thinking about is the one that we were

16   thinking about as well to try to move this issue.  But at

17   the same time, we think Your Honor needs to know two

18   things.  One is that Dr. Addanki, the defendant's economic

19   expert, has said absolutely nothing about why he needs

20   this data, what he would do with this data.  In fact, he

21   hasn't even said that he does need this data.  And so what

22   we're doing here, along the lines of what Mr. Shadowen has

23   said, is we're assuming this data is necessary for some

24   purpose, and we're assuming that on the say-so of counsel.

25   And I'm not doubting counsel's good faith, but what I am
```

1    saying is if they don't have an expert that actually needs

2    this data for the purposes of calculating some reduction

3    of the overcharges suffered by the end-payors, then this

4    entire process could be a huge waste of time and

5    encountered for no reason at all.

6              The other point I wanted to make to Your Honor,

7    and then I'll sit down, is that it's pretty clear from the

8    defendants' motion that when they move against the named

9    wholesaler plaintiffs that what they're really after are

10   the other absent class member wholesalers, who are much

11   larger, in most cases, than the three named or four named

12   wholesaler plaintiffs.  And what's going to happen down

13   the line in front of Your Honor is I imagine that when

14   those other wholesalers, based on Your Honor's ruling here

15   today, end up getting subpoenas from the defendants to

16   produce either average or transactional sales data,

17   they're going to come before Your Honor and they're going

18   to be asking the same questions that I'm asking here

19   today, and in some cases it's going to be far more

20   burdensome on them to produce their data than it is for

21   us.  It's not that burdensome for us.  That's why we made

22   the offer to try and move the issue.  It may not be the

23   same case for the other wholesalers.  And they're going to

24   ask, Why is it that the Court is requiring this?  Is there

25   some expert who says that he needs data from the

1    wholesalers making sales to the retailers that is somehow

2    relevant and going to be used in the defense of the claims

3    of the end-payors against the defendants?  And if so, who

4    is it that says that they need that and what is it that's

5    going to be done that makes that necessary?  That's the

6    only point I wanted to make to Your Honor.

7            THE COURT:  Good.  Thank you.

8            MR. HOLDING:  Your Honor, Chris Holding.  I

9    promise this will be very brief, but I do want to respond

10   a little bit to what Mr. Shadowen was saying about IMS

11   data.  You and I actually had this same conversation about

12   nine months ago, but I just want to put it back in your

13   mind and refer you to a quote we put in slide 9 on there.

14   So they have Professor Rosenthal from Harvard, respected

15   economist, does a lot of work with them, who'd like to

16   have this data.  I get that.  What I want to be sure is

17   not lost is that there are equally respectable economists

18   who say it doesn't work for these purposes, and so the

19   quote I put in there is from something written by Fiona

20   Scott Morton, who is a professor at Yale.  I'm not trying

21   to make this an Ivy League fight, but what she says is it

22   doesn't work for these purposes.  IMS is the gold standard

23   for some things.  If you want to know the number of units,

24   if you want to know the number of prescriptions, that's

25   the place everybody in the industry goes as far as I can

1    tell.  It doesn't work for dollars because it doesn't

2    capture all that information.  So it's the gold standard

3    for some things.  Lots of respected economists will tell

4    you it is not the gold standard with respect to figuring

5    out the dollars, and that's what we're going to talk

6    about.  So I just didn't want you to think that it's

7    somehow undisputed that, in fact, this other database

8    could get the job done.  We think it doesn't.  So thank

9    you.

10             THE COURT:  I picked up on that much.

11             MR. SHADOWEN:  Just very briefly, Your Honor,

12   I'm sure Mr. Holding just misspoke.  We never said that

13   IMS data was the gold standard for rebate data.  It's

14   right in Dr. Rosenthal's affidavit that we put in here.

15   They have the actual rebate data.  That's their data.

16   They know what rebates they gave.  And so what

17   Dr. Rosenthal does and what all economists do who deal

18   with this data is they use IMS for quantity and list

19   price, and then they get the defendants' data and fold it

20   in for rebates.  So that's really neither here nor there.

21             And just a couple other points with respect to

22   the IMS data.  Counsel said that there could be a margin

23   of error of 5 percent on IMS data.  The document they show

24   says it's 2 percent, and what they don't have is an expert

25   affidavit in front of the Court that says what they're

1   going to come up with rebuilding the thing from the ground

2   up using 35 percent of the sales in the industry is going

3   to get anywhere near as good as 2 percent or 5 percent or

4   even a 10 percent margin of error.

5           So I echo again what Mr. Kohn said, why are we

6   doing this, because at the end of the day they know, which

7   is why they don't have an expert affidavit, no expert they

8   have is going to be able to stand here before the Court,

9   look you in the eye and say the thing that we just

10  jerry-rigged together is better than the IMS data.  That's

11  not going to happen.  So we're all going to be back here

12  at some point and having this discussion again, having

13  burned through all these resources to do it.

14          THE COURT:  Well, I think the big difference of

15  opinion here is what amount of resources is it going to

16  take to provide this information, and I've heard a lot of

17  adjectives, but I haven't heard a lot of facts, except

18  with respect to Kroger, and even those facts aren't that

19  scary to me, frankly, in this case.  So I think it's worth

20  the candle to do this.  It gives them -- look, part of

21  this process is to give everybody a sense that they have

22  what they need to either prosecute or defend the case.

23  This looks like data the defense thinks it needs.  I

24  believe that's a good faith view.  It does not look to me

25  like it's a great deal of trouble to get it.  If it turns

1    out that it is, I've said we'll revisit the issue, but I

2    don't think it's going to be, and it will give the defense

3    the sense that they are able to challenge the numbers on

4    damages, which is an important part of this litigation.

5    So I'm just not convinced that it's not proportional, too

6    burdensome, etc.  I haven't seen anything really to

7    support that.

8                   MR. ELFAND:  Thank you, Your Honor.  Does that

9    opinion apply to all the requests or are we focused just

10   on data?  Otherwise, I will turn to the other requests

11   that we have or sit down quickly.

12                  THE COURT:  The camel just got the nose under

13   the tent.  Let's do them one by one.

14                  MR. ELFAND:  On the contracts, you're certainly

15   right as to burden.  The contracts, no one has actually

16   asserted a burden on the contracts, Your Honor.  The

17   contracts request are -- contracts are discrete, contracts

18   are very easy for the plaintiffs to produce, so we're not

19   talking about a burden issue here.

20                  THE COURT:  This goes to the exception point?

21                  MR. ELFAND:  Well, the contracts are also needed

22   for purposes of duplicative recovery, calculating damages

23   on the indirect purchaser side as well as the cost-plus

24   exception, so they're both --

25                  THE COURT:  What's the first need?

1          MR. ELFAND:  The same as what we've been talking

2     about.  If we're getting sample data and we look at a

3     contract that --

4          THE COURT:  But you're not getting sample data;

5     you're getting data.

6          MR. ELFAND:  Right.  If we get the data -- the

7     contract will allow us to give color to a lot of the data.

8     If they're marking up -- the wholesalers are marking up a

9     certain percentage at the retail level, that will be there

10    in a contract, not just in the data.  If the retailers

11    are, through their PBMs, retaining a certain amount of

12    rebates that the manufacturers pay, which is not either in

13    the manufacturer's possession nor is it something that's

14    reflected on IMS data, that rebate information that the

15    PBMs retain wouldn't necessarily be in that data, it would

16    be in some of the contracts or it would be in the PBMs'

17    files themselves.  So we do need some business documents

18    as well for purposes of just determining damages

19    downstream and for purposes of rebutting and explaining

20    why the IMS data is off.

21         THE COURT:  All right.  So just so we're clear,

22    what is the scope of these contracts?  I mean, how many --

23    are we talking about thousands of contracts?  Are we

24    talking about a contract per year with each --

25         MR. PERWIN:  Can I respond, Your Honor, since

```
 1    you're asking about my clients' --

 2              THE COURT:  Right.

 3              MR. PERWIN:  -- contracts?  There's two

 4    different kinds of contracts that Mr. Elfand is not

 5    distinguishing between.

 6              THE COURT:  All right.

 7              MR. PERWIN:  There's the contracts that we have

 8    with the wholesalers --

 9              THE COURT:  Yes.

10              MR. PERWIN:  -- which are a small number.  We're

11    not claiming they're burdensome.  We're claiming they're

12    irrelevant and highly confidential.

13              THE COURT:  Okay.

14              MR. PERWIN:  Then we have contracts with third-

15    party payors.  We have thousands of contracts with

16    third-party payors.

17              THE COURT:  Third-party payors meaning insurance

18    companies?

19              MR. PERWIN:  Insurance companies; PBMs; Humana,

20    for example.  They reimburse us for a portion of the

21    prescription price of the drug.

22              THE COURT:  Right.

23              MR. PERWIN:  When we dispense a drug to a

24    patient, we get something from the patient as a co-pay; we

25    get the rest of it from the third-party payor.
```

1           THE COURT:  All right.

2           MR. PERWIN:  And there are, as I said, thousands

3   of those contracts.  All they do is tell the parties how

4   much we get paid for that prescription, which is going to

5   be in the data that Your Honor has asked us to try to

6   provide.  So those contracts are not going to tell them

7   anything that's extremely burdensome.  They haven't even

8   briefed why they need those.  They don't appear in their

9   brief at all.  The brief talks about the contract with the

10  wholesalers and the cost-plus exception.  They don't talk

11  about the PBM contract at all.  There's thousands of them.

12  They won't tell them anything.  They will be extremely

13  burdensome for us to produce them, and they have

14  absolutely no relevance to anything in the case because

15  they're going to get the reimbursement when they get the

16  data.

17          MR. ELFAND:  I'm just going to take them in

18  turn.  He's right there are different kinds of contracts.

19  For the thousands of contracts that they have with third-

20  party payors, we've asked for a sample of those, and we

21  would take a sample of those state by state, ten in each

22  state, fifteen in each state.  That's certainly something

23  that we would be open to.  But the retailers' position,

24  and it's in the correspondence, Mr. Perwin sent us an

25  email in January of this year and it said that they are

1    not going to identify a single custodian outside of their

2    purchasing department for the purposes of collecting

3    documents.  That means they're going to give us nothing

4    because the purchasing department is not going to have

5    those third-party payor contracts.  We're open; we'll work

6    with them; this may be an easy issue.  The purchasing

7    contracts that they refuse to produce that they say is

8    confidential, those we want all of them.

9            THE COURT:  All right.  In terms of

10   confidentiality, we have a protective order, attorneys'

11   eyes only.  Are those contracts different from any other

12   highly confidential document?

13           MR. PERWIN:  Yes, because they're irrelevant,

14   that's the other thing, because they deal with sales from

15   the -- remember, we have assignments, from the

16   wholesalers.  We're pursuing the wholesalers' claims with

17   respect to the purchases that they make on our behalf.

18   These are sales from the wholesaler -- these contracts

19   govern the sales from the wholesaler to the retailer.

20   They have nothing to do with our damages.  They have

21   nothing to do with Mr. Shadowen's clients' damages.  They

22   are completely irrelevant, unless they can establish the

23   cost-plus exception, which would essentially make my

24   clients the direct purchasers and make our assignments

25   unnecessary.  But these are not cost-plus contracts as

1    we've explained in our brief because they, number one,

2    don't use actual cost; and, number two, they don't have a

3    fixed quantity requirement.

4              THE COURT:  Let me just find out, is that the

5    purpose of your seeking these, what do you call them,

6    supply contracts?

7              MR. PERWIN:  Supply contracts.

8              THE COURT:  Supply contracts?

9              MR. ELFAND:  We're seeking them both for the

10   cost-plus exception, which we're in discovery, it's hard

11   for us to say --

12             THE COURT:  Right.

13             MR. ELFAND:  -- when we don't have them.

14             THE COURT:  Right.

15             MR. ELFAND:  Publicly available information does

16   show the national wholesalers do set their sales price

17   based on their cost with a fixed percentage markup.  There

18   is some evidence of that in the public record as well as

19   what we've received so far, so we just want the -- so for

20   the cost-plus exception, plus what I said earlier to -- to

21   assess what's going on in the middle of the distribution

22   chain with regards to pricing.

23             THE COURT:  Okay.  Maybe I misheard what you

24   said.  To be a cost-plus, the contract has to obligate the

25   purchaser, doesn't it, to set a customer price at

1    cost-plus percentage as opposed to a decision by the

2    purchaser, Oh, it's a pharmaceutical, we always add

3    13 percent or 21 percent or whatever we're going to add?

4           Maybe I'm missing you, but what you're saying is

5    in practice the purchasers here, i.e. the wholesalers, are

6    always marking up some percentage when they receive these

7    drugs.  Is that your argument?

8           MR. ELFAND:  That is the argument.

9           THE COURT:  Okay.  But if they're not obligated

10   to do it in the contract, how does the contract become

11   relevant?

12          MR. ELFAND:  Again, the manufacturers'

13   contracts -- you have to look at this as a whole because

14   they're all tied together.  There's the manufacturer

15   contract with the big three wholesalers, as well as the

16   wholesalers' contracts downstream.  They're interconnected

17   in a lot of ways.  We don't have the downstream -- the

18   wholesaler contracts in order to assess whether it really

19   is a fixed -- the fixed quantity amount or other issues

20   like that.  But they are interrelated, these contracts,

21   but we only have -- we only have the contracts that we had

22   with the wholesalers.

23          THE COURT:  Right, and you know what they say.

24          MR. ELFAND:  Right.

25          THE COURT:  And why do you need the wholesalers'

 1    contracts with retailers?

 2              MR. ELFAND:  Because our position is that the

 3    cost-plus exception would also apply if --

 4              THE COURT:  Am I correct that it only applies if

 5    those contracts say you, Mr. Retailer, will mark up this

 6    drug 21 percent over what we're selling it to you for?

 7              MR. ELFAND:  My understanding of the cost-plus

 8    exception is that would also apply if the wholesalers'

 9    contracts with the retailers say, Our price to you is

10    going to be based on our cost of acquisition plus a

11    markup.  That would satisfy the cost-plus exception under

12    *Hanover Shoe*.

13              THE COURT:  Why would a wholesaler explain to

14    the retailer what the price of the drug is and how it

15    relates to their cost-plus?  Why would you do that?  If

16    I'm selling -- I'm going to sell you this car, I'm getting

17    it from Ford for $10,000, I'm going to sell it to you for

18    10,000 plus 5,000, I'm not going to -- why would I do

19    that?

20              MR. ELFAND:  Maybe we're having a disconnect.

21    The contracts that we do have, the contract between the

22    wholesaler and the retailer says that in this sale from

23    the wholesaler to the retailer --

24              THE COURT:  Yes.

25              MR. ELFAND:  -- the sale price from the

1   wholesaler to the retailer is based on the wholesaler's

2   cost of acquisition from the manufacturer, plus a markup.

3            THE COURT:  Plus a markup.

4            MR. ELFAND:  Right.

5            THE COURT:  My point is, don't you have to show,

6   to meet this exception, that the wholesaler's contract

7   with the retailer requires the retailer to mark up?  In

8   other words, it's a form of making sure that a margin is

9   made, am I right?  Am I missing --

10           MR. ELFAND:  That's not my reading of *Hanover*

11   *Shoe*.  I think *Hanover Shoe* said if there is a preexisting

12   contract --

13           THE COURT:  No, no, but here's the point.  Every

14   wholesaler is going to mark up a price, and then every

15   retailer is going to mark up a price.  That's not

16   sufficient, the fact that there is a markup.

17           MR. ELFAND:  Right.

18           THE COURT:  But the exception, I think, requires

19   that the contract obligate the purchaser to mark up, to

20   establish a price based upon --

21           MR. ELFAND:  I don't think that's right, Your

22   Honor.

23           THE COURT:  So as long as it's not a straight

24   pass-through without making any money on it, if there's

25   anything other than a straight pass-through --

```
 1            MR. ELFAND:  No, that's -- if there's a
 2   preexisting contract within the contract that says, You
 3   will always price to your customer based on your cost of
 4   acquisition plus this exact markup --
 5            THE COURT:  You shall.  You're obligated.
 6            MR. ELFAND:  You shall.  You're obligated.
 7            THE COURT:  That's what I'm saying.
 8            MR. ELFAND:  Right.
 9            THE COURT:  If you obligate yourself --
10            MR. ELFAND:  Yes.
11            THE COURT:  -- I, Mr. Retailer, will always add
12   10 percent to whatever it costs me to buy Aggrenox.
13            MR. ELFAND:  Right, and that's what's happening
14   in these contracts.  The wholesalers say, I obligate
15   myself, McKesson --
16            THE COURT:  No, no.
17            MR. ELFAND:  I don't want to get into specifics.
18            THE COURT:  No, no, no.  It's the retailer has
19   to obligate, not the wholesaler.
20            MR. ELFAND:  I don't think that's right, Your
21   Honor.  I think that it's the wholesaler.
22            MR. HOLDING:  I agree; I don't think that's
23   right.  First of all, the antitrust law says you're not
24   supposed to do that.
25            THE COURT:  Of course, right.
```

1              MR. HOLDING:  So the wholesaler typically

2    purchases it at wholesale acquisition cost, WAC, and the

3    contract says, as I understand it, no matter what product

4    I sell you, I, Mr. Wholesaler, sell you, Mr. Retailer, I

5    will sell it to you at WAC plus -- WAC plus "X" percent.

6    That's a cost-plus because WAC was my cost of buying it

7    from Boehringer Ingelheim, and I'm going to now sell it to

8    you, and it's not that I can mark it up whatever I want to

9    mark it up at my discretion because I want to make more

10   money today and less money tomorrow, no matter what the

11   WAC is, no matter what I've done, I'm going to sell it to

12   you for WAC plus 1 percent or WAC plus 2 percent.  If it

13   states that in it, that satisfies, as I understand the

14   law, the cost-plus.

15             There's a separate volume issue, I admit we have

16   to talk about, I know Mr. Kohn is trying to talk about

17   that.  That's a separate issue.  In terms of the cost-plus

18   part of it, I don't think it's anything to do with saying

19   you, Mr. Retailer, when you sell it, must have a certain

20   markup on it.

21             THE COURT:  I understand.  Okay, that's helpful.

22   But do these contracts that you've found publicly obligate

23   anybody to purchase a fixed amount of product regardless

24   of price?

25             MR. ELFAND:  On the fixed amount issue, the

1    plaintiffs' allegations themselves say that in this

2    industry, according to their own theory in the case,

3    because there's a disconnect between the doctor

4    selecting -- selecting the drug and the third-party payor

5    paying for it and the consumer using it, because of that

6    dynamic, the normal rules of supply and demand, which is

7    what *Hanover Shoe* and *Illinois Brick* were afraid of

8    getting into, they don't apply here, that price doesn't

9    matter.  This is their own theory of the case.  And by

10   definition, we can look at whether that's true, whether

11   their -- whether the output post generic entry has, rather

12   than gone up, it has gone down, and it means we don't have

13   to get into output issues under their own theory of the

14   case.  By definition --

15            THE COURT:  But the exception only applies if

16   there is an obligation to purchase a fixed amount

17   regardless of -- I can't imagine that there's a wholesaler

18   out there that says, We're going to buy a hundred thousand

19   units of Aggrenox every month regardless of whether any

20   doctors are prescribing this thing.

21            MR. ELFAND:  There are tiers that the price is

22   dependent upon sometimes --

23            THE COURT:  But that's different, that's

24   different.  There's not an obligation -- in other words,

25   it's not like -- I keep using cars.  A Ford dealership may

1  be obligated to take ten F-150s every month regardless of

2  how many he has in inventory.  Ford says, We're going to

3  send you ten every month, right, regardless of whether you

4  need them; regardless of whether the price is going up or

5  down, you're going to take ten.  That's not in these

6  contracts, is it?

7             MR. ELFAND:  That's not -- we don't have the

8  contracts so we don't know.

9             THE COURT:  The ones you have, the ones you keep

10  talking about that you have.

11             MR. ELFAND:  They've only produced one.  And in

12  the --

13             THE COURT:  So here's the compromise.

14             MR. ELFAND:  Yes.

15             THE COURT:  Counsel should go and figure out

16  whether any of these contracts obligate the customer to

17  buy a fixed quantity regardless of price --

18             MR. ELFAND:  Right.

19             THE COURT:  -- and make an affidavit that you

20  can rely on that none of these contracts has that in it.

21  If they find one that has it in it, produce it.

22             MR. PERWIN:  None of them have that in them.

23             THE COURT:  Yes, I'm not surprised.

24             MR. PERWIN:  How could a retailer be obligated

25  to buy a fixed quantity of Aggrenox no matter what

 1    happens?  And just while I'm up, we don't say that price

 2    doesn't matter and that there's a fixed quantity.  In

 3    fact, we say that output increases when the generic comes

 4    on the market --

 5              THE COURT:  Of course.

 6              MR. PERWIN:  -- because you stop getting

 7    substitution.

 8              THE COURT:  Right, of course.

 9              MR. ELFAND:  I guess two things.  If we go down

10    that road, we would want the big three wholesalers because

11    they're the ones who really have most of the contracts.

12    The retailers only have their own contracts with the big

13    three wholesalers.  We would like them to do that

14    exercise.  If they represent in open court none of them

15    have it, then okay, but we would still want the big three

16    retailers to do the same exercise.  And I would just

17    say --

18              THE COURT:  The big three wholesalers?

19              MR. ELFAND:  The big three wholesalers.  They're

20    the ones who have the --

21              THE COURT:  Well, they're not here today.

22              MR. ELFAND:  Right.

23              THE COURT:  So we'll worry about that at another

24    time.

25              MR. ELFAND:  As long as this ruling isn't

 1    binding on that exercise, that would be okay.

 2              THE COURT:  They can make the same

 3    representation.

 4              MR. ELFAND:  If I could just say that we are in

 5    discovery.  Your Honor doesn't have to make a legal ruling

 6    on that issue.

 7              THE COURT:  I'm not making a legal ruling.

 8              MR. ELFAND:  We don't think that that's required

 9    that it has to be in the contract.  What *Hanover Shoe* said

10    was the whole reason why these cost-plus contracts,

11    whether there should be an exception for a cost-plus

12    contract is because you don't need to get into what would

13    have happened if there was no anticompetitive --

14              THE COURT:  Just to be clear, just to be clear,

15    I'm not making a legal ruling because I don't think I'm

16    ever going to have to because I'm being told that these

17    contracts don't exist --

18              MR. ELFAND:  Right.

19              THE COURT:  -- so I don't have to decide the

20    issue.  They're going to look.  If they don't have the

21    terms, then --

22              MR. ELFAND:  I guess what I'm saying is we don't

23    think that that is a requirement for the cost-plus

24    exception to apply, that it has to be in the contract that

25    it's a fixed quantity, where the plaintiffs' own theory of

1   the case necessarily means there's a fixed quantity.

2          THE COURT:  Okay.  I think we've solved this

3   problem for now.  They're going to search.  If they've got

4   any contracts that obligate a fixed quantity or that set a

5   customer's price as a percentage of a direct purchaser's

6   actual cost, we're going to hear about it.

7          MR. HOLDING:  May I ask just one clarification

8   about that?  I would ask that the affidavit answer those

9   two questions individually for the reasons Mr. Elfand

10  said.  So if the contract says, yes, it's a fixed -- if

11  the representation is yes, this contract is for a fixed

12  price, but no, it's not for a fixed quantity, I think it's

13  important for us that we have to hear both of those

14  things.

15         THE COURT:  That's fine.

16         MR. PERWIN:  Judge, I can tell you the answer

17  now.

18         THE COURT:  Yes.

19         MR. PERWIN:  The contracts are based on WAC.

20  It's WAC minus, not WAC plus, but that's what the

21  contracts say, and WAC is not necessarily the wholesaler's

22  actual cost.  And second of all, none of them have fixed

23  quantity requirements.

24         THE COURT:  Okay.

25         MR. PERWIN:  That's the answer to the question,

1    but we'd be happy to provide an affidavit.

2              THE COURT:  That would be great.  Okay.

3              MR. ELFAND:  Okay, so we'll move on to the third

4    category, which is the sales and pricing strategies if --

5              THE COURT:  Yes.  And my question there is, I

6    think I saw one sentence or a portion of a sentence in

7    your brief supporting the need for sales strategies.  I

8    can cite you to it, I think.  Page 17.  The sentence

9    says -- it's actually just a clause -- the sentence says,

10   quote:  Defendants' requests cover more than just data.

11   They also cover business documents that would shed light

12   on plaintiffs' sales strategies and profitability -- which

13   are relevant to assessing whether they absorbed or passed

14   on any alleged overcharge, unquote.

15             I mean, the statement that you're seeking it and

16   the assertion that they're relevant is all I have.  I

17   don't have an argument why it's relevant.  I don't have an

18   argument what you're going to find.  I don't have anything

19   really on that issue.

20             MR. ELFAND:  Again, the plaintiffs are going to

21   be calculating the but-for price of generic Aggrenox when

22   they think it should have entered earlier.  They think it

23   should have entered in 2009.

24             THE COURT:  Right.

25             MR. ELFAND:  That is necessarily going to be an

1    estimate.  It is going to be an expert opining on what

2    would have happened in a but-for world.

3              THE COURT:  Well, not really necessarily, at

4    least not as much as usual because we have actual market

5    data.

6              MR. ELFAND:  Right.

7              THE COURT:  This is what actually happened.

8    Now, maybe somebody can argue 2016 is different than

9    2012 --

10             MR. ELFAND:  Exactly.

11             THE COURT:  -- for some reason, but --

12             MR. ELFAND:  Exactly.  And if we get their

13   general -- we're not looking for every communication on

14   their pricing strategies.  We will work with them in

15   limiting this.  Again, the problem is that this topic has

16   been a nonstarter with them.  They will not search -- they

17   will not even search for this.  They will not produce

18   anything outside of the purchasing department.  This would

19   obviously be in their sales department.  We'll work with

20   them on this, but we do want high-level sales pricing

21   strategies that will show what they were doing in 2009

22   versus 2015 to say, You can't just look at what's

23   happening in 2015 when the generic entered and apply that

24   to 2009 because look at how your pricing strategies have

25   changed over time.  And if they've changed in a way that

1    makes their calculation wrong or inflated, those pricing

2    strategies are going to be relevant.

3              THE COURT:  I'm not sure I follow.  So give

4    me -- I mean, try to make this into an example.  In 2009

5    they say what?

6              MR. ELFAND:  In 2009 they say that we're only

7    going to -- we're going to -- the retail price for our

8    generics generally is going to be 50 percent of the brand,

9    whereas they price it differently -- and then we look at

10   what happened for Aggrenox today and it's totally

11   different, and they're applying a price gap between the

12   brand and the generic today that would have been lower in

13   2009 because of their change in pricing policies at the

14   retail level.

15             THE COURT:  So you think there is a strategy out

16   there where the generic is priced at a percentage of the

17   brand?

18             MR. ELFAND:  Not necessarily as a percentage of

19   the brand but just where their pricing strategy would make

20   it different from -- we don't know, we don't have their

21   pricing strategies, but if their strategies change over

22   time, we --

23             THE COURT:  We don't even know if there is a

24   strategy.  For all we know, they add a 4 percent markup to

25   everything.  Whatever drug we buy, we add 4 percent.  For

```
 1    all we know, that's what it is.  And that's not a
 2    strategy; that's like a policy.
 3            MR. ELFAND:  Well, a policy, strategy, we're
 4    looking for their high-level policies, how they set their
 5    prices from 2009 to 2015.  We think it will allow us to
 6    show why their estimates are --
 7            THE COURT:  But you're going to try to apply
 8    whatever they chose to do with respect to generics of
 9    other drugs and try to say that that's what they would
10    have done with the generic Aggrenox.
11            MR. ELFAND:  That's what the plaintiffs are
12    going to do as well.  They're not just going to use the
13    real-world data 2015.  Their expert report, declaration
14    that they submitted didn't actually explain it exactly how
15    they're going to calculate the conversion rate and the
16    price.  It provided a general estimate, a general
17    explanation that that's what they're going to do.  They're
18    going to use IMS data.  They're going to set the retail
19    price.  But the conversion rate between the brand and the
20    generic and the price of the generic in the but-for world,
21    they're not only necessarily -- they're not necessarily
22    only going to use the data from 2015.  We don't -- we
23    don't know exactly what they're going to do, and we're in
24    discovery -- because we're in discovery, we just want to
25    get as much information as we can so that we're prepared
```

1    to respond to what their expert actually ends up doing.

2              THE COURT:  All right.  Can you point me to the

3    request?  What did you actually request?

4              MR. ELFAND:  It's in Appendices A and B.

5              THE COURT:  Is it revised appendix?

6              MR. ELFAND:  Actually, I think I have it here.

7    It would be Appendices A and B, the Revised Appendices A

8    and B.  We list the request on Slide 18.  And, again,

9    we'll work with them on limiting this.  We understand that

10   they don't have to produce every single document that

11   we've requested here, but it's been a nonstarter.  They've

12   refused to produce any of it.  So we've got Request 4.  It

13   says all documents.  We don't need all documents.

14             THE COURT:  All right, maybe I should hear from

15   the other side.  I mean, if there is a method to generic

16   pricing, I'm going to want to know that.

17             MR. PERWIN:  Are you talking about retailers'

18   pricing, Your Honor?

19             THE COURT:  Well --

20             MR. KOHN:  Let's start with wholesalers'

21   pricing.  Your Honor, we've represented that we don't have

22   these documents, that we do not have strategy documents

23   about profitability or policies with respect to generic

24   drugs.  The way a wholesaler --

25             THE COURT:  That's easy.

1          MR. KOHN:  And that's it.  I'll go sit down.

2    But I will say that a wholesaler will price based on what

3    the market will bear for a generic, for a brand that's

4    cost minus some percentage, WAC minus some percentage.

5    And Your Honor said at the beginning that we were forging

6    a compromise here, that we'd provide sales data, and that

7    was the compromise.  So I'm surprised that given the

8    compromise we're even discussing this, but we don't have

9    any documents, and we've so represented.

10          THE COURT:  All right.

11          MR. ELFAND:  We would be okay with that for the

12   wholesalers.  We just want to make sure that, again, the

13   big three national wholesalers certainly have pricing

14   strategies and they certainly have these kinds of

15   documents.

16          THE COURT:  They may.  We'll deal with them some

17   day.

18          MR. PERWIN:  Judge, first of all, our damages

19   are overcharge damages at the wholesale level, nothing to

20   do with sales.  And second of all, I don't know what

21   Mr. Elfand means by pricing strategies.  98 percent of the

22   people who get their prescriptions filled at one of our

23   pharmacies are covered by an insurance plan.  The

24   insurance plan sets the price that we get filling that

25   prescription.  There's no strategy involved.  We negotiate

1  the best deal we can with Humana and Aetna and the other

2  third-party payors, health insurance companies, and we get

3  whatever we've negotiated.  That's what we get paid.

4  There's no strategy involved.  We try to do the best we

5  can, and unfortunately we don't get very good margins,

6  especially on branded drugs, but that's what we have to

7  live with.  And so there's nothing to look for.  We have

8  turned over everything that's in our purchasing department

9  that deals with Aggrenox or generic Aggrenox.  I don't

10  even know how I would go about trying to find pricing

11  strategy documents.  Again, all we do is contract with

12  third-party payors.  They give the price.

13           THE COURT:  Let me ask you this.  Is there a

14  document somewhere that says 2007 here's what we're

15  getting from all the insurers for Aggrenox -- I'm sorry,

16  for -- yes, for Aggrenox?

17           MR. PERWIN:  Well, if you're talking about data

18  that shows what our margin is for the year on a particular

19  drug, I don't think there is, but it probably could be

20  created if somebody was going to set about to do that.  We

21  don't, as far as I know, keep documents drug by drug.

22  Remember, Judge, we're retailers.  We sell every drug on

23  the market.  We don't have people sitting around drumming

24  up strategies for Aggrenox.  We're just trying to fill

25  prescriptions, trying to get the drug from the warehouse

1    to the store and fill the prescription when the patient

2    comes in.  That's what we do.

3              THE COURT:  Yes, right.  Okay.

4              MR. SHADOWEN:  Your Honor, just very briefly

5    from the end-payors' perspective so you'll see where this

6    is all headed, the way we will prove damages in this case

7    is with a yardstick measure of damages; that is, we'll say

8    here's what people actually paid for the brand, and we'll

9    go back to the relevant year, whether it's 2009, 2012 or

10   whatever it is, and we'll pick an exemplar, some other

11   generic drugs entered the market that year and they,

12   within a certain number of months, they took 80 percent of

13   the sales of that branded drug, and they did so with an

14   80 percent discount, and that's how we'll prove the

15   damages.  That's how damages are proved in all of these

16   cases.

17             Obviously we'll have the check of what actually

18   happened in 2015, but we'll use yardsticks from the

19   relevant year, and there's publicly available data, what

20   were the -- they're called erosion rates, what was the

21   generic erosion rate typically that year, is it less than

22   it was in 2015, and that's it.  And so you have to sort of

23   ask yourself, what would be -- let's say that Kroger,

24   somebody had a document that said here's our strategy for

25   generics in 2012, and it turns out to be different than in

1    2015.  Mr. Perwin says that's not true, that sounds right

2    to me, but suppose it were.  What possible relevance would

3    it have to this case that one retailer somewhere in the

4    country had some minor difference in their pricing

5    strategy for 2012 versus 2015?  The individual -- again,

6    they're talking about building up from the ground -- from

7    the ground up some attack on what the national data will

8    show.  The national data will show, well, whatever various

9    retailers did, here's what the results were in 2015.

10   There was a generic erosion rate of 80 percent, and people

11   got a 90 percent discount.  It's pretty much that simple.

12   And I don't understand, if they tried to come in front of

13   a jury and say, Okay, that's what the data shows, you

14   know, happened in 2015 on average, what possible relevance

15   could that be to a jury to say, Well, Kroger wasn't the

16   average, it was a little bit below the average or a little

17   bit above the average.  So what?

18            I guess that's the point I keep coming back to

19   is, the data and the documents they want are these little

20   disaggregated data that don't amount to anything.  They

21   all get swept away in the averages that are going to be

22   used.

23            MR. ELFAND:  We're not seeking these documents

24   in order to -- the data that we talked about earlier is

25   what's going to allow us to make specific calculations on

1   why the IMS data is inaccurate.  The high-level documents

2   discussed in the forecasts, budgets, high-level documents

3   that look into what they're generally doing are going to

4   allow our experts to give color to what -- why they're

5   explaining -- why the price of the generic is different

6   in -- would have been different in 2009 than 2015.  These

7   kinds of documents will help assist in that process.

8   That's why we're seeking them.

9           THE COURT:  Yes, I just don't have a sense that

10  they're really going to help you at all, frankly.  I think

11  you're going to have the data.  Let's see when you get the

12  data what your expert needs.  I'm just really struggling.

13  When we have a situation where the actual generic is out

14  and would have been out probably two or three years by the

15  time we get to trial, we're going to have actual data to

16  rely upon for what happens in the market, and the idea

17  that there's some difference between 2015 and some earlier

18  year based upon what a seller is trying to do, it doesn't

19  matter what they're trying to do.  This is how the market

20  reacted when the generic came out.  We're going to have

21  that in this case.  We don't have to do the usual

22  estimates and assumptions, and so forth.

23          MR. ELFAND:  I think the estimates and

24  assumptions are going to have to be done because we're

25  calculating what the price would have been in 2009, so by

1    definition there's going to be some kind of extrapolation

2    from 2015 to 2009, and there is definitely going to be

3    explanations on both sides as to why it would have been

4    different in 2009.

5            THE COURT:  Well, I don't see how somebody's

6    hope about a different drug, generic drug, is going to

7    affect any of that analysis.  If --

8            MR. ELFAND:  Well, I don't want to -- I do think

9    it would help, but, Your Honor, if you've made a ruling, I

10   don't want to --

11           THE COURT:  Yes, I'm going to sustain the

12   objection on the strategies.

13           MR. ELFAND:  Mr. Holding for premiums, if that's

14   all right.

15           THE COURT:  Yes, I think that will be short.

16           MR. HOLDING:  That's either good news or bad

17   news.

18           THE COURT:  I think it's bad news for you.  Let

19   me just ask you a question.  Do you have any reason to

20   believe or any information that any premium was ever

21   affected in any way by the price of Aggrenox?

22           MR. HOLDING:  Yes.  I don't have any -- I don't

23   have any documents to prove it.

24           THE COURT:  So you think that there's a --

25   what's the name of the insurance guys who do the --

```
 1              MR. HOLDING:  Actuaries.

 2              THE COURT:  Actuary.  You think there's an

 3    actuary out there somewhere who is looking at the price of

 4    Aggrenox before setting a premium, as opposed to what is

 5    the overall price of prescription drugs, because these

 6    plans are going to cover 50, 60, 200,000 drugs, whatever

 7    it is out there, and you've made arguments time after time

 8    after time about how little market power Aggrenox had and

 9    all the substitutes that were available for Aggrenox, and

10    you're going to tell me now that the insurance policies,

11    the premiums are affected by the price of Aggrenox?

12              MR. HOLDING:  I fully believe that the evidence

13    is going to show the answer to that question is yes

14    because that's how actuaries work.  And I actually don't

15    hear them to be denying it.  They're just saying they

16    don't think it's that very big.  But an actuary is going

17    to have a big spreadsheet that's going to roll up a whole

18    bunch of numbers which collectively is going to make a

19    number, and so, yes, I think that --

20              THE COURT:  The number is going to be the

21    overall price trend of prescription drugs, which we all

22    know looks like this.

23              MR. HOLDING:  And I think -- well, it is, but it

24    is a bundled number that is composed of aggregates, and so

25    I believe the evidence is going to show --
```

1          THE COURT:  It's like saying Mrs. Smith's

2     driving history is going to change the premiums for Geico

3     because she's one of "X" hundred thousand drivers, and

4     that the actuary for Geico is going to look at each one of

5     those before deciding.  No.  The actuary for Geico is

6     going to look at what are the number of accidents in

7     Connecticut.

8          MR. HOLDING:  And part of that is going to say

9     so it's 2010, and they're going to say, How were we doing

10    in 2009?  Did we cover our costs?  And if the answer to

11    that is yes, because Aggrenox -- this was your phrase, is

12    priced in to that -- to that amount --

13         THE COURT:  They're not going to say, Did we

14    cover our costs for Aggrenox.  Go off, take as many

15    depositions as you want of insurance companies and focus

16    on the impact of Aggrenox on the setting of premiums.  My

17    bet is you're not going to do that.  Why?  Because it's

18    ridiculous to try to do that.  Of course Aggrenox doesn't

19    have any impact on premiums.

20         MR. HOLDING:  So here's what I would say to

21    that, Judge.  As we stand here today, I totally get that's

22    your instinct, but that's not -- there's no record in

23    front of you that says that that's right, and I'm telling

24    you that my understanding of the actuaries I know -- and

25    I'm sure you know some, too -- they're the most -- they're

1   the most nitpicky data people in the world.

2           THE COURT:  Go take depositions of any of these

3   insurers that you have, focused on the impact of Aggrenox,

4   and if you get somebody to testify we adjusted our rates

5   because of what happened with the price of Aggrenox, that

6   may open the door.

7           MR. HOLDING:  So I would think it would be

8   both -- well, thank you, I think we'll do that and come

9   back and talk to you about this, but I think it wouldn't

10  be just we adjusted our rates, because if the rates stayed

11  the same because it turned out that they knew that they

12  had been covering that cost and they knew they were going

13  to have to keep covering it, that means they covered the

14  cost and didn't suffer a harm.

15          THE COURT:  Yes, I understand the theory.

16  There's not an insurance company in America that adjusted

17  its rates based upon the price of Aggrenox.  They might

18  have adjusted them, I'm sure they did, on the price of

19  prescription drugs, and maybe they've got some program

20  that says drugs in this price category or at this volume,

21  drugs in that price category in that volume, and they

22  aggregated all of that, but nobody in their right mind is

23  looking at whether Aggrenox -- I mean, look, if you were

24  talking about a drug that was one of the top three drugs

25  in America, maybe somebody is going to take a look at

1    that.  If you're talking about the price of an Epipen and

2    it goes up 40,000 percent, maybe they take a look at that.

3    But we're talking about a drug that doesn't have huge

4    sales.  It's just part of the mix.  I can't believe, I

5    can't believe that there's even an argument here that this

6    was somehow passed on because they said Aggrenox's price

7    is doing X, Y and Z so we're going to raise or lower our

8    premiums.  I just can't see that.

9            MR. HOLDING:  Okay, so here's what I would

10   suggest.  I want to be clear.  I think when they're

11   meeting their premiums, if they're not thinking a need to

12   raise their premiums, even if you see it on an aggregate

13   level, if they're recognizing that the premium they set,

14   the portion of the premium that's attributed to the drug

15   prescription benefit as a whole in this year was met and

16   then was met this year, I think that means they've

17   accurately priced in Aggrenox and everything else, and

18   even if you don't see a document that specifically talks

19   about Aggrenox, it still has the effect that they

20   accurately priced it in.

21           THE COURT:  Okay, but you're trying to reduce

22   damages in this way with a prediction.  The prediction we

23   made this year and the prediction we made last year are

24   consistent.  That says nothing about whether it's been

25   passed on or hasn't been passed on.

1           MR. HOLDING:  But if the prediction was -- I

2    guess you and I have a different set of expectations of

3    what discovery would show.  I'm anticipating that

4    there's -- there certainly is an actual document that says

5    last year for Aggrenox we actually spent whatever to cover

6    it, and that gets built into an analysis that says how are

7    we doing, are our premiums covering it?  Now, we might

8    have to do it for Lipitor and a whole bunch of other

9    things as well, but it's part of detailed, data-driven

10   analysis that says where are we going in the future.

11           THE COURT:  No one is buying Aggrenox insurance.

12   They're buying prescription drug coverage.

13           MR. HOLDING:  Correct.

14           THE COURT:  And so the insurance companies are

15   making all kinds of assumptions about how many people are

16   going to buy this versus buy that, what's the cost of this

17   versus the cost of that.  It's a grain of sand on the

18   beach in terms of setting -- in terms of setting premiums.

19           MR. HOLDING:  Well, I think that we should be

20   given the opportunity to determine what does the data

21   actually show because if they have, if it turns out,

22   Judge, that your instinct on this one is just wrong, and

23   the data shows that they are addressing it and they are

24   building it into the premium and that the premiums are

25   covering their costs, then I think the law is clear they

1    haven't suffered an actual damage.  And so this part of

2    the table too is going to be asking us for an enormous

3    amount of money based on their actual damages, and we want

4    to say, Look, it turns out you did a good job, you covered

5    it correctly, you weren't harmed, and we should be

6    entitled to investigate that.

7              THE COURT:  Well, yes, you can investigate it.

8    What I'm looking for is an actuary who says, We changed

9    our rates based upon something that happened with

10   Aggrenox, up or down, not -- as opposed to we changed our

11   rates because of our predictions about what our

12   policyholders are going to spend on prescription drugs.

13   And the fact that Aggrenox is a prescription drug doesn't

14   get you what you want.  It has to be, We are concerned

15   about Aggrenox, it is so widespread, and the price is so

16   critical to the way we value or we adjust our premiums

17   that when the price of -- in fact, we have a ticker around

18   our office that shows the price of Aggrenox on a wholesale

19   and retail basis, and when it ticks, we start getting

20   nervous about changing our premiums.

21             MR. HOLDING:  So, again, the record isn't before

22   us.  What one question is, let's go look for those

23   documents.  Let's see what they have.

24             THE COURT:  What documents?

25             MR. HOLDING:  Do they have documents that

1     demonstrate that in the process of figuring out their

2     premiums from one year and then figuring out how did they

3     do and then figuring out what do they need to do the next

4     year, are there actually documents that show that they

5     considered Aggrenox or not, because if documents show it,

6     that means it's built in and they're covering it.

7           THE COURT:  You know, this is like not a fishing

8     expedition, it's like a flotilla.  I mean, the net is

9     getting cast so widely here that it's going to catch every

10    minnow in the sea.

11          MR. HOLDING:  I really have a hard time --

12    obviouly, you and I see this very differently.  I have a

13    hard time understanding that.  I think the net is being

14    cast very specifically.  It's saying, You guys are saying

15    that you were harmed, and we're saying we think you're not

16    out of pocket because you got the money from these other

17    people.  So were you harmed or were you not?  Does the

18    premium in fact cover you for this cost?  That's what we

19    want to know.

20          I think that is -- that is probably one of the

21    key questions for the damages claims that the EPPs are

22    going to put on, were they harmed or not.  They paid, they

23    certainly had an outflow of money, but that's not the

24    legal standard for them.  The question is, did somebody

25    else reimburse you for that, and we think the answer is

1  going to show the answer is yes.  Whether it was the whole

2  amount or half of it or something else, it offsets their

3  damages.

4         THE COURT:  A premium is not a reimbursement.  A

5  premium is the cost for the right to demand a

6  reimbursement.  So it's not --

7         MR. HOLDING:  A prepayment of the cost that

8  they're going to have to pay.  It's a prepayment.

9  Whether --

10         THE COURT:  No, no, it's not a prepayment.  It's

11  insurance.  I don't know what health problems I'm going to

12  have in the next year.  Maybe my doctor is going to

13  prescribe Aggrenox.  I bought Blue Cross/Blue Shield.

14  It's going to cover me.  I don't have to worry.  I'm

15  buying peace of mind, and the insurance company is

16  providing me with peace of mind and absorbing the risk

17  that I get prescribed Aggrenox or anything or I break my

18  arm or whatever.

19         MR. HOLDING:  But Humana says, I have a bunch of

20  enrollees, and some, hopefully a large number of them, are

21  going to continue next year and stay with me and not go to

22  Cigna or Aetna or somebody else, and they have data

23  experience that says we know that for our enrollees last

24  year, there were a whole bunch of them that took Aggrenox,

25  and it cost us "X," and it's probably likely that they're

1    going to stay here with us and not go to Aetna, and

2    because Aggrenox is the kind of drug you're supposed to

3    take for a long time, they're going to continue to take

4    that.  So as we think about what our costs are, for them

5    it's not insurance, it's we have a cost that we're

6    virtually certain we're going to have to pay.  We can't

7    just pay it all ourselves because we'll go out of buiness.

8    We need money from these guys to help pay for it.

9           THE COURT:  But it's not a reimbursement.  It's

10   a prediction.  It's a prediction that the insured is going

11   to stay on Aggrenox, it's a prediction that they're not

12   going to use a substitute, it's a prediction they're not

13   going to die, it's a prediction that they're not going to

14   get better.  I mean, it's too many variables.  The price

15   of Aggrenox is a piece of sand, a grain of sand on the

16   beach in terms of setting premiums.  If there were one

17   drug in America and Aggrenox were it, yes, you would get

18   this discovery.  You probably still would not have a good

19   legal argument, but you'd get the discovery.  But when you

20   have hundreds of thousands of drugs, the idea that any one

21   of them is driving the premium is nonsensical.

22          MR. HOLDING:  I certainly am not suggesting that

23   Aggrenox by itself is responsible, but I do think that the

24   portion of the premium that is built on the prescription

25   drug benefit, that is itself an amount that's based on the

1    aggregation of a bunch of individual costs.  That's how

2    actuaries work.  Otherwise, actuaries would just be

3    guessing and throwing a dart against the wall.  And that's

4    what actuaries do.

5         THE COURT:  And so people who never took

6    Aggrenox, never had to buy Aggrenox are paying for it, and

7    people who took Aggrenox are paying for it, and they're

8    paying for it in the same way, through a premium.  That's

9    not a reimbursement of the --

10        MR. HOLDING:  I agree with you factually that

11   that's probably what happens, but the question is, how do

12   the funds flow?  Follow the money.  It sounds like

13   Watergate.  How do the funds flow?  And if they're getting

14   an offset, that means they're not suffering actual

15   damages, whether it happens --

16        THE COURT:  It's not an offset.

17        MR. HOLDING:  -- before or after.

18        THE COURT:  It's not an offset.  They're making

19   predictions about how many people are going to sign up for

20   their insurance plan.  If they get another hundred

21   thousand people to sign up, they can reduce the price even

22   if the price of all drugs are going up.  Why?  Because

23   they have that many more people among whom to spread the

24   risk.  It just doesn't work.  It's insurance.  It's not an

25   offset.  This is not -- it's not a rebate.

1          MR. HOLDING:  It is -- it is a financial

2    transaction -- so here's my somewhat silly analogy, okay?

3    It's lunchtime.  I turn to Matt and say, Matt, I'm going

4    to go across the street to the deli, grab a sandwich.  Do

5    you want something?  Yeah, bring me a ham sandwich.  I'm

6    out five dollars to buy him a ham sandwich, except he

7    gives me some money back.  Now, he may give me five

8    dollars after I've come back, bought the sandwich, and

9    says, Here's five dollars, or when I ask him, he may say,

10   Oh, here, here's five dollars.  Financially I'm

11   indifferent as to those two things.  Either way I'm not

12   absorbing the cost of his sandwich.  That is, from an

13   economic perspective, what's happening here.

14         THE COURT:  No.  From an economic perspective,

15   if he gave you a hundred dollars at the beginning of the

16   year and said, Anytime we're in court and I'm hungry,

17   you'll buy me lunch, it might never happen, it might

18   happen every day, you're taking a risk about how many

19   times you're going to have to buy him lunch.

20         MR. HOLDING:  Right, but I know Matt really well

21   because he's actually worked with me and been in my system

22   for a long time, so actuarially I can figure that out.

23         THE COURT:  And if Humana was only insuring one

24   person, the analogy would work, but they're insuring

25   presumably tens, if not hundreds -- or millions of people,

1    I have no idea, and the whole idea of insurance is you

2    spread the risk.  And so whatever the experience is with

3    Matt or anybody else, whoever is hungry or not hungry

4    doesn't matter because they've taken assumptions about how

5    many of those million people are going to be hungry on any

6    particular day and how much the sandwich is going to cost,

7    and everything else, what the weather is going to be like,

8    how many court proceedings there are.  There are going to

9    be lots and lots of factors that go into setting this.

10            MR. HOLDING:  And they've done all that, and if

11   they've done it correctly, including getting this

12   correctly, then they haven't harmed themselves.  Here's

13   what I think --

14            THE COURT:  It's not an offset, so, look, I'm

15   going to --

16            MR. HOLDING:  I'd like to take the discovery,

17   I'd like to take the depositions.  I would like to have an

18   opportunity to depose --

19            THE COURT:  When you say "the depositions" --

20            MR. HOLDING:  --depose --

21            THE COURT:  Let's talk one at a time so the

22   court reporter doesn't mess up.  What do you want to do?

23            MR. HOLDING:  I guess I'd like to do two things.

24   I would like to take some 30(b)(6) depositions, one of

25   Humana and one, I guess, of the main plaintiffs who are

1    EPPs about what is your process for setting premiums, how

2    does it work, to what degree are individual -- so all of

3    these things.

4           Here's the second thing I'd like to do.  2015

5    happened and everybody knew, because we announced to the

6    world, that we were going to be entering, so I'd like to

7    see what documents do they have, I imagine from 2014

8    timeframe, anticipating our generic entry, what is there

9    that discusses or doesn't discuss whether the impending

10   entry of a generic version of Aggrenox is going to

11   influence premiums in any way.  There's your natural

12   experiment.  And so if we started with those two things, I

13   think we would know more about whether -- and I could come

14   back to you -- more information about doing more discovery

15   on this.

16          THE COURT:  Okay.  I'm going to resist that for

17   this reason.  Until we've settled the issue of whether

18   this is an offset or not an offset, there's no point in

19   taking any discovery.  So you're assuming that it's an

20   offset.  I don't think it is.  If it's an offset, what

21   you're suggesting might be reasonable, but I don't see how

22   you get past that first hurdle.

23          MR. HOLDING:  That's the legal question.

24          THE COURT:  The legal question.  In other words,

25   how can you say that charging a premium in advance of the

 1    incurring of a cost is an offset of a cost that hasn't

 2    been incurred?

 3              MR. HOLDING:  Sorry, that has been incurred or

 4    is going to be incurred?

 5              THE COURT:  How can you say that charging

 6    somebody a premium for an insurance policy against the

 7    risk that a cost will be incurred is an offset, in other

 8    words, a future-looking charge, prediction is an offset of

 9    a past expense that has been incurred?

10              MR. HOLDING:  That's not my argument.  I want to

11    be clear about this because I think our papers passed

12    through the night a little bit.  I'm not suggesting

13    that -- again, I'll just use some numbers -- we're not

14    arguing that the 2011 premiums are intended to make up for

15    what happened in 2010.  I recognize one is retrospective;

16    one is prospective.  I don't think the law requires a

17    pass-on to only occur after the transaction has occurred.

18              What I'm suggesting is because these guys can

19    accurately predict what's going to happen, that -- my

20    builder, I'm doing work on my bathrooms, I put some of the

21    money down up front, and then he's going to do some work,

22    and at the end of it, if we're not done, I'm going to pay

23    him some more, but what I set up front is plainly an

24    offset to the cost he's spending on fixing the leak in my

25    upstairs bathroom.  I don't think the timing changes the

1      fact that the flow of funds creates an offset so that

2      they're not out of pocket for the expense.

3              And I don't see anything in the law -- I know

4      some cases have said because one is retroactive and one is

5      not, but they don't explain why, and I don't think there's

6      a really definable reason why.

7              THE COURT:  I think -- I don't want to get too

8      broad here, but I think the concept of insurance in this

9      context as an offset just doesn't work.  This is not a

10     situation where somebody goes to the hospital after an

11     automobile accident, and the insurance company pays.  What

12     you're arguing is you're arguing from a premium point of

13     view that they are making predictions to receive in

14     premium enough to cover any change in Aggrenox, and the

15     problem with that argument goes back to what I said

16     before.  Aggrenox cannot, just cannot be sufficiently

17     significant to affect the premiums that are charged to

18     thousands or millions of people by insurance companies.

19             MR. HOLDING:  I think that's an empirical

20     question, and I don't think you have a record in front of

21     you that supports that.  I see that you don't agree with

22     me, but that's how it strikes me.

23             THE COURT:  Well, you don't have one that

24     supports your position either, and so we're at a toss-up,

25     and I've got to decide, under the federal rules, whether

```
 1    this is proportionate, and I don't see how it possibly is.
 2    It's a waste of time, from my point of view, waste of
 3    time, an effort to get information about an issue that
 4    cannot affect the outcome of this case, either liability
 5    or damages.
 6             MR. HOLDING:  Okay.  So I'll just say, again,
 7    the question in their case is what are their actual
 8    damages, not did they pay an overcharge.  They're not the
 9    direct purchasers.  The question is, what is their actual
10    damages, which means end of the day, netting it all out,
11    what did they pay out, what did they take in from other
12    sources, how much are they out.  And the premiums are
13    their best guess to estimate and get a prepayment for what
14    those -- they may be right, they may be wrong, they may
15    have missed it.  They could say, Look we guessed wrong,
16    and we missed it by this much, and their damages are
17    there, but to pretend the premiums don't exist, which is
18    what I think they're asking the Court to do, just doesn't
19    make sense with what the business of being an insurer is.
20    Where else does their money come from?
21             THE COURT:  Of course their money comes from
22    premiums, of course it does.  That's not the issue.  The
23    issue is they've taken in premiums.  They're hoping to
24    have very few claims, they're hoping nobody uses Aggrenox,
25    either version of it, and they're either going to guess
```

1    right or wrong on general prescription drug use and

2    general use of generics and general pricing, etc., etc.

3    They're making all kinds of generalized assumptions in

4    order to set the price of their product, their product

5    being a risk-shifting insurance policy.  That is unrelated

6    to whether they've been damaged or not.  They've been

7    damaged if the cost that they had to reimburse is higher

8    than the cost that they would otherwise have to reimburse,

9    either because more people use it -- they can't blame you

10   for that -- or because the price was too high.  They can

11   blame you for that.  The premiums are what the premiums

12   are, and they're based on assumptions, and they can

13   change, yes, they can, but it doesn't matter if they

14   change or not because they're always predictive, and

15   they're always attempting to look at what is going to be

16   our experience with use, price, etc.  And the fact that

17   the use, price, etc. is different than they predict when

18   they set the premiums doesn't matter.  They've been harmed

19   if they're paying out $130 rather than $50.

20           MR. HOLDING:  Not if they've planned it

21   correctly, I don't think so.

22           THE COURT:  We're going to have to disagree.

23   We've been going around and around --

24           MR. HOLDING:  Okay.

25           THE COURT:  -- and we're just going to have to

1    disagree on that one.

2              MR. HOLDING:  So I just want to be clear.  I

3    asked to take depositions and for discovery about the

4    change in 2015.  I just want to be sure I understand what

5    your ruling is on that.

6              THE COURT:  I'm overruling that request.  I'm

7    sustaining the objection which I assume would be made to

8    that request because I don't think it helps, and I don't

9    think it matters legally, and I don't think it matters

10   factually.  And if you can come back and show me a bunch

11   of cases where premiums are deducted somehow from the

12   costs that an insurance company pays out or otherwise show

13   me that a particular prescription drug has been held to

14   affect premiums in a way that it's treated as an offset

15   when that price changes, I will reconsider.

16             MR. HOLDING:  Thank you.

17             THE COURT:  I think we ought to give our court

18   reporter a little bit of a break.  She's been going for

19   over two hours.  We're done with the first of these two

20   big motions, is that right?

21             MR. ELFAND:  That's right, Your Honor.

22             THE COURT:  All right.  Let's take a ten-minute

23   break.  We'll stand in recess.

24             (Recess:  3:06 p.m. - 3:15 p.m.)

25

1          THE COURT:  All right, we're moving on now to

2     the motion regarding search terms, basically, the search

3     for responsive documents.  I'm inclined to give you my

4     sense of how that ought to come out term by term, and then

5     we can focus on it.

6          It looks to me like search terms 1, 2 and 14 are

7     probably appropriate; that terms 5, 6, 8, 11, 12 and 13

8     are probably inappropriate.  And the others might be with

9     certain adjustments, but I don't know if that's going to

10    help focus your argument or not, but that's kind of how I

11    saw it.

12         MR. KESSLER:  I apologize, Your Honor.  I was

13    trying to grab my list, and I did not catch all your

14    numbers.  I apologize.

15         THE COURT:  Yes, sure, no problem.  So 1, 2 and

16    14 I think should -- those search terms should be used.

17    Five, 6, 8, 11, 12 and 13 appear to me to be

18    inappropriate, and the remainder are ones that might well

19    be appropriate if they were modified in some way.

20         MR. KESSLER:  Okay.  This is David Kessler from

21    Norton Rose Fulbright for Boehringer.

22         So I have good news for Your Honor, which I'd

23    like to start with given the time of the day.  I believe

24    11, 12 and 13 were withdrawn by us before they filed a

25    response, so we can take those, I believe, off the table.

1    Is that correct?

2          MR. KOHN:  Yes.  We'd like Your Honor to pick

3    three others, though, that are inappropriate.

4          MR. KESSLER:  So I do want to actually focus on

5    some of the others that you've referenced.  I should note

6    that most of these search terms have been agreed to by the

7    other plaintiffs.

8          THE COURT:  I've read your papers.

9          MR. KESSLER:  Right.  I think 5 and 6 really go

10   to a very important issue in this case.  You can't really

11   separate out Mirapex given that we believe they took

12   contradictory positions in earlier litigation that would

13   be important for this matter.  Now, the search term, one

14   might argue, is overly broad.

15         THE COURT:  All right, we're not going to try

16   Mirapex in this case, right?

17         MR. KESSLER:  No.

18         THE COURT:  So if you have a prior inconsistent

19   position they took in a court case, it's potentially

20   something you can use in evidence in this case, but if

21   there's an email communication between Tom and Betty that

22   talks about Mirapex, why do we care about that?

23         MR. KESSLER:  Because if they incorporated their

24   contradictory position in that email, then we would -- we

25   would want to have that.

1          THE COURT:  It doesn't matter to me.  If Tom and

2     Betty agreed that the contrary position was absolutely

3     wonderful, we endorse the contrary position a hundred

4     percent, so what?  The issue is what did they say in

5     court?  Is there a judicial admission that is admissible,

6     as such, in this case?  We're not going to -- we're not

7     going to retry this other case here.

8          MR. KESSLER:  And I'm not asking you to retry

9     that case here, Your Honor.  I hope that's not the

10     impression.  But if they made a party opponent admission

11     about Aggrenox versus Mirapex, that matters, and

12     understand I'm not saying I need the whole --

13          THE COURT:  All right.  Give me an example.

14     What is the smoking gun you're looking for?  Tom tells

15     Betty what?

16          MR. KESSLER:  That the value in the Aggrenox --

17     well, wouldn't use Aggrenox -- the issue here is what

18     could be found outside of the Aggrenox, right, but they

19     say that the value -- there was no value in Mirapex

20     settlement, all the value was in the other litigation or

21     the other settlement or the other piece of the settlement.

22          THE COURT:  Right.

23          MR. KESSLER:  That would be --

24          THE COURT:  So what?  Now you're saying we're

25     going to compare -- we're going to try this other case so

1    the jury can now compare this other case to our case.

2    Doesn't matter.  If there was or wasn't value in Mirapex,

3    so be it.

4              MR. KESSLER:  Right.

5              THE COURT:  What we're trying is was there or

6    was there not value in Aggrenox?  And you're going to have

7    evidence about there was value, and they're going to have

8    evidence that there wasn't value.  Whatever people thought

9    about Mirapex doesn't matter.

10             MR. KESSLER:  Well, Your Honor, I appreciate

11   your perspective, but you have to understand they're

12   not -- they're tied.  If I believe that there was no value

13   in Mirapex, and I said there was value in the other

14   litigation or the other patent or the other settlement,

15   even -- remember, the issue here is not whether you agree

16   with our argument but whether we have a right to look for

17   documents that would support our defense, right?  The

18   important thing here is they will not find any of those

19   documents searching merely for Aggrenox and dipyridamole,

20   right?  They're not doing a reasonable search to help us

21   find that story.

22             THE COURT:  Okay, before we worry about them

23   finding them, I still need to be convinced why this is

24   important.  Spell it out.  You've got a jury in the box.

25   You're making a closing statement.  Tell me why Mirapex

1    matters.

2              MR. KESSLER:  The reason Mirapex matters is

3    because in the conversation about Mirapex, they

4    differentiate the -- part of the agreement around

5    Aggrenox.  So if there is no value in the Mirapex

6    settlement, there has to be value in Aggrenox.  Now

7    they've lost that, and now they've just flipped it.  Some

8    of the plaintiffs, who are sitting here today, were in

9    that case, and if they were talking internally about the

10   settlements of these patents in that dichotomy,

11   necessarily if they find all the value is in the other

12   settlement, the other portion had value, the

13   anticompetitive behavior with respect to Mirapex, it lends

14   credence to that the settlement here was not

15   anticompetitive, right?  And we need those communications.

16   We don't expect there to be many of those

17   communications --

18             THE COURT:  And why --

19             MR. KESSLER:  -- but --

20             THE COURT:  Why do you think -- assuming there's

21   value to this, why do you think you're not going to find

22   it by searching for Aggrenox?  You're saying, you're

23   distinguishing Mirapex from Aggrenox.  We think that

24   Mirapex has all the value and Aggrenox doesn't.

25             MR. KESSLER:  Right, and we do find, by the

1    way --

2              THE COURT:  So the word "Aggrenox" shows up, and

3    when they search for "Aggrenox" they're going to turn it

4    over.

5              MR. KESSLER:  Well, okay, but let's be clear.

6    We do find Mirapex documents in the documents they

7    produced.  They're not emails, they're not the same type

8    of documents that I'm looking for, but they don't

9    necessarily -- just because I search for one set of

10   documents using search terms in a commingled set, like

11   email or loose files, it does not necessarily mean that I

12   know what's outside of that set, right?  There is no

13   evidence, just because I couldn't find it inside the set,

14   that it doesn't exist outside the set, and that's why we

15   think they haven't done a reasonable search.  They haven't

16   looked for these types of documents.  We're entitled to

17   find those, in fact they agreed to produce them, right,

18   but if they don't look for them, we'll never find them.

19             Now, I agree that Mirapex is overly broad,

20   right?  We said so in our letters to them at the beginning

21   of this case.  The problem is, we don't know how they

22   communicated about these things.  We can't see their data,

23   right?  We asked them to provide limiters to us so we can

24   narrow down these searches and make them more tailored,

25   more focused.  Mirapex is the broadest of the search terms

1    in our set.  But we got no help in trying to focus these

2    searches, right?  There may be none, but I can't tell

3    that.  The only people who know that -- and they haven't

4    done the due diligence under 26(g) to establish that,

5    right?  The affidavits they provided, they can't possibly

6    know.  The CEO of one of these companies can't possibly

7    know how everyone has communicated about these topics,

8    right, so I should have the opportunity to go look, right,

9    go search.  If there's nothing there, there's nothing

10   there.  There's no burden.  Okay, we're done.  But if

11   there is something there and it's key, just like my

12   example, then I'm entitled to that document.  Whether you

13   think it's going to be persuasive to the jury or not,

14   that's a whole other question, but I should at least have

15   my documents to figure out what's my best argument, the

16   best story that I can put forward before you and the jury.

17   If I never see the information --

18           THE COURT:  But the class of documents you're

19   worried about are documents that reference Mirapex and

20   don't reference Aggrenox.

21           MR. KESSLER:  Correct.

22           THE COURT:  We're at trial; you offer a document

23   that says Mirapex is the greatest thing.  The settlement

24   has got huge value.  You offer that.

25           MR. KESSLER:  Except the opposite.

1          THE COURT:  It's got no value; you offer that.

2          MR. KESSLER:  Right.

3          THE COURT:  You offer it.  Objection.  How do

4   you get it in?

5          MR. KESSLER:  Well, I can lay the foundation

6   that the two settlements were connected, that they knew

7   they were connected, and that no value in Mirapex shows

8   that all the value was in Aggrenox.

9          THE COURT:  No, because now they're making that

10  assumption that you're making.

11         MR. KESSLER:  Well, first of all, 26(b) --

12         THE COURT:  If it said, Look, Aggrenox has great

13  value, that's an admission of a party opponent.  If it

14  says Mirapex has no value, you're a step or two away from

15  an admission of a party opponent.  It's an admission about

16  a different, although related, situation.

17         MR. KESSLER:  Well, I don't think I need to go

18  this far, Your Honor, to get the discovery I want because

19  26(b)(1) before December 1 and after December 1 made it

20  clear that the admissibility of the document --

21         THE COURT:  No --

22         MR. KESSLER:  -- isn't relevant to the scope of

23  discovery.

24         THE COURT:  Absolutely, but why should they go

25  search for Mirapex, which there may be a million documents

1    that talk about Mirapex?  Every prescription anybody has

2    ever filled for Mirapex is going to show up as a

3    responsive document that some lawyer has to look through

4    and say, Oh, that's just a prescription for Mirapex.  You

5    have to tie it somehow to this case to make it

6    proportional and not burdensome.

7              MR. KESSLER:  But, Your Honor, I agree with you

8    that "Mirapex" is overbroad, but the burden should be then

9    on them to say, Well, only a piece of Mirapex, because I

10   can't know their documents.  How am I to know what

11   limiters to add that will do this?

12             THE COURT:  Why should they suggest to you the

13   focus of your discovery?  You haven't focused this at all.

14   You're saying, Give me every document relating to this

15   drug.  They have to know what you want before they can

16   suggest a term.  If you can't say, Give us documents

17   relating to evaluations of the strength or weakness of

18   Mirapex --

19             MR. KESSLER:  But that's what we did, Your

20   Honor.  Our document requests and our letters say we want

21   documents -- we don't want all documents relating to

22   Mirapex.  Obviously not all of them are relevant.  We

23   focused it and we said to them --

24             THE COURT:  But that's what you're asking for

25   here.  Your term is "all documents mentioning or related

1    to Mirapex."  So what is your and, what is your or, what

2    are your parens?  What are you going to put in there?

3           MR. KESSLER:  So I'll tell you what we did with

4    Humana.  So let's talk about the negotiation we had with

5    Humana.  I can show that.  We did the exact same thing and

6    said, Humana, we're interested in Mirapex and the

7    settlement, your view on that settlement, right?  And they

8    said, Well, why don't we add and settle asterisk, so

9    wildcard, right, and we had a negotiation, but, Your

10   Honor, I appreciate that --

11          THE COURT:  Is that your request?  You want now

12   a search term that says Mirapex and settle exclamation?

13   Is that the request?

14          MR. KESSLER:  Sure.

15          THE COURT:  All right.  What's wrong with that?

16          MR. KOHN:  Well, we're certainly not going to

17   have anything about it.

18          THE COURT:  Right, so all the better.  You run

19   the search; no documents; you're done.  There's no burden

20   in running a search that's not going to come up with any

21   documents.

22          MR. KOHN:  Well, that's not entirely true.

23   There's some burden involved.  I mean, pretty soon you've

24   got people just plugging in all sorts of search terms into

25   software.  But I don't disagree with Your Honor.

1          THE COURT:  I'm a slow typist, but I bet I could

2     do that in four seconds, on my phone with my left hand.

3          MR. KOHN:  It has to do with the search tool

4     that's available at the client, but if the Court wants us

5     to run Mirapex and settle, we'll do it.

6          THE COURT:  All right, great.  You happy with

7     that?  You're not happy with that.

8          MR. KESSLER:  I am happy with --

9          THE COURT:  Wait, wait.  Wait a minute.  She's

10    not happy with it.

11          MS. SEGURA:  Your Honor, Susan Segura,

12    S-e-g-u-r-a, on behalf of Miami-Luken.  Miami-Luken was

13    not a plaintiff in this prior litigation that they are

14    talking about, and from my standpoint it seems unnecessary

15    to even run that search.

16          MR. KOHN:  In fact, I will say to the Court that

17    I believe that of the plaintiffs who were plaintiffs in

18    the Mirapex case and plaintiffs in this case, I think the

19    only plaintiff in both was Rochester Drug Cooperative,

20    Incorporated, and so why doesn't RDC be the one to run

21    that data?

22          MR. KESSLER:  Your Honor, I -- okay.  This is a

23    little frustrating because they all negotiated with me as

24    a single unit, and now they want to break it up into

25    pieces, which searches -- which we offered to do --

1          THE COURT:  All right.

2          MR. KESSLER:  -- and they decided not to do it.

3          THE COURT:  Why is that a bad idea?

4          MR. KESSLER:  I don't think, unless someone is

5    going to scream at me, that I particularly care if

6    Miami-Luken runs that search.  I would not expect them to

7    have those documents.  But can I just -- the reason I'm a

8    little uncomfortable with settle, but if that's what the

9    Court would like to be the wildcard, Humana talked to me

10   about it and said if we were going to do this, right, it

11   would have -- they represented to me, because they looked

12   at their data and maybe did search, you know, I don't know

13   that they know --

14         THE COURT:  Yes, look.  I know the other side is

15   always bad and acting in bad faith.  We're trying to

16   resolve these.

17         MR. KESSLER:  Yes, I know.

18         THE COURT:  So Mirapex and settle run by the

19   one --

20         MR. KOHN:  Rochester Drug.

21         THE COURT:  Rochester Drug, right?  Is that

22   good?

23         MR. KESSLER:  Yes, Your Honor.

24         THE COURT:  All right.  So what have you got

25   next?

1              MR. KESSLER:  I don't know how to go through all

2     of these.  Let's talk about the 10a, b and c, all right?

3     These are searches designed to capture communications

4     between the plaintiffs and each other about this case.

5              THE COURT:  Right.

6              MR. KESSLER:  They are very narrowly tailored.

7     They will only be about this case.  In fact, the number,

8     right, are -- the DPPs have said we're not getting any of

9     this because all this search is prior to this case opening

10    up.  That's not entirely true.  Plus the plaintiffs have

11    said they want to continue moving discovery forward, so I

12    don't want to come back before Your Honor to negotiate

13    this.  They've said in their document requests they

14    produced these documents.  They don't necessarily use the

15    term Aggrenox and dipyridamole, right, so if they're

16    talking about the Boehringer antitrust suit or the Teva,

17    none of that is going to get found, right?  And these

18    aren't going to bring back huge amounts of documents, and

19    we don't know of any burden, right, because the

20    plaintiffs, EPPs, have not provided any evidence that any

21    of this would be burdensome, right?  They didn't provide

22    any facts that it's going to bring up a lot of searches --

23             THE COURT:  Let me just tell you my problem.

24    The description in 10 of the search terms doesn't meet

25    your suggestion about what it's going to find.  You say

1    that the DPPs agree to produce "documents concerning any

2    communications between or among the DPPs and any other

3    plaintiff concerning Aggrenox, generic Aggrenox or any

4    other antiplatement treatment."  But what you're getting

5    at in this search is, in fact, not that.  You're getting,

6    for example in "a," a newspaper article that Humana was an

7    antitrust plaintiff in a case involving aspirin, or in "b"

8    you're getting the fact that Rochester Drug was sued for

9    antitrust by some nursing home or whatever.  You're not

10   getting documents concerning communications about

11   Aggrenox, generic Aggrenox or other antiplatelet treatment

12   because you're not even using those terms in your terms.

13            MR. KESSLER:  But that request goes to Aggrenox

14   and dipyridamole, which are the basis of this case.  It's

15   meant to get to communications related to this case.  This

16   case is about Aggrenox and dipyridamole, but you can

17   have --

18            MR. KOHN:  Your Honor, may I be heard?  I agree

19   with Mr. Kessler, the case is about Aggrenox and

20   dipyridamole, and that's why our search terms, Aggrenox

21   and dipyridamole, would have brought forth any documents

22   about these other parties or this lawsuit.  That's the way

23   you get to documents about this lawsuit.  You put the name

24   of the lawsuit into it.  Our clients don't speak about,

25   you know, patent numbers, NDA numbers; they speak about

1       the name of the lawsuit, if they speak about it at all.

2                    THE COURT:  Or the product.

3                    MR. KOHN:  Yeah, the product.

4                    THE COURT:  Right.

5                    MR. KESSLER:  Your Honor, very careful about

6       how -- we should all be very careful about how we think

7       other people speak, right, because we don't actually know,

8       and the reality is I'd be talking about -- I gave a good

9       example, the Boehringer and Teva antitrust case, that

10      would be about this case, one could presume it would be

11      about this case and not mention Aggrenox or dipyridamole,

12      and we don't know how many of those communications exist.

13      There's been no evidence that they've tried to find them.

14      We don't know how much it would cost them to get those,

15      but --

16                   THE COURT:  Okay.  So why don't we search for

17      Boehringer antitrust.

18                   MR. KOHN:  So Boehringer and antitrust, okay.  I

19      will note that 10a through c don't say the words

20      Boehringer or Teva, but --

21                   THE COURT:  Right, I know.

22                   MR. KOHN:  So we'll do --

23                   MR. KESSLER:  I tried capturing with antitrust.

24      This is a negotiation that I wanted to have with the

25      DPPs --

1          THE COURT:  I know.

2          MR. KESSLER:  -- and they refused.

3          THE COURT:  And they wanted to have one with

4    you, and that didn't work either.

5          MR. KESSLER:  Fine, but if we're going to do

6    this live, which I'm happy to do, I can talk -- maybe we

7    should do this --

8          THE COURT:  We're doing this live.

9          MR. KESSLER:  I don't know if you really want to

10   go through this, but we could talk about BI, Boehringer

11   Ingelheim, Boehringer, BIPI, right, Teva, Barr.

12         THE COURT:  Fine.

13         MR. KOHN:  Can we just do Boehringer and forms

14   of that because if we do Teva and antitrust, we're going

15   to get a whole lot of documents, and they're going to be

16   just not related to this case at all.

17         MR. HOLDING:  I object.

18         THE COURT:  Yes, fair enough.  I agree.  It's

19   unlikely that somebody would refer to this case as a Teva

20   case rather than a Boehringer case, right?  That should

21   make your objection withdrawn.

22         MR. HOLDING:  Delighted to hear that, Your

23   Honor.

24         THE COURT:  All right, so are we done with 10?

25         MR. KESSLER:  I believe so, Your Honor.

1              THE COURT:  Okay, what else?

2              MR. KESSLER:  I'm trying to -- I guess we start

3     at the top.  The first two are yeses.

4              THE COURT:  All right.

5              MR. KESSLER:  You said, I guess, no to 3a and

6     3b.

7              THE COURT:  I didn't say no.  I said this is a

8     modifiable one.

9              MR. KESSLER:  Right.  The other -- I don't know

10    what's your -- I guess may I ask your concern?  The other

11    parties, Humana, the EPPs, I believe -- I should check

12    that before I say that.

13             THE COURT:  So -- all right.  So this would get

14    any document relating to the launch of any generic drug --

15             MR. KOHN:  I was going to say that.

16             MR. KESSLER:  Well, at -- yes.

17             THE COURT:  -- period, which is hugely

18    overbroad, right?  There are lots of generic drugs.  Many

19    of them have actually been launched, right?  In fact,

20    probably all of them have.  So I'm not sure what you're

21    looking for, but --

22             MR. KOHN:  So I actually do know what he's

23    looking for.  If you look at our Appendix A, which I think

24    is kind of handy in order to condense all of the arguments

25    that are being made, on the first page, the last row as

1    this one, Mr. Kessler says that the directs' approach to

2    purchasing drugs at risk might be relevant to damages, and

3    what he's theorizing is, well, maybe if the directs in the

4    but-for world, if Teva had launched generic Aggrenox at

5    risk, maybe the directs would have been shy about buying

6    it because maybe there would have been some infringement

7    consequence to purchasing a drug at risk, the infringing

8    nature of which had not yet been fully and finally

9    determined by a court of law.  And so what he wants, he

10   says, are documents that bear on that question, and I

11   think the best way to get at that is just to ask a

12   deposition question, which is how it's been handled in

13   other cases.  In fact, I'm in other cases where that

14   question was asked because of that issue that the defense

15   attorneys thought of.

16            MR. KESSLER:  Thank you.  I think the actually

17   better way to handle this, now that he has gone that

18   direction, as a compromise we switch the "or" between

19   "launch" and "at risk" to an "and."  That will now limit

20   it only to generic matters where there's a question about

21   at risk.  And that would significantly, I would expect,

22   reduce the number of documents and would allow me to

23   cross-examine at the deposition because I actually have

24   the documents in front of me to see if the testimony

25   matches the ordinary course materials.

1            THE COURT:  Well, you're still getting every

2    generic, so why wouldn't it be "launch" and "at risk" and

3    "antiplatelet"?

4            MR. KESSLER:  I learned long ago to quit while

5    I'm ahead, so that's fine, I think, by us, or how about

6    antiplatelet and platelet because they --

7            THE COURT:  Fine.

8            MR. KESSLER:  Okay.

9            THE COURT:  Antiplatelet or platelet.

10           MR. KESSLER:  Yes.

11           THE COURT:  All right.  Okay, that's fine.  Any

12   problem with that?

13           MR. KOHN:  We'll live with that, Your Honor.

14           THE COURT:  All right.

15           MR. KESSLER:  Could we then do a similar

16   adjustment with respect to 3b and drop authorized generic

17   and generic and replace it with platelet or antiplatelet?

18           MR. KOHN:  So it would be platelet or

19   antiplatelet within 50 of market or launch?

20           MR. KESSLER:  Yes.

21           MR. KOHN:  So we'd get every drug that was

22   characterized as an antiplatelet drug or platelet drug

23   that was launched.

24           THE COURT:  It's the same search except you

25   don't have the limitation of at risk.  You're making "b"

```
 1   just duplicative of "a."

 2                MR. KESSLER:  Okay, I agree with you, Your

 3   Honor.  Thank you.

 4                THE COURT:  Four is another one that I think is

 5   just way overbroad.  Any document relating to a generic

 6   substitute?

 7                MR. KESSLER:  It's very hard to do this live.

 8                MR. ELFAND:  If we could flip in the last one

 9   for 3, we would prefer authorized within 2 generic and

10   anti -- and antiplatelet.  Would that be okay?

11                MR. KOHN:  Yes, is that in lieu of launch at

12   risk or --

13                MR. KESSLER:  No, in lieu of 3b.  Instead of

14   saying 3b, as the Court has pointed out that once you make

15   that change it makes it redundant, we're recommending that

16   instead we do authorize within 2 of generic.

17                MR. KOHN:  So we'll get every -- any discussion

18   of any authorized generic version of any antiplatelet

19   drug, and your own Appendix A says that there are hundreds

20   of antiplatelet drugs.  So we're going to end up

21   getting -- I don't know that all of them have authorized

22   generics, but it is a common strategy, and so we're going

23   to get a whole lot.  What are we getting at there?  What

24   are you guys seeking?

25                MR. ELFAND:  I thought there would be a limited
```

1    amount of authorized generics.  I didn't think that would

2    be that burdensome.  But there is a specific amount of

3    authorized generics for antiplatelets.  It's not a huge

4    number.  That's why I thought that would be reasonable.

5              THE COURT:  But what does that get you?  If you

6    find out there's documents relating to an authorized

7    generic for a different antiplatelet drug than Aggrenox,

8    how are you going to use that?

9              MR. KESSLER:  Well, because I think the plan is

10   that how I treat -- when you limit the search only to

11   Aggrenox and how to focus on Aggrenox, you can have a

12   broader policy that talks about authorized generics,

13   authorized generic launches and the market for authorized

14   generics as compared to branded without referencing

15   Aggrenox, but still -- and this is where it's key, this is

16   something that we've had this issue with, the notification

17   of the DPPs about, is that that document can still be

18   relevant and inform how the DPPs feel about Aggrenox just

19   because it talks about the broader universe of material,

20   universe of drugs.  And we need that information because

21   we need that broader feel to know what they really feel

22   about Aggrenox itself and how Aggrenox launched,

23   whether -- in this case authorized generic of Aggrenox

24   launched.

25              MR. KOHN:  But then Aggrenox, our search term

1    that we've already used, or dipyridamole, the search term

2    that we've already used, would have taken care of that.

3              THE COURT:  Yes, I think so.

4              MR. KESSLER:  Well, except -- this is where we

5    have this issue, Your Honor.  If they said -- hypothetical

6    example -- we don't believe that the price differential

7    for a launch at risk, this talks more about 3a than 3b,

8    right, for an authorized generic is significant, right,

9    which would be a significant issue in the middle of a

10   litigation --

11             THE COURT:  And that's one you're getting.

12             MR. KESSLER:  Right, but authorized generics and

13   launches generally, right, I want to know -- and

14   especially if you limit it to platelets -- that their

15   philosophy about those entrances into the market or the

16   market for those tells us about what they think the market

17   for Aggrenox will be after the launch of the authorized

18   generic.  It's very -- even though this case is all about

19   Aggrenox and dipyridamole, those two words don't define

20   the universe of documents that could be responsive or even

21   material to our defense, right, and that's what the

22   exercise we're going through is.  So I don't know, right,

23   that there are any documents here that I want, I'm

24   speculating as the DPP said, but so are they when they say

25   there's a lot.

1          THE COURT:  So for 3b you're asking authorized

2     within 2 generic and antiplatelet?  Is that right?

3          MR. KESSLER:  Within 50 of market or launch,

4     yes, I believe that's what -- one of the problems I have,

5     of course I don't know what -- there might be better terms

6     that they could suggest to me, but they haven't partaken

7     in that, so I'm doing this sort of without any real

8     knowledge of how the documents --

9          MR. KOHN:  We could do that, but it's still not

10    clear what you want.  Is your supposition that there's

11    some different purchasing patterns that wholesalers engage

12    in for authorized generics versus ANDA generics?

13         MR. KESSLER:  Yes, and/or how you feel, the

14    pricing issues -- this is why I don't have any feel for

15    the information.

16         MR. KOHN:  See, we actually have, Your Honor, we

17    have declarations that we put forward in this case, and I

18    have Mr. Rattini's declaration.  He's the president and

19    CEO of Miami-Luken.  This is dated November 20 of 2015.

20    Miami-Luken doesn't distinguish between authorized

21    generics and other generics.  RDC does not distinguish

22    between authorized generics and other generics.  They're

23    fungible.  That's why they're launched.  They're launched

24    so that they capture a portion of what would otherwise be

25    the generic sales enjoyed by the -- by the ANDA generic.

1    So this whole idea is -- it's going to pick up a lot of

2    junk, is what it's going to pick up, and the problem is I

3    think this is better approached, this speculative theory,

4    at a deposition.  Just ask.  Do you treat -- do you think

5    about authorized generics as different in some way than

6    other generics, Mr. Wholesaler CEO 30(b)(6) witness, and

7    there will be an answer to that question.  I can tell you

8    what I think the answer is, but they'll get their answer.

9         MR. KESSLER:  But, Your Honor, they've told us

10   they will give us these documents that we're entitled to,

11   and I can't effectively cross-examine a witness without

12   them.

13        And let's also look at their own production.

14   Now, they've only produced -- not that many documents in

15   this case, but in documents they've produced, we have

16   found that our search terms hit on responsive documents.

17        I don't know what they would do unconstrained by

18   Aggrenox and dipyridamole.  Neither do they because they

19   didn't do the investigation.

20        THE COURT:  Okay, but now we're talking about 3a

21   and b, okay?  You got 3a, the launch of at risk

22   antiplatelets.

23        MR. KESSLER:  Right.

24        THE COURT:  Okay?

25        MR. KESSLER:  Right.

1          THE COURT:  So --

2          MR. KESSLER:  But there's also a launch without

3    at risk, and we limit this one by authorized generic

4    versus just purely generic.  With the Court's guidance

5    we've added platelet or antiplatelet to continue to narrow

6    that field down, but we need the information about what

7    they're thinking about or what their policies are or how

8    they feel about authorized generics in this -- not

9    because -- I don't need the red herring product market

10   because they will speak to Aggrenox and dipyridamole.

11         THE COURT:  I really don't see that, frankly.  I

12   mean, I think this is getting pretty broad.

13         MR. KESSLER:  Okay.

14         THE COURT:  I think you'll get what you need

15   from 3a.

16         MR. KESSLER:  Okay.

17         MR. KOHN:  Your Honor has already given an

18   opinion on 4, generic or therapeutic and substitution,

19   which is -- you know, that's generic drugs, all of them.

20         THE COURT:  Right.

21         MR. KOHN:  So if there's something different

22   about Aggrenox or dipyridamole than our search terms,

23   we've already captured anything about substitution for

24   Aggrenox or dipyridamole.

25         MR. KESSLER:  Your Honor, I would ask that if

1   the Court doesn't want to grant this request, that it

2   limit it once again by antiplatelet or platelet, all

3   right?  That would limit it to their documents about the

4   substitution of generics and their -- substitutions in

5   that field.  You could have documents discussing that

6   market, focus on Aggrenox -- this is not about product

7   market, right -- that would be responsive to our requests

8   and would be useful in our defense.

9            Remember, search terms don't determine

10  responsiveness.  They're going to review these documents,

11  right?  There may be documents in that search that I'm not

12  entitled to --

13           THE COURT:  That's the problem, though.  When

14  you have a wildly overbroad search term, some lawyer has

15  to look at all the responsive documents to figure out --

16  or all the documents that are kicked out to decide what's

17  actually responsive.  And so there needs to be reasonable

18  limits on these searches so we don't have hundreds of

19  thousands of documents that some lawyer has to look at.

20           MR. KESSLER:  I completely agree, Your Honor,

21  and if you look at our correspondence, tell us how to

22  limit these -- because we don't know -- you know, just as

23  we talked about at the very beginning of this hearing,

24  right, I don't know what terminology they would use that

25  would effectively limit the documents.  I can't know,

1    right?

2              THE COURT:  Well, they can't know either.  They

3    can't know.

4              MR. KESSLER:  There are ways they could

5    reasonably investigate that would provide --

6              THE COURT:  Well, okay.  Let's not have that

7    fight.  Let's just try to figure this out.

8              MR. KESSLER:  Yes.

9              THE COURT:  What if we simply say at the end of

10   4 within 5 of antiplatelet.

11             MR. KOHN:  All right, Your Honor, we'll do that.

12             THE COURT:  All right?

13             MR. KESSLER:  Okay, thank you, Your Honor.

14             THE COURT:  We talked about 5.

15             MR. KESSLER:  We talked about 5.  Given how

16   narrow 6a and 6b are, which are the patents in and around

17   Mirapex, can we have RDC search those?

18             MR. KOHN:  Well, RDC doesn't refer to patent

19   numbers.  There were some documents that were in our

20   production that was the product of third-party discussions

21   of the Aggrenox lawsuit, the patent lawsuit, and a patent

22   number got picked up that way.  We're wholesalers.  We're

23   not tracking litigation.  We sell products, drug products.

24             MR. KESSLER:  But, Your Honor, (a), discovery

25   isn't limited to what they create, it's what's in their

1    possession and control.  They agreed these documents were

2    responsive.  They gave them to me.  And these are really

3    narrow.  They're not going to hit a bunch of nonresponsive

4    documents.

5            THE COURT:  Yes, that's fine.  I think it's

6    probably silly, but just run it, just run it.  I don't

7    think you'll come up with anything.

8            MR. KESSLER:  With respect to 7, 7 is designed

9    to get at what 10 was designed to get at, cross companies,

10   internal discussions of either this case or the co-promote

11   or promotion agreement that's at issue in this case.  So

12   the internal discussions, the internal monologue of the

13   plaintiffs', the DPPs' feelings about the substance of

14   this litigation.

15           Now, I agree with you that there could be

16   documents that use Aggrenox.  They don't necessarily use

17   Aggrenox.  I don't think this is extremely broad.

18           THE COURT:  Well, I do.  If you look at this,

19   any document that has the word Teva and antitrust in it

20   will come out.

21           MR. KESSLER:  You're right, Your Honor, correct.

22           THE COURT:  So we've got to pare it down in a

23   reasonable way.  Do you really think that Teva is going to

24   be mentioned and BI is not?

25           MR. KOHN:  And, Your Honor, the justification

1   for this particular search string in Mr. Kessler's motion

2   is that he's interested in whether the wholesalers valued,

3   placed a value upon the Duramed co-promotion agreement for

4   Aggrenox or this other -- I don't think it was ever

5   marketed, maybe it was, this drug called flibanserin --

6           MR. KESSLER:  Flibanserin, yes.

7           MR. KOHN:  Okay, flibanserin, thank you very

8   much for that -- that that's relevant, but we ran

9   Aggrenox, and we even ran flibanserin, and so any

10  valuation, any discussion of any co-promotion agreement

11  that was entered into with regard to those drugs would

12  have been picked up by those search terms.  We searched

13  Aggrenox, dipyridamole and flibanserin.

14          MR. KESSLER:  Your Honor, that's an assumption,

15  right?  That's not a fact, right?  You could easily -- we

16  think that the Boehringer/Teva co-promote is a brilliant

17  legal strategy with lots of value.  Is that document

18  likely to exist?  No, but making assumptions about how

19  people speak and assuming that every time they're going to

20  talk about Aggrenox, or that co-promote regarding

21  flibanserin or future of flibanserin, they're going to use

22  that term, is very risky.  They've never measured the

23  recall, right?  They're supposed to find all -- do a

24  reasonable search to find all responsive documents.  They

25  assumed it.

1          MR. KOHN:  Your Honor, my colleague, Ms. Segura,

2    has pointed out to me that this is also duplicative of

3    search term Number 2, which you've given them.

4          THE COURT:  Yes, it's also duplicative of

5    Number 8.

6          MR. KOHN:  Which you said is inappropriate.

7          THE COURT:  Right.

8          MR. KOHN:  So I think Number 2 takes care of 7

9    and 8.

10          MR. KESSLER:  Your Honor, I think it would be

11    appropriate to limit 7, remove Barr or Teva.

12          THE COURT:  What is it about 2 that's not going

13    to get what you want?

14          MR. KESSLER:  Well, 2 focuses on the value that

15    we found in the agreement, in the promotion.  That was one

16    of the key defenses for us.  This could talk about whether

17    they thought someone was anticompetitive.  Boehringer and

18    antitrust, right, would get me those documents.

19          MR. KOHN:  We're already running that at your

20    request with regard to 10a through c.  You asked us to do

21    that.

22          MR. KESSLER:  No.  And by the way, I should make

23    it clear -- and this is not clear in the document, I just

24    realized -- I don't expect Rochester to search Rochester

25    Drug, right?  That would bring back everything, right?

1       What I'm saying in that one, in case it was unclear to

2       everyone, right, I want you to search for the other

3       plaintiffs, not search for your own name because that

4       would --

5               MR. KOHN:  Cause the system to explode.

6               MR. KESSLER:  Right.  But you notice Boehringer

7       doesn't appear in any of those search terms.  So there's

8       an internal discussion between your CEO and your CFO --

9               MR. KOHN:  I'm sorry, what are we talking about

10      now?

11              MR. KESSLER:  With 7.  You said 7 was

12      duplicative of 10, and it's not duplicative of 10 because

13      Boehringer and BIPI do not appear within 10.  So this will

14      find documents, internal documents, say, between your CEO

15      and your CFO talking about this antitrust case with

16      Boehringer.

17              MR. KOHN:  Yes, but your justification for 7 has

18      nothing to do with that.  You say that you want the

19      valuation of the Duramed co-promotion for Aggrenox and

20      flibanserin, and you point us to your Requests 55 and 59

21      which has to do with Teva's promotion.

22              MR. KESSLER:  But why is that important?  It's

23      important because of this case, right?  I do want those

24      values.  If you're battling whether this case has value or

25      not, you're valuing on that basis.

1           MR. KOHN:  Your Honor, my point was that you're

2    already giving that to them with regard to Search 2, which

3    will pick up anything about Duramed's promotion of,

4    frankly, any drug, whether it be Aggrenox, flibanserin,

5    Cinestin, other Duramed drugs to the OB-GYN specialty,

6    which is what's at issue in this case.

7           THE COURT:  All right, looking at 10 for a

8    second, didn't we already deal with 10?

9           MR. KESSLER:  Yes, we did, Your Honor.

10          THE COURT:  And didn't we agree that 10 is going

11   to be basically Boehringer and antitrust?

12          MR. KOHN:  Yes, Your Honor, that's exactly

13   right.

14          THE COURT:  So when we have that, what else are

15   you getting out of 7, if that's what you're really looking

16   for in 7?

17          MR. KESSLER:  I apologize, Your Honor, my notes

18   don't reflect that, but I can't --

19          THE COURT:  I think that's the answer.

20          MR. KESSLER:  Okay.

21          THE COURT:  And I think that knocks out 7 and 8.

22          MR. KESSLER:  Okay, sorry.  Then let's move on,

23   Your Honor.  I apologize.

24          MR. KOHN:  There's only one left, which is 9a

25   and 9b, and we have declarations that we just don't talk

```
 1   about drugs by their -- by their NDA or ANDA number.

 2   Those are numbers that are index numbers assigned by FDA

 3   for their approval process.  We only refer to drugs either

 4   by their NDC number or their name.  We don't even use the

 5   NDC number.  We use an inventory number of our own.  So

 6   hard-coded in our systems are the names of drugs.  They're

 7   not truncated.  It's Aggrenox.  It's dipyridamole.

 8            MR. KESSLER:  Well, wait.  I want to be clear.

 9   You've already agreed to run the abbreviations and

10   misspellings of Aggrenox, right?  We're not arguing that

11   motion.  That was agreed to by all the parties.  I brought

12   in the motion.  You didn't contest it, right?

13            MR. KOHN:  Yes.

14            MR. KESSLER:  Okay, I just want to make sure

15   we're on the same page with that.

16            MR. KOHN:  We agreed to run it.

17            MR. KESSLER:  Right.  The new drug applications,

18   these search terms come up in their documents that they

19   produced to us.  The fact that they don't create them once

20   again is not the standard.  I don't think these are

21   particularly overly broad, but to make them even narrower

22   so that we reach compromise, why don't we only search for

23   NDA within 20 of that number and ANDA within 20 of that

24   number.  I can't imagine it's going to bring back a lot of

25   irrelevant documents.
```

1           MR. KOHN:  Your Honor, this is the ANDA for

2    generic Aggrenox and the NDA for Aggrenox.

3           THE COURT:  Right.

4           MR. KOHN:  And that's -- so any document that --

5           THE COURT:  But it's not a big deal.  Let's

6    search those numbers.  So basically the last parenthetical

7    or I guess the only parenthetical in "a" and the only

8    parenthetical in "b," all right?  So we're good?

9           MR. KESSLER:  I think we are, Your Honor.

10           THE COURT:  All right.

11           MR. KOHN:  Your Honor, can we -- one request.

12    Instead of within 20 of those NDA numbers, can we shorten

13    that because we have tons of numbers in our systems

14    because we're buying, we're selling, so it would be very

15    nice to have the NDA within three or four of those -- of

16    those numbers.  So the proximity, instead of within 20,

17    being within four?

18           THE COURT:  Let's make it 10.

19           MR. KESSLER:  Thank you, Your Honor.

20           THE COURT:  Okay.  All right.  I think we're

21    done.  I hate to put an end to the party.  The DJ is

22    leaving the building.  Is everybody happy?

23           MR. KOHN:  No.

24           MS. SEGURA:  No.

25           MR. KESSLER:  I'm going to say yes, Your Honor.

1          THE COURT:  That's good, that's good.  If

2    everybody is not happy, then we've had a productive day.

3          All right.  Unless there's anything else, we'll

4    stand in recess.  Thank you.

5          MR. KOHN:  Thank you, Your Honor.

6          MR. KESSLER:  Thank you, Your Honor.

7          (Whereupon, the above proceedings adjourned at

8    4:01 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



                    October 20, 2016


                    /S/ Sharon L. Masse
                  Sharon L. Masse, RMR, CRR
                    Official Court Reporter
                    915 Lafayette Boulevard
                Bridgeport, Connecticut  06604
                    Tel: (860)937-4177