```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                                :
IN RE:                          :  No. 3:14-MD-2516(SRU)
                                :  915 Lafayette Boulevard
AGGRENOX ANTITRUST LITIGATION   :  Bridgeport, Connecticut
                                :
                                :  April 3, 2017
- - - - - - - - - - - - - - - x
```

              ORAL ARGUMENT ON MOTION FOR ATTORNEYS' FEES


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

   FOR THE DIRECT PURCHASER CLASS PLAINTIFFS:

       GARWIN GERSTEIN & FISHER LLP
             88 Pine Street
             New York, New York  10005
       BY:   JOSEPH OPPER, ESQ.


       ODOM & DES ROCHES, LLC
             650 Poydras Street, Suite 2020
             New Orleans, Louisiana  70130
       BY:   DAN CHIOREAN, ESQ.


   FOR THE BARR/TEVA DEFENDANTS:

       GOODWIN PROCTER, LLP
             Exchange Place
             Boston, Massachusetts  02109
       BY:   SARAH K. FREDERICK, ESQ.


(continued)

FOR THE BARR/TEVA DEFENDANTS:

     PULLMAN & COMLEY LLC
          850 Main Street
          P.O. Box 7006
          Bridgeport, Connecticut  06601-7006
     BY:  JAMES T. SHEARIN, ESQ.


FOR THIRD-PARTY GYMA LABORATORIES:

     BLANK ROME LLP
          The Chrysler Building
          405 Lexington Avenue
          New York, New York  10174-0208
     BY:  ROBERT J. KENNEY, JR., ESQ.

                    Sharon L. Masse, RMR, CRR
                     Official Court Reporter
                     915 Lafayette Boulevard
                  Bridgeport, Connecticut  06604
                      Tel: (860)937-4177

1              (Whereupon, the proceedings commenced at 2:03

2    p.m.)

3              THE COURT:  Good afternoon.  We're going to be

4    connecting someone by phone.  While my clerk is arranging

5    that, let me just get appearances, please.

6              MR. OPPER:  Yes, Joseph Opper for the direct

7    purchaser class plaintiffs.

8              MR. CHIOREAN:  Dan Chiorean for the direct

9    purchaser class plaintiffs, Your Honor.

10             THE COURT:  Thank you.

11             MR. KENNEY:  Robert Kenney, Blank Rome.

12             MS. FREDERICK:  Sarah Frederick from Goodwin for

13    the Barr and Teva defendants.

14             MR. SHEARIN:  Good afternoon, Your Honor.

15    Timothy Shearin for the same defendants.

16             THE COURT:  Okay.

17             (Pause.)

18             THE CLERK:  Good afternoon.  This is Michael

19    Landman from Judge Underhill's chambers.  We're just

20    checking to see if all parties listening over the phone

21    can hear us.

22             A VOICE:  We can.

23             THE CLERK:  All right, we can --

24             A VOICE:  Yes, we can.

25             THE CLERK:  We can hear you as well.

1          THE COURT:  All right.  We are here on the

2     motion for attorneys' fees.  I don't intend to take

3     appearances from folks on the phone unless you wish to

4     have your names listed on the record; instead, we're going

5     to proceed into argument.  So, Mr. Kenney, it's your

6     motion.

7          MR. KENNEY:  Thank you, Your Honor.

8          Your Honor, I'd like to start pretty much where

9     I started last time, which I believe was October.  GYMA

10    has always been happy to produce documents.  This dispute

11    arose mainly over the issue of costs.  GYMA, as we've

12    spent a lot of time writing about, is a small family-owned

13    company.  I know that the plaintiffs have taken some

14    umbrage with that statement based upon listings of some

15    addresses in other countries.  I spoke with Hal Lipton,

16    the owner of GYMA this morning, and he assures me that

17    those offices are mail drops and that they have some --

18         THE COURT:  Well, it doesn't really matter, does

19    it?

20         MR. KENNEY:  It doesn't.  They have 23

21    employees.  It's a small company.  This is a really large

22    endeavor for them.  And the reason that's important, it

23    goes towards the burden of this, complying with the

24    subpoena.

25         THE COURT:  Are you their ordinary counsel?

1          MR. KENNEY:  What's that?

2          THE COURT:  Are you their litigation counsel?

3          MR. KENNEY:  That's correct, Your Honor.

4          THE COURT:  Okay.  So they've hired you at your

5     current rates in the past?

6          MR. KENNEY:  Correct.  We've been their counsel

7     for various matters over the course of many years, Your

8     Honor.

9          THE COURT:  Okay.

10          MR. KENNEY:  As you know, it's a very complex

11     litigation, so when we received the subpoena, we didn't

12     really know what to make of it.  It was open-ended.  It

13     didn't have any really start or end time.  So we very

14     quickly had a conference call with plaintiffs.

15     Plaintiffs, actually, are the ones who initiated it.  And

16     they did actually narrow it somewhat, only within the year

17     mark, and they narrowed it to nine years, and that's still

18     a very lengthy time.  They didn't really narrow the

19     documents that they were looking for.  They explained all

20     the documents, but it sounded exactly the same as the

21     subpoena itself.

22          Without having a lot of information about the

23     litigation itself, sure, they sent us some documents.  We

24     were sort of left to wonder, without search terms, how to

25     go about searching, and that led to obviously discussions

1   over how we were going to do this and, of course, going to

2   our client to talk to them about where their documents

3   might be.  And as Your Honor might remember, there were

4   three servers that were used in the course of this

5   nine-year period.

6           THE COURT:  Right.

7           MR. KENNEY:  One was a Eudora server, one was a

8   Microsoft Outlook server, and then eventually everybody

9   was put onto Microsoft Exchange, and there was a period of

10  time where people were on two different servers.

11          THE COURT:  Right.  The Eudora server you say is

12  defunct.

13          MR. KENNEY:  Yes, Your Honor.

14          THE COURT:  You still had that server?

15          MR. KENNEY:  They had the server.  It was time-

16  consuming to obtain documents from it and to convert them

17  so that they were in a readable form, but we were able to

18  do that.

19          THE COURT:  Okay.  Well, I mean, down in my

20  basement I have an old Microsoft whatever, whatever.  If I

21  plug it in and I turn it on, I can see everything on

22  there.  So you're saying what, that you were unable to use

23  the Eudora server to figure out what was on it?

24          MR. KENNEY:  It took extra time, Your Honor, and

25  it took a lot of consulting with an outside vendor in

1   order to do that.  Eudora is a whole different animal, I'm

2   told.  I'm no expert, but it's very different than, for

3   instance, a Microsoft server which runs off of kind of the

4   same, you know, software that your Microsoft computer

5   might run off of.  So it's a little bit different, and if

6   your computer system is no longer set up to integrate with

7   it, then it takes a little bit more work to get into it.

8            THE COURT:  Right, but when the company needed a

9   document from 2012, they needed to find some email from a

10  customer in 2012, what did they do?

11           MR. KENNEY:  Well, they don't normally in the

12  course of business need to do that, Your Honor, and they

13  haven't done that, and this is the first time that they've

14  actually had to reach back into the Eudora server, and so

15  that's why this was a problem.

16           THE COURT:  They've never been sued before?

17           MR. KENNEY:  Not that I know of, Your Honor.

18  You know, this is the first time -- this is the second

19  time they've been subpoenaed.  The first time, I worked on

20  that subpoena as well.  The first time the case settled

21  before we had to produce documents, so we never got into

22  the issue.

23           THE COURT:  I guess I'm struggling to understand

24  why the Eudora server isn't something that you turn on

25  and, worst case, print out hard copies of the --

1          MR. KENNEY:  Well, the server itself, it's a

2     server as opposed to a computer, and so it needs to

3     integrate with some kind of software so that you can read

4     it.  So what we eventually were able to do was to work

5     with an outside provider and our IT department and the

6     company's IT department to come up with a solution, but it

7     took some work to do that over the course of some time,

8     and even after we were able to get a search done and have

9     the emails brought over to our firm, we still had to then

10     convert them into a form that we could use to review them

11     in order to produce them.

12          THE COURT:  A form that you could use.

13          MR. KENNEY:  That's correct, Your Honor.

14     Searching is one thing; reviewing, obviously, something

15     different where you can actually sit down and read the

16     words.

17          THE COURT:  All right.  So there was no desktop

18     or laptop at -- is it pronounced GYMA?

19          MR. KENNEY:  Right.

20          THE COURT:  GYMA?

21          MR. KENNEY:  GYMA.  Correct, Your Honor.

22          THE COURT:  -- at GYMA that had Eudora software

23     on it still?

24          MR. KENNEY:  That's correct, Your Honor.  In

25     fact, that Eudora server hadn't been used in quite some

1    time.  I think it's common for a lot of companies, when

2    they switch out computer systems, so long as they're not

3    under a litigation hold, they will then switch out and

4    dispose of their old computers.  Either they'll get a

5    credit for it from their provider or they'll recycle it or

6    do something else, but they don't generally hold on to

7    them unless there's some reason to do that, but they held

8    on to the server, so the server was there, which is the

9    point of getting those documents off of that server.

10           At any rate, that's just one of the many issues

11   that caused delay and increase of fees and costs in this

12   matter, and one of the larger ones was the lack of search

13   terms.  In fact, we asked for search terms for months and

14   months and never got them until the Court ordered the

15   plaintiffs to provide them in October.

16           THE COURT:  And you couldn't figure out from the

17   four simple requests what the search terms ought to be?

18           MR. KENNEY:  We could have come up with some

19   search terms, Your Honor, certainly, yes, and we could

20   have provided some documents, but they may not have been

21   complete, and we didn't want to end up doing this twice

22   because then there would have been a double cost, and then

23   instead of looking for, what, $60,000 or sixty -- yes,

24   $60,000 on the production, we'd be looking at 120, or

25   maybe we'd be looking at, you know, maybe it would be 90,

1    but it would be something more than it is today.  And we

2    obviously didn't want to do it twice; and frankly, you

3    know, it wasn't really up to us to decide in this complex

4    litigation what the search terms ought to be.

5              There was a point early on in discussions where

6    plaintiff had said that they were expecting interrogatory

7    responses from Teva, Barr/Teva, and that they would

8    provide those to us so that we could see and understand a

9    little bit more about the case to see if we could come up

10   with search terms on our own, but then later on declined

11   to do so.  We offered to sign any, you know, Exhibit A or

12   anything else that was necessary under whatever protective

13   agreement they had in order to view whatever documents

14   were out there, but the plaintiffs declined to let us do

15   that.  So we still were left in the dark, and we kept

16   asking them for these things.

17             We kept in touch with the plaintiffs over the

18   course, as you can see from the two motions, over the

19   course of this entire period.  I was a little bit

20   surprised to see that they thought that they were seeing

21   things for the first time since we had been communicating

22   about these things from the very get-go.  I had regular

23   telephone conversations with Stuart Des Roches about the

24   problems we were having and how to go out and collect the

25   documents and where to find who the custodians were

1    because we had to go to three different servers, and they

2    were overlapping servers, and we wanted to make sure we

3    gave a complete production.  But then there was the issue

4    where, you know, we weren't looking for a blank check,

5    like the plaintiffs claim.  We were just --

6                 THE COURT:  Well --

7                 MR. KENNEY:  -- looking for some commitment that

8    there would be --

9                 THE COURT:  -- you spent 44 hours on this

10   discovery.

11                MR. KENNEY:  Yes, Your Honor.

12                THE COURT:  Forty-four hours for a partner

13   billing $750 an hour.

14                MR. KENNEY:  Quite a bit of it on the phone with

15   the plaintiffs, yes, Your Honor.

16                THE COURT:  It seems incomprehensible to me.

17                MR. KENNEY:  Well, it seems incomprehensible to

18   me, too, Your Honor, because it shouldn't have been this

19   difficult, but it was.

20                THE COURT:  So why isn't your associate on the

21   phone with them?

22                MR. KENNEY:  Well, we usually talk partner to

23   partner.  My associate sometimes was on the phone, and

24   sometimes she wasn't.  But when I call the partner at a

25   firm, I usually call myself as opposed to having an

1    associate call a partner because the associate we used in

2    order to keep the fees low was a first-year associate.

3    And it's not something that we do, to have a first-year

4    associate call a partner at another firm to go over

5    complex matters.

6             THE COURT:  So email, "we need search terms."

7             MR. KENNEY:  We did that several times, Your

8    Honor.  Several times we did that.

9             THE COURT:  I can't figure out how a partner

10   spends 44 hours on a document production.  I mean, this

11   is -- you ended up producing how many documents?  A few

12   thousand?

13            MR. KENNEY:  5500 I think, Your Honor.

14            THE COURT:  Yes, a few thousand.

15            MR. KENNEY:  Yes.

16            THE COURT:  So you spent --

17            MR. KENNEY:  Listen, Your Honor, I --

18            THE COURT:  -- ten minutes per document

19   produced, basically.

20            MR. KENNEY:  I completely agree with your

21   quandary here, and I don't think any of this should have

22   taken this long.  I think that if we had had more

23   cooperation from the beginning and if we had a better

24   understanding of what the plaintiffs were looking for,

25   then we would have been able to do this within a month's

1    time, and you would have seen maybe three hours from me.

2              THE COURT:  This is what I don't understand.  If

3    you're having trouble from the plaintiffs, send them a

4    letter saying, "We're not getting cooperation, we're not

5    doing anything until we get your help," and then stop

6    billing it.  I feel like the billing here is like somebody

7    gave you a credit card and you're just charging away.

8              MR. KENNEY:  Well, unfortunately, what happened

9    is we had similar emails like that, like, "Listen, you've

10   got to -- you know, we need cooperation," but then we'd

11   have a phone call and then receive an email that was

12   inconsistent with the phone call, and we'd be back to

13   square one again.  And it just kept rolling on and on and

14   on and on, and, you know, it was surprising to me.  I've

15   done many of these, Your Honor, and I've never had such a

16   difficult document production, you know, in my career.

17   But this is the way this one particular document

18   production occurred.  We don't think it was GYMA's fault.

19   We sought the help of the plaintiffs on multiple

20   occasions.  We had a lot of meet-and-confers, we had a lot

21   of email traffic, and over time those hours did add up.

22             So, I mean, that's why -- that's where we are.

23   And for the production, we're asking for a total of

24   $60,119.20.  $20,000 has already been paid, as you know,

25   Your Honor, that you ordered -- I don't know if you knew

```
 1   it was paid, but you ordered it, and it has been paid, and

 2   then on the motion $12,658.  I can tell you that that is

 3   not the total of what our client has incurred over the

 4   course of this production.

 5               THE COURT:  And what, just to be clear, what is

 6   the authority that you're relying on to get the costs of

 7   the motion?

 8               MR. KENNEY:  We have quite a bit in our motion

 9   here, Your Honor.  Hold on one second.  You mean

10   specifically just on costs?

11               THE COURT:  Well, no, the costs --

12               MR. KENNEY:  Are you looking for the lodestar --

13               THE COURT:  I understand you to be making a

14   motion for costs under Rule 45.

15               MR. KENNEY:  Right.

16               THE COURT:  I also understand you to be making a

17   motion for attorneys' fees, for example in connection with

18   this motion.

19               MR. KENNEY:  Uh-huh.  We've got *MacDermid*

20   *Printing v. Cortron Corp.*  It's number 3:08-CV-01649.

21   It's two thousand --

22               THE COURT:  No, I'm looking really more for are

23   you -- what is the fee-shifting statute that you're

24   relying on or rule that you're relying on?

25               MR. KENNEY:  Well, it's case law, Your Honor.
```

1    There's case law in our brief, and that allows for

2    attorneys' fees on the cost motion, and the reason for

3    that is that we shouldn't have to be making a motion for

4    costs.  We should have been able to negotiate it.  But

5    that didn't work out.  We were asked by the plaintiffs to

6    give them an estimate.  Our estimate turned out to be

7    fairly accurate.  And they came back and they gave us a

8    low ball offer and said they would not negotiate

9    afterwards.  That's the reason that the law is there, is

10   in the case that the issuer doesn't do that and take

11   advantage of somebody who's not even a part of the case.

12           THE COURT:  Well, you have an interest in the

13   case, don't you?

14           MR. KENNEY:  We have an interesting case, Your

15   Honor?

16           THE COURT:  Interest in the case.

17           MR. KENNEY:  No.  No, we don't.

18           THE COURT:  Wouldn't you like to see Teva win?

19           MR. KENNEY:  Your Honor, with all due respect to

20   Teva, we don't care.  We haven't had an order from them

21   since 2014 that we know of.  We have seen an email in 2015

22   where there was some talk about another order, but we

23   haven't -- we haven't seen any evidence that it ever went

24   through.  Teva was a customer, but a very small customer.

25   We, over the course of 2017 to 2014, we sourced

1    dipyridamole for Teva and for only -- I think our profits

2    were -- or GYMA's profits were thirty-five to forty

3    thousand dollars.  This is not a big client.

4              So do we have an interest in this?  I would say

5    no, Your Honor, we don't.  And, you know, with all due

6    respect to a former client or a former customer, we don't

7    have an interest at all.

8              THE COURT:  Okay.  And what's the appropriate,

9    assuming you get some of these costs, what's the

10   appropriate hourly rate in a matter pending in

11   Connecticut?

12             MR. KENNEY:  Well, you know, it's interesting,

13   Your Honor.  We provided and we did say -- use the term

14   New York in our brief, but we did provide as Exhibit A a

15   list by state --

16             THE COURT:  Right.

17             MR. KENNEY:  -- of high, median and low.

18             THE COURT:  Right.

19             MR. KENNEY:  And in Connecticut it's really --

20             THE COURT:  And for Connecticut the median for

21   partners and associates is the same number.

22             MR. KENNEY:  It's roughly the same, yes.

23             THE COURT:  It's exactly the same, $350.

24             MR. KENNEY:  Right.

25             THE COURT:  So does that make sense to you?

1          MR. KENNEY:  Yes, Your Honor.

2          THE COURT:  That partners and associates in

3    Connecticut charge the same thing?

4          MR. KENNEY:  Partners in Connecticut?

5          THE COURT:  Right.

6          MR. KENNEY:  No, that does not make sense to me.

7          THE COURT:  No.  Well, that's what it says --

8          MR. KENNEY:  I'm sorry.

9          THE COURT:  -- on this sheet.

10          MR. KENNEY:  I thought you meant associates in

11    New York and associates in Connecticut.

12          THE COURT:  No.  The information you provided is

13    that the median partner rate in Connecticut is 350, and

14    the median associate rate in Connecticut is 350.

15          MR. KENNEY:  Well, yes, but that takes into

16    account lawyers at all ends of the spectrum, Your Honor.

17          THE COURT:  Right.  But --

18          MR. KENNEY:  You've got partners that --

19          THE COURT:  -- does that make sense to you, that

20    partners and associates, the median is the same?  What

21    value --

22          MR. KENNEY:  I can't say why or how other firms

23    price themselves.

24          THE COURT:  Do you believe that most states in

25    America partners charge more than associates?

```
 1                 MR. KENNEY:  I would say so, yes, Your Honor.
 2                 THE COURT:  Yes, right, so --
 3                 MR. KENNEY:  But these are medians.  These
 4      are -- these are averages.
 5                 THE COURT:  Right, but what value is that
 6      information if it's telling me that partners and
 7      associates have the same median rate?
 8                 MR. KENNEY:  Well, what we're showing is, Your
 9      Honor, that we're within the realm here.  We're not way
10      outside the realm.  In fact, we're way below the high end.
11      We're closer to the median in both areas -- well, perhaps
12      in partner we're not, but we're certainly below the
13      partner level of $1200 in Connecticut, which is the high
14      end.  At 685 and 715 we're well below.  So the information
15      I think is still good.
16                 THE COURT:  Well, I don't know about that, but I
17      understand your argument on that.
18                 Okay.  What's the most you've ever charged in
19      the past for a document production that produced 5500
20      documents?
21                 MR. KENNEY:  That's information I do not have,
22      Your Honor.
23                 THE COURT:  All right.
24                 MR. KENNEY:  I can tell you I've never
25      experienced a document production that was this difficult,
```

1    and I can tell you that a lot of the costs or fees have

2    gone to the back-and-forth and the dealings between

3    counsel that occurred over the course of almost a year.

4              THE COURT:  Yes.

5              MR. KENNEY:  And we discussed that at the last

6    hearing, and it still holds true today.

7              THE COURT:  Would you agree that the

8    documents -- the work that you did prior to November 8,

9    2016 was not document review?

10             MR. KENNEY:  Well, what I would say is, first of

11   all, it was a lot of trying to find out what they're

12   looking for.  There were a lot of meet-and-confers, which

13   I think are legitimate, there were a lot of emails, and

14   there was a lot of advising our client on sort of what --

15   how to start looking around within their three computer

16   systems, three servers, to find out who -- and granted,

17   the plaintiffs did suggest who the custodians might be,

18   and they were dead on, but they asked us to confirm it,

19   and so we did, we went to confirm it.  How to confirm it,

20   looking at the fact that these people overlapped in

21   different ways on different servers and then looking at

22   where all those documents might be, and we were in

23   constant contact with the plaintiffs as we were doing

24   this, which was no surprise as they claim in their papers,

25   but that's all part of the document review, when you're

1   advising your client on how to collect.

2           We had another solution initially, as you know,

3   Your Honor, an outside vendor, but with the outside vendor

4   the costs were significantly higher, and I think that, you

5   know, the plaintiff and you and I all agreed that that was

6   way too high.  It was, I think, $157,000.  So what we did

7   was we went to find an easier solution but a more

8   efficient solution, and that more efficient solution

9   required more attorneys' time, and that's why you see a

10   lot of coordination with our IT team at Blank Rome and

11   with the IT team over at GYMA.  And, you know, those are

12   all legitimate costs because that is how you go and find

13   out what the sources are, where the documents are and how

14   you're going to collect them.  And we significantly

15   lowered the numbers by doing that.

16           You know, we gave numbers in our -- we're not

17   even asking for everything.  There are a lot of costs and

18   fees that we're not asking for.  In our papers we say that

19   the fees were a total of 105,585.  In fact, we saw some

20   later entries that showed that it was actually 120,000,

21   and I can break that up into two different categories.

22   One is there was a motion to compel, which we certainly

23   never asked for any money for, but there was also a

24   cross-motion back then for fees, and we were entitled to

25   fees on that motion as much as we're entitled to fees on

1   this motion, but we didn't ask for them, and so that's all

2   left out there.  All we're asking for are the production

3   costs, which include everything, including the review,

4   including all the process of finding the documents,

5   including all of the back-and-forth between the attorneys,

6   and then $12,658.50 on the motion.

7            THE COURT:  Okay.  I understand.  Thank you.

8            MR. KENNEY:  That's it.  Thank you, Your Honor.

9            THE COURT:  Unless you have something else you

10   want to make.

11            MR. KENNEY:  I don't believe I do.  Let me just

12   look really quickly over my notes, but I don't believe I

13   do.

14            I guess the one point I would like to make is we

15   did make two productions, and one of them was early, so

16   it's proof that we weren't trying to withhold, as the

17   plaintiffs claim.

18            And the other point, I guess, is they've made a

19   point to argue that there was collusion between GYMA and

20   Barr/Teva, and nothing could be further from the truth.

21   The one phone call that they mention and harp on the most

22   is an April 12 phone call which the plaintiffs were a part

23   of; and, in fact, they organized that phone call.  If you

24   look at the time entries, there are three time entries:

25   One from me; one from our associate, Anna Svensson; and

1     one from Teva counsel, Sarah Frederick.  And both Sarah

2     Frederick, Ms. Frederick and I, mention plaintiff.

3     Ms. Svennson apparently forgot to put that in.  It doesn't

4     mean that we were concluding with Teva.

5            We had some other very short telephone

6     conversations that were courtesy calls, one when I called

7     to let them know that we were going to be objecting and

8     that they could expect objections soon.  I think there was

9     a call where Ms. Frederick told us that she intended to

10    send an identical subpoena.  And there was one time when I

11    called, which was probably that same phone call, when I

12    asked if she could tell me anything that could help me

13    figure out what it is the plaintiffs were looking for, and

14    I think she felt constrained by the protective order and

15    just said, Listen, I can't help you with that.  And that

16    was it.  Those are the phone calls.

17           And I read Ms. Frederick's affirmation -- pardon

18    me, declaration, and I agree with everything she said in

19    there.  I have the same recollection.  Her time records, I

20    think, bear that out.  Thank you, Your Honor.

21           THE COURT:  So you're saying you did not make

22    any time entries related to the phone calls with Teva's

23    counsel other than what you billed your client for?

24           MR. KENNEY:  Correct.  That's correct, Your

25    Honor.

1            THE COURT:  Okay.  All right, who wants to go

2     next?

3            MR. CHIOREAN:  Good afternoon, Your Honor.  Dan

4     Chiorean for the direct purchaser class plaintiffs.

5            I just want to focus the discussion a little

6     bit, and I'd like to go backwards from -- in time from

7     your discussion with Mr. Kenney issue-wise just because I

8     think the last one is the sort of simplest.  You asked

9     Mr. Kenney what he relies upon for their request for

10    $12,000 for fees in preparation for the motion, and I

11    would point out to Your Honor that the case that GYMA

12    relies upon is *Smart SMR of New York, Inc. vs. Zoning*

13    *Commission of the Town of Stratford.*  And if you look at

14    our memo in opposition, Your Honor, on page 17 of our memo

15    we point out that that case actually supports our

16    position.  In that case the Court denied the fees for

17    preparation of the motion.

18            The next issue, I'd like to go back and discuss

19    the total fees that GYMA incurred after the October status

20    conference where Your Honor ordered that they produce

21    documents.  So you asked Mr. Kenney if he agrees that the

22    costs related to the production of documents are only the

23    ones after that, that status conference, and we agree,

24    Your Honor.  And I went back through what is Exhibit B to

25    GYMA's motion, which is the Blank Rome billing statements,

1    and tallied up the amount of money spent by Blank Rome

2    between October 21, 2016 and January 31, 2017.  The total

3    amount of those entries is $40,073.28.

4           The other thing that I did, Your Honor, is I

5    went back again through that same list of entries, and I

6    looked at how much money GYMA spent communicating with us

7    over the deadlines that we had set for them because they

8    were being, again, unresponsive in terms of providing the

9    costs, as well as how much money GYMA spent reviewing and

10   opposing our January 4, 2017 letter to Your Honor

11   concerning the cost dispute, and that total amount was

12   $12,360.  So if you subtract that from the $40,073, you're

13   left with actual money spent on production between October

14   and January of $27,713.28.

15          Now, as Your Honor knows, we've already paid

16   GYMA $20,000 for production of documents in this case, and

17   we believe that the case law, including the *Jackson* case,

18   the *Honda Lease Trust* case and the *Wells Fargo* case all

19   support our position that because the documents in this

20   case are necessary for us to make our case because Teva

21   has implicated GYMA in their interrogatory responses and

22   their defenses in this case, that the burden on GYMA is

23   reasonable, and that because we have already paid them the

24   20,000, that we should not be required to pay any

25   additional fees to GYMA given that the total amount

1    actually spent producing documents was $27,713.28.  Our

2    belief is that the remainder of that $7,000 should be

3    incurred by GYMA itself.

4         And there's one more thing I'd like to point

5    out, Your Honor, which is with respect to the fees prior

6    to October that Your Honor asked Mr. Kenney about, and

7    Mr. Kenney mentioned that a lot of that was spent in terms

8    of trying to figure out what the subpoena was asking for

9    and what plaintiffs wanted and that burden was created

10   there because we did not provide search terms for, quote

11   unquote, months and months.  What I'd like to point out,

12   Your Honor, is Exhibit B to -- or Exhibit 2, rather, to

13   our opposition to GYMA's motion is an email in early March

14   of 2016 between Stuart Des Roches from our firm to

15   Mr. Kenney at GYMA outlining exactly what the subject

16   matter was that we were searching for, and the terms that

17   we use in that email, including dipyridamole, Aggrenox,

18   Teva, Sims, these are all the search terms that we

19   actually agreed upon in November after communication back

20   and forth with GYMA after the October status conference.

21        Moreover, I think the issue is that if GYMA

22   maintains that it did not have the information it needed

23   to conduct a search, then the question remains why is it

24   that they billed so much time and they actually did

25   conduct a search?  If you look at their -- again, if you

1      look back at Exhibit B to their motion and specifically at

2      page 29 of that exhibit, they have time entries from June

3      of 2016, various time entries -- excuse me -- where

4      they've collected documents and collected emails pursuant

5      to searches that we were unaware were taking place.  And

6      the reason we were unaware, Your Honor, was that as you

7      can see from our exhibit to our motion to compel back in

8      August, GYMA was telling us that they were not going to

9      produce documents, and that we needed to agree on costs.

10     And that exhibit to our motion was Exhibit 10.

11             So at this time in June of 2016, as far as

12     plaintiffs were concerned, we weren't getting any

13     documents.  We were planning to file a motion to compel,

14     we had told GYMA that we were going to do so, and the only

15     reason why we ended up filing it in August rather than

16     June was that Teva served amended interrogatory responses,

17     which caused us to have to tweak our motion concerning the

18     particular responses and particularities that they alleged

19     within the responses and naming GYMA itself as a cause for

20     their defense and the reason why they -- that they

21     allegedly could not come to market with generic Aggrenox.

22             So, Your Honor, my submission is that all of the

23     time before the October status conference that GYMA is

24     asking for costs for was spent either in resisting the

25     subpoena, which the *Stormans* case makes clear that GYMA is

1    not entitled to recover for, or time spent by GYMA

2    searching for documents without our knowledge, either at

3    the direction of the conference calls that they had with

4    Teva or at GYMA's own volition in terms of deciding what

5    they wanted to do.  And we did not approve those searches,

6    we weren't aware of them, and in fact I don't believe --

7    and I can be corrected on this -- but I don't believe we

8    actually got the emails that were found as a result of

9    those searches.  We did receive, as Your Honor knows, a

10   surprise production on June 31, just as we were about to

11   file our motion to compel, but that production consisted

12   of about 600 pages of sales receipts.

13           And so, Your Honor, circling back to my main

14   point, I think that the issue here is that GYMA is arguing

15   the extraordinary -- apparently extraordinary burden upon

16   it from this case, but as I've illustrated, we believe

17   that the majority of the time spent by GYMA was done so

18   resisting the subpoena.  They did not tell us that they

19   were conducting any work and searches.  As far as we knew,

20   they were doing nothing because they were waiting for us

21   to agree on payment.  And the time that they spent after

22   the October conference, as I outlined for Your Honor, is

23   the relevant amount and the relevant cost that should be

24   considered here, and we believe given how much we've

25   already paid, the 20,000, that GYMA and/or Teva and GYMA

 1   combined should be responsible for absorbing the rest.

 2           THE COURT:  So what are you including in your

 3   27,000?

 4           MR. CHIOREAN:  I included, when I went through

 5   their -- when I went through their Exhibit B and went

 6   through every item that was entered between October 21 and

 7   June 31, I included everything but several communications

 8   that we had in late November, which were concerning the

 9   deadline that we had set for GYMA to respond to our

10   request for costs, and I also took out the --

11           THE COURT:  So, for example, November 21,

12   communications with plaintiffs' attorneys re arbitrary

13   deadline.

14           MR. CHIOREAN:  Yes, correct, entries like that,

15   and then the entries that concern reviewing and responding

16   to our letter that was dated January 4 to the Court and

17   attending that status -- that telephone conference with

18   Your Honor concerning that particular letter.  So those

19   costs I tallied up to be, as I mentioned, 12,360.

20           THE COURT:  Okay.  So you're not challenging the

21   reasonableness or the amounts of the remaining?

22           MR. CHIOREAN:  The remaining 27,000, we're not

23   challenging the reasonableness of that amount, and that's

24   why we believe that the 20,000 we've already paid is

25   sufficient given that the case law states and is very

```
 1    specific about the fact that plaintiffs are not

 2    responsible for covering every cost of a third party with

 3    respect to production.  And, in fact, the Wells Fargo case

 4    I think states it succinctly and says that courts have

 5    made clear that Rule 45's required protection of a

 6    nonparty from significant discovery expenses does not mean

 7    that the requesting party must bear the entire cost of

 8    compliance in every case.  And so we believe that we've

 9    borne more than 75 percent of the cost of compliance when

10    you look at the 20,000 out of 27,000.

11              THE COURT:  Okay, unless you have anything else?

12              MR. CHIOREAN:  No, that's it.  Thank you, Your

13    Honor.

14              THE COURT:  Thank you.

15              MS. FREDERICK:  Your Honor, Sarah Frederick for

16    Barr and Teva.  I just plan to be very brief.

17              There's no motion pending right now for costs as

18    to my client, but I'm just responding out of an abundance

19    of caution because in the opposition brief in this

20    particular motion the plaintiffs raised the issue of cost

21    sharing from Barr and Teva, and I wanted to respond as to

22    that.  I don't plan to go into details unless Your Honor

23    has questions about kind of the history and the

24    back-and-forth there, but very briefly I'd just like to

25    say a few points.
```

1             One is that my client, we did serve a third-

2    party subpoena on GYMA very early on, very early on in

3    discovery, and we were on on -- at least one initial call

4    with the plaintiffs as well after they had served their

5    subpoena to discuss with GYMA kind of the scope of the

6    subpoena.  And --

7             THE COURT:  So was your subpoena served first

8    or --

9             MS. FREDERICK:  The plaintiffs' was served

10   first, maybe about three weeks earlier.

11            THE COURT:  And then you served one that was

12   identical to the plaintiffs'.

13            MS. FREDERICK:  It was identical.  It was very

14   early on in discovery, and at that point we weren't sure

15   whether GYMA would have documents that would inform our

16   defenses, and we wanted to make sure that we had protected

17   our opportunity to obtain those documents.

18            THE COURT:  Well, you would have received a copy

19   of whatever documents were produced to the plaintiffs'

20   counsel pursuant to their subpoena, wouldn't you?

21            MS. FREDERICK:  That's true, under our discovery

22   request that all the parties have served here and all the

23   parties have responded that they would provide any

24   third-party productions to all the parties in this

25   litigation.

1          THE COURT:  So what was the purpose of serving a

2     duplicative subpoena?

3          MS. FREDERICK:  In text it was duplicative, but

4     we weren't sure that the plaintiffs would have the same

5     interests as our clients in terms of the particular

6     documents sought, and it was very early on in discovery,

7     and so we felt that the wording was broad enough to cover

8     what might be responsive to inform our defenses.  However,

9     once we got into the meet-and-confer process and we

10    received the objections, there were issues raised as to

11    cost.  We weighed the costs and benefits at that point and

12    decided not to pursue the subpoena any further.  So all

13    the ensuing meet-and-confers, letter-writing campaigns,

14    motion-writing campaigns, after that we were not involved

15    in.

16         THE COURT:  The subpoena obviously gave you the

17    ability and the right to contact counsel for GYMA.  Did

18    you ever take advantage of that?

19         MS. FREDERICK:  To contact counsel for GYMA?

20         THE COURT:  Right.

21         MS. FREDERICK:  So early on, after we served the

22    subpoena, I actually received a message, I believe, from

23    Stuart Des Roches for direct purchasers that invited us to

24    take part in a meet-and-confer call that they were

25    scheduling with GYMA because issues around the

1   confidentiality of my client's information might have

2   arisen, and so I agreed to join that call, and I did join

3   that call, and I believe that was the call that was

4   reflected in the April 12 or something 2016 time entry.

5          As to any additional calls regarding the scope

6   of the subpoena, Mr. Kenney's recollection is the same as

7   mine.  I didn't initiate any calls.  He may have reached

8   out at one point, and I think I do recollect that he

9   asked, Can you help me, what are plaintiffs looking for,

10  and I didn't feel comfortable giving him information about

11  what the plaintiffs might be seeking in their own

12  subpoena.

13         So in the opposition brief there were a number

14  of kind of statements made based on, I believe, kind of

15  time entries that GYMA had provided about, you know,

16  providing Teva expending search terms or custodians, and

17  that never happened, and so that's why I provided an

18  affidavit in the reply brief.

19         THE COURT:  Was there any discussion between you

20  and counsel for GYMA regarding Teva sharing in the costs

21  of the production of the subpoena?

22         MS. FREDERICK:  So on the joint calls or joint

23  call, I can't remember if there was one or more than one

24  with the plaintiffs and GYMA, GYMA raised the issue of

25  wanting to seek costs for compliance with the subpoena.

1          THE COURT:  That's early on.

2          MS. FREDERICK:  That was early on, and we never

3     said that we would.  And then when plaintiffs reached out

4     to us to ask if we would share the costs, we said no

5     because we didn't seek to compel any documents from GYMA.

6     We had decided not to further pursue the subpoena, and we

7     didn't feel like they were responsible for sharing in the

8     costs of their own litigation strategy.

9          You know, we initially served the subpoena.

10    About a month later, you know, after about a month,

11    basically by April of 2016, we did nothing further on the

12    subpoena, and we decided not to pursue it.  And one of the

13    purposes of going through the initial process of

14    objections is to give the serving party an opportunity to

15    decide whether and how to move forward, and we decided not

16    to do so, and we don't feel that it's appropriate to share

17    the costs of plaintiffs' choice to move forward with their

18    litigation strategy.

19          THE COURT:  All right.  But just to be clear,

20    you didn't have any discussions with anybody representing

21    GYMA about sharing costs or contributing to the costs of

22    the production or anything like that?

23          MS. FREDERICK:  No, we never agreed to do so.

24          THE COURT:  No, that's not the question.  Did

25    you have any conversations?

1          MS. FREDERICK:  Well, GYMA had asked when we

2     were on the joint call with plaintiffs if we would share

3     in the costs.

4          THE COURT:  Right.

5          MS. FREDERICK:  That was the only -- there may

6     have been one conversation, there may have been two, but

7     there were no separate conversations with GYMA about

8     costs, and they never separately asked Barr/Teva outside

9     the presence of plaintiffs about that.

10          THE COURT:  There's a time entry from Mr. Kenney

11     on November 15, 2016, traffic re Teva paying a portion of

12     plaintiffs' costs on subpoena.  Was that traffic anything

13     that you were involved in?

14          MS. FREDERICK:  That may have been in reference

15     to a letter that plaintiffs sent to Barr/Teva in the

16     November 2016 timeframe with plaintiffs asking for

17     contribution to costs.  They may have c.c.'d GYMA on that

18     correspondence.  That's to the best of my recollection

19     right here.  I could kind of go back and kind of analyze

20     further, but I believe that's what that would be referring

21     to.

22          THE COURT:  Okay.  But you didn't have any of

23     those calls or emails or discussions of any kind?

24          MS. FREDERICK:  Not separately with GYMA, no.

25     November 2016 was when plaintiffs asked Barr/Teva to share

1    in those costs and when we responded via email that we

2    would not, we had not pursued the subpoena, we had not

3    moved to compel, and those are the emails -- that's

4    actually the email chain that I've attached to the reply.

5    I can point out the exhibit.  Actually, it's November 15.

6    It's Exhibit G to the reply brief.  It's Document 602-8

7                THE COURT:  Yes, that's what I was looking at.

8                MS. FREDERICK:  Right.

9                THE COURT:  That's where you indicate that you

10   have a right to get the documents.  "To the extent

11   plaintiffs obtain any documents pursuant to the subpoena,

12   you are obligated to produce those to all defendants."

13               MS. FREDERICK:  Yes.

14               THE COURT:  That's what prompted my query why

15   you would serve an identical subpoena if you were already

16   entitled to receive the documents.

17               MS. FREDERICK:  Right.  Very early on, as I

18   mentioned, we weren't sure whether there would be

19   identical interests in the particular documents pursued.

20   When a subpoena is served, often topics are narrowed,

21   search terms and custodians are discussed, and we may have

22   had different interests in which particular documents to

23   obtain.  And when GYMA objected on various grounds,

24   including costs, we decided not to pursue, and it was --

25   you know, at that point also we were later on in our own

1   kind of document collection and review process and were

2   able to make a cost benefit analysis of whether it was

3   appropriate to move forward, and we decided against it.

4          There are a number of third-party productions in

5   this case.  All the parties have sought out documents from

6   third parties, and so it is kind of a general term that

7   we've all agreed to, to provide productions to all the

8   other parties.  We have not actually received the GYMA

9   production, the most recent one, so our decision not to

10  pursue the subpoena certainly didn't come after we

11  received the documents.  It was a determination we had

12  made well in advance.

13          THE COURT:  Okay.

14          MS. FREDERICK:  Thank you.

15          THE COURT:  Thank you.  Anything further?

16          MR. KENNEY:  Really quickly, Your Honor.  I'm

17  going to jump around a little bit, if that's okay.

18          I wanted to start out with plaintiffs' statement

19  that we agreed that only costs after the January call

20  would be costs that we would be allowed to receive fees

21  for.  That is something I specifically don't recall and I

22  never would have agreed to because we had already produced

23  documents, and there was quite a bit that had gone on

24  searching for documents -- well, not searching for

25  documents but looking at servers to find documents.  But

1     not only that, we had actually produced documents.  And,

2     yes, we did look at hard copy documents which did include

3     some emails, which the emails that Mr. Chiorian --

4               MR. CHIOREAN:  Chiorean.

5               MR. KENNEY:  Sorry -- that Mr. Chiorian referred

6     to.  There were some emails within that production that

7     were reviewed.  But we did not agree that the prior to

8     January production or any of the other processes that we

9     went through to do a production were not going to be part

10    of the cost calculation.

11              THE COURT:  Okay, I didn't understand him to be

12    saying that.  I understood him to be trying to use an

13    analysis of the time records to come to a more reasonable

14    dollar number.  And so what he was saying, as I understood

15    it, I was using November 8, he was using I think

16    October 21, and I think what he's saying is really it's

17    only October 21 forward where there's, in effect, a

18    requirement that you go forward when the Court has said go

19    produce documents, and so from that point forward is the

20    pertinent or at least the principal pertinent area to look

21    at.  And so he counted up from October 21 through the end

22    of your time records how much was related.

23              MR. KENNEY:  Right.

24              THE COURT:  I didn't understand there to be an

25    agreement, that suggestion of an agreement.

1           MR. KENNEY:  Oh, okay, because I can certainly

2    say we would never have agreed to that.

3           THE COURT:  No.

4           MR. KENNEY:  Certainly we had already produced

5    in June, which was the beef that they have with us

6    reviewing documents in June.  That was the production that

7    we made in June, all the hard copy documents, and we

8    certainly would not have agreed that the fee calculation

9    would start in October.

10          THE COURT:  No, I didn't understand him to be

11   saying that you agreed to anything.  With respect to the

12   June review, correct me if I'm wrong, your associate,

13   Svennson --

14          MR. KENNEY:  Correct.

15          THE COURT:  -- says download and examine files

16   June 24.  That was seven-tenths of an hour.  And then

17   there's what amounts to basically through June 30 a quick

18   eyeball says there's about six hours, maybe seven hours of

19   time between yourself and her with respect to that

20   document production in June.  Does that sound about right?

21          MR. KENNEY:  I don't have it in front of me,

22   Your Honor.  I can get it, but it's possible.  But, again,

23   that production, as you probably know, was scanned by our

24   client and put in a drop box and that's why we had to pull

25   it up; but, again, there was a lot of talk and a lot of

1   finding out where those documents would be, how to get

2   them from GYMA to us, and even so, I mean these were the

3   documents that regardless of what misunderstandings we had

4   or just not understanding what it was that plaintiffs were

5   looking for, that we knew they wanted for sure, and they

6   were transmittal documents, and the transmittal documents

7   are all in hard copy in files.  And so they took those

8   files, they scanned them, they put them in a drop box, and

9   we pulled them and we looked at them.  But there was a lot

10  more that went into it before they got to us and before we

11  started to review them.  That is the point that I think is

12  important.

13          So I think it's also not true that the

14  plaintiffs were not aware that we were looking at our

15  servers to figure out how and -- how we were going to end

16  up doing this, with all the multiple servers and the

17  overlap.  We had multiple conference calls.  We told them

18  what we were doing.  We kept them apprised all the way

19  through that we were doing this.  In fact, we kept telling

20  them, We're happy to produce the documents.  We were never

21  resisting, as Mr. Chiorean has claimed.  We never resisted

22  the subpoena.  We were just trying to figure out how to do

23  it and do it right so that everybody would be happy.

24          And the other issue that we ran into, as you

25  know, is that we consistently asked for just a commitment

1    to contribute to fees, not a blank check, just a

2    commitment, "Okay, yeah, sure, we'll work with you on

3    that," something, but we never got that, and that's what

4    led to this.

5            I think the other issue I was going to talk

6    about has been already addressed, but just to show you,

7    Exhibit C to our opposition and cross-motion was an

8    internal agenda that we had to prepare for a telephone

9    call with plaintiffs and perhaps Teva.  I don't recall.

10   It was 4/22/2016.  And the first item on here is

11   "plaintiffs not yet sure what they want, no reason to

12   produce until they decide."  And I don't know if that's

13   because they were expecting an amended interrogatory

14   response or what it was, but at that point we weren't

15   sure, they weren't sure, it was hard for us to understand

16   what they were looking for, especially since they didn't

17   know what they were looking for.  And so --

18           THE COURT:  I'm sorry, what are you referencing,

19   Exhibit C?

20           MR. KENNEY:  Exhibit C to our -- the last set of

21   motion papers.

22           THE COURT:  Okay.

23           MR. KENNEY:  I have a copy, Your Honor, if you'd

24   like to see it.

25           THE COURT:  Yes, sure.

1          MR. KENNEY:  If I may approach.  (Handing.)

2          MR. OPPER:  Do you have a copy for counsel?

3          MR. KENNEY:  I don't.

4          THE COURT:  I'm just going to read it and you

5     can have it.

6          MR. KENNEY:  But they were filed.

7          THE COURT:  Okay, thank you.

8          THE CLERK:  (Handing.)

9          MR. KENNEY:  So I just wanted to go through just

10     a few of these cases on attorneys' fees in connection with

11     the motion.  The *Serricchio* case *v. Wachovia,* 706F.Supp 2d

12     237 District of Connecticut 2010, affirmed by the Second

13     Circuit 2011, and I'll just read a quick quote from that

14     case:  A reasonable fee should be awarded for time

15     reasonably spent preparing and defending an application

16     for fees.  I understand we have ellipses in there, but

17     that's the gist of it, and that's a quote.

18          And the *Smart SMR of New York, Inc. v. Zoning*

19     *Commission, Town of Stratford,* 9F Supp. 2d 143, 153,

20     District of Connecticut 1998:  Generally prevailing

21     parties are entitled to reimbursement for amount of time

22     spent by their lawyers in preparing fee applications.

23          And in the last --

24          THE COURT:  Is GYMA a prevailing party here?

25          MR. KENNEY:  Prevailing party?

1          THE COURT:  The prevailing party language comes

2     from fee shifting statutes that relate to substantive

3     causes of action.  If you win your --

4          MR. KENNEY:  It's a good question, Your Honor;

5     but, on the other hand, we're not a party, and we have

6     asked for fees, and we've been awarded a certain amount of

7     fees.

8          THE COURT:  My question is simply this.  You're

9     citing to me cases that deal with prevailing party awards

10    of attorneys' fees, so my question is simply:  Is GYMA a

11    prevailing party for purposes of fee shifting statutes

12    such that it would be entitled --

13         MR. KENNEY:  I understand what you're saying,

14    Your Honor.  This is just one case out of three cases that

15    we cite --

16         THE COURT:  Okay.

17         MR. KENNEY:  -- but it shows a trend toward

18    attorneys' fees for fee applications, and I understand

19    this one in particular was for a prevailing party,

20    probably had a provision in a contract or something like

21    that.  However, the *Serricchio* case did not, and the

22    *Tucker* case does not.  And I can go through, just

23    basically summarizing, where a party had to engage in

24    practices outside of its regular course of business in

25    order to comply with a subpoena.  The Court ruled that the

1    plaintiff, which issued the subpoena, will incur the costs

2    involved in creating the mirror images, recovering

3    information and translating information into searchable

4    formats.  I mean, that's obviously not a fee application,

5    but it is in line with our total argument that we should

6    be awarded fees for costs of the motion as well as the

7    production.

8              THE COURT:  Okay.  Thank you.  Anything further?

9              MR. CHIOREAN:  Just very briefly, Your Honor, I

10   recognize I don't get a sur-reply to Mr. Kenney, but I'd

11   like to reply to counsel for Teva's argument concerning

12   their identical subpoena to GYMA.

13             So what I wanted to mention was that counsel for

14   Teva mentioned that their subpoena was served very early

15   on in the production process and they wanted to make sure

16   that they would get the documents that they would need

17   from GYMA.  What's important to note, and I think we've

18   noted in our opposition as well, the reason we asked that

19   Teva share in the costs is that they never withdrew that

20   subpoena.  They maintained it.  And even in July of 2016

21   after Teva served its amended interrogatory responses,

22   which are an exhibit to our motion to compel, and cited

23   GYMA in its defenses, Teva maintained its subpoena to

24   GYMA; and, in fact, as the exhibit that Ms. Frederick

25   noted, there were email communications back and forth with

1    Teva where Teva made sure to ask for plaintiffs to share

2    the documents from GYMA.  And she also correctly stated

3    we're already obligated to do so under the discovery

4    order.

5           So although Teva didn't file any motions or

6    anything of that nature, they essentially -- they

7    maintained the subpoena, and they wanted to get the

8    documents and continued asking for those documents and

9    wanted to receive them but allow plaintiffs to do all of

10   the legwork of actually forcing GYMA to produce them and

11   collect them and review them, and so forth.  And this is

12   why, Your Honor, we believe that Teva should be

13   responsible for part of the costs because we essentially

14   have taken on the burden of doing all of the work, and

15   Teva maintained an identical subpoena, will receive the

16   identical documents, and they never withdrew that subpoena

17   even though they could have done so anytime and they would

18   have still received the documents from us under the

19   discovery order.  Thank you, Your Honor.

20          THE COURT:  Well, isn't that an argument that

21   suggests that GYMA should, if it chooses to, seek a

22   portion of the fees from Teva, not that -- I mean, in

23   other words, you're asking for money from Teva,

24   essentially, aren't you?

25          MR. CHIOREAN:  Right.

1          THE COURT:  No?

2          MR. CHIOREAN:  Well, that's because, Your Honor,

3    we have already paid the 20,000 directly to GYMA per Your

4    Honor's order because at that time Your Honor said you

5    didn't have enough information to make a decision about

6    the costs.  So if we're going by the total amount of the

7    27,000 and then the 20 that we've paid, we believe it's

8    fair, of course, for GYMA to incur the additional 7,000 on

9    their own but for us to be reimbursed for a portion of the

10   amount that we've already paid given the circumstances I

11   just mentioned.

12          THE COURT:  Reimbursed by?

13          MR. CHIOREAN:  Pardon me?

14          THE COURT:  Reimbursed by whom?

15          MR. CHIOREAN:  By Teva.

16          THE COURT:  So how do you get that?  I mean, is

17   this like a cross discovery motion?

18          MR. CHIOREAN:  I suppose it is, Your Honor.

19          THE COURT:  All right.  I'll think about it.

20          MR. CHIOREAN:  Thank you.

21          THE COURT:  Okay, thank you all.  Unless there's

22   anything further, we'll stand in recess.

23          (Whereupon, the proceedings were adjourned at

24   3:14 p.m.)

25

C E R T I F I C A T E

I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

April 10, 2017

/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177