UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                                :
IN RE:                          :  No. 3:14-MD-2516(SRU)
                                :  915 Lafayette Boulevard
AGGRENOX ANTITRUST LITIGATION   :  Bridgeport, Connecticut
                                :
                                :  April 27, 2017
- - - - - - - - - - - - - - - x



                    TELEPHONE STATUS CONFERENCE


B E F O R E:

      THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

   FOR THE PLAINTIFFS:

        HILLIARD & SHADOWEN LLP
             919 Congress Avenue, Suite 1325
             Austin, Texas  78701
        BY:  DONALD SEAN NATION, ESQ.


        KENNY NACHWALTER, P.A.
             1441 Brickell Avenue, Suite 1100
             Miami, Florida  33131
        BY:  SCOTT E. PERWIN, ESQ.


   FOR THE BOEHRINGER DEFENDANTS:

        WHITE & CASE
             1155 Avenue of Americas
             New York, New York  10036
        BY:  ROSS E. ELFAND, ESQ.



(Continued)

```
            DAY PITNEY LLP
                    242 Trumbull Street
                    Hartford, Connecticut  06103
            BY:   BRYAN ORTICELLI, ESQ.


    FOR THE BARR/TEVA DEFENDANTS:

            GOODWIN PROCTER LLP
                    Exchange Place
                    53 State Street
                    Boston, Massachusetts  02109
            BY:   MATTHEW T. HUNTER, ESQ.



    FOR McKESSON CORPORATION:

            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
                    Four Embarcadero Center, 17th Floor
                    San Francisco, California  94111
            BY:   STEVEN H. WINICK, ESQ.


    FOR CARDINAL HEALTH:

            BAKER HOSTETLER
                    Capitol Square, Suite 2100
                    65 East State Street
                    Columbus, Ohio  43215
            BY:   ROBERT J. TUCKER, ESQ.


    FOR AMERISOURCE BERGEN:

            BUCHANAN INGERSOLL & ROONEY P.C.
                    Two Liberty Place
                    50 S. 16th Street, Suite 3200
                    Philadelphia, Pennsylvania  19102
            BY:   DAVID A. SCHUMACHER, ESQ.
```

Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177

```
 1                   (Whereupon, the proceedings commenced at 2:02
 2     p.m.)
 3                   THE COURT:  Stefan Underhill.
 4                   COUNSEL:  Good afternoon, Judge.
 5                   COUNSEL:  Good afternoon, Judge.
 6                   THE COURT:  Good afternoon.  We are on the
 7     record.  It probably makes sense, at least for anybody who
 8     expects to be speaking today, to make their appearance.
 9                   MR. ELFAND:  Sure.  Good afternoon, Your Honor.
10     This is Ross Elfand with White & Case on behalf of the
11     Boehringer defendants.
12                   MR. ORTICELLI:  Just for the record, Your Honor,
13     this is Bryan Orticelli of Day Pitney, also for the
14     Boehringer defendants.
15                   MR. WINICK:  Good afternoon, Your Honor.  This
16     is Steve Winick on behalf of McKesson Corporation.  We're
17     a nonparty to this case.
18                   MR. TUCKER:  Good afternoon, Your Honor.  This
19     is Rob Tucker.  I am an attorney for Cardinal Health,
20     who's also a nonparty to this case.
21                   MR. SCHUMACHER:  Good afternoon, Your Honor.
22     This is David Schumacher on behalf of nonparty
23     AmerisourceBergen Drug Corporation.
24                   THE COURT:  Okay.
25                   MR. NATION:  Good afternoon --
```

1          THE COURT:  Go ahead.

2          MR. NATION:  Good afternoon, Your Honor.  This

3  is Sean Nation on behalf of the end-payor class

4  plaintiffs.

5          MR. HUNTER:  Good afternoon, Your Honor.  This

6  is Matt Hunter for Barr and Teva.

7          THE COURT:  All right.  If each of you could

8  identify yourselves when you start speaking, that would

9  make the record a lot clearer.

10          I have seen the joint letter, reviewed that and

11  am prepared to take up the issue.  I think it would be

12  helpful at the start to hear a little bit more about why

13  the defendants think that the information that's being

14  sought, that is, the identity of the purchasers, is

15  relevant to any issue in the case.

16          MR. ELFAND:  Sure.  This is Ross Elfand for the

17  Boehringer defendants, Your Honor.  I can answer that.

18          And you're right, the only issue before the

19  Court is whether the national wholesalers should produce

20  the customer-identifying information with the sales data

21  that they've already agreed to produce.  And we need that,

22  that customer-identifying information, because defendants

23  cannot evaluate the overlap between the direct and the

24  indirect purchasers' alleged damages without knowing who

25  sold what to whom.  And that overlap in the damages, the

1    alleged damages, that the indirect and direct suffered is

2    key to avoiding the duplicative recovery that both state

3    and federal laws require the courts to avoid.  And the

4    relevant laws and statutes are all in our briefing papers

5    on the renewed motion, but to give you just a practical

6    reason why we would need this information, one of the

7    reasons would be, for example, let's say we only go to

8    trial against retailers and Humana.  Humana would have

9    given us their reimbursement data, and they may have

10   reimbursed both retailers in the case, and we would have

11   those retailers' purchase information, but they've also

12   reimbursed retailers who are not in this case, and we do

13   not know who those nonparty retailers purchased from.  And

14   so if we go to trial against the subset of the parties

15   here, which is very possible, we will not be able to

16   calculate the overlap between those parties' claims unless

17   we get the national wholesalers' sales data and the

18   customers who they sold to.

19            So if the national wholesalers sold to a

20   nonparty retailer and that retailer was reimbursed by

21   Humana, that would be an overlapping damages claim between

22   Humana and the retailers who are suing on assignment from

23   those national wholesalers.  So that's one practical

24   reason.

25            THE COURT:  Well, let's take them up one at a

```
 1    time.

 2             MR. ELFAND:  Sure.

 3             THE COURT:  So on that one what you need to know

 4    is whether the numerical designation provided for a

 5    particular retailer refers to a party or nonparty?

 6             MR. ELFAND:  Well, we'd need to know not just

 7    the nonparty, but we need to know the specific retailer

 8    because Humana's reimbursement data is going to identify

 9    both party -- is going to identify the retailer whom they

10    reimbursed, and we could only figure out that overlap if

11    we know the exact retailer who both Humana reimbursed and

12    the national wholesaler sold to.  So it's not just party

13    versus nonparty.  It still wouldn't do the trick.

14             THE COURT:  All right.  I'm not sure I

15    completely follow that.  If Humana says we had $50 million

16    of reimbursements, 40 million of which went to parties and

17    10 million of which went to nonparties, and then you know

18    from the national wholesalers what all the purchases were,

19    the amounts, etc., and you know only whether they're a

20    party or nonparty, why is that not sufficient?

21             MR. ELFAND:  Because if the national wholesalers

22    sold to a nonparty who's a retailer -- they may have sold

23    to nonparties who are retailers who were both reimbursed

24    by Humana or not reimbursed by Humana, and it's not just

25    the overlap -- just because it's a nonparty retailer
```

1    doesn't mean that those claims are not in the case because

2    the retailers are suing on assignment for those national

3    wholesalers.  So if AmerisourceBergen sold -- if one of

4    the retailers who goes to trial is suing on assignment

5    from AmerisourceBergen, then regardless of whether

6    AmerisourceBergen sold to a party or nonparty, the

7    purchases of AmerisourceBergen are still going to be in

8    that case.

9            THE COURT:  But all you have to do is eliminate

10   double-dipping.  So --

11           MR. ELFAND:  Right.

12           THE COURT:  -- it's just not clear to me why you

13   have to know the identity of the customer in order to do

14   that.  You're going to have the aggregate data of, for

15   example, Humana reimbursements to parties and Humana

16   reimbursements to nonparties.  If it's a nonparty, it's

17   not clear to me how that comes in at all.  If it's a

18   party, you've got the numbers.  You can do the calculation

19   in bulk.

20           MR. ELFAND:  Well, let's say Humana reimbursed

21   Retailer X and Retailer Y, both of whom are nonparties.

22           THE COURT:  Okay.

23           MR. ELFAND:  And AmerisourceBergen -- and,

24   again, we're speaking hypotheticals here --

25   AmerisourceBergen, all of their purchases that went to a

1    retailer who's in the case, they were sold to, say, CVS;

2    CVS goes to trial; Amerisource -- and I don't have the

3    particular assignments in front of me, but let's say the

4    assignments from AmerisourceBergen to CVS are in the

5    trial, and those purchases -- AmerisourceBergen then

6    resold to both Retailer X and Retailer Y, as well as CVS,

7    and Humana is reimbursing all three.  We won't know what

8    is double-dipping and what is not unless we know exactly

9    what's reimbursed to both Retailer X and Retailer Y.

10             THE COURT:  And how do Retailer X and Retailer

11   Y's claims get in the case?

12             MR. ELFAND:  Through Humana.

13             THE COURT:  Okay.

14             MR. ELFAND:  As well as -- as well as

15   potentially purchases by AmerisourceBergen.

16             THE COURT:  Well, okay.  So maybe I'm just

17   missing this.  CVS and Humana, you can figure that out, so

18   that's not an issue, right?

19             MR. ELFAND:  Right.

20             THE COURT:  Okay.

21             MR. ELFAND:  Right.

22             THE COURT:  So your concern is we have two

23   nonparty retailers, and you've got a claim by Humana.

24   Where is the possibility for double-dipping?  If

25   Retailer X and Retailer Y are not parties, why isn't the

1    full reimbursement from Humana to those nonparties part of

2    the case without the possibility of a double dip?

3            MR. ELFAND:  I think I see what you're getting

4    at.  In that example, knowing the nonparty versus party

5    retailer purchase of the sales may work, but we also don't

6    know how it's going to play out.  If the DPP class --

7    there are several iterations of how this could play out.

8    The DPP class may -- we may settle with the DPPs.  The DPP

9    class may not be certified, and certain class

10   representatives may go forward.  There's just so many

11   different iterations of how this could go forward, and our

12   experts are only going to be submitting reports in the

13   next six to eight months, and that may be before we know

14   whether or not class certification happens and before

15   there's settlements which may happen right before trial.

16   And so our experts are going to need to be doing a lot of

17   these evaluations early on in the case.

18           THE COURT:  Right, right.  Okay, I understand,

19   it's a complicated case.  I get that.

20           MR. ELFAND:  Right.

21           THE COURT:  I'm still not -- I'm puzzling to

22   figure out a scenario in which sales to nonparty retailers

23   are going to create a double-dipping situation if you

24   don't know the identity of those retailers.  So the

25   Humana/CVS, you have all the data.  Regardless of who

1    settles, you can figure out that situation because you're

2    going to have all the data.  You're going to have the

3    names, you're going to have how much Humana reimbursed

4    CVS, etc., etc.  Your experts are not going to have a

5    problem.

6              With nonparty retailers, what's the risk that

7    you're not going to be able to figure out the double dip?

8    That's what I can't figure out.  And the nonparty

9    retailers, I mean by definition they're not in the case,

10   their claims are not in the case, so I guess I'm

11   struggling to understand the relevance of the identity.

12             MR. ELFAND:  Well, the DPPs are also seeking

13   damages on behalf of the entire -- of everybody, of all

14   purchases in this case, and so if they are able to

15   recover, there certainly would be a double dip there for

16   any of Humana's reimbursements as well, so that's a double

17   dip there.

18             THE COURT:  Wait, wait, wait.  Slow down.  Let's

19   take it one at a time.

20             MR. ELFAND:  Sure.

21             THE COURT:  So you've got the DPPs as a class

22   seeking damages on behalf of nonparty retailers.  Is that

23   what you're saying?

24             MR. ELFAND:  No.  DPPs are seeking damages for

25   all direct purchases from the defendants other than the

1    ones that have been -- they're seeking to represent a

2    class of all direct purchasers from the defendants.  That

3    would exclude the purchases that have been assigned by --

4    the national wholesalers that have been assigned to the

5    retailers.  Eventually we assume that they would be

6    knocked out.  So, in aggregate, all direct purchases are

7    at issue in this case, and both the DPPs and the EPPs,

8    end-payor classes, are arguing that the EPPs -- the EPP

9    class is able to recover a hundred percent of the

10   overcharge, and the DPPs argue they can recover a hundred

11   percent of the overcharge, and that will, with treble

12   damages, result in six-fold damages.  So there is an

13   overlap, and what we're trying to avoid is a situation

14   down the road when there's so many iterations of how this

15   could play out where we just don't have the data that we

16   need.

17          THE COURT:  But as I understand it, you have the

18   data.  What you don't have is the identity.

19          MR. ELFAND:  Correct.

20          THE COURT:  So what I don't follow is how having

21   the identity helps you with the data.  In other words,

22   you're going to know the volume -- so I guess the point is

23   this, right, your point is the national wholesalers are

24   part of the DPP class.  Is that your point?

25          MR. ELFAND:  Correct.  The national wholesalers

1    are both part of the DPP class as well as being assigned

2    some of their purchases to the retailers, that's right.

3              THE COURT:  Okay.  And so your concern is when

4    they then sell to the end-purchaser plaintiffs, your

5    concern is the double dip comes from they've already

6    claimed the damages and now they're going to -- the EPPs

7    are going to claim the damages again.

8              MR. ELFAND:  Correct.

9              THE COURT:  So --

10             MR. ELFAND:  Correct.

11             THE COURT:  All right.  So when you see that a

12   national wholesaler purchased $10 million of the product

13   and sold $4 million of the product, why do you need to

14   know to whom they sold the 4 million?

15             MR. ELFAND:  If they sold 4 million to a

16   retailer that is in the case --

17             THE COURT:  So, okay, right, so of the

18   4 million you now know by coding that 1.2 million of that

19   is to parties in the case, and 2.8 million is to parties

20   not in the case.

21             MR. ELFAND:  Right.

22             THE COURT:  How can you not calculate the amount

23   of the double-dipping without knowing who those

24   $2.8 million of sales went to, or those $4 million of

25   sales really?

1          MR. ELFAND:  Right.  It depends on $4 million in

2    sales to who.  Is that $4 million in sales to the retailer

3    plaintiff in the case or not in the case?

4          THE COURT:  That's what I'm saying.  You know

5    from the codes that 1.2 million went to retailers in the

6    case, and 2.8 million went to retailers not in the case.

7    Now, how is it, when you know all of that, you cannot

8    calculate the double dip without knowing who those 1.2 and

9    $2.8 million purchasers are?

10          MR. ELFAND:  I think in that situation where all

11    that's left in the case are the retailers and let's say

12    Humana, you're right, we would only need to know the

13    retailer -- whether or not the sales were to a retailer in

14    the case or not in the case, and I believe we could figure

15    out the overlap in that situation.

16          THE COURT:  Right, because we're talking about

17    aggregates.  It's not going to make a difference that $38

18    of Aggrenox got sold to mom and pop pharmacy.

19          MR. ELFAND:  Right.  Yes, in that situation we

20    would be able to do that with -- I guess we would need

21    more than just a numeric identifier.  We would need a

22    numeric identifier and then which numbers are --

23          THE COURT:  Parties and which ones are not.

24          MR. ELFAND:  Identify the retailers, I guess,

25    that are in the case.

1          THE COURT:  Right, as a group, as a group.  In

2     other words, all numeric identifiers beginning with a 1

3     are parties to the case and all beginning with a 2 are not

4     parties to the case.  In other words, even for the parties

5     in the case you don't need to know which party bought how

6     much; you just need to know in aggregate how much they

7     purchased from a particular national wholesaler.

8          MR. ELFAND:  Right, I think usually that would

9     be kept on a monthly basis.  That would be helpful to

10    have, on a monthly basis would be ideal; but, correct, it

11    would be the aggregate.  We wouldn't need the overlap --

12    we wouldn't need to trace every pill.  We've been saying

13    that all along, we don't need to trace every bottle.

14          THE COURT:  Right.

15          MR. ELFAND:  We could aggregate it on a monthly

16    basis.  Now, there is another example --

17          THE COURT:  Okay.

18          MR. ELFAND:  -- where we would need to know the

19    specific markups, I guess.  Defendants are obviously

20    arguing about liable law, but if we're liable for

21    anything, it's only the overcharge that we actually

22    charged, not --

23          THE COURT:  Right.

24          MR. ELFAND:  -- markups that are in the middle

25    of the distribution chain.

```
1              THE COURT:  Right.

2              MR. ELFAND:  Let's say Retailer Y is marking up

3    Aggrenox to a consumer and then is reimbursed by Humana.

4    We wouldn't know what the markup is unless we have the

5    reimbursement price from Humana plus what that retailer

6    actually purchased the product for, which we would only

7    get from national wholesalers.

8              THE COURT:  All right.  And you're suggesting

9    that Humana's reimbursement is going to be based upon the

10   ultimate sales price rather than the price paid for the

11   product by the retailer?

12             MR. ELFAND:  Right.  Humana's -- the data we've

13   gotten from all the insurer parties identifies the

14   reimbursement amount as well as the co-pay amount that the

15   consumer paid, and generally you combine that number and

16   that's the sales price at the retail level.

17             THE COURT:  Okay.  Because Humana's

18   reimbursement is going to the ultimate consumer, is that

19   right?

20             MR. ELFAND:  Humana's reimbursement is going to

21   the retailer.

22             THE COURT:  Well, if it's going to the

23   retailer -- what you're saying is Humana is basing its

24   reimbursement to the retailer on the ultimate sales price

25   rather than the cost to the retailer?
```

1              MR. ELFAND:  The retailer is filling

2    prescriptions to the consumer.

3              THE COURT:  Right.

4              MR. ELFAND:  And at the pharmacy desk, the only

5    thing that the consumer pays, unless the consumer/patient

6    is paying full price, the patient will just provide a

7    co-pay at the time of the prescription being filled.

8              THE COURT:  Right.

9              MR. ELFAND:  And then the retailer will, based

10   on the insurance card that's provided at the time, the

11   retailer will have a negotiated price with whoever the

12   insurer is, either through a PBM, pharmacy benefit

13   manager, or directly with the insurer, and that price is

14   negotiated, and the reimbursement happens directly, not

15   with the prescription being filled, not at the desk, but

16   through a computer transaction that goes between the PBM

17   or insurer and the retailer.  And the data we get from the

18   insurers, insurer plaintiffs, either EPPs or Humana or

19   other opt-out, is we get the data from them saying, Here's

20   the amount we reimbursed the retailer, and here's the

21   amount that the patient provided out of pocket.

22             THE COURT:  And why is the claim here going to

23   be for more than Humana reimbursed?  The retailer is going

24   to claim what, the difference between the reimbursement

25   amount and the amount it paid?  Is that the point?

1          MR. ELFAND:  The end-payors are going to claim

2     that their damages are the reimbursement amount -- the

3     end-payors, they're claiming on behalf of the patient and

4     the insurers, but if we just focus on opt-out insurers, it

5     will make it easier.  Opt-out insurers are claiming that

6     their damages is the reimbursement amount, that's how much

7     was out of pocket, and the but for price in the but for

8     world that they would have paid for the generic had the

9     generic entered earlier, and they calculate the difference

10    between the two.  And what we're saying is if a

11    reimbursement amount is based on a price that has been

12    marked up by the retailer through negotiations, that that

13    is not conduct -- that is not antitrust -- directly

14    traceable to the antitrust injury.

15          THE COURT:  Yes, I get that, but do you have

16    reason to believe that the insurance company is paying

17    based upon the retail amount that a particular retailer is

18    charging?  I mean, the insurance company is going to say,

19    We're not going to pay more than 61 cents per Aggrenox

20    pill.  You can charge whatever you want for them, but

21    we're only going to pay 61 cents.  They're not going to

22    say, We're going to pay you -- oh, you charged them $1.25

23    a pill?  Oh, sure, here it is.  We'll pay you for that.

24          They're going to have a price that they're -- I

25    assume they're going to have a price, a standard price, We

1   only pay "X" dollars or "X" cents per Aggrenox pill,

2   right?

3           MR. ELFAND:  Right.  That is the retail price.

4           THE COURT:  Well, no, no.  The insurer,

5   presumably, has negotiated as part of its -- maybe as part

6   of its policy -- we only pay 61 cents a pill for Aggrenox.

7   You can charge whatever you want for it.  We're only going

8   to reimburse you 61 cents.

9           So how is the reimbursement, in other words,

10  tied to the amount that's actually charged?  There's no

11  markup that's going to be reflected in an insurance

12  payment, I don't think, because --

13          MR. ELFAND:  There is.

14          THE COURT:  There is?  Go ahead.

15          MR. ELFAND:  There is.  The reason there is, is

16  because the negotiated amount between the insurer and the

17  retailer is the retail price, and that amount is going to

18  be larger than -- is going to be, in certain

19  circumstances, marked up above the amount by which the

20  retailer purchased from the wholesaler.

21          THE COURT:  So what you're saying is the

22  insurance company just says to the retailer, Charge

23  whatever the heck you want for Aggrenox.  We'll pay for

24  it.  Don't worry about it.

25          That's not the way the world works, is it?

1              MR. ELFAND:  No, no.  It works -- there's

2    negotiated prices between the retailer and the insurer --

3              THE COURT:  Right.

4              MR. ELFAND:  -- that end up being higher than

5    the price the retailer purchased the drug for, and that

6    markup -- that's a markup in the middle of the

7    distribution chain that the defendants had nothing to do

8    with.

9              THE COURT:  All right.  And how do we know it's

10   a markup?

11             MR. ELFAND:  We know from the data that -- well,

12   first of all, the retailers have to make their own profit,

13   so they're going to get more money from the insurer and

14   the patient than they pay for the product, so there's a

15   markup right there.

16             THE COURT:  Well, I don't know how it works, but

17   the co-pay is something, right?  If I walk in and I buy a

18   bottle of Aggrenox and I have to pay, under my plan, $20,

19   you're saying that goes back to the insurance company or

20   does that go to the retailer?

21             MR. ELFAND:  That goes to the retailer.

22             THE COURT:  Right.  So there we go.  They're

23   making $20 off the bottle even if they are charging

24   exactly what they're being reimbursed for, charging their

25   cost.  But, okay, let's back up.

1          My belief about how this works, and maybe I'm

2     just wrong, is that the insurance company negotiates or

3     just sets a reimbursement rate for a particular drug.

4     We're going to pay "X" cents per pill or "X" cents per

5     milligram or however they're going to do it.  You charge

6     whatever you want.  If there's a markup at the retail,

7     that's not changing what the reimbursement rate is, I

8     don't think.  If Humana says, We're going to reimburse 61

9     cents per Aggrenox pill, and there's some retailers that

10    are selling it for 90 cents and others selling it for

11    $1.25, they're all getting 61 cents.  They're making their

12    money, I think, off either the consumer and/or the co-pay

13    or something.  They're not making it off the insurer.  So

14    if you got the insurance numbers, who's claiming that

15    markup?  The insurance company is not claiming the markup,

16    presumably, unless I'm misunderstanding how the world

17    works.

18          MR. ELFAND:  Right.  The retailer is getting the

19    markup at -- through the negotiation with the insurance

20    company because the retail price is the negotiated price.

21    The insurance company isn't saying you can charge whatever

22    you want at the counter.  The insurance company is saying,

23    Here's the negotiated price for patients covered by us,

24    here's the co-pay, here's what you should ask the patient

25    at the pharmacy counter at the time of the sale for a

1    co-pay amount, and here's what we will reimburse you for,

2    and that's all negotiated before the sale.  So the retail

3    price is that negotiated amount.

4              THE COURT:  All right.  And so how does the

5    markup come into it then?  There's a preexisting

6    negotiated price.  Where does the markup happen?

7              MR. ELFAND:  In that negotiated price.  It's

8    going to be higher than the price the retailer has paid,

9    and we only know the amount the retailer has paid for

10   retailers that are parties, not retailers that are

11   nonparties.  But those nonparty retailers' markup is still

12   relevant because opt-out insurers are reimbursing both

13   party retailers and nonparty retailers.

14             THE COURT:  All right.  I'm looking back at your

15   example on page 3 of the letter, which I don't think

16   really captures the problem you're now describing.  The

17   negotiated price that's the covered price by the insurance

18   company is going to be based upon the wholesale price to

19   the retailer, correct?

20             MR. ELFAND:  I believe that's right.  It's

21   different, but yes, I believe that is right.  It's often

22   based on the average wholesale price.

23             THE COURT:  Right.  So you've got an average

24   wholesale price of, let's say, 55 cents a pill, and the

25   insurance company says, We'll reimburse you for 61 cents,

1    or maybe it's the other way around, maybe it's 65 cents

2    per pill and we'll reimburse you for 61 cents.

3            Now the retailer says, Okay, if we're going to

4    make any money off this deal, we've got to charge $1.20.

5            I guess I'm still missing how there's a double

6    dip here.  You have the price that the retailer paid, you

7    have the negotiated insurance price, and you know the

8    total retail sales price is the volume times price.  Why

9    is it that smart people can't figure out --

10            MR. ELFAND:  In that situation it's not a

11    double-dip issue.

12            THE COURT:  Right.

13            MR. ELFAND:  It's just the ability -- the

14    defendants need to be able to calculate what the indirect

15    purchasers' damages are to rebut their damage

16    calculations.  They're going to argue, They don't need

17    this information in order to calculate the damages.  They

18    cite a lot of class certification decisions on that.

19            Our response to that is forget -- putting aside

20    class certification, whether the way they want to

21    calculate damages is enough for class cert purposes, we're

22    entitled to try to rebut that, and one way we can rebut

23    their damages calculations is to say that the markup --

24    that part of what they're calculating to be damages caused

25    by defendants' conduct is really caused by markups in the

1    middle of the distribution chain.

2              THE COURT:  Well, that's true only if their

3    damages are the retail price, not the wholesale price.  So

4    why isn't the answer that the retailers get the wholesale

5    price as damages?

6              MR. ELFAND:  Because they're alleging that --

7    sorry, say that question one more time.  I want to make

8    sure I understand it.

9              THE COURT:  So what you're worried about is the

10   retailer is going to say, Hey, we sold this for $1.20, and

11   you're worried about the markup over the 61 cent retail

12   price as damages, and you don't want to pay damages on

13   their markup, I get that, but why aren't their damages

14   then defined by what they paid for the pill as opposed to

15   what they sold it for?  They bought the pill from the

16   wholesalers.  That data is going to be available to you.

17   Why --

18             MR. ELFAND:  Right.  I think I get the

19   disconnect now.  The retailers are not seeking damages

20   based on their purchases.  The retailers' purchases are

21   not in this case whatsoever as far as retailers' damages

22   because the retailers are only suing based on assignments

23   from the national wholesalers.

24             THE COURT:  Okay.

25             MR. ELFAND:  So the damages that I'm talking

1      about in the indirect purchaser damages are the damages

2      allegedly suffered by the insurers and patients.  Patients

3      is only part of the end-payor class, and insurers are both

4      part of the end-payor class as well as opt-outs.  And

5      those opt-outs are reimbursing based on the $1.20 retail

6      price that's set, and they're going to claim that's the

7      price we paid, and our damages are the difference between

8      that price and the price that we would have paid had the

9      generic entered earlier, and our point is that they

10     shouldn't be able to recover that entire gap between the

11     but for generic price and the brand price because a lot of

12     it is markup at the middle of the distribution chain.

13             THE COURT:  Okay.

14             MR. ELFAND:  When you --

15             THE COURT:  So you're focusing on the damages

16     suffered by the end-user patients, is that right?

17             MR. ELFAND:  In that example yes, but it's

18     compounded -- that example is focused on being able to

19     calculate the alleged damages suffered by the end-payors,

20     but the problem is compounded by the fact that we're also

21     facing that exact same overlapping overcharge at the

22     direct purchaser level, and if they're able to recover not

23     only the exact overlap and overcharge but on top of that

24     markups in the middle of the distribution chain, it

25     compounds the problem.

1             THE COURT:  Right, okay, but here we go.  Let's

2    get back to basics.  What you're seeking is the identity

3    of the retailers, right?

4             MR. ELFAND:  The identity, correct, of the

5    national wholesalers' customers, which would be retailers.

6             THE COURT:  Right.  And what I still am --

7    however you calculate the damages, whether you have your

8    experts take out or include the markup, which they ought

9    to be able to do based upon aggregate data, here's the

10   aggregate wholesales, here's the aggregate retails, what's

11   the difference?  Oh, there's "X" amount of markup in

12   there.  We're not going to -- or we're going to argue that

13   that's not appropriate damages.  We're going to have a

14   fight about that.

15            What I don't get is how does it matter to you

16   that mom and pop pharmacy is the one who bought 60 bottles

17   of Aggrenox?

18            MR. ELFAND:  It can certainly be done on an

19   aggregate basis, but I'm sure the comeback to that once

20   we're at trial with a subset of parties is they will

21   argue, Well, it wasn't us that marked it up that much.  It

22   was the ones who are not in the case.

23            THE COURT:  But it doesn't matter who marked it

24   up, does it?  In other words, you can calculate along the

25   chain when you know the manufacturing cost and you know

1    the wholesale price and you know the retail price.  The

2    identity of any of those entities doesn't -- the specific

3    retail stores that were involved doesn't really matter,

4    does it?

5              MR. ELFAND:  It does because that markup is

6    likely to vary from retailer to retailer, and we'd only

7    know the markup in two ways, either through aggregate data

8    through INS or -- which the plaintiffs will rebut by

9    saying that that markup is not reflective of the purchases

10   that are in the case that's left, or by knowing what the

11   retailers paid and what they sold it for.  We have what

12   they sold it for.  What we don't have is what they

13   purchased it for, if they're a nonparty.  And the only way

14   to get that is through the national wholesalers.

15             THE COURT:  Right, but you'll get that.  What

16   you won't get is that it's mom and pop retailer that is

17   represented by this particular line of sales data.

18             MR. ELFAND:  Right, and the issue with that is

19   if an opt-out insurer, we know that they reimbursed

20   Retailer X for a certain amount and it's a nonparty, we

21   wouldn't know what that particular Retailer X purchased it

22   for without having national wholesalers identify how much

23   they sold --

24             THE COURT:  No, but --

25             MR. ELFAND:  -- to Retailer X and how much and

1    the price.

2            THE COURT:  What I'm suggesting is you're going

3    to know that, but you're not going to know the name of the

4    entity.  You're going to know it's Customer 1234.

5            MR. ELFAND:  I don't think we will because we

6    won't be able to match it up.  We'll have the name of

7    Retailer X through the opt-out insurer, but then we go to

8    the national wholesalers' data and all we know is they

9    sold "X" amount to --

10           THE COURT:  But if you aggregate it, why do you

11   need to match it up?  Humana spent $12 million reimbursing

12   nonparties.  Nonparties, who purchased the product, had

13   the following aggregate sales data.  Here's what they

14   bought it for.  Here's what they sold it for.  I'm not

15   following, unless you are doing a pill by pill, I'm not

16   following why you need to know mom and pop as opposed to

17   Purchaser 1234.

18           MR. ELFAND:  Let's say Humana purchased from

19   Retailer X and Y, and one of the national resalers sold to

20   Retailers XYZ, ABCD, all different retailers, all

21   nonparties, and retailers have reiterated 70 percent of

22   the retail market is not in this case.  So there's all

23   these sales by the national wholesaler, but we don't

24   know -- we know these different numbers are nonparties,

25   but we don't know the two numbers that match up with what

1    the opt-out insurer reimbursed.  There's the overlap, but

2    there would also be sales by the national wholesaler that

3    Humana just didn't reimburse to.  They didn't go to that

4    retailer.

5            THE COURT:  You're going to know the

6    reimbursements by Humana.  You're going to know the number

7    of pills for which they reimbursed.  I'm not an economist,

8    but I don't see why you can't claim an exemption for that

9    amount -- I say claim an exemption, I mean why you can't

10   figure out what amount is properly in the case and what

11   amount is not in the case.  I'm just not --

12           MR. ELFAND:  Should I -- I thought that example

13   was a good example of where we can't do it.  If the

14   national wholesaler sells to 50 retailers who are

15   nonparties and Humana is only reimbursing to three of

16   them --

17           THE COURT:  Right.

18           MR. ELFAND:  -- we would only know --

19           THE COURT:  You're happy, you're happy at that

20   point because the folks who are not -- the retailers who

21   are not in the case are not making a claim, so there you

22   go.

23           MR. ELFAND:  Right.

24           THE COURT:  You just reduced your damages.

25           MR. ELFAND:  Right.

```
 1              THE COURT:  The only damages at that point are

 2    damages from Humana's reimbursements.

 3              MR. ELFAND:  Right, but we can't get the

 4    overlap -- the overcharge, the markup by the retailers

 5    whom Humana reimbursed.

 6              THE COURT:  Pick an average of all the

 7    nonparties.  On average they received "X."  Humana

 8    reimbursed "Y."  Subtract "Y" from "X" or "X" from "Y,"

 9    whatever.

10              MR. ELFAND:  Right.  We can certainly take the

11    average, but then what Humana or the opt-out insurers may

12    argue is that the markup by Retailers X and Y was really

13    small, and you're taking an average of both Retailer X and

14    Y and all these other retailers, and it's those other

15    retailers that are marking it up, not the ones that we're

16    reimbursing.  So they would say that that average is not

17    right.

18              THE COURT:  That's their problem, isn't it, not

19    yours?

20              MR. ELFAND:  Well, we're in discovery right now.

21    How that plays out, if that's what you're saying, we would

22    agree with that, but I don't know how that's going to play

23    out; and if we're at trial and this comes up, that's the

24    issue we're trying to avoid.

25              THE COURT:  Well, I guess I don't see how this
```

1    isn't tracing every pill, frankly.

2         MR. ELFAND:  Because it's an average by

3    customer, not by pill.  We're not tracing the pill, we're

4    just -- we would be averaging each customer's markup for

5    each month and where an opt-out insurer reimbursed that

6    particular month, now we know what the markup was for that

7    particular retailer, and that should come out of the

8    averages.

9         THE COURT:  So you're tracing every bottle, not

10   every pill.

11        MR. ELFAND:  Well, we're tracing every

12   customer's prices on a monthly basis, not every pill,

13   through the distribution chain, and not every bottle

14   through the distribution chain either.

15        THE COURT:  All right.  Let me hear from some of

16   the opponents of the discovery so they can tell me if I'm

17   crazy here.

18        MR. WINICK:  Your Honor, this is Steve Winick on

19   behalf of McKesson Corporation.  We're a nonparty.  We're

20   opposing this request.  And the nitty-gritty that you just

21   got involved in is something that we can't do that well in

22   that the national wholesalers are not active in the

23   indirect purchaser claims.  We haven't walked through all

24   of the points.  We don't know how they're going to prove

25   their case.  We are not an indirect purchaser.  The only

1    information that's relevant to our direct -- as a putative

2    member of the direct purchasers is our purchase data,

3    that's it, and as a general rule, we never produce sales

4    data in any respect in these cases, and there's

5    substantial case law to support that.  We have never

6    produced the data that's being requested here in any case,

7    at any time, and the only case that we've ever come close

8    to producing this was the *Androgel* case, which is out of

9    the 11th Circuit, which has an outlier rule that allowed,

10   in the direct purchaser case under Valley Drug to test

11   whether or not there was a class conflict, and so

12   therefore they got to see our sales data.  But even in

13   that case, which is not relevant here, that line of

14   reasoning is not being put forward by the defendants in

15   this case, nor has it ever been accepted by any

16   jurisdiction outside of the 11th Circuit, even in that

17   case we did not produce customer identifying data.

18           The sales information itself is a very tough,

19   bitter pill for us to swallow.  It's no exaggeration to

20   suggest that -- to describe this as some of our crown

21   jewels.  Who our customers are, the pricing that we have

22   to them is some of our most secretive information.  One

23   small little anecdotal evidence, as outside legal counsel,

24   McKesson does not even produce their supply agreements to

25   me.  If I want to see them, I have to go to their offices

1    and see them.  This is really proprietary, really

2    confidential information.

3             So I go back, then, to what defendants' burden

4    is.  So they need to show a particularized need, and it's

5    got to be narrowly tailored to the need.  And what I just

6    heard -- and we've already done our share of arguing with

7    the defendants along the way, and we can't connect the

8    dots why they need this on a customer basis, and we're

9    left with the idea that at the end of the day the only way

10   this is coming in is through a pill-by-pill analysis.  And

11   we're getting hypotheticals presented to us, and even some

12   of the language that counsel used today was suggesting, We

13   don't really know how this is going to play out.  And I

14   highlight the fact that they didn't produce and they

15   haven't given us any expert's declaration, testimony that

16   would explain how they would actually use this data, this

17   very highly proprietary data.

18            In indirect purchase cases I've never -- we're

19   not aware that this process or this analysis that

20   defendants are now suggesting has ever taken place; and,

21   in fact, most courts that have considered this, as

22   recently as the *Asacol* case out of -- which I believe was

23   after this Court looked at this issue with respect to the

24   retailers, rejected this discovery completely, in which

25   case we shouldn't be producing our sales data at all

1    because it's just not -- it's not relevant.

2            What we've offered here is I believe an

3    abundantly reasonable compromise where we would produce

4    the sales data with a unique customer identification

5    number, and at the same time it would be without prejudice

6    to plaintiffs introducing evidence later, if all of a

7    sudden a theory came and it became very clear based on

8    what the indirect purchaser plaintiffs were arguing in the

9    case or something to that effect, that they could come

10   back.  But this argument has now been -- has been in play

11   for at least five months, since when I think the judge

12   heard this previously, and the hypotheticals that they

13   present are just that, they're hypotheticals; and from our

14   perspective, aggregate data satisfies all the different

15   hypotheticals that have been presented thus far.

16           And that's all of my comments, and I know that

17   Amerisource and Cardinal counsel may also want to argue as

18   well.

19           THE COURT:  All right.  Before I hear from them,

20   let me just have you confirm that you're obviously going

21   to maintain an encryption key, if you will, that will

22   allow, should it become necessary at a later date, to say

23   that Customer 1234 is mom and pop pharmacy in Peoria,

24   Illinois or whatever?

25           MR. WINICK:  Yes, we will have an encryption

1    key.

2              THE COURT:  Okay.

3              MR. TUCKER:  Your Honor, this is Rob Tucker.  I

4    represent Cardinal Health.  I just wanted to take a minute

5    to respond a little bit to the back-and-forth that Your

6    Honor had with Mr. Elfand about the notion of the markup

7    that occurs in the middle of the distribution chain.

8              My understanding is the same as Your Honor's

9    about how the process works between the insurance company

10   and the retailers as to how it is determined what the

11   insurance company is going to reimburse the retail

12   pharmacy for, that it's done through a negotiation, and a

13   lot of times it's done through a negotiation with a PBM

14   where there's a set rate that is agreed the insurance

15   company is going to pay those pharmacies for particular

16   products.  And what I understand from Mr. Elfand is he

17   wants to know whether there was some sort of markup that

18   was discussed during that process.

19             Even assuming that were to be true, our clients,

20   at least I know my client would not have any information

21   or any data that would relate to that particular markup.

22   So providing sales data with the customer names, for

23   example, sales that Cardinal Health made to Bob's Pharmacy

24   in Dallas, Texas and what they paid wouldn't get them any

25   further in determining what markups were fully made

1   through the distribution chain that ended up having some

2   type of impact on the negotiated price between Humana and

3   CVS, for example.  And so I think the reason that's been

4   proffered for needing our contact -- our customer-specific

5   contact information wouldn't get them where they want to

6   go.  I just thought it would be helpful to try to clarify

7   that point.

8              THE COURT:  Okay, thank you.

9              MR. PERWIN:  Your Honor, this is Scott Perwin

10  for the Walgreen plaintiffs.  I just wanted to make one

11  point, if I could, just a factual point, very briefly --

12             THE COURT:  Sure.

13             MR. PERWIN:  -- as somebody who represents

14  retailers.  Retailers mark up generics more than they mark

15  up brands, so from the standpoint of the end-payors'

16  damage claim, that works in the defendants' favor.  It

17  reduces the overcharge because it offsets the lower price

18  that the retailer pays for the generic and means that

19  less -- a lower overcharge is going to exist at the

20  end-payor level than would if they used the same markup

21  for the brand and the generic.

22             So I just want the Court to be clear on that.

23  It seems like Mr. Elfand was suggesting the opposite, that

24  they don't want to pay for markups that are over and above

25  the markup that would apply to the generic, but it's the

1   other way around.  Generic markups are higher than branded

2   markups.

3                THE COURT:  As a percentage of the price or as

4   a --

5                MR. PERWIN:  As a percentage of the price.  So

6   if they pay a dollar for the brand, they might mark it up

7   ten cents.  If they paid 50 cents for the generic, they

8   might mark it up 25 cents.  And as I said, that means that

9   the overcharge to the end-payor is going to go down

10  because some of that money is going into the pockets of

11  the retailer.

12               THE COURT:  Got it.  Okay.

13               All right.  Mr. Elfand, did you want to respond

14  at all?

15               MR. ELFAND:  Yes, I would.  I could start with

16  the point that Mr. Winick made or if you'd rather hear our

17  response to the markup issue.

18               THE COURT:  Doesn't matter, whatever.

19               MR. ELFAND:  I'm sorry?

20               THE COURT:  Anywhere is fine.

21               MR. ELFAND:  Sure.  I'll start with -- first on

22  the *Androgel* case, in that case the national wholesalers

23  did identify the customers who were parties in that case,

24  the retailers to whom they had assigned the claims.  So

25  when Mr. Winick said that we were speaking hypotheticals

1   and we don't know how this is going to play out, that was

2   on the duplicative recovery issue, and I think we -- this

3   hasn't been proposed before until Your Honor raised it,

4   and thinking it through I do believe that that would be a

5   satisfactory compromise for the duplicative recovery

6   issue.  But on the markup issue, we would need to know the

7   individual customers.

8            I'll get to the markups in a second, but

9   Mr. Winick also mentioned that this is their crown jewels.

10  I think if we get past the fact that -- if Your Honor is

11  convinced that we need the information, that the

12  protective order in this case will protect their crown

13  jewels.  The defendants have produced their crown jewels

14  in this case as well, their manufacturing process used,

15  the formulation process used, and third parties have done

16  the same as well.  Other generics in this case have

17  produced their end of files and their highly confidential,

18  commercial, sensitive information.  So I think the

19  protective order will address that.  And they have a

20  supplemental protective order in this case as well that

21  specifically goes to national wholesalers' concerns about

22  their information being revealed to each other were it at

23  a live hearing.  So they've got the protection they need

24  if this information is relevant.

25            As far as the *Asacol* case goes, that case

1    actually supports our argument because, just like in this

2    case, the DPPs there agreed to produce their sales

3    information, and the national wholesalers weren't at issue

4    in that argument.  The exhibits in Mr. Shadowen's letter,

5    I think it's the EPPs' letter that they submitted in

6    supplemental, submitted in response to the joint letter,

7    they attached that order, and the order makes it clear

8    that the DPPs were required to produce their sales

9    information if the defendants requested it because the

10   DPPs had agreed and had offered to produce it, and if the

11   defendants wanted more, they could come back.  So that

12   case only supports our position because the DPPs are the

13   wholesalers, and it's the same thing that's going on in

14   this case.

15          And, finally, on the markups issue, I wasn't

16   suggesting that the markup was higher for the brand than

17   the generic.  I believe Mr. Perwin is right, that

18   generally the markup for the generic is going to be higher

19   on both the absolute and a percentage basis.  There may be

20   exceptions to that, but generally that is true.  But the

21   actual price paid is still a price that's been marked up,

22   by no doing of the defendants, and the reason why -- that

23   may sound like it doesn't matter, but it matters because

24   they're indirect purchasers.  And we already have a class

25   of direct purchasers collecting one hundred percent of the

1  overcharge, so the damages calculation should not be the

2  price that -- for the indirect purchasers should not be

3  the price that the indirect purchasers actually paid; it

4  should be what overcharge flowed through, what actual

5  overcharge that the defendants' conduct caused, what

6  flowed through the distribution chain to the indirect

7  purchasers?  That's the law.  And even if they're

8  intending to calculate their damages by looking at the

9  price they actually paid and then the but for price,

10  that's okay if that's how they want to do it.  We're

11  entitled to rebut that calculation by saying the price

12  they paid does not include -- includes a markup, and we

13  shouldn't be required to pay damages based on a markup.

14         THE COURT:  Okay.  Let me confirm with the

15  wholesaler counsel that they would be able to code the

16  customers by whether they're parties or nonparties to this

17  litigation.

18         MR. WINICK:  This is Steve Winick on behalf of

19  McKesson Corporation.  Yes, we could.

20         THE COURT:  Okay.

21         MR. TUCKER:  Your Honor, on behalf of Cardinal

22  Health, what we had proposed was giving them the sales

23  data without the customer names and addresses and giving

24  them another sheet -- but that did have customer numbers,

25  and then giving them a separate sheet that identified the

1    customer numbers for each of our assignees in this case.

2           MR. SCHUMACHER:  Your Honor, this is David

3    Schumacher on behalf of AmerisourceBergen.  I believe that

4    we could do something similar to what Cardinal is

5    proposing.

6           THE COURT:  Okay.  So, in other words, it would

7    be possible from that information to figure out whether

8    any particular customer identified by a number was a party

9    or nonparty?

10          MR. SCHUMACHER:  This is David Schumacher.  But

11   one thing I'd like to correct, I believe that Mr. Elfand

12   stated, that in the *Androgel* case where Mr. Winick noted

13   that that was the one case where a Court has ordered any

14   of the three of us to produce national or complete sales

15   data, the order in that case specifically says, quote:

16   The above sale data may be produced with customer names

17   and addresses redacted so long as an identifiable customer

18   number can be matched throughout the data.

19          So to my recollection and pursuant to the order

20   in that case, there was no direction by the Court that

21   any -- any party -- I'm sorry, the names of any entities

22   be identified, whether they were retailers or whoever they

23   were.  We were allowed to take out names and addresses for

24   everyone and just give a number, just as we're proposing

25   to do here, and again the number could be sorted on by the

1    defendant's expert, etc., etc.

2            THE COURT:  Right.

3            MR. ELFAND:  Your Honor, if I could just respond

4    to that.  This is Ross Elfand.  He left out the next

5    phrase in that same sentence on page -- this is Exhibit, I

6    believe, 6 to our reply brief:  ...redacted so long as an

7    identifiable customer number can be matched throughout the

8    data and to the contracts referenced in paragraph 3 below.

9    And those contracts are the contracts with the retailers

10   who they assigned their purchases to.

11           THE COURT:  Okay.  The thing that I want to be

12   clear about is whether the customer lists are going to be

13   sortable by party versus nonparty, because I think in

14   order to get the aggregate data they're going to have to

15   understand which sales were to parties and which sales

16   were to nonparties.

17           MR. WINICK:  And, Your Honor -- this is Steve

18   Winick on behalf of McKesson -- all three of the national

19   wholesalers said we can do this.

20           THE COURT:  Okay, fair enough.

21           Okay.  Well, I'm going to sustain the position

22   of the wholesalers here.  I do need them to code the

23   numerical identifiers by party or nonparty in some manner

24   that permits the defendants to figure out which sales were

25   to parties and which sales were to nonparties, but I don't

1    believe that the identification of the wholesalers'

2    customers is indeed relevant here.  I'm convinced that the

3    appropriate attack on the damages theory can be made on an

4    aggregate basis, and that's not to say at some future date

5    we may have to come back here and have this battle again

6    if it turns out that, for some reason that I'm not

7    anticipating now, it's important to know who the customers

8    are; but it does seem to me that the information is

9    extremely sensitive, that it's not necessary to the

10   defendants' position, and we ought to seek, to the extent

11   that we can, to proceed without that identification being

12   made.  The wholesalers are providing a great deal of

13   information, and I believe it will be sufficient to allow

14   the defendants to make whatever arguments they need to to

15   address the damages theory.  I hope that resolves the

16   issue.

17          Is there anything else we can usefully take up

18   today?

19          MR. ELFAND:  Nothing from the defendants'

20   perspective.  Thank you for considering the issue, Your

21   Honor.

22          THE COURT:  Sure.  Thank you.

23          MR. WINICK:  Thank you, Your Honor.

24          THE COURT:  All right, thank you all.  Good

25   luck.  Take care.

1              (Whereupon, the proceedings adjourned at

2    3:08 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


May 3, 2017


/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177