UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

IN RE:                        :  No. 3:14-md-2516(SRU)
                              :  915 Lafayette Boulevard
AGGRENOX ANTITRUST LITIGATION  :  Bridgeport, Connecticut
                              :
                              :  July 11, 2017

- - - - - - - - - - - - - - - x


TELEPHONE STATUS CONFERENCE

B E F O R E:

   THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

   FOR THE PLAINTIFFS:

        KENNY NACHWALTER, P.A.
            1441 Brickell Avenue, Suite 1100
            Miami, Florida  33131
        BY:  LAUREN C. RAVKIND, ESQ.
            SCOTT E. PERWIN, ESQ.

        HILLIARD & SHADOWEN LLP
            2407 S. Congress Avenue, Suite E-122
            Austin, Texas  78701
        BY:  STEVEN D. SHADOWEN, ESQ.

        LOWEY DANNENBERG, P.C.
            44 South Broadway, Suite 1100
            White Plains, New York  10601
        BY:  PETER D. ST. PHILLIP, JR., ESQ.

        MILLER LAW LLC
            115 S. LaSalle Street, Suite 2910
            Chicago, Illinois  60603
        BY:  MARVIN A. MILLER, ESQ.

(Continued)

GARWIN GERSTEIN & FISHER, LLP
    Wall Street Plaza
    88 Pine Street, 10th Floor
    New York, New York  10005
BY:  JOSEPH OPPER, ESQ.


HURWITZ SAGARIN SLOSSBERG & KNUFF LLC
    147 North Broad Street
    Milford, Connecticut  06460-0112
BY:  MEAGHAN McGURRIN MILES, ESQ.


HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER
    4400 Deer Path Road, Suite 200
    Harrisburg, Pennsylvania  19103
BY:  MONICA KILEY, ESQ.


FOR THE BOEHRINGER DEFENDANTS:

    WHITE & CASE
        1155 Avenue of Americas
        New York, New York  10036
    BY:  ROSS E. ELFAND, ESQ.

    WHITE & CASE
        701 Thirteenth Street, N.W.
        Washington, D.C.  20005
    BY:  MATTHEW S. LEDDICOTTE, ESQ.


Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177

```
 1                         (3:12 p.m.)

 2              THE COURT:  Stefan Underhill.

 3              UNIDENTIFIED SPEAKER:  'Afternoon, Judge.

 4              THE COURT:  'Afternoon.  I understand folks may

 5  still be calling in to the revised number, but I figured

 6  we'd get started, and hopefully they'll join us.  If there

 7  are any more, they'll join us as we go.

 8              We have a lot to take up, I think, today.  Let

 9  me start by requesting that the joint status report get

10  filed a little sooner than it has been the last couple

11  times.  It's very difficult for me to get prepared fully,

12  with other matters being scheduled on the docket, when the

13  status report comes in basically the day of the

14  conference.  So, if possible, it would be great to get

15  that on file two or three days before the next conference.

16              I assume we should just run through that.  I

17  also wanted to make sure that everybody is prepared to

18  take up the motion to dismiss filed vis-à-vis the

19  Louisiana Health complaint against the German defendants.

20              MR. ELFAND:  Your Honor, this is Ross Elfand for

21  Boehringer.  When you say take it up, do you mean argue it

22  right now?

23              THE COURT:  Well, okay, argue it or -- I'm

24  prepared to rule, frankly, on it today.  I don't know if

25  we need oral argument especially.  It's fairly
```

1    straightforward.  Does anybody think we need argument?

2            MR. ELFAND:  That's okay with Boehringer.

3            THE COURT:  Okay.  All right.

4            Well, let's start going through the status

5    report and figure out what we need to do.  The question of

6    extending the deadlines is probably the best place to

7    start.  I'll tell you I'm not inclined to extend the

8    deadlines.  We have a trial date of February 2019, which

9    is going to be a good five years after the case was filed,

10   so I think we need to try to hold to that.  If there's

11   some critical problem, let's hear it, but in general I'd

12   like to try to hold to these current scheduling dates.

13           MS. RAVKIND:  Your Honor, this is Lauren

14   Ravkind, and we certainly agree with you.  We'd like to be

15   able to hold that trial date, and we are making every

16   effort to complete fact discovery by September 28, which

17   is the current deadline.  In light of the fact that we

18   have the status conferences every other month, we wanted

19   to just give the Court a heads-up given the number of

20   depositions that remain to be scheduled that this may be

21   an issue; and so, again, our plan is to make every effort

22   to complete it by September 28.

23           THE COURT:  All right.  You mentioned the

24   conferences.  Do you think having monthly conferences

25   rather than conferences every other month would be of

1   assistance?

2            MS. RAVKIND:  We may be heading into a time

3   where, Your Honor, that might make sense, and then

4   revisiting it after we get through fact discovery.

5            MR. SHADOWEN:  Your Honor, this is Steve

6   Shadowen on behalf of the end-payor class plaintiffs.  I

7   don't know whether going forward from now till the end of

8   the case we would need one every month, but I do think

9   that an interim status conference next month in August,

10  given the close of fact discovery at the end of September,

11  that having the conference in August where everything is

12  brought to a head would be, I think, useful.  I understand

13  that August is a difficult month, but you see from the

14  number of things in this joint status report, now this

15  party says they're going to file a motion, that party says

16  they're going to file a motion, I think that having a

17  status conference in August would bring all that to a

18  head, and if people are going to file motions, they'll

19  file them, and you can hear argument on them in August.

20           THE COURT:  Anyone disagree?

21           MR. LEDDICOTTE:  Your Honor, this is Matthew

22  Leddicotte from White & Case for the Boehringer

23  defendants.  We are fine with scheduling an August status

24  conference if that would assist both the parties and the

25  Court.  I think, as you've perhaps deduced from the status

1    report, certainly the defendants were looking at it from

2    -- without that conference having yet been scheduled, we

3    were looking at it that we were trying to bring as many

4    issues to the forefront for today's conference as possible

5    knowing that it was essentially the penultimate status

6    conference on the schedule to date, but we are happy to do

7    an August conference as well.

8              THE COURT:  Okay.  I'm hopeful that Thursday,

9    August 10 at 3:00 p.m. works for everybody, or at least

10   for most of you.

11             MR. LEDDICOTTE:  That works for the Boehringer

12   defendants, Your Honor.  This is Matt Leddicotte.

13             MR. ST. PHILLIP:  That works for Humana, Your

14   Honor.

15             MS. RAVKIND:  For the Walgreen plaintiffs --

16             MR. MILLER:  End-payors as well, Judge.

17             MS. RAVKIND:  For the Walgreen plaintiffs, Your

18   Honor, assuming we can reschedule a deposition that has

19   been set in this case, then that should work as well.

20             THE COURT:  Okay.  So let's do that.  Let's have

21   another conference Thursday, August 10 at 3:00 p.m., and

22   hopefully -- I need to move something as well, but

23   hopefully we all can make that happen.  Okay, very good.

24   And hopefully that will keep us on schedule, which is

25   becoming, I think, more and more important.

1           Okay.  I'm just going to ask folks to go through

2   and identify issues in the status report that you think we

3   should take up today.

4           MR. LEDDICOTTE:  Your Honor, this is Matthew

5   Leddicotte for the Boehringer defendants.  I believe just

6   going merely through the status report, the next one was a

7   plaintiffs' issue, and then we proceed to defendants'

8   issue, so I defer to the plaintiffs of whether or not they

9   want to address anything with Your Honor on their second

10  issue.

11          THE COURT:  That's the FTC production?

12          MR. LEDDICOTTE:  That's the one, I believe so,

13  yes.

14          THE COURT:  Right.

15          MR. ST. PHILLIP:  Yes, Your Honor, this is Peter

16  St. Phillip for Humana.  We're preparing a motion to

17  compel on this, hoping to continue to meet and confer kind

18  of one last time with the defendants before we're able to

19  make that ripe and expect to be able to file very

20  shortly --

21          THE COURT:  Okay.

22          MR. ST. PHILLIP:  -- if we can.

23          THE COURT:  Very good.  All right.  So turning

24  to the Boehringer or the  defendants' issues?

25          MR. LEDDICOTTE:  Yes, Your Honor, I think there

1    are two that fall in generally the same category, so let

2    me speak to them -- this is Matthew Leddicotte -- let me

3    speak to them briefly together and then take them one by

4    one.

5            Essentially the first two issues that the

6    defendants have raised, that is, the supplementation of

7    requests relating to purchasing and reimbursement

8    transaction data by the retailer plaintiffs and DPPs, as

9    well as asking for additional information or supplemental

10   information from the retailer plaintiffs regarding their

11   assignments, we see it generally as coming under the

12   moniker of given the fact that there is less than three

13   months in the calendar for discovery right now, all the

14   defendants are trying to do is understand the full basis

15   for the claims being asserted by the plaintiffs in this

16   case.  In fact, we don't think particularly on the

17   purchasing and reimbursement transactional data, that is,

18   the first issue that we address on page 5 of the status

19   report, there is actually any opposition to this.  This

20   data has already been produced up to certain time periods,

21   and all the defendants are asking for is that the data

22   that has been produced be supplemented to cover up to the

23   end of 2016.  And we think that is reasonable, and we

24   think it is well within the defendants' -- excuse me, the

25   plaintiffs' ability to do.  Even if all of this data is

1   not in their possession, we think it's reasonable that

2   they need to move forward expeditiously to do it because

3   the request was made some five months ago.

4        So I think that one is relatively

5   straightforward unless Your Honor has any questions on the

6   defendants' position.

7        THE COURT:  No, I understand your position.  I

8   guess I'd like to hear more from the opposition.

9        MS. RAVKIND:  Well, this is Lauren Ravkind, and

10  with respect to the requests that have been made from the

11  retailer plaintiffs, we have requested the data.  We've

12  explained to defense counsel that some of the data comes

13  from the wholesalers.  As you see, our ability to dictate

14  when we obtain that data is beyond our control, and we

15  have told the defendants we have requested the data from

16  our clients, we will provide it as we receive it on a

17  rolling basis.  It's updated data.  We don't anticipate

18  the fields or the nature of the data to be any different

19  than that which has been provided.

20        With respect to the wholesalers, Your Honor may

21  recall that Amerisource and Cardinal have produced their

22  sales data.  We were not provided with a copy of what they

23  produced, and we are aware as a result of discussion

24  within the context of the status report that the customer

25  information -- or customer name is not provided, so we are

1    trying to determine whether or not and how expeditiously

2    we can obtain updated data pertaining to our clients from

3    the wholesalers, and we're working on it, and we will

4    provide it as soon as we obtain it.

5            THE COURT:  All right.  Your response indicates

6    that you're going to provide it on a rolling basis as

7    received.  It wasn't clear to me whether you're going to

8    provide it through the end of 2016 or some other date.

9            MS. RAVKIND:  So we've requested the data

10   through the present, so it will at least go through 2016

11   is our expectation, Your Honor.

12           MS. KILEY:  Your Honor, this is Monica Kiley for

13   the Rite Aid and CVS plaintiffs.  I just want to make it

14   clear that what we're talking about here is our purchase

15   data.  These are our purchases from the wholesalers.  I

16   think defense counsel also mentioned reimbursement data

17   and sales data, and I just want to make it clear that

18   there was -- and Your Honor may recall there was a

19   compromise under which the retailers agreed to produce

20   some summary sales data.  That particular data, at least

21   for my clients, ran through the end of 2016, so there's

22   nothing to produce in terms of updated sales data.  All

23   we're talking about here is purchase data, and as

24   Ms. Ravkind indicated, we requested that our clients pull

25   that purchase data at least through the end of 2016 and

1    send it to us so we can produce it.

2           MS. RAVKIND:  And that clarification, Your

3    Honor, applies to our clients as well.

4           THE COURT:  Okay.  And do you have any sense of

5    when it might be coming in?

6           MS. RAVKIND:  We were expecting it in the next

7    couple of weeks, at least to the extent our clients have

8    that data, Your Honor.  Again, we do not have an estimate

9    from the wholesalers, and we're trying to determine

10   whether or not we need to resubpoena an updated data,

11   whether there's some way to work with what Amerisource and

12   Cardinal have already provided and what McKesson will

13   presumably be providing, which will go through 2016.

14          MS. KILEY:  And, Your Honor, the same is true

15   for my clients as well.

16          THE COURT:  Okay.

17          MR. LEDDICOTTE:  Your Honor, if I may, Matthew

18   Leddicotte for the Boehringer defendants.  We appreciate

19   that there may be some challenges getting this data, but

20   we're also facing the real end of discovery here and

21   knowing -- knowing the specific purchases and

22   reimbursements upon which plaintiffs will rely for their

23   claims, and so what we're trying to do and working with

24   the plaintiffs as much as possible, but we do need to move

25   this to a close both with the data and the interrogatory

1    responses.  The interrogatory responses may be able to be

2    done now as to identifying the specific purchases and

3    reimbursements upon which the plaintiffs are relying, but

4    this is the struggle that we're in and trying to work

5    through.  Perhaps the addition of the August status

6    conference will help for that in terms of updating the

7    Court and moving the parties towards doing this, but this

8    is the basis for our request.

9              THE COURT:  All right.  Well, would anybody feel

10   it unfair if we set an August 1 deadline for production of

11   that supplemental information?

12             MS. RAVKIND:  Your Honor, with respect to the

13   data that is coming from the wholesalers, that's beyond

14   our control; so to that extent, with all due respect, we

15   would view that as unfair.

16             THE COURT:  And what have you done to compel

17   them to produce the information?  Are you subpoenaing that

18   information?  Are you simply working with counsel?  What

19   are you doing?

20             MS. RAVKIND:  We have not yet reissued

21   subpoenas.  We were trying, and we're trying to get our

22   arms around what Amerisource and Cardinal have already

23   produced in this case in response to a subpoena served by

24   the defendants, which we understand includes sales data to

25   our clients but does not include client names.  We have

1    inquired and are attempting to determine from the

2    defendants what fields are in that data to determine

3    whether or not there is something in there that will allow

4    us to expeditiously identify which of those sales are to

5    our clients so we can get that information to them

6    quickly.  If those fields don't exist, then we will need

7    to proceed with communicating and seeing whether or not we

8    need to reissue subpoenas or whether it can be done

9    pursuant to just an update.

10           MR. PERWIN:  Your Honor, this is Scott Perwin

11   also for the retailer plaintiffs.  I'm not sure whether

12   counsel for the wholesalers are even on this phone call,

13   so if the Court was going to order them to do something, I

14   would think they would need to be heard from.

15           THE COURT:  Well, is anybody on the phone?

16           (No response.)

17           MR. ELFAND:  Your Honor, this is Ross Elfand for

18   Boehringer.  On the transactional data issue, one question

19   we had was why the retailers cannot produce this

20   themselves since it's their purchase data.  Although they

21   are sitting on assignment, they're sitting in the shoes of

22   the wholesalers, the scope of their assignment is based on

23   the amount of purchases that these retailers purchased

24   from the wholesalers, and vice-versa, the amount that the

25   wholesalers sold to these retailers, so they should have

1    the data as well.

2               MR. PERWIN:  Well, your Honor, some of our

3    clients -- this is Scott Perwin again -- just don't --

4    they rely on the wholesaler to keep track of the purchases

5    there.  For example, Walgreen gets all of its purchases

6    from Amerisource directly to the stores.  They're in small

7    quantities, called DSD, direct store delivery, and we have

8    to get that information from the wholesalers.

9               THE COURT:  That is a little surprising,

10   frankly.  Even if you're having direct delivery to the

11   stores, isn't there going to be some sort of invoicing

12   system that describes the deliveries that were made and, I

13   mean, obviously the cost?

14              MR. PERWIN:  Well, but that would be like every

15   drug to every store, and that's not what the defendants

16   are interested in.  They're interested in us pulling out

17   the Aggrenox and generic Aggrenox purchases, and one of

18   the services that the wholesaler provides is keeping track

19   of that information.

20              THE COURT:  And is there a contractual

21   obligation to do that?

22              MR. PERWIN:  That's a good question, Your Honor.

23   I'd have to check the contracts.

24              THE COURT:  I would think if there's a

25   contractual obligation to do it, that the retailers would

1     have the ability to require, as a contractual matter, that

2     the wholesalers provide the information.

3                MR. PERWIN:  Well --

4                MS. KILEY:  Your Honor --

5                MR. PERWIN:  I'm sorry.  Go ahead.

6                MS. KILEY:  Go ahead, Scott.

7                MR. PERWIN:  I would say our practice has been

8     to subpoena them.  That's been the request that we've been

9     given by the outside counsel for the wholesalers, so it

10    goes through the legal department and not through the

11    business department.

12               MS. KILEY:  Your Honor, this is Monica Kiley.  I

13    want to make sure that something doesn't get lost in this

14    discussion, and that is what we're talking about here is a

15    couple months worth of data.  We produced data, years

16    worth of data to the defendants.  They have that data.

17    Some clients produced through March 2016 for me, some

18    produced -- the other client I think produced through

19    April 2016.  So really what we're talking about here is

20    just to finish out the year 2016, that data.

21               The defendants have the data, they've been able

22    to share that with their expert, and we're working on

23    getting the updated data for them, and it takes time.  It

24    truly does.  We're not dragging our feet.  It truly takes

25    time.

1          To the extent the data comes internally, we

2     actually have some data that we need to process and get

3     out that we received from the clients this morning.  We

4     will send that data on a real-time basis, and we're

5     working to get that out to the defendants now, but it

6     truly does take time.  I just wanted to make sure that you

7     understood that what we're talking about here is months

8     worth of data, as opposed to the entire data production.

9          THE COURT:  Fair enough, but I do think we are

10    coming to the end of discovery.  We want to try to wrap

11    these things up, and I'd hate to see these kind of

12    disputes lead to an extension of the discovery period

13    simply because we can't seem to get it done.  So I

14    appreciate your efforts, and I'm just trying to think

15    creatively whether there's some other way to get the

16    information promptly so that this can be put to bed.

17         MR. ELFAND:  Your Honor, I have a compromise --

18    Ross Elfand for Boehringer -- a compromise proposal.

19    While we do need the data, we would like a date certain by

20    which it will be produced.  More essential for the

21    upcoming depositions than the data, since we already do

22    have some data that we can ask questions on, if necessary,

23    what we need are supplemental responses to those

24    interrogatories identifying the end date for which the

25    plaintiffs are seeking damages, the last transaction date

1    and whether they are seeking damages for generic

2    purchases.  So if we can get supplemental responses on

3    that for the upcoming depositions, and if they're unable

4    to produce the data before the depositions, we reserve the

5    right to have a very short deposition to the extent we

6    need one, although we've promised the plaintiffs and lived

7    up to thus far that we would ask the data questions first

8    via letter and get their responses via letter, and I think

9    we can do that.  But if we were able to get the

10   interrogatory responses in the next couple of weeks before

11   any upcoming 30(b)(6) deposition, that would address that,

12   Judge.

13            THE COURT:  How does that sound?

14            MR. PERWIN:  Well, Judge, this is Scott Perwin

15   again.  The end date of the damage analysis will probably

16   not be known until our expert does their damage model.

17   It's hard to tell, it's hard to predict how many years

18   after generic entry the damages run out in these cases.

19   It's probably -- probably about there, but we don't know

20   for certain.  And so that's the kind of question that I

21   think would be better given to an expert, to our economist

22   to explain why the damages ran out.  Obviously if we don't

23   produce data for some period of the damage period, we're

24   not going to be able to claim damages, so it's in our

25   interest to make sure the data exists.

1           THE COURT:  Well, for want of a nail, the

2    kingdom is going to fall here.  We've got a dominoes

3    scenario set up where one thing can't happen until

4    something else happens, and I worry that we're getting

5    delayed in the big picture because of little problems like

6    this, frankly.  Is there some way to answer

7    interrogatories subject to your expert witness?

8           MS. KILEY:  Your Honor, this is Monica Kiley.

9    I'm somewhat confused because we did agree to provide

10   interim updates to our interrogatory responses by

11   August 22.  I don't know if Mr. Elfand is talking about a

12   different set of interrogatory responses or if he's

13   referring to Interrogatories 2, 3 and 4, and we agreed

14   earlier this morning that we would provide updated interim

15   responses by August 22.

16          MR. ELFAND:  Those are different

17   interrogatories. I'm afraid Interrogatory 1 --

18          THE COURT:  Sir, can you speak up please?

19   Sorry.

20          MR. ELFAND:  Sure, sure.  Those refer to

21   different interrogatories.  We did come in agreement on

22   those.  What defendants were asking for was a supplemental

23   response to Interrogatory Number 1, which asks for the

24   transactions that form the basis for plaintiffs' claims;

25   and while Mr. Perwin says the end date would be subject to

1   expert discovery, the plaintiffs -- the generic has been

2   on the market since July 2015.  We think that the

3   plaintiffs have had enough time to determine what

4   transactions they are going to be seeking damages for.

5   They have an obligation to identify the scope of their

6   claims for the defendants while fact discovery is going

7   on, in fact in the beginning -- before filing a complaint.

8             MR. PERWIN:  Well, Your Honor, they know what

9   the basis for our claims is, it's our purchases of

10  Aggrenox that would have been generic.  The question that

11  he's asking is what's the last purchase that we're going

12  to claim damages on.  We don't know that yet.

13            THE COURT:  And you don't know that yet because?

14            MR. PERWIN:  Because the common economic model

15  will eventually show when the damages are no longer

16  accruing, when the world looks just like it would have

17  looked had generic entry occurred in 2009, and it takes

18  some time for that point to be reached, and it may have

19  happened last month, it may happen next month, it may have

20  happened by the end of 2016.  That's actually -- we have

21  to crank the numbers to figure that out.  But as I said,

22  it's in our interest to make sure that we have enough data

23  so that we can go out to the end of the damage period.

24  Otherwise, we'll be giving up some damages.

25            THE COURT:  All right.  Let's do this.  In terms

1    of the supplemental data, let's use the August 22 date as

2    a firm date for completion.  That's three weeks past when

3    I was hoping to get it done, frankly.  And I think the

4    interrogatory answers regarding the economic model will

5    have to wait.  Obviously, we're in a point now of very

6    minimal damages, if any, continuing damages, but the

7    precise date, it seems to me, is going to have to wait

8    until we have expert testimony.

9                Anything further on those issues?

10               MR. LEDDICOTTE:  Not from the defendants, Your

11   Honor.

12               THE COURT:  All right.  What's the next issue

13   that the defense wants to take up?

14               MR. LEDDICOTTE:  The next issue, Your Honor --

15   this is Matthew Leddicotte for Boehringer again -- the

16   next issue is the request that the retailer plaintiffs

17   provide additional information regarding their

18   assignments.  Again as I mentioned earlier, we see this as

19   just a simple request to understand the permutations and

20   boundaries of the claims that the retailer plaintiffs are

21   asserting, and that is what we're trying to get at.  This

22   is not challenging whether or not they can bring this

23   claim.  That was resolved by Your Honor in earlier

24   discussions that we had in this case.  This is the basis

25   of them asking -- they're proceeding on those claims, what

1    are the boundaries of those claims.  In part, this has

2    been driven by the production over the course of discovery

3    recently of what either appears to be a new or an updated

4    assignment on behalf of one of the wholesalers to one of

5    the retailers.  That purports to increase the claims; and

6    all the defendants are seeking is to know the boundary of

7    the assigned claims, the quantification of the assigned

8    claims that the retailers are requesting; and to do that,

9    both the actual assignments, the contracts, etc., but to

10   the extent there are -- there might be agreements, you

11   know, for kind of continuing assignment or something like

12   that, we think we're entitled to understand how the

13   assignments have been made such that how -- so, in turn,

14   how do they delineate the claims that the retailers are

15   asserting.

16            THE COURT:  All right.  And the response is

17   what, that it's not ripe?

18            MS. RAVKIND:  The response is twofold, Your

19   Honor.  One is we believe meet and confer is ongoing with

20   respect to this, and there's not a motion to compel

21   pending.  Secondly, Your Honor, we don't see that the

22   mechanics are relevant here to defining the scope of our

23   claim.  In terms of providing updated assignments, at the

24   time we filed the lawsuit, the damages were continuing, so

25   certain assignments need to be updated because they only

1    go through the date of the assignment, but yet damages

2    were continuing.  And so, therefore, we provided updated

3    assignments in the context of this lawsuit.  We think

4    that's the efficient thing to do, and we don't understand

5    the relevancy of the mechanics of that.  We do understand

6    that to the extent that we have updated assignments which

7    then tie into the purchases upon which our damage claim is

8    based, that those should be provided; and we have provided

9    them as they have been received.

10            MR. PERWIN:  And Judge -- this is Scott Perwin

11   again -- we expect to have assignments that cover all of

12   the purchases that our clients made from the national

13   wholesalers over the course of the -- through the rest of

14   the damage period.  That's just the mechanical process of

15   actually getting the -- except if there's an assignment

16   that only runs to a particular date, as Ms. Ravkind said,

17   we have to get an updated one, which means getting the

18   wholesalers to sign it, and once they do, we'll produce

19   it, but we expect to have assignments to cover all of our

20   purchases.

21            THE COURT:  And basically you're arguing, the

22   two of you are arguing that this is going to happen in due

23   course; that is, as you get the assignments they're going

24   to be produced?

25            MR. PERWIN:  That's right.

1          THE COURT:  All right.  Is that a sufficient

2    representation for the defense?

3          MR. LEDDICOTTE:  That's very helpful, Your

4    Honor, but I guess what the defendants are trying to also

5    understand is for the various entities from whom the

6    assignments are being derived, are all of them a

7    continuing assignment, are only part of them a continuing

8    assignment?  That is what the defendants are trying to

9    understand, so as to understand the overall boundaries of

10   the retailers' claims.  Perhaps one wholesaler assigns on

11   a perpetual basis, but perhaps another wholesaler it's a

12   negotiated basis.  We don't know.  We're trying to

13   understand that so that we can understand what indeed

14   these retailers are claiming it under, unless it is a

15   situation that they're representing to us that they're

16   claiming under only the assignments that they've delivered

17   to us to date.

18         MR. PERWIN:  I thought I just said that we

19   expect to have assignments covering all of our purchases

20   during the damage period.  Some of the assignments that we

21   have been given go to a particular date, the date that the

22   assignment was signed; and to the extent that there are

23   purchases after that date that have potential -- we could

24   potentially have damage claims on, we need to get an

25   updated assignment, and that's what we intend to do.

```
 1              THE COURT:  And when you do, it will be

 2   produced?

 3              MR. PERWIN:  Yes.

 4              MS. RAVKIND:  Yes.

 5              MR. PERWIN:  Yes, Your Honor.

 6              THE COURT:  I think that's sufficient for now.

 7   If the defense is not satisfied with that, then you should

 8   confer further and file any motion that you might need to,

 9   but it sounds to me like the representation that the

10   assignments will be produced when obtained is -- ought to

11   resolve that issue.

12              MR. LEDDICOTTE:  Yes, Your Honor, and if we

13   have -- we'll continue to speak with the retailer

14   plaintiff on that; and if we have any more issues, we will

15   endeavor to make it right procedurally before the next

16   status conference.

17              THE COURT:  Okay.  What do you want to take up

18   next?

19              MR. LEDDICOTTE:  Certainly.  This one, and I

20   think we learned earlier that although they had been given

21   the status report, they are not on the phone call, so we

22   may -- it may be an issue that goes a bit further into the

23   August status conference, but McKesson has previously

24   agreed to produce materials and under order in response to

25   a subpoena, and they haven't.  They have only just
```

1    produced, in less than 24 hours ago, purchase data but not

2    other materials that they are subject to producing, and we

3    are just bringing that to Your Honor's attention.

4           I suspect that Your Honor will tell me that

5    since they're not on the phone, we may not have an order

6    coming out of you today, so this may be something that we

7    have to bring up through either letter briefing and/or at

8    the next status conference.

9           THE COURT:  Yes, I think that's right.  You

10    don't have to wait till the next status conference if you

11    want to bring it on by way of letter or by way of motion

12    and have, in effect, a separate argument on that.  I'm

13    happy to try to accommodate you.

14           MR. LEDDICOTTE:  Thank you, Your Honor.

15           I believe the next topic, it starts on page 11

16    of the status report, Your Honor, is the defendants are

17    seeking to depose an actuary employed by Humana.  Our

18    position is twofold.  One, we think that there is -- we

19    have noticed this deponent for various topics that

20    deal with -- thus far have no relevance to previous

21    rulings Your Honor has made, and so we think the

22    deposition on those topics should go forward regardless,

23    regarding documents that he's custodian of that predict

24    forecasting of when generic Aggrenox might be launched and

25    other issues that go to that.  That, to us, would seem to

1  be uncontroversial, but because there is a second issue,

2  which we believe is touched on by one of Your Honor's

3  previous orders, we did want to bring this up now in

4  advance of the deposition being taken so that we could

5  have an orderly way of dealing with this.  And we do want

6  to bring questions to this deponent's attention that have

7  to deal with premium information and whether or not

8  Aggrenox then adjusted the premiums.  We've seen documents

9  in the production that suggest that Aggrenox is used as a

10  percentage of the premiums, and if you recall, Your Honor,

11  at a previous hearing that you said you thought you might

12  reconsider this issue if there were documents that came

13  out in production.  We think we have seen those, and so we

14  would like to depose this deponent on that document,

15  understand what the document means, but we wanted to be

16  efficient about this because if we were to do it now,

17  plaintiffs may rightly object, and that would either set

18  forward a need to continue the deposition or to come on an

19  emergency basis to Your Honor, but that did not seem the

20  most efficient way to do it for us.

21          If the way to do this is to submit a brief

22  letter brief to you showing you the documents,

23  articulating our argument within the next week we can do

24  that; but some of it is flagging it for Your Honor and

25  also understanding how we can go forward so that we can

1    both have the deposition on the topics that are not

2    implicated by your prior ruling, as well as the topics

3    that may be.

4             MR. ST. PHILLIP:  Your Honor, this is Peter

5    St. Phillip for Humana in response.  We're actually in a

6    deposition with one of the Humana witnesses, Mr. Elfand

7    and I today.  We're on a break from that.  The ineluctable

8    facts of whether Aggrenox affects premiums are unaffected

9    by some of the material and documentation that is being

10   referenced.  I mean, there is actuarial communication in

11   connection with the prescription drug benefits and trying

12   to predict large products that are going off market for

13   purposes of evaluating what the next year's premiums might

14   be, all of which refers to, as Your Honor said during the

15   argument of Mr. Holding, Aggrenox being a grain of sand on

16   the beach; and, in any event, the prospective analysis of

17   what premiums may be in a competitive environment for next

18   year's pitch to employer groups, etc., has nothing to do

19   with the damages of overpayment for Aggrenox in a prior

20   period.

21             And so, you know, if a letter brief is what Your

22   Honor would like to do in connection with the motion for

23   reconsideration, we're happy to respond to that with

24   reference to the materials the defendants think give rise

25   to a need for reanalysis, but we don't want to retread old

1    ground.

2            Insofar as Mr. Poerschmann himself and the

3    deposition of Mr. Poerschmann on other aspects of things

4    that the defendants think are independent of premium

5    setting, he is an actuary, so we're not really sure

6    exactly what those are.  There are topics on the 30(b)(6)

7    deposition that has been propounded on us that would cover

8    the areas in which there would be inquiry, and it would be

9    our proposal that we designate a witness at this point in

10   time and then revisit it, which is a proposal that I've

11   made to the defendants.

12           THE COURT:  All right.  I think this one would

13   benefit from letter briefing where I can see the documents

14   and understand your positions better than I do just from

15   the status report.  So why don't you two confer about

16   timing, and we'll get that on file and take it up

17   separately.

18           MR. ST. PHILLIP:  Thank you, Your Honor.

19           MR. LEDDICOTTE:  Thank you, Your Honor.

20           Your Honor, Matthew Leddicotte again.  The fifth

21   item that we've identified is the letter brief that we

22   filed yesterday seeking to compel discovery from Blue

23   Cross/Blue Shield of Louisiana.  We filed a letter brief.

24   We are still engaged in meet-and-confer with them.  It may

25   be that that will moot some of the issues in the letter

1   brief, but given the timing, we did feel it was important

2   to start the formal process, and that's where we are at

3   that point.  So we're not today asking for anything formal

4   from Your Honor, but we wanted to let you know that that

5   was there in the docket, and that is also what we're going

6   forward on.

7            THE COURT:  Right.  I reviewed the letter brief

8   but not all of the attachments, so I think it makes sense

9   to brief it to the extent that that needs to be taken up.

10           Do we want to get dates for an opposition?

11           MR. ELFAND:  That's what I was just going to

12   propose.  This is Ross Elfand, Your Honor.  Given that the

13   close of fact discovery is coming up, we do want the brief

14   timing on an expedited basis.

15           THE COURT:  Who's on for Louisiana Health?

16           MS. MILES:  Your Honor, this is Meaghan Miles.

17   I'm at Hurwitz, Sagarin, Slossberg & Knuff. I'm local

18   counsel for Louisiana Health.  I'm in Milford.  I do not

19   believe Louisiana counsel has made it on the line.  I've

20   reached out, tried to get them the new dial-in, but they

21   haven't gotten back to me, and I don't believe they've

22   spoken up.  No.

23           So considering a deadline, I can certainly

24   facilitate that, whatever defendants are proposing here;

25   but as I said, I'm trying to get ahold of Louisiana

1    counsel to get them in too because they've been the ones

2    handling the meet-and-confer and various things like that.

3            THE COURT:  Well, how quickly is the defense

4    proposing that we get this briefed and decided?

5            MR. ELFAND:  We would like the documents be

6    produced by -- we were proposing August 1, particularly

7    mid-August.  These are documents that Blue Cross/Blue

8    Shield of Louisiana agreed to produce a long time ago, so

9    we think that this could be done pretty quickly.

10           THE COURT:  All right.  Let's set an opposition

11   deadline of two weeks from today.

12           MS. MILES:  That should be fine, Your Honor.

13           THE COURT:  Okay, thank you.

14           MS. MILES:  Yes.

15           MR. LEDDICOTTE:  Your Honor, this is Matt

16   Leddicotte for Boehringer.  I believe the final item that

17   the defendants had flagged in the status conference was

18   the production of Humana's privilege log.  Given the

19   document production that Humana has made and the lack of a

20   privilege log, we think it's time that we can set a

21   deadline by which that privilege log would be produced to

22   the defendants.  Obviously we are, as Mr. St. Phillip

23   mentioned, we're engaged in depositions already right now

24   with Humana, that this is part of the process that just

25   needs to be completed given the trailing end of discovery.

1          MR. ST. PHILLIP:  Your Honor, this is Peter

2     St. Phillip for Humana.  We have been diligently going

3     through the -- we have produced over 4 million pages of

4     documents.  It's been a significant custodial production,

5     and there are a large volume of documents that have hit on

6     terms, privilege terms that we are going through a pace.

7     So we're working hard, and we understand the defendants

8     need these materials shortly.  We have not conferred over

9     a deadline as of yet, but we'd like to have the

10    opportunity to do that with the defendants and come up

11    with a mutually agreeable or disagreeable deadline and

12    propose that to Your Honor.

13          THE COURT:  Well, can we do that now?  Is

14    August 1 acceptable?

15          MR. ST. PHILLIP:  It's hard for me to speak for

16    the person that's doing that because it's not me, but if

17    we could get another -- at the next status conference I

18    think we'd be able to do that, August 10 if that's

19    agreeable to the defendants.  Obviously if there is

20    material that becomes challenged and produced and is

21    relevant, we would have to put up our witnesses again, but

22    we think we might need that time.  There's a large volume

23    of material that we're going through, Your Honor.

24          MR. LEDDICOTTE:  Your Honor, Matthew Leddicotte

25    for Boehringer.  I would wonder if it's possible to do a

1    rolling production of logs.  I can appreciate, having been

2    in similar situations myself with Mr. St. Phillip and his

3    colleagues, that it does at times take time depending upon

4    the size of your productions, but if there is a portion of

5    the log that can be -- half, two-thirds, whatever it might

6    be -- that could be done by, say, an August 1 deadline

7    with completion by August 10, perhaps that would

8    facilitate it.  I have not raised this with Mr. St.

9    Phillip before now, I will say that, but it is an idea

10   that occurs to me as we're talking.

11            MR. ST. PHILLIP:  Your Honor, that's a deal.

12            THE COURT:  Great.  I was just about to suggest

13   the same thing, so there we go.  Okay, good.  So we'll get

14   a partial production August 1, complete production

15   August 10.

16            MR. ST. PHILLIP:  Thank you, Your Honor.

17            THE COURT:  Great.  Ideally, August 10 before

18   3:00.  In other words, I don't want to be on the call on

19   August 10 and not know that the privilege log has been

20   completed.

21            MR. ST. PHILLIP:  Understood.

22            THE COURT:  Right, great.  Are there matters

23   other than the Louisiana Health service issue to take up?

24            MR. TOWNSEND:  Your Honor, Taylor Townsend.  I

25   fell off the call.  I'm back on for Blue Cross/Blue Shield

1    Louisiana.  We're going to converse with the defendants

2    following this call.

3              MR. SHADOWEN:  Your Honor, Steve Shadowen on

4    behalf of the end-payor class plaintiffs.  Shall we plan

5    on the August 10 conference being in person or do we want

6    to do that by phone?

7              THE COURT:  I'm happy either way.  If anybody

8    thinks that in person is worth the effort, I'm happy to do

9    that.  Sometimes it does facilitate negotiation to have

10   everybody in the same room.

11             MR. LEDDICOTTE:  Your Honor, Matthew Leddicotte

12   for the defendants.  Without having talked to all of my

13   colleagues, would it be acceptable for you, if we're

14   filing the status report three or so days before that

15   conference, to suggest in the status report whether or not

16   we think it needs to be in person or by phone?

17             THE COURT:  That would be fine.

18             MR. OPPER:  Your Honor, this is Joe Opper on

19   behalf of direct purchaser class plaintiffs.  Our case is

20   referenced in the first section on the mediation where we

21   have a settlement in principle with the defendants.  On

22   the assumption that we're going to be able to finalize

23   that agreement shortly, the next step in our case would be

24   to file a motion for preliminary approval with Your Honor

25   that would contain a request for approval of settlement as

1    fair, reasonable and adequate, certification of a direct

2    purchase class.  We would include a form notice for the

3    Court's approval and then proceed from there.  And I just

4    wanted to apprise the Court that that's probably going to

5    occur in the near term.

6            THE COURT:  Very good.  Yes, that was the best

7    sentence in the status report.

8            All right.  Anything else that we need to take

9    up other than the motion to dismiss?

10           MR. LEDDICOTTE:  Your Honor, Matthew Leddicotte.

11   I don't think so from the defendant's side.

12           MR. ELFAND:  This is Ross Elfand.  Now that

13   Mr. Townsend is on the line, I did want to confirm the

14   opposition deadline to the motion that defendants filed

15   last night regarding Blue Cross/Blue Shield of Louisiana,

16   that the opposition would be due in two weeks from

17   yesterday.

18           MR. TOWNSEND:  I think that is correct.

19           THE COURT:  Okay, very good.  Well, anybody who

20   doesn't want to participate in the argument of the motion

21   to dismiss for untimely service is welcome to sign off the

22   call, and we'll stay on for purposes of that argument.

23           MR. SHADOWEN:  Thank you, Your Honor.

24           THE COURT:  All right, be well.

25           In terms of the motion to dismiss, I've read

 1    through the briefing and a number of the cases, and I

 2    think the motion and the opposition can be summarized,

 3    frankly, somewhat candidly as follows.  A party who made

 4    virtually no effort to serve foreign defendants, those

 5    foreign defendants who suffered virtually no prejudice are

 6    now facing a motion to dismiss for failure to timely

 7    serve.  So I frankly don't think that either side has got

 8    kind of a great position here.  It seems to me that

 9    service certainly should have been accomplished long, long

10    before it was; and, on the other hand, this is not a

11    situation where the defendants who have not been served

12    have not been brought into and have not been able to

13    participate in the lawsuit as a practical matter.  They've

14    been here for a very long time and facing very similar, if

15    not identical claims, and it seems to me on balance that

16    my discretion ought to be exercised in favor of denying

17    the motion to dismiss, but I'm happy to hear any argument

18    that either of you want to make on that topic.

19            MR. ELFAND:  Your Honor, Ross Elfand for the

20    defendants.  In addition to not attempting service for a

21    long time --

22            THE COURT:  Mr. Elfand, we're having trouble

23    hearing you.  I don't know if you're on a speaker or a

24    cellphone or what, but it's really not coming through very

25    clearly.

1          MR. ELFAND:  Sorry, Your Honor.  We're on a

2    break from a deposition.  We're in a large conference

3    room.  Can you hear me better now?

4          THE COURT:  Yes, that's better.

5          MR. ELFAND:  Okay.  Although the plaintiff did

6    not -- the plaintiff did not attempt service for some

7    time, but also when it accomplished service under the

8    Hague Convention, what it served was the original

9    complaint, not the operative complaint at that time.  And

10   defendants, we recognize that the German defendants have

11   been in the case, in the MDL for other cases for some time

12   and certainly had actual notice of the action.  The courts

13   are pretty clear that actual notice is not sufficient to

14   accomplish service.  And the German defendants filed a

15   motion just to pursue their right to be served under the

16   Federal Rules, under the Hague Convention, and because

17   service wasn't attempted and service wasn't accomplished

18   under the operative complaint, that is a basis for

19   dismissal.

20         THE COURT:  Well, once they were served with a

21   complaint, they're in front of the Court, at which point

22   they can be served by serving counsel.  Why is it

23   necessary or why is it significant that the operative

24   complaint was not served via the Hague Convention?

25         MR. ELFAND:  Those are the rules that have been

 1    set up by the -- the Federal Rules as well as the Hague

 2    Convention that what has to be served is the operative

 3    complaint at the time of service.  What they served was

 4    not -- was a complaint, but it wasn't the one that was the

 5    basis for the cause of action that they were pursuing.

 6              THE COURT:  Well, okay.  So in a worst case

 7    scenario, you're now in this case with the wrong

 8    complaint, and if they now today move to amend their

 9    complaint against you, pursuant to the Federal Rules,

10    what's wrong with that scenario?  You're brought in by

11    service of a complaint, and now they want to have a

12    different complaint against you, so they move to amend.

13    What's your opposition to that?

14              MR. ELFAND:  If that's what they want to do,

15    they certainly -- there would be no prejudice to us if

16    they were to amend their complaint and serve it on us.

17              THE COURT:  Right.

18              MR. ELFAND:  The point of our motion is that the

19    rules are the rules, and if they are not followed and if

20    the plaintiff does not serve a complaint the way it is

21    required under the Federal Rules as well as the Hague

22    Convention, then what is the point of having the rule?

23              THE COURT:  But the rules were followed in the

24    sense that you're served with a complaint, and now your

25    argument is it was the wrong complaint, so you're in front

1    of the Court.   Rule 15 is very broad.   I'll accept an oral

2    motion right now to move to amend the complaint to make it

3    the operative complaint.   This is -- you know, this is the

4    problem.   I'm not happy that Louisiana Health sat on its

5    hands and apparently also is having some problem producing

6    documents, etc.   I hope they're actually engaged in this

7    case and prosecuting this case.   But in terms of the

8    service problem, it's more than actual notice.   The German

9    defendants have been here in this court for years on

10   essentially these claims, and if we need to correct a

11   technical deficiency by making a post-service motion to

12   amend the complaint, then it seems to me that's the

13   appropriate way to go about it.

14           I just don't see any prejudice at all.   And the

15   whole point of these rules is to get people in here

16   without the prejudice that would happen if this were -- if

17   you were the only defendant and this case had been pending

18   forever and they hadn't bothered to serve you, then yes,

19   it would be dismissed, but that's not the situation we

20   have.   It's a very technical argument I think that you're

21   making here.

22           MR. ELFAND:   We understand the technical

23   argument, we understand where you're coming from, Your

24   Honor, as far as prejudice goes; but we do think when it

25   comes to service, there's a reason why it's required

1    regardless of technicalities and the procedures that must

2    be followed, and one of those procedures is to at least

3    attempt service in the Second Circuit within 180 days, and

4    that did not happen.

5            THE COURT:  Well, I think the cases -- I think

6    the cases you rely upon make it clear that it's

7    discretionary on the part of the Court to dismiss or not

8    to dismiss if the failure to attempt service isn't made

9    within 120 days.  So certainly if I dismissed on that

10   grounds, chances are the Second Circuit would affirm it,

11   but that's a little different than saying that I'm

12   required or that Second Circuit precedent suggests I ought

13   to dismiss it if they didn't attempt service within 120

14   days.  And, by the way, those cases are not ones like this

15   one where the defendants are actually present and actually

16   defending and actually participating in a multidefendant

17   litigation raising the same claims.  So...

18           MR. ELFAND:  Understand, Your Honor, it is

19   discretionary, but our reading of the case law was that

20   that discretion comes into play only when there's been

21   some amount of due diligence, and when that happens then

22   there's a balancing of the prejudice to the defendant; but

23   when there's been no due diligence, no attempt, that the

24   Court doesn't even get to any balancing effort, and we

25   couldn't find a case where it hasn't been dismissed when

1    there's been absolutely no effort to attempt service.

2              THE COURT:  Right, but you're relying, for

3    example, on *Montalbano*, M-o-n-t-a-l-b-a-n-o, where the

4    Court basically said that Easco never attempted to serve

5    process in a foreign country; the 120-day time limit

6    imposed by 4(j) seems therefore perfectly proper.

7              Well, it may be perfectly proper, but the Court

8    of Appeals is not saying that there's no jurisdiction or

9    the Court is required to dismiss or anything else.

10   They're affirming a decision to dismiss.

11             MR. ELFAND:  We understand, Your Honor.

12             THE COURT:  All right.  Do you want a formal

13   motion to amend the complaint since you were brought in on

14   an earlier version of the complaint?

15             MR. ELFAND:  We wouldn't.

16             THE COURT:  All right.  Mr. Townsend?

17             MR. TOWNSEND:  No, sir, Your Honor, we have

18   nothing further.

19             THE COURT:  No, are you going to make the motion

20   to amend?  Having brought these defendants in on an

21   earlier complaint, are you going to move to amend your

22   complaint to bring --

23             MR. TOWNSEND:  Judge, I'm going to say yes, but

24   I do want to confer with co-counsel, who has been out of

25   the country for the last two and a half weeks. He's coming

1    back in tomorrow.

2              THE COURT:  All right.  Well, if you want to

3    move to amend and bring the complaint that you currently

4    intend to bring against these defendants against these

5    defendants, then it seems to me you better make a motion

6    to amend.

7              MR. TOWNSEND:  I think I do want to make that

8    motion, Your Honor, and we'll follow that up with a

9    written motion.

10             THE COURT:  Okay.  All right.  Well, long story

11   short, I'm really not happy with either side on this one,

12   but in the end I think that my discretion is best

13   exercised by denying the motion to dismiss.

14             MR. TOWNSEND:  Okay.

15             THE COURT:  I'm happy to try to articulate that

16   further if anybody would like me to do that.

17             MR. TOWNSEND:  No, I think that's good, Judge.

18             MR. ELFAND:  We understand, Your Honor.

19             THE COURT:  All right.  Well, thank you all.  I

20   think that's the last thing we have to take up today.  And

21   we'll talk with you next month.

22             MR. ELFAND:  Thank you, Your Honor.

23             (The proceedings adjourned at 4:14 p.m.)

24

25

C E R T I F I C A T E


I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


August 8, 2017


/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177