UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
IN RE: AGGRENOX ANTITRUST     :   No. 3:14-md-02516(SRU)
LITIGATION                    :   915 Lafayette Boulevard
                              :   Bridgeport, Connecticut
                              :
                              :   October 12, 2017
- - - - - - - - - - - - - - - x


TELEPHONIC MOTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

     FOR THE PLAINTIFFS:

          LOWEY DANNENBERG, P.C.
               White Plains Plaza
               One North Broadway, Suite 509
               White Plains, New York  10601-2310
          BY:  PETER D. ST. PHILLIP, JR., ESQ.
               NOELLE-KRISTEN F. RUGGIERO, ESQ.

          YOUNG COTTER & MEADE LLC
               909 Poydrass Street, Suite 1600
               New Orleans, Louisiana  70112
          BY:  JOHN ALDEN MEADE, ESQ.

     FOR THE DEFENDANTS:

          WHITE & CASE
               1155 Avenue of Americas
               New York, New York  10036
          BY:  ROSS E. ELFAND, ESQ.

          GOODWIN PROCTER LLP
               100 Northern Avenue
               Boston, Massachusetts  02210
          BY:  CHRISTOPHER T. HOLDING, ESQ.

(Continued)

APPEARANCES (Continued):

        PULLMAN & COMLEY
            850 Main Street
            P.O. Box 7006
            Bridgeport, Connecticut  06601-7006
        BY:  JAMES T. SHEARIN, ESQ.

        NORTON ROSE FULBRIGHT US LLP
            1301 Avenue of the Americas
            New York, New York  10019-6022
        BY:  DAVID KESSLER, ESQ.

Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177

1                    (Proceedings commenced at 5:03 p.m.)

2                    THE COURT:  Good afternoon.  Stefan Underhill

3   here.

4                    COUNSEL:  Good afternoon, Your Honor.

5                    THE COURT:  'Afternoon.  We are on the record,

6   but instead of taking appearances, I'll just ask that you

7   identify yourselves each time you start speaking.

8                    We have a fair number of things to take up

9   today, so what I thought I would do is do three quick ones

10  and then take up the argument.  Is counsel for Par

11  Pharmaceutical on the line?

12                   MR. SHEARIN:  Your Honor, this is Tim Shearin.

13  I do not believe he is.

14                   THE COURT:  Okay.  I was going to take that one

15  up first so that counsel not interested in the other

16  issues wouldn't have to --

17                   MR. SHEARIN:  Your Honor, it's Tim Shearin.  I

18  did not give him notice of this.  I didn't know that the

19  Court wanted to hear it at this point, but if you want, I

20  will reach out to counsel for Par, and we'll arrange for a

21  special date to get on a call with Your Honor, if that's

22  okay.

23                   THE COURT:  That would be helpful.  All right,

24  great.

25                   MR. SHEARIN:  Thank you, Judge.

1          THE COURT:  All right.  So the three quick ones,

2     although I'm happy to talk about any of these if anybody

3     wants to, first I'm very well aware that I owe you a

4     ruling in the GYMA fees issue.  I'm also aware I owe you

5     the results of the in-camera review of documents.

6          What I will say is there was a September 29

7     letter basically asking for permission to supplement the

8     attorney's fees application once the GYMA motion is

9     decided; and that, of course, will be permitted.  So I'll

10     get that to you hopefully, hopefully next week.

11          Okay.  We have a couple of issues to take up.  I

12     don't know if it makes sense to take up one versus the

13     other first.  If anybody thinks it makes more logical

14     sense to talk about deadlines before motions to compel or

15     vice-versa, I'm happy to take your suggestions.

16          MR. ELFAND:  It may make sense to take up the

17     schedule first, Your Honor.  This is Ross Elfand for the

18     Boehringer defendants.

19          THE COURT:  Okay, we can do that.  Let's see.

20     Okay, so the motion is really a motion to do two things;

21     it's to amend the schedule but also a motion to change the

22     order of the disclosure of expert witnesses.

23          So let's start with the first part.  In terms of

24     appropriate deadlines, I guess I would like to hear

25     whether there is a need to initiate more discovery or

1    merely a need to have a little bit more time to complete

2    discovery that has already been initiated.

3            MR. ST. PHILLIP:  So, Your Honor, this is Peter

4    St. Phillip for Humana.  Thank you very much.  There's

5    been a lot of work done to try and meet the October

6    deadline.  We've taken four depositions of defendants

7    recently.  We have next week a banner week.  We have six

8    depositions that are scheduled, some of which are 30(b)(6)

9    depositions that may take some time.  They're generally,

10   with respect to Teva, their regulatory affairs individual,

11   and the manufacturing 30(b)(6), which is, as you can tell

12   from the opposition brief, multifaceted.  It's our

13   expectation that there may be some cleanup material that

14   goes -- that is generated out of some of the testimony

15   that we're getting, and that's mainly our concern with the

16   October 20 deadline.  We have most of what we think we

17   need.  There are a couple of witnesses that we've asked

18   for that are outstanding.  One is Marla Persky.  That's

19   dependent upon the in-camera review materials.  There's

20   been a few witnesses that are pending to try and see if

21   other witnesses' testimony is sufficient to make our

22   record.  It's just, you know, the 20th we don't think is

23   going to really work in terms of getting everything done,

24   and so we're hopeful that we can get some relief.  It's

25   going to depend really upon what happens next week and

1   getting the material.  There are -- you know, Teva did

2   identify to us that there are some documents coming off

3   the privilege log that will be produced, 40, maybe less

4   than 40, but we just don't know at this point in time with

5   precision what we'll need, but we know we'll need some

6   time after the 20th.  Our request at the time we filed it

7   in October 3rd was for six weeks.  We don't think we'll

8   need a full six weeks at this point in time because we've

9   done a lot of work since then, and we've narrowed a lot of

10  issues.  But, you know, that's just the status report that

11  we have now, and we'd like a little bit of time to manage

12  those items, and we may need to notice a few more

13  individuals to take them.

14          THE COURT:  Yes, that's what I was trying to

15  figure out, whether you were just trying to clean up

16  notices that you've either issued or at least discussed

17  with other parties or whether you are thinking about

18  another round of notices and/or requests.

19          MR. ST. PHILLIP:  No, it's not a new round of --

20  most of the requests that are out there we're cleaning up

21  to make sure we have all the documents.  There's one third

22  party that we recently subpoenaed, Amneal, we have to

23  identify a witness there, but most of it is cleanup work,

24  Your Honor.

25          THE COURT:  Okay.

```
 1              MR. ELFAND:  Your Honor, this is Ross Elfand for

 2    the Boehringer defendants.  From what I've just heard and

 3    also what we've talked about with counsel for the

 4    plaintiffs since they filed their motion, there are no

 5    other depositions that they need to take, other than Marla

 6    Persky.  That's the only one that counsel for Humana just

 7    identified.  And after they filed their motion, we emailed

 8    them and said, You have four witnesses that you referred

 9    to in your motion; who are they?  And they identified two

10    witnesses -- two employees of Boehringer and two employees

11    of Teva, or 30(b)(6) of Teva, and since then one of those

12    witnesses for -- employees for Boehringer is Marla Persky.

13    We've agreed that her deposition can be postponed and can

14    take place after the fact discovery deadline.  The other

15    one just yesterday Humana has released and said that they

16    do not intend to depose that witness.  One of the Teva

17    witnesses, one of the two Teva witnesses has been

18    scheduled for October 19.  That's one of the depositions

19    counsel for Humana referenced.  And then the last Teva

20    witness that they listed was a witness who I understand

21    counsel for Teva said was available in September, the

22    September 1 email, and to this date Humana has not

23    responded to that email and actually requested a date for

24    that witness.

25              So there really is just one more witness that
```

1    we're talking about here, and we've got a bunch of

2    depositions next week, four of which are being taken by

3    plaintiffs.  One is being taken by defendants of a third

4    party.  The subpoena was handled by defendants, not the

5    plaintiff.  And then there was the sixth that counsel for

6    Humana referenced has been -- that was a deposition, I

7    believe it's the deposition of Blue Cross Blue Shield that

8    was originally noticed for next week, but we are in

9    continued discussions with Blue Cross of Louisiana and

10   have since agreed on a stipulation to schedule that one

11   for October 30 after the fact discovery deadline, and we

12   will file that.  We, I believe, sent over a proposed

13   stipulation today, and I think we have agreement on that,

14   and we'll get that on file shortly.

15          So we haven't really heard of any discovery that

16   really actually needs to take place, and we're open to the

17   witness -- the one witness that has been identified, we're

18   open to having her deposition taken after Your Honor rules

19   on the in-camera review.  And the Amneal deposition

20   just -- or the Amneal subpoena for a deposition just went

21   out very recently.  We're not opposed to a deposition of

22   Amneal; we're just opposed to that being a reason to

23   extend the fact discovery deadline.  Defendants were

24   working with Amneal, actually, on a subpoena that we

25   served in August of 2016, and they produced documents

1    pursuant to that subpoena, and we shared those documents

2    with the plaintiffs in October of 2016, and then Amneal

3    launched a generic version of Aggrenox in January of 2016.

4    So this is nothing new.  The fact that there's been a

5    subpoena served on Amneal just in the last week or so

6    should not be a reason to extend the fact discovery

7    deadline, given that they waited so long to do so.  We

8    were in discussions with Amneal to avoid a deposition

9    because they produced the documents.  We were going to

10   have them authenticate them.  They have agreed -- I spoke

11   with them just a couple hours ago -- they have agreed to

12   authenticate and update their transactional data, and we

13   were going to have an agreement that the deposition

14   wouldn't be necessary, but we've reserved the right if --

15   should a deposition go forward as scheduled or at a later

16   date, if there's a dispute between Amneal and the

17   plaintiffs, then we would -- we would reserve the right to

18   cross-notice and ask questions at the deposition as well.

19   But because the plaintiffs just have not identified any

20   specific discovery that they actually need after the fact

21   discovery deadline, we don't think open-ended discovery

22   should continue, and we continue to be willing to work

23   with them on witnesses they've already identified but

24   don't think discovery needs to continue.

25              THE COURT:  Well, that was what I was trying to

1   determine, because it seems to me that in any case of this

2   size, certainly you're going to have some miscellaneous

3   cleanup and situations where scheduling requires a

4   deposition to be taken, or in this case a late ruling from

5   the Court requires a deposition be taken after the

6   otherwise generally applicable discovery deadline.  And if

7   there is no need for anything other than what's been

8   discussed so far, my inclination is simply to say proceed

9   and finish up what you've gotten out there, but let's hold

10  the deadline where it is as a general matter, and it

11  sounds like there may be, what, three depositions -- Blue

12  Cross, Amneal and Persky -- that may get taken after the

13  20th, but I haven't heard of a general need for further

14  discovery.  So let me know, especially Humana, let me know

15  if I'm missing something.

16          MR. MEADE:  Well, Your Honor, this is John Alden

17  Meade on behalf of Blue Cross Blue Shield of Louisiana.

18  We support Humana's motion.  The only thing we would add

19  is that -- and it's in the papers -- that with the

20  settlements of the class plaintiffs we do have some

21  openings in the schedule, so this wouldn't actually push

22  out trial date or anything like that, so we don't really

23  see any harm or prejudice to it, and it has fallen on to a

24  smaller group of lawyers now to get everything finished

25  up.  So it just seemed like administratively it was a

1    simple thing to get it extended by just a few weeks.

2              THE COURT:  Right, but if you're just finishing

3    up, as opposed to starting anew with some new area or new

4    deponent or whatever, then it seems to me that, sure, take

5    your time, get it done, finish it up, even if it's past

6    the 20th.  We don't need to extend the general deadline,

7    and extending the general deadline does shorten the time

8    that the defendants have to prepare summary judgment

9    motions, so I think this is at least some potential

10    prejudice there, and I'm not suggesting in any way you

11    can't finish up what's already out there.  I understand

12    you have fewer lawyers handling what was going to be

13    perhaps an easy task, and now it becomes a tough task.

14    But I think that's just a question of having a few

15    straggling depositions go beyond the deadline rather than

16    extending that deadline.  So --

17              MR. ST. PHILLIP:  Your Honor, this is Peter St.

18    Phillip.  I have no objection to that.  I will say that

19    there's one other additional deponent that we're awaiting

20    to determine whether we need -- we have a deposition on

21    Monday of Mr. Bogna from Teva.  And we've talked to

22    Mr. Holding, and we said we may need Hope Donovan, we may

23    not, depending upon what testimony comes out.  I just put

24    a flag in in reserve if there is something that comes out

25    of the documents that are being produced as we -- as they

1    go and something that comes out of the materials if

2    they're subject to the Court's order, the FTC materials.

3    It's possible that there's another witness out there

4    that -- or two that we need.  I just raise that.  It will

5    just be a good cause standard at that point in time, but

6    we are -- because we have the designee depositions

7    noticed, they may take more time than the one day because

8    there are significant causation issues, but we will

9    endeavor to clean this up and move the case forward.

10            THE COURT:  All right.  So as a practical

11   matter, I guess the bottom line is the October 20 deadline

12   is going to hold, but it's going to have some exceptions,

13   and I think we've discussed those, and if you've got folks

14   that you haven't yet noticed and that you want to notice,

15   obviously see whether the other side consents.  If they

16   do, that's fine.  If they don't, then we'll have a quick

17   and immediate phone call to try and take that up and get

18   it resolved short of the next regularly scheduled status

19   conference.

20            MR. ST. PHILLIP:  Thank you, Your Honor.

21            THE COURT:  Sure.  All right.  The second part

22   of the motion is to basically reverse the order of expert

23   disclosures, and I'll be frank, I'm not inclined to do

24   that at this point.  I think that there's a couple of

25   issues here.  First, the standard that's been quoted in

1    the motion is one that requires a showing to be made.

2    Here I don't know that that showing has been made.  It

3    seems to me that the -- to shift the burden to the

4    defendant to rebut really anticipates that there's an

5    inference that kind of is out there kind of unchallenged

6    or unexplained, and here we have certainly a theory, an

7    argument, an approach that suggests that the reverse

8    payment was not the -- was not the reason for some or all

9    of the delay in bringing the generics to market.  And so

10   it seems to me under those circumstances and especially in

11   light of the timing that we have at this point that it

12   doesn't make sense at this point to shift the order of

13   disclosure of experts; and, again, I'm happy to hear

14   people on that, but I think it's a difficult thing to do

15   this far into the game.

16            MR. ST. PHILLIP:  Your Honor, this is Peter St.

17   Phillip again for Humana.  The way that we perceived this

18   issue is that the *Actos* Court described if there is an act

19   that is deemed wrongful because it's believed to increase

20   the risk of a particular injury, and the injury occurs,

21   then there gives rise to a presumption which the

22   defendants have a burden to show that there are some other

23   factors.  In some of these cases *in the Publication Paper*

24   as Your Honor knows, the description is if there's a

25   price-fixing agreement, there's sufficient risk that

1   that's going to cause supracompetitive prices, and so then

2   that triggers.  Here, it's our view that the *Actavis* Court

3   described in the majority opinion something very similar,

4   which is the risk that a reverse payment creates

5   anti-competitive concerns.  The problem that's faced by

6   plaintiffs in these matters is kind of divorced from the

7   actual injury, the agreement to delay generics, because

8   what happens in these cases is the document shows that the

9   defendant generic company agrees to not launch, in this

10   case until 2015.  There is then a -- a state of

11   manufacturing and FDA reasons that the defendants have

12   within their possession of problems that they have seeking

13   approval or what have you in terms of in the but-for

14   world, regardless of the fact that we had agreed not to --

15   not to launch for a period of time.  There's various and

16   sundry reasons why we couldn't have done it anyhow.  The

17   evidence from the plaintiffs says you were unwilling, and

18   so when it comes time for the expert reports, we're kind

19   of in a position to anticipate the arguments.  And so our

20   experts will come in and say, We think the defense are

21   going to raise this manufacturing problem; here's why it

22   wasn't a problem; this problem, this problem and this

23   problem.  But we don't know for sure, and so what we think

24   the way of scheduling out -- and this is not to change

25   necessarily what the burdens are, the Court can identify

1    those later, but we think it's more rational to have the

2    defendants tell us what they think the manufacturing

3    problems are, and then our experts can respond to that

4    because it's really their defense.  And so that's the

5    reason for what we think the sequencing is.  We don't

6    think there's necessarily prejudice, we can deal with that

7    because of the added time we have in the schedule, but it

8    makes -- it will make for an easier presentation of the

9    expert reports.  So that's my pitch on that.  I understand

10   Your Honor's initial reaction, but that's my argument.

11            THE COURT:  All right.  Well, anybody else want

12   to be heard?

13            MR. HOLDING:  Your Honor, this is Chris Holding

14   for the Teva and Activus defendants. I won't belabor the

15   point, but I did want to say a few things in response to

16   what Mr. St. Phillip just said.  One of them is we have

17   provided extensive and from our perspective we think very

18   clear explication of what these issues are.  We have

19   served initial and amended interrogatories that go on for

20   pages describing in chapter and verse all of these

21   manufacturing problems, so I don't think that it's a

22   question of trying to anticipate what we're going to --

23   what we're going to say.  We've laid the facts out there

24   very clearly.

25            I don't think that *Actos* can properly be read to

1    apply here.  Whatever it may mean in a reverse payment

2    context, the harm that the Supreme Court anticipated was

3    not that an applicant that was trying hard would not be

4    able to get to fruition, and the record is clear, and we

5    tried to put this in some of the materials we submitted,

6    these problems predate the agreement.  This is not some

7    sort of post hoc pretext.  Months and months before the

8    first negotiations began we were looking around and

9    saying, We have a real problem and we can't fix it.  That

10   factually, I think, is very important for how you look at

11   this.  And so whether we view it as not being within

12   the -- whatever inference or presumption may arise in the

13   first instance, or whether we think about it as saying we

14   have met the burden of production under *Zenith* to show

15   that there is a substantial factual basis for an

16   alternative reason here, I don't think that this comes

17   anywhere near what *Actos* might mean.  And I also agree

18   with one of the points I think you made, which is apart

19   from all of that, just procedurally, this late in the day,

20   three years into the case, it's too late to change the

21   order.  That would be prejudicial to us.

22              THE COURT:  All right.  Well --

23              MR. MEADE:  Your Honor, this is John Alden Meade

24   again on behalf of Blue Cross Blue Shield.  We support

25   Humana's motion.

```
 1              THE COURT:  All right, thank you.  I'm going to
 2   stick with my initial inclination here.  The Publication
 3   Paper case was a 2012 decision.  It's been out there for a
 4   while.  The Actos decision is from 2017, but it's been out
 5   there certainly for a number of months.  We've had this
 6   schedule in place for quite a long time, and especially in
 7   light of the suggestion, which I accept, that the
 8   defendants have provided interrogatory responses that lay
 9   out the position that there were reasons other than
10   reverse payment for the delay, it seems to me that
11   plaintiffs' experts are in a position to capably take that
12   on and indicate their opinions based upon and in reliance
13   on those interrogatory answers.  So it seems to me that we
14   can't change the order of disclosure at this late date,
15   and obviously plaintiffs will have a chance to have their
16   experts do a rebuttal if they have misunderstood the
17   interrogatory answers or otherwise not properly
18   anticipated defense position.  So I think we'll stick with
19   the current order of disclosure.
20              MR. MEADE:  Thank you, Your Honor.
21              THE COURT:  All right.  So we've got, then, the
22   678 motion regarding Humana's production from network
23   drives and production of certain links in some of the
24   emails that were previously produced.
25              MR. ELFAND:  Your Honor, this is -- I don't mean
```

1    to interrupt.  There is one more issue before we get to

2    that motion to compel related to the schedule that was in

3    the joint status report and just wanted to make sure that

4    that --

5              THE COURT:  Oh, fine.  Who's speaking, please?

6              MR. ELFAND:  This is Ross Elfand for the

7    Boehringer defendants.

8              THE COURT:  Okay.

9              MR. ELFAND:  The defendants raised an issue

10   related to Blue Cross Blue Shield Louisiana, and I just

11   wanted to provide an update for the Court since there's

12   continuing discussions.  As I mentioned earlier, we

13   believe we've reached an agreement on the date of the

14   deposition, but we still are in continuing discussions as

15   to outstanding discovery that we believe we're owed and

16   believe that Blue Cross Blue Shield Louisiana agreed that

17   they would produce, and so we've proposed a meet and

18   confer for tomorrow.  We're waiting to hear back, and

19   we're waiting to hear back on a number of deficiencies.

20   We are hopeful we'll be able to come to an agreement like

21   we did on the deposition date, but it's possible we will

22   file a motion to compel next week on that as well.  I just

23   wanted to let Your Honor know that that is ongoing and

24   happening, but hopefully we'll be able to find resolution

25   on that.

1          THE COURT:  Yes.

2          MR. MEADE:  That's correct, Your Honor.  This is

3     John Alden Meade on behalf of Blue Cross, and that's all

4     accurate.

5          THE COURT:  Okay, great.  I noted in the report

6     that you say that you may have to file a motion to compel

7     after the October 20 deadline.  Just consistent with what

8     we discussed before, if that date gets tight because

9     everybody is busy with depositions or whatever, feel free

10    to have a little bit of time past that date so we don't

11    file, in effect, a motion to compel prematurely.  I'd

12    rather have you two try and work this out in the first

13    instance, and if that takes a little more time, then I

14    will understand.

15         MR. ELFAND:  Thank you, Your Honor.  We'll do

16    that.

17         MR. MEADE:  Thank you.

18         THE COURT:  All right.  So motion to compel

19    production from Humana.  Let me cut to the chase again.  I

20    think -- my impression, having read the papers, is that

21    the motion has merit; that is, it looks to me like the

22    links are to a relatively small number of identified

23    emails.  I didn't completely understand the suggestion

24    that there might be hundreds of links to a particular

25    email, perhaps we can discuss that, but it seems to me

1    it's less than a complete production if the links are not

2    provided because the links presumably give context to the

3    email and complete, if you will, the disclosure of the

4    document.  So my sense is that those ought to be turned

5    over.

6            And in terms of the searches of the additional

7    network drive, again, it seems to me -- I'm happy to hear

8    what I'm missing, but it seems to me that that type of

9    discovery is not especially onerous, may in fact turn up,

10   probably will turn up some relevant information and

11   doesn't, at least from what I've been able to read, does

12   not seem to be disproportionate.  So I'm happy to hear

13   argument from both sides on that, but that's kind of an

14   initial impression to help guide your comments.

15           MS. RUGGIERO:  Your Honor, this is -- oh, sorry.

16   On behalf of Humana, if we could start --

17           THE COURT:  I couldn't hear who's speaking.  I'm

18   sorry.

19           MS. RUGGIERO:  I'm sorry, this is Noelle

20   Ruggiero on behalf of Humana.

21           THE COURT:  Thank you.

22           MS. RUGGIERO:  If we could just start with the

23   links.

24           THE COURT:  Okay.

25           MS. RUGGIERO:  I appreciate Your Honor's

1    sensitive ruling there.  If we could just look at the

2    number, it does seem small in comparison to Humana's

3    entire production, as defendants point out, but it is --

4    it's over 1,000 emails that they have identified by Bates

5    number.  When you look at those emails, those emails can

6    have an indefinite number of links embedded in them, and

7    their motion does not make it clear and their initial

8    request does not make it clear what links they are looking

9    for us to retrieve.  They have made no showing that all of

10   the links in these emails are relevant.  And for Humana to

11   pull these documents and to do an efficient job of doing

12   so, we will first turn the emails as we have produced them

13   over to Humana, and then their internal IT department is

14   going to have to go in, find the original email, pull them

15   all and then open each one individually and click on all

16   of the links within them, see where those go, and then we

17   don't have any instruction once we get there because we

18   don't know what defendants are looking for here.  And they

19   put in, as part of their motion, I believe it's

20   Exhibit 13, that's an email that has 389 links in it.

21   They have not told us do they expect us to click on every

22   link and produce everything that that link leads to,

23   regardless of the content?  These can be linked to entire

24   drives, which then do they need to be collected and

25   searched themselves?  There's no limits to this request.

```
 1    So it might seem small in terms of the number, but it
 2    actually is quite burdensome, especially this late in the
 3    game and especially, as you heard Boehringer say earlier,
 4    there are no Humana depositions on tap in the schedule.
 5    They have completed three days of testimony already.  They
 6    have never once showed a witness an email with a link and
 7    asked them where it led or, you know, why it could be
 8    relevant to testimony and discovery that they're seeking.
 9    They have not demonstrated that they don't have the
10    documents that these links lead to in another form,
11    because as we say in our papers, we've actually collected
12    the relevant documents of the types that are on these
13    drives for Aggrenox and generic Aggrenox, and we began
14    producing those back at the end of 2014 all the way
15    through 2016, and those are the exact types of documents
16    that are on these drives now that defendants are now
17    claiming to need, in addition to any other documents that
18    might be found in these links.  And what we're asking for
19    is more -- even if there are -- even if we do have to go
20    and pull the links, we're asking for more guidance.  We're
21    asking for a clear set of instructions as to what
22    defendants are looking for and why.  We gave them the
23    opportunity to narrow the list.  We're willing to meet and
24    confer with them and work with them to come to an
25    agreement, but to just issue this boundless request for
```

1    documents because they believe they might be relevant, we

2    don't think that's proportional, and given where we are

3    and the extent of our productions at this time in the

4    case, we just don't see that it's proportional and

5    relevant to what we're doing here.

6              THE COURT:  Well, okay.  Let me suggest this.

7    You were able to identify the emails as potentially

8    responsive to a request.

9              MS. RUGGIERO:  Yes, they were pulled back by the

10    search terms, yes.

11              THE COURT:  Right.  So why can't you use that

12    same approach with respect to the links?  Obviously if

13    you're linking to an entire drive, then they're not going

14    to get the entire drive, fine.  But with respect to what

15    I'll call ordinary links, when a reviewer looks at an

16    ordinary link and sees a document that has to do with a

17    different drug or has to do with, I don't know, something

18    unrelated to this litigation, certainly not responsive to

19    the Request for Production that led you to disclose the

20    email, then as with any other nonresponsive document, you

21    wouldn't produce it.  But when a link opens and it shows a

22    document regarding Aggrenox or generic Aggrenox or

23    otherwise within the scope of the request, presumably the

24    reviewer says, Oh, that's something we have to produce.

25              I guess, in other words, I'm not clear, other

1   than with respect to the linking to an entire drive, why

2   this is any different than clicking on a PDF that's

3   attached to an email.  Presumably --

4          MS. RUGGIERO:  I think part of it -- I'm sorry,

5   I didn't mean to interrupt.

6          THE COURT:  No, go ahead.  Go ahead.

7          MS. RUGGIERO:  Part of it has to do with the

8   fact that unlike the emails that we've already collected

9   and that we can review, we don't, in the first instance,

10  have access to these, so we can't see what they're linking

11  to.  Humana is going to have to pull all of that

12  regardless of its -- regardless of whatever that link

13  brings to because we can't expect our IT people to make

14  that judgment call, and then we'll have to import all of

15  that material, no matter what it is, and then it will have

16  to be searched.  That's going to take a very long time to

17  do.  It just would because of all the steps that have to

18  be taken there, and we can't have -- unfortunately, we

19  can't have their IT person being the screener of what's

20  relevant and what's not and --

21         THE COURT:  No, but why can't a lawyer or a

22  paralegal or someone capable of doing the screening sit

23  with the IT person as the link is opened and say, Oh, no,

24  that's a link to whatever, the conference on generic

25  drugs, that has nothing to do with this litigation, we

1    don't need that one?

2              MS. RUGGIERO:  If defendants would be open to

3    that and if the production would be seen as compliant, we

4    could discuss that, but then I think that leads into, you

5    had said earlier that you are inclined to grant their

6    request with respect to searching these network drives.

7              THE COURT:  Right.

8              MS. RUGGIERO:  If we're going to do that, then

9    there's no reason we shouldn't just do that, because as

10   they say in their email, these links are to documents in

11   these network drives.  So if they want us to find those

12   documents that are the relevant ones that hit on their

13   search terms, then we might as well not go through the --

14             THE COURT:  Well, okay, fine.  I misunderstood.

15   So what you're saying is an electronic search, a search

16   term search of these drives would produce the documents

17   that are shown as links in the emails at issue?

18             MS. RUGGIERO:  It will if they're relevant,

19   because then it will hit on the search terms.

20             THE COURT:  All right.

21             MS. RUGGIERO:  So rather than go through all the

22   responses of this link, this link, this link, we can

23   collect the drive, search the drive and turn over the

24   hits.

25             THE COURT:  Okay.  And now so the only question

1    I have perhaps for the defendants, then, is if you receive

2    the documents, but they're not identified by the fact that

3    they are the link that is shown in an email, is there

4    going to be any problem using the documents?

5          MR. KESSLER:  Your Honor, this is David Kessler

6    from Norton Rose Fulbright for the Boehringer defendants.

7    I have a few issues to address.

8          THE COURT:  Okay.

9          MR. KESSLER:  The question you just asked, I

10   don't believe that will be a problem.

11         THE COURT:  Okay.

12         MR. KESSLER:  But I think that there's a

13   misunderstanding as to the two requests that the

14   defendants have made.  The requests for the links is not

15   completely a subset of the documents in these five file

16   shares, the joint repositories.  The links go to multiple

17   different locations and many of which are not within these

18   five file shares.  So just searching the five file shares

19   will not pull back all of these documents.  And even if

20   they were, these documents may not contain the search

21   terms that Humana agreed to run in these file shares, so

22   that even if they were, you wouldn't necessarily hit all

23   these links.

24         THE COURT:  Okay, let me just pause right there

25   because if there's a link to a document that doesn't have

1   one of the agreed to search terms, why do you need that

2   document?  In other words, presumably the search terms are

3   going to cover what you need, and so aren't you defining a

4   link that is going to be irrelevant?

5          MR. KESSLER:  No, Your Honor, just because a

6   document hits a search term, it doesn't make it either

7   responsive or not responsive.  The reason we use the

8   search terms is essentially to create a more rich

9   environment to identify potentially relevant documents.

10  These links, by looking at this email, right, and to be

11  clear, we reviewed all of these emails that Humana

12  provided to us, and we condensed it and made a targeted --

13  these are the 1200 emails that we think are material to

14  this case, not barely relevant or potentially relevant,

15  these are the ones that we believe go to serious issues

16  around damages in the but-for world and how Humana was

17  making decisions about coverage, that are only available

18  to Humana, and I could go into detail as to why I think

19  this information is not duplicative or cumulative.  I can

20  tell you, for instance, we ran searches based on the

21  document titles in these links, and those document titles

22  haven't been produced to us.  So these are not documents

23  we have already.

24          THE COURT:  Okay, let me just pause for a

25  second.  So that's why you need to search the drives, and

1    I've suggested you should be allowed to search the drives

2    using the search terms.  Let me follow up on this.  Are

3    you able to figure out -- you said something about some of

4    these links don't go to the network drives at issue, is

5    that right?

6            MR. KESSLER:  Yes.

7            THE COURT:  How do you know that?

8            MR. KESSLER:  Your Honor, the -- Your Honor,

9    there were numerous shared drives that Humana did not

10   search, and because of the way that Humana communicates

11   between key players in this case, they, instead of

12   attaching documents, they link as a single instant source

13   a variety of locations.  So some of these are going to be

14   in the five file shares that we narrowed down and focused

15   on, but others may be in other locations that these key

16   players had access to and were using.  And so they won't

17   be found if you just search the five locations.

18            And I think the Court -- Humana in its response

19   pointed to this one email that had 389 links.  We went

20   back and looked at the 1200 documents, emails that we

21   have.  The overwhelming majority, more than a thousand, we

22   believe, only have one link.  We believe, based on the

23   information we have, that those are documents, not shares.

24   In fact, Humana does not identify any email in its papers

25   that goes to an entire drive, and since they have all the

1    documents that we identified, you'd think if they had one

2    that actually went to a whole drive, they would have

3    identified it to Your Honor.

4            I will also note while Humana complains about

5    the burden of doing all of this, it doesn't estimate the

6    number of documents at issue, the time it will take or the

7    cost, all of which is its burden to do, and I can't -- I

8    don't have access to that information.  I can't tell you

9    that, Your Honor.

10           THE COURT:  No, no, of course.  But let me just

11   pause for a second.  All right, so you can tell,

12   apparently, that some of the links go to the drives at

13   issue, and some of them don't.  Are you able to

14   identify --

15           MR. KESSLER:  Yes, Your Honor.

16           THE COURT:  Okay.  Why would you not be

17   satisfied with a search term search of the drives and

18   production of the links that go to places other than these

19   drives?

20           MR. KESSLER:  Your Honor, and I don't know, I

21   don't have the content of the documents that are parts of

22   the links, but there is a, not just theoretical, but an

23   actual probability that at least one of those links, and I

24   don't know how important that document will be, I don't

25   have access to this information, only Humana does, but if

1    I have an email talking about, for instance, the clinical

2    policy for Aggrenox, right, and it links to something

3    saying, You should look at this, this is my current edit

4    or my current thoughts on how we should manage this issue,

5    while it's possible, maybe even probable that that

6    document contains one of the search terms, that's no

7    guarantee.  And if you look at our ESI protocol, Your

8    Honor, which Humana negotiated with us and agreed to, it

9    had an obligation to provide family relationships and

10   provide the embedded documents, which we have done

11   faithfully in our production to the plaintiff.  And, in

12   fact, there's a specific provision in the ESI protocol,

13   B3N, where if there was an attachment that was

14   nonresponsive, then that's fine, you don't have to produce

15   it, but you have to identify it as a clerk sheet, right?

16   And you should know, Your Honor, Humana has not been

17   reviewing its documents before it produces them, so as

18   soon as it finds a document, whether responsive or not to

19   our request, if it hit a search term, unless it hit a

20   privilege term, they just simply turned it over.  So there

21   is no cost of review, particularly for the link, but I

22   would argue probably for these other searches as well

23   before they hand these documents over.  At this point for

24   Humana to argue, well, some of these documents may be

25   irrelevant, that didn't stop them from producing all of

1    those documents in all of its earlier production over the

2    last few months.

3              MS. RUGGIERO:  I would just like to add there

4    that the documents we produced all hit on search terms, so

5    it seems -- Mr. Kessler seems to be saying that we need to

6    not only turn over documents now that hit on search terms,

7    but if these links go to documents that wouldn't otherwise

8    be returned by a search, which the search includes the

9    word "Aggrenox" and every permutation of it, that we also

10   have to turn those over.  That's beyond the scope of what

11   we've ever agreed to, and we don't intend to start doing

12   that now, number one.

13             MR. KESSLER:  Your Honor -- may I respond to

14   that, Your Honor?

15             THE COURT:  Sure.

16             MR. KESSLER:  The agreement was that if a

17   document is an email with attachments, that we had to

18   review the entire family, we couldn't just pick and

19   choose, because you need the context of the entire

20   document, right?  So we're not asking for Humana to start

21   looking at documents that didn't hit search terms.  The

22   emails they produced to us already hit the search terms;

23   otherwise, we would not have them.  These links provide

24   essentially the substance, right, of the communication

25   between key players in this case.  So I can't -- giving me

1    half the conversation or a part of the document and not

2    the entire document doesn't give me the completeness I

3    need in order to understand how Humana is making coverage

4    decisions related to this -- to Aggrenox and what share of

5    co-pay they have received.

6              THE COURT:  I mean, I think that's a valid

7    point.  It's the completeness that I talked about before,

8    it's the completeness of the document, that is, the email

9    that was produced pursuant to the search by search terms.

10   Especially if the emails are kind of merely cover notes to

11   a substantive document that's being sent around, it's the

12   substantive document that really matters.  So I think the

13   links have to be produced one way or the other.  I'm just

14   trying to figure out the best way to do it.

15             MS. RUGGIERO:  So are we.

16             THE COURT:  Well, do you dispute the contention

17   that you're producing documents, in effect, unreviewed;

18   and, if so, why don't you just send the links over, send

19   the documents that are at the other end of the link over?

20             MS. RUGGIERO:  Well, they first have to be -- we

21   don't have them, so first we would have to collect them

22   and --

23             THE COURT:  Well, when you say "we," you mean

24   you, the lawyer, don't have them.

25             MS. RUGGIERO:  Yes.

1          THE COURT:  But your client has them.  I mean,

2    that's part of the -- right?

3          MS. RUGGIERO:  Yes.  So that we will -- assuming

4    they don't -- as defendants just indicated, if most of

5    them link to one document, that's not an issue.  The issue

6    would be, like the example that they put in here which has

7    389 links, and if we run across any that link to larger

8    collections of documents, that is where the issue comes up

9    of what do we turn over.  But if IT can go through and

10   they pull one document from each one and those are what we

11   turn over, then that would, in theory, work.

12         MR. KESSLER:  Your Honor, obviously the

13   defendant has no interest in making this more difficult

14   than it has to be, and we're happy to work in good faith

15   with Humana to help them produce the documents.  And if

16   there is -- if we are unaware of some extraordinary burden

17   this creates, they have to go through the drive or some

18   enormous amount of documents, we will work with them to

19   reduce that because we have every interest in closing out

20   discovery and moving this case forward to dispositive

21   motion.  So if the order of the Court is Humana has to

22   produce these links and search the five file shares, we

23   will work with Humana to make that as cost effective and

24   as efficient as possible.

25         MS. RUGGIERO:  And I can add there, if we are

1     going to go beyond the links and we are going to search

2     the actual drive, that will be hundreds of thousands of

3     documents more that will have to be collected, and those

4     will be searched, so there is time and cost associated

5     there that obviously is going to run past the October 20

6     deadline.

7             MR. KESSLER:  I'm surprised to hear that.  This

8     is the first time, it's not in the papers, and it wasn't

9     in our meet and confer, the size of this.  You know, we

10    need those documents, if there's a way for us to somehow

11    reduce that burden, but it appears from the production so

12    far from Humana that these five file shares do contain

13    contemporaneous conversations by Humana with key people,

14    not just what the final decision was but how they reached

15    the decision around insurance coverage, which is, of

16    course, crucial for us creating the but-for world if a

17    generic form of Aggrenox had come on the market earlier.

18    It goes directly to Humana's damages in this case.

19            THE COURT:  Yes, I think the links need to be

20    produced, and if you run into a situation where a link is

21    going to a depository of documents of some sort, a drive

22    or otherwise a large collection of documents, then discuss

23    that.  I think probably those links don't have to be

24    produced, but certainly the links that make these emails

25    comprehensible and meaningful need to be produced.  And --

1              MR. KESSLER:  What's the Court's view on the

2    five?

3              THE COURT:  Yes, the five drives I think at

4    least have to get run through the -- why wouldn't they be

5    run through the search terms that have been agreed to in

6    the past?

7              MS. RUGGIERO:  With respect to the drive, Your

8    Honor, so they would have to be -- unfortunately, Humana

9    does not have the power to search those in house, so they

10   would have to be harvested, and they will be -- they would

11   be searched by our vendor.  As I said, it would be

12   hundreds of thousands of documents that will need to be

13   searched, and the reason why we were not initially

14   inclined to do so was because we've already searched the

15   emails and hard drives of 27 custodians for all of the

16   search terms that were agreed upon which cover all of the

17   permutations of formularies and step edits and policies

18   and procedures and everything that has ever been in place

19   with Aggrenox, and as a result, anything beyond that is

20   duplicative and not proportional.  We've produced

21   4.6 million pages already, which defendants seem to be

22   complaining about is so much, but that's what happened

23   when we searched 27 custodians with 52 detailed search

24   strings, and now if you have to go back and do that with

25   more documents, we will if we need to, but we really feel

1    that it's duplicative and overburdensome at this point.

2              MR. KESSLER:  Your Honor, the reason we picked

3    these five locations is based on Humana's -- this is not a

4    guess or idle speculation.  It appears that the most

5    important custodians in this case used these five

6    locations to store documents related to how they made

7    coverage decisions.  The PMG committee used this location

8    to store documents.  We do not believe there are

9    duplicative documents here, and of course even if there

10   were, Humana could run nearly dupe technology or run MD5

11   hash and eliminate those from its process.  And remember,

12   Your Honor, because Humana is not reviewing these for

13   responsiveness, once they collect them on search terms,

14   unless they're going to run privilege terms on top of

15   that, which they're free to do, they just turn documents

16   over to us, and it becomes our problem, right?  The volume

17   of documents will not create a huge review problem for

18   Humana because Humana has decided to waive their right to

19   review the documents for responsiveness.

20              THE COURT:  Yes, I think the drives need to be

21   searched.  It's unfortunate it's happening this late.

22   It's unfortunate that this is going to be potentially

23   burdensome on both parties, but I don't think it's

24   disproportionate.  I think that for the reasons stated,

25   there's a good chance that important documents will be

```
 1    located, and I think it's worth the effort.

 2              MS. RUGGIERO:  Thank you, Your Honor --

 3              MR. KESSLER:  Thank you, Your Honor.

 4              MS. RUGGIERO:  -- for your ruling.

 5              THE COURT:  All right.  Are there other issues

 6    that we ought to take up today?

 7              MR. KESSLER:  No, Your Honor.

 8              THE COURT:  Okay, best of luck.  I know you have

 9    a lot on your plate.  I have a fair amount on mine as

10    well.  Hopefully all of us will get that work done, and

11    we'll proceed into the next phase.  I appreciate everybody

12    participating in the call today.

13              MR. ELFAND:  Thank you, Your Honor.

14              MR. KESSLER:  Thank you, Your Honor.

15              MR. ST. PHILLIP:  Thank you, Your Honor.

16              THE COURT:  Thank you.  Bye-bye.

17              (Proceedings adjourned at 5:58 p.m.)

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


No. 3:14-md-02516(SRU)
In Re:  Aggrenox Antitrust Litigation



              I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



                    October 17, 2017


                    /S/ Sharon L. Masse
                  Sharon L. Masse, RMR, CRR
                   Official Court Reporter
                   915 Lafayette Boulevard
                 Bridgeport, Connecticut  06604
                    Tel: (860)937-4177