# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE AGGRENOX ANTITRUST LITIGATION | No. 3:14-md-02516 (SRU) |
| THIS DOCUMENT RELATES TO: ALL DIRECT PURCHASER ACTIONS | |

## RULING ON MOTION FOR COSTS AND FEES

In the complex multidistrict case *In re Aggrenox Antitrust Litigation*, the recipient of a Rule 45 non-party subpoena, Gyma Laboratories of America ("Gyma"), has moved to recover costs and fees from the Direct Purchaser Plaintiffs ("the DPPs"). Gyma claims that it incurred $105,585 in costs and attorneys' fees complying with the DPPs' subpoena, of which it asks to be reimbursed $72,778.20. Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 5–6. The DPPs argue that Gyma's claimed expenses are exaggerated, poorly documented, or incurred as a result of its own efforts to resist complying with the subpoena. Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 9. The DPPs also argue that the cost of compliance should be shared with the defendants, and ask that I order Gyma to return half of the payment that the DPPs already made. *Id.*

After carefully examining the documentation submitted by Gyma's counsel, I conclude that Gyma's reasonable costs of compliance total $21,343.40. In accordance with my earlier order, *see* Conf. Mem. & Order, Doc. No. 586, the DPPs already have made a good-faith payment of $20,000. Under the circumstances of the present case, I conclude that the equities favor placing the remaining $1,343.40 on Gyma, and exercise my discretion not to award any further costs or fees to Gyma for its compliance with the subpoena.

# I. Standard of Review

Federal Rule of Civil Procedure 45 provides that "[a] person commanded to produce documents or tangible things . . . may serve on the party or attorney designated in the subpoena a written objection . . . to producing electronically stored information in the form or forms requested." Fed. R. Civ. P. 45(d)(2)(B). "If an objection is made," then:

> (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
>
> (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*Id.* The Rule also provides that when a person moves to "quash or modify [a] subpoena," the court may "order . . . production . . . if the serving party . . . ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(B)–(C).

Courts have deemed those provisions to "ma[k]e cost shifting mandatory in all instances in which a non-party incurs significant expense from compliance with a subpoena."[1] *Legal Voice v. Stormans, Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (citing *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001)). "Rule 45's required protection of a non-party from significant discovery expenses does not mean that the requesting party must bear the entire cost of compliance," however. *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 207 (D. Conn. 2009). Rather, "[a] non-party can be required to bear some or all of the expenses where the equities of the particular case demand it." *Id.* To determine the proper allocation of costs, the court should consider "(1) whether the non-party actually has an interest in the outcome of the

---

[1] In fact, "[i]t is not necessarily clear that 'protect' means that the requesting party foot the nonparty's bill of compliance," but "the Advisory Committee's note to the Rule, commentaries, and the small universe of decisions applying the Rule appear to intimate such an interpretation." *In re Am. First Corp.*, 184 F.R.D. 234, 240 (S.D.N.Y. 1998).

litigation; (2) whether the non-party can more readily bear the costs than the requesting party; and (3) whether the litigation is of public importance." *Id.* (citing *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C. 1992)); *In re Honeywell Int'l Sec. Litig.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003).

Furthermore, "only reasonable expenses are compensable" under Rule 45. *G & E Real Estate v. Avison Young–Wash., D.C., LLC*, 317 F.R.D. 313, 316 (D.D.C. 2016); *accord In re Subpoena of Am. Nurses Ass'n*, 924 F. Supp. 2d 607, 626 (D. Md. 2013); *In re Honeywell Int'l Sec. Litig.*, 230 F.R.D. at 303. "The determination of . . . reasonableness is committed to the sound discretion of the trial court," *see Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005), but with regard to professional expenses, federal appellate courts have outlined factors that the district judge should consider when setting a reasonable fee.[2] For an attorney, "[t]he reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008) ("*Arbor Hill*"). Therefore, "in exercising its considerable discretion," the district court should "bear in mind . . . case-specific variables," *id.* at 190, including the factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92–93, 96 (1989). Those factors are:

> (1) the time and labor required;
>
> (2) the novelty and difficulty of the questions;
>
> (3) the level of skill required to perform the legal service properly;
>
> (4) the preclusion of employment by the attorney due to acceptance of the case;
>
> (5) the attorney's customary hourly rate;
>
> (6) whether the fee is fixed or contingent;

---

[2] The decisions that discuss what constitutes a "reasonable" attorneys' fee primarily arose in the context of civil rights laws, but "case law construing what is a 'reasonable' fee applies uniformly to all . . . federal fee-shifting statutes." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

(7) the time limitations imposed by the client or the circumstances;

(8) the amount involved in the case and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

*Arbor Hill*, 522 F.3d at 186 n.3. The court "should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* at 190.

A non-party who moves for costs and fees bears the burden of demonstrating that those costs and fees are reasonable. *See Blum v. Stenson*, 465 U.S. 886, 897 (1984). Therefore, when claiming attorneys' expenses, the movant must provide "contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). The court may deduct from the requested amount "[h]ours that are 'excessive, redundant, or otherwise unnecessary.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). Moreover, the movant also "has the burden of showing by satisfactory evidence—in addition to the attorney's own affidavits"—that the requested rates are those "prevailing . . . for comparable attorneys of comparable skill and standing in the pertinent legal community." *Farbotko v. Clinton Cnty.*, 433 F.3d 204, 209 (2d Cir. 2005) (quoting *Blum*, 465 U.S. at 896 n.11); *Kirsch*, 148 F.3d at 172. The pertinent community typically is "the forum of the litigation"—even if that is not where the non-party's "counsel has its primary office"—unless the movant shows that "a reasonable, paying client would have retained out-of-district counsel." *Arbor Hill*, 522 F.3d at 184 n.2; *Smart SMR of N.Y. v. Zoning Comm'n*, 9 F. Supp. 2d 143, 149 (D. Conn. 1998).

In addition to shifting costs for non-parties' compliance with a subpoena, Rule 45 directs district courts to "impose an appropriate sanction—which may include . . . reasonable attorney's fees—on a party or attorney who fails to comply" with the Rule's mandate to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). That provision authorizes district courts to "protect non-parties from abusive subpoenas" by "award[ing] . . . attorneys' fees for litigating the subpoena." *In re Rule 45 Subpoena Issued to Cablevision Systems Corp. Regarding IP Address 69.120.35.31*, 2010 WL 2219343, at *11 (E.D.N.Y. Feb. 5, 2010); *Stormans Inc. v. Selecky*, 2015 WL 224914, at *6 (W.D. Wash. Jan. 15, 2015). Courts have awarded attorneys' fees for resisting a subpoena if (1) "the subpoena imposed an undue burden" on a non-party, and (2) the party requesting the subpoena "fail[ed] . . . to carry out [its] Rule 45–mandated duty to 'take reasonable steps to avoid imposing an undue burden'" on the non-party. *See Molefi v. Oppenheimer Tr.*, 2007 WL 538547, at *2 (E.D.N.Y. Feb. 15, 2007). In considering the reasonableness of fees sought in a sanction motion, courts apply the same factors as used in the cost-shifting analysis. *See Johnson v. N.Y.C. Transit Auth.*, 823 F.2d 31, 32–33 (2d Cir. 1987); *Molefi*, 2007 WL 538547, at *5.

## II.  Background

The present discovery dispute arises out of the complex multidistrict antitrust case, *In re Aggrenox Antitrust Litigation*. The DPPs have sued a large manufacturer of generic drugs, Teva Pharmaceutical Industries, Ltd., and its various subsidiaries (collectively, "Teva"), alleging that Teva violated federal antitrust law by entering into a reverse payment settlement with Boehringer Ingelheim Pharmaceuticals and its subsidiaries (collectively, "Boehringer"), in which Teva agreed to delay producing a generic version of Boehringer's brand-name anti-stroke medication, Aggrenox. *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 231–32, 236–37 (D. Conn.

2015). In its responses to interrogatories, Teva has told the DPPs that it plans to raise a causation

defense to the antitrust claims, namely, that "it could not manufacture commercial quantities of

generic Aggrenox between 2009 and the present day" because of "problems obtaining necessary

ingredients." *See* DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 2. One of the necessary

ingredients is dipyridamole, an active pharmaceutical ingredient supplied by Gyma. *Id.* at 1.

"Teva specifically implicates quality problems with Gyma's product" as part of its causation

defense. *Id.* at 2 (citing Teva's Resp. to DPPs' First Set of Interrogs., Ex. 5 to Gerstein Decl.,

Doc. No. 502, at 74–75). To assess Teva's causation defense, in February 2016, the DPPs served

a Rule 45 non-party subpoena upon Gyma. DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 3.

A. The Rule 45 subpoena

The Rule 45 non-party subpoena served upon Gyma included four document requests:

> *Request No. 1*: Communications, including both your internal
> communications and your external communications with Barr/Teva,
> relating to Aggrenox or generic Aggrenox.
>
> *Request No. 2*: Documents regarding any and all contracts or agreements
> you entered into, or contemplated entering into, with Barr/Teva,
> concerning any aspect of Aggrenox or generic Aggrenox, including
> "requests for proposals" or other bidding solicitations and responses
> thereto; drafts of contracts or modifications to contracts; executed
> contracts or executed modifications to contracts; performance under or
> pursuant to any written or unwritten agreements; and internal discussions
> about any such agreements and performance under such agreements.
>
> *Request No. 3*: Documents regarding your actual, proposed, contemplated
> or forecasted supply of any component part(s) or ingredient(s) for generic
> Aggrenox to Barr/Teva.
>
> *Request No. 4*: Documents regarding the patent litigation involving
> Barr/Teva concerning its generic Aggrenox product.

DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 2–3. Gyma objected that those requests were

"overbroad," in that they "requested any and all documents related to Barr's business

relationship with [Teva]," without "specify[ing] a relevant time period." Gyma's Opp'n Mot. Compel, Doc. No. 535, at 7. The DPPs' and Gyma then engaged in a series of phone calls that narrowed the scope of the requests but left them, in Gyma's view, "significantly overbroad." *See id.* at 8; DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 3.

The crux of the dispute concerned Gyma's anticipated costs for complying with the subpoena. According to Gyma, "there were several issues that would add time and expense to the collection, review, and production of documents." Gyma's Opp'n Mot. Compel, Doc. No. 535, at 9. First, "Gyma switched to an outsourced e-mail exchange server" in June 2013, which meant that it "would need to collect e-mails not only from various custodians, but also different storage locations." *Id.* Second, "any e-mails sent or received prior to June 2013 . . . would have to be restored before Gyma would be able to search, review, and—if necessary—produce them." *Id.* Some of those emails were stored on "a Eudora server," which is "no longer manufactured or serviced." *Id.* at 5–6. Third, "not all of the potential custodians are current Gyma employees." *Id.* at 9. Gyma concluded that those problems would result in it "incurring costs of $176,000," and— according to the DPPs—informed the DPPs that it "expected [them] to pay some or all of that figure *before* it produced *any* documents." DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 3. Skeptical of the claimed costs, the DPPs "asked [Gyma] to provide a detailed breakdown of its estimate so that [they] could . . . collaborate on ways to greatly lower what appeared to be an exaggerated estimate," but, according to the DPPs, Gyma "refused to provide th[at] information." *Id.* Gyma, in turn, alleges that it asked the DPPs to "provide search terms to narrow the scope of documents needing to be collected, reviewed, and produced," but the DPPs "refused to provide any search terms." Gyma's Opp'n Mot. Compel, Doc. No. 535, at 11.

In June 2016, Gyma made what the DPPs characterize as a "very small production" of 625 pages of transactional data, "but still refuse[d] to produce the bulk of the documents sought by the subpoena unless [the DPPs] commit[ted] to pay its . . . costs." DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 3–4. Gyma asserts that the DPPs refused "to commit to covering at least a portion of the extensive costs of responding to the Non-Party Subpoena." Gyma's Opp'n Mot. Compel, Doc. No. 535, at 12. With an impasse reached, the DPPs filed a motion to compel Gyma to produce documents pursuant to the subpoena on August 17, 2016. Doc. No. 499. Gyma opposed the motion on September 27, 2016, Doc. No. 535, and filed a cross-motion for costs associated with the subpoena the same day, Doc. No. 537.

B. The DPPs' motion to compel

I heard argument on the motion to compel and cross-motion for costs as part of a hearing on all pending discovery motions in *Aggrenox* on October 14, 2016. *See* Doc. No. 569. At the hearing, I expressed concern that Gyma had not established "a record supporting . . . the difficulty . . . of getting the[] documents" from the Eudora server. Mot. Hr'g Tr., Doc. No. 568, at 6. I also opined that "the [$]176,000 [figure] seems outrageously high." *Id.* at 7. Gyma's counsel replied that Gyma had "offered a lot of different ways to keep the costs lower," and only "asked for . . . a commitment that when [it] go[es] and do[es] this, that there would be some defrayment of the cost." *Id.* at 8. I stated that Rule 45 "provides for reasonable costs" and that Gyma certainly would "get [its] reasonable costs," but that those costs needed "to be *reasonable*." *Id.* at 8–9 (emphasis added).

I asked Gyma why it "had to hire a third party" to find documents on its (still-operating) Eudora server. *Id.* at 8. Gyma's attorney replied that doing so was "the optimal way to collect all the information and not miss anything," but that it was "willing to have . . . Gyma's employees,

8

go and do the searches themselves," which "would certainly limit the costs." *Id.* at 9. I also asked Gyma to elaborate on the basis for its objections, because "it's not really burdensome to type in searches into an email server." *Id.* Gyma's counsel responded that the search was burdensome because of "the broadness of the subpoena, [and] the number of years" sought, but I noted that the subpoena called for "nine years with a relative narrow search." *Id.*

I then heard from the DPPs' counsel. The DPPs agreed to pay for the costs of Gyma's compliance, provided that Gyma provide "a breakdown of the costs," which, I stated, "of course [they]'ll get." *Id.* at 11–12. I asked counsel for Gyma and the DPPs to "go out in the hall, . . . come up with search terms, . . . [a]nd then set up some arrangement where there will be, based upon what the scope of the search is going to be, some estimate of what is going to be involved by way of costs." *Id.* at 13. The attorneys conferred in the hall, and then returned with an agreement for the DPPs to "provide a set of initial search terms to Gyma," which "Gyma would . . . supplement . . . with other reasonable additions," and then Gyma would "provide [the DPPs] with a breakdown of the costs that it would take to comply" so that the DPPs could "take a look at that and come to an agreement on the costs." *Id.* at 21–22. I excused counsel, and expressed the hope "not to hear from [them] again." *Id.* at 22. In the minute entry for the hearing, I denied as moot both the motion to compel and the motion for costs. *See* Doc. No. 569.

C.  The parties' letter motions

On January 4, 2017, the DPPs sent a letter to the court asserting that they and Gyma "ha[d] reached an impasse concerning reimbursement of reasonable costs for production of documents," and that Gyma "ha[d] refused to negotiate further." Doc. No. 579, at 1. According to the DPPs, Gyma "provided [the DPPs] with cost estimates for production in the amount of $19,937, in addition to past attorney's fees up to that point totaling $36,954, for a total of

$56,891 to produce a mere 3,700 *pages* of documents." *Id.* at 2. The DPPs contended that the "$35,857 [in] past costs were primarily attorneys' fees caused by Gyma's own obstinacy resisting [the DPPs]' subpoena, to which Gyma is not entitled." *Id.* They add that "the $20k cost estimate for the *actual* review and production of a mere 3,700 pages was unreasonable," and stated that they counter-proposed $10,420 "for costs to produce documents as well as for the review of the 3,700 pages." *Id.* In response, the DPPs claimed, Gyma called "[the] offer 'unreasonably low' and refus[ed] to negotiate further or make a counter-offer." *Id.* The DPPs "request[ed] a telephone conference" with Gyma and the court to resolve the dispute. *Id.* at 1.

On January 10, 2017, Gyma sent a letter responding to the DPPs' assertions. Gyma claimed that the "breakdown of the costs associated with the production, . . . including the fixed costs of the prior production came to $55,794.00." Doc. No. 581, at 1. "That number," Gyma averred, "include[d] Gyma's prior review and production of the transaction documents, and review and production of electronic and hard files that were not part of the initial production," but did "not . . . include costs associated with litigating the Non-Party Subpoena." *Id.* Gyma stated that the DPPs' offer of $10,400 "d[id] not even meet the cost of the prior production," and alleged that the DPPs "ha[d] refused to negotiate further." *Id.* Gyma also sought a phone conference so that it might "move past this litigation in which it is not even a party." *Id.* at 2.

On January 12, 2017, I held a phone conference on the record with counsel for the DPPs and Gyma. *See* Conf. Memo. & Order, Doc. No. 586, at 1. Because I "determined that I currently lack[ed] sufficient information to decide what costs of production would be reasonable," I ordered that, within 14 days, the DPPs "make a good-faith initial payment of $20,000 to Gyma" (the estimated "minimum amount of reasonable costs") and Gyma "substantially complete its production of documents." *Id.* I also ordered that, within 14 days of substantially completing

production, Gyma "file a formal motion for costs and fees, providing detailed information (using contemporaneous time records and affidavits) with regard to why, when, and by whom expenses were incurred." *Id.* I directed the DPPs to file their response, if any, within 21 days of Gyma's motion. *Id.*

D. Gyma's motion for attorneys' fees

On February 9, 2017—28 days after the phone conference—Gyma submitted its motion for attorneys' fees.[3] Doc. No. 594. The DPPs filed their opposition 21 days later. Doc. No. 601. On March 6, 2017, Teva filed a reply to the DPPs' opposition. Doc. No. 602. I held a hearing on the motion on April 3, 2017, at which I took the motion under advisement. Doc. No. 609.

III. **Discussion**

Gyma chiefly contends that, "[a]s a result of its good faith compliance" with the DPPs' subpoena, it "has lost significant employee time and has incurred attorneys' fees and costs of over [$]105,585.00," while "receiv[ing] no benefit in return." Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 5. Gyma asks that I grant it $72,778.20 in costs and fees, a figure that it states "excludes costs incurred by Gyma as a result of litigating the subpoena itself." *Id.* at 6.

The DPPs respond that Gyma's claimed costs "are inflated, incurred resisting the subpoena, [and] largely of its own doing." Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 21. They also assert that a significant portion of those costs and fees were incurred "prior to November 8, 2016, when [the DPPs] and Gyma first agreed upon search terms and custodians." *Id.* at 4. Furthermore, the DPPs allege that Gyma engaged in discussions with Teva about the

---

[3] Gyma originally attached its memorandum of law in support of its motion as the final exhibit to its motion for attorneys' fees. On February 14, 2017, it filed a substantially identical memorandum in support of its motion that made "minor changes" to correct "editing errors." *See* Mem. Supp. Mot. Attorney Fees, Doc. No. 597; Kenny Decl., Doc. No. 597-1, at 1–2.

subpoena and possible search terms, without the knowledge of the DPPs. *Id.* Because those conversations with Teva "caused the incurrence of costs and fees with no knowledge to [the DPPs]," the DPPs argue that "any and all amounts paid to Gyma should also be the responsibility of Teva." *Id.* at 5. They request that I deny Gyma's motion for costs and fees, and also order Gyma to return half of the $20,000 the DPPs already paid, with the remaining $10,000 to be borne by Teva if Gyma makes another motion. *Id.* at 9.

Teva replies that although it served a subpoena on Gyma three weeks after the DPPs, it "did not compel the production [of] documents from Gyma" after receiving Gyma's objections, and "did not take part" in what it describes as "the letter-writing, and motion-writing campaign between [the] DPPs and Gyma that ensued after April 20, 2016." Reply to Mem. Opp'n Mot. Attorney Fees, Doc. No. 602, at 1–2. Teva asserts that the DPPs are mistaken about the extent of Teva's discussions with Gyma related to the DPPs' Rule 45 subpoena, and that Teva "should not be required to pay for [the DPPs'] unilateral decision to litigate Gyma's subpoena." *Id.* at 5.

Gyma asserts that it incurred $105,585 "[i]dentifying the scope of the Non-Party Subpoena, resolving issues with the collection of documents and the conversion of the Eudora emails, and reviewing approximately 5545 pages of documents and emails." Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 9. It asks that I award it $60,119.20 "relating to compliance with the Non-Party Subpoena," and $12,658.50 "relating to th[e] [m]otion" for attorneys' fees. *Id.*

A. Gyma's reasonable costs and expenses

The "lodestar" amount for attorneys' fees—what the Second Circuit has called the "presumptively reasonable fee," *Arbor Hill*, 522 F.3d at 183—"is the product of reasonable hours times a reasonable rate." *Dague*, 505 U.S. at 559. In calculating an award of fees and costs, I first determine the "reasonable hourly rate," that is, "what a reasonable, paying client would be

willing to pay." *Arbor Hill*, 522 F.3d at 184. Then, I multiply that rate by "the number of hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 433. "[I]n exercising [my] considerable discretion," I may increase or reduce the amount of the award in accordance with equitable considerations such as the *Johnson* factors. *Arbor Hill*, 522 F.3d at 190; *see, e.g.*, *Serricchio v. Wachovia Sec., LLC*, 706 F. Supp. 2d 237, 255, 262–63 (D. Conn. 2010) (reducing award because [i] "a reasonable client [would] experience 'sticker shock' and . . . seek to negotiate a lower fee," [ii] "a savvy client would recognize potential leverage to negotiate a lower fee from the reputational benefits that would accrue to Plaintiff's counsel for taking on this representation," and [iii] "administrative and clerical tasks that could have been performed by a paralegal but were performed by Plaintiff's counsel should be awarded at the paralegal rate"), *aff'd*, 658 F.3d 169 (2d Cir. 2011).

1. *Gyma's reasonable rate*

"[A] reasonably hourly rate is the 'prevailing market rate,'" that is, "the rate 'prevailing . . . for similar services by lawyers of reasonably comparable skill, experience, and reputation' . . . [in] the district in which the court sits." *Farbotko*, 433 F.3d at 208 (quoting *Blum*, 465 U.S. at 896 n.11). Connecticut district courts typically "consider the billing rates of the District of Connecticut," even if counsel has its primary offices elsewhere. *See Smart SMR of N.Y.*, 9 F. Supp. 2d at 149. Nevertheless, the district court may award "out-of-district fees" to attorneys from outside Connecticut "if a reasonable, paying client would have retained out-of-district counsel." *See Arbor Hill*, 522 F.3d at 186. As with other aspects of a motion for fees, "the fee applicant has the burden of showing by 'satisfactory evidence—in addition to the attorney's own affidavits'—that the requested hourly rates are the prevailing market rates." *Farbotko*, 433 F.3d at 209 (quoting *Blum*, 465 U.S. at 896 n.11).

Here, Gyma asserts that the rates for its attorneys at Blank Rome LLP ("Blank Rome") "are reasonable because they are the regular hourly rates for the Blank Rome attorneys, and th[o]se rates are within the range of prevailing market rates." Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 14. Blank Rome partner Robert J. Kenney, Jr. declares that "[a]ccording to the 2015 National Law Journal ('NLJ') Billing Survey," the billing rates for the two Blank Rome associates "are below the median hourly rate for a junior associate[] in New York."[4] Kenney Decl., Doc. No. 594-1, at 2. He also states "[u]pon information and belief, [his] rate as a partner with 25 years of legal experience at a large New York firm is within the average hourly rate for a partner with like experience." *Id.* That evidence is insufficient.

As an initial matter, Gyma has not shown that "a reasonable, paying client would have retained out-of-district counsel" at Blank Rome to respond to the Rule 45 subpoena. *See Arbor Hill*, 522 F.3d at 186. Although Attorney Kenney averred that Blank Rome is Gyma's usual outside counsel, it is far from clear that Gyma needed to retain one of New York's largest and most expensive firms to respond to a straightforward non-party subpoena. *See The Am Law 100*, Am. Lawyer (Apr. 25, 2016) (listing Blank Rome as the country's 94th-largest law firm by gross revenue). Even if Gyma—which has its corporate headquarters in Nassau County, New York— might reasonably have hired counsel outside the District of Connecticut, it likely could have retained less expensive attorneys on Long Island, or else used its own employees to respond to the subpoena. As I noted at the October 14, 2016 hearing on the motion to compel, Gyma appears to have chosen to incur "unnecessary" costs by "hir[ing] . . . third part[ies]" rather than reviewing the documents on its own. Mot. Hr'g Tr., Doc. No. 568, at 8.

---

[4] The evidentiary value of that survey—which strangely found that both associates and partners in Connecticut charged the same median hourly rate, $350—seems quite limited.

Even assuming that Gyma—which, according to its president, has only "20 to 25" employees,[5] Lipton Aff., Doc. No. 594-8, at 1—reasonably turned to its familiar, Manhattan-based outside counsel to respond to the subpoena, the rates charged by Blank Rome are excessive relative to those prevailing in Connecticut. The highest hourly rate awarded to date in a published Connecticut case appears to be $525 per hour. *See Barati v. Metro-North R.R. Co.*, 939 F. Supp. 2d 153, 156 (D. Conn. 2013) (attorney was "a leading specialist in the law governing railroad employees' rights, and his longstanding and highly developed practice ma[de] him more efficient, creative, and effective . . . than an attorney of similar trial experience"); *cf. Serricchio*, 706 F. Supp. 2d at 255 (awarding then-highest rate of $465 per hour, when the previous highest rate awarded was $400 per hour, in light of "attorney affidavits . . . giv[ing] indication that market rates for highly experienced, successful, specialized counsel have increased"); *A. v. Hartford Bd. of Educ.*, 2017 WL 187138, at *3–*7 (D. Conn. Jan. 17, 2017) (awarding $450 per hour for a case that "required substantial time and labor," and relying in part on an affidavit opining that "the prevailing hourly rate currently charged in complex civil litigation by Connecticut attorneys with more than 40 years of litigation experience is within the range of $500 to $550"); *M.K. ex rel. K. v. Sergi*, 578 F. Supp. 2d 425, 427 (D. Conn. 2008) (collecting cases). Based on past cases and my own awareness of prevailing rates in Connecticut, *see Miele v. N.Y. State Teamsters Conf. Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir. 1987) (district judge "had discretion to rely . . . on his knowledge of New York City rates"); *Smart SMR of N.Y.*, 9 F. Supp. 2d at 149 (relying on the court's "knowledge of rates charged by counsel in th[e] District"), I conclude that a 30 percent reduction in Blank Rome's charged rates

---

[5] Gyma has not provided evidence of its size and revenues besides that vague statement, nor has it explained why the president of the company cannot identify the exact number of employees.

adequately accommodates Gyma's decision to retain its usual outside counsel without dramatically exceeding the ordinary rates in the district.

Three attorneys at Blank Rome worked on the Rule 45 subpoena for Gyma. Partner Robert J. Kenney, Jr. charged $685 per hour prior to April 2016, and $715 per hour thereafter. *See* Kenney Decl., Doc. No. 594-1, at 1. Associate Anna K. Svensson charged $310 per hour prior to January 2017, and $345 per hour thereafter. Svensson Decl., Doc. No. 594-4, at 1. Associate Richard Wolf charged $285 per hour prior to January 2017, and $320 per hour thereafter. Wolf Decl., Doc. No. 594-6, at 1. Applying the 30 percent reduction, I will proceed to calculate Gyma's award using rates of between $479.50 and $500.50 per hour for Attorney Kenney, between $217 and $241.50 per hour for Attorney Svensson, and between $199.50 and $224 per hour for Attorney Wolf.

2. *Gyma's reasonable hours*

Records submitted with Gyma's motion show that Gyma was billed a total of over $70,000 by Blank Rome in connection with the subpoena or the motion for attorney fees. *See* Ex. B to Mot. Attorney Fees, Doc. No. 594-3 ("Billing Records"). Approximately half that amount was incurred before October 14, 2016, the date of the hearing at which I ordered Gyma respond to the subpoena, and the DPPs and Gyma first agreed on search terms. Blank Rome partner Kenney states that, between March 22, 2016, and January 31, 2017, he spent 44 hours responding to the Rule 45 subpoena, and 5.4 hours preparing Gyma's motion for attorney fees. Kenney Aff., Doc. No. 594-1, at 2. Blank Rome associate Svensson states that, between March 22, 2016, and January 31, 2017, she spent 69.5 hours responding to the Rule 45 subpoena, and 25.5 hours preparing Gyma's motion for attorneys' fees. Svensson Aff., Doc. No. 594-4, at 2. Blank Rome associate Wolf states that, between January 17, 2017 and February 8, 2017, he spent 19.7 hours responding to the Rule 45 subpoena. Wolf Aff., Doc. No. 594-6, at 1. Two of Gyma's

employees also state that they spent 35 hours, combined, on complying with the subpoena. *See* Minoggio Aff., Doc. No. 594-5, at 2; Yen Aff., Doc. No. 594-7, at 2. The only other expense apparent from the motion is the cost of hiring "Blank Rome's legal process outsourcing vendor DTI." Svensson Aff., Doc. No. 594-4, at 2. Because Gyma only has provided "contemporaneous time records" for its attorneys, I only consider those costs when determining an appropriate award.[6] *See Smart SMR of N.Y.*, 9 F. Supp. 2d at 153; *cf. Kirsch*, 148 F.3d at 173 ("Applications for fee awards should generally be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done.").

      a.   Hours incurred before Gyma and the DPPs agreed on search terms

In their motion papers, the DPPs argue that they are not responsible for costs Gyma incurred before November 8, 2016, when they and Gyma "first agreed on search terms and custodians." *See* Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 4. At the hearing on the motion for attorneys' fees, the DPPs clarified that the start date for most of Gyma's expenses should be October 14, 2016, the date of the hearing on the motion to compel. Prior to the hearing on the motion to compel, the DPPs "believed . . . that Gyma was continuing to object to the subpoena, conducting no searches, doing little to no work, and not intending to produce documents." *Id.* at 7. Therefore, the DPPs assert, Gyma cannot fairly seek reimbursement "for work that it . . . undertook on its own with no reasonable notice." *Id.*

"Rule 45's required protection of a non-party from significant discovery expenses does not mean that the requesting party must bear the entire cost of compliance in every case." *Konover*, 259 F.R.D. at 207. To the contrary, "[a] non-party can be required to bear some or all of the expenses where the equities of the particular case demand it." *Id.* Here, I conclude that the

---

[6] Gyma has not substantiated in any way the cost of the time spent by its own employees to comply with the subpoena, nor has it attached records of any other expenses to its motion.

equities of the case favor excluding most of the costs incurred by Gyma prior to October 14, 2016. The transcript of the hearing on October 14, 2016 supports the DPPs' assertion that they (and the court) thought that Gyma had not yet begun to "run the search" and "review the documents." *See* Mot. Hr'g Tr., Doc. No. 568, at 12. At the hearing, I indicated that the DPPs and Gyma should "*first* . . . [be] in agreement about what the search is going to be, the scope of it, and so forth, and *then* . . . everybody can say, 'Well, it's going to cost us probably about "X" hours of attorney time looking at these documents.'" *Id.* (emphasis and internal quotation marks added). Gyma cannot fairly charge costs to the DPPs that were incurred before it provided the DPPs with an accurate estimate of production costs,[7] and before the DPPs had an opportunity to reduce expenses by limiting "what the search is going to be, the scope of it, and so forth." *See id.*

Furthermore, many of the expenses that Gyma incurred before October 14, 2016 appear to have been related—directly or indirectly—to its efforts to resist the subpoena.[8] Gyma is not entitled to recoup those costs. "The plain language of Rule 45 provides that non-parties must be protected from significant expenses resulting from *compliance* [with a court order or subpoena]. It is a tenuous proposition, at best, that attorneys' fees incurred *resisting* a subpoena are expenses resulting from compliance." *Selecky*, 2015 WL 224914, at *6; *cf. G & E Real Estate*, 317 F.R.D.

---

[7] The only estimate that Gyma gave the DPPs before the hearing was $176,000, which, as I noted at the hearing, "seem[ed] outrageously high." Mot. Hr'g Tr., Doc. No. 568, at 7. In early December, after the hearing, Gyma provided the DPPs with a breakdown of costs that came to approximately $56,000. *See* Letter Mot., Doc. No. 579, at 2 (quoting figure of $56,891); Resp., Doc. No. 581, at 1 (quoting figure of $55,794).

[8] Gyma insists that its claimed fees "do not include time and expense associated with litigating the Non-Party Subpoena." Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 9 n.2. True, Gyma does not appear to have charged to the DPPs the time its attorneys spent drafting motion papers and attending the October 14, 2016 hearing, but many of its claimed expenses clearly relate to its efforts to resist the subpoena. *See, e.g.*, Billing Records (Apr. 12, 2016) ("research shifting of attorneys fees for complying with non-party subpoenas . . . legal research re recovery of costs on subpoena"); *id.* (Apr. 13, 2016) ("research re limiting subpoena and collecting costs"); *id.* (May 23, 2016) ("re conference call on . . . unwillingness of issuing attorney to pay costs").

at 316 ("It is critical . . . that only expenses that result from, and therefore, are caused by, the order of compliance are potentially compensable."). Many of the submitted records establish that Gyma's attorneys were engaged in tasks wholly unrelated to document production, such as attempting to "show burden" to resist the subpoena, *see* Billing Records (June 14, 2016), Doc. No. 594-3, at 28; discussing whether an associate should file a motion for admission *pro hac vice*, *see id.* (June 8, 2016), Doc. No. 594-3, at 28; and "research[ing] shifting of attorneys fees for complying with non-party subpoenas." *See id.* (Apr. 12, 2016), Doc. No. 594-3, at 14; *see also id.* (Apr. 13, 2016), Doc. No. 594-3, at 14; *id.* (Apr. 22, 2016), Doc. No. 594-3, at 16; *id.* (Apr. 27, 2016), Doc. No. 594-3, at 17. Those costs, "even undertaken in some sense as a response to [the] subpoena," cannot be said to have "result[ed] from that subpoena." *See G & E Real Estate*, 317 F.R.D. at 316. Rather, they "result[ed] from whatever set of decisions by and on behalf of the non-party led to those unreasonable expenses being incurred." *Id.*

Attributing all of Gyma's pre–October 14, 2016 costs to the DPPs is particularly unwarranted because Gyma's efforts to resist the subpoena were largely unsuccessful. *See Sergi*, 578 F. Supp. 2d at 429 ("[T]he [c]ourt has the discretion to reduce the award to account for the [movant]'s limited success."). At the hearing on the motion to compel, I directed Gyma to produce all of the DPPs' desired documents, expressed skepticism at Gyma's "outrageously high" cost estimate of $176,000, and required the DPPs to make a "good-faith initial payment" of only a small fraction of Gyma's claimed anticipated expenses. *See* Mot. Hr'g Tr., Doc. No. 568, at 6; Conf. Mem. & Order, Doc. No. 586, at 1. The DPPs should not be required to bear the cost of Gyma's unilateral "decis[ion] to litigate issues related to the subpoena zealously" when those efforts were, at best, minimally successfully. *See G & E Real Estate*, 317 F.R.D. at 318.

In sum, Gyma has claimed approximately $35,000 in expenses incurred before it agreed on search terms with the DPPs or provided the DPPs with a reasonable estimate of costs. Many of those expenses appear only marginally related to the production of the DPPs' desired documents, and were incurred without the knowledge or agreement of the DPPs. Thus, I will not allow Gyma to recoup fees for the vast majority of its expenses claimed before October 14, 2016.

A few of the pre–October 14, 2016 costs are reasonable, however, particularly those associated with the initial production of June 30, 2016. *See* Billing Records (June 24, 2016), Doc. No. 594-3, at 29; *id.* (June 27, 2016), Doc. No. 594-3, at 29; *id.* (June 28, 2016), Doc. No. 594-3, at 29; *id.* (June 29, 2016), Doc. No. 594-3, at 29; *id.* (June 30, 2016), Doc. No. 594-3, at 29. In total, I calculate that—prior to October 14, 2016—Attorney Kenney reasonably expended 1.1 hours at a rate of $479.50 per hour and 3 hours at a rate of $500.50 responding to the subpoena. Attorney Svensson reasonably expended 6 hours at a rate of $217 per hour over the same period. Hence, I will award Gyma $3,330.95 in reasonable costs it spent responding to the Rule 45 subpoena before it reached agreement with the DPPs on search terms.

b. Other unreasonable hours

At the hearing on the motion for attorneys' fees, the DPPs appeared to concede that most of Gyma's costs after October 14, 2016 were reasonable. I agree, but I decline to award Gyma costs for two categories of expenses that were not reasonable. First, Gyma has attempted to bill the DPPs for time it spent arguing with the DPPs' counsel about costs and production deadlines. *See, e.g.*, Billing Records (Nov. 21, 2016) (0.8 hours by Attorney Kenney for "communications with plaintiffs' attorneys re arbitrary deadline"); *id.* (Nov. 28, 2016) (0.8 hours by Attorney Kenney for "re deadline for estimate on costs"); *id.* (Dec. 2, 2016) (1.8 hours by Attorney Svensson for "finalize production of previous bills to produce as evidence of costs to date to plaintiff's counsel"); *id.* (Dec. 7, 2016) (1.9 hours by Attorney Svensson for "review of emails

from plaintiffs' [counsel] concerning negotiation of costs; internal discussion regard further breakdown of costs; draft and revise breakdown of costs"); *id.* (Dec. 15, 2016) (0.3 hours from Attorney Kenney for "letter from plaintiff counsel with low-ball counter offer; discuss same with A. Svensson"); *id.* (Dec. 22, 2016) (0.3 hours from Attorney Kenney for "further discussions with plaintiff counsel re costs and their refusal to negotiate"). Attorney Kenney and Attorney Svensson claim a total of 5.7 hours and 6 hours, respectively, spent negotiating with the DPPs about costs and deadlines after October 14, 2016.

"Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" *United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014). In particular, non-parties "should not be permitted to run up bills" merely because they expect "someone else [to] pay[] the tab." *Cf. Gumbhir v. Curators of Univ. of Mo.*, 157 F.3d 1141, 1146 (8th Cir. 1998); *Medcom Holding Co. v. Baxter Travenol Labs.*, 200 F.3d 518, 521 (7th Cir. 1999). A "reasonable, paying client," I conclude, "would [not] be willing to pay" over $4,150 for its attorneys to bicker fruitlessly with opposing counsel about fees and deadlines. Therefore, I discount 5.7 hours from Attorney Kenney's total hours, and 6 hours from Attorney Svensson's.

In addition, Gyma has sought to charge the DPPs for the costs of drafting and reviewing its four-page letter to the court of January 11, 2017. *See, e.g.*, Billing Records (Jan. 5, 2017) (1.6 hours by Attorney Kenney for "draft and review letter to court in response to plaintiff's re costs"); *id.* (Jan. 9, 2017) (1.9 hours by Attorney Svensson for "revise motion letter concerning response to plaintiffs' letter requesting court intervention"). In total, Attorney Kenney and Attorney Svensson billed 6.9 hours and 7.7 hours, respectively, for preparing the letter and attending the telephone status conference on January 12, 2017. Not only is $5,300 in costs

"unnecessary and excessive" for drafting a four-page letter and participating in a ten-minute telephone conference, *cf. Smart SMR of N.Y.*, 9 F. Supp. 2d at 151, but also the need for the letters and the phone conference only arose at all because of Gyma's own determination to "expend significant resources on the document review effort" and "litigate issues related to the subpoena zealously." *See G & E Real Estate*, 317 F.R.D. at 318. Those costs spent resisting the subpoena may not fairly be pushed onto the DPPs. *Selecky*, 2015 WL 224914, at *6.

After excluding the unreasonable hours, I calculate a total of 11.1 hours reasonably expended by Attorney Kenney in responding to the Rule 45 subpoena after October 14, 2017; 34.3 hours reasonably expended by Attorney Svensson (of which 5.2 hours were billed at a rate of $217 per hour, and 29.1 hours were billed at a rate of $241.50 per hour); and 19.2 hours reasonably expended by Attorney Wolf (all at a rate of $224 per hour). Multiplied by the attorneys' respective reasonable rates, I calculate $5,555.55 in reasonable expenses by Attorney Kenney, $8,156.05 in reasonable expenses by Attorney Svensson, and $4,300.80 in reasonable expenses by Attorney Wolf, for a total of $18,012.40 in reasonable costs after October 14, 2016.

Combining the $3,330.95 reasonably expended by Gyma before October 14, 2016 with the $18,012.40 reasonably expended thereafter, I calculate a total of $21,343.40 in reasonable costs incurred as a result of Gyma's compliance with the Rule 45 subpoena. The DPPs already made a good-faith payment of $20,000 to Gyma in accordance with my January 13, 2017 order. *See* Conf. Mem. & Order, Doc. No. 586, at 1. At most, therefore, Gyma is entitled to $1,343.40, the difference between its costs and what it already has been paid.

c. Non-significant costs

Rule 45 only protects non-parties from "*significant* expense resulting from compliance," *Legal Voice*, 738 F.3d at 1184 (quoting Fed. R. Civ. P. 45(d)(2)(B)(ii)), and "[a] non-party may be required to absorb a non-significant portion of its expenses," particularly "where the equities

of the particular case demand it." *Konover*, 259 F.R.D. at 207; *Stormans Inc.*, 2015 WL 224914, at *6; *see In re Subpoena of Am. Nurses Ass'n*, 924 F. Supp. 2d at 626 ("Although the . . . Plaintiffs shall bear the majority of the costs of production, there are some costs the ANA should absorb."). Other courts have tended to take a fairly broad view of what constitutes a "significant" expense. *See, e.g.*, *Legal Voice*, 738 F.3d at 1185 ($20,000 in expenses held "significant"); *Linder*, 251 F.3d at 182 ($9,000 in costs considered "significant"); *G & E Real Estate*, 317 F.R.D. at 320–21 ($3,148.44 in expenses held "significant"). One federal district court even concluded that $43 to copy and mail 11 sheets of paper was a "significant" expense. *See Broussard v. Lemons*, 186 F.R.D. 396, 398 (W.D. La. 1999).

The Second Circuit has cautioned, however, that "attorney's fees are to be awarded with an eye to moderation, seeking to avoid either the reality or the appearance of awarding windfall fees." *N.Y. State Ass'n for Retarded Children v. Carey*, 711 F.2d 1136, 1139 (2d Cir. 1983). Furthermore, I conclude that "the equities of th[is] particular case" favor requiring Gyma to bear the $1,343.40 in reasonable but yet unpaid costs. *See Konover*, 259 F.R.D. at 207. As the Second Circuit has held, district courts may depart from the "presumptively reasonable fee" on the basis of "equitable considerations," such as "economic disparities between the parties, [and] 'the [movant]'s degree of good faith in prosecuting the action.'" *Jaeger v. Cellco P'ship*, 2015 WL 1867661, at *4 (D. Conn. Apr. 23, 2015) (quoting *Johnson*, 823 F.2d at 32–33; *Faraci v. Hickey-Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir. 1979)). Here, Gyma has not presented evidence that it cannot "more readily bear the costs than the requesting party."[9] *Konover*, 259 F.R.D. at 207. Nor has it necessarily shown "good faith" in the course of its involvement with the litigation:

---

[9] Gyma states that it is "a small, family owned business" that only employs "20 to 25" people, *see* Lipton Aff., Doc. No. 594-8, at 1, but it has not produced any financial data, and its averments that it is "small" do not show that it is unable to bear $1,343.40 in costs.

Gyma was notably intransigent and dilatory in its response to the subpoena, taking a full year and necessitating three interventions by the court to complete a review of 5,545 pages of documents. *See Jaeger*, 2015 WL 1867661, at *4. Gyma also appears to have repeatedly exaggerated its costs, claiming in its latest motion that it spent nearly $20 per page in document review. *See* Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 9 (stating that Gyma spent $105,585 to review 5,545 pages of documents). Considering the Second Circuit's admonition that courts "not endors[e] scorched earth tactics" or "hardball litigation strategy," *Arbor Hill*, 522 F.3d at 184; *cf. Hartford Accident & Indem. Co. v. RJR Nabisco, Inc.*, 721 F. Supp. 534, 541 (S.D.N.Y. 1989), I conclude that Gyma should bear the $1,343.40 balance of its costs

I decline to award Gyma additional costs. Under "the equities of th[is] particular case," the DPPs' $20,000 payment has "shift[ed] enough of the cost of compliance to render the remainder non-significant." *See Legal Voice*, 738 F.3d at 1185; *Konover*, 259 F.R.D. at 207.

B. Gyma's request for attorneys' fees

In addition to its costs of compliance with the subpoena, Gyma argues that it "is entitled to . . . $12,658.50 in costs related to th[e] [m]otion" for attorneys' fees. Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 9. The DPPs retort that Gyma does not deserve compensation for the cost of preparing its motion because "Gyma's fees are inflated, incurred resisting the subpoena, [and] largely of its own doing." Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 21.

In the context of civil rights statutes, the Second Circuit has held that "a reasonable fee should be awarded for time reasonably spent in preparing and defending an application for [section] 1988 fees." *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999). "As a general matter," the court has held, "such motion costs should be granted whenever underlying costs are allowed." *Id.* But under federal fee-shifting statutes, motion costs are due only to a "prevailing or

substantially prevailing party," and it is not obvious that Gyma has "prevail[ed] or substantially prevail[ed]" here. *See Dague*, 505 U.S. at 562. Moreover, Rule 45—unlike section 1988 and other statutes, *see Dague*, 505 U.S. at 61–62 (citing 42 U.S.C. §§ 1988, 2000e-5(k), 6972(e), & 7604(d); 33 U.S.C. § 1365(d))—does not explicitly direct courts to "award costs of litigation (including reasonable attorney . . . fees)." *Id.* (quoting 42 U.S.C. § 6972(e) 33 U.S.C. § 1365(d)) (emphasis omitted). As a result, it is not clear that Gyma is entitled to those costs.

Even if Gyma had a legal claim to motion costs, those costs must be "*reasonable*." *Id.* at 561. Here, "the amount of time spent for research and drafting is excessive in relation to the relative simplicity of the core issues." *See Sonoma Cnty. Ass'n of Ret. Emps. v. Sonoma Cnty.*, 2015 WL 10767718, at *2 (S.D.N.Y. Oct. 6, 2015). Gyma claims $12,658.50 in costs—of which its attorneys' time entries appear to account for at most $7,309[10]—in preparing its motion. That amount clearly seems "excessive" and "unnecessary" to prepare what should have been a simple and straightforward motion for fees. *Hensley*, 461 U.S. at 434. In particular, it is unclear why Attorney Kenney—a Blank Rome partner billing $715 per hour—devoted hours to drafting and revising a motion that could have been prepared by a first- or second-year associate. I doubt that Gyma would have been willing to pay such inflated costs absent the prospect of fee-shifting, and "[h]ours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley*, 461 U.S. at 434; *see also Arbor Hill*, 522 F.3d at 184 (fee awards should account for that "the reasonable, paying client . . . wishes to pay the least amount necessary to litigate the case effectively.").

---

[10] It is unclear from its motion whether Gyma's alleged costs account only for its actual motion for fees, or also for its letter motion of January 10, 2017. The $7,309 figure includes time spent preparing both motions; if Gyma intends only to claim costs for the former, then the divergence between its estimate and the billing entries is even more stark.

Furthermore, even if Gyma had a right to motion costs, and even if those claims were reasonable, "the existence of special circumstances might render the award of attorneys' fees unjust." *Smart SMR of N.Y.*, 9 F. Supp. 2d at 147. The DPPs assert that such "special circumstances" exist here, Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 21, and I agree. The motion for fees was made necessary by Gyma's decision "to litigate fiercely." *G & E Real Estate*, 317 F.R.D. at 318. Not only did Gyma begin with an "outrageously high" estimate of its costs of compliance with the subpoena, *see* Mot. Hr'g Tr., Doc. No. 568, at 7, but also it took seven weeks after the October 14, 2016 hearing to produce a new estimate (and a week after that for it to itemize its costs). *See* Letter Mot., Doc. No. 579, at 2. That estimate of approximately $57,000 was itself seemingly inflated,[11] and has now ballooned to $105,585 in Gyma's latest motion. Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 5. The DPPs have some justification in arguing that Gyma "has been anything but reasonable" in its negotiations over the Rule 45 subpoena, Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 20, and to award it motion costs would improperly "endors[e] [its] scorched earth tactics." *See Arbor Hill*, 522 F.3d at 184.

Gyma's relation to the underlying lawsuit also constitutes a "special circumstance[]." *See Smart SMR of N.Y.*, 9 F. Supp. 2d at 147. Despite Gyma's protestations that it "does not have a stake in this litigation," Mem. Supp. Mot. Attorney Fees, Doc. No. 597, at 16, Gyma "is not the classic disinterested party subject to a subpoena from a party to a lawsuit in which it has no connection." *See Konover*, 259 F.R.D. at 207. Teva, one of the defendants, has raised a causation defense "specifically implicat[ing] quality problems with Gyma's product," a product that Gyma "*continues* to supply . . . for Teva's stand-alone dipyridamole tablet product to this day." *See* DPPs' Mem. Supp. Mot. Compel, Doc. No. 500, at 2; Mem. Opp'n Mot. Attorney Fees, Doc.

---

[11] I count only $36,380 in total expenses billed since November 8, 2016.

No. 601, at 12. Gyma thus could be expected to have a professional interest in producing documents that would rebut Teva's claim of quality issues with its product.[12] *Cf. In re Am. First Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) (reducing costs awarded to Price Waterhouse–United Kingdom (PW-UK) because "PW-UK could be expected to feel a professional commitment to clearing up the financial frauds that were committed by PW-UK's client and that presumably escaped PW-UK's scrutiny"). That partial interest in the subject matter of the subpoena favors reducing the share of costs borne by the DPPs, because Gyma "actually has an interest in the outcome of the case." *In re Honeywell Int'l Sec. Litig.*, 230 F.R.D. at 303.

In short, it is not clear that Rule 45 actually provides for shifting motion costs (as opposed to compliance costs); Gyma's claimed expenses appear unreasonable; and "special circumstances" such as Gyma's obstructionist tactics and partial interest in the litigation "might render the award of attorneys' fees unjust." *See Smart SMR of N.Y.*, 9 F. Supp. 2d at 147. Therefore, I elect not to award Gyma fees for preparing its various motions for costs.

C. <u>The DPPs' request that a portion of Gyma's costs be borne by Teva</u>

In their motion in opposition to Gyma's request for attorneys' fees, the DPPs argue that Teva should be responsible for half of Gyma's compliance costs, because "Teva served an identical document subpoena on Gyma and was involved in discussions concerning document collection and custodians with Gyma over a period of months prior to [the DPPs]' agreement with Gyma on custodians and search terms." Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at

---

[12] Conversely, Gyma's ongoing business relationship with Teva—about which the DPPs aver they only learned "after reviewing the emails, purchase orders, and invoices . . . that were produced on January 27, 2017," Mem. Opp'n Mot. Attorney Fees, Doc. No. 601, at 12 n.25—might incentivize it to resist the Rule 45 subpoena in order to avoid angering an important client by helping rebut its causation defense. That further undercuts Gyma's claim to be a "truly disinterested party entitled to invoke the protections of Rule 45." *See Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 206–07 (D. Conn. 2009).

9. In its reply brief, Teva denies that it "secretly and independently sought documents beyond those sought by [the] DPPs," and contends that it should not be required to pay for the DPPs' decision to enforce the subpoena (which Teva "did not join"). Reply to Mem. Opp'n Mot. Attorney Fees, Doc. No. 602, at 2–3.

I conclude that the DPPs have presented some circumstantial evidence of cooperation between Teva and Gyma,[13] which might make it appropriate to apportion Gyma's costs of compliance between Teva and the DPPs. *Cf. Jackson v. AFSCME Local 196*, 246 F.R.D. 410, 413–14 (D. Conn. 2007) (allowing costs of production to be "apportioned" among various requesting parties). Teva, of course, also presumably has an interest in the documents produced, given that part of its causation defense turns on the alleged inability of Gyma to supply the active pharmaceutical ingredient in generic Aggrenox. But Teva is correct that neither the DPPs nor Gyma have "made a proper procedural motion to request such fees" from it, and, as such, the matter "is not properly before the [c]ourt." *See* Reply to Mem. Opp'n Mot. Attorney Fees, Doc. No. 602, at 1, 5. Hence, I will not adjust the amount of Gyma's award against the DPPs to account for costs properly billed to Teva.

## IV.  Conclusion

Gyma's total requested costs and attorneys' fees of $72,778.20 are poorly documented, legally unsupported, and unreasonable. After eliminating certain categories of unreasonable expenses and reducing Gyma's attorneys' hourly rates to a reasonable rate for this district, I

---

[13] Gyma's counsel separately billed for a number of calls with Teva. Call Entry (Apr. 12, 2016); *id.* (Apr. 15, 2016); *id.* (Nov. 15, 2016) ("traffic re Teva paying portion of plaintiffs' costs on subpoena"). Teva explains away many, but not all of these calls. *See* Reply to Mem. Opp'n Mot. Compel, Doc. No. 602, at 3–4 (not addressing November 15, 2016 entry). Gyma and Teva have an ongoing business relationship, *see* Mem. Opp'n Mot. Compel, Doc. No. 601, at 12—which they apparently concealed from the DPPs and from the court—and Teva admits that it spoke to Gyma's counsel "independently by phone to clarify Gyma's relationship to the litigation" on "one or two occasions." Reply to Mem. Opp'n Mot. Compel, Doc. No. 602, at 3 n.2.

conclude that $21,343.40 will adequately compensate Gyma for its compliance with the Rule 45 subpoena. The DPPs already have made a good-faith payment of $20,000 to Gyma, and—under the equities of this particular case—I deem the remaining $1,343.40 in expenses non-significant. Therefore, I decline to award Gyma additional costs beyond those already paid by the DPPs.

So ordered.

Dated at Bridgeport, Connecticut, this 18th day of October 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge