# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

IN RE AGGRENOX
ANTITRUST LITIGATION

No. 3:14-md-02516 (SRU)

THIS DOCUMENT RELATES TO:
*Humana*, No. 3:14-cv-00572 (SRU), and
*Louisiana Health*, No. 3:15-cv-00964
(SRU)

## RULING ON HUMANA'S MOTION TO COMPEL

In this multidistrict litigation, plaintiffs Humana, Inc. and Louisiana Health Service

Indemnity Co. (collectively, "Humana")[1] have moved for an order compelling defendant

Boehringer Ingelheim Pharmaceuticals ("Boehringer") to produce 52 documents (the "FTC

documents") that Boehringer produced to the Federal Trade Commission ("FTC") in response to

an order of the United States District Court for the District of Columbia. For the following

reasons, I grant the motion to compel in part and deny it in part.

## I.      Standard of Review

Where "a party fails to answer an interrogatory" or "fails to produce documents . . . as

requested," Federal Rule of Civil Procedure 37 permits "[the] party seeking discovery . . . [to]

move for an order compelling an answer, designation, production or inspection." Fed. R. Civ. P.

37(a)(3)(B); *see Scott v. Arex, Inc.*, 124 F.R.D. 39, 40 (D. Conn. 1989). Because "the Federal

---

[1] Originally, the Retailer Plaintiffs—Walgreen Co., Safeway, Inc., HEB Grocery Co. L.P.,
Albertson's LLC, Kroger Co., Rite Aid Corp., Rite Aid Headquarters Corp., and CVS
Pharmacy—joined Humana's motion to compel. Subsequent to the filing of the motion to
compel, however, the Retailer Plaintiffs reached a settlement with the defendants and stipulated
to the dismissal of their claims with prejudice. *See* Stipulation for Voluntary Dismissal, Doc. No.
722. Thus, the motion is moot with respect to those plaintiffs.

Rules . . . are to be construed liberally in favor of discovery," *McCulloch v. Hartford Life & Accident Ins. Co.*, 223 F.R.D. 26, 30 (D. Conn. 2004), "the party resisting discovery bears the burden of showing why discovery should be denied," *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009) (Smith, J.); *see Penthouse Int'l v. Playboy Enters.*, 663 F.2d 371, 391 (2d Cir. 1981) ("Where, as here, the documents are relevant, the burden is upon the party seeking non-disclosure or a protective order to show good cause.").

All "[m]otions relative to discovery," including motions to compel, "are addressed to the discretion of the [district] court." *Soobzokov v. CBS*, 642 F.2d 28, 30 (2d Cir. 1981). "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery," *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998), and the discovery orders "will only be reversed if [the district court's] decision constitutes an abuse of discretion," *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991).

## II.      Background

The factual background to this case is set forth in greater detail in *In re Aggrenox Antitrust Litigation*, 94 F. Supp. 3d 224 (D. Conn. 2015). Briefly summarized, in January 2000, Boehringer obtained a patent for Aggrenox, a brand-name anticoagulant "consisting of a particular combination of dipyridamole and aspirin." *See id.* at 236. Seven years later, Barr Laboratories ("Barr"), a generic drug manufacturer, filed an Abbreviated New Drug Application under the Hatch-Waxman Act that sought to market a generic equivalent of Aggrenox and challenged the validity of Boehringer's patent. Boehringer promptly sued Barr for patent infringement. *Id.*

In August 2008, Boehringer and Barr entered into a settlement agreement. Under the terms of the settlement, "Barr agreed to drop its patent challenge and not market generic

Aggrenox until July 2015 (eighteen months prior to the expiration of the patent)," and also promised to promote the medication by using the "specialized sales force" of its subsidiary, Duramed, to "educate obstetricians and gynecologists about Aggrenox." *Id.* Boehringer, in turn, dropped its claims of patent infringement and agreed to "compensate[] [Barr] based on several factors, including net sales of Aggrenox, regardless of whether its co-promotion generated any additional sales." *Id.* That settlement agreement eventually led to the present case, in which the plaintiffs allege that the defendants illegally agreed to "delay entry of generic Aggrenox" by Barr in exchange for a "large and unjustified" payment from Boehringer. *See id.* at 235, 237 (quoting *FTC v. Actavis, Inc.*, __ U.S. __, 133 S. Ct. 2223, 2237 (2013)).

A. The FTC investigation

In January 2009—several years before this litigation began—the FTC began to formally investigate "whether, via the settlement," Barr and Boehringer "engaged in unfair methods of competition with respect to the sale of [Aggrenox] and [its] generic counterpart[]." *See FTC v. Boehringer Ingelheim Pharm.*, 286 F.R.D. 101, 105 (D.D.C. 2012) ("*Boehringer I*"), *aff'd in part, vacated in part, and remanded*, 778 F.3d 142 (D.C. Cir. 2015) ("*Boehringer II*"), *on remand*, 180 F. Supp. 3d 1 (D.D.C. 2016) ("*Boehringer III*"). Shortly after the investigation began, the FTC issued an investigative subpoena to Boehringer that requested "all relevant documents concerning the litigation between [Boehringer] and Barr; sales, profits, and marketing of the brand-name drugs; the settlement agreement; co-marketing with Barr and other firms; the marketing of the generic substitutes by Barr; and analyst reports on the drugs." *See id.* at 105–06. When Boehringer failed to comply with the deadline for production, the FTC filed a petition in the United States District Court for the District of Columbia in October 2009, seeking an "order [for Boehringer] to comply with the subpoena." *Id.* at 105.

1.   *Boehringer I*

Boehringer eventually certified compliance with the investigative subpoena, but withheld approximately one-quarter of the responsive documents "under claims of work product and attorney-client privilege." *Id.* at 106. The FTC objected to Boehringer's withholding, arguing that (1) the documents were not protected as work product because they were "typical business forecasts not done by lawyers"; (2) the documents were not protected under the attorney-client privilege because they "contain[ed] no confidential communications between client and attorney"; and (3) any privilege that did exist was "overridden by the FTC's substantial need for the[] documents in order to conclude its law enforcement investigation." *See id.*  The District Court reviewed a representative sample of the documents *in camera* and "issued a decision largely upholding Boehringer's work product claims." *See Boehringer II*, 778 F.3d at 147.

With respect to the documents at issue here—"financial analyses of the Aggrenox co-promotion agreement, forecasting analyses of alternative time lines for generic entry into the market, and financial analyses of the business terms of the settlement agreement," *id.*—the District Court held that the documents were work product because they were obviously "prepared 'in anticipation of litigation'" or "'integral' to the global settlement deal" between Barr and Boehringer. *See id.* (discussing *Boehringer I*, 286 F.R.D. at 109–10). Moreover, the District Court deemed the materials to constitute highly-protected "opinion work product": "although the materials resembled financial reports that might be prepared in the standard course of business," they "were prepared using 'information and frameworks' provided by Boehringer counsel and reflected . . . counsel's opinions as to what data were important in determining an acceptable settlement." *See id.* Finally, the District Court concluded that the FTC "had not demonstrated the sort of 'overriding and compelling' need required to pierce opinion work

4

product protection." *See id.* at 148. The Court declined to order Boehringer to produce the documents.

     2.  *Boehringer II*

On appeal by the FTC, the D.C. Circuit affirmed in part and vacated in part. The D.C. Circuit agreed with the FTC that "the District Court applied an overly broad definition of opinion work product." *Id.* at 151. "Much of what the FTC s[ought]," the D.C. Circuit noted, consisted of "factual information produced by non-lawyers that, while requested by . . . attorneys, d[id] not reveal any insight into counsel's legal impressions or their views of the case." *Id.* at 152. Rejecting the District Court's "implied [view] that an attorney's mere request for a document was sufficient to warrant opinion work product protection," the D.C. Circuit concluded that "general and routine" requests by in-house counsel did not create a "real, nonspeculative danger of revealing the lawyer's thoughts." *Id.* (quoting *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1015 (1st Cir. 1988)). "[C]ounsel's general interest in the financials of the deal," the court reasoned, "reveal[ed] nothing at all: anyone familiar with such settlements would expect a competent negotiator to request financial analyses like those performed here." *Id.* Because "whether the agreements made financial sense w[as] a matter of business judgment, not legal counsel," any specific "information and frameworks" contained in the requests by Boehringer's counsel "ha[d] no legal significance." *Id.* at 153. "Where an attorney's mental impressions are those that 'a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description "legal theory,"' those impressions are not opinion work product." *Id.* (quoting *In re John Doe Corp.*, 675 F.2d 482, 493 (2d Cir. 1982)).

Thus, the D.C. Circuit held that "[w]here it appears that the focus or framework provided by counsel is obvious or non-legal in nature, it is incumbent upon the party claiming opinion work product protection to explain specifically how disclosure would reveal the attorney's legal impressions and thought processes." *Id.* Because the District Court "failed to demand such a showing from Boehringer," the D.C. Circuit vacated the lower court's order and remanded for a "determin[ation] [of] which of the sampled documents may be produced, in full or redacted form, as factual work product."[2] *Id.* at 153, 158.

### 3.  *Boehringer III*

On remand, the District Court "conclude[d] that most of the documents [were] mere fact work product and [were] therefore not protected from disclosure." *Boehringer III*, 180 F. Supp. 3d at 6. "[T]he documents themselves convey[ed] no legal impressions or opinions," *id.* at 19, and "even assuming they were created at [Boehringer's counsel's] behest and analyze[d] variables she identified," they "d[id] not sufficiently reflect her mental impressions regarding which scenarios were legally feasible or desirable" to constitute opinion work product. *Id.* at 25. "[T]he mental impressions revealed by the[] documents [were], at best, those that a businessperson would have in the same situation, and "d[id] not reflect [in-house counsel]'s impressions as a legal advisor." *Id.* at 26. Therefore, the Court held that the documents

---

[2] The D.C. Circuit agreed with the District Court's "implicit[] determin[ation] that the FTC had satisfied the 'substantial need' and 'undue hardship' requirements." *Boehringer II*, 778 F.3d 142, 154 (D.C. Cir. 2015). The District Court, the D.C. Circuit observed, "stated that it was 'sympathetic to the FTC's argument that the[] financial analyses [were] the only documents that could demonstrate whether or not [Boehringer] was using the co-promotion agreement to pay Barr not to compete,'" and "directed Boehringer to produce 'factual work product that c[ould] be reasonably excised from any indication of opinion work product.'" *Id.* at 157 (quoting *Boehringer I*, 286 F.R.D. 101, 110 (D.D.C. 2012), *aff'd in part, vacated in part, and remanded*, 778 F.3d 142). Those statements "ma[de] clear that the District Court found that the FTC had shown a substantial need and undue hardship for [the] materials." *Id.*

"qualif[ied] only as fact work product." *Id.* at 28. "Because the Court of Appeals ha[d] already concluded that the FTC ha[d] shown sufficient need for the[] documents," the District Court ordered Boehringer to produce nonprivileged documents responsive to the subpoena.[3] *Id.*

Boehringer moved for a stay of the District Court's order pending appeal. *See FTC v. Boehringer Ingelheim Pharm.*, 241 F. Supp. 3d 91, 94 (D.D.C. 2017) ("*Boehringer IV*"). The District Court denied the motion, holding that "Boehringer ha[d] demonstrated a very low likelihood of success on the merits of its appeal." *Id.* at 98. Boehringer then moved the D.C. Circuit for a stay, which the Court of Appeals also denied. *See* Order, *FTC v. Boehringer Ingelheim Pharm.*, No. 16-5357 (D.C. Cir. May 17, 2017) (per curiam), *attached as* Ex. 8 to Humana's Mot. Compel, Doc. No. 643-10, at 2.

Boehringer thereafter produced 52 documents to the FTC.[4] *See* St. Philip Decl., Doc. No. 643-2, at 3.

B.  Humana's motion to compel

After the D.C. Circuit denied Boehringer's motion to stay the District Court's order compelling production, Humana's counsel wrote to Boehringer's attorneys "requesting contemporaneous production of all documents that [Boehringer] was ordered to produce to the FTC." *See id.* at 2 (citing Letter from Peter D. St. Philip to Robert A. Milne & Peter J. Carney

---

[3] Many of the documents the District Court considered on remand "also b[ore] an assertion of the attorney-client privilege." *See Boehringer III*, 180 F. Supp. 3d 1, 28 (D.D.C. 2016). The District Court held that all such documents were "protected" and not subject to disclosure. *Id.* at 35. The FTC has appealed that ruling. *See FTC v. Boehringer Ingelheim Pharm.*, No. 16-5356 (D.C. Cir.). Boehringer has not claimed attorney-client privilege with respect to any of the documents requested in this case. *Compare* Mem. Supp. Humana's Mot. Compel, Doc. No. 643-1, at 7 n.12 *with* Persky Decl., Ex. B to Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-3, at 5–13.

[4] Nearly half the documents—23 of 52—only concern Boehringer's settlement of litigation with Barr over the drug Mirapex. The Mirapex settlement is not at issue in this litigation, and Humana represented at the hearing that it does not seek to obtain information relating to Mirapex.

(May 24, 2017), *attached as* Ex. 5 to Humana's Mot. to Compel, Doc. No. 643-7, at 2).

Boehringer refused to produce the documents, asserting that they were "privileged" and that

"[t]he D.C. Circuit's decision regarding the documents' disclosure to the FTC rest[ed]

specifically on the Circuit's holding that a government agency can make a lesser showing of

substantial need to obtain work product in an investigation than is required in private litigation."

Letter from Matthew S. Leddicotte to Peter D. St. Philip (June 5, 2017), *attached as* Ex. 6 to

Humana's Mot. Compel, Doc. No. 643-8, at 2. The parties conferred by phone on June 16, 2017,

and Boehringer "reiterated . . . that the documents may be withheld pursuant to the work product

doctrine." *See* St. Philip Decl., Doc. No. 643-2, at 3. Humana then filed its motion to compel on

July 24, 2017, asking that I order Boehringer to produce the documents. *See* Doc. No. 643.

On September 18, 2017, I held a telephonic hearing on Humana's motion. I took the

motion under advisement and determined that I should examine the documents *in camera* before

ruling. *See* Conf. Mem. & Order, Doc. No. 686, at 1. At my request, Boehringer provided

electronic and paper copies of the documents, which I have carefully considered *in camera*.

### III.    Discussion

"The work-product doctrine . . . is intended to preserve a zone of privacy in which a

lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free

from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196

(2d Cir. 1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)). First set forth by the

Supreme Court in *Hickman v. Taylor*, the work product doctrine subsequently was "substantially

incorporated in Federal Rule of Civil Procedure 26(b)(3)." *Upjohn Co. v. United States*, 449 U.S.

383, 398 (1981). That rule provides:

> Ordinarily, a party may not discover documents and tangible things that
> are prepared in anticipation of litigation or for trial by or for another party

> or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But . . . those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3). The "core" of the work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *In re Steinhardt Partners*, 9 F.3d 230, 234 (2d Cir. 1993) (quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)). "The party invoking the privilege"—here, Boehringer—"bears the heavy burden of establishing its applicability." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007).

As outlined by *Hickman* and Rule 26(b)(3), "work product" consists of "[t]angible material or its intangible equivalent" that was "prepared in anticipation of litigation . . . by or for another party or its representative." Fed. R. Civ. P. 26(b)(3); *Black's Law Dictionary* (10th ed. 2014). The distinguishing feature of work product is that it is created "with an eye toward" or "in anticipation of" litigation. *Hickman*, 329 U.S. at 510–11; Fed. R. Civ. P. 26(b)(3). Materials are "subject to work-product protection . . . 'if, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'"[5] *Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir.

---

[5] Some documents, "although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of the litigation." *United States v. Adlman*, 134 F.3d 1194, 1197–98 (2d Cir. 1998). The Second Circuit has held such materials "do[] not lose protection" under the work product doctrine "merely because [they also] . . . assist with a business decision." *Id.* at 1202. At the same time, the doctrine "does not apply" to "documents that [were] prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation, . . . [e]ven if such documents might also help in preparation for litigation." *Id.* In other words, whether materials were "prepared because of . . . expected litigation really turns on whether [they] would have been prepared irrespective of the expected litigation." *Id.* at 1204.

2015) (quoting *Adlman*, 134 F.3d at 1202). "[T]he party invoking the protection of the work product doctrine . . . has the burden of establishing that the documents at issue were prepared in anticipation of litigation." *Loftis v. Amica Mut. Ins. Co.*, 175 F.R.D. 5, 11 (D. Conn. 1997).

The D.C. District Court held that the FTC documents were work product, *see Boehringer I*, 286 F.R.D. at 109, and that portion of its ruling was affirmed by the D.C. Circuit.[6] *See Boehringer II*, 778 F.3d at 149–50. The documents "constitute[d] work product," the District Court reasoned, because they "were prepared using information and frameworks provided by [Boehringer] attorneys . . . [in order] to aid th[o]se attorneys in the settlement process." *Boehringer I*, 286 F.R.D. at 109. Although "similar reports [were] prepared for [Boehringer] executives as a matter of regular business," the FTC documents specifically "were prepared for counsel and were not business forecasts made in the ordinary course of business." *Id.* As a result, the District Court held that "the documents [were] work product and thus protected." *Id.*

In the current proceedings, neither Humana nor Boehringer object to the characterization of the FTC documents as work product. *See* Mem. Supp. Humana's Mot. Compel, Doc. No. 643-1, at 9 ("The documents [Boehringer] withheld contain fact work product."); Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 6 ("Plaintiffs concede that the documents at issue are privileged under the work product doctrine."). Instead, the parties dispute whether the documents are "fact work product" (as the D.C. courts held) or "opinion work product," which is subject to greater protection. In addition, should I hold that the documents are "fact work product," Boehringer argues that Humana has not met the "'substantial need' and 'without undue

---

[6] The FTC did not appeal the District Court's ruling that most of the documents were work product, and the D.C. Circuit affirmed with respect to the documents for which the FTC did appeal. *See Boehringer II*, 778 F.3d at 149–50.

hardship' standard" required to discover fact work product under Rule 26(b)(3). *See Upjohn*, 449

U.S. at 401. I will address each issue in turn.

A.  Are the FTC documents fact work product or opinion work product?

"Most courts," including the Second Circuit, "distinguish between 'opinion' work

product . . . and 'ordinary' [or 'fact'] work product." *In re Grand Jury Subpoena*, 220 F.R.D.

130, 144 (D. Mass. 2004); *cf. In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183

(2d Cir. 2007) ("There are two types of work product, ordinary or fact . . . and opinion.").

Opinion work product "reveals the 'mental impressions, conclusions, opinions, or legal theories

of an attorney or other representative,'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d

at 183, and may be discovered "only in rare circumstances where the party seeking discovery can

show extraordinary justification." *FDIC v. Wachovia Ins. Servs.*, 241 F.R.D. 104, 106–07 (D.

Conn. 2007); *see Adlman*, 134 F.3d at 1204 ("[A]t a minimum," opinion work product "is to be

protected unless a highly persuasive showing is made."); *Dir., Office of Thrift Supervision v.

Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997) (deeming opinion work product

"virtually undiscoverable"). Fact work product, by contrast, "encompass[es] factual material,

including the result of a factual investigation," *In re Grand Jury Subpoena Dated July 6, 2005*,

510 F.3d at 183, and may be discovered "upon a showing of substantial need and inability to

obtain the equivalent without undue hardship." *Upjohn*, 449 U.S. at 400. "To be entitled to

protection for opinion work product, the party asserting the privilege must show a real, rather

than speculative, concern that the work product will reveal counsel's thought processes in

relation to pending or anticipated litigation." *In re Grand Jury Subpoena Dated July 6, 2005*, 510

F.3d at 183–84 (internal quotation marks omitted).

In reversing portions of *Boehringer I*, the D.C. Circuit strongly suggested that the FTC documents were fact work product, *see Boehringer II*, 778 F.3d at 152 ("Much of what the FTC seeks is factual information produced by non-lawyers that, while requested by . . . attorneys, does not reveal any insight into counsel's legal impressions or their views of the case."), and on remand, the District Court duly "h[eld] that the vast majority of the documents . . . constitute[d] fact work product." *Boehringer III*, 180 F. Supp. 3d at 25. Most of the documents consisted of "PowerPoint presentations, charts, graphs, and tables analyzing possible factual scenarios affecting the Boehringer-Barr settlement and the co-promotion agreement." *Id.* After examining the materials *in camera*, the District Court concluded that "nothing in the documents themselves . . . reveal[ed] [Boehringer's counsel]'s analysis of the legal issues at hand," and that—because the data requested was simply what "any reasonable businessperson . . . would analyze in th[at] situation"—counsel's "mere selection of variables for Boehringer staff to analyze d[id] not rise to the level of reflecting [the attorney's] mental impressions regarding the case." *Id.*

1. *Collateral estoppel*

At the hearing on Humana's motion, I suggested to counsel that Boehringer may be collaterally estopped from relitigating whether the FTC documents are fact work product or opinion work product. "Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984). "Collateral estoppel . . . serves to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" *Id.* (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). "Offensive" collateral estoppel refers to the use of the doctrine "by a non-party to [the] prior lawsuit." *See id.* at 158–59.

Under federal common law—which courts "apply to establish the preclusive effect of a prior federal judgment"—collateral estoppel applies when:

1) the identical issue was raised in a previous proceeding;

2) the issue was actually litigated and decided in the previous proceeding;

3) the party had a full and fair opportunity to litigate the issue; and

4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006). In addition to those "required" factors, the court also "must satisfy itself that application of the doctrine is fair." *Bear, Stearns & Co. v. 1109580 Ontario*, 409 F.3d 87, 91 (2d Cir. 2005). Offensive use of collateral estoppel may be "unfair to a defendant"—and therefore "should not be applied," *id.*—when, for example, (a) application of the doctrine would "reward a private plaintiff who could have joined in the previous action," *Parklane Hosiery*, 439 U.S. at 332; (b) the defendant lacked an "incentive to litigate the [first] lawsuit fully and vigorously," *id.*; (c) the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," *id.* at 330; or (d) "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 331.

    a. Was an "identical issue . . . raised, . . . actually litigated[,] and decided" in the D.C. federal courts?

Humana correctly states that "[w]hether the [FTC] documents . . . are protected as work product has been heavily litigated by the FTC and [Boehringer]." Mem. Supp. Mot. Compel, Doc. No. 643-1, at 9. The D.C. federal courts "exhaustively addressed the issue[] to be decided here" and "concluded that the documents were fact work product." *Id.* at 9; *see generally Boehringer II*, 778 F.3d 142; *Boehringer III*, 180 F. Supp. 3d 1. Thus, because an "identical issue

was raised, . . . actually litigated[,] and decided in [a] previous proceeding," the first two

requirements for application of collateral estoppel are met. *See Ball*, 451 F.3d at 69.

> b. Did Boehringer have a "full and fair opportunity to litigate the issue" in the D.C. federal courts?

Although Boehringer insists that "[t]he D.C. Circuit's holding" with respect to whether

the documents were fact work product or opinion work product was "incorrect and inconsistent

with Second Circuit precedent," Mem. Opp'n Mot. Compel, Doc. No. 657-7, at 25, Boehringer

does not suggest that it lacked a "full and fair opportunity to litigate the issue" in the D.C. federal

courts. *Cf. Ball*, 451 F.3d at 69. To the contrary, as the D.C. District Court observed in

*Boehringer IV*, Boehringer has engaged in "years of largely unsuccessful litigation over [its]

work product claims," including twice appealing to the D.C. Circuit and petitioning for certiorari

to the U.S. Supreme Court. 241 F. Supp. 3d at 98. Boehringer may disagree with the holdings of

the D.C. federal courts, but the nine years of litigation in Washington over the FTC's subpoena

clearly gave Boehringer a "full and fair opportunity to litigate the issue." *See Ball*, 451 F.3d at

69. Hence, the third element for application of collateral estoppel is satisfied.

> c. Was "the resolution of the issue . . . necessary to support a valid and final judgment on the merits" in the D.C. federal courts?

To bind Boehringer through collateral estoppel, the D.C. federal courts' resolution of the

work product issue must have been "necessary to support a valid and final judgment on the

merits." *See id.* With respect to the first component, the D.C. federal courts' determinations that

the FTC documents were fact work product certainly were "necessary" to their decisions. Both

the D.C. District Court and the D.C. Circuit noted that "opinion work product is 'virtually

undiscoverable,'" *Boehringer II*, 778 F.3d at 153 (quoting *Dir., Office of Thrift Supervision*, 124

F.3d at 1307); *Boehringer III*, 180 F. Supp. 3d at 18 (same), which indicates that the FTC could

not have obtained the documents had they constituted opinion work product. Boehringer also has

not suggested that the D.C. federal courts' decisions were not "valid." Therefore, the only

remaining consideration is whether the ruling in *Boehringer III* was a "final judgment."

"[F]inal," as the Second Circuit has observed, is "a word of many meanings." *Lummus

Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (quoting *Sw. Bell Tele. Co. v.

Pub. Serv. Comm'n*, 262 U.S. 276, 310 (1923) (Brandeis, J.)). For purposes of collateral

estoppel, the word "'final' . . . is not identical to 'final' in the rule governing the jurisdiction of

appellate courts." *Sherman v. Jacobson*, 247 F. Supp. 261, 268 (S.D.N.Y. 1965) (Feinberg, J.).

Rather, a "final judgment" in the collateral estoppel context "includes any prior adjudication of

an issue in another action that is determined to be sufficiently firm to be accorded conclusive

effect." Restatement (Second) of Judgments § 13 (1982) ("Restatement (Second)"). Thus, a

decision will be considered "final" when—for instance—"[t]here is no indication that th[e]

decision was intended to be 'provisional and subject to change and modification in the future by

the same tribunal,' or that it was 'avowedly tentative,'" *Sherman*, 247 F. Supp. at 270 (quoting

*Bannon v. Bannon*, 270 N.Y. 484, 489 (1936); *Lummus Co.*, 297 F.2d at 89); when "the decision

. . . was adequately deliberated and firm," Restatement (Second) § 13, cmt. g; when "the parties

were fully heard," *id.*; when "the court supported its decision with a reasoned opinion," *id.*; or

when "the decision was subject to appeal or was in fact reviewed on appeal." *Id.* In short, a

ruling will "be considered 'final' in the sense of precluding further litigation of the same issue"

when "the litigation of [the] particular issue has reached such a stage that a court sees no really

good reason for permitting it to be litigated again." *Lummus Co.*, 297 F.2d at 89.

I conclude that the decision in *Boehringer III* undoubtedly constituted a "final judgment"

in the "collateral estoppel sense." *Cf. Sherman*, 247 F. Supp. at 268. The FTC initiated the D.C.

proceedings to enforce its subpoena against Boehringer. By ruling that the documents at issue were fact work product and were subject to disclosure to the FTC, the D.C. federal courts "dispose[d] of at least [the FTC's] claim[s]" with respect to those documents. *See Acha v. Beame*, 570 F.2d 57, 62 (2d Cir. 1978) (discussing standard of finality under Rule 54(b)); *cf. Sherman*, 247 F. Supp. at 268 ("The judgment may be final as to some matters, even though the litigation continues as to others . . . ."). The D.C. District Court has now "disassociate[d] itself from the case" with regard to those documents, *Coleman v. Tollefson*, __ U.S. __, 135 S. Ct. 1759, 1764 (2015), and review of its decision is pending before the D.C. Circuit.[7] *See* Restatement (Second) § 13, cmt. g. Thus, the ruling that Boehringer produce the FTC documents in *Boehringer III* was "sufficiently firm to be accorded conclusive effect," *see* Restatement (Second) § 13, which satisfies the fourth criterion for application of collateral estoppel.

  d. Would application of offensive collateral estoppel otherwise be "unfair"?

  Finally, Boehringer has not shown that collateral estoppel would be "unfair" for any of the reasons suggested by the Supreme Court. *See Bear, Stearns & Co.*, 409 F.3d at 91. First, Humana "could not have joined in the . . . action brought by the [FTC]." *See Parklane Hosiery Co.*, 439 U.S. at 332. Second, Boehringer "had every incentive to litigate the [FTC] lawsuit fully and vigorously"—and by all accounts has done so—because the basis for the investigation was "serious," and "subsequent private suits" were entirely "foreseeab[le]." *See id.* Furthermore, Boehringer does not contend that the present case "affords [it] procedural opportunities unavailable in the first action that could readily cause a different result." *See id.* at 331.

---

[7] Boehringer's appeal "does not deprive [the] judgment of its preclusive effect." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 905 F.2d 610, 621 (2d Cir. 1990); *see, e.g., Coleman v. Tollefson*, __ U.S. __, 135 S. Ct. 1759, 1764 (2015) ("[A] judgment's preclusive effect is generally immediate, notwithstanding any appeal."); *Sherman v. Jacobson*, 247 F. Supp. 261, 270 (S.D.N.Y. 1965) (Feinberg, J.) ("[T]he possibility of appeal . . . does not prevent application of the doctrine of collateral estoppel.").

Boehringer does suggest that the D.C. federal courts' rulings are "inconsistent with . . .

previous judgments," *see id.* at 330, in that they are "incorrect and inconsistent with Second

Circuit precedent." Mem. Opp'n Mot. Compel, Doc. No. 657, at 25. In particular, Boehringer

argues that "[t]he D.C. Circuit's holding . . . is contrary to the Second Circuit's holding in

[*United States v.*] *Adlman*," which Boehringer takes to establish a rule that "an attorney's mental

impressions regarding the 'feasibility of reasonable settlement' or 'the likely outcome of

litigation' is a form of 'legal analysis' that constitutes opinion work product.'" *Id.* at 25–26

(quoting *Adlman*, 134 F.3d at 1199–1200). Despite the impression conveyed by Boehringer,

however, *Adlman* and other Second Circuit decisions do not conflict with *Boehringer II*.[8]

In *Adlman*, the Second Circuit addressed a "58-page detailed legal analysis of likely IRS

challenges" to a proposed corporate reorganization, prepared by an accountant and lawyer, which

discussed "statutory provisions, IRS regulations, legislative history, and prior judicial and IRS

rulings, . . . proposed possible legal theories or strategies . . . , and made predictions about the

likely outcome of litigation." *Adlman*, 134 F.3d at 1196. The Court easily concluded that "[t]he

Memorandum f[ell] within the most protected category of work product—that which shows the

'mental impressions, conclusions, opinions or legal theories of an attorney or other

---

[8] Indeed, in *Boehringer II*, the D.C. Circuit specifically relied upon decisions that followed *Adlman* and other Second Circuit cases. For example, the D.C. Circuit quoted language taken from *Adlman* when it stated, "Where a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available." *See Boehringer II*, 778 F.3d at 149 (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010), which quoted *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998)). And the D.C. Circuit relied upon a D.C. District Court case that quoted another Second Circuit decision for the proposition that "[w]here an attorney's mental impressions are those that 'a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description "legal theory,"' those impressions are not opinion work product." *See id.* at 153 (quoting *In re HealthSouth Corp. Sec. Litig.*, 250 F.R.D. 8, 11 (D.D.C. 2008), which quoted *In re John Doe Corp.*, 675 F.2d 482, 493 (2d Cir. 1982)).

representative.'" *Id.* at 1204 (quoting Fed. R. Civ. P. 26(b)(3)). More recently, in *Schaeffler v. United States*, the Second Circuit considered a memorandum that "identified and analyzed possible IRS challenges to . . . tax treatment of [certain] transactions, and discussed in detail the relevant statutory provisions, U.S. Treasury regulations, judicial decisions, and IRS rulings." 806 F.3d at 28. Although the Court did not ultimately decide whether the document was fact or opinion work product, it held that such "highly detailed, litigation-focused analysis and advice" clearly "contain[ed] 'legal analysis that f[ell] squarely within [*Hickman v. Taylor*]'s area of primary concern—analysis that candidly discusses the attorney's litigation strategies [and] appraisal of likelihood of success.'" *Id.* at 44–45 (quoting *Adlman*, 134 F.3d at 1200) (alteration in *Schaeffler*); *cf. Loftis*, 175 F.R.D. at 7, 11 (noting that attorney's "legal opinion regarding [defendant]'s exposure to a bad faith claim based upon his review of the facts . . . constitute[d] opinion work product").

The tax law memoranda in *Adlman* and *Schaeffler* bear little resemblance to the FTC documents in this case. None of the documents here "proposed possible legal theories or strategies" or "made predictions about the likely outcome of litigation." *Cf. Adlman*, 134 F.3d at 1196. To the contrary, according to the D.C. courts' *in camera* review, the FTC documents "contain only factual information . . . produced by non-lawyers" and "do not reflect [counsel]'s assessments of the viability of success of Boehringer's litigation or settlement strategy." *See Boehringer II*, 778 F.3d at 152; *Boehringer III*, 180 F. Supp. at 27. The Second Circuit and the D.C. Circuit agree that such "factual material" is not entitled to the "[s]pecial treatment for opinion work product." *See Adlman*, 134 F.3d at 1197. Therefore, I conclude that the D.C. Circuit's decision in *Boehringer II* is not "inconsistent with" Second Circuit precedent. *See Parklane Hosiery Co.*, 439 U.S. at 330. As a result, all of the elements for application of

18

offensive collateral estoppel are satisfied, and I hold that Boehringer is collaterally estopped from contesting that the FTC documents are fact work product.

    2.  *Work product analysis*

Alternatively, even if collateral estoppel did not apply, I would independently hold that the FTC documents are fact work product. Boehringer argues that the "analyses were ordered by [Boehringer] legal personnel for the purpose of evaluating the pending litigations and settlement options," and therefore "are imbued with . . . [Boehringer] counsel's mental impressions and thoughts." Mem. Opp'n Humana's Mot. Compel, Doc. No. 657, at 18. Boehringer attaches a declaration filed in the D.C. courts by its former general counsel, Marla Persky, who "was primarily responsible for negotiating the Aggrenox . . . settlement agreement[] with Barr." *See* Persky Decl., Ex. B to Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-3, at 3. In that declaration, Persky states that she "directed the businesspeople at [Boehringer] to gather information about specific economic parameters that [she] identified," and that she "used th[at] information to assess the legal and economic viability of various settlement options." *Id.* "[B]y requesting economic parameters from the businesspeople," Persky avers, she "was acting as a lawyer weeding through various settlement options to provide legal advice to [her] client regarding the desirability and feasibility of settlement." *Id.* Therefore, Boehringer contends that "[t]he documents at issue . . . reflect [] Persky's mental process, as well as her legal thoughts and impressions." Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 19.

Humana, unsurprisingly, disagrees. Quoting from the FTC's brief on its successful appeal to the D.C. Circuit, Humana states that Boehringer's "witnesses testified that the financial analyses lacked any substantive contribution from in-house counsel," and that Persky "herself testified that she provided minimal, if any, substantive input." Mem. Supp. Humana's Mot. Compel, Doc. No. 643-1, at 9 (internal quotation marks omitted). "[T]he assumptions underlying

the financial analyses did not contain legal opinions" because "Persky testified that she had not supplied any legal assumptions about [Boehringer]'s odds of success in the patent litigation." *Id.* at 10 (internal quotation marks omitted). If anything, Persky stated, "the information flowed in the opposite direction." *Id.* That is—according to Humana—Persky used the FTC documents to reach legal conclusions; she did not rely on her legal opinions in requesting particular data.

The D.C. District Court previously reviewed the declaration by Persky later filed in this case, and concluded that it "actually undermine[d] rather than strengthen[ed] Boehringer's arguments." *See Boehringer III*, 180 F. Supp. 3d at 26. Persky's "expla[nation] why she chose certain financial variables over others . . . gives away that her involvement in the creation of these documents was merely directory." *Id.* "She did not cull the data she received," nor do the materials "reveal how she analyzed the data she requested or what data or scenarios she presented to her client." *Id.* In short, Persky "did not 'sharply focu[s] or wee[d]' the facts contained in the[] documents such that revealing th[o]se facts would reveal her legal impressions of the case." *Id.* (quoting *Boehringer II*, 778 F.3d at 152) (emphasis in *Boehringer III*).

The materials provided by Boehringer in support of its opposition brief support the D.C. District Court's determination. In Persky's testimony before the FTC, she stated that she "didn't provide" any "legal assumptions . . . [such as] a legal opinion on odds of success in the patent litigation" to the creators of the documents, nor did she "provide them with figures." *See* Persky Hr'g Testimony, Ex. C to Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-4, at 11–12. The two Boehringer employees primarily responsible for drafting the FTC documents—Elizabeth Cochrane and Paul Fonteyne—likewise told the FTC that they were "simply doing the math," Cochrane Hr'g Testimony, Ex. D to Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-5, at 6, and "provid[ing] commercial input" in the form of "financial projections of potential settlement

possibilities." Fonteyne Hr'g Testimony, Ex. E to Mem. Opp'n Humana's Mot. Compel, Doc.

No. 657-6, at 6–7. Although Cochrane and Fonteyne "would meet at the direction of counsel . . .

and have a common understanding as to what the topics were going to be" in the settlement

discussions, Fonteyne Hr'g Testimony, Doc. No. 657-6, at 7, nothing that Boehringer has offered

indicates that they had any inkling of Persky's legal opinions concerning the litigation. *Cf.*

*Boehringer III*, 180 F. Supp. 3d at 27 ("Boehringer's charts, graphs, and spreadsheets do not

reflect Persky's assessments of the viability of success of Boehringer's litigation or settlement

strategy. . . . [T]he facts contained in th[o]se documents did no more than equip Persky to make

those assessments."); *see also In re Six Grand Jury Witnesses*, 979 F.2d 939, 945 (2d Cir. 1992)

(deeming it "difficult to imagine what 'mental impressions' were involved" in producing

"straightforward calculations from raw data").

   Boehringer attempts to rely on cases that held materials such as the FTC documents were

work product. *See* Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 20 (citing, e.g.,

*Hallmark Cards v. Murley*, 2010 WL 4608678, at *5–*6 (S.D.N.Y. Nov. 9, 2010) (holding that

documents created by "computer forensics analys[ts] . . . in anticipation of litigation" were

"potentially protected by the work-product doctrine"); *Rodriguez v. SLM Corp.*, 2010 WL

1416107, at *2 (D. Conn. Apr. 5, 2010) (holding that "tests, studies, or analyses conducted by

[defendant] constitute[d] work product")). Those decisions largely are not helpful to Boehringer,

however, because the parties here "agree that all the documents at issue meet the threshold

requirements for work-product protection." *See Boehringer III*, 180 F. Supp. 3d at 26; *but see*

*Rodriguez*, 2010 WL 1416107, at *3 (concluding that "materials contain[ed] opinion work

product" because the plaintiffs sought defendant's "review and study of its own data and its

awareness and opinion" regarding defendant's compliance with antidiscrimination law).

Furthermore, a comparison of the FTC documents to those that courts have held to constitute opinion work product "underscore[s] why [Boehringer's] work-product claims in this case should fail." *See Boehringer III*, 180 F. Supp. 3d at 27. As discussed above, the *Adlman* and *Schaeffler* decisions both involved "detailed legal analys[es]" of the tax implications of different business decisions. *Adlman*, 134 F.3d at 1196 (memorandum discussed "statutory provisions, IRS regulations, legislative history, and prior judicial and IRS rulings, . . . proposed possible legal theories or strategies . . . , and made predictions about the likely outcome of litigation"); *see Schaeffler*, 806 F.3d at 28 (memorandum "identified and analyzed possible IRS challenges to . . . tax treatment of [certain] transactions, and discussed in detail the relevant statutory provisions, U.S. Treasury regulations, judicial decisions, and IRS rulings"). The Second Circuit indicated that both memoranda "f[ell] within the most protected category of work product—that which shows the 'mental impressions, conclusions, opinions or legal theories of an attorney or other representative.'" *Adlman*, 134 F.3d at 1204 (quoting Fed. R. Civ. P. 26(b)(3)); *see Schaeffler*, 806 F.3d at 44–45 (stating that "highly detailed, litigation-focused analysis and advice" clearly "contain[ed] 'legal analysis that f[ell] squarely within [*Hickman v. Taylor*]'s area of primary concern—analysis that candidly discusses the attorney's litigation strategies [and] appraisal of likelihood of success'") (quoting *Adlman*, 134 F.3d at 1200).

*Adlman* and *Schaeffler* are inapposite here, because the FTC documents do not "propose[] possible legal theories or strategies" or "ma[ke] predictions about the likely outcome of litigation." *See Adlman*, 134 F.3d at 1196. As the D.C. courts held, the FTC documents "contain only factual information . . . produced by non-lawyers" and "do not reflect [counsel]'s assessments of the viability of success of Boehringer's litigation or settlement strategy." *See Boehringer II*, 778 F.3d at 152; *Boehringer III*, 180 F. Supp. at 27. Such "factual material" is not

entitled to the "[s]pecial treatment for opinion work product." *See Adlman*, 134 F.3d at 1197; *cf. In re Grand Jury Subpoena Dated July 6, 2005* ("To be entitled to protection for opinion work product, the party asserting the privilege must show . . . that the work product [could] reveal counsel's thought processes in relation to pending or anticipated litigation." (internal quotation marks omitted)). Therefore, I hold that the FTC documents are fact work product.

B.  Has Humana satisfied the "substantial need" and "undue hardship" standards for obtaining the FTC documents?

Because the FTC documents are fact work product, they may be disclosed to Humana upon "an adequate showing of substantial need for the document and an inability to obtain its contents elsewhere without undue hardship." *Adlman*, 134 F.3d at 1203; *see Upjohn*, 449 U.S. at 400 ("The Rule permits disclosure of documents and tangible things constituting attorney work product upon a showing of substantial need and inability to obtain the equivalent without undue hardship. . . .") The party seeking disclosure bears the "burden of proving that the need for the documents overrides the protection of the work product doctrine." *Loftis*, 175 F.R.D. at 11. Nevertheless, "a trial court has wide discretion in determining the existence of substantial need and undue hardship." *Handsome, Inc. v. Town of Monroe*, 2014 WL 348196, at *7 (D. Conn. Jan. 31, 2014); *see In re Int'l Sys. & Ctrls. Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982) "The district court . . . has broad discretion to determine whether an adequate showing has been made" of "substantial need and undue hardship.").

1.  *Substantial need*

"The meaning of Rule 26(b)(3)'s 'substantial need' requirement is not clear from the plain language of the rule." *Boehringer II*, 778 F.3d at 154 (citing, e.g., *A.I.A. Holdings, S.A. v. Lehman Bros.*, 2000 WL 1639417, at *2 (S.D.N.Y. Nov. 1, 2000) ("The law is not well

developed as to what constitutes 'substantial need.'"); Special Project, *The Work Product Doctrine*, 68 Cornell L. Rev. 760, 802 (1983) ("The substantial need requirement is the least uniformly applied by the courts.")). Courts in the Second Circuit have held that "[a] substantial need exists 'where the information sought is "essential" to the party's defense, is "crucial" to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues.'" *Gucci Am. v. Guess?, Inc.*, 271 F.R.D. 58, 74–75 (S.D.N.Y. 2010) (quoting *Nat'l Cong. for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)); *Lagace v. New Eng. Cent. R.R.*, 2007 WL 2889465, at *2 (D. Conn. Sept. 28, 2007) (same) (quoting *Strauss v. Credit Lyonnais*, 242 F.R.D. 199, 237 (E.D.N.Y. 2007)); *cf. In re Savitt/Adler Litig.*, 176 F.R.D. 44, 48 (N.D.N.Y. 1997) (test met when "critical information [was] in the sole possession of an adversary"). Although the documents need not "be essential to the claim or probative of a critical element," they must "have a unique value apart from those already in the movant's possession." *Boehringer II*, 778 F.3d at 155–56. "[R]ank speculation . . . does not constitute a showing of substantial need," *AmTrust N. Am. v. Safebuilt Ins. Servs.*, 2016 WL 3260370, at *5 (S.D.N.Y. June 10, 2016); rather, the moving party "must make a strong showing of the documents' relevance and importance." *United States v. Duke Energy Corp.*, 208 F.R.D. 553, 556–57 (M.D.N.C. 2002).

Humana asserts that it has a "substantial need" for the FTC documents because "[t]he financial analyses and forecasting documents . . . are the only direct evidence of how [Boehringer] contemporaneously valued the co-promotion agreement." Mem. Supp. Humana's Mot. Compel, Doc. No. 643-1, at 12. To the extent that FTC documents support Humana's claim that Boehringer's payments to Barr were "large and unjustified"—"the FTC estimated that the deal would cost Boehringer over $120 million in royalties," *In re Aggrenox Antitrust Litig.*, 94 F.

Supp. 3d at 236—they would be probative of antitrust liability under *Actavis*. *See* Mem. Supp.

Humana's Mot. Compel, Doc. No. 643-1, at 11 (quoting *Actavis*, 133 S. Ct. at 2237). Thus,

Humana contends that the documents "should be disclosed . . . [because they] are 'likely to go to

the heart of [Humana's] case.'" *Id.* at 12 (quoting *United States v. ISS Marine Servs.*, 905 F.

Supp. 2d 121, 139 (D.D.C. 2012)).

      Boehringer rejoins that Humana does not need the FTC documents because they "can

make th[o]se calculations themselves" with the "sales and pricing data" in their possession.

Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 12. Boehringer also argues that

Humana has not shown that it cannot obtain the information from other sources, such as

"depositions, interrogatories, or other documents already produced." *Id.* at 13; *cf. Handsome,*

*Inc.*, 2014 WL 348196, at *6 ("A witness's availability for a deposition defeats a claim of

substantial need for work product material . . . ."); *Lagace*, 2007 WL 2889465, at *2 ("[I]n order

to overcome work product protection, [the movant] must demonstrate that it cannot obtain the

substantial equivalent of the information it seeks."). In addition, Boehringer notes that the D.C.

District Court stated that the FTC documents "'are not in any way evidence of any conspiratorial

intent to violate the law' and 'do not cast any light on the fundamental legal issue of whether the

deal was or was not anti-competitive in intendment or result.'" *Id.* at 14 (quoting *Boehringer I*,

286 F.R.D. at 110). Because the documents "add nothing to what is already known about what

the involved companies intended," Boehringer asserts that they cannot "be 'essential' to a

'critical issue.'" *Id.* (quoting *Boehringer I*, 286 F.R.D. at 110).

      Boehringer also claims that "[t]he D.C. Circuit and Second Circuit have different legal

standards for what constitutes 'substantial need,'" and that "[u]nder Second Circuit law,

Plaintiffs face a higher standard to show 'substantial need' than the FTC did under D.C. Circuit

law." *Id.* at 14–15. Those statements are misleading. The D.C. Circuit did observe in *Boehringer II* that "[t]here has been a ratcheting up of the 'substantial need' standard in recent years by some courts," citing (among others) a case from the Southern District of New York, *National Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 105 (S.D.N.Y. 2000). *See Boehringer II*, 778 F.3d at 156 n.4. The D.C. Circuit also characterized a Second Circuit case, *Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 558 (2d Cir. 1967), as "demanding a heightened showing of relevance" to overcome work product protection. *See Boehringer II*, 778 F.3d at 156. But *Republic Gear Co.* predated Rule 26(b)(3) by several years, and its suggestion that work product could only be discovered if it was "'essential to the preparation of [movant]'s case on [a] critical issue' . . . has no basis in the [Advisory] Committee notes or the cases cited therein."[9] *See id.* (quoting *Republic Gear Co.*, 381 F.2d at 558). Furthermore, *Republic Gear Co.* did not indicate whether the materials at issue in that case were fact work product or opinion work product,[10] a distinction emphasized in more recent Second Circuit cases. *See In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 183–84; *Adlman*, 134 F.3d at 1197, 1204.

---

[9] *Republic Gear Co.* took the "essential to the preparation of . . . [its] case" language from *Hickman v. Taylor*, 329 U.S. 495 (1947). *See Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 557 (2d Cir. 1967) (quoting *Hickman*, 329 U.S. at 511). The Second Circuit reasoned that "[s]uch necessity may arise when the documents would 'give clues to the existence or location of relevant facts . . . , [are] useful for purposes of impeachment or corroboration . . . , [or] where the witnesses [whose information is contained in the documents sought] are no longer available or can only be reached with difficulty.'" *Id.* (quoting *Hickman*, 329 U.S. at 511). "[D]iscovery [would] not [be] permitted," however, "merely to aid opposing counsel 'to help prepare himself . . . and to make sure that he has overlooked nothing.'" *Id.* (quoting 329 U.S. at 513). The D.C. Circuit has noted that *Hickman*'s standard for discovering fact work product is "remarkably similar to the relevance standard under Rule 26(b)(1)." *Boehringer II*, 778 F.3d at 156 (citing *Hickman*, 329 U.S. at 511; Fed. R. Civ. P. 26(b)(1)). Thus, the full language of *Republic Gear Co.* indicates a somewhat less demanding standard than the "essential to the preparation of . . . [the] case" phrase would suggest. *Cf. Republic Gear Co.*, 381 F.2d at 557.

[10] The materials in *Republic Gear Co.* belonged to a lawyer who had "professionally represented" the companies whose actions were the subject of the suit at the time those actions

Instead of following *Republic Gear Co.*, the Advisory Committee Notes to Rule 26(b)(3) "explained that the . . . 'substantial need' and 'undue hardship' requirements reflect[ed] the holding[]" of an Eastern District of New York case, *Burke v. United States*, 32 F.R.D. 213 (E.D.N.Y. 1963). *Burke* "indicate[d] that a moving party's burden is generally met if it demonstrates that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested materials itself." *Boehringer II*, 778 F.3d at 115 (citing *Burke*, 32 F.R.D. at 215). That test achieves "the purpose of the work-product immunity," *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir. 1982)—namely, "to avoid chilling attorneys in developing materials to aid them in giving legal advice," *id.*—without "engender[ing] [problems] in the civil discovery area" by rendering fact work product effectively undiscoverable. *See FTC v. Grolier, Inc.*, 462 U.S. 19, 25 (1983); *cf. In re Grand Jury Subpoena*, 220 F.R.D. at 149 (noting that "[w]ere the Supreme Court to address [Rule 26(b)(3)] squarely, . . . it might well rely on purposive interpretation, and perhaps even the absurdity canon, to give the Rule a less expansive meaning than a 'literal' reading might permit"). Therefore, the D.C. Circuit's test fully accommodates the Second Circuit's directive that "[c]ommon sense and the practicalities of litigation define the limits of the work product doctrine." [11] *In re Steinhardt Partners*, 9 F.3d at

were taken. *See* 381 F.2d at 553. That suggests the documents may have been opinion work product.

[11] Boehringer suggests that Humana must meet a higher standard for "substantial need" because "the D.C. Circuit reasoned that the FTC"—"an investigative agency analyzing . . . whether to bring a complaint"—"may succeed in making a showing of 'substantial need' where a civil litigant cannot." Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 16. That argument flagrantly misreads the D.C. Circuit's opinion. The D.C. Circuit did not "conclude that there . . . was a heightened standard in a private suit under Rule 26(b)(3)." *See* Mem. Supp. Humana's Mot. Compel, Doc. No. 643-1, at 13. In fact, the D.C. Circuit "f[ound] no merit in Boehringer's argument" that Rule 26(b)(3) requires "a heightened showing of a document's relevance or

235; *cf. In re Six Grand Jury Witnesses*, 979 F.2d at 944 (stating that "relevant, non-privileged

facts may be discovered from an attorney's files where their production is essential to the

opponent's preparation of its case," and that "common law principles embodied in the work

product doctrine are to be applied in a common sense way in light of reason and experience").

Humana has shown "substantial need" for the FTC documents here. *See Boehringer II*,

778 F.3d at 155–56; *Gucci Am.*, 271 F.R.D. at 74. Antitrust liability in the present case largely

will turn on whether "the settlement [with Barr that] included a large and unjustified reverse

payment that was made *in order* to avoid the risk of patent invalidation." *See In re Aggrenox*

*Antitrust Litig.*, 94 F. Supp. 3d at 247. The "contemporaneous financial evaluations" in the FTC

documents, which "provide unique information about Boehringer's reasons for settling in the

manner that it did," certainly are "relevant to the case." *See Boehringer II*, 778 F.3d at 155, 158.

Having examined the documents myself *in camera*, I conclude that they also may have "unique

value" and "carr[y] great probative value on contested issues." *Id.* at 155; *Gucci Am.*, 271 F.R.D.

at 75. Hence, I hold that Humana has sufficiently shown "substantial need" for the documents

under Rule 26(b)(3). *See Gucci Am.*, 271 F.R.D. at 74.

I note that Humana is not precluded from showing substantial need by the D.C. District

Court's comments in *Boehringer I*—heavily emphasized by Boehringer—that the documents

---

probative value." *Boehringer II*, 778 F.3d at 154. Although the Court did add that "even if a
heightened relevance requirement were appropriate during discovery in a typical post-complaint
civil lawsuit, such a rule would be misplaced in the investigatory context of an agency subpoena
enforcement proceeding," *id.*, the Court's "use of the subjunctive form 'were'" clearly indicates
"a contrafactual condition" and "demonstrat[es] that [it] did not base its holding on the posited
hypothetical." *See Fong v. Poole*, 522 F. Supp. 2d 642, 656 (S.D.N.Y. 2007) (Lynch, J.).

The D.C. Circuit "made clear that [its] statement was *dicta*." *See Chisholm v. Ramia*, 639
F. Supp. 2d 240, 246 (D. Conn. 2009). It is perverse for Boehringer to suggest that the Court
somehow relied on a "holding that a government agency can make a lesser showing of a
substantial need to obtain work product." *See* Letter from Matthew S. Leddicotte to Peter D. St.
Philip (June 5, 2017), *attached as* Ex. 6 to Humana's Mot. Compel, Doc. No. 643-8, at 2.

"are not in any way evidence of any conspiratorial intent to violate the law" and "do not cast any light on the fundamental legal issue of whether the deal was or was not anti-competitive in intendment or result." *See Boehringer I*, 286 F.R.D. at 110; Mem. Opp'n Mot. Compel, Doc. No. 657-7, at 14 (quoting *Boehringer I*, 286 F.R.D. at 110). As an initial matter, the decision in *Boehringer I* preceded the Supreme Court's "seminal decision" in *Actavis*, which "fundamentally altered U.S. law governing the relationship between patents and antitrust." *See In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 663 (D. Conn. 2016); Alan Devlin, *Antitrust Limits on Targeted Patent Aggression*, 67 Fla. L. Rev. 775, 842 (2015); *see also, e.g.*, Michael A. Carrier, *After* Actavis*: Seven Ways Forward*, 67 Rutgers U. L. Rev. 543, 543 (2015) (calling *Actavis* "one of the most important antitrust decisions in the modern era"). The FTC documents may be more probative of intent to violate the antitrust laws than was apparent to the D.C. District Court prior to *Actavis*. *See Boehringer II*, 778 F.3d at 147 (noting that a reverse payment "settlement may be subject to antitrust scrutiny if it appears that the patent-holding firm . . . was using the co-promotion agreement as a vehicle to avoid legitimate competition") (citing *Actavis*, 133 S. Ct. at 2236–37). Moreover, evidence need not be "dispositive" in order to be sufficiently "probative" to show substantial need. *Cf. Boehringer II*, 778 F.3d at 154; *Gucci Am.*, 271 F.R.D. at 75.

The D.C. District Court itself, despite its "observation that the documents contain[ed] 'no smoking guns,' . . . implicitly determined that the FTC had satisfied the 'substantial need' . . . requirement[]." *See Boehringer II*, 778 F.3d at 154. When viewed in conjunction with the rest of the voluminous discovery provided to Humana, the FTC documents may have evidentiary value beyond what was apparent in *Boehringer I*.[12] *Cf.* Mem. Opp'n Humana's Mot. Compel, Doc. No.

---

[12] Were the documents as valueless as the D.C. District Court suggested, it also is not apparent why Boehringer would have spent nine years ferociously litigating the FTC subpoena (including

657-7, at 13–14 (stating that Boehringer has produced "over 700,000 documents (over 10 million pages)"). Thus, notwithstanding the comments in *Boehringer I*, I adhere to my conclusion that Humana has shown "substantial need" for the FTC documents. *See Gucci Am.*, 271 F.R.D. at 74.

2. *Undue hardship*

To obtain discovery of Boehringer's fact work product, Humana also must show that it cannot "obtain the substantial equivalent of the materials without undue hardship." *Loftis*, 175 F.R.D. at 11. "What hardship is 'undue' depends on both the alternative means available and the need for continuing protection from discovery." *Grolier*, 462 U.S. at 31 n.2. Thus, "[u]ndue hardship does not mean that [Humana] must prove that obtaining the information elsewhere is absolutely impossible." *Lagace*, 2007 WL 2889465, at *2 (quoting *Strauss*, 242 F.R.D. at 237). "All [Humana] must show is that 'it is likely to be significantly more difficult, time-consuming or expensive to obtain the information from another source than from the factual work product of the objecting party." *Id.* (quoting *Strauss*, 242 F.R.D. at 237).

The D.C. Circuit did not clearly separate the "substantial need" and "undue hardship" inquiries when resolving the FTC's appeal, merely observing that "the[] financial analyses are the only documents that could demonstrate whether or not [Boehringer] was using the co-promotion agreement to pay Barr not to compete." *See Boehringer II*, 778 F.3d at 157. In the present case, Humana argues that it has shown "undue hardship" because the "assumptions and formulas that [were] the basis of [Boehringer]'s analyses" in the FTC documents "are not available" through other discovery. Humana's Mot. Compel, Doc. No. 643-1, at 12. Boehringer responds that Humana—which apparently "only deposed five [Boehringer] witnesses"—has not

---

requesting rehearing *en banc* from the D.C. Circuit and petitioning for a writ of certiorari to the U.S. Supreme Court). *See Boehringer IV*, 241 F. Supp. 3d 91, 98 (D.D.C. 2017).

shown that it "cannot obtain substantially comparable evidence" through "depositions or other

discovery methods." Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 13 (quoting

*Gucci*, 271 F.R.D. at 80–81; *GEICO v. Saco*, 2013 WL 5502871, at *2 (E.D.N.Y. Oct. 2, 2013)).

I conclude that Humana has satisfied the test for "undue hardship." First, Humana

"cannot . . . obtain the[] substantial equivalent [of the FTC documents] by other means." *See*

Fed. R. Civ. P. 26(b)(3). The documents at issue consist of "PowerPoint presentations, charts,

graphs, and tables analyzing possible factual scenarios affecting the Boehringer-Barr settlement

and the co-promotion agreement." *See Boehringer III*, 180 F. Supp. 3d at 25. Such financial data

cannot feasibly be obtained through oral questions, especially nearly a decade after the events at

issue. The statements that could be elicited through witness testimony today—e.g., "Q. Does

th[e] financial analysis support your testimony that Boehringer did not use the co-promote to pay

Barr not to compete? A. Yes." Persky Hr'g Testimony, Doc. No. 657-4, at 14—are not the

"substantial equivalent" of "financial projections of potential settlement possibilities" created

when the settlement occurred. *See* Fonteyne Hr'g Testimony, Doc. No. 657-6, at 7.

Similarly, only the FTC documents provide "contemporaneous" indications of how

Boehringer "underst[ood] . . . the financial impact of the alleged anticompetitive agreement." *See*

*Boehringer II*, 778 F.3d at 158; Mem. Supp. Humana's Mot. Compel, Doc. No. 643-1, at 12.

Even if Humana "ha[s] the sales and pricing data" and can itself "calculat[e] valuations under

various generic dates," Mem. Opp'n Humana's Mot. Compel, Doc. No. 657-7, at 62, those

calculations would not be "equivalent" to evidence that Boehringer itself anticipated that its

"total payment [to Barr was] far greater than the fair value of the services falling under the Co-

Promotion Agreement." *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d at 243. The latter

would much more strongly indicate that the settlement agreement involved "a large and

31

unjustifiable reverse payment . . . made in order to avoid the risk of patent invalidation—the ultimate inquiry under *Actavis*. *See id.* at 245 (citing *Actavis*, 133 S. Ct. at 2237).

In sum, I hold that Humana has shown "substantial need" and "undue hardship" sufficient to overcome Boehringer's fact work product privilege in the FTC documents, insofar as those documents contain information pertinent to this case. Boehringer represented at the hearing that 23 of the 52 documents only concern litigation with Barr over a different drug, Mirapex, and that some of the remaining 29 documents contain information about both the Aggrenox and the Mirapex settlements. Humana clarified in response that it did not seek to obtain documents that only relate to Mirapex and that it would allow information pertaining solely to Mirapex to be redacted from the remaining documents. Therefore, I grant Humana's motion to compel with respect to the documents and portions of documents that relate to Aggrenox, and deny it with respect to the documents and portions of documents that only relate to Mirapex.

## IV.    Conclusion

I grant Humana's motion in part and deny it in part. Boehringer shall produce to Humana the 29 FTC documents that relate to the Aggrenox settlement. Boehringer may redact portions of those documents that only pertain to the Mirapex settlement.


So ordered.

Dated at Bridgeport, Connecticut, this 29th day of November 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
