```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
        - - - - - - - - - - - - - - - x
 3
        IN RE:                        :  No. 3:14-md-02516(SRU)
 4                                     :  915 Lafayette Boulevard
        AGGRENOX ANTITRUST LITIGATION  :  Bridgeport, Connecticut
 5                                     :
                                       :  December 18, 2017
 6
        - - - - - - - - - - - - - - - x
 7

 8                        FAIRNESS HEARING

 9
        B E F O R E:
10
             THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.
11

12      A P P E A R A N C E S:

13          FOR THE DIRECT PURCHASER CLASS:

14              GARWIN GERSTEIN & FISHER, LLP
                    Wall Street Plaza
15                  88 Pine Street, 10th Floor
                    New York, New York  10005
16              BY:  BRUCE GERSTEIN, ESQ.
                     JOSEPH OPPER, ESQ.
17

18          LIAISON COUNSEL FOR THE DIRECT PURCHASER CLASS:

19              ROCHE PIA LLC
                    Two Corporate Drive, Suite 248
20                  Shelton, Connecticut  06484
                BY:  GERALD C. PIA, JR., ESQ.
21

22

23

24      (Continued)

25
```

```
 1          FOR THE BOEHRINGER DEFENDANTS:

 2              WHITE & CASE
                    701 Thirteenth Street, N.W.
 3                  Washington, D.C.  20005
                BY:  MATTHEW S. LEDDICOTTE, ESQ. (via telephone)
 4
                DAY PITNEY LLP
 5                  One Audubon Street
                    New Haven, Connecticut  06511
 6              BY:  RICHARD P. COLBERT, ESQ.

 7

 8          FOR THE BARR/TEVA DEFENDANTS:

 9              GOODWIN PROCTOR LLP
                    100 Northern Avenue
10                  Boston, Massachusetts  02210
                BY:  CHRISTOPHER T. HOLDING, ESQ.
11

12              PULLMAN & COMLEY
                    850 Main Street, P.O. Box 7006
13                  Bridgeport, Connecticut  06601-7006
                BY:  JAMES T. SHEARIN, ESQ.
14

15

16

17

18

19

20

21

22

23                  Sharon L. Masse, RMR, CRR
                    Official Court Reporter
24                  915 Lafayette Boulevard
                Bridgeport, Connecticut  06604
25                  Tel: (860)937-4177
```

```
 1                    (Proceedings commenced at 1:12 p.m.)

 2                    THE COURT:  Good afternoon.

 3                    COUNSEL:  Good afternoon.

 4                    THE COURT:  We're here in the Aggrenox case.  We

 5       have a limited group today, so why don't we actually take

 6       appearances.

 7                    MR. GERSTEIN:  Bruce Gerstein of Garwin Gerstein

 8       & Fisher, for the direct purchaser class.

 9                    MR. OPPER:  Joe Opper, Garwin Gerstein & Fisher,

10       for the direct purchaser class.

11                    MR. PIA:  Gerald Pia, liaison counsel for the

12       direct purchaser class.

13                    THE COURT:  Thank you.

14                    MR. COLBERT:  Good morning -- good afternoon,

15       actually.  Rich Colbert from Day Pitney as local counsel

16       for the Boehringer defendants.  Also on the phone is Matt

17       Leddicotte from White & Case.

18                    MR. LEDDICOTTE:  Good afternoon, Your Honor.

19                    THE COURT:  Good afternoon.

20                    MR. HOLDING:  Good afternoon, Judge.  Chris

21       Holding with Goodwin Proctor for the Barr and Teva

22       defendants.

23                    MR. SHEARIN:  Good afternoon, Your Honor.  Tim

24       Shearin for the same set of defendants.

25                    THE COURT:  Very good.  Thank you.
```

1          Well, we're here, obviously, for consideration

2    of final approval of the proposed settlement.  I've read

3    and I take it that there's been no change in the status in

4    terms of objections or anybody who wants to be heard or

5    the like?  There's no one present, for example, who wants

6    to be heard?

7          MR. GERSTEIN:  Bruce Gerstein, again, for the

8    direct purchaser class.  We mailed out the notice on

9    October 4, 2017.  The deadlines for opt-outs and

10   objections were November 3, and there has been none.  We

11   didn't expect any, to be quite frank.  We've actually

12   heard from many class members who were very pleased with

13   it, and we have some letters, etc., that have been

14   deposited with you.

15         THE COURT:  Right.

16         MR. GERSTEIN:  And just for one other point is

17   the three largest class members who had the most

18   purchasers with over 80 percent, they actually had to

19   agree to the settlement as part of that, and they had

20   agreed up front as part of the overall settlement and all

21   the terms, etc., so clearly the class is strongly

22   supportive of the settlement.

23         THE COURT:  Very good.  Thank you.  Well, it

24   looks to me like a settlement that should be approved as

25   well.  As I said before, the only real issue I have is

1    attorneys' fees, and we'll talk about that in a moment.

2    But let me just say for the record that I believe that the

3    settlement class meets the requirements of Rule 23(a) and

4    23(b).  I think the only -- without going through each of

5    those in any detail -- I think the only question, really,

6    about the 23(a) factors is numerosity, and I think we're

7    close enough to what the Second Circuit has approved to

8    find that numerosity exists, especially with a case such

9    as this where the burden of individual actions I think

10   would be -- on all parties, including the defendants --

11   would be quite substantial in light of the huge volume of

12   documents that has been exchanged and reviewed.  I think

13   it would be unfortunate to let the close call on the

14   numerosity get in the way of what is otherwise a very

15   clear example of an appropriate class action and a

16   reasonable settlement.

17          The Grinnell factors in terms of substantive

18   fairness -- obviously, the procedural fairness is obvious

19   in light of the heavy litigation, the extensive arm's

20   length negotiations, and I don't think there's really any

21   doubt about the procedural fairness here.  The substantive

22   fairness under the Grinnell test I think is also easily

23   met:  complexity, reaction has been mentioned already,

24   stage of the proceedings, etc.  These are all factors, I

25   think, that support the settlement that was reached, so I

1    don't see an issue there.

2             So the substance of the settlement looks good.

3    The question really is what portion of that settlement

4    fund should go to counsel and what portion should go to

5    the clients.

6             I really -- obviously, we're looking now at the

7    Goldberger factors, at least in part, the Goldberger

8    factors:  time and labor expended, magnitude and

9    complexities of the litigation, risk of litigation,

10   outcomes, quality, representation and relationship of the

11   fees to the settlement, among others.

12            I think there's maybe three issues that I have

13   with respect to the fees application.  First, it's just a

14   huge number.  I mean, I'll be completely frank.  You know,

15   as a practical matter, it's $50 million, and $50 million

16   is a gigantic attorneys' fee.  When we look at *Goldberger*,

17   which I think has been cited in support of the

18   application, *Goldberger* is recognizing the concept that as

19   the settlement amount gets larger, the percentage of the

20   settlement amount that ought to go to attorneys' fees gets

21   smaller, and my recollection is the percentage in that

22   case that was eventually approved was very small.  And the

23   Court cited, with approval, empirical studies that

24   basically say that between 50 and 75 million, courts are

25   awarding between 11 and 19 percent of the settlement

1    amount, with even smaller rates for larger settlements.

2    So that is a concern.

3            The effort to justify the percentage by looking

4    at the hourly rate that would have been charged for the

5    time expended is somewhat concerning, largely because I

6    don't have a sense that most of the hourly rates are real

7    in the following sense:  Are these rates that are charged,

8    actually charged and actually paid, to hourly rate

9    customers?

10           Mr. Gerstein, I think your rate list is $1,100,

11   which is more than twice what I think is the highest rate

12   ever approved in the District of Connecticut.  So maybe

13   you've got a bunch of clients where you charge them $1,100

14   and they happily pay it, I don't know; but if most of your

15   business is contingent fee business and you don't have a

16   client who's actually paying that rate, you could say $400

17   an hour or you could say $2,500 an hour, and it would be a

18   number picked out of the air as far as making sense of the

19   claimed fee amount.  So I am skeptical about the rates

20   that are being charged.

21           There was also lots of partner time.  When only

22   six depositions have been taken and the principal work

23   performed in terms of hours expended is document review,

24   10 or 11 million documents, most of that work should not

25   be done by partners.  Most of that work should be done by

1    paralegals and contract attorneys and junior associates,

2    as some of it was, but there was a huge percentage, a

3    larger percentage of partner time than expected for the

4    types of work that ended up being done in this case.

5            And, finally, I'm just a little skeptical,

6    again, as some of the academic authorities cited in the

7    *Goldberger* case indicated, what the real risk here was,

8    the litigation risk that was assumed by these firms.  In

9    the securities area, in the antitrust area, these are

10   cases that rarely go to trial, and so 98, 99, approaching

11   a hundred percent of these cases settle.  The risk is, are

12   they going to settle for more or less than an amount that

13   can pay the attorneys' fees the plaintiffs have incurred.

14   And that, it seems to me, is not an issue in this case;

15   that is, there's more than enough money here in this

16   settlement, and if there wasn't ever really a risk that

17   this case was going to go to trial and that the plaintiffs

18   would lose, then the amount of the fund for litigation

19   risk, it seems to me, can't be too large.

20           So I'm happy to hear from plaintiffs' counsel.

21   I assume defense counsel have no dog in this fight, but if

22   you want to be heard, obviously I'll hear from you; but

23   I'd be interested in hearing from plaintiffs' counsel,

24   especially on those three issues.  If you multiply out the

25   hours by the highest rate I'm aware of ever approved by a

1    district court in the District of Connecticut, which I

2    think is $500, you come out with a number, even though

3    that's the average for now, paralegal hours and associate

4    hours and contract attorney hours, if you give that rate

5    to everybody, you still have a number that's significantly

6    below the request.  So I'm happy to be convinced here.

7                    MR. GERSTEIN:  Should I --

8                    THE COURT:  Wherever you're comfortable is fine

9    with me.

10                   MR. GERSTEIN:  That's okay, I'll come to the

11   podium.

12                   Judge, it's important for you to look at this

13   case for what it is, which is unique on a number of

14   different levels, and it really is important.  Let's look

15   at the class itself, where you mentioned there's 35 class

16   members.  Specifically, those 35 class members are

17   sophisticated business entities.  When you're looking at

18   the Goldberger factors, typically they're having tests for

19   large classes, sometimes consumer classes, etc., when you

20   have people who are not as sophisticated, don't deal with

21   business lawyers, etc.  So you're dealing with that.  As I

22   said, within the class are the three large national

23   wholesalers who are specifically sophisticated Fortune 20

24   companies who regularly hire counsel and have an idea of

25   counsel fees, etc.  All of those have approved the overall

1    settlement.  So the Goldberger factors, if you look at it,

2    what it's basically trying to do is place on the courts a

3    basic test to stand in the place of less sophisticated

4    people to make sure that the settlement is fair.  But

5    there's an inverse relationship when you have very

6    sophisticated entities who are overseeing this; and not

7    only that, the class is not singular to this action.  The

8    class -- we've been litigating these cases going back to

9    1998 and all through pre-*Actavis*.  We were very, very much

10   involved in the whole *Actavis* situation.  We also were

11   with the conflict case with *Actavis*, the *K-Dur* case in the

12   Third Circuit.  And contrary to your suggestion, there

13   have been numerous failures, as well as successes.  There

14   have been numerous trials.  There have been a number of

15   trials.  We went through the *Nexium* trial, I think it was

16   eight weeks, and we lost that.  You know, these cases do

17   not always settle.  Many of them don't.

18              THE COURT:  Right.

19              MR. GERSTEIN:  Our job is to try to, but if we

20   can't --

21              THE COURT:  What about since *Actavis* was

22   decided?

23              MR. GERSTEIN:  *Nexium* we lost.  Once again, we

24   have a number of cases on the precipe of trial right now

25   because of the exact issue that you're raising about

1    *Actavis*.   *Actavis* left open, as you know, as many issues

2    as it solved or maybe more.   It opened up like a can of

3    worms we've been going back and forth with.

4           But if you look at that and also in the context

5    that we're always on the leading edge of the law,

6    constantly having to deal with and challenging what is

7    important and how you emphasize it, when you're dealing

8    with, for example, the issues of -- the impact of patent

9    law, the patent law goes into the various economic models

10   that we're dealing with on damages and everything else.

11   When you suggest, you know, how we run the cases and the

12   matter of senior attorney time, etc., partner time, these

13   are complex issues.   They're something that you just can't

14   have a checklist for.   There are very, very complex issues

15   that have tremendous interrelationships throughout.

16           So just going back, if you think about who we

17   are, we actually -- as I said, you have very sophisticated

18   entities who have looked at this.   They know our history

19   because the core of the class have been involved in these

20   cases since 1998.   If you've seen, and we have a chart,

21   specifically it has been routine to provide similar type

22   of compensation.   There has never been a single objector

23   from any of these corporate entities.   They basically are

24   very much engaged; and the fact is they have a lot at

25   stake, it's their money, and they have monitored

 1  throughout what we do.  And as I've said, there's never

 2  been an objection.  In this case, which is slightly

 3  unique, to be quite frank, because of the numerosity issue

 4  we had an alternative provision where if, in fact, the

 5  Court didn't certify the class -- we thought class

 6  certification is the appropriate way -- that they would be

 7  entitled to their proportion amount of settlement on an

 8  individual basis.  They all had to sign on to that

 9  beforehand as part of our agreement.  So, I mean, it's

10  unique to say that the actual entity, specifically

11  sophisticated entity, agreed to this.  They didn't just,

12  you know -- basically, when we settle, etc., and

13  negotiate, we're basically negotiating with them, with

14  specific authority from the principals, including the

15  largest class members involved.

16          So going back to that, if you look at the basic

17  issues that you raised with me, you say it's a huge

18  number, but it's not if you look at the amount of effort

19  and time we put in this, plus the interests of the class,

20  the core interests in seeing that we're motivated to also

21  assume the losses that we have, because there are emerging

22  issues, there are many issues.  We just had a case, for

23  example, where, in the Third Circuit, where the Court

24  certified the class.  We had to go to the -- we settled

25  with three of the parties initially.  Then we settled with

1    the second party.  The last party, who didn't settle, who

2    is going to trial, appealed under 23(f) to the Third

3    Circuit.  The Third Circuit reversed on the numerosity

4    issue overall and -- you know, right before trial.  Those

5    are the type of things that you have.  You have lots and

6    lots of issues involved with this unique class that have

7    been contested throughout.

8              So if you look at that, we provided a chart

9    because it's been routine that the courts have granted a

10   third -- I think I listed 18 cases -- the Court has never

11   denied our fee, and there's never been an objection by any

12   of these sophisticated entities, including the national

13   wholesalers.

14             THE COURT:  Right, but most of those are from

15   out of circuit.

16             MR. GERSTEIN:  What?

17             THE COURT:  Most of those decisions --

18             MR. GERSTEIN:  There were three in this circuit.

19             THE COURT:  Three in this circuit, right, one of

20   which is of the magnitude that this case is.  Two of the

21   three are much smaller.

22             MR. GERSTEIN:  One is -- I think it was

23   $220 million.

24             THE COURT:  Right; and two of them were, I

25   think, under $20 million.

1          MR. GERSTEIN:  Which shows specifically the

2     issues that you have.  You also have to look at the timing

3     of the cases.  For example, we went through a period where

4     we had to slog on, pre-*Actavis*, when the rules were

5     specifically where the courts were routinely dismissing

6     the cases on scope of the patent.  All these issues that

7     we've been fighting for this class for all those years are

8     embedded, and that's what they recognize, and that's why

9     they have strongly supported us.

10          When you look at the hourly rates, which you say

11     how do we charge, you're correct that I've been doing this

12     and my firm has been doing this basically exclusively

13     since 1998; but, as I said, the class members, who

14     regularly hire outside lawyers, know what reasonable rates

15     are, they've never had an objection to any of that even

16     though they're fully aware of the facts that are before

17     you.  We're up against, and the real issue is --

18          THE COURT:  But you're not charging them that

19     rate.  You're saying, "I'll take it on a contingent fee

20     basis, and I want a third of whatever we get," right?

21          MR. GERSTEIN:  No, that's not true.

22          THE COURT:  You're charging them by the hour?

23          MR. GERSTEIN:  What we do is we never say that

24     to them because we don't have an agreement up front.  At

25     the end of the case, we ask them whether they have any

```
 1    objection to it, that's all.  We don't have an agreement
 2    beforehand.  I'm at risk in every case.
 3              THE COURT:  Whew, don't say that in Connecticut.
 4    You'll get in big trouble if you don't have a fee
 5    agreement in Connecticut.
 6              MR. GERSTEIN:  No, I'm talking about -- we have
 7    with the named plaintiff.  We're talking about with the
 8    rest of the class members.
 9              THE COURT:  Oh, I see what you're saying, okay.
10    So with the named plaintiff.
11              MR. GERSTEIN:  With the named plaintiffs we've
12    been retained specifically.
13              THE COURT:  Right, but it's not an hourly
14    agreement.
15              MR. GERSTEIN:  No, the agreement is with the
16    named plaintiffs that we will accept whatever the Court
17    awards.
18              THE COURT:  Right.
19              MR. GERSTEIN:  And they have a right to object,
20    and they never have, and nor has any class member.
21              THE COURT:  Okay, right, right.  I know they
22    haven't objected, but that begs the question to a certain
23    extent.  We're talking about the reasonableness of the
24    rates, and what you're telling me is I could put in $2,500
25    because they never object.
```

1            MR. GERSTEIN:  Well, our rates are basically

2    comparable to our adversaries.  We have to put on --

3            THE COURT:  They may be, but they're getting,

4    you know, one times their hourly -- the hours put in, and

5    you're asking for three times the hours put in.

6            MR. GERSTEIN:  And we are on a contingency.  The

7    whole point of, in this circuit, is that it's based on a

8    percentage with a lodestar check, and it's supposed to be

9    just as a balancing, that it's not out of bounds.  Under

10   three is not an unusual lodestar check.

11           THE COURT:  No, it's not, but my point about it

12   is it's not a check because it's not a real lodestar.  The

13   fact that you -- your time and a first-year associate's

14   time are fungible here because the hours are all that

15   matter, not the rate.  Because you're just saying, We're

16   going to justify this lodestar by all the hours that I put

17   in are going to be $1,100, and we're going to put in $400

18   for a first-year associate.

19           MR. GERSTEIN:  And that's exactly what's known

20   by the class members when they deal with it, and they know

21   about that, and they think that, to be quite frank, a

22   third is fair.  So when you're looking at it, if you're

23   looking at a percentage --

24           THE COURT:  Whether a third is fair is a

25   different thing than saying that this supposed lodestar is

1      a good check.  It's not a good check.  It's like -- it's a

2      made-up check.

3              MR. GERSTEIN:  Everything has to be in that way

4      if you're on a contingency basis.  We have a contingency

5      practice --

6              THE COURT:  Right, right.  That's my point.

7              MR. GERSTEIN:  -- and the only way we can do --

8      the point is that we can have on that, specifically where

9      we obviously keep our time records, is we can, on that

10     check, is to see that my rate is comparable to somebody

11     who is --

12             THE COURT:  Right, but here's the problem.  When

13     you're using made-up rates, it doesn't matter if you're

14     sitting out there doing document review, and no reasonable

15     client would pay $1,100 for you to review, in the first

16     instance, documents rather than paying three or four

17     hundred dollars for a first-year associate to do the same

18     thing.  And so what we get is a lot of partner time.  Why?

19     Because partners want to stay busy; that's great.  And

20     then they're multiplied by these outrageous rates, 1,100;

21     950; 900.  It's la-la land in terms of the rates.  And

22     then you come up with this huge number that you say, "Oh,

23     look, it's pretty reasonable.  It's only 2.47 times the

24     lodestar."  The lodestar is not a real lodestar.

25             MR. GERSTEIN:  I agree that it is not a lodestar

1    specifically on the basis of what you charge, but if I

2    charge another client that, doesn't change the existence.

3    I'm a fiduciary.  You appointed my firm lead counsel.  I

4    had to oversee what the people did, and I take that

5    responsibility very seriously, in this case and many

6    others.

7                    THE COURT:  The case law says I'm a fiduciary --

8                    MR. GERSTEIN:  I agree with that.

9                    THE COURT:  -- for the class, and so they're not

10   here, and the defense here doesn't care how we spend their

11   money, and so I've got to look out for what's happening.

12   I've got to look out for all the class members here.

13                   MR. GERSTEIN:  I understand your basic concern,

14   but as I said -- you're going back to it -- the class is

15   here.  This is a sophisticated group who did have a clear

16   opportunity to say, "No, this is too high."  So they

17   aren't here in a way.  You're right, you have to deal with

18   that because we did proceed as a class, but that class is

19   here.  I could understand your overall concern if it was a

20   class made up of thousands of people or people who are, as

21   I said, less sophisticated, but you have a class made up

22   of people who are expecting substantial amounts of money.

23   Some of them will be getting in the nine figures, well

24   into nine figures --

25                   THE COURT:  Right.  It's not a rounding error,

1    though.  Look at *Wal-Mart*.  *Wal-Mart* is sophisticated

2    plaintiffs in the class.

3              MR. GERSTEIN:  Yes.

4              THE COURT:  And the Court didn't say, You can

5    have less review or approve a big number because they're

6    sophisticated, they should have known better, and they

7    didn't complain about it.  That's not the standard.  You

8    know, I've got to impose a fee award that's rational here.

9              MR. GERSTEIN:  Well, I would hope that you'd see

10   it as rational because, Judge, if you -- if you look at

11   this case in a very, very narrow way, specifically where

12   you're talking about this case, just on all fours, versus

13   the efforts that we've made on behalf of this class; the

14   risk we've suffered in other cases; the number of cases

15   we've had dismissed on either technicalities, procedural

16   hurdle, as the law was evolving; as I said, if you look at

17   the sophisticatation of the people, I think that you would

18   see that this is a different situation.  I think the other

19   courts have recognized that.

20              If this was a one-outer, if Wal-Mart, if this

21   was their only case and somehow they didn't pay attention

22   to it, this is a regular source of revenue for these class

23   members.  And as I said to you, I don't want to be -- say

24   this in the wrong way, but in effect it's their money.

25   You're right that it's your overall responsibility to deal

1    with it, but this -- if you look at -- they know even more

2    than this Court does the risks that we've undertaken on

3    their behalf.  They know the history of the cases for the

4    last twenty years.  They've seen the ups and downs in the

5    courts, the initial cases that we had, like, for example,

6    the *Cardizem* case when we had a per se liability for

7    reverse payment, to the cases like *Tamoxifen*, etc., where

8    the Court specifically had a full stop, specifically that

9    it had to be a scope of the patent, it had to be the only

10   way you could proceed was with a share case.  They've seen

11   us go up and down in the Court of Appeals on numerous

12   times with these cases, and they understand the overall

13   efforts that are being made on their behalf, and that's

14   what really is in this courtroom right now as we speak.

15        They have these sophisticated entities who are,

16   as I said, they're not -- they want lawyers who are

17   comparable to what the adversaries are, which is the best

18   in the nation, who are going to put up the fight, who are

19   funding the case throughout, throughout the litigation,

20   all the way through -- numerous times through trial,

21   through the Court of Appeals.  They understand that we

22   have to take -- retain numerous experts, all out of pocket

23   to deal with that, and that's their response.

24        So you're right if you look at a test, but the

25   only thing I'm urging you is when you look, for example,

1   at *Goldberger*, don't ignore the policy behind it.  They're

2   trying to step in the shoes of what would be a

3   sophisticated person negotiating an agreement with an

4   attorney.  Well, you have that in this case already, and

5   they've done that.  And although, as I've said, you might

6   disagree with them, they've really been hurt.  They want

7   to incentivize us.

8              THE COURT:  Well, okay.  As you know,

9   $50 million comes out to an outrageous hourly rate.  And

10  when you look at the -- when you look at some of the rates

11  being included here, very, very junior people, very,

12  very -- I mean, presumably inexperienced lawyers, a lot of

13  paralegal time, this is -- this is -- it's a windfall.

14  And that's what the Court of Appeals has said to avoid, is

15  a windfall.

16             MR. GERSTEIN:  Judge, it wouldn't be a windfall

17  if -- and I've said this to a number of people, anybody

18  who would go into our practice has got to be crazy when

19  you suggest -- and the reason it's not a windfall is we

20  have to fund everything.  We have to pay all those

21  people --

22             THE COURT:  There were lawyers lined up to be

23  lead counsel in this case.

24             MR. GERSTEIN:  You know something --

25             THE COURT:  Lined up, experienced lawyers.

1        MR. GERSTEIN:  Judge, you wouldn't find that in,

2   for example, for our cases for the direct purchaser class.

3   There are relatively few who can undertake the expenses

4   involved.  Some of them, for example, we had -- I had a

5   case that settled earlier this year just before trial,

6   through a mediator, that went on for 17 years, I think it

7   was.  That is not unusual.  We have cases that are going

8   on 10, 12 years, that are up and down in the Court of

9   Appeals that we have to deal with.  Every single issue is

10  fought out of these cases.

11       THE COURT:  Right.  In those cases maybe you get

12  a higher --

13       MR. GERSTEIN:  Well, but it's being reflected by

14  this class.  If this class was a one-off away from those

15  other cases, I would agree with you.  But the core,

16  99 percent of the class members are in virtually every

17  case, and they understand it, and they understand it full

18  well.

19       So the only thing I can suggest to you is to

20  urge you to try to look at the bigger picture, and the

21  bigger picture is they have come back and supported us

22  each time.  When I went through, as I said, saw the

23  support I had from the class members overall to this

24  Court, they support us; they want us to represent their

25  interests; and they, as I said, have strongly communicated

1    to you that they don't have a problem with that.  They

2    want us incentivized.  I can understand that you're going

3    to do that, but you're actually basically providing monies

4    to people who are suggesting the opposite to you.  They

5    really don't want it.  And the problem I have is it's

6    equating, in a more generalized text, the class action

7    that there is people who do need more court oversight.

8             THE COURT:  Well, okay.  But you're not telling

9    me that you're not going to be incentivized if you get

10   less than --

11            MR. GERSTEIN:  We're incentivized, I agree, Your

12   Honor, but the fact of the matter is it's a question of

13   what generally is thought of as fair.  And as I said, if

14   this Court -- virtually every other Court has provided

15   specifically a third, except for one Court where we asked

16   for 27.5 percent because it was over $500 million, and

17   that was only a partial settlement, and one Court was

18   30 percent, which is the very, very first case going back

19   to the early 2000s that was settled.

20            THE COURT:  Well, that just seems inconsistent

21   with what the Second Circuit is telling me in terms of

22   reducing the percentage as the settlement amount goes up.

23   *Goldberger* was what, 4 percent, something like that?

24   Eleven?  What was it?

25            MR. GERSTEIN:  I've never seen percentages, and

1    it depends on the complexity, what was done in the case.

2              THE COURT:  Right, but, you know --

3              MR. GERSTEIN:  You, yourself, have to put out

4    and deal with some of the most complex issues going on,

5    and you saw the level of lawyering that was needed.  This

6    is a national issue, with big policy issues, that we've

7    been basically dealing with throughout the entire course

8    of the litigation.

9              THE COURT:  Yes, it was an interesting, complex

10   case, but it was not a case -- you know, when you have six

11   depositions, and you had a very interesting motion to

12   dismiss and a couple of interlocutory appeals that were

13   easily rejected --

14             MR. GERSTEIN:  When you have six -- when you

15   have six depositions, you're not seeing what's going on

16   behind the scenes to get us to a point where we can

17   negotiate.  The experts that we have to engage here, the

18   different points that we have, the biggest issue you have

19   in this case that you would have been facing is the but

20   for world and the causation issues.  That is all -- you

21   know, has to be basically vetted for us to be able to come

22   to a reasonable settlement.  We have to get to a point.

23   You're right that good lawyering, if it's done right, will

24   avoid trial, but there are significant trials, but we have

25   to get to the point and we have to be prepared to try it.

1   And that is what was engaged.

2           So I understand what you're seeing on the

3   surface, but you're really not seeing what was done to get

4   us to the point of being able to resolve this case.  It

5   would be exactly the same type of issues, I mean, because

6   we've been litigating these on numerous cases.  Causation

7   is -- you would have two fundamental issues, you know,

8   whether or not the reverse payments were pretextual or

9   not; but the other big issue is the causation issues, and

10   that involves serious issues on patent law, because the

11   question of likelihood of when a generic would have come

12   to market, the success, all of that would go into the

13   various causation theories that we had to deal with.  We

14   were working throughout with numerous, numerous different,

15   you know, aspects of this case to get to that point.  We

16   didn't just go in there and negotiate a settlement with

17   the mediator, with the suggestion, Well, what do you think

18   is a good number?  These were done with the clear idea of

19   what would we be bringing to trial.  What are we dealing

20   with?

21           Now, fortunately, you didn't have to basically

22   do that, publicize that, but it was all done internally,

23   and it was all necessary to bring this case to a proper

24   conclusion.

25           THE COURT:  Okay.  So if we took the 33,000

1     hours of professional time, which I take it means

2     everything from partner down to paralegal --

3               MR. GERSTEIN:  Correct.

4               THE COURT:  -- right, and we used the highest

5     rate ever approved in the District of Connecticut, $500 an

6     hour, we get to $16.5 million.  So that's $500 an hour for

7     paralegals, $500 an hour for first-year associates --

8               MR. GARWIN:  But these are national firms.

9     These are national cases.  We have to litigate against

10    similarly national firms.  But you're close to what we

11    had.  We had 19,633.  But the reality is we're still from

12    New York litigating this nationally, from New York, from

13    Boston, from Philadelphia.  So to suggest Connecticut, I

14    can understand if it's a local issue, but this is really a

15    national case that happened to be located in Connecticut.

16    I mean, we're spending our time in New York, with the New

17    York rents and everything else, and paying all the support

18    staff at New York rates, which is quite different than

19    Connecticut.  I agree with you there.

20              THE COURT:  Okay.  All right.

21              Anyone else want to be heard?

22              MR. GERSTEIN:  Thank you, Your Honor.

23              THE COURT:  Thank you.

24              Well, look.  I understand these are issues that

25    are very important to lawyers, and I have spent a fair

1    amount of time trying to figure this one out because of

2    the various factors that you've mentioned, but I'm not at

3    one-third on the percentage that ought to be paid out in

4    legal fees.  It seems to me that the Second Circuit has

5    repeatedly said that as the settlement amount goes up, the

6    percentage that's appropriate goes down.  Whether you look

7    at it from an hourly rate or a percentage rate, the point

8    is to avoid a windfall to counsel in a case where the

9    clients, even though there aren't a huge number of them,

10   are not present to be looking over the factors that the

11   Court is using to determine an award.

12           I think that in light of the complexity of

13   issues, the relative risk that there would not be a

14   favorable outcome, the amount of time expended, etc., that

15   a fee award equal to 20 percent of the settlement fund is

16   an appropriate and, frankly, still massive attorneys' fee

17   award.  And so it would be my intention to award a total

18   of fees of 20 percent of the fund, with interest, with

19   costs.  There were almost a million dollars in costs.

20   Obviously, that's not to come out of the 20 percent.  And

21   the interest, 20 percent of the interest is also

22   appropriate.  But it seems to me that if I look at

23   *Goldberger*, if I look at *Wal-Mart,* if I look at any number

24   of cases out of the Second Circuit, a fee of 33-1/3 would

25   be a complete windfall, in my view, in light of the

1  various factors that I'm required to consider.

2           So if anybody wants to be heard further, before

3  we finalize this, let me know.

4           MR. GERSTEIN:  Judge, I have two other points.

5           THE COURT:  Yes.

6           MR. GERSTEIN:  What is -- we requested an

7  incentive award for the plaintiffs --

8           THE COURT:  Oh, yes.

9           MR. GERSTEIN:  -- $75,000.

10          THE COURT:  Yes.  Look, I think that's quite

11  generous, too, but I'm not going to buck you there.  I

12  think that's fine.

13          MR. GERSTEIN:  And formally we have to present

14  to you the allocation plan, which is based pro rata, or we

15  need you to rule on that.

16          THE COURT:  Yes, I think that's an appropriate

17  plan.  Thank you.

18          So I plan to sign the proposed order that was

19  submitted with the paperwork with the adjustment for the

20  attorneys' fees, but otherwise they look fine to me.

21          Anybody want to be heard?

22          MR. COLBERT:  Nothing, Your Honor.

23          THE COURT:  All right.  Well, I want to thank

24  everybody for coming in.  Thank you also for reaching a

25  settlement that I think is a fair one.  And we will see

1    you next time.  We'll stand in recess.

2              (Proceedings adjourned at 1:52 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


No. 3:14-md-02516(SRU)

In Re:  Aggrenox Antitrust Litigation


        I, Sharon L. Masse, RMR, CRR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.



            December 27, 2017


                /S/ Sharon L. Masse
            Sharon L. Masse, RMR, CRR
             Official Court Reporter
             915 Lafayette Boulevard
           Bridgeport, Connecticut  06604
              Tel: (860)937-4177