```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
      - - - - - - - - - - - - - - - x
 3
      IN RE:                        :  No. 3:14-md-2516(SRU)
 4                                   :  915 Lafayette Boulevard
      AGGRENOX ANTITRUST LITIGATION  :  Bridgeport, Connecticut
 5                                   :
                                     :  July 19, 2018
 6
      - - - - - - - - - - - - - - - x
 7

 8

 9

10                         MOTION HEARING

11

12

13    B E F O R E:

14         THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

15

16

17

18

19

20

21

22

23                  Sharon L. Masse, RMR, CRR
                      Official Court Reporter
24                   915 Lafayette Boulevard
                 Bridgeport, Connecticut  06604
25                    Tel: (860)937-4177
```

```
1   A P P E A R A N C E S:

2

3        FOR THE PLAINTIFFS:

4            HILLIARD & SHADOWEN LLP
                 2407 S. Congress Avenue
                 Suite E122
5                Austin, Texas  78704
             BY:  STEVEN D. SHADOWEN, ESQ.
6
             MILLER LAW LLC
7                115 S. LaSalle Street
                 Suite 2910
8                Chicago, Illinois  60603
             BY:  MARVIN A. MILLER, ESQ.
9
             MOTLEY RICE LLC
10               600 Third Avenue, Suite 2101
                 New York, New York  10016
11           BY:  MICHAEL M. BUCHMAN, ESQ.

12           HEINS MILLS & OLSON, P.L.C.
                 310 Clifton Avenue
13               Minneapolis, Minnesota  55403
             BY:  RENAE D. STEINER, ESQ.
14

15       FOR THE DEFENDANTS:

16           WHITE & CASE LLP
                 1221 Avenue of Americas
17               New York, New York  10020-1095
             BY:  ROSS E. ELFAND, ESQ.
18               KATHRYN J. MIMS, ESQ.

19           GOODWIN PROCTER LLP
                 901 New York Avenue NW
20               Washington, D.C.  20001
             BY:  BRIAN BURGESS, ESQ.
21
             PULLMAN & COMLEY
22               850 Main Street
                 P.O. Box 7006
23               Bridgeport, Connecticut  06601-7006
             BY:  JAMES T. SHEARIN, ESQ.
24

25   (Continued)
```

1          FOR THE ASO, OPT-OUTS:

2               LOWEY DANNENBERG, P.C.
                    44 South Broadway, Suite 1100
3                   White Plains, New York  10601
               BY:  URIEL RABINOVITZ, ESQ.

4

5      FOR THE OBJECTOR, PEOPLE OF CALIFORNIA,
       ACTING BY AND THROUGH ORANGE COUNTY
6      DISTRICT ATTORNEY TONY RACKAUCKAS:

7               MEADE YOUNG LLC
                    909 Poydrass Street
8                   Suite 1600
                    New Orleans, Louisiana  70112
9               BY:  JOHN ALDEN MEADE, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Whereupon, the proceedings commenced at 1:20

2   p.m.)

3          THE COURT:  Good afternoon.

4          ALL COUNSEL:  Good afternoon, Your Honor.

5          THE COURT:  We're here in the Aggrenox

6   litigation.  I hope all of you have given your appearances

7   to the court reporter.

8          ALL COUNSEL:  Yes, Your Honor.

9          THE COURT:  And I would just ask that when you

10  speak, you remind me of your name and tell me who you

11  represent so I can figure that out.

12         Okay.  We're here, obviously, to take up issues

13  related to final approval of the proposed settlement.

14  We've got, as I understand it, one outstanding objection

15  and some issues regarding opt-out requests.

16         MR. SHADOWEN:  That's correct, Your Honor.

17         THE COURT:  All right.  Take it away.

18         MR. SHADOWEN:  All right.

19         Good afternoon, Your Honor.  Steve Shadowen on

20  behalf of the end-payor plaintiffs.

21         We do have two motions.  One is for final

22  approval of the settlement itself.  The other is for

23  approval of the attorneys' fees request.  I'm going to

24  address the final approval, and my colleague, Renae

25  Steiner, will address the attorneys' fees issue.

1          With respect to final approval, unless the Court

2    has specific questions on some of the issues, we're happy

3    to, on the basic issue of approval of the settlement, rest

4    on our papers, and then use our oral argument time to

5    directly address the one outstanding objection, and then

6    also address the question of the opt-outs.

7          THE COURT:  All right.  That makes sense to me.

8    I obviously am familiar with the case and have reviewed

9    the documents and understand your position.  It might be

10   good to start with perhaps counsel for the objector.

11         MR. SHADOWEN:  Okay.

12         THE COURT:  Very good.

13         MR. MEADE:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MR. MEADE:  My name is John Alden Meade.  I

16   represent the people of California, acting by and through

17   the Orange County District Attorney, Tony Rackauckas.

18         As we made clear in our papers, it's incumbent

19   upon me to reiterate that we're making a special

20   appearance here.  We're not consenting to personal

21   jurisdiction.  What we're essentially trying to do here is

22   prevent a subsequent settled litigation.  We're trying to

23   save everyone a lot of time.  I've been involved in

24   something very similar to this in the Flonase litigation,

25   which we put in our last papers, our opposition to their

1    motion to -- they don't really say what they want to do

2    with their motion.  But, anyways, I think it's first and

3    foremost very important to make clear that we are here in

4    our capacity as a sovereign.  There has been some, I think

5    in the defendants' papers, saying that the Orange County

6    D.A. is a political subsidiary, and while it may -- the

7    sense is that it can otherwise be true, the statutes being

8    enforced here are quite clear.  17-200 and following

9    statutes authorizes not just the attorney general but the

10   district attorney to act on behalf of the people of the

11   State of California.  And when this case was conditionally

12   removed to the JPML panel to be considered for being

13   transferred here, the federal courts in -- the federal

14   court in California made that specific finding, and it was

15   actually important to that decision because the removal is

16   based on diversity.  And the question there, as I've cited

17   in our opposition papers, was that by virtue of enforcing

18   this statute, 17-200, the State of California, which may

19   not operate the way every other state has done, it has

20   decided to delegate in certain instances of exercise of

21   its sovereign rights, not just to the office of the

22   attorney general but to district attorneys.  So by

23   representing the people of the State of California, the

24   federal court, on remand, said this is the state acting in

25   its sovereign capacity.  This is a law enforcement action

1    and it's exercise of police powers of the State of

2    California.

3            So right away that puts us into kind of a new

4    ball game.  The sovereign rights of a state cannot be just

5    wrapped up into a settlement between private litigants in

6    federal court.  There would have to be a whole waiver

7    issue here.

8            I think the next most important --

9            THE COURT:  Let me have you flesh that out a

10   little bit.  It's not clear to me how the sovereign rights

11   of California are being wrapped up here.  I'm not taking

12   any action in the removed and then remanded case.

13           MR. MEADE:  Right.  So here's how.  It's

14   actually exactly where I was going.  These statutes that

15   give the people of California -- and I'd like to

16   pretermit for the moment whether the application of the

17   Niaspan, a separate drug ruling that the attorney -- I'm

18   sorry, that the district attorney, when it comes to

19   monetary relief --

20           THE COURT:  Don't worry about that.  Don't worry

21   about that.

22           MR. MEADE:  Because even without that, it's

23   still a conflict with Orange County.  What happened here

24   is that on April 11, 2017, that is the filing date that

25   the people of California filed their action in the

1    exercise of this police power, in this law enforcement

2    action.  At that time, in this case there was only a

3    putative class action.  There was no motion for class

4    certification, much less was it approved.  So the normal

5    construct is very familiar, that any class member who

6    files their own case, prior to a motion and then order

7    certifying the class, has, in effect, opted out already.

8    They don't have to later opt out, nor do they even later

9    need to object.  Their filing of their own action, prior

10   to the end of the opt-out period, and we did it obviously

11   before the end of the opt-out period, before there was

12   even a motion, so we effectively have opted out.  The

13   challenge has been, "Oh, we don't have the authority to do

14   that.  We're not a class member."  We know that the Orange

15   County district attorney himself is not a class member,

16   but he is authorized by statute, through the state

17   government of the State of California, to act on behalf of

18   the people of California.  So --

19            THE COURT:  But let's just pause right there.

20   To act as a sovereign on the behalf of the people of

21   California.

22            MR. MEADE:  Correct.

23            THE COURT:  Not to act as a class representative

24   or other representative of the people of California.  The

25   term "the people of California" means the State of

1   California.

2         MR. MEADE:  Yes, it does.

3         THE COURT:  Right.  And so --

4         MR. MEADE:  That's the way the statute is

5   organized, Your Honor.  I admit California is a little odd

6   in this respect.

7         THE COURT:  But when you file a case on behalf

8   of the people of the State of California, there's not a

9   list of 40 million people who are plaintiffs there.  It's

10   a sovereign capacity --

11         MR. MEADE:  Right.

12         THE COURT:  -- as you started out by saying.

13         MR. MEADE:  That's correct, Your Honor.

14         THE COURT:  So you don't represent the people in

15   the same way that the plaintiffs in this case represent

16   some residents of California.

17         MR. MEADE:  It's certainly through a different

18   mechanism, that's absolutely true.  It's a different

19   mechanism, which would -- if we weren't here, if we hadn't

20   filed a case --

21         THE COURT:  Right.

22         MR. MEADE:  I understand the general

23   proposition, and we don't contest the general proposition,

24   that residents in the State of California can be included

25   in a class.  We're not saying that can't happen.

1          THE COURT:  Right.

2          MR. MEADE:  But that's what the *Intelligender*

3    case talks about, is that if there is a case, a class

4    action such as this one where there is a settlement, and

5    under there's a CAFA notice that goes out, and there's

6    that objection period, and there is no objection, then

7    there will be res judicata effects on that judgment that

8    will be enforceable against the people who would otherwise

9    might have been represented through a district attorney in

10   California.  That's not what happened here.

11         So not only did we -- we didn't wait for a

12   potential settlement and CAFA notice to come out.  We had

13   filed our own independent action before there was even a

14   motion for -- much less an order, much less a settlement,

15   much less the CAFA notice, and we were way ahead of that

16   whole train.

17         THE COURT:  Okay, fair enough.  But what you're

18   saying, in effect, is when the State of California, acting

19   in its sovereign capacity, files an enforcement action

20   against a party that is a defendant in a class action, it

21   has the effect of a stay of the federal court class action

22   to the extent that it affects anybody who's a resident of

23   the state of California.

24         MR. MEADE:  I wouldn't say it brings about a

25   stay.  I think it requires a change in the class

1    definition.  So the class definition here assumes

2    incorrectly that these people are unrepresented.  So

3    that's what the whole thing, you know, when we talk about

4    who's an absent class member and can you have a

5    representative be certified, you know, on all the

6    typicality and all the 23(a) requirements to represent

7    absent people.  I'm saying we're not absent.

8                THE COURT:  Okay, but here's the deal.  Any

9    particular plaintiff can maintain at the same time the

10   same claim in state court and federal court.  Happens all

11   the time.  There would be a claim pending in state courts

12   of California and a claim pending in the District of

13   Connecticut, same claims, same parties.  The first one to

14   judgment wins.

15               MR. MEADE:  Well --

16               THE COURT:  Why is that not what we have here?

17               MR. MEADE:  Well, because the state here is

18   acting in its sovereign capacity.  That is a major

19   distinction; that, yes, you can have private parties, some

20   operating in state court, some operating in federal court,

21   and there could be a race to judgment.  But the State of

22   California -- and this is an important part -- with the

23   MDL -- sorry, the JPML's decision, I guess they were

24   required to do it, but when there was a remand, so this

25   case came up and was potentially going to be part of what

1   you have here in front of Your Honor, in which case you

2   could be deciding all of these issues, and as you know,

3   we've argued in our brief that once we got the remand and

4   the vacation of the conditional transfer order, it's

5   essentially a fait accompli at that point, that the state

6   court case would proceed independently.

7               THE COURT:  And it has.

8               MR. MEADE:  And it has and it will, but the rule

9   of *Intelligender* tells you that it is possible, when the

10  state does not act, for there to be a res judicata effect

11  on the monetary relief side, not the civil penalties or

12  injunctive relief, but there can be a res judicata effect

13  on a separate federal class action somewhere else, but

14  that is in the absence of the state acting.  And our point

15  here is the state has acted and acted prior to any

16  authority invested in the class representatives.

17              THE COURT:  So pull out *Intelligender* and just

18  point me -- I'm not, apparently, seeing in that decision

19  what you're seeing in that decision --

20              MR. MEADE:  Okay.

21              THE COURT:  -- so it would be helpful to me

22  to --

23              MR. MEADE:  Actually, it's not right here in my

24  binder, but the -- I won't be able to quote verbatim.

25              THE COURT:  Well, here's I think what you're

1    relying on.  "We agree that a CAFA class action

2    settlement, though approved by the district court, does

3    not act as res judicata against the state in its sovereign

4    capacity even though many of the same claims are included

5    in both actions."

6              MR. MEADE:  I believe that's with respect to the

7    civil penalties and injunctive relief, Your Honor.

8              THE COURT:  Okay.  So --

9              MR. MEADE:  And what we're here attempting to

10   do, because this is what we see happening --

11             THE COURT:  Well, I'm just going to give you a

12   minute.  Grab that decision because you're relying on

13   it --

14             MR. MEADE:  I am.

15             THE COURT:  -- and --

16             MR. MEADE:  Mind if I go back to my --

17             THE COURT:  Sure, yes.

18             (Pause.)

19             THE COURT:  I mean, the Court held that because

20   the requirements of res judicata have been met with

21   respect to the claims for restitution --

22             MR. MEADE:  Right.

23             THE COURT:  -- the injunction may issue under

24   the Anti-Injunction Act; that is, there, there was

25   actually an injunction to preclude the State from --

1            MR. MEADE:  Seeking monetary relief.

2            THE COURT:  Restitution.

3            MR. MEADE:  Right, right.  So that's what we're

4    getting at here.  That's what we're trying to say, is

5    eventually -- you know, so if we lose here and we lose an

6    appeal, we'll essentially be back in the same place where

7    what will happen in California is they will -- the

8    defendants will file that suit -- an injunction against

9    the State saying as to the monetary relief, the

10   restitution, it's already been resolved.  And there we

11   will be consenting to the jurisdiction of the state court,

12   obviously, and instead saying that was a mistake that the

13   federal courts made, and it's unenforcable here in

14   California, and the reason why is because the class

15   definition should not have included the people of the

16   State of California when those people were already

17   represented in a separate suit.  That's going to be our

18   position when we have to have this fight, and we're trying

19   to say, Well --

20           THE COURT:  But they weren't represented in the

21   same way.

22           MR. MEADE:  Maybe not in the same way, but they

23   are represented, Your Honor.

24           THE COURT:  Okay, so you have a list of

25   plaintiffs in the state court?

1            MR. MEADE:  No, no, I don't, Your Honor; but

2   it's important to distinguish that in the federal class

3   action context under Rule 23, you have a putative class,

4   right?

5            THE COURT:  Right.

6            MR. MEADE:  You don't actually -- you know,

7   there's discussion about what your ethical duties are to

8   absent class members and whatnot, but you don't actually

9   have a certified class where you represent them until Your

10   Honor grants that motion, which was here done in the

11   context of settlement.

12            THE COURT:  Right.

13            MR. MEADE:  When you do it in California, as

14   soon as you file a suit, you've got it by statute.

15            THE COURT:  Right.  So --

16            MR. MEADE:  So our authority predates theirs.

17            THE COURT:  But that doesn't matter.  What

18   matters is who goes to judgment first.

19            MR. MEADE:  Well, I guess that's just -- we

20   don't agree with that.  I see that that's where you come

21   out, but...

22            THE COURT:  Well, what is to prevent private

23   plaintiffs from having a class action in California where

24   they copy the complaint in this case and they just put a

25   state court caption on it and proceed?  And we've got

```
 1    duplicative cases --
 2              MR. MEADE:  It wouldn't work.  It wouldn't work.
 3    You have to be a state actor.  You have to have operated
 4    pursuant to the statutes.
 5              THE COURT:  No, no, no.  This is a more general.
 6              MR. MEADE:  If -- in that hypothetical you're
 7    talking about, it would be a race to judgment --
 8              THE COURT:  Right.
 9              MR. MEADE:  -- because you'd have private
10    plaintiffs on both sides.
11              THE COURT:  Right.
12              MR. MEADE:  I agree with you entirely.
13              THE COURT:  Okay.
14              MR. MEADE:  That is not what's happened here.
15              THE COURT:  Okay.
16              MR. MEADE:  By virtue of filing suit, on the day
17    you file suit --
18              THE COURT:  All right, let me try it this way.
19    What authority do you have that says that the moment the
20    State of California filed suit in an enforcement action, I
21    was required -- presumably, I was supposed to just know
22    this out of the blue, but I was required then to proceed
23    no further with respect to anybody who lives in
24    California?  I haven't seen those cases.
25              MR. MEADE:  That's not our contention, Your
```

1    Honor.

2            THE COURT:  Well, it is, because you're saying

3    take them out of the class.

4            MR. MEADE:  Yes, but I think it was not your

5    responsibility, Your Honor.  I think when --

6            THE COURT:  No, no, but -- okay, what authority

7    do you have that anybody has a responsibility to report to

8    the Court, "Oh, Your Honor, it's like a bankruptcy stay,

9    we just received notice, you have to stop with respect to

10   anybody who lives in California because the State just

11   filed an action out there"?

12           MR. MEADE:  Well, ultimately I think it would be

13   the defendants' responsibilities, Your Honor, because it's

14   at their hazard.

15           THE COURT:  Whosoever responsibility.  Let's say

16   it's everybody's responsibility.  What case law do you

17   have that says that I, as a judge sitting on this MDL

18   class action, have to carve out California residents the

19   moment you file a lawsuit out there?  I haven't seen those

20   cases.

21           MR. MEADE:  Yeah, that particular case does not

22   exist, Your Honor.

23           THE COURT:  That's what you're asking me to do.

24           MR. MEADE:  Well, I'm asking you to rely on the

25   statute.  So is there a case that directs you to this

1    exact conclusion?  No.  At least not that I found.  What

2    is clear, however, is that from -- all of these cases that

3    get filed in California, where it's not a private party,

4    but where it is the district attorney or the attorney

5    general --

6              THE COURT:  Right.

7              MR. MEADE:  -- it has never not been the case

8    that -- no one has ever challenged the standing of a

9    district attorney or attorney general to represent the

10   whole people of California.

11             THE COURT:  Oh, I'm not challenging your

12   standing either.  I'm saying there's nothing about your

13   filing the lawsuit out in California to enforce whatever

14   rights you want to enforce, which you have complete right

15   to do, there's nothing about that that has an impact at

16   all on me.

17             MR. MEADE:  Except --

18             THE COURT:  At some point, at some point, if I

19   approve this class, somebody is going to make a motion in

20   the state court and to say, We already paid --

21             MR. MEADE:  Right.

22             THE COURT:  -- "X" million dollars to members of

23   California, so the restitution obligation is gone.  And

24   what's wrong with that?

25             MR. MEADE:  What's wrong with that is it's

1    private parties in a federal court usurping the sovereign

2    rights of the State of California.  That's what's wrong

3    with it.

4              THE COURT:  Okay.  So if I had a California

5    resident sue in this court individually and win $175, and

6    then Boehringer goes out there and says, when it's time

7    for restitution, Well, we do have this $175 credit because

8    one of the residents sued already.

9              MR. MEADE:  So if a single resident sued and was

10   paid, I think, you know, when you say the people are

11   sovereign, the ultimate sovereign is the individual.  So

12   if an individual had filed suit and was paid, there's no

13   superior right than that expressed by the individual.

14             THE COURT:  Okay.  So the only difference

15   between my hypothetical and this case is that we're using

16   Rule 23, and instead of having a single plaintiff, we have

17   a whole lot of plaintiffs.  So what's the difference?

18   Why -- again, give me some authority for the

19   proposition --

20             MR. MEADE:  Okay.

21             THE COURT:  -- that I can't do something because

22   you filed this lawsuit.

23             MR. MEADE:  Our opposition to their motion to

24   exclude our objection talks at length about how when an

25   individual files their own action, it's effectively an

1    opt-out.  So there's the bridge that has to get crossed.

2    Those are the two pieces of the puzzle that have to get

3    married.  And I understand you're asking me where is the

4    case that puts those two pieces together.  I don't have

5    that case for you.

6              THE COURT:  Okay.

7              MR. MEADE:  But that connection is just sitting

8    there waiting to be made.  Two and two is four.  If under

9    Rule 23 it is the rule that anyone who's otherwise in the

10   class definition files their own suit prior to the end of

11   the opt-out period, it's an opt-out.  So that rule exists.

12             Now, the question is, can that rule be applied

13   when it wasn't an individual who filed, but it was a

14   district attorney in the state of California on behalf of

15   the people of California.  Does that fit that rule?  And

16   the defendants have said, no, it doesn't, and we say, yes,

17   it does, because what's required only is that the district

18   attorney have the authority to do so, which the

19   statutes --

20             THE COURT:  But the difference is you're not

21   filing on behalf of specified individuals.  You're

22   bringing police power action, and you're saying, We have

23   sovereign authority.  We want civil penalties.  We want

24   restitution for any victims, who will be identified at

25   some point.  We don't know who they are today because

```
 1    they're not listed in our --
 2              MR. MEADE:  They're knowable.  It's the same
 3    ascertainability question that there is under Rule 23.
 4              THE COURT:  Sure.
 5              MR. MEADE:  I mean, I don't think class counsel
 6    can come up here and name every class member either.
 7              THE COURT:  I'm not disputing -- well, okay.
 8    Maybe they can; maybe they can't.
 9              MR. MEADE:  I mean, eventually they will be able
10    to.  When it comes into the claims administration process,
11    they will gradually learn; but we could find out who
12    everybody in California is.
13              THE COURT:  Yes, but here's the point.  You
14    don't need anybody with an actual claim to file your
15    lawsuit.  You're a sovereign.  You can do an enforcement
16    action.  You're not seeking damages, as are sought in this
17    case.  You're seeking restitution.
18              MR. MEADE:  And they are different, that is
19    true.  However, we have that rule of *Intelligender* that
20    says that a damages final judgment can be used --
21              THE COURT:  Exactly.  That's my point.
22              MR. MEADE:  But with *Intelligender* that happened
23    because at the time of the settlement, nobody had filed
24    one of these cases in California, nor was there an
25    objection.
```

1          THE COURT:  Show me that again in the case.

2    Maybe I'm just missing --

3          MR. MEADE:  The timing of the suit in

4    *Intelligender* was brought -- the state court action under

5    17-200 was brought after.

6          THE COURT:  I recognize that.  Where does it say

7    in that decision that due to the timing, we have a

8    different outcome?

9          MR. MEADE:  Oh, no, it doesn't say that, Your

10   Honor.  It doesn't explicitly say that.  But what it does

11   say is that res judicata was possible because the final

12   judgment in that case, the new case wasn't filed until

13   after, so there was res judicata because that judgment

14   predated the filing by --

15         THE COURT:  Well, res judicata, let's assume you

16   get a judgment three days after I enter judgment here.

17   That's three days too late.  Res judicata is from the date

18   of the judgment.

19         MR. MEADE:  Right, right.  No, I understand.

20   And if it were just individual actions, because right now

21   we don't have a final judgment, right?

22         THE COURT:  Not yet.

23         MR. MEADE:  So that's why we're trying to come

24   here early, is because what we're saying -- I guess what

25   I'm trying to acknowledge is that res judicata can apply

1    and would apply were it not for the actions taken by the

2    State of California that predate the motion certifying the

3    class here.

4              THE COURT:  But what case do you say -- what

5    case do you have that says res judicata would otherwise

6    apply, but it doesn't because the State did "x"?

7              MR. MEADE:  Well, no, the only case on point is

8    *Intelligender,* and it doesn't consider explicitly the

9    reverse, the converse.  So it doesn't come out and say,

10   Oh, and, by the way, we're going to make an auxiliary

11   holding that were the timing switched, it would be

12   different.  But another thing that's different here is the

13   use of Rule 23, which assumes absent class members, and I

14   realize I'm doubling back here, but -- so whose authority

15   to represent these people is superior, and even if it's

16   not superior, who exercised it sooner.  So our point is

17   that you can't get a judgment with respect to class

18   members that are not absent.  That's our point.  And the

19   people of California are not absent.  They're ineligible

20   for inclusion in the class.  So that is the nub of our

21   argument.

22             THE COURT:  Right, but you have no authority for

23   that proposition.

24             MR. MEADE:  Well, the authority is all the cases

25   I cited showing that when an individual does it, it pulls

1    them out.

2            THE COURT:  Because they have brought

3    individually the damages claim at issue in the federal

4    court.

5            MR. MEADE:  Right, so this would be an argument

6    for an extension -- this would be an argument for an

7    extension of the law.  I think it's a logical necessity

8    that if you accept the one, you accept the next.  That's

9    our argument.

10            THE COURT:  Yes, but I guess I disagree with

11    you.

12            MR. MEADE:  I can tell.

13            THE COURT:  Yes.  The fact that the state has

14    the ability to seek restitution on behalf of victims who

15    are resident of the state does not mean that a federal

16    court cannot proceed with a class action and bind,

17    frankly, the rights of absent class members.  They're

18    still absent class members even if you've brought an

19    enforcement action.  They have two ways to win; but if

20    they want to win your way, they have to opt out of this

21    way.

22            MR. MEADE:  I understand your point.

23            THE COURT:  Any California residents who have

24    opted out, go ahead, get restitution for them.  But I

25    don't see how you can hold this up just because you filed

1    an action out there.

2              MR. MEADE:  Right.  Well, I accept -- we

3    disagree, but we accept your --

4              THE COURT:  Okay.

5              MR. MEADE:  -- opinion, and we will do as

6    required.

7              THE COURT:  Does anybody want to be further

8    heard on this?  Does anybody want a greater explanation

9    than was provided through colloquy?  Obviously I haven't

10   come out and said it directly but --

11             MR. SHADOWEN:  No, Your Honor.

12             MR. ELFAND:  No, Your Honor.

13             THE COURT:  All right.  Well, I appreciate --

14   look, it's an interesting issue.  I appreciate you coming

15   out here and raising it, but I just obviously disagree.

16             So I'm going to overrule the objection made on

17   behalf of the people of California for the reasons I think

18   adequately set forth in colloquy with counsel.

19             All right.  That brings us, I think, to the next

20   major question, which is the ability of insurers to opt

21   out on behalf of their ASOs.  Whose motion is that?

22             MR. RABINOVITZ:  The end-payors motion.  I'm not

23   sure who Your Honor wants to hear from --

24             THE COURT:  Well, I want to hear from you first,

25   I think.

1          MR. RABINOVITZ:  Okay.  All right, thank you,

2     Your Honor.  Uriel Rabinovitz from Lowey Dannenberg on

3     behalf of the insurers, so that is Aetna, Cigna and four

4     Blue plans.

5          So I just want to add on a couple points we had

6     in our papers and kind of address what was in the latest

7     filing, the replies from defendant and end-payor counsel.

8          I think what, when you cut through a little bit

9     of it, you'll see that one of the -- the question that

10    rises to the top is the question of authority, the

11    question of, you know, do we -- does end-payor counsel and

12    defendants believe that we represent -- that we can -- we

13    are able to do this on behalf of ASOs.  They do believe

14    that.

15         THE COURT:  Well, why is their subjective state

16    of mind important?  I mean, you either have the authority

17    or you don't.

18         MR. RABINOVITZ:  Absolutely.  My point is that I

19    think they concede we have the authority; and the fact

20    that in the class action, if we were to claim in the

21    class, take out the six insurers I represent, take someone

22    Horizon, Blue Cross New Jersey, they're going to claim on

23    the class, they're going to give their data and they're

24    going to claim on behalf of their ASOs, their self-funded

25    customers, and they're going to get a check from the

1    claims administrator if the settlement is approved.

2              THE COURT:  Okay.

3              MR. RABINOVITZ:  They're going to get a check

4    for a hundred thousand dollars, let's say, and they're

5    going to distribute $60,000 of it to their ASO customers.

6              THE COURT:  Right.

7              MR. RABINOVITZ:  They're claiming on behalf of

8    their ASOs.

9              THE COURT:  Right.

10             MR. RABINOVITZ:  They have authority to do so.

11             THE COURT:  Okay.

12             MR. RABINOVITZ:  That authority is not in

13   question.  We're here, this motion has been filed because

14   that same authority has been questioned when it comes to

15   opting out.  So they believe -- the question of authority

16   is not one if you want to stay in the class; it's only an

17   issue if you want to get out of the class.  That's the

18   problem we have.  We think, one, that's a due process

19   problem.

20             THE COURT:  Well, doing nothing you stay in the

21   class, and then eventually you file a claim; and, frankly,

22   that's not my -- I don't get my hands dirty on the claims,

23   right?  I'm just deciding who's in the class and who's not

24   in the class.  And so the class is everybody in the

25   defined class, except those who opt out.

```
 1              MR. RABINOVITZ:  Right.

 2              THE COURT:  So now your position is although our

 3    ASOs have not opted out, we know better than they do what

 4    they ought to do, and so we're going to opt out for

 5    them --

 6              MR. RABINOVITZ:  No, see --

 7              THE COURT:  -- which is going to create a

 8    problem down the road when they say, "Wait a minute,

 9    where's my check?" and they're told, "Oh, you opted out

10    through your insurer."

11              MR. RABINOVITZ:  Okay, so I'll take those one at

12    a time.

13              THE COURT:  Okay.

14              MR. RABINOVITZ:  One, we don't think -- we're

15    opting out on their behalf, so they're opting out of the

16    class as well.  They're opting out of the class.  Just as

17    they could claim in the class through us, they could opt

18    out of the class through us.

19              THE COURT:  Did they get notice?

20              MR. RABINOVITZ:  We don't dispute notice.

21              THE COURT:  Okay, so they got notice, and the

22    notice says, If you don't want to be in the class, opt

23    out.

24              You had two options here.  You can send out an

25    email to all of your ASOs and say, Hey, you know what, the
```

1    judge in Connecticut is really being difficult here, he

2    wants affidavits, we don't have time to do that.  Just opt

3    out.  We'll protect your interests.  Don't worry about it.

4    Then they send in their opt out notices, everybody is

5    happy.  They've opted out.  You got what you wanted.  They

6    got presumably what they wanted.

7         That didn't happen.  I don't have ASOs opting

8    out, and so now you're coming in with no indication that

9    you have authority to opt out for them, and you're saying

10   we believe we have authority to do it.

11        MR. RABINOVITZ:  Hold on.  We think

12   contractually we're allowed to do it on their behalf.  We

13   think we have authority in the contract that they contract

14   with us to give us authority to do it on their behalf.

15   That's one.

16        THE COURT:  Whatever you think, you didn't come

17   forward with a contract.  You didn't even send in saying,

18   Paragraph 13 of the contract says in any class action you

19   can opt out.  I think you had one trust agreement where

20   you said something to that effect.  But what you're doing

21   is you're creating the opportunity for prejudice to the

22   other side because they're going to -- they're going to be

23   caught in the middle here.

24        MR. RABINOVITZ:  Let's take a step back for a

25   second.  Let's go through your hypothetical.

```
 1              THE COURT:  Okay.
 2              MR. RABINOVITZ:  If our ASOs, let's say Verizon,
 3    wanted to opt out of the class, you know what they would
 4    do?  They'd pick up the phone, they'd call Aetna and say,
 5    "I need my data because I need to opt out."
 6              In this industry it's incredibly inefficient to
 7    do that.  They effectively have their health benefit
 8    providers, but they completely outsource it to Aetna to
 9    do.
10              THE COURT:  Okay, let me press you a little bit.
11    Do they need to call Aetna to opt out, or do they need to
12    call Aetna to present a claim?
13              MR. RABINOVITZ:  They --
14              THE COURT:  If Verizon wants to opt out, why do
15    they not fill out the form, sign it "love Verizon," and
16    send it back?
17              MR. RABINOVITZ:  Because they'd be back here and
18    end-payor counsel would claim that opt out wouldn't be
19    good because it wouldn't come with all the requirements in
20    opt out, for example, the data.  That comes from Aetna.
21    They don't have the information they need, required to opt
22    out, to opt out.
23              THE COURT:  To be supplied.  Look, I have no
24    indication whatsoever that any of these ASOs want to opt
25    out, nor does class counsel.  So what do they do?  Do they
```

1    process a claim by Verizon or not?  They're caught in the

2    middle.

3              MR. RABINOVITZ:  I think it's clear.  I think

4    it's been done several times in the last twenty years.

5    Those -- just like Aetna, for its fully insured line of

6    business for which it's at risk, it opted out.  They're

7    not managing it, they're not going to adjudicate that in

8    the claims administration.  The same thing for its ASOs.

9              THE COURT:  So you were on notice that you

10   needed to provide information sufficient to allow us to

11   figure out whether you had authority.  If Verizon wants to

12   opt out, okay, fax me a letter that says you want to opt

13   out.  Attach the letter to all the data, send it in.  Now

14   you've opted out of Verizon, and there's an indication,

15   binding Verizon, that Verizon wants out.  But what you're

16   trying to do is say, We know better, we assume all these

17   people want to opt out, and we're going to opt out, quote

18   unquote for them, and then we're going to be caught in the

19   middle.

20             MR. RABINOVITZ:  Okay, so if we're talking about

21   three or four, there would be no question here.  We're

22   talking about more than two thousand.  This is an

23   incredible burden --

24             THE COURT:  It's not a burden.  You're managing

25   these people's plans.  You're managing their benefits.

1    It's a simple thing to take their letters, put them all

2    together and say, We've got 2,000 letters here.  Every

3    single one of our ASOs wants to opt out.

4              MR. RABINOVITZ:  It is a burden in the sense

5    that, again, this industry is unique.  It's not calling

6    cards and other cases cited.  They completely rely on

7    Aetna and Cigna to do this.  In the contract they say when

8    you recover -- when there are overcharges and presumably

9    when you recover for yourself, cover for us too.

10             THE COURT:  Send an email out to all ASOs:  I

11   need proof that you want to opt out.  Hit "reply" and say

12   "I want to opt out" and indicate the name of your entity.

13   Sincerely.

14             And by reply mail, email, in ten seconds you've

15   got everything you need to show that these people actually

16   want to opt out, but you don't do any of this.

17             MR. RABINOVITZ:  But they contract to avoid

18   having that burden.  They want us to do it.

19             THE COURT:  Show me the contract.  I haven't

20   seen a contract that says, We divest ourselves of any

21   rights to opt out, and we send them along to our insurer.

22   Where is that contract?

23             MR. RABINOVITZ:  Can I get it?

24             THE COURT:  Yes, grab them.  Sure.

25             MR. RABINOVITZ:  So this would be in the St.

1    Phillip declaration, Exhibit 11.  This is just an example.

2    This is Florida.  This is Document 801-1, page 255 of 756.

3    "Additionally, the trust" -- which is in this case the ASO

4    -- "delegates to BCBS" -- which is BCBS Florida, one of

5    the insurers -- "the discretion and authority to pursue

6    coverage for claims paid as a result of fraud, abuse and

7    other inappropriate action by a third party, including the

8    right to opt out or opt in the trust from any class

9    action."

10                THE COURT:  Right.  I said you had one.

11                MR. RABINOVITZ:  Okay.

12                THE COURT:  All right.

13                MR. RABINOVITZ:  Let's go to more.

14                THE COURT:  So now we've heard one.

15                MR. RABINOVITZ:  Vermont.  There's another one,

16    a Florida, the same language.

17                "Whenever" -- this is Vermont.  This is 808-01,

18    page 380.  "Whenever contract administrator," which in

19    this case is BCBS Vermont, "becomes aware of an

20    overpayment under the plan, contract administrator shall

21    make a diligent attempt to recover such overpayments."

22                THE COURT:  This is not an overpayment case.

23                MR. RABINOVITZ:  Well, part of it is.  I mean,

24    we paid more for Aggrenox than we should have.  That's

25    one -- that's one -- "Contract administrator shall not" --

1    I'm skipping ahead -- "Contract administrator shall not be

2    required to institute any legal proceedings to recover

3    such overpayments.  Contract administrator may use its

4    reasonable judgment to compromise and settle

5    overpayments."

6                THE COURT:  Well, I guess we disagree.  I think

7    "overpayments" means we ordered "X," and they overcharged

8    us, not there's an antitrust violation.

9                MR. RABINOVITZ:  Okay.  I mean, we see it as a

10   recovery -- it's they contract to that recovery

11   opportunities, including overpayments, paying more for the

12   drug than you would have in a but for world.

13               THE COURT:  Your subjective view, again, isn't

14   binding here.  The fact that you think overpayments

15   includes the type of claims brought in this case doesn't

16   provide authority for me.

17               MR. RABINOVITZ:  Let's give another example.

18               THE COURT:  Let me ask, so was all of these

19   contracts submitted with the opt outs?

20               MR. RABINOVITZ:  Not with opt outs.  With

21   opposition to the motion.

22               THE COURT:  Right.  So did you not understand

23   that that was -- these are documents you had in your

24   control.  All you had to do was --

25               MR. RABINOVITZ:  But, Your Honor, it's 2,000

1    documents.  This is an attempt to make it too hard to opt

2    out.  Imagine if every time you had to opt out, you had to

3    do 2,000 -- in some of our cases it's been 20,000.  This

4    is a relatively smaller one.  I mean, the sheer burden is

5    a major element of this.

6              THE COURT:  Right.  So far you've shown me one

7    trust document that arguably applies.  It doesn't seem

8    burdensome.  The others you're overreaching here.

9              MR. RABINOVITZ:  Again, let's go back to the

10   burden for a second.  The burden is requiring us to do

11   this in the first place.  This is a sampling.  Everyone

12   has their language of doing it.  Some are a little bit

13   more black on white.  They all allow, all the contracts

14   throughout the industry allow to recover for overcharging.

15   Think about it from the perspective of the ASO.  Health

16   insurance is so expensive.  When you recover for yourself,

17   do it for us as well.  That's exactly what they contract

18   for.

19             THE COURT:  Exactly, right, for overcharges.  I

20   get that.

21             MR. RABINOVITZ:  For overcharges, for

22   settlements, for anytime --

23             THE COURT:  That's not what you just read to me,

24   settlements.  You didn't read to me MDL antitrust cases.

25             MR. RABINOVITZ:  Again, they're not going to get

1    into the nitty-gritty.  It's a contract.  Whenever you're

2    recovering from any kind of fraud or abuse, an overcharge

3    is one but example of that.

4              THE COURT:  Okay.  Do we have fraud and abuse

5    claims in this case?

6              MR. RABINOVITZ:  We have antitrust claims.

7              THE COURT:  Right.

8              MR. RABINOVITZ:  We have consumer protection

9    claims.

10             THE COURT:  Right.  Do we have fraud and abuse

11   claims?

12             MR. RABINOVITZ:  Close cousins in that sense in

13   this case.

14             THE COURT:  Well, look.  I'm not persuaded by

15   your burden argument.  I don't understand, and you haven't

16   told me why, you couldn't simply send out an email to all

17   of your ASOs and say, "This is important.  Hit 'reply' and

18   tell me whether you authorize me to opt out on your

19   behalf.  We have a deadline of 'X.'"  Then literally

20   you've got email.  You just attach those emails to the opt

21   out, and it demonstrates and it gives -- it's going to

22   bind the people that you claim to represent when they go

23   back and say "I didn't get my payment."  Then we've got a

24   plaintiff administrator who can say, "Wait a minute, you

25   opted out.  Here's the email where you sent back to Blue

1   Cross and said you opted out."

2          MR. RABINOVITZ:  The reason they contract is to

3   avoid having that burden.  And then also it ignores

4   intricacies of the system.  This case, this class action

5   goes back to '09.  Some of them are no longer our clients,

6   and we contract to retain the claims.

7          THE COURT:  How can I allow anybody to opt out

8   on behalf of anybody else without some demonstration that

9   they're authorized to do so?  If I want to opt out of the

10  class for you, you're going to be angry about that.  I

11  believe I'm authorized to opt you out.  I believe it.  I

12  have a sincere belief.

13         MR. RABINOVITZ:  So I'll say two things to that.

14  The court-approved mechanism to claim in the class allows

15  for that very thing, very thing.  You're allowing one

16  person to claim on behalf of another, without --

17  apparently without authority, without proven authority,

18  the way the Court reading it.  That's happening.  That's

19  going to happen.

20         THE COURT:  Well, it's not happening with the

21  ASOs, which was an issue that was raised in advance of the

22  notice going out, and you were put on notice that you had

23  to come up with -- because this was a problem, and it was

24  anticipated to be a problem, and you were given a remedy.

25  Now, we used the word "affidavit," but any proof that this

1    was authorized would work.

2              MR. RABINOVITZ:  We provided the names, the

3    claims data to avoid any issues that could come up with

4    this, and we provided, without overly doing it, because

5    we're talking about more than 2,000, contracts.

6              Again, when Your Honor says it's not an issue

7    for ASOs on the claims form part, it absolutely is an

8    issue for ASOs.  Verizon is not going to claim in this

9    case.

10             THE COURT:  Why not?  They call you up and they

11   say, "Give us our data so we can claim."

12             MR. RABINOVITZ:  They contract for Aetna to do

13   it for them, and they expect Aetna to do it.

14             THE COURT:  That's fine.  So have Verizon opt

15   out.  They got notice, have them opt out, and then you

16   bring a lawsuit on their behalf and collect it, as you

17   claim you're entitled to do.

18             MR. RABINOVITZ:  But why should it be that to

19   claim to be in the class is less burdensome, substantially

20   so, than to get out of the class?

21             THE COURT:  You're in the class unless you opt

22   out.  That's the way 23(b)(3) works.  You're in the class

23   unless you opt out.

24             MR. RABINOVITZ:  Granted they're in the class.

25   I'm talking about the question of authority, the question

1   of where is that money going?  How is the Court ensuring

2   that money goes to Verizon?  It's believing Aetna has a

3   right to do it under its contract.

4           THE COURT:  I am not following this argument at

5   all.

6           MR. RABINOVITZ:  All right, let's slow it down.

7   Let's go to what's going to happen, the way Your Honor is

8   leaning, Verizon is not opted out.

9           THE COURT:  Right.

10          MR. RABINOVITZ:  Let's take a different example.

11  Let's do Horizon.  Horizon is going to submit a claim

12  before the September something deadline --

13          THE COURT:  Right.

14          MR. RABINOVITZ:  -- and it's going to claim in

15  the class on behalf of Verizon.  The claims administrator

16  is going to see a list of claims data that includes

17  Horizon's fully insured line of business and ASO including

18  Verizon.  It's going to check, did anyone else claim on

19  behalf of Verizon.

20          THE COURT:  Sure.

21          MR. RABINOVITZ:  And Verizon is going to -- it's

22  going to give a certain amount of money, allocation from

23  the class pool --

24          THE COURT:  Right.

25          MR. RABINOVITZ:  -- that's earmarked for

 1    Verizon.  It's going to go in a single check made out to

 2    Horizon --

 3              THE COURT:  Okay.

 4              MR. RABINOVITZ:  -- because the claims

 5    administrator, via the mechanism approved by the Court and

 6    the class counsel, allowed Horizon to claim in the

 7    class --

 8              THE COURT:  Right.

 9              MR. RABINOVITZ:  -- on behalf of Verizon.

10              THE COURT:  Sure.

11              MR. RABINOVITZ:  No question of authority.

12    They're believed to do it.

13              THE COURT:  Oh, sure.  No, I get that.  But

14    having made the claim, now Horizon is taking the risk of a

15    suit if they don't turn the money over to Verizon.

16              MR. RABINOVITZ:  Okay.  But the same authority

17    allows Horizon to opt out, if it wanted to, Verizon from

18    the class.  The question of authority comes from one

19    place.

20              THE COURT:  It comes from the settlement plan

21    and administration plan.

22              MR. RABINOVITZ:  How does the settlement plan

23    allow -- how does the settlement plan allow Horizon to act

24    on behalf of?  Horizon is only allowed to act on behalf of

25    someone else because it has a contractual authority to do

 1  so.  Horizon's business is that it does this for its ASOs.

 2          THE COURT:  Are we using Verizon and Horizon?

 3  Our poor court reporter is going to mess this up.

 4          MR. RABINOVITZ:  I'm sorry.

 5          THE COURT:  Let's use, I don't know, Wal-Mart

 6  and Horizon.  How about that?

 7          MR. RABINOVITZ:  Okay.

 8          THE COURT:  They're different.  Okay.

 9          So Wal-Mart has got a claim.  Horizon submits

10  the claim on behalf of Wal-Mart.  Is that any different

11  than my accountant submitting my claim on behalf of me?

12  No.  You get claims from third parties on behalf of other

13  people all the time.  Why?  They've got the documentation.

14  You've got the proof of the loss.  It's checked.  It looks

15  legit.  We send a check out.

16          So I don't have a problem with a third party

17  submitting.  It happens all the time.  Do you file your

18  own tax returns or do you have somebody prepare them for

19  you?

20          MR. RABINOVITZ:  I sign something that allows my

21  accountant to do it for me.

22          THE COURT:  Fine.  So maybe the claims

23  administrator won't pay unless they get something signed.

24  I don't know.  But the point is it doesn't bother me that

25  it's easier to make a claim than it is to opt out.  When

```
 1    you're opting out for somebody else, you're affecting
 2    their legal rights.  When you're making a claim for
 3    somebody, it's just administratively simple to do that.
 4              MR. RABINOVITZ:  When you're opting out on
 5    behalf of someone else, you're taking money that is
 6    earmarked to a class member, and you are believed that you
 7    will properly distribute that to where it should go.  In
 8    addition --
 9              THE COURT:  Wait, wait, wait.  When you opt out?
10              MR. RABINOVITZ:  No, when you claim.  Sorry.
11    When you claim.
12              THE COURT:  Okay, yes.
13              MR. RABINOVITZ:  The --
14              THE COURT:  Look, if I submit a claim through my
15    accountant, and my accountant gets a check and doesn't pay
16    me, I'm going after my accountant.  There's no great
17    problem there.  There is a problem when there's a
18    third-party opt-out that is not authorized.  The
19    administrator recognizes the opt-out, and then the party
20    makes a claim.  Why?  Because now we've got them basically
21    in a bind.  What do they do?
22              MR. RABINOVITZ:  When the claims administrator
23    is taking Wal-Mart's -- is getting data specific to
24    Wal-Mart, it's checking that Wal-Mart wasn't represented
25    by Blue Cross Blue Shield of Arkansas.
```

```
 1              THE COURT:  Sure.

 2              MR. RABINOVITZ:  And it is adding up all the

 3     figures.  I mean, it's a data-rich area.  The ability to

 4     claim on behalf of someone else is that it essentially

 5     comes down to when you're staying in the class, if you

 6     want to participate in the class, these hurdles are not

 7     there.  If you want to opt out of the class, the hurdles

 8     are -- you know, we disagree on the hurdles, but they're

 9     ginormous.

10              THE COURT:  Well, they're present at least.

11     Rule 23(b)(3), if you don't opt out, you're in the class

12     for better or for worse.  Whether you make a claim

13     ultimately or not, you're in the class, and you're going

14     to be bound by -- I mean, the class action method or

15     procedure is not perfect.  There are inefficiencies at the

16     margins.  But that's the way it works.  You get a notice

17     that says if you do nothing, you're in the class, and so

18     you have an obligation to do something to get out of the

19     class.

20              Wal-Mart can send in a piece of paper saying "I

21     want out of the class."  They can ask you to send in a

22     piece of paper, authorize for them to opt them out of the

23     class.  "Please opt us out; Love, Wal-Mart."  But what

24     you're doing is you're standing up here saying we opted

25     out all these people that nobody in this room has any
```

1    reason to believe authorized the opt out.  That's just

2    where we are.  I have no evidence at all that any of these

3    2,000 entities wanted to opt out.

4         MR. RABINOVITZ:  These entities all have an

5    ongoing business relationship --

6         THE COURT:  I understand that.

7         MR. RABINOVITZ:  -- with these people.  We've

8    provided data to show that we didn't make this up out of

9    thin air.

10        THE COURT:  I understand that.  Some of them you

11   told me are not even your clients anymore, so you don't

12   have an ongoing relationship, but you're still opting them

13   out.

14        You know, look.  The bottom line is nobody is

15   opting out of this without evidence that they want to opt

16   out, period.  And I don't have any evidence that any of

17   your clients, any of these ASOs, want to opt out.  I don't

18   feel I can let them opt out when nothing was done to

19   present evidence that they wanted out.  If we got an

20   email, a letter, a handwritten note signed by somebody in

21   a position of authority that said, "Please opt us out or

22   let Horizon opt us out," we'd be in a different situation.

23   We have nada.

24        MR. RABINOVITZ:  I understand what Your Honor is

25   saying, but my point is this upsets the business model all

1    these people live in and contract for.

2                THE COURT:  I can't help the business model.

3    This is not a business court.  This is a federal district

4    court.  I've got a class action here, and under Rule

5    23(b)(3), I've got to figure out who's in the class and

6    who's opted out, and I can't just let them opt out because

7    you believe they want to opt out.

8                MR. RABINOVITZ:  You would let them opt out

9    because they contracted that authority to their third-

10   party administrator, who then did it for itself and on

11   their behalf.

12               THE COURT:  Well, I haven't seen that evidence.

13               MR. RABINOVITZ:  Okay.  Thank you, Your Honor.

14               THE COURT:  Yes, thank you.  Anybody else want

15   to be heard?

16               MR. SHADOWEN:  Very, very briefly, Your Honor,

17   just to perfect the record.  We submitted a declaration

18   from the claims administrator this afternoon.

19               THE COURT:  Yes, I saw that.

20               MR. SHADOWEN:  And one of the things that's in

21   it is the fact that four major corporations, like

22   AstraZeneca, Liberty Mutual Insurance Company, that they

23   claim are ASOs that they have authority for --

24               THE COURT:  Actually opted out.

25               MR. SHADOWEN:  No.  They submitted claims, they

1    submitted claims negating any inference --

2              THE COURT:  Right.  This is the Miller

3    affidavit?

4              MR. SHADOWEN:  It is, Your Honor.

5              THE COURT:  Yes, okay.

6              MR. SHADOWEN:  Thank you.

7              THE COURT:  Thank you.

8              MR. RABINOVITZ:  Can I just address that point,

9    Your Honor?

10             THE COURT:  Sure.

11             MR. RABINOVITZ:  So I saw it come across the

12   email.  I was already in Bridgeport, and my phone is not

13   that advanced.  I think that makes our point for us in a

14   sense.

15             First of all, some of these clients are around

16   for only a certain period of time.  You know, it's a

17   business that has lot of interchangeability.  You don't

18   like your ASO, you don't like your TPA, you switch around.

19   For a period of time, we probably had these clients and

20   were opting out their claims for that period of time.

21             The other thing I would say, I think class

22   counsel -- again, I didn't see the filing, but it's three

23   or four out of 2,000.  So the other 2,000-plus were

24   relying on their third-party administrator to handle this

25   for them.  Do we know why?  Of course we do.  It's in

1    their contract.  That's what they do.  This is

2    AstraZeneca.  They're a pharmaceutical company.  They're

3    not dealing with recovery opportunities that Aetna and

4    Cigna deal with every single day.

5         THE COURT:  So how many communications did you

6    receive from ASOs saying "I got an opt-out notice; I

7    assume you're handling this for us"?

8         MR. RABINOVITZ:  I can't say for sure, but I can

9    let you know that.  Absolutely we get -- our clients get

10   communications like that.  "By the way, are you monitoring

11   this class action?  I got this notice in the mail."  Most

12   of the -- that is a minority.

13        THE COURT:  No, no, no, that's not what I'm

14   asking.  I'm asking you when they got the notice, the ASOs

15   got the notice that said, "If you don't opt out, you're

16   in," knowing these contracts were in effect, how many of

17   the ASOs communicated in any way to your client to say

18   "Please opt me out of this because I don't have the data,

19   I'm not going to send it in"?

20        MR. RABINOVITZ:  I don't know that offhand, but

21   what I imagine is they would get that notice and say, "Oh

22   good, this is why we contract Cigna to handle these things

23   for us, either to opt out or to claim."

24        THE COURT:  If they think they've contracted it

25   out, they would send you a notice.  "You guys are handling

1    this.  Be sure to opt us out, because we want out of

2    this."  Otherwise, it's not their decision; it's your

3    decision.

4                    MR. RABINOVITZ:  Which they contracted to give

5    us.

6                    THE COURT:  But they didn't.  We're going back

7    to where we were.  You don't have contracts that say we

8    delegate to you the right to opt in or out of this or any

9    other class action.

10                   MR. RABINOVITZ:  Well, the one contract

11   definitely has that language.

12                   THE COURT:  The one contract.

13                   MR. RABINOVITZ:  The other contracts, which --

14   which I think is enough at least for some of this

15   opt-outs; but the other ones, and I'm losing Your Honor's

16   patience, I understand, but the other ones are, you know,

17   recovery mechanisms to keep insurance costs down.  You do

18   it for yourself; we expect you to do it for us.  That's

19   the layman's terms of what's in the contract.  That's

20   what's there.  Your recovery, overpayments, all that

21   stuff.

22                   THE COURT:  Right.  What you're doing is

23   assuming the authority.  You assume you have authority

24   because the general business practice is that you try to

25   claim overcharges for them.  That doesn't get you what you

1    need in this case.

2              MR. RABINOVITZ:  Okay.  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              So I'm going to -- I forget the form of the -- I

5    think it was an objection to acknowledging or recognizing

6    opt-outs.  Is that the form it took?

7              MR. SHADOWEN:  It was, Your Honor.  It was a

8    request, a motion by us for the Court to confirm that

9    those ASOs remain in the class.

10             THE COURT:  Yes.  To the extent that's a motion,

11   I'll grant the motion to confirm; and to the extent it's

12   an objection to the indirect opt-outs, I'll sustain the

13   objection.

14             MR. SHADOWEN:  Thank you, Your Honor.

15             THE COURT:  All right.  Is there anybody present

16   who wants to be heard regarding the fairness of the

17   proposed settlement?

18             (No response.)

19             THE COURT:  Hearing nothing, do counsel want to

20   be heard?

21             MR. SHADOWEN:  With respect to the basic

22   approval of the settlement, Your Honor, unless the Court

23   has specific questions, we're happy to rest on the papers.

24   The Court knows well that this was a hard fought

25   litigation, arm's length negotiation, I don't think anyone

1    can question that, and complex issues where the plaintiffs

2    believed in our case.  On the other hand, we have enough

3    experience in other of these cases to know that there are

4    major risks in these litigations.  And based on the

5    experience of counsel, we came to a firm conclusion that

6    this settlement was in the best interests of the class,

7    and we think that the amount of the settlement compares

8    favorably with other litigations of this nature and

9    proportionally to the amount that the direct purchasers

10   received.  And so all indications were to us that we got

11   ourselves a settlement that, like every settlement, we

12   weren't thrilled with; but, on the other hand, we thought

13   it was fair and in the best interest of the class.

14              THE COURT:  All right, thank you.  Anyone else?

15              MR. ELFAND:  Nothing further, Your Honor.

16              THE COURT:  All right.  I heard mention of

17   somebody talking about attorneys' fees?

18              MS. STEINER:  Yes, Your Honor, if you'd like to

19   hear a bit.

20              I'd like to hand up, if I could, a couple

21   Powerpoint slides --

22              THE COURT:  Sure.

23              MS. STEINER:  -- because there's a fair amount

24   of numbers we're talking about now.

25              THE COURT:  Right.

1          MS. STEINER:  My name is Renae Steiner.  Good

2   afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MS. STEINER:  As the Court may recall, we asked

5   for one-third of the attorneys' fees of the net settlement

6   fund.  Because of opt-outs, the net settlement fund

7   decreased from the $54 million that was negotiated to,

8   with the Court's decision today to not allow ASO clients

9   to opt out, to it ratcheted down to $50,229,193.  So a

10  third of that would be a fee request of $16,000,743.60 --

11  763 -- I'm going to do that again -- 16,743,064.  That

12  results in a negative multiplier of our lodestar at last

13  report of .93.  So we've expended about $18 million of

14  time in this case, and we're requesting a little over

15  $16,743,000.

16         The trend in this circuit is percentage of the

17  fund, but many Courts do a lodestar cross-check.  We cited

18  a number of cases in this district where the Courts gave

19  between 30 percent and 35 percent of the funds.  There are

20  two large cases in this district, *Haddock*, which was a

21  $140 million settlement, where the Court gave --

22         THE COURT:  I remember that one.

23         MS. STEINER:  Huh?

24         THE COURT:  I remember that one.

25         MS. STEINER:  -- where the Court awarded

1    35 percent, and that was a three multiplier on the

2    expended lodestar.  *Collins* and *Sturm* were smaller cases,

3    and they were both a third.  And then *Priceline* was

4    30 percent; but, again, that was an almost two multiplier.

5         In *Collins*, which was a very small case, there

6    was no lodestar indicated.  It was a one million dollar

7    settlement.  In *Sturm*, they did report their hourly rate

8    there, which was a blended hourly rate of $465 an hour

9    before the multiplier.  After the multiplier, it resulted

10   in an award of $586 an hour.

11        Here, we expended over 40,000 hours, and so the

12   blended hourly rate comes to just over 440 an hour.  We

13   think that's quite reasonable.  We're national law firms.

14   I know that the Court addressed with the direct payors

15   that in the District of Connecticut, the billable rates

16   that were reported there weren't the billable rates in

17   this district, but I would point the Court to the

18   *Priceline* case that talked about when you don't have a

19   perfect proxy, when it's a national complex case, you can

20   look to national rates.  But irrespective, because the

21   blended hourly rate here is 440, we think it would comport

22   with the district rates as well.

23        We think the hours billed were also reasonable.

24   We did a couple things here.  We required monthly

25   reporting.  Those were looked at by a CPA to make sure

1    that they were reported in the correct format and looked

2    reasonable on the face.  Afterwards, we did an audit.  We

3    cut all MDL time, we call it, people going to the MDL

4    court and then people fighting about the leadership of the

5    case.  We struck all that time.  We also struck all meet

6    and review time.  And we also capped document review rates

7    at 375.  That seems to be a movement afoot.  A lot of

8    courts are asking for it.  We did it of our own volition.

9    And so that also greatly decreased the lodestar to what we

10   ultimately reported.

11            So that is our request for a third of the net

12   settlement fund.  There is a provision in the settlement

13   called a set aside where if defendants settle a case or

14   cases with former class members who were opt-outs of this

15   case, they're required to set aside an amount that's equal

16   to ten percent of those settlements, not from those

17   settlements but equal to ten percent of those settlements,

18   into an escrow, and we're then allowed to come back to

19   Your Honor and request those as additional fees for the

20   benefit generated.  We have not been notified to date of

21   any settlements with opt-out class members.

22            THE COURT:  All right, thank you.

23            MS. STEINER:  Thank you.

24            MR. ELFAND:  Nothing further, Your Honor.

25            THE COURT:  You're following the standard

1    procedure?

2           MR. ELFAND:  Yes.

3           THE COURT:  Very well.  Well, I'm going to do a

4    couple things.  I'm going to just quickly say that I do

5    think that the settlement should be approved.  I think the

6    class should be -- Rule 23 has been met.  The Grinnell

7    factors suggest that the settlement is appropriate; and I

8    actually, which is somewhat rare for me, I actually think

9    that the fees request is reasonable as well.  I have given

10   class counsel in other cases a hard time about the

11   percentage of fees or the hourly rate that results or

12   whatever, and I think that the result here was quite good

13   for a reasonable rate.  I think a reasonable client would

14   have paid these rates to obtain the outcome.  And,

15   accordingly, I intend to approve everything.

16          I will ask -- this should be done in a written

17   order, and I will ask that the proposed order that was

18   submitted earlier be slightly modified and resubmitted,

19   that is, to -- I don't think it's necessary to include in

20   that order the rulings on the OCDA objection or the

21   opt-out issues, but rather just to have a straightforward

22   order approving the settlement, but we do need the amounts

23   that you've described inserted.  And I'll give it one last

24   read, and chances are that I will get that filed fairly

25   soon.

1               I'd like to get this wrapped up.  How quickly do

2   you think you could get that revised order submitted?

3               MR. SHADOWEN:  We'll submit it tomorrow, Your

4   Honor.

5               THE COURT:  All right, that would be great.

6   That would be great.  So I don't intend to go into it any

7   more on the record in terms of the analysis.  I think it's

8   a fairly easy decision, and I commend really both sides

9   for -- this was a hard fought litigation, and I'm very

10  pleased that you were able to reach a resolution, and it

11  seems to me it ought to be approved.  I think there's a

12  great benefit for the class, and I appreciate your help.

13              Unless there's anything else, I think we'll

14  stand in recess.

15              (Proceedings adjourned at 2:26 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

No. 3:14-md-2516(sru)
In Re:  Aggrenox Antitrust Litigation


        I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



            July 27, 2018


            /S/ Sharon L. Masse
        Sharon L. Masse, RMR, CRR
         Official Court Reporter
         915 Lafayette Boulevard
       Bridgeport, Connecticut  06604
           Tel: (860)937-4177